IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| _____ ) | |
| Trenton J. Palmer ) | |
| ) | |
| Petitioner, ) | September Term, 2023 |
| ) | |
| v. ) | USCA Case No. 23-1239 |
| ) | |
| Administrator, ) | |
| Federal Aviation Administration & ) | |
| National Transportation Safety Board,) | |
| ) | |
| Respondents. ) | |
| _____ ) | |

## UNDERLYING DECISION FROM WHICH PETITION ARISES

The underlying decision from which this petition arises is the July 12, 2023

final order issued by the National Transportation Safety Board otherwise

denying Petitioner's Motion for Reconsideration of the Board's March 30, 2023

Order (EA-5947) affirming the FAA Administrator's 120-day Order of

Suspension of Petitioner's airman certificate.

The aforementioned Order is attached hereto as Exhibit 1.


Dated this 10th day of October 2023.

Respectfully submitted,

*Robert Schulte*

Robert D. Schulte
Schulte Booth P.C.
14 N. Hanson Street
Easton, MD 21601
Tel: (410) 822-1200
Fax: (410) 822-1299
*Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of October 2023, I electronically filed the foregoing Underlying Decision From Which Petition Arises by using the appellate CM/ECF system.  Furthermore, a copy of the foregoing has been sent via electronic mail to the following counsel of record:

> Joy Park
> Federal Aviation Administration
> Office of the Chief Counsel
> 800 Independence Avenue, S.W.
> Washington, D.C. 20591
> Tel: 202-267-7617
> Joy.park@faa.gov

> *Robert Schulte*
> _____
> Robert D. Schulte
> Schulte Booth P.C.
> 14 N. Hanson Street
> Easton, MD 21601
> Tel: (410) 822-1200
> Fax: (410) 822-1299
> *Counsel for Petitioner*



SERVED: July 12, 2023

NTSB Order No. EA-5956

UNITED STATES OF AMERICA
**NATIONAL TRANSPORTATION SAFETY BOARD**
WASHINGTON, D.C.

Adopted by the NATIONAL TRANSPORTATION SAFETY BOARD
at its office in Washington, D.C.
on the 12th day of July, 2023

_____
                                              )
POLLY TROTTENBERG,                            )
Administrator,                                )
Federal Aviation Administration,              )
                                              )
          Complainant,                        )
                                              )          Docket SE-30880
     v.                                       )
                                              )
TRENTON J. PALMER,                            )
                                              )
          Respondent.                         )
                                              )
_____ )


**<u>ORDER DENYING PETITION FOR RECONSIDERATION</u>**

Respondent filed a timely petition for reconsideration of NTSB Order No. EA-5947, served on March 30, 2023. Respondent contends that the Board erroneously: 1) affirmed the law judge's finding that the respondent's chosen landing site was inappropriate; and 2) found that the law judge concluded that respondent had an "'alternative' path [that] would have kept [r]espondent and his aircraft more than 500 feet away from persons or structures on the ground." For the reasons stated below, we deny respondent's petition for reconsideration.

Section 821.50 of our Rules of Practice (49 C.F.R. part 821) governs the submission and our review of petitions for rehearing, reargument, reconsideration, or modification of an order of the Board. Section 821.50(c) requires the petitioner to explain why the Board's decision was erroneously decided and provides that the Board will not consider arguments a party could have made on appeal or in reply briefs received prior to the Board's decision. In addition, § 821.50(d) states, "[r]epetitious petitions will not be entertained by the Board, and will be summarily dismissed." Here, respondent's argument that that the Board erred in determining that

70412

respondent's intended landing site was inappropriate was previously raised in respondent's appeal to the Board. The Board already considered, and rejected, respondent's allegation that the Administrator withdrew the claim concerning the appropriateness of the landing site and that respondent was not required to prove that the landing site was appropriate. Our rules do not require us to consider this argument and therefore, we summarily dismiss the repetitious claim.

Further, respondent's argument that the Board mistakenly interpreted the law judge's finding concerning respondent's alternative path lacks merit. Citing select portions of the law judge's decision, respondent posits that the law judge did not state that another path would have kept respondent and his aircraft more than 500 feet from persons or structures on the ground. However, respondent does not consider the whole of the law judge's decision and ignores the context in which the law judge discussed the alternative path. The law judge was assessing whether another path existed that would have allowed respondent to comply with the applicable regulation and the Board reasonably read the law judge's finding to mean that respondent had an alternative option that was consistent with the regulation.

Moreover, on appeal from the law judge's decision, the Board reviews the case *de novo,*[1] assessing the record as a whole and drawing our own conclusions based on the evidence.[2] Thus, the Board acted within its authority in interpreting the entire record as it pertains to the alternative flight path addressed at the hearing and in the law judge's decision. Respondent offers no convincing reason to reconsider our conclusions.

**ACCORDINGLY, IT IS ORDERED THAT:**

Respondent's petition is denied.

HOMENDY, Chair, LANDSBERG, Vice Chairman, GRAHAM and CHAPMAN, Members

of the Board, concurred in the above opinion and order.

---

[1] *Administrator v. Smith*, NTSB Order No. EA-5646 at 8 (2013); *Administrator v. Frohmuth and Dworak,* NTSB Order No. EA-3816 at 2 n.5 (1993); *Administrator v. Wolf*, NTSB Order No. EA-3450 (1991); *Administrator v. Schneider*, 1 N.T.S.B. 1550 (1972) (in making factual findings, the Board is not bound by the law judge's findings).
[2] "The NTSB has plenary review authority with respect to ALJ decision making." *Singer v. Garvey*, 208 F.3d 555, 558 (6th Cir. 2000).

SERVED: March 30, 2023

NTSB Order No. EA-5947

UNITED STATES OF AMERICA
**NATIONAL TRANSPORTATION SAFETY BOARD**
WASHINGTON, D.C.

Adopted by the NATIONAL TRANSPORTATION SAFETY BOARD
at its office in Washington, D.C.
on the 30th day of March, 2023

_____
                                                                    )
BILLY NOLEN,                                                )
Acting Administrator,                                        )
Federal Aviation Administration,                        )
                                                                    )
           Complainant,                                         )
                                                                    )          Docket SE-30880
      v.                                                              )
                                                                    )
TRENTON J. PALMER,                                      )
                                                                    )
           Respondent.                                          )
                                                                    )
_____ )

**<u>OPINION AND ORDER</u>**

## 1. *Background*

Respondent and the Administrator appealed the Oral Initial Decision of Administrative

Law Judge Darrell L. Fun, issued on April 6, 2022, in which the law judge affirmed the

regulatory violations in the Administrator's amended order, but reduced the sanction from a 120-

day suspension to a 60-day suspension. The law judge ruled that the Administrator proved by a

preponderance of the evidence that respondent operated a low altitude flight in violation of 14

C.F.R. §§ 91.119(a), (c) and 91.13(a) but identified mitigating factors justifying a reduced

69543

penalty.[1] Both parties timely appealed. For the reasons set forth below, we deny respondent's appeal and grant the Administrator's appeal.

### A. Facts

Respondent holds a Private Pilot Certificate and is the registered owner of N318JJ, a 1997 Johnson John T KITFOX V.[2] On November 24, 2019, respondent operated N318JJ as the pilot-in-command near 300 Desert Sun Lane and 400 Desert Sun Lane in Reno, Nevada.[3] While conducting a low inspection pass during the flight, respondent operated the aircraft within 500 feet of persons, vessels, vehicles, and structures,[4] and at an altitude of 100 feet or less than 100 feet above ground level.[5] During the flight near the residences, three adults and two children were outside and witnessed respondent's pass.

### B. Procedural Background and Witness Testimony

On October 8, 2020, the Administrator issued an Order of Suspension, which became the complaint in this case, alleging respondent violated 14 C.F.R. §§ 91.119(a), (c) and 91.13(a). Respondent timely appealed the order on October 8, 2020, and filed an answer to the complaint on October 16, 2020. The Administrator amended the complaint on September 20, 2021, suspending respondent's certificate for 120 days. The law judge conducted a three-day hearing from March 29, 2022, to April 1, 2022, and issued an oral initial decision on April 6, 2022. The parties cross-appealed. Respondent timely appealed on April 8, 2022, and filed a supporting brief

---

[1] A copy of the law judge's initial decision is attached.
[2] Amended Compl. at ¶¶ 1-2; Answer at ¶¶ 1-2.
[3] Amended Compl. at ¶ 3; Answer at ¶ 3.
[4] Amended Compl. at ¶ 4(a)-(c); Tr. 26-27, 353; Oral Initial Decision at 708, 710.
[5] Amended Compl. at ¶ 4; Tr.190; Oral Initial Decision at 699.

3

on June 9, 2022.[6] The Administrator filed a reply brief on August 10, 2022.[7] The Administrator

timely appealed on April 12, 2022, and filed a perfecting brief on May 26, 2022. Respondent

filed a reply brief on June 27, 2022.

At the hearing before the law judge, the following witnesses testified on the

Administrator's behalf: Gabriel Pena; Julia Pena; Russell Stanley; respondent; Inspector Ronald

Green, Principal Operations Inspector and Aviation Safety Inspector at the FAA Flight Standards

District Office (FSDO); and Jared Likes. Roy Speeg, Jr., FAA Technical Specialist, testified for

the Administrator as an expert in general aviation and flight operations. Respondent also testified

on his own behalf.

Mr. Pena testified that he had resided at 400 Desert Sun Lane in Reno, Nevada for over

five years.[8] He stated that he is an electrician and a combat veteran from the United States

Seabees, serving for four years.[9] Mr. Pena explained that he was a heavy machine gunner, mostly

on the MK19 machine gun, and was deployed twice, once to Iraq and once to Kashmir.[10]

According to Mr. Pena, using the MK19 provided him with experience in estimating distances,

stating because the weapon is a grenade launcher, he was required to estimate the distance of the

target.[11]

Mr. Pena testified that on Sunday, November 24, 2019, at 12:00 p.m., he was talking to

his neighbor, Russell Stanley, on his fence line.[12] Referring to a photograph, he described the

---

[6] On May 4, 2022, the General Counsel extended the time for respondent to a file an appeal brief to June 9, 2022.

[7] On June 24, 2022, the General Counsel extended the Administrator's deadline to file a reply brief to August 10, 2022.

[8] Tr. 45.

[9] *Id.*

[10] *Id.*

[11] *Id.* 45-46.

[12] *Id.* 46, 48.

structures on and near his property and where they are located, including his and Mr. Stanley's houses, his driveway, backyard, propane tank, dog kennel, two stable areas, and chicken coop.[13] Mr. Pena stated that while he was talking to Mr. Stanley, his wife pulled up in a car to drop off their daughter, and then his wife drove into the garage, parked, and began walking toward them while carrying their son.[14] Mr. Pena stated that his wife was walking past an area near the front door when he heard a loud engine noise coming from the north of the property, but because he could not see any aircraft or vehicle, Mr. Pena believed the aircraft was flying low to the ground and below the line of his house.[15] Mr. Pena testified that he yelled at his wife to start running, explaining,

> [S]o when I saw the aircraft when it came into view, it looked to me like it was pretty much at the ridge line of my house, which is about 20 feet off grade of my home, off the grade of the garage. And when I saw the aircraft it was performing a hard eastward banking aggressive maneuver and then it seems to straighten out as it dipped a little bit lower and then it pulled up. Actually, I thought it was going to crash into my neighbor's [….][16]

Mr. Pena estimated that the aircraft was no more than 300 feet from where he was standing, and 25 to 30 feet above the grade of his house, or five to ten feet above the ridge peak of his roof.[17] Mr. Pena also surmised that the aircraft flew over his propane tanks based on their location on his property.[18] Mr. Pena described photographs taken when the FAA measured the distances between his property structures on December 19, 2019.[19] Mr. Pena stated that he observed the aircraft fly northeast to southeast, further explaining,

> So when I saw the aircraft, it was performing a – almost a 90 degree bank maneuver. If

---

[13] *Id.* 47-48.
[14] *Id.* 49-50.
[15] *Id.* 50-51.
[16] *Id.* 52.
[17] *Id.* 53-54.
[18] *Id.* 55.
[19] *Id.* 82-94; Exh. A-17.

you're piloting the aircraft it would be turning to the left and then it quickly straightened out, it dipped a little bit going south, slightly southwest, and then it rose up a little bit and went over [my neighbor] Mr. Likes' house and then went off into the horizon so that that hard left bank maneuver, when it came into my sight, would lead me to believe that it was coming towards my house, I guess coming from the east, which would make sense with the – and then it did a hard left bank to orientate itself more southerly and then it dipped down and then rose above my neighbor's house. It was probably above his – the peak of his roofline from what I saw, maybe 30 feet over his house.[20]

Mr. Pena further estimated that the aircraft flew about 30 feet above his propane tank.[21]

On cross-examination, Mr. Pena testified that he had not observed the aircraft fly over his property before the incident in question, although he had seen it fly over once after the incident.[22] He also testified that as a result of the one pass the aircraft made, there was no damage to his property.[23] However, Mr. Pena stated that he, his wife, and daughter were traumatized by the incident, although they did not seek medical treatment.[24] At no time was the aircraft directly over Mr. Pena's head.[25] Mr. Pena testified that neither he nor his wife is a pilot and that they reported the incident to the sheriff and the FAA.[26]

On re-direct, Mr. Pena asserted that two and a half years after the incident, his daughter is visibly shaken when an aircraft flies over the house or in close proximity, and both of his children ask questions, such as whether the aircraft is going to crash into their house.[27] At the time of the incident, Mr. Pena's son was one year old and his daughter was between three and four years old.[28]

---

[20] Tr. 93-94.
[21] *Id.* 101.
[22] *Id.* 102.
[23] *Id.* 102-03.
[24] *Id.* 103.
[25] *Id.* 105.
[26] *Id.* 105-06.
[27] *Id.* 109.
[28] *Id.*

6

Upon questioning from the law judge, Mr. Pena stated that he and his wife saw the aircraft flying low again a few weeks later and they wondered whether the flight was "some type of intimidation tactic or harassment."[29] Mr. Pena and his wife were in their backyard when they observed the aircraft, which he estimated was 200 to 300 feet from them. While Mr. Pena did not report the second flight to the FAA, he mentioned it to the FAA Inspector.[30] Further, Mr. Pena clarified that during the November 24th flight, he estimated that the aircraft was 50 feet above his propane tank at the moment it first came into view and then it dipped a bit lower.[31] When Mr. Pena first heard the aircraft, he stated that he initially thought something was crashing into or near his house and as a combat veteran, the sound startled him.[32] When he initially saw the aircraft, Mr. Pena stated that his thoughts were, "[d]isbelief, shock, anger that somebody would do something like that."[33]

Ms. Pena, Mr. Pena's wife, testified that she works from home and has lived at 400 Desert Sun Lane in Reno, Nevada for over five years.[34] On November 24, 2019, Ms. Pena states that she had returned home with two of her children at around 11:50 a.m. when she saw her husband speaking with their neighbor, Mr. Stanley.[35] Her daughter asked to get out of the car and after speaking with her husband and Mr. Stanley for a few minutes, Ms. Pena drove toward the house and parked either in or near the garage.[36] Ms. Pena stated that she took her son out of the car and dropped off her belongings, and then while holding her son, began walking toward her

---

[29] *Id.* 110.
[30] *Id.* 111.
[31] *Id.* 111-12.
[32] *Id.* 112.
[33] *Id.* 113.
[34] *Id.* 121.
[35] *Id.*
[36] *Id.*

husband, daughter, and Mr. Stanley.[37] Before she reached them, Ms. Pena testified that she heard a "very loud engine" and although she could see that her husband was yelling, she could not hear him.[38] Ms. Pena described her observations as,

> All I could hear was an engine coming from somewhere behind me and then I looked towards where I could hear the engine sound moving towards, which is coming more from south and I saw it come into view past the garage peak, the roofline because I had a view of the two different roofline sections.
>
> And I saw it and I was immediately just kind of dumbfounded because I couldn't believe how close it was to the house and how close it was to the ground. And then it continued going south towards our neighbor's house at 300 Desert Sun and I actually – I was ready to watch it impact into the house because I thought there was no reason that this plane was so low unless it was having an emergency and so I thought for sure it was going to crash into my neighbor's living room.
>
> But at the last minute he pulled up and flew over the house and kept going straight until he was out of view.[39]

She testified that the experience was frightening, leading the Penas to report the incident to the FAA.[40] Ms. Pena stated that she did not see the aircraft until it passed the garage and estimated that it was 50 feet above the ground while passing over the garage.[41] When Ms. Pena observed the aircraft, she testified that it did not make any quick turns and therefore, she assumed it was flying straight ahead, over the horse stables, propane tank and/or the hay shed.[42]

She also explained that when she saw the aircraft, she believed it banked because she viewed the underside of the wing.[43] Ms. Palmer stated that she saw red and white markings, and possibly blue markings, on the underside of the airplane.[44] She and her husband reviewed the

---

[37] *Id.* 121-22.
[38] *Id.* 122.
[39] *Id.* 122-23.
[40] *Id.* 123.
[41] *Id.* 124-26.
[42] *Id.* 126-27.
[43] *Id.* 127.
[44] *Id.* 128.

8

camera footage from the garage camera and confirmed the markings.[45] Ms. Pena stated that the right side of the aircraft tilted upward, and then the aircraft straightened as it flew over the Penas' property fence line that they share with Mr. Likes.[46] Ms. Pena testified that once the aircraft came into her view, it was near the propane tank and/or hay shed, and the wings were level at the time it reached the fence between hers and Mr. Likes' properties.[47] Ms. Pena estimated that the aircraft was still 50 to 60 feet in altitude as it flew over the fence line.[48] Ms. Pena stated that the airplane pulled up once it flew closer to Mr. Likes' residence, describing the movement as a "pretty quick pull up," then leveling out and staying at the same altitude for the duration of Ms. Pena's observation.[49] Ms. Pena recalled that the aircraft continued flying in a straight path until she lost sight of it.[50]

After viewing a video depicting part of the flight that the law judge declined to admit into evidence, Ms. Pena recollected that the aircraft flew over the eastern side of Mr. Likes' swimming pool and at the edge of his garage.[51] Ms. Pena stated that when she heard the aircraft, she was in a state of panic and wanted to run, but did not know in which direction to run because she initially could not see the airplane.[52] Once the airplane was in her view, she thought she was safe, but believed that the aircraft was going to crash into her neighbor's house.[53] Ms. Pena recalled that she and her husband contacted the FAA the same week in which they observed the

---

[45] *Id.* 128.
[46] *Id.* 129-30.
[47] *Id.* 134-35.
[48] *Id.* 135.
[49] *Id.*
[50] *Id.* 136.
[51] *Id.* 140.
[52] *Id.* 141-42.
[53] *Id.* 142.

9

flight.[54] Ms. Pena testified that her one-year-old son cried when the aircraft flew overhead and that her daughter talked about the low-flying airplane for months and continued to do so at the time the hearing took place.[55]

On cross-examination, Ms. Pena stated that when she first saw the aircraft, it was flying away from her in a left bank, but moving in a straight line.[56] Ms. Pena testified that her observation of the flight at issue lasted two or three seconds.[57] She also acknowledged that jets from the Reno air races fly close enough to her property to hear and see them, but that they "turn around out in the field."[58]

Mr. Stanley testified that on November 24, 2019, he resided at 445 Desert Sun Lane, next door to the Penas.[59] He stated that on that date around lunchtime, he was at the fence between his and the Penas' property, speaking with his neighbor, Mr. Pena.[60] Mr. Stanley identified the properties, including his and the Penas', on an unadmitted photograph.[61] Mr. Stanley recalled that Ms. Pena and her children were on their property, but could not remember their exact location.[62] Regarding respondent's aircraft, Mr. Stanley testified that,

I noticed the airplane flying on the eastern side of the valley, up along the mountain range or ridge line or whatever you want to call it. He was coming from the south so it would have been my right. I was facing the east. And then he came and was flying down across that ridge line to the left, over the BLM [Bureau of Land Management land north of the properties][63] … which is on the left-hand side.

Kind of really didn't think much of it and then kind of I looked out to the BLM range and

---

[54] *Id.* 143.
[55] *Id.* 145.
[56] *Id.* 149-50.
[57] *Id.* 155.
[58] *Id.* 154.
[59] *Id.* 159.
[60] *Id.* 159-60.
[61] *Id.* 161-62.
[62] *Id.* 162.
[63] *Id.* 160.

saw him turn to the left and then started coming back to us, towards us at a lower altitude
or level than he was when he was heading out over the BLM…[64]

Mr. Stanley estimated that the aircraft was 80 feet above the ground when flying over the Penas'

house.[65] Mr. Stanley further explained that it was a clear day and the mountain range is likely a

mile or less from his home.[66] He stated that he recognized the aircraft because it had flown over

their properties multiple times, "but this one was specifically just a little bit too low for our

comfortableness."[67] Mr. Stanley stated that the aircraft made a U-turn after flying over the

mountain range, and flew south, heading back toward him and Mr. Pena at a sustained, lower

altitude.[68] Mr. Stanley also noted that the aircraft grew louder when it turned and moved to a

lower altitude.[69] In addition, the witness explained that the aircraft was briefly out of sight when

his view was obscured by trees and the Penas' house.[70] Mr. Stanley also testified that after flying

over the Penas' house, the aircraft made a "little bit of a left turn" during which he saw the

bottom side of the wing, and then "it just took off."[71] Mr. Stanley observed the aircraft turn left

before reaching Mr. Likes' house, noting that the airplane also increased in altitude by 15 to 20

feet as it turned.[72] However, according to Mr. Stanley, the airplane was approximately the same

distance above Mr. Likes' house as it was when flying over the Penas' house – about 80 to 100

feet.[73]

---

[64] *Id.* 162-63.
[65] *Id.* 163.
[66] *Id.* 163-64.
[67] *Id.* 164.
[68] *Id.* 165-66.
[69] *Id.* 166-67.
[70] *Id.* 168.
[71] *Id.* 169.
[72] *Id.* 170, 172.
[73] *Id.* 172.

On cross-examination, Mr. Stanley testified that he has never taken flying lessons.[74]

When asked whether he considered himself to be traumatized by the flight, Mr. Stanley

responded that it bothered him and he was disturbed, explaining that his wife and children ran

out of the house when they heard the aircraft.[75] He acknowledged that the airplane did not hit

anyone's house.[76]

Respondent testified that the wing-span of his aircraft, N318JJ, is 32 feet, its true speed is

100 miles per hour, and the landing speed is approximately 32 miles per hour.[77] Respondent

stated that as of November 24, 2019, he had 900 hours as the pilot-in-command in the aircraft.[78]

He acknowledged that on or about December 7, 2017, he received counseling from the FAA,

Reno FSDO concerning the use of an unmanned aircraft system outside of N318JJ, noting that he

was not the pilot-in-command at that time.[79] He also received a letter of warning from the FAA

regarding a flight for which he was the pilot-in-command and was carrying a passenger.[80] During

that flight, respondent engaged in water skiing on Lake Tahoe, which respondent described as

dragging the airplane tires on the water.[81]

Respondent testified that he received a letter of investigation from FAA Reno Inspector

Morgan concerning his November 24, 2019, operation of N318JJ in the vicinity of 300 and 400

Desert Sun Lane.[82] In response, respondent stated that he contacted Mr. Morgan, but was unable

---

[74] *Id.* 174-75.
[75] *Id.* 176.
[76] *Id.*
[77] *Id.* 179.
[78] *Id.*
[79] *Id.* 180-82; Exh. A-3.
[80] Tr. 184; Exh. A-4.
[81] Tr. 184.
[82] *Id.* 186; Exh. A-5.

to recall that conversation.[83] Respondent also testified that he went to the Reno FSDO on December 3, 2019, and viewed a video of his November 24th flight.[84] Respondent stated that he confirmed that the aircraft was his and that he was the pilot-in-command during the flight.[85] Respondent admitted that the video showed that he flew in the proximity of 300 and 400 Desert Sun Lane and acknowledged that he flew less than 100 feet from the ground while operating the aircraft.[86] Regarding the flight, respondent testified, "I was making a low inspection pass at an RC [(remote controlled)] runway that was in the backyard of my friend's house as part of a safe landing procedure as outlined in the off airport ops guide that the FAA has released."[87] He further explained that a low inspection pass has to be conducted at 70 miles an hour at 16 knots ground speed and that he determined that the intended land site was not safe for landing because he could not identify the intended touchdown spot clearly enough when viewing it from his left window.[88] Respondent stated that because this was a low inspection pass, he assessed the safety and feasibility of the landing site, but did not intend to land during the pass.[89] Respondent stated that he flew over the nearby mountains at an altitude of 500 to 1,000 feet, but disputed Mr. Stanley's testimony that respondent made a left turn over the mountains; rather, respondent stated that he maneuvered north of the area.[90]

According to respondent, an hour earlier, he was heading toward Bedell Flats and to the Reno Stead Airport, and flying in a straight line meant flying over the Desert Sun Lane housing

---

[83] Tr. 186-88.
[84] *Id.* 188.
[85] *Id.* 188-89.
[86] *Id.* 189-90.
[87] *Id.* 191.
[88] *Id.* 193.
[89] *Id.* 194.
[90] *Id.* 198-99.

development.[91] He clarified that at the lowest point in the pass, flying over the center meant

flying over 300 Desert Sun Lane.[92] When he typically conducts a high reconnaissance pass over

the Desert Sun Lane area at about 500 to 1,000 feet, respondent testified that,

> I had observed the Likes' backyard had a large flat graded area that they used for flying the open toe airplanes. It was pointing roughly north/northeast would be the departure path. You would approach from the north/northeast. My assessment of it was that it was a one way in/one way out which is fairly typical for off airport landings, the only reason being that the approach or departure from the south would put you over powerlines and even closer to other houses whereas the approach from the north had you over open BLM land.
>
> Also to the east of all the Google map images that you've shown there is a draw on the back side of what would be the Pena's [sic] property that sets a lower terrain, so I was – made the assessment from above that my best approach would be up that draw towards the RC landing strip. It really was just the clearest spot in that backyard.[93]

On cross-examination, respondent again testified that he understood the term "water

skiing" to mean dragging the aircraft's tires on the water, explaining that it is a landing

technique, but that he was not water skiing during the November 24, 2019 flight.[94] Moreover,

respondent testified that Mr. Likes had granted him permission to land on his property because

Mr. Likes and his son fly radio-controlled airplanes, stating that this was part of the reason for

respondent's operation on November 24th.[95] Respondent testified that he flies over the flats and

near the residential properties multiple times per week, noting that the Bedell Flats area is

frequented by aircraft for training and maneuvering, and given that the Reno Stead Airport is

used for air races, he has observed F-5's, the Air National Guard, Black Hawks and Schnook

helicopters, and air race planes, such as Mustangs and P6s, in the area.[96] Respondent further

---

[91] *Id.* 199-201.
[92] *Id.* 201.
[93] *Id.* 202-03.
[94] *Id.* 215-16.
[95] *Id.* 217-18.
[96] *Id.* 219-20.

stated that he lives two miles south of Desert Sun Lane, asserting that it is not uncommon for the Air National Guard to fly through the area during the day or night at 200 feet above the ground.[97]

Respondent further testified that his aircraft, N318JJ, is capable of takeoff and landing at 150 feet while at sea level on a "standard day."[98] He estimated that the shortest landing he has made was at 30 to 50 feet.[99] Respondent stated that he often flies in the "back country," at unimproved strips and off airport operations.[100] Respondent estimated that he has landed his aircraft off-airport more than 1,000 times.[101] He also stated that during the 2018-2019 time period, he flew approximately three to four times per week, noting that it was not uncommon for him to land 30 plus times off-field per week.[102] Respondent explained that after making changes to the aircraft before November 24, 2019, it is quieter, guessing that the plane was measured at 71.8 decibels at takeoff.[103] Respondent surmised that if his engine suddenly failed, he would lose thrust, but would not suddenly lose lift and the aircraft would not career out of control.[104] Rather, respondent testified that he would have to descend to maintain proper airflow over the wing to sustain lift, and assuming no other structural failures, he would have "full and complete" control over the aircraft.[105]

On November 24, 2019, respondent stated that his intention was to make a low inspection pass to assess the feasibility of the landing site, as outlined in the FAA Off Airport Ops Guide.[106]

---

[97] *Id.* 220.
[98] *Id.* 485.
[99] *Id.* 486.
[100] *Id.* 489.
[101] *Id.* 489-90.
[102] *Id.* 490.
[103] *Id.* 492.
[104] *Id.*
[105] *Id.* 493-94.
[106] *Id.* 494.

Respondent explained that while he would normally fly over the strip to assess its length, "on the later portion of my approach to the strip, I was unable to identify my touchdown point. At which point I made a slight left turn and aborted the operation."[107] Respondent testified that had he lost his engine during the November 24th flight, he would have landed in the sagebrush in a vacant lot near Mr. Likes' property, noting that he is very familiar with the area in which he was flying.[108] According to respondent, there was plenty of room to effect an emergency landing.[109] Respondent stated he was in control of his aircraft at all times during the November 24th operation.[110] Respondent disagreed with Inspector Speeg's suggestion[111] that respondent could have taken a better approach path, stating,

> The primary [path] I placed myself off to the right of my landing site, so that I can view it out of my window and door on my left side, since I sit in the left seat. If I were to place it off the right, my panel and cowling would be covering that, as well as my passenger seat floorboard. And specifically the distance he showed inspecting it from would have been insufficient to gather really any useful data on the landing site. I think he had me offset by something like 300 feet. And it would just be ineffective.[112]

Respondent testified that he used a Google Earth image to draw his flight path and intended landing site on Mr. Likes' land.[113] Respondent further explained that he placed his aircraft to the right of the runway, between the proposed landing area and Mr. Likes' house so that he could inspect the surface conditions and landing site off of his left wing and through the window.[114] Respondent testified that had he identified a landing site, he would have performed a

---

[107] *Id.* 495.
[108] *Id.* 497.
[109] *Id.*
[110] *Id.* 498.
[111] *See infra* summary of Inspector Speeg's testimony.
[112] Tr. 501-02.
[113] *Id.* 503 (discussing Exh. R-2).
[114] *Id.* 503-04.

"left crosswind" turn to land.[115] Rather, respondent stated that after he chose not to land, he flew to Stead airport and landed.[116] Respondent testified that Mr. Morgan from FSDO contacted him about the November 24th flight and during their conversation, respondent stated that he did not remember flying over houses because he was flying often and could not recall that flight.[117] Respondent testified that he met with three or four people at FSDO, including Mr. Morgan and Inspector Green.[118] At the meeting, respondent was shown a video of his aircraft and he informed the attendees that the video depicted him flying the aircraft.[119]

On additional cross-examination, respondent acknowledged that his aircraft has dual controls so that he could operate the airplane from the left or right seat.[120] However, he testified that he could not have operated from the right seat during the November 24th flight because all of his hours in the aircraft have been in the left seat, switching seats would have added another variable to consider, and his primary gauges are on the left side.[121] Respondent explained that on November 24th, he flew over the potential landing site on Mr. Likes' property at over 500 feet above the ground and had he landed there, he would have approached to the south because the land slopes downhill to the north and he would use the "up slope" toward the south to assist in stopping.[122] Respondent also testified that another reason to avoid approaching from the south is the presence of houses and power lines, although his primary concern was the runway's slope.[123]

---

[115] *Id.* 505-06.
[116] *Id.* 507.
[117] *Id.* 508-09.
[118] *Id.* 510.
[119] *Id.*
[120] *Id.* 511.
[121] *Id.* 512.
[122] *Id.* 517-19. *See also* Exh. R-2.
[123] Tr. 519-20. *See also* Exh. R-2.

Respondent stated that he decided not to land shortly before he executed his left turn.[124]

Respondent stated that he had been to his intended landing area before and disagreed with Mr.

Likes' testimony that the runway runs from east to west.[125]

On cross-examination, respondent did not recall informing the FAA during the December

3rd meeting that he opted not to land at his intended landing site because he deemed the site

unsafe.[126] Respondent denied that he could not identify the landing site because his altitude was

too low, but stated that, "It was much harder to identify from the perspective that you would have

on the approach than I had anticipated. And there were just not enough identifying features to the

terrain."[127] Moreover, respondent asserted that he did not recall whether he spotted the fence line

separating the Penas' and Likes' houses.[128] Although respondent stated he did not recall his

lateral distance from Mr. Likes' property, he estimated that the distance was 100 to 150 feet.[129]

Respondent also clarified that he was not intending to land, but was executing a low pass.[130]

Respondent explained that while flying at 100 feet in altitude at 70 miles per hour at a 40 degree

bank, the bank would add load to the wing, "With added load, it adds drag and your lift vector is

no longer in the vertical position. So yeah, you wouldn't be able to glide as far in a turn, as you

can flat and level or with level wings."[131] Respondent testified that while flying over the Desert

Sun Lane area, his aircraft would require a slightly longer runway for takeoff and landing

because of the thinner air at the higher altitude.[132]

---

[124] Tr. 520. *See also* Exh. R-2.
[125] Tr. 521. *See also* Exh. R-2.
[126] Tr. 521.
[127] *Id.* 522.
[128] *Id.*
[129] *Id.* 523.
[130] *Id.* 523-25.
[131] *Id.* 537.
[132] *Id.* 538.

On re-direct, respondent testified that the Penas' and Likes' properties are at about 5,500 to 5,700 feet above sea level, but the altitude difference from his takeoff and landing point did not materially affect his aircraft's performance.[133] When asked whether the pass he made on November 24th was necessary for him to evaluate the landing area for suitability for landing, respondent replied, "Absolutely, yes."[134]

In response to the law judge's questioning, respondent confirmed that he routinely flies over the Desert Sun Lane area, usually at 6,000 to 6,500 feet above mean sea level.[135] He further testified that above ground level, his standard cruise altitude over sparely populated, rural areas was 500 to 1,000 feet "if I'm only transitioning for five minutes and to another landing."[136] Respondent stated he did not recall on November 24th how high above ground level he was transitioning, or his altitude above ground level when he decided to get a closer look at the runway on the Likes' property, or how far away he was from the Likes' property when he traveled northbound to Bedell Flats.[137] He also did not recall when he began his low pass or descended to 100 feet above ground level.[138] Respondent did not recall any landmarks to assist him in locating the runway, stating that he believed there was sagebrush "or something" at the intersection of one of the roads in the Likes' backyard, but respondent could not identify it from the air.[139] For purposes of landing on the runway on the Likes' property, respondent testified that he did not study any navigational or aviation maps.[140] Explaining why he chose not to land or

---

[133] *Id.* 538-39.
[134] *Id.* 540.
[135] *Id.* 540-41.
[136] *Id.* 541-42.
[137] *Id.* 542-43.
[138] *Id.* 543.
[139] *Id.* 545.
[140] *Id.* 546.

conduct additional inspection passes, respondent stated,

> I think there was a multitude of reasons that I decided it was not worth going back. And within that was not being able to identify that, but also I did factor in the proximity of [the] house and if that landing, you know, was worth me inspecting over and over. So I chose – to move on.[141]

The law judge asked respondent whether he considered conducting his low pass in the opposing direction to the intended landing site facing northward, while offsetting the landing site to respondent's left, and respondent stated that he had not thought of that.[142] Respondent elaborated that the terrain rises to the south by 20 to 30 feet, so the low inspection pass would have been less effective.[143]

Respondent testified that he has likely known Mr. Likes since 2012, explaining that he raced radio-controlled cars with Mr. Likes and Mr. Likes' son, both of whom worked on respondent's house.[144] Respondent recalled that he received permission to land on the Likes' property before September 2019.[145] Prior to conducting the low pass during the November 24th flight, respondent stated that he was not in contact with Mr. Likes or his son.[146] Respondent also stated that he did not make any radio calls as he made the low pass or approached the vicinity of Desert Sun Lane because there were not enough recognizable landmarks to identify his location.[147] Finally, respondent reiterated that the only reason he made the low pass on November 24th was to determine the suitability of the landing location.[148]

Inspector Ronald Green testified that he is the Principal Operations Inspector and

---

[141] *Id.*
[142] *Id.* 549-50. *See also* Exh. R-2.
[143] Tr. 550.
[144] *Id.* 553.
[145] *Id.* 554.
[146] *Id.*
[147] *Id.* 555.
[148] *Id.* 556.

Aviation Safety Inspector at the FAA Reno FSDO and has been employed by the FAA for two and a half years.[149] He described his duties as managing certificates for both organizations and airmen, investigating aircraft accidents, and taking complaints from the general public about matters that involve aviation.[150] Prior to joining the FAA, Inspector Green served in the U.S. military for 20 years as an aviator and has approximately 4,500 hours of flight time.[151] Inspector Green stated that he holds the following airmen certificates: airline transport pilot for rotorcraft helicopter; commercial pilot for airplane, single engine land, and instrument airplane; flight instructor for rotorcraft helicopter and instrument helicopter; and remote pilot.[152]

On November 24, 2019, Inspector Green stated that he served as an Operations Inspector and Aviation Safety Inspector, but had not yet been promoted to as a Principal Operations Inspector.[153] He explained that his office received a video of a low-flying aircraft in the North Valley areas around Reno and Inspector Green was assigned to assist now-retired Inspector Morgan with his investigation.[154] As part of the investigation, the inspectors interviewed the Penas, Mr. Stanley, Mr. Likes, and respondent.[155] Inspector Green testified regarding a photograph of the Penas' garage that Inspector Green took to depict the security camera that captured respondent's aircraft as it flew near the Penas' house and to give a sense of scale because the FAA took many measurements from the center of the garage.[156] Inspector Green also identified a photograph of an area on the Penas' property including Inspector Morgan, the Penas'

---

[149] *Id.* 223-24.
[150] *Id.* 224.
[151] *Id.* 224-25.
[152] *Id.* 225.
[153] *Id.*
[154] *Id.* 225-26.
[155] *Id.* 226.
[156] *Id.* 227; Exh. A-17 at 1.

propane tank, and the nearby mountains, explaining that the photograph was taken to depict a distance of 300 feet from the Penas' driveway to where Inspector Morgan stood.[157] Inspector Green also explained that a photograph of Inspector Morgan standing next to the propane tank was taken to demonstrate the proximity of the tank to the Penas' driveway and house, which was a little over 56 feet.[158] Inspector Green also identified a photograph of Inspector Morgan standing approximately 78 feet from the center of the Penas' garage and a fence, which also showed the propane tank, the stable, and the Penas' neighbor's home to the east and testified the photograph was taken because he and Inspector Morgan believed it represented the location of respondent's flight path.[159] Further, the witness identified a photograph taken from the center of the garage facing south toward Mr. Likes' residence and including Mr. Pena at the fence line between his and Mr. Likes' properties.[160] Inspector Green testified that the photograph contains Mr. Penas' driveway, Mr. Likes' house, fences on Mr. Likes' property, powerline poles, and other neighbors' houses, and noted that the elevation rises on Mr. Likes' property.[161] He also testified that in the photograph, Mr. Pena was approximately 226 feet from the center of his driveway.[162] Further, Inspector Green stated that the distance from the center of the garage to eastern edge of the house at the white gutter was 15 feet.[163]

      To determine the location of respondent's flight path, Inspector Green stated that he relied on the video received with the initial complaint, as well as "the known size of the aircraft, and its size in the frame in relation to the ground, and the height at which the garage camera, or the

---

[157] Tr. 228-29, 232; Exh. A-17 at 3, 5.
[158] Tr. 232-33; Exh. A-17 at 7, 9.
[159] Tr. 234-35, 240; Exh. A-17 at 11, 13.
[160] Tr. 235; Exh. A-17 at 15.
[161] Tr. 235-36; Exh. A-17 at 15.
[162] Tr. 236-37; Exh. A-17 at 15, 17.
[163] Tr. 239.

22

camera at the peak of the garage is located, 20 feet above the ground."[164] Moreover, he stated

that he relied on the witnesses' description of the flight.[165] Inspector Green testified that he and

Inspector Morgan considered the slope of certain parts of the properties, including the downslope

from the Penas' garage toward the east, which rises again to the east, but stated that they did not

assess the grade of slope for the propane tank.[166] Inspector Green pointed out the location of

power poles northwest of the Likes' driveway in the photograph of Mr. Pena standing at the line

between his and Mr. Likes' property and on a slide Inspector Green created using Google Earth

and PowerPoint to demonstrate respondent's flight path and the structures and witnesses within

the 500 foot lateral limit of the path.[167] According to Inspector Green, the power poles were

contained within in the 500 foot lateral limit.[168]

On cross-examination, Inspector Green agreed that Google Earth images are not updated

on a regular basis.[169] On the image that Inspector Green created, everything to the right of the

flight path is desert scrub.[170] Inspector Green also stated that he interviewed respondent and

when he showed him the video of the flight, respondent conceded that he was in the video.[171]

Inspector Green further explained that he received a total of two videos as part of his

investigation into respondent's flight, and while he believed that the FAA received the video

from the garage security camera via email, he was unsure of the exact method used to submit the

video.[172] He did not recall seeing a flash drive or CD of the videos, but expounded that while at

---

[164] *Id.* 241.
[165] *Id.* 241-42.
[166] *Id.* 243.
[167] *Id.* 246, 250-54; Exhs. A-17 at 15; A-18.
[168] Tr. 254.
[169] *Id.* 256.
[170] *Id.* 256; Exh. A-18.
[171] Tr. 257.
[172] *Id.* 257-58.

the Penas' house, he connected his FAA-issued camera to the Penas' computer to upload the videos to the camera, which he took back to his office to upload to the investigation file.[173] Inspector Green stated that he viewed the version of the security camera video that he uploaded to his camera, but does not know whether the video was in its native format.[174] Finally, Inspector Green testified that to his knowledge, the videos obtained as part of the investigation did not have sound.[175]

Moreover, Inspector Green acknowledged that the bulk of the measurements he and Inspector Morgan took were based on their interviews with the Penas and Mr. Stanley.[176] Inspector Green testified that he did not measure the size of the Penas' or Likes' lots and did not measure the distance of any potential landing area on Mr. Likes' lot because they were unable to reach Mr. Likes to obtain a statement or get permission to access his property.[177]

On re-direct, Inspector Green testified that he and Inspector Morgan visited the Penas on December 19, 2019, and took the discussed photographs, measurements, and retrieved the video.[178] He clarified that to obtain the video from the Penas' computer, he used a USB connection to direct connect the camera with the computer.[179] Inspector Green testified that he also used the USB connection to transfer the video and photographs from his camera to a shared drive at his office.[180] On the shared drive, the files are labeled using the enforcement investigative report (EIR) number for the case.[181]

---

[173] *Id.* 258-60.
[174] *Id.* 266.
[175] *Id.* 279.
[176] *Id.* 261.
[177] *Id.* 262-63.
[178] *Id.* 279-80.
[179] *Id.* 280.
[180] *Id.* 281.
[181] *Id.*

Upon questioning from the law judge, Inspector Green explained that they took a photograph of Inspector Morgan approximately 300 feet from the center of the Penas' garage to obtain a sense of scale. Although they believed that respondent's flight path was approximately 78 feet from where the photo was taken, Inspector Green recalled that they were unable to measure 500 feet, so they selected 300 feet to get a sense of the scale given the lack of landmarks.[182] Inspector Green testified that he and Inspector Morgan assessed the aircraft's altitude using the videos of the flight and approximate dimensions of the aircraft.[183] Inspector Green did not recall discussing the use of a laser range finder to obtain measurements on Mr. Likes' property.[184]

Inspector Green agreed that there were two videos obtained as part of the investigation – one from the garage peak camera and one from the front door camera, clarifying that those were the only two videos he viewed.[185] He testified that when reviewing the case file, he viewed the garage peak and front door videos taken using an iPhone, rather than the native files.[186] Additionally, Inspector Green stated that he viewed the videos he stored on his camera as he uploaded it onto the FAA shared drive, and he recalls that they were the videos taken with the iPhone.[187] Inspector Green remembered that the videos were short, about three to ten seconds in length.[188] Once he uploaded the files from the camera to the shared drive, Inspector Green stated that he deleted the files from his camera so that he had adequate storage capacity for his other

---

[182] *Id.* 282-83.
[183] *Id.* 283.
[184] *Id.* 284-85.
[185] *Id.* 285.
[186] *Id.* 286.
[187] *Id.* 287.
[188] *Id.* 287-88.

25

duties.[189] Inspector Green stated that he and Inspector Morgan visited the Penas three times, and the December 19, 2019 visit was the second visit; they first met with the Penas shortly after receiving the initial complaint and the third visit was after Christmas or in early January 2020.[190] Inspector Green testified that Inspector Morgan visited the Penas a few times on his own between January and April 2020.[191]

On further re-direct, Inspector Green clarified that he and Inspector Morgan determined the approximate altitude of respondent's aircraft using various factors, including the garage video, witness statements, and the downgrade slope of the property east of the Penas' house.[192]

On re-cross examination, Inspector Green confirmed that when he stated that he based respondent's approximate altitude on the garage peak video, he was referring to the video of the video, not the native file.[193] He also testified that he did not ask the Penas for the native file of the video and was unaware whether Inspector Morgan requested the native file.[194] Finally, Inspector Green acknowledged that after downloading the video file to the FAA shared drive, he could have saved a copy on his camera's SD card.[195]

After being recalled as a witness, Inspector Green further testified that he attended the third meeting with respondent at the Reno FSDO and that respondent stated that he was conducting an approach to a radio-controlled airfield on Mr. Likes' property.[196] According to Inspector Green, respondent stated that he did not land on Mr. Likes' property because he

---

[189] *Id.* 288.
[190] *Id.* 289-90.
[191] *Id.* 291.
[192] *Id.* 292-93.
[193] *Id.* 293.
[194] *Id.* 293-94.
[195] *Id.* 294.
[196] *Id.* 449.

deemed it unsafe.[197] In addition, he testified that during the meeting with respondent, Inspector Green and Mr. Morgan showed respondent the video of the aircraft and respondent admitted that he was flying.[198]

Jared Likes testified that on November 24, 2019, he resided at 300 Desert Sun Lane and had lived there for 18 years.[199] He stated that while living at that residence, he observed aircraft flying over the desert area "quite a bit."[200] Mr. Likes testified that he granted respondent permission to land on his property, but mentioned that he was not home during respondent's November 24th flight.[201] Mr. Likes stated that he and his son fly electric remote controlled airplanes and created an area on his property for conducting the operations with a 400 to 500 feet landing area.[202] Mr. Likes also testified that he has flown with respondent in his aircraft a "handful" of times and they landed off-airport, including in an area a 20 minutes' drive north of his home.[203] When he flew with respondent, Mr. Likes described the landings as "[v]ery safe and doable," estimating that after touchdown, the aircraft rolled a short distance, about 100 feet.[204]

On cross-examination, Mr. Likes testified that he was not in respondent's aircraft on November 24, 2019.[205] Mr. Likes stated that he flew with respondent about a month before November 24th.[206] He further explained that when operating his radio-controlled aircraft, he used

---

[197] *Id.* 449-50.
[198] *Id.* 464.
[199] *Id.* 298.
[200] *Id.* (Mr. Likes initially testified that he did not observe aircraft flying over "that area" when he resided at 300 Desert Sun Lane).
[201] *Id.* 299.
[202] *Id.* 299-300.
[203] *Id.* 300-01.
[204] *Id.* 304-05.
[205] *Id.* 305.
[206] *Id.*

a 400 to 500 foot clearing as a runway, with approximately 10 acres of open space behind it.[207] Mr. Likes denied ever flying a drone in that area, but acknowledged that his nephew may have.[208] Furthermore, Mr. Likes reiterated that no one was at his home during respondent's flight on November 24th.[209]

Upon questioning from the law judge, Mr. Likes recalled giving respondent permission to land on his runway on his property at least a month before November 24, 2019, informing respondent that he could use the runway if he ever needed it and believed that he granted respondent the permission a single time.[210] Mr. Likes clarified that he granted respondent permission to land on his property at any time respondent needed to land and did not limit the permission to any specific dates or times.[211] Mr. Likes stated that the runway had been on his property for years and estimated that it was 25 to 30 feet wide, describing it as a smooth dirt runway with a bit of scrub.[212] Mr. Likes guessed that the runway was at least 500 feet from his home and was oriented east to west.[213] He also testified that there are other areas on his property that could be used as runways, stating, "I had a complete perimeter trail, path around that place with paths through my yard on ten acres that I could land anywhere out there."[214]

On recross-examination, Mr. Likes testified that he and his son are still good friends with respondent and have flown with respondent, but not recently because both Mr. Likes and his son have been busy.[215] Mr. Likes moved about eight miles down the street from his 300 Desert Sun

---

[207] *Id.* 306.
[208] *Id.* 307-08.
[209] *Id.* 308.
[210] *Id.* 308-09.
[211] *Id.* 309.
[212] *Id.* 310.
[213] *Id.* 310-11.
[214] *Id.* 311.
[215] *Id.* 311-12.

Lane residence and respondent lives about eight miles "down the road."[216]

Over respondent's objection, Roy Speeg, Jr. testified as an expert in general aviation and flight operations, with a particular focus on low flight operations, and the FAA regulatory requirements for low flight operations.[217]   He testified that he has worked for the FAA for 18 years and is currently on the EIR review team.[218] Inspector Speeg stated he was a Regional Aviation Event Specialist for the Northwest Mountain Region from 2012 to 2017, dealing with waivers for air shows, banner-tow operations, cross-country air races, and aerobatic competitions under section 91.119(a).[219] He asserted that he is very familiar with the regulation and when waivers are permitted.[220] Inspector Speeg stated that prior to joining the FAA, he held a "statement of aerobatic competency down to 500 feet."[221] Inspector Speeg noted that he possesses the following airmen certificates: airline transport pilot, single and multi-engine land with type ratings in all the citation 500 series business jets, the Airbus A-320 series, and the Embraer 171-90 series; and flight instructor with instrument airplane and multi-engine instructor ratings.[222] He further testified that he has a little more than 6,500 hours of flight time as a pilot-in-command.[223]

Inspector Speeg explained that during a low pass, a pilot ensures that there are no animals, fallen trees, or other obstacles on the runway and performs the low pass at a slower than

---

[216] *Id.* 312.
[217] *Id.* 343-45. The law judge found that Inspector Speeg was not qualified as an expert in short field take off and landings with regarding to the Kitfox 5 aircraft.
[218] *Id.* 318.
[219] *Id.* 318-19, 321.
[220] *Id.* 319.
[221] *Id.*
[222] *Id.* 321.
[223] *Id.*

cruise speed.[224] According to Inspector Speeg, if the runway is clear, the pilot would "come back around and land."[225] He also testified that considering the statements from the Penas and Mr. Stanley and the photographs and measurements, respondent's aircraft was an estimated 50 feet in altitude during the low pass on November 24th.[226] He also estimated that based on the evidence presented at hearing, when Mr. Pena first spotted the aircraft, it was 78 feet in lateral distance from the Penas' house and 30 to 50 feet above the ground.[227] Inspector Speeg further opined that respondent flew at altitudes that would not allow him to react timely in an emergency, stating,

> He would have to first fly the airplane. He would have to figure out where he was going to put the airplane down. And he would have to be able to do all of that without creating undue hazard to the persons or property on the surface. And I'm not sure that that could have been done from 30 to 50 feet above the ground in a steep bank, because if the engine quits in a steep bank, you're going to have an immediate loss of width, because the wings are sideways. They're not level with the horizon. Whether they have STOL additions to the wing or not. But STOL additions to the wing are useless if they're in, you know, six feet or more degrees of bank.[228]

He also stated that in an emergency, respondent's attempts to land would create an undue hazard to those residing in the neighborhood, and noted that banking the aircraft could result in structure failure.[229] Inspector Speeg explained that respondent himself made statements indicating that it was unsafe to land on the east side of his flight path, meaning that the only place to land would have been in the residential subdivision – creating an undue hazard to people and property.[230] Inspector Speeg testified that, referring to the map that Inspector Green created, the propane tank was the structure closest to the Penas' home.[231] Moreover, Inspector Speeg opined that

---

[224] *Id.* 348.
[225] *Id.* 348-49.
[226] *Id.* 350.
[227] *Id.* 353-54.
[228] *Id.* 357.
[229] *Id.* 359-60.
[230] *Id.* 361.
[231] *Id.* 365-66 (discussing Exh. A-18). Respondent's counsel conceded that the propane tank is a

respondent's aviation maneuvers were not necessary for landing, elaborating that banking is not required to "get to an area to assess a possible landing area."[232] He concluded that respondent engaged in intentionally reckless behavior in violation of section 91.119(a).[233]

Inspector Speeg further testified that respondent violated section 91.119(c) by flying recklessly at low altitudes with disregard for the safety of people and structures.[234] Inspector Speeg identified aggravating factors he considered in reaching his opinions, including: the degree of hazard respondent created; respondent's experience level, which the witness considered to be generally low; the intentional nature of respondent's actions; and the prior warnings the FAA issued to respondent.[235] Inspector Speeg further expounded that, "[t]he margin for error when you're operating that low to the ground, things happen fast. … like I said if the engine quit, a lot of things have to happen real fast in order to get that airplane to a place where you can land it, let alone get on the ground."[236] He expressed a lack of confidence that respondent could respond in an emergency given respondent's level of experience, reiterating his opinion that respondent showed a significant disregard for safety.[237]

On cross-examination, Inspector Speeg testified that he had never met respondent or had an opportunity to assess his flying skills prior to the instant case.[238] He also acknowledged that section 91.119 does not mention an aircraft's bank angle and that an FAA pilot flying handbook is advisory, rather than mandatory.[239] Inspector Speeg further testified that respondent's maneuvers

---

structure. *Id.* 365.
[232] *Id.* 367.
[233] *Id.*
[234] *Id.* 367-68.
[235] *Id.* 368.
[236] *Id.* 369.
[237] *Id.*
[238] *Id.* 370.
[239] *Id.* 370-71.

during the November 24th flight were not necessary for normal flight, traffic pattern operations, or to observe a possible landing spot, and that based on the video he viewed, he estimated that respondent's aircraft banked at up to 60 degrees.[240] Inspector Speeg agreed with respondent's counsel that on a three-degree glide slope, an aircraft that is one mile from a runway is 300 feet from the ground, and an aircraft one-quarter of a mile from a runway is 75 feet from the ground.[241] Respondent's counsel then questioned the expert witness concerning a photograph of the Linden, NJ airport, showing that the airport is near several houses, and asserting that airplanes operate in close proximity to persons and properties well below 500 feet during landing.[242] In response to whether such an assertion is correct, Inspector Speeg responded, "They do, but …" before respondent's counsel interrupted him.[243] Inspector Speeg opined that during instrument instruction "at a developed airport," students aim to become comfortable "coming down to minimums," where they are flying close to the ground, buildings, and structures.[244] Inspector Speeg agreed that a low-flying aircraft may operate in an airfield regularly in sparsely populated areas, adding, "[t]his is not a sparsely populated area."[245] He also acknowledged that how well a pilot flies is based on skill and experience, as well as judgment.[246] In addition, he agreed that where an aircraft lands depends on the pilot's skill, the aircraft's capabilities, and applicable regulations.[247]

Referring to the FAA Off Airport Ops Guide, Inspector Speeg testified that making a pass to examine the landing surface is permissible when performed correctly, and while the pass

---

[240] *Id.* 371-73.
[241] *Id.* 376-78.
[242] *Id.* 379-81.
[243] *Id.* 380-81.
[244] *Id.* 381-82.
[245] *Id.* 383.
[246] *Id.* 384-85.
[247] *Id.* 389.

requires a low altitude, Inspector Speeg opined that, "[y]ou have to be at an altitude that takes you higher than the intended point of landing."[248] Inspector Speeg also explained that a pilot must conduct a higher level pass to determine whether there are obstructions to landing and in a sparsely populated area, a pilot may fly low to the ground, but must remain 500 feet from persons, property, vessels, and vehicles.[249]

> On re-direct, Inspector Speeg testified that under the applicable regulations,
>
> except for takeoff and landing, you have to stay above the altitudes indicated in the regulation. So if you're doing a pass over it, that's not landing or take off, and I think that's been interpreted previously. But so if you do a low pass and decide not to land, you have to stay, you know, 500 feet above persons, property on the ground. You have to be able to land without causing undue hazard if you lost an engine.[250]

Moreover, Inspector Speeg identified alternative flight paths respondent could have taken that would not have violated the regulations.[251]

In response to questioning from the law judge, Inspector Speeg opined that under the regulations, an aircraft may fly within 500 feet of persons, property, structures, vessels or vehicles if it was done for purposes of landing.[252] Further, the Inspector stated that the pilot exercises judgment when determining which flight path to take and the regulation applies regardless of whether there are other, safer approaches for landing.[253] Inspector Speeg also explained that there is a difference between a low pass and an approach to land because during a low pass, no landing is actually performed.[254] Finally, Inspector Speeg stated that he did not view respondent's intended landing area in person, but formed his opinion based on the exhibits and

---

[248] *Id.* 393-94; Exh. A-22 at 3.
[249] Tr. 394-97.
[250] *Id.* 407.
[251] *Id.* 409-12.
[252] *Id.* 412-13.
[253] *Id.* 414.
[254] *Id.* 415.

testimony.[255] He also testified that he did not know whether he viewed the native video of respondent's flight or a copy.[256]

On additional re-direct, Inspector Speeg testified that if respondent's flight path was necessary for landing and he could ensure a landing without causing an undue hazard to persons or property on the ground, then respondent would not have violated section 91.119(a).[257]

On re-cross examination, Inspector Speeg testified that section 91.119 does not differentiate between on airport and off airport operations and FAA's off airport operations guidance is advisory.[258] Furthermore, Inspector Speeg stated that it is "prudent" to conduct off airport operations in accordance with FAA's guidance, so long as it is consistent with the regulations.[259]

Upon additional questioning from the law judge, Inspector Speeg opined that, except when necessary for takeoff or landing, section 91.119(a) sets forth altitude limits on flights, explaining "we have to be at an altitude that allows[,] if a power unit fails a landing, an emergency landing without undue hazard."[260] Inspector Speeg testified that section 91.119(c) addresses distances.[261]

Prior to issuing his decision, the law judge denied respondent's motion to dismiss the case for failure to state a claim upon which relief can be granted.[262] Respondent argued that the Administrator's amended complaint failed to allege that the low pass operation was not

---

[255] *Id.* 416-17.
[256] *Id.* 417.
[257] *Id.* 424.
[258] *Id.* 425.
[259] *Id.* 426.
[260] *Id.* 429.
[261] *Id.* 426.
[262] *Id.* 580-81.

necessary for takeoff or landing, as stated in the prefatory clause of Section 91.119.[263] The Administrator asserted that whether the low altitude operation was necessary for takeoff or landing is an affirmative defense that respondent must prove.[264] In denying the motion, the law judge cited Board precedent and determined that respondent has the burden of proving the low operation was necessary for takeoff or landing.[265]

### C. Law Judge's Oral Initial Decision

In the April 6, 2022, Oral Initial Decision, the law judge determined that the Administrator proved respondent violated 14 C.F.R. §§ 91.119(a), (c) and 91.13(a) by operating his aircraft at low altitudes, but mitigated the sanction from a 120-day suspension to a 60-day suspension. In making this determination, the law judge cited the regulatory violations alleged in the complaint, noted respondent's admissions and denials in his answer, listed the admitted exhibits, summarized the witness testimony, and addressed respondent's affirmative defenses. The law judge modified the complaint and found that the Administrator proved by a preponderance of the evidence most allegations in the modified complaint.

The law judge made several findings of fact and conclusions of law. The law judge found that: respondent holds a private pilot certificate; he is the registered owner of a 1997 Johnson John T Kitfox 5, registration number N318JJ; on November 24, 2019, respondent was the pilot-in-command of his aircraft in the vicinity of 400 Desert Sun Lane and 300 Desert Sun Lane in Reno, Nevada; and respondent flew less than 100 feet above ground level during his low pass.[266] The law judge modified paragraph 4 of the Administrator's amended complaint so that it reads,

---

[263] *Id.* 570-71.
[264] *Id.* 571.
[265] *Id.* 580. Although the law judge acknowledged that respondent's motion to dismiss was untimely, the law judge declined to dismiss the motion on those grounds. *Id.* 572.
[266] Oral Initial Decision at 698-99.

"During the referenced flight operation, you operated N318JJ at altitudes of 100 feet AGL or less than 100 feet AGL."[267] The law judge further found that the propane tank on the Penas' property is a structure under the regulations.[268] The law judge held that the preponderance of the evidence showed that respondent flew less than 500 feet from the Penas' residence and their stable, shed, and propane tank.[269] The law judge determined that while the Penas' testimonies were likely biased and embellished because of their marital relationship, the problems they had with Mr. Likes flying drones near their home, and their belief that respondent retaliated against them on Mr. Likes' behalf, the law judge did not believe that they falsified their testimonies about what they saw on November 24th.[270] Further, the law judge found Mr. Stanley's testimony to be credible, noting that he corroborated the Penas' testimonies concerning the fight path, his testimony was not embellished, and he did not have an "axe to grind."[271]

Based on his findings, the law judge modified the amended complaint as follows: paragraph 4(a) will now read, "closer than 500 feet of a stable, shed, and propane tank"; paragraph 4(b) will now read "closer than 500 feet of a residential home at 400 Desert Sun Lane"; and paragraph 4(c) will now read "closer than 500 feet of an adult and a child who were outside the residential home at 400 Desert Sun Lane."[272] The law judge found that the Administrator failed to prove paragraph 4(d), alleging that respondent operated within 300 feet or closer than 500 feet of two adults and two children near the perimeter of 400 Desert Sun Lane.[273]

---

[267] *Id.* at 699.

[268] *Id.* at 701.

[269] *Id.* at 706, 708.

[270] *Id.* at 704.

[271] *Id.* at 705.

[272] *Id.* at 708, 710.

[273] *Id.* at 711.

The law judge criticized the Administrator for failing to obtain or preserve the native video from the Penas' garage peak camera showing respondent's aircraft on November 24th.[274] However, the law judge declined to apply an adverse inference and instead, excluded copies of the video taken with an iPhone and other evidence relying on the video, and gave no weight to Inspector Speeg's and Inspector Green's testimonies based on the excluded video copy.[275]

In evaluating whether respondent's low pass at 100 feet above ground level allowed for an emergency landing without undue hazard to persons or property in the event of a power unit failure, the law judge credited Inspector Speeg's testimony concerning respondent's ability to land in an emergency, which was not based the excluded video and which the law judge found credible.[276] The law judge cited Inspector Speeg's opinion that respondent could have flown an alternate route further to the east to avoid structure or people, noting that during the law judge's questioning, respondent acknowledged that he could have taken another path, but did not consider it.[277] The law judge found not credible respondent's reasons for declining to take another route or fly at a higher altitude.[278] Thus, the law judge determined that respondent flew at an altitude that did not allow for an emergency landing without undue hazard to persons or property on the surface in the event of a power unit failure, in violation of section 91.119(a).

In finding that respondent violated section 91.119(c), which prohibits flying within 500 feet from any person, vessel, vehicle, or structure in a sparsely populated area unless landing or taking off, the law judge found that, as respondent admitted, respondent flew within 100 feet or

---

[274] *Id.* at 714-17.
[275] *Id.* at 712-13, 716-17.
[276] *Id.* at 718-20.
[277] *Id.* at 719-21.
[278] *Id.* at 721-22.

less from any person, vessel, vehicle or structure.[279] Further, the law judge determined that respondent has the burden of proving that his low altitude operation was necessary for takeoff or landing, and citing respondent's testimony, the legislative history of the regulation, and Board precedent, found respondent failed to meet this burden given that the landing site was inappropriate under the circumstances.[280] The law judge found that the Administrator proved every allegation in the complaint, as modified, by a preponderance of reliable, probative and credible evidence, except for paragraph 4(d).[281] Further the law judge concluded that respondent violated 14 C.F.R. §§ 91.119(a) and (c), and 14 C.F.R. § 91.13(a).[282]

The law judge rejected the following affirmative defenses given that respondent failed to offer convincing credible evidence to support them: the Administrator fails to state a claim upon which the Board may grant the relief requested; the Administrator's interpretation of the relevant Federal Aviation Regulations (FARs) is arbitrary, capricious, an abuse of discretion and not in accordance with the law; the Administrator's interpretation of the FARs is unconstitutionally vague; the Administrator's application of the FARs is contrary to the regulation's plain language; the Administrator lacks substantial basis in law and fact to continue prosecution of this matter; and that the sanction of suspension is contrary to policy, precedent, and procedure.[283]

The law judge examined the Administrator's sanction of revocation under the deference provided in the Pilot's Bill of Rights[284] and the Supreme Court's decision in *Martin v. Occupational Safety and Health Review Commission*.[285] The law judge considered aggravating

---

[279] *Id.* at 722.
[280] *Id.* at 722-32.
[281] *Id.* at 732-34.
[282] *Id.* at 733-34.
[283] *Id.* at 735-37.
[284] Public Law 112-153 (2012).
[285] 499 U.S. 144 (1991).

and mitigating circumstances in assessing the Administrator's 120-day suspension and

determined that while there were no aggravating factors supporting a longer sanction, the

Administrator's failure to preserve the native video in the case was mitigating.[286] The law judge

noted that the FAA sanction guidance, FAA Order 2150.3C, provided a sanction range of a 60-

to a 120 day-suspension for careless operation with a severity level 2, which encompasses the

failure to maintain the required minimum altitude in an uncongested area. The law judge reduced

respondent's sanction from a 120-day suspension to a 60-day suspension based on the

Administrator's failure to preserve evidence and Board precedent.[287] Further, the law judge

explained, "[a] suspension of 60 days is at the low end of the moderate range, which is

appropriate given all the circumstances and accounting for [r]espondent's experience as a private

pilot and failure in judgment in conducting a low pass."[288]

   *D.  Issues on Appeal*

   The parties cross-appealed different aspects of the law judge's decision. On appeal,

respondent argues that the law judge erred by: 1) not dismissing the Administrator's Amended

Order of Suspension for failure to state a claim upon which relief can be granted; 2)

misinterpreting and misapplying 14 C.F.R. § 91.119 because a low inspection pass is

"necessary" in conjunction with an off-airport landing; 3) finding respondent's intended landing

site was inappropriate or not suitable; 4) not dismissing the proceedings in light of the FAA's

sloppy investigation; and 5) committing numerous and other prejudicial errors, including

amending the Administrator's complaint, relying on an unpled allegation in his decision, and

relying on discredited testimony. The Administrator argues on appeal that the law judge erred in

---

[286] Oral Initial Decision at 740-41.
[287] *Id.*
[288] *Id.* at 741.

reducing the sanction from a 120-day suspension to a 60-day suspension.

*2. Decision*

While we give deference to our law judge's rulings on certain issues, such as credibility

determinations,[289] we review the case under *de novo* review.[290]

    A.  *The law judge did not err in denying respondent's motion to dismiss.*

We affirm the law judge's denial of respondent's motion to dismiss for failure to state a

claim. Respondent alleges that the Administrator's complaint was deficient because it did not

include the prefatory language to 14 C.F.R. § 91.119, "[e]xcept when necessary for takeoff or

landing." Respondent also makes a vague assertion that the complaint fails to specify the "facts

and circumstances" giving rise to the alleged regulatory violations. The law judge found that the

complaint provided respondent with sufficient notice of the allegations and that the prefatory

clause of § 91.119 is an affirmative defense that respondent must prove.

  "[W]e have long held that in our proceedings, 'notice pleading' principles require the

Administrator to 'give only a short and plain statement of the claim showing that the pleader is

entitled to relief, and not a complete detailing of all the facts.'"[291] Further, the Board has stated,

"[b]ecause the complaint is the vehicle by which respondent is given fair notice of the charges he

will be expected to defend against and which facts and circumstances underlie those alleged

violations, we cannot give any weight to apparent violations which were not alleged in the

---

[289] *Administrator v. Porco*, NTSB Order No. EA-5591 at 13 (2011), *aff'd sub nom.*, *Porco v. Huerta*, 472 Fed. App'x 2 (D.C. Cir. 2012) (per curiam).
[290] *Administrator v. Smith*, NTSB Order No. EA-5646 at 8 (2013); *Administrator v. Frohmuth and Dworak,* NTSB Order No. EA-3816 at 2 n.5 (1993); *Administrator v. Wolf*, NTSB Order No. EA-3450 (1991); *Administrator v. Schneider*, 1 N.T.S.B. 1550 (1972) (in making factual findings, the Board is not bound by the law judge's findings).
[291] *Administrator v. Siegel*, NTSB Order No. EA-5838 at 11-12 (2018) (quoting *Administrator v. Robert*, NTSB Order No. EA-5556 at 10-11 (2010); Black's Law Dictionary 1271 (9th ed. 2009); *Administrator v. Darby*, NTSB Order No. EA-5521 at 8 (2010)).

Administrator's complaint."[292] We find that the Administrator's amended complaint was sufficient to place respondent on notice about the charges, itemizing the specific flight, altitudes, and distances at issue, and citing the specific regulations that respondent violated. Respondent was provided sufficient information necessary to prepare a defense and an exchange of additional detail was more appropriate during the discovery and hearing phases. Further, respondent has not demonstrated how the supposed lack of specificity in the amended complaint prejudiced him.[293] Regarding respondent's claim that the absence of § 91.119's prefatory language was fatal, the amended complaint advised respondent of which regulations he was accused of violating and nothing prevented him from referring to those regulations.[294] Moreover, respondent was on notice that the prefatory language of § 91.119 was at issue given that both before and during the hearing, he asserted as an affirmative defense that his low altitude flight

---

[292] *Siegel*, *supra* note 291, at 12 (quoting *Administrator v. Scott*, NTSB Order No. EA-4030 at 6 (1993)).

[293] *See e.g.*, *Administrator v. Ringer*, NTSB Order No. EA-1699 (1981) (finding that the complaint was sufficiently pled, noting that respondent could avail himself of discovery procedures for more details and "has made no attempt to indicate how any alleged lack of specificity in the complaint adversely affected his ability to respond to it in any respect either before or during the hearing."). *See also Administrator v. Bates*, NTSB Order No. EA-1484 (1980) (rejecting respondent's assertion that the complaint was deficient, stating, "[t]he primary purpose of the complaint is to apprise a [r]espondent of the charges so that he can prepare a defense.").

[294] *Administrator v. Richard, et al.*, NTSB Order No. EA-2575 (1987) (Although the complaint failed to specify a prerequisite to violating the regulation – that the excess crewmember hours occurred while in air carrier service – the Board affirmed the law judge's dismissal of respondent's motion for a judgment on the pleadings. The Board explained, "It is well settled that the purpose of modern pleadings is to satisfy the notice-giving function and to dispense with the rigid formalism of the common law. There could be no violation of the only regulation cited in the complaint unless the flight time was in air carrier service, and taken as a whole, the complaints provided respondents with fair notice that an element of the violation which the Administrator would have to prove was that the flight time was in air carrier service…it is apparent that the parties understood before the hearing that an essential element the Administrator had to prove and which respondents would be expected to defend against was that all of the flight time was in or could be applied to the 100-hour limit for air carrier service.").

was necessary for landing.[295] His claim that the amended complaint was inadequate is unconvincing and we affirm that law judge's dismissal of respondent's motion to dismiss.

The law judge did not err in finding that respondent had the burden of establishing applicability of the prefatory language in § 91.119. The law judge's conclusion is consistent with Board precedent, albeit sparse. The Board has noted that the burden of proving the applicability of § 91.119's prefatory clause rests with a respondent.[296] Respondent offers no contrary authority or other reason to refute the law judge's decision and thus, we have no basis to overturn the law judge's finding that respondent, not the Administrator, must establish that his low altitude flight was necessary for takeoff or landing.

> ### B. The law judge did not misinterpret 14 C.F.R. § 91.119 and did not err in finding respondent's intended landing site was inappropriate.

Respondent posits that the law judge misinterpreted § 91.119 in finding that a low inspection pass is not necessary for an off-airport landing, but the law judge did not issue such a finding. Rather, the law judge determined that respondent did not prove his affirmative defense that he met the prefatory clause – that his low inspection pass was necessary for landing during the November 24th flight.[297] The law judge reasoned that respondent had other alternatives for

---

[295] *See* Respondent's Compliance with Prehearing Order at 1-2; Tr. 41 (respondent's opening statement).

[296] *Application of Wick*, NTSB Order No. EA-5038 (2003) (rejecting respondent's EAJA claim and finding that the Administrator was substantially justified in bringing the matter to a hearing, noting "[i]t was respondent's burden of proving such exculpatory claims, including his defense that any low flight fell within the ambit of the except for landings exception to the proscriptions contained in FAR section 91.119(c)"); *Administrator v. Essery*, NTSB Order No. EA-2221 at 6 (1985) ("In order to show that a low altitude was 'necessary for takeoff or landing,' a respondent must show that the landing site was an appropriate one"), *aff'd* 857 F.2d 1286 (9th Cir. 1988). *See also Administrator v. Chemello*, Docket No. SE 18472 (NTSB 2009) ("The exception is in Section 91.119(b), if necessary for takeoff or landing imposes the burden on the proponent of the exception to show that the exception applies"), *aff'd* NTSB Order No. EA-5503 (2010).

[297] *See* Oral Initial Decision at 722-32.

conducting the low inspection pass that did not violate the regulation by flying within 500 feet to any person, vessel, vehicle, or structure. Given that the law judge did not find that a low inspection pass is not necessary for an off-airport landing, he did not misinterpret the regulation as respondent suggests.

Further, respondent argues that the law judge erroneously concluded that respondent's intended landing site was inappropriate, claiming that: the Administrator abandoned the argument that the landing site was not suitable and in considering it, the law judge violated respondent's due process; the record shows that the landing site was suitable; the law judge relied on Inspector Speeg's "incompetent" and "biased" testimony; and the law judge abused his discretion in crediting Inspector Speeg's legal conclusions.

Although the Administrator objected to respondent's questioning concerning the suitability of the landing site, the law judge acted within his purview and consistent with Board precedent in evaluating the landing site to determine whether respondent's operation was necessary for landing, as required under § 91.119. Our law judges have significant discretion in making evidentiary rulings. In this regard, we will only overturn a law judge's evidentiary ruling when the appealing party can show the law judge's ruling amounted to an abuse of discretion, after a party can show such a ruling prejudiced him or her.[298] Respondent has not shown the law judge's decision to consider the suitability of the landing site caused him prejudice, but merely

---

[298] *See, e.g.*, *Administrator v. Kolodziejczyk*, NTSB Order No. EA-5909 ay 49 (2021) (citing *Administrator v. Wright*, NTSB Order No. EA-5872 (2020)); *Administrator v. Tarola*, NTSB Order No. EA-5858 (2019); *Administrator v. Leyner*, NTSB Order No. EA-5732 at 4 n.19 (2014) (citing *Administrator v. Walker*, NTSB Order No. EA-5656 at 15 n.39 (2013)); *Administrator v. Giffin*, NTSB Order No. EA-5390 at 12 (2008) (citing *Administrator v. Bennett*, NTSB Order No. EA-5258 (2006)); *Administrator v. Martz*, NTSB Order No. EA-5352 (2008); *Administrator v. Zink*, NTSB Order No. EA-5262 (2006); *Administrator v. Van Dyke*, NTSB Order No. EA-4883 (2001).

asserts that it violated his due process because the Administrator "withdrew" the claim.

However, under our case law, we have long examined the suitability of the intended landing site when assessing whether the operation at issue fell under the prefatory clause of § 91.119. In rejecting respondents' assertion of the regulation's exception, we have held,

> We cannot accept respondents' proposition that the low altitudes at which their aircraft were operated were excused by the prefatory clause of section 91.[119]. As the law judge stated, respondents' interpretation of the above regulation would in effect excuse low flight where necessary for "any takeoff or any landing from any area anywhere at any time" … Such an interpretation is patently fallacious in that it would excuse low flight regardless of the appropriateness of the landing site.[299]

Further, we have explained that "[r]espondent could not simply choose any takeoff route or time and call it necessary. He must make a reasonable, appropriate choice, or the regulation has no meaning."[300] Moreover, we have rebuffed allegations of a due process violation in considering a landing site's suitability when assessing a § 91.119 violation.[301] Thus, the law judge properly considered the appropriateness of respondent's intended landing site to determine whether the operation was necessary for landing under § 91.119's prefatory clause. Respondent has not addressed whether consideration of the landing site's suitability caused him prejudice. Because

---

[299] *Administrator v. Cobb, et al.*, NTSB Order No. EA-962 (1977), aff'd, 572 F.2d 202 (9th Cir. 1977). *See also Administrator v. Prior*, NTSB Order No. EA-4416 at 9 (1996) (finding respondent's flights were not suitable, noting he had other landing options and therefore, the operations were not necessary for landing under the meaning of section 91.119); *Administrator v. McCollough*, NTSB Order No. EA-4020 at 5 (1993) ("We have long held, however, that the exception is inapplicable in cases where an unsuitable landing site is used").

[300] *Prior*, *supra* note 299, at 7 (quoting *Administrator v. Kittleson*, NTSB Order No. EA-4068 (1994)).

[301] *McCollough*, *supra* note 299, at 6-7 ("we have noted respondent's contention that, as no landing site suitability requirement appears in the language of the prefatory clause of section 91.119, the imposition of that requirement upon his operation deprived him of due process. We must, however, point out that the United States Court of Appeals for the Ninth Circuit expressly considered and rejected such an argument in *Essery v. Department of Transportation*, *supra*, holding that the suitability requirement represented a reasonable administrative interpretation of the low flight regulation and that previous decisions setting forth that requirement provided airmen with adequate notice of its applicability.").

respondent has not demonstrated that the law judge's analysis of the landing site prejudiced him, we do not reach the issue of whether the law judge abused his discretion.

Additionally, we have no reason to overturn the law judge's finding that the intended landing site was unsuitable. The law judge made the determination based on the credible testimony of the witnesses and the evidence before him, and respondent offers no support for his claim that the site was suitable. Rather, respondent merely asserts that he and his aircraft were capable of landing on the runway.[302] Respondent himself testified that during his low inspection pass, he decided against landing at the landing site because he could not identify the touchdown point or center line of the runway.[303] Given the lack of evidence backing respondent's claim that the landing site was suitable, there is no basis to refute the law judge's conclusion. Further, the law judge found credible the testimony of the Administrator's witnesses supporting the unsuitability of the landing site, and as discussed, we must defer to the law judge's credibility findings. Such credible testimony further supports the law judge's conclusion that the landing site was not suitable.

Further, the law judge did not rely on Inspector Speeg's testimony in determining that the landing site was inappropriate and respondent did not suffer prejudice as a result of the law judge's consideration of Inspector Speeg's testimony pertaining to other matters.[304] Respondent was aware in advance that the Administrator planned to call Inspector Speeg as an expert[305] and had the opportunity to conduct a *voir dire* examination and cross-examine him.[306] Respondent

---

[302] Respondent's Appeal Br. at 25.
[303] Tr. 507, 523.
[304] Oral Initial Decision at 728-32 (relying mostly on Mr. Likes' testimony).
[305] *See* Complainant's Compliance with Prehearing Order at 5-7; Complainant's Initial Disclosures.
[306] *See, e.g.*, *Administrator v. Decruz*, NTSB Order No. EA-5827, at 30 (2017) (finding the law judge did not abuse his discretion in admitting expert testimony because the Administrator

presents no convincing argument that Inspector Speeg's testimony was biased, other than respondent's disagreement with the expert's responses and his displeasure with the law judge's conclusions. According to respondent's logic, no federal employee could testify without bias where he or she is paid by his or her respective agency and testifies on that employer's behalf. Respondent's arguments are nonsensical. The fact that Inspector Speeg receives his salary and awards from the FAA does not diminish his expertise. Moreover, there is no evidence that the law judge credited legal conclusions from Inspector Speeg. Instead, he weighed the expert's opinion regarding the applicable regulations. In fact, the law judge limited his reliance on Inspector Speeg's testimony, deciding not to credit testimony concerning respondent's flight path, altitude above ground level, or bank angle because such testimony was based on the excluded video.[307] We find that the law judge's reliance on Inspector Speeg's expert testimony did not prejudice respondent and thus, we do not determine whether the law judge abused his discretion in giving weight to portions of Inspector Speeg's testimony.

> C. *The law judge did not err in refusing to dismiss the proceedings as a result of the flaws in the FAA's investigation.*

Respondent argues that the law judge should have dismissed the case as a result of the Administrator's "sloppy" investigation and in particular, the failure to preserve the native video from the Pena's security camera.[308] Rather than dismiss the entire case, the law judge excluded the non-native video and did not consider any testimony relying on the excluded video. Respondent has not demonstrated that the law judge's decision caused him prejudice given that

---

provided advance notice to respondent, identified the witness as an expert witness, and proffered the scope of his testimony in pretrial disclosures and at hearing, respondent had the opportunity to object to questions and cross-examine the witness).

[307] Oral Initial Decision at 717.

[308] Respondent's Appeal. Br. at 31-33.

the excluded evidence did not impact the law judge's ruling on the case and the non-native video was not the only evidence supporting the Administrator's complaint. Moreover, the law judge's decision to exclude certain evidence, instead of dismissing the entire case, is consistent with Board precedent. We have held that in the absence of malfeasance, dismissal of the case or an adverse inference are not appropriate to remedy missing evidence, particularly where other evidence exists.[309] The law judge rectified the lost native video by excluding certain evidence, and respondent is not entitled to an additional remedy, especially since the law judge found that the Administrator did not intentionally destroy evidence. We reject respondent's contention that the law judge erred in refusing to dismiss the case.

D. *We reject respondent's arguments that the law judge committed numerous and other prejudicial errors.*

Respondent argues, without support, that the law judge committed a prejudicial error in amending the Administrator's complaint when issuing the Oral Initial Decision.[310] We disagree. The statute governing appeals to the Board expressly grants the law judge the authority to "amend, modify, or reverse the [Administrator's] order."[311] Thus, the law judge acted within his authority in amending the complaint.

Respondent also claims that although the law judge found "no allegation [in the Administrator's Complaint] that [r]espondent operated within 500 feet of 300 Desert Sun Lane,

---

[309]*See Administrator v. Abiraman*, NTSB Order No. EA-4978 (2002) (denying request for adverse inference because while the lost communications with air traffic control were the best evidence, they were not the only evidence, and there was no purposeful destruction of the evidence); *Administrator v. Stricklen*, NTSB Order No. EA-3814 (1993) (rejecting adverse inference for missing radar data, noting respondent took no steps to ensure its preservation); *Administrator v. Rauhofer*, NTSB Order No. EA-3268 (1991) (declining to dismiss the case or draw an adverse inference over missing computer data, which was not critical evidence, and communications with air traffic control, which would not have changed the outcome of the case).
[310] Respondent's Appeal Br. at 34.
[311] 49 U.S.C. § 44709(d).

which is Mr. Likes' house," the law judge considered this fact in his decision.[312] Respondent misconstrues the law judge's opinion. The law judge actually explained, "[s]ince the Amended Complaint fails to allege that [r]espondent operated within 500 feet of 300 Desert Sun Lane in violation of the regulations, my findings in this regard are made only for purposes of making a determination of [r]espondent's flight path and altitude prior to that point."[313] Respondent does not allege that he was prejudiced by the law judge's application of this finding and because the finding regarding 300 Desert Sun Lane did not impact the outcome of the case, we conclude that respondent was not prejudiced.

Finally, respondent claims that the law judge credited the Penas' testimonies, despite stating that they were biased and their testimonies embellished.[314] On the contrary, the law judge appropriately weighed the Penas' testimonies. The law judge explained that their testimonies were likely biased because of their marital relationship and likely embellished given their view of Mr. Likes and their belief that respondent retaliated against them on Mr. Likes' behalf. Nevertheless, the law judge explicitly added, "However, I do not believe they falsified their basic testimony about what they saw."[315] Once again, respondent provides no evidence that the law judge caused him prejudice and does not allege that the law judge's credibility determinations were erroneous.[316] Respondent's assertion that the law judge improperly weighed the Penas' testimonies is meritless.

---

[312] Respondent's Appeal Br. at 34 (citing Oral Initial Decision at 701).

[313] Oral Initial Decision at 702.

[314] Respondent's Appeal Br. at 34.

[315] Oral Initial Decision at 704.

[316] Even if respondent alleged that we should overturn the law judge's credibility determinations, we decline to do so. We will not overturn a law judge's credibility determination unless a party can establish the determination was arbitrary and capricious. *Porco*, *supra* note 289, at 20-21. The law judge based his credibility findings on the record before him and respondent provides no reason to disturb the findings.

E.   *We reverse the law judge's mitigation of the Administrator's sanction.*

The Administrator argues that the law judge erred in reducing respondent's sanction from a 120-day suspension to a 60-day suspension. We agree. As discussed, *supra*, the law judge assessed the Administrator's choice of sanction using the standard set forth in *Martin v. Occupational Safety and Health Review Commission* and after weighing the mitigating factors, including the Administrator's failure to preserve the native security video. However, since the law judge's decision, the United States Court of Appeals for the District of Columbia Circuit has clarified the deference we must afford the Administrator's sanction selection. The Circuit Court held that the Board should only overturn the Administrator's sanction if it is "unwarranted in law or without justification in fact."[317] Specifically, in that case, the Circuit Court determined that the Administrator had justification for its selection of the remedy, citing the applicable regulations and statute.[318]

Here, respondent has provided no convincing mitigating factors demonstrating the Administrator's choice of sanction was unjustified in fact and/or unwarranted in law. Rather, the Administrator's sanction is supported by its sanction guidance, FAA Order 2150.3C, which provides for a sanction of a 90- to 150-day suspension for a failure to maintain a minimum altitude in an uncongested area where the severity is high, or reckless or intentional.[319] Given the absence of aggravating or mitigating factors, the Administrator selected a sanction within the midpoint of the range – a 120-day suspension.[320] The Administrator provided a reasonable

---

[317] *Pham v. Nat'l Transp. Safety Bd.*, et al., 33 F.4th 576, 583 (D.C. Cir. 2022) (citing *Amer. Power & Light Co. v. SEC*, 329 U.S. 90, 112-13 (1946)).

[318] *Pham*, *supra* note 317 at 583.

[319] Exh. A-23 at 3-4.

[320] Tr. 600; Administrator's Appeal Br. at 14. It is not clear why the law judge referred to the sanction guidance's penalty range for a careless operation, rather than a reckless or intentional operation, under which the FAA determined respondent's conduct fell. Oral Initial Decision at

explanation for determining that respondent's conduct fell within the high severity category, citing respondent's testimony regarding his flight experience, the level of risk posed, and his prior warnings from the FAA regarding his conduct.[321]

Further, there are no mitigating circumstances warranting a reduction in the penalty. The law judge considered the Administrator's failure to preserve evidence as mitigating, but as previously discussed, the law judge remedied that error by excluding certain evidence and testimony. Thus, the missing native security video is not a mitigating factor requiring a reduction in the sanction and more importantly, such a factor does not render the Administrator's penalty choice unjustified in fact or unwarranted in law. We reverse the law judge's reduction of the sanction and affirm the Administrator's 120-day suspension of respondent's certificate.

**ACCORDINGLY, IT IS ORDERED THAT:**

1. Respondent's appeal is denied;

2. The Administrator's appeal is granted;

3. The law judge's reduction in the sanction is reversed; and

4. The Administrator's 120-day suspension of respondent's Private Pilot Certificate is affirmed.

---

741. The law judge stated that the penalty range for a careless operation was a suspension between 60 and 120 days and explained that a sanction at the lower end of that range was appropriate in this case. However, the law judge did not explicitly invalidate the Administrator's conclusion that respondent's operation was reckless or intentional. We find that the Administrator's finding that the conduct was reckless or intentional and that a sanction in the middle of the range for such conduct – a 90 to 150 day suspension – was justified in fact and warranted in law.

[321] Tr. 601-03.

50

HOMENDY, Chair, LANDSBERG, Vice Chairman, GRAHAM and CHAPMAN, Members

of the Board, concurred in the above opinion and order.