**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 23-1239

TRENTON J. PALMER,

*Petitioner,*

*v.*

FEDERAL AVIATION ADMINISTRATION/NATIONAL
TRANSPORTATION SAFETY BOARD,

*Respondent.*

_____

*Petition for Review from Federal Aviation Administration Order Suspending the
Pilot Certificate of Trenton J. Palmer on April 6, 2022, Otherwise Affirmed by the
National Transportation Safety Board on March 30, 2023*

# BRIEF FOR PETITIONER

ROBERT D. SCHULTE
SCHULTE BOOTH, P.C.
14 North Hanson Street
Easton, Maryland 21601
Tel.: (410) 822-1200
Fax: (410) 822-1299
rschulte@schultebooth.com

*Counsel for Petitioner*

December 11, 2023



COUNSEL PRESS    (800) 4-APPEAL • (325339)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____
                                          )
Trenton J. Palmer.                        )
                                          )
                  Petitioner,             )        September Term, 2023
                                          )
         v.                               )        USCA Case No. 23-1239
                                          )
Administrator of the                      )
 Federal Aviation Administration & the)
National Transportation Safety Board,  )
                                          )
                  Respondents.            )
_____ )

## PETITIONERS' CERTIFICATE AS TO PARTIES, <u>RULINGS UNDER REVIEW, AND RELATED CASES</u>

Pursuant to the Court's Order dated July 31, 2020 (Document # 1854476), Petitioners hereby certify the following:

A. **Parties and Amici.** The parties to this case are Petitioner, Trenton J. Palmer, and Respondents, Administrator of the Federal Aviation Administration ("FAA") and the National Transportation Safety Board (NTSB). This matter was not before the District Court, and there are presently the following *amici* appearing: Aircraft Owners and Pilots Association.

B. **Rulings Under Review.** Petitioner seeks review, pursuant to 49 U.S.C. § 46110(a), of the final agency Order issued by the Administrator of the Federal Aviation Administration (hereinafter FAA) on April 6, 2022, affirmed by the National Transportation Safety Board on March 30, 2023, suspending the Airman Certificate of Trenton J. Palmer for alleged violations of 14 C.F.R. § 91.119 and § 91.13(a).

C. **Related Cases.** This case was not previously before this Court or any other court. There are no other related cases pending before this Court.

Dated this 11th day of December 2023.

Respectfully submitted,

**SCHULTE BOOTH, P.C.**

By: */s/Robert D. Schulte*
    Robert D. Schulte
    14 N. Hanson Street
    Easton, Maryland 21601

    (410) 822-1200
    rschulte@schultebooth.com

ii

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| _____ ) | |
| Trenton J. Palmer. ) | |
| ) | |
| Petitioner, ) | September Term, 2023 |
| ) | |
| v. ) | USCA Case No. 23-1239 |
| ) | |
| Administrator of the ) | |
| Federal Aviation Administration & the) | |
| National Transportation Safety Board, ) | |
| ) | |
| Respondents. ) | |
| _____ ) | |

**CORPORATE DISCLOSURE STATEMENT**

Petitioner Palmer is an individual with no parent corporation or corporate members or shareholders, therefore no 26.1 statement is necessary.  Palmer is additionally unaware of any publicly-held entity with a direct financial interest in the outcome of this Petition for Review.

Respectfully submitted,

**SCHULTE BOOTH, P.C.**

By: */s/Robert D. Schulte*
     Robert D. Schulte
     14 N. Hanson Street
     Easton, Maryland 21601

     (410) 822-1200
     rschulte@schultebooth.com

iii

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................vi

JURISDICTIONAL STATEMENT ........................................................ix

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUES. ...........................................................1

STATEMENT OF THE CASE ...............................................................2

    I.      PROCEDURAL  HISTORY ........................................................2

               REGULATORY BACKGROUND ................................................3

               THE ADMINISTRATOR'S COMPLAINT AGAINST PETITIONER ..................4

               THE FAA'S WITNESSES.......................................................7

SUMMARY OF ARGUMENT...............................................................17

STATEMENT OF STANDING.............................................................18

STANDARD OF REVIEW....................................................................19

ARGUMENT .....................................................................................20

    A. The Law Judge Erred by Not Dismissing the Administrator's Amended Order of Suspension for Failure to State a Claim Upon Which Relief Can be Granted. ...................................................................20

        1.  The Administrator's Complaint is Deficient....................................20

        2.  14 C.F.R. § 91.119 Contains No Affirmative Defenses.................23

    B. The Law Judge Erred by Misinterpreting and Misapplying 14 C.F.R. § 91.119 Because a Low Inspection Pass is "Necessary" in Conjunction with an Off-Airport Landing...................................................25

    C. The Law Judge Erred by Finding Petitioner's Intended Landing Site was Inappropriate or Not Suitable ....................................................27

        1.  The Suitability *vel non* of Petitioner's Intended Landing Site was Abandoned by the Administrator at Trial ........................................28

2. The Record Evidence Established that the Intended Landing Site was Suitable and Was Otherwise Contrary to the Law Judge's Findings, Which Were Clearly Erroneous. ..................................32

3. The Law Judge Erroneously Relied Upon Incompetent and Hopelessly Biased Witness Testimony to Conclude that Petitioner's Intended Landing Site was Inappropriate. ..............34

4. The Law Judge Abused his Discretion by Crediting the Legal Opinions of Specialist Speeg. ....................................................39

D. The Law Judge Erred by Not Dismissing the Proceedings in Light of the FAA's Sloppy Investigation .........................................................42

E. The Board's Deference to the FAA's Choice of Sanction Conflicts With Congressional Intent ...................................................................45

CONCLUSION ..............................................................................................46

CERTIFICATE OF COMPLIANCE ...............................................................47

# TABLE OF AUTHORITIES

**Cases:**

**Page(s)**

*Administrator v. Johnson*, 2 N.T.S.B. 1598 (1975)....................................................41

*Admin. v. MacGlashan*, 5 NTSB 1539 (1986)....................................................20

*Admin. v. McCollough*, 2 N.T.S.B. 1034 (1974) ........................................2, 28, 41

*Admin. v. Moore*, 2001 NTSB LEXIS 68 ............................................................2, 42

*Admin. v. Robinson*, 5 NTSB 1690 (1987) ............................................................20

*Admin v. Rounds,* EA-5359 (2008)........................................................................42

*Admin. v. Scott*, EA-4030 (1993)....................................................................20, 23

*Admin v. Wick*, 2001 NTSB LEXIS 113............................................................23, 24

*Aguilar v. International Longshoremen's Union Local No. 10*, 966 F.2d 443 (9th
    Cir. 1992) ........................................................................................................ 40

*Application of Waingrow*, EA-2175 (1985)............................................................42

*Ashcroft v. Iqbal*, 556 US 662 (2009) ............................................................20, 21

*Bell Atl. Corp v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 .....21

*Burkhart v. Wash. Metro. Area Transit Auth.*, 324 U.S. App. D.C. 241, 112 F.3d
    1207 (1997) ....................................................................................................40

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. (1962) ............................................................................................ 19

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)......19

*Cooper v. NTSB*, 660 F.3d 476 (2011) ................................................................19

*Donnelly v. FAA*, 411 F.3d 267 (D.C. Cir. 2005) .................................................19

*Essery v. Department of Trans.*, 857 F.2d 1286 (9th Cir. 1988) ...........................32

*Flytenow, Inc. v. FAA*,
    808 F.3d 882 (D.C. Cir. 2015) ....................................................................ix

*GlobeRanger Corp. v. Software AG*, 27 F.Supp.3d 723, (N.D. Tex. 2014) ..........30

*Janka v. Dep't of Transp.*, 925 F.2d 1147 (9th Cir. 1991) ...................................19

*J.Andrew Lange, Inc. v. FAA*, 208 F.3d 389 (2nd Cir. 2000)................................19

*Johnston v. United States*, 597 F. Supp. 374 (1984)...............................................35

*Martinez v. Balley's La., Inc.*, 244 F.3d 474 (5th Cir. 2001) .................................30

*Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) ...........................40

*Merritt v. United Parcel Ser*vice, 956 A.2d 1196 (Del. 2022) ..............................30

*Papasan v. Allain,* 478 U.S. 265, 286, 106 S. Ct. 2932,
    92 L. Ed. 2d 209 (1986) ..............................................................................21

*Roadway Express v. Reich*, No. 93-3787, 1994 U.S. App. LEXIS 22924
    (6th Cir. 1994)........................................................................................... 31

*Taylor v. Huerta*, 723 F.3d 210 (D.C. Cir. 2013)..................................................19

*Torres v. County of Oakland,* 758 F.2d 147 (6th Cir. 1985) .................................40

*United States v. Chavez-Hernandez*, 671 F.3d 494 (5th Cir. 2012) ......................30

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) ..............................................40

*Utica Packing Co. v. Block,* 781 F.2d 71 (6th Cir. 1986).......................................31

*Viterbo v. Dow Chemical Co.*, 646 F. Supp. 1420 (1986)......................................35

*Weston v. WMATA,* 316 U.S. App. D.C. 321, 78 F.3d 682 (D.C. Cir. 1996).........40

*Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975) ........... 31

**Statutes & Other Authorities:**

FAA Order 2150-3(c)........................................................................44

FRCP 12(b)6 ...................................................................................2

FRCP 26.1(a)(2) ............................................................................39

Nev. Rev. Stat. Ann. § 493.050 .....................................................5

Pilots Bill of Rights, 112 P.L. 153, 126 Stat. 1160 ......................20

Rule 403, Federal Rules of Evidence............................................35

Rule 702, Federal Rules of Evidence............................................40

112 P.L. 153 ..................................................................................20

126 Stat. 1159 ...............................................................................20

5 U.S.C. § 706 (2)(A).....................................................................19

5 U.S.C. § 706 (2)(D).....................................................................19

49 U.S.C. § 44709(d) ...............................................................45, 46

49 U.S.C. § 46110(a)..................................................................ii, ix

49 U.S.C. § 1153 ...........................................................................18

49 C.F.R. § 9.3 ..............................................................................24

49 C.F.R. § 9.9 ................................................................................7

49 C.F.R. § 9.13 ............................................................................13

49 C.F.R. § 821 ...............................................................................1

49 C.F.R. § 821.14 ......................................................................2, 3

14 C.F.R. § 91.3(b) .......................................................................24

14 C.F.R. § 91.13(a)............................................ii, 2, 3, 4, 16, 22, 23

14 C.F.R. § 91.119 ..............ii, iv, 3, 6, 7, 8, 15, 17, 23, 24, 25, 27, 30, 41

14 C.F.R. § 91.119(a)......................................1, 2, 3, 16, 22, 39

14 C.F.R. § 91.119(c)....................................1, 2, 3, 16, 17, 22, 23, 27, 39

## JURISDICTIONAL STATEMENT

This matter arises from an administrative action, namely the Federal Aviation Administration ("FAA")'s issuance of a 120-day suspension of Petitioner's Airman's or Pilot's Certificate. This Court has jurisdiction over the FAA's action pursuant to 49 U.S.C. §§ 46110(a) and 1553 (authorizing judicial review of the FAA's enforcement orders and decisions of the National Transportation Safety Board ("the Board")); *see also Flytenow, Inc. v. FAA*, 808 F.3d 882 (D.C. Cir. 2015) (noting the Circuit Court's jurisdiction over orders issued by the FAA).

Petitioner filed a timely petition for review on September 8, 2023 [Doc # 2015966] and otherwise within Sixty (60) days of the Board decision of which Petition seeks this review. Venue in this Court is appropriate pursuant to 49 U.S.C. § 46110(a) (authorizing filing a petition for review in the District of Columbia Circuit Court for review of federal agency decisions).

This Petition for Review is from a final agency order. However, finality under 49 U.S.C. § 46110 is non-jurisdictional and not required for this Court to maintain jurisdiction. *Flytenow*, 808 F.3d at 888-89 (D.C. Cir. 2015).

## INTRODUCTION

This Petition for review principally centers on whether the FAA has complied with the most basic precepts of the due process of law in conducting air safety proceedings pursuant to 49 C.F.R. § 821 *et seq.*, and specifically, whether or not it allowed the Administrator to proceed forward on a Complaint which failed to identify any meaningful facts against which the Petitioner was to defend himself. Otherwise, this Petition too addresses whether the FAA's final order of April 6, 2022, otherwise affirmed by the Board by its Order of March 30, 2023, was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law.

## STATEMENT OF THE ISSUES

1.    Did the Law Judge Err by Not Dismissing the Administrator's Amended Order of Suspension for Failure to State a Claim Upon Which Relief Can be Granted?

2.    Did the Law Judge Err by Misinterpreting 14 C.F.R. § 91.119(a) & (c)?

3.    Did the Law Judge Err by Finding Petitioner's Intended Landing Site was Inappropriate or Not Suitable?

4.    Did the Law Judge Err by Not Dismissing the Proceedings in Light of the FAA's Sloppy and Careless Investigation?

5.    Did the Board's Deference to the FAA's Choice of Sanction Conflict with Congressional Intent?

## <u>STATEMENT OF THE CASE</u>

### PROCEDURAL HISTORY

The Administrator filed his initial Order of Suspension on October 15, 2020,

subsequently amending it on September 20, 2021 (the "Complaint").  **AR 80 - 84**.[1]

The Administrator's factual allegations did not change between his two (2) pleadings

save for the sanction sought.  He charged Petitioner with violating various provisions

of the Federal Aviation Regulations, including 14 CFR § 91.119(a) & (c) and, of

course, the residual charge of § 91.13(a),[2] in connection with a flight that occurred

on November 24, 2019.

Prior to a merits hearing that was held between March 29, 2022 and April 4,

2022, Petitioner moved to dismiss the Administrator's Complaint for failure to state

a claim upon which relief can be granted under FRCP 12(b)6) and 49 C.F.R. §

---

[1] The Certification of Record in this matter was filed on or about October 30, 2023.
References to the Administrative Record shall be **AR ___**.   However, these
proceedings took place over five (5) days.  Accordingly, references to hearing
testimony located at **AR 167-809** otherwise contained in four (4) volumes and the
Law Judge's Oral Initial Decision (**AR 824-936**) will be to the actual page numbers
of the official transcripts and will be designated as **TR ___** here. Appendix
references shall be to **A ____**.

[2] A "residual charge" is one that is not independently supported by its own factual
*allegata*, but rather arising as a consequence of the violation of other FARs.  See,
e.g., *Admin. v. McCollough*, 2 N.T.S.B. 1034, 1040 (1974); *Admin. v. Moore*, 2001
NTSB LEXIS 68, *10-11. Stated conversely, if there is no violation of another FAR,
the residual charge falls away.

821.14. **AR 811 - 817**. The Law Judge, who requested both Parties to brief the issue, held the matter *sub curia* pending the outcome of the hearing. Following a multi-day trial, the Law Judge issued his oral decision on April 6, 2022 and found in favor of the Administrator on all alleged violations, **AR 824 - 936**, denied Petitioner's Motion to Dismiss, but otherwise reduced the 120-day suspension of Petitioner's Airman Certificate sought by the Administrator to 60 days. Petitioner appealed that decision to the Board who, on March 30, 2023, affirmed the Law Judge's decision, except that the Board reinstated the original 120-day sanction sought by the FAA. **AR 1146 - 1308**. Petitioner moved the Board for reconsideration of its Opinion and Order, which the Board denied on July 12, 2023. **AR 1321 - 1372**. This timely appeal followed.

### REGULATORY BACKGROUND

The Administrator charged Petitioner with violations of 14 C.F.R. 91.119(a), (c), and, residually, 14 C.F.R. § 91.13(a). Those regulations provide, in pertinent part:

> ### § 91.119 Minimum safe altitudes: General
>
> Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:
>
> **(a) *Anywhere.*** An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

**(c)** *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

### § 91.13 Careless or reckless operation.

**(a)** *Aircraft operations for the purpose of air navigation.* No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

THE ADMINISTRATOR'S COMPLAINT AGAINST PETITIONER

In his Amended Complaint, the Administrator made the following, and *only* the

following, factual allegations relative to the offenses alleged:

4.    **During the referenced flight operation, you operated N318JJ at altitudes less than 100 feet AGL and:**

    a.    **within approximately 50 feet of a stable, shed, and propane tank;**

    b.    **within approximately 100-150 feet of the residential home at 400 Desert Sun Lane;**

    c.    **within approximately 100-150 feet of an adult and a child who were outside the residential home at 400 Desert Sun Lane;**

    d.    **within approximately 300 feet of two adults and two children who were outside and near the western perimeter of the residential property at 400 Desert Sun Lane.**

See Amended Order of Suspension, **Appx. A.14**, **AR 80 - 84**, ¶¶ 5-6. There

were no other factual *allegata* set forth in the Administrator's Complaint.

While Petitioner disputed the "precise" measurements set forth in the

Administrator's Complaint, he at all times conceded that he operated his Kitfox V

Aircraft ("Aircraft") closer than 500 feet to persons, vessels, vehicles, or structures on November 24, 2019, during the course of a necessary "inspection pass" of an intended off-airport landing site. See Answer, **Appx. A.19**, **AR 18 - 21**, ¶ 4; see also Tr. 26, ln. 14-25, Tr. 27, ln. 1-11, Tr. 353, ln. 9-16. That off-airport landing site was a parcel of land owned by his friend Jared Likes and was otherwise situated on the edge of an expanse of sparsely populated desert outside of Reno, Nevada, consisting of 10 acres.  Tr. 306, ln. 12-13; Tr. 311, ln. 8-1. 2.

Petitioner's Aircraft is a purpose built "STOL" or "Short Takeoff and Landing" Aircraft that can land in distances of under 200 feet. Tr. 485, ln. 17-20. Mr. Likes invited Petitioner to land upon his property, which featured a 500 x 30-foot unimproved landing strip used principally for remote-controlled aircraft,[3] but well-within the capability of Petitioner's Aircraft. While the flight path of Petitioner's Aircraft did take him on a path parallel to 2 houses – including that of Mr. Likes – everything to the left of Petitioner's flight path was open desert scrub. Tr. 306, 11-13, **Appx. A.449**. Mr. Likes had previously flown with Petitioner and was confident that he could land and stop in a very short distance. Tr. 304, ln. 22-25.

---

[3] Under Nevada Law, an aircraft may land upon the property of another with that property owners' permission. See Nev. Rev. Stat. Ann. § 493.050.

5

In accordance with the FAA's own "Off Airport Operations Guide," Petitioner conducted a "low inspection pass" of the intended landing site to determine surface landing conditions.   Tr. 217, ln. 4-9; **Appx. A.449, A.499**; **AR 1007 - 1018.** Because Petitioner could not identify the intended touchdown point, making him uncomfortable, he elected to abandon the approach and leave the area in a climbing left turn.  Tr. 507, ln. 5-10.   The "Off Airport Operations Guide" makes no mention of 14 C.F.R. § 91.119, or any other Federal Aviation Regulation. **Appx. A.499**, **AR 1007 - 1018.**  Petitioner testified without refutation that, had he lost an engine during the course of his operation, he would have "just gone out to the open sagebrush.  It's a very sparsely populated area.  So, there would be no reason to go to a road [in the subdivision to the right of his flight path]."  Tr. 498, ln. 2-4.  He too testified that his aircraft at takeoff produces a noise signature of 71.8 decibels, Tr. 492, ln. 12-16 and is certified to EASA standards and is otherwise "very quiet."[4] Tr. 491, ln. 24-25, Tr. 492, ln. 1-2. Petitioner has conducted "north of 1000" off-airport landings.  Tr. 490, ln. 2.

---

[4] It is a fair question to ask: what does noise have to do with 14 C.F.R. § 91.119? The short answer is nothing.  But the Administrator, over Petitioner's objection, continuously solicited testimony from witnesses about the alleged "incredibly loud roar" of Petitioner's aircraft.

**The FAA's Witnesses**

In its Case in Chief, the Administrator offered several witnesses, among them the Administrator's designated "expert," "Specialist" Roy Speeg, FAA Aviation Inspector ("ASI") Ron Green, Gabriel and Julia Pena, and Russell Stanley. Each is discussed below s*eriatim.*

**Specialist Speeg**

At the time of the underlying hearing, Mr. Speeg was then an 18-year employee of the FAA. Tr. 318 at 21. He has testified in 5 or so enforcement proceedings, and he only testifies on behalf of the FAA.  Tr. 332, ln. 20-23.  Indeed, and under the law, the Specialist is prohibited from testifying for anyone other than the FAA. Tr. 616, ln. 9-16; see also 49 C.F.R. § 9.9. And when he does "high quality, efficient and timely work" for the FAA, including serving as an "expert witness during the hearing process," the Specialist receives "cash awards, time-off and accolades."  Tr. 615 at 16-19; A-19. Mr. Speeg was offered as an aviation "expert," who was, *inter alia*, "very familiar" with … the verbiage of [14 C.F.R. § 91.119]." Tr. 319, ln. 13-15.  When pressed by the Law Judge upon the meaning of the language of the Regulation, Mr. Speeg testified that "it would probably be best to pull up the regulation and look at it if you want me to" comment upon the language of the regulation. Tr. 426, ln. 25; Tr. 427, ln. 1-3. The Specialist misquoted the regulation numerous times during the course of the proceedings.  Tr. 426-27, *passim.*

Prior to joining the FAA, Specialist Speeg had an unremarkable aviation career, making no more than $50,000 annually before joining the FAA in 2004 and more than doubling his salary. Tr. 329, ln. 6-9; Tr. 330, ln. 7-13. At the time of the hearing, the Specialist earned $147,500 per year – the most money he has made at any time in his working career. Tr. 331, ln. 11-19. Mr. Speeg admitted that an inspection pass is "necessary" prior to landing at an off-airport location, something he testified that he has done himself. Tr. 334, ln. 25, Tr. 335, ln. 1-15. Specifically, Mr. Speeg testified as follows:

> PETITIONER: My question is 91.119 does not differentiate between on airport operations and off airport operations, correct?
>
> SPECIALIST SPEEG: That's correct.
>
> PETITIONER: And the FAA off airport ops guide provides guidance on how to safely conduct and prudently conduct an off airport landing, correct?
>
> SPECIALIST SPEEG: Correct. Advisory in nature.
>
> PETITIONER: Advisory in nature, that's right. And so when it comes to aviation safety, safety by definition is necessary; don't you agree?
>
> SPECIALIST SPEEG: Yeah.

Tr. 425, ln. 14-25. He too conceded that the Federal Aviation Regulations do not prohibit off-airport landings. Tr. 390, ln. 11-13.

That said – and despite that dispositive concession – Mr. Speeg knew nothing of Petitioner's Aircraft, Tr. 325 at 10-12, had never flown in it or one like it, Tr. 325

at 5-7, was unfamiliar with its model of engine or propeller, Tr. 325, ln. 21-25, Tr. 326, ln. 1-5; never asked to see its logbooks, Tr. 326, ln. 9-11; never attempted to inspect it, Tr. 325, ln. 10-20; knew nothing of Petitioner's flying abilities, had never flown with Petitioner, had never witnessed Petitioner fly, and had never had an opportunity to evaluate Petitioner's flying skills, Tr. 370 at 17-21; and did not inspect the intended landing area and made no attempt to do so, Tr. 416, ln. 18-25, Tr. 417, ln. 1. Indeed, when asked to confirm that when he "formed [his] opinions in this case that he … [ultimately offer[ed], … [that] he had no knowledge of the performance characteristics of [Petitioner's] Aircraft," the Specialist responded "[t]hat's correct."  Tr. 326, ln. 12-20.  Mr. Speeg conceded that the appropriateness of an intended landing site was a function of both the pilot's abilities and the performance characteristics of the aircraft being flown.  Tr. 387, ln. 24-25, Tr. 388, ln. 1-3, Tr. 389, ln. 10-25, Tr. 390, ln. 1-7.  As he agreed, "it's all in the mix."  Tr. 389, ln. 10-24, Tr. 390, ln. 1-7.[5]

He agreed that in order to conduct off airport operations "safely," it would be prudent to do [so] in accordance with the [FAA's Off Airport Operations Guide]." Tr. 426, ln. 5-8, Tr. 621, ln. 1-5.  He agreed that aircraft operate in close proximity

---

[5] Mr. Speeg – who is neither an attorney, nor was he offered as a "legal expert" – had all manner of legal opinions which were proffered and admitted over Petitioner's objection, a subject discussed further infra.

to persons and houses on a regular basis, and sometimes within less than 100 feet during otherwise normal operations, Tr. 380-383, *passim*, and that it is necessary to get "fairly low" to the ground to conduct an inspection pass, something he has done himself.  Tr. 334, ln. 25, Tr. 335, ln. 1-15.  Specialist Speeg conceded that he heard testimony from other witnesses that the area adjacent to Petitioner's flight path was nothing but "scrub and desert."  Tr. 376, ln. 10-14. Mr. Speeg has conducted between 25-50 off-airport landings in his life.  Tr. 334, ln. 24.

Due to a lack of expertise and/or competence, the Law Judge excluded Specialist Speeg from testifying to anything other than "general aviation, flight operations, general area of low flight operations, and regulatory requirement under the FAA as he's experiencing (sic) those areas." Tr. 345, ln. 2-5. The Law Judge found Mr. Speeg unqualified to present expert testimony for "short field takeoff and landing with regard to the Kitfox 5." Tr. 345, ln. 6-7. Referencing the Specialist's statements about his personal experience operating STOL aircraft, the Law Judge noted that, while "he perhaps might have some experience in that area," he did not "think that necessarily qualified him as an expert in that area ..." Tr. 344, ln. 1-4.

### **Gabriel and Julia Pena**

This matter ultimately was prompted by Julia Pena's complaint to the FAA about Petitioner's inspection pass.  Tr. 143, ln. 12-21.  The Penas reside at 400 Desert Sun Lane.  Tr. 45, ln. 6-8.  They do not like their neighbor Justin Likes.  Tr. 71-72.

10

The Penas have a home security system that partially recorded the Petitioner's inspection pass. Tr. 62 ln. 1-7, 17-23.  That native video was either destroyed by the FAA or not recovered by it in its "negligent and careless, and at worst, reckless" investigation.  Tr. 716-17.

While both the Penas testified about the "incredible loud" engine noise of Petitioner's Aircraft, Tr.  50, ln. 10, 18, 20-21; Tr. 51, ln. 17-18; Tr. 55, ln. 17; Tr. 122, ln. 5-6, and of its "aggressive" or "steep" bank, Tr. 52, ln. 2-3, 16; Tr. 55, ln. 3; Tr. 62, ln. 6; Tr. 93, ln. 22; Tr. 94, ln. 2, they too testified that during the brief inspection pass, Mr. Pena was looking at his wife and trying to get her attention, and Mrs. Pena was looking at her husband trying to understand why he was motioning to her. Tr. 51, ln. 25, Tr. 52, ln. 1-3; Tr. 122, ln. 4-15. The inspection pass lasted perhaps 2 to 3 seconds.  Tr. 155, ln. 1-4. Both then offered detailed observations of Petitioner's inspection pass which had occurred years before, including the Aircraft's height, distance, location, and the like.  Mr. Pena – an Iraqi war combat veteran – testified that he and his entire family were "traumatized" by the inspection pass.  Tr. 102, ln. 22-24; Tr. 103, ln. 5-11. Nobody in the Pena family sought medical treatment for their "trauma."  Tr. 103, ln. 12-16. Both Mr. and Mrs. Pena testified that they thought the airplane was "going to crash," Tr. 52, ln. 18-19; Tr. 55, ln. 18-20; Tr. 112, ln. 18-22; Tr. 123, ln. 2-3; Tr. 142, ln. 17, 20-21; Tr. 176, ln. 15-16. Both have no aviation background.  Tr. 105, ln. 24-25; Tr. 106, 1-6; Tr. 135, ln. 21.

11

Both the Penas conceded that the area to the left of Petitioner's flight path was nothing but "open desert land" or "open field and scrub." Tr. 151, ln. 15-18; Tr. 107, ln. 14-16. And Mr. Pena testified that Petitioner made one inspection pass, left the area, and that no harm was done to their property or persons. Tr. 102, ln. 10-25; Tr. 103, ln. 1-2.

Mr. Pena testified that he believed he gave the FAA "a native video" of his security camera on both a CD and flash drive. Tr. 70, ln. 108; Tr. 276, *passim*.

The Law Judge found that the Penas' testimony was "likely biased" and that it was "reasonable to believe that [they] would embellish their testimony." Tr. 704, ln. 6-14. He nonetheless credited their testimony. Tr. 704, ln. 14-15.

### Russell Stanley

Mr. Stanley too was a neighbor of Mr. Likes and the Penas. Tr. 159, ln. 3-11. During the inspection pass, he was conversing with Mr. Pena across their property line fence. Tr. 160, ln. 3-8. Mr. Stanley was not "traumatized" by the inspection pass. Tr. 176, ln. 19-20. He merely expressed being "disturbed" by it. Tr. 176, ln. 19. He observed Petitioner's Aircraft in a "slight [left] turn," which he described as not "drastic." Tr. 171, ln. 3-7. He too agreed that everything to the left side of Petitioner's flight path "is basically scrub brush and desert." Tr. 173, ln. 13-22. Mr. Stanley did not corroborate the Penas' "trauma." Rather, he testified after having witnessed the inspection pass that "[he] and Mr. Pena looked at each other and were

like, serious, this guy just did that and then [Petitioner] was gone." Tr. 172, ln. 8-10.

### Inspector Ron Green

Inspector Green is a Principal Operations Inspector and aviation safety inspector at the Reno Flight Standards District Office (FSDO), Tr. 224, ln. 5-6, and was one of the two Reno FSDO inspectors assigned to investigate the Penas' complaint. Tr. 225, ln. 25; Tr. 226, ln. 1-3. Prior to his position at the Reno FSDO, Inspector Green was a career military aviator, mainly in rotorcraft. Tr. 224, ln. 15-24. The other inspector assigned to the investigation, Inspector Don Morgan, retired prior to the hearing. Tr. 226, ln. 4-5. Inspector Green testified regarding the FAA's method of obtaining the security camera videos of Petitioner's operation. Mr. Green did *not* corroborate the Penas' testimony concerning their having provided a CD or flash drive of the videos to the FAA inspectors, as he had no knowledge of such transfer having occurred. Tr. 266, *passim*. When pressed as to which version of the video he believed he downloaded to his FAA-issued camera's SD card, he stated that he wasn't sure whether it was the iPhone "video of a video," or the actual native video recorded by the Penas' security cameras. Tr. 266, ln. 10-18.  Upon questioning by the Law Judge, the Inspector later testified that he thought, in fact, it was the "video of the video."  Tr. 287, ln. 10-22. Further, Inspector Green admitted to erasing the videos on his camera SD card after downloading them to the FSDO office computer, in order to clear space on the card for "other duties." Tr. 288, ln. 8-17.

13

Inspector Green made numerous references in his testimony to the excluded video and how it influenced the entirety of the FAA's investigation. Tr. 226, ln. 6-11, Tr. 227, ln. 9-25, Tr. 228, ln. 1, Tr. 241, ln. 1-14, Tr. 242, ln. 1-2, Tr. 246, ln. 14-25, Tr. 248, ln. 8-18, Tr. 249, ln. 6-9, 11-13, Tr. 283, ln. 21-24, According to Mr. Green, among the many things the video provided to the investigation were: "a kind of reference point for all of the measurements we would take as part of the investigation," Tr. 227, ln. 19-25, Tr. 228, ln. 1, (measurements and the procurement of which were discussed in great detail in Tr. 227-240, *passim*); it informed the investigators' opinions of the location of Petitioner's flight path, Tr. 241, ln. 1-7, his attitude, ("We know that the Petitioner was in a left bank when he was flying past, based on the video"), Tr. 249, ln. 6-8, and estimated altitude, ("[t]he videos were our basis for approximating the altitude of the aircraft."), Tr. 283, ln. 21-22; and that it was relied upon in the development of Administrator's Exhibit. Tr. 246, ln. 14-25, Tr. 248, ln. 10-18.

**The Law Judge**

Following the presentation of evidence on March 29 to April 4, 2022, the Law Judge issued his oral initial decision on April 6, 2022.  While the Law Judge went through the testimony and evidence such as it was, he ultimately ruled that:

(1)    "**In this case, Petitioner denies he was intending to land during his low-level pass, but that he was merely seeking to identify the touchdown point. When he was unable to do so, he turned and climbed to depart the area and return to the airport. Given**

14

Petitioner's assertion that he was not landing during his low level [inspection] pass, it is clear that his low pass falls outside the prefatory exception [of 14 C.F.R. § 91.119]. I, therefore, find he was not landing and the prefatory exception does not apply," Tr. 723, ln. 9-16.

(2)    "In this case, it is very clear that there was no necessity for the Petitioner to conduct a low pass, whether or not he decided to land on the RC runway. I find that there were no other constraints limiting his landing choices such as shortage of fuel, mechanical emergency, or weather considerations dictating the necessity of the low pass. Instead, he deliberately and intentionally chose this location because he thought he could land and takeoff based on a conversation with his friends, the Likes." Tr. 728, ln. 13-20.

(3)    "Testimony also established that the surrounding area to the east and a lot to the south of the Likes' was scrub brush and desert. The runway was 400 to 500 feet long and 25 to 30 feet wide according to Mr. Likes. There was no evidence as to where -- there was no evidence of any runway markings, lights, navigation aids, or glide slope indicators, or even a windsock. Mr. Likes testified he used it to fly RC foam electric aircraft, aircraft that contain no pilot, contain no passengers, and operate on electric -- operate on electricity and are made from foam. While he said there were other trails and areas around his property which he used for this purpose as well. All of the evidence establishes that the RC runway was made of dirt, as well as any of the surrounding trails, and they were unsuitable for landing under normal conditions or absent an emergency in Petitioner's aircraft." [6] Tr. 730, ln. 20-25, Tr. 731, ln. 1-10.

---

[6] With all respect to the Administrative Law Judge, there was absolutely no evidence that the surface of Mr. Likes' backyard was "unsuitable" for landing Petitioner's Aircraft, which is purpose-built to land in unimproved areas. Tr. 484, ln. 4-7. Moreover, even if there was, it would have to have come by way of expert testimony, and the Administrator's expert was unqualified to discuss the capabilities of Petitioner's Aircraft. Tr. 344, ln. 1-11. And finally, and as the Law Judge noted himself in reference to the FAA's "sloppy", "negligent and careless" investigation,

(4)    **Specifically, circumstances that show an airman operated in a careless or reckless manner so as to endanger the life and property of another would apply in all phases of air operations, whether takeoff, en-route at cruising altitude, holding or landing. That is even if we assume that Petitioner was conducting a low level pass for purposes of inspecting the runway for a possible landing and takeoff, it still cannot be done in a careless and reckless manner.** Tr. 734, ln. 12-19. [7]

(5)    **I, therefore, find that Petitioner violated 14 CFR, Section 91.119(a) in that he operated at altitudes of 100 feet above ground level or less, an altitude which was below an altitude allowing for an emergency landing without undue hazard to persons or property on the surface if a power unit failed.** Tr. 733, ln. 22-25, Tr. 734, ln. 1.

In short, the Law Judge ruled that, because Petitioner was not engaged in the precise act or final phase or approach to landing, anything that followed was "not necessary" as envisioned by 14 C.F.R. § 91.119(c); that the landing site chosen by Petitioner was "not suitable" for landing, apparently because it was made of dirt; and

_____

Tr. 717, ln. 1-2, its investigators never set foot on Mr. Likes' property, and therefore never examined the intended landing site. Tr. 717, ln. 3-12.

[7] The Administrator conceded that his 14 C.F.R § 91.13(a) charge was a "residual" violation, making this part of the Law Judge's ruling completely unnecessary, Tr. 597, ln. 9-10, and beyond the allegations made by the Administrator in this Complaint. Moreover, there was no evidence about what exactly made the manner in which the Petitioner conducted his inspection pass careless and reckless, especially given that he conducted it in accordance with the FAA's own published guidance. Specialist Speeg's *ipse dixit*, conflicting and unqualified pronouncements on that point does not make it so.

that his would-be landing was non-emergent and, therefore, "unnecessary." As a result, to the extent the runway inspection was "unnecessary," the Law Judge ruled that Petitioner violated 14 C.F.R. § 91.119(c) by operating within 500 feet of persons or structures on the ground. In addition, the Law Judge too apparently concluded that Petitioner had no choice but to land in a subdivision in the event of a power unit failure, thereby causing an undue hazard to persons and/or property on the ground, despite unrefuted testimony otherwise acknowledged by the Administrator that Petitioner had access to – and would have used – the adjacent open desert in such an emergency.

## SUMMARY OF ARGUMENT

The Law Judge and the Board committed numerous errors of law in this matter. First, both failed to grant Petitioner's Motion to Dismiss the Administrator's deficient Complaint which failed to state sufficient facts that, taken as true, would allow the Law Judge to draw the reasonable inference that the Petitioner was guilty of the alleged regulatory infraction. Second, the Law Judge misinterpreted the very regulation which prompts these proceedings – 14 C.F.R. § 91.119 – by concluding that an aircraft operator must honor the lateral/vertical limitations set forth in FAR 91.119 except "when landing." Third, the Law Judge erred by concluding that Petitioner's landing site was "inappropriate" because: (1) that issue was abandoned by the FAA at trial; (2) his findings in that regard were clearly erroneous and not

17

supported by substantial evidence of record; (3) were based upon the hopelessly biased, uninformed and incompetent testimony of the FAA's "expert" witness, and (4) because the law judge erroneously credited the legal opinions of the expert witness. Finally, the Board erred by not sustaining the Law Judge's sanction, instead deferring to the agency, abdicating its judicial role, and ignoring a Congressional mandate.

## **STATEMENT OF STANDING**

On September 8, 2023, Petitioner petitioned this Honorable Court pursuant to 49 U.S.C. § 1153 for review of a final order issued by the NTSB in *Administrator v. Palmer*, NTSB Order No. EA-5956, served on July 12, 2023, which affirmed an Order of Suspension of Petitioner's Airman Certificate for 120 days.  The NTSB's order disposes of the parties' claim. Accordingly, Petitioner enjoys substantial interest in NTSB Order No. EA-5838 issued by the Board related to an aviation matter.

The Appellate Jurisdiction of this Honorable Court is conferred pursuant to 49 U.S.C. § 1153 since a timely Petition for Review was filed on September 8, 2023 and otherwise not later than Sixty (60) days after the final order was issued by the NTSB on July 12, 2023.

## STANDARD OF REVIEW

Any agency action, finding, or conclusion must be held unlawful and set aside if the Court finds it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706 (2)(A) and (D).

The task of the reviewing Court under this standard is to determine "whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a rational connection between the facts found and the choice made." *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2nd Cir. 2000) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

The FAA's interpretation of its regulation is "to be accorded deference . . . unless it is clearly contrary to the plain and sensible meaning of the regulation." *Cooper v. NTSB*, 660 F.3d 476 at 481 (2011) (internal quotation marks omitted); *see also Taylor v. Huerta*, 723 F.3d 210, 213 (D.C. Cir. 2013).

The Court reviews legal questions *de novo*. *Janka v. Dep't of Transp.*, 925 F.2d 1147, 1149 (9th Cir. 1991). The Court applies *Chevron* deference, however, to the agency's interpretation of the statute it administers. *See Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).

# ARGUMENT

**A.**  **The Law Judge Erred by Not Dismissing the Administrator's Amended Order of Suspension for Failure to State a Claim Upon Which Relief Can be Granted.**

### 1.  The Administrator's Complaint is Deficient.

The Administrator's Amended Complaint suffers from a fatal dearth of factual *allegata*. As the Board said in *Admin. v. Scott*, EA-4030 (1993), '[b]ecause the complaint is the vehicle by which Petitioner is given fair notice of the charges he will be expected to defend against ***and*** which ***facts and circumstances*** underlie those alleged violations, we cannot give any weight to apparent violations which were not alleged in the Administrator's complaint." (Emphasis added). See also NTSB Order No. EA-4030 at 6 (1993); and *Administrator v. MacGlashan*, 5 NTSB 1539, 1541 (1986) (the complaint establishes the parameters of the Administrator's case); *Administrator v. Robinson*, 5 NTSB 1690, 1692 (1987) (Board cannot redraft the complaint but must evaluate the evidence in light of the allegations).

With respect to Federal Pleading standards[8], *Ashcroft v. Iqbal*, 556 US 662 (2009) instructs:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader

---

[8] As a result of the Pilot's Bill of Rights, as amended, the Federal Rules of Procedure must be used in these proceedings "where practicable." See Pilots Bill of Rights, 112 P.L. 153, 126 Stat. 1159, 1160.

is entitled to relief." As the Court held in *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," ***but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation***. *Id*., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (citing *Papasan* v. *Allain,* 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). ***A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do***." 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (Brackets omitted.) (Emphasis added.).

*Iqbal*, 556 U.S. at 677-78.

   *Iqbal* describes the Administrator's Complaint to a "T." It merely contains a recitation of *some* of the elements of the alleged violations and little more. While there are limited factual allegations in the Administrator's Complaint relative to altitudes and distances from persons and structures on the surface, even taken as true – as the Law Judge was required to do in the face of Petitioner's Motion to Dismiss – those allegations simply do not sufficiently inform the Petitioner that he is liable for the misconduct alleged.

21

Perhaps if the Administrator had alleged that the aircraft was simply "buzzing" the Likes' or Penas' residence, or showing off; that he had no viable options in the event of an engine failure other than to crash into and harm persons or property on the ground, or that such an event could or would cause a catastrophic fire; that he was conducting ill-advised low-altitude maneuvers/aerobatics at inappropriate airspeeds (say, like a "knife edge" or "60 degree bank"); that his choice of an intended landing site was "inappropriate" (and pled and articulated facts and circumstances why that was so); that he was otherwise harassing a neighborhood at low altitude to scare or "traumatize" people on the ground, or that there were alternative ways to conduct his operation, thereby rendering it "unnecessary;" there may have been a basis for the violations charged. Certainly, it is *possible* that the altitudes and distances alleged in the Administrator's Amended Complaint could be consistent with violations of FAR § 91.119(a) & (c), or even § 91.13(a). But the Administrator's Amended Complaint "stops short of the line between possibility and plausibility."  556 U.S. at 678.

Indeed, the nearly 4 days of hearings and the detailed evidence that the Administrator pursued and put before the Administrative Judge makes Petitioner's point.  Rather than allege specific facts that would make his Complaint plausible on its face that the Petitioner committed the offenses alleged, the former merely made a few references to altitudes and distances, cited the elements of FAR § 91.119(a),

22

(c) and § 91.13(a), and left the Complaint at that.

Low flight over persons, structures and the like under 500 feet – something the Administrator's own expert conceded is a regular occurrence – is not necessarily a violation of any regulation, and certainly not necessarily of the regulations cited. Put simply, the Administrator's Complaint fails to "give fair notice of the charges the [Petitioner] was expected to defend against ___**and**___ which <u>facts and circumstances</u> underlie those alleged violations." *Scott*, *supra*. It therefore fails to state a claim upon which relief can be granted.

On that score, the Law Judge and the NTSB both erred by not dismissing the Administrator's Amended Complaint for failure to state a claim due to its absolute dearth of factual *allegata*. Accordingly, the Administrator's Amended Complaint should have been dismissed. To the extent that either the Law Judge or the Board failed to do so, both erred.

### 2.    <u>14 C.F.R. § 91.119 Contains No Affirmative Defenses.</u>

Still, the Administrator urged that 14 C.F.R. § 91.119's prefatory "except as necessary for takeoff and landing" is in the nature of an affirmative defense. Petitioner has been unable to find any direct authority on point.

That said, and in *Admin v. Wick*, SE-16105, the Administrator there charged an airman with violations of 14 CFR § 91.119 and § 91.13(a) and specifically alleged "that [the airman] operated an aircraft ___**when it was not necessary**___ for take-off or

23

landing closer than 500 feet to a person, vehicle or structure." *Wick*, pg. 3 (Emphasis added.). If the Administrator believed that the prefatory language of FAR § 91.119 is an affirmative defense, he would not have alleged it as he did in *Wick*.  Taken to its logical conclusion, the Administrator argues that every defense in fact must be pled as an affirmative defense. Respectfully, that makes little sense, and would otherwise impose a burden upon Petitioners that they simply do not have.[9]

To the contrary, the prefatory language in 14 C.F.R. § 91.119 is an element of the offense, albeit a negative element, that must be pled if *that* is the regulatory violation with which Petitioner is charged.[10]  If altitude and distances were merely all that need be alleged in these types of cases, then literally every takeoff and/or landing would be an offense against which airmen would have to defend themselves.[11]

---

[9] Petitioner also notes that, although the Administrator asserts that he suffers under no burden to plead or prove that point, the latter spent no small effort in his case-in-chief eliciting testimony about the "necessity" *vel non* of Petitioner's inspection pass (before abandoning that position).  He cannot have it both ways.

[10] While the Administrative Law Judge seemed to vacillate on this point, he did state at one point in the proceeding that "I [] find that under the Wick case, it is the Administrator's burden to provide [that the] operation was within the exception." Tr. 581, ln. 18-19.

[11] Compare 14 CFR § 91.119 with § 91.3(b), the latter of which permits a pilot to "deviate from any rule of this part to the extent required to meet [an] emergency." That is an affirmative defense.

**B.    The Law Judge Erred by Misinterpreting and Misapplying 14 C.F.R. § 91.119 Because a Low Inspection Pass is "Necessary" in <u>Conjunction with an Off-Airport Landing</u>.**

The "prefatory language" of 14 C.F.R. § 91.119 is not "[e]xcept when landing," it is "[e]xcept when necessary … <u>*for*</u> landing." (Emphasis added.). To the extent that the Law Judge suggests otherwise, as he did when he stated that he believed that Petitioner's would-be landing itself was not "necessary," Tr. 728, *passim*, that is incorrect as a matter of law and inconsistent with the Regulation's text.

Regardless, not one witness – not one – including Specialist Speeg, the Administrator's putative "expert," testified that a low inspection pass is "unnecessary" in conjunction with an off-airport landing.[12]   To the contrary, he testified that it *is* necessary. Tr. 425, ln. 14-25, Tr. 334, ln. 25, Tr. 335, ln. 1-15. He further testified that it would be "prudent" to conduct a low inspection pass in accordance with the FAA's own published guidance on the topic – the FAA's Off Airport Operations Guide.  Tr. 426, ln. 5-8.  It specifically states, among other things, that in conjunction with (or "for") an off-airport landing, the airman should:

> **[m]ake a pass to check for cuts in gravel, rocks, dips, bumps, etc., that can't be seen from directly above. It is important to be at an angle to the runway, not above it. Certain light**

---

[12] Specialist Speeg agreed that there is no prohibition on off-airport landings.  Tr. 390, ln. 11-13.

**conditions can make a bad site seem good. Check and double check any area not used before, or locations that have had high water since the last landing. Make another pass and roll one tire for a few feet to get a feel for the landing surface.**

See https://www.faasafety.gov/files/notices/2015/Oct/AOAOG_Web.pdf, A-22 and R-1.

While the Law Judge suggested that Petitioner could have done his inspection pass from another area "further away,"[13] that is utterly impossible based upon the FAA's own recommendations.   Indeed, as the FAA's own "expert witness" stated, you have to get "fairly low" to the ground to conduct an inspection pass, something he has done himself.  Tr. 334, ln. 25, Tr. 335, ln. 1-11. One cannot "roll one tire for a few feet" on a surface from which one is 500 feet or more distant.

Moreover, one of the cover pages of the Off Airport Operations Guide features a photograph of three aircraft parked closely together on a gravel bar.  According to the Law Judge's interpretation of the subject Regulation (or Specialist Speeg's), once the first aircraft lands, the following aircraft cannot do inspection passes – a "necessary" activity for landing off-airport – without running afoul of the altitude and

---

[13] There was no finding or evidence that, had Petitioner conducted his inspection pass from "further away" or in a different fashion, it would have taken him more than 500 feet from persons or structures on the ground. Petitioner respectfully submits that, while there may be a number of ways in which the cat can be skinned, that does not bear upon the question of the necessity of skinning the cat in the first place.

distance limitations set forth in 14 C.F.R. § 91.119 (a) & (c). **Appx. A.499** (**A.500**);

**AR 1007 - 1018**. Rather, and according to the ruling, the second and third aircraft

must suffer the Hobbesian choice of committing to an uncertain and possibly unsafe

landing for want of a "prudent" inspection pass, or else suffer the wrath of the FAA

for having done an inspection pass within 500 feet of another aircraft and/or person.

Put simply, and under 14 C.F.R. § 91.119, the question is not whether a

particular landing is "necessary," the question is whether a particular *operation* is

necessary in conjunction with, or "for,[14]" the landing. And when it comes to off-

airport operations, a low inspection pass is decidedly necessary. Otherwise, virtually

no off-airport landing – which are not prohibited by any Federal Aviation Regulation

– could be conducted with more than one (1) aircraft at a time, or within the stone's

throw of even an outhouse.

### C.    The Law Judge Erred by Finding Petitioner's Intended Landing Site was Inappropriate or Not Suitable.

The Law Judge correctly characterized and cited the law that no operation

could be "necessary for … landing" if the landing site itself is "not suitable" or

---

[14] Black's Law Dictionary defines "for" as follows: "It connotes the end with reference to which anything is, acts, serves, or is done. In consideration of which, in view of which, or with reference to which, anything is done or takes place. In direction of; with view of reaching; with reference to needs, purposes or uses of; appropriate or adapted to; suitable to purpose, requirement, character, or state of." Black's Law, 5th Ed.

"appropriate."  See, e.g., *Administrator v. McCollough*, NTSB EA-4020. However, as noted above, no factual allegations were made in the Administrator's Complaint in that regard.  The "suitability" of Petitioner's landing site was first raised at trial in his case-in-chief.  That said, the Administrator withdrew that issue at trial; the record evidence was to the contrary and based upon irrelevant considerations; and any conclusions in that regard were derived from the testimony of an incompetent and hopelessly biased expert witness.

### 1.    The Suitability *vel non* of Petitioner's Intended Landing Site was Abandoned by the Administrator at Trial.

While the Law Judge spent an inordinate amount of time in his oral opinion about the "suitability" or "appropriateness" of Petitioner's intended landing site, the fact is the Administrator withdrew that non-pled issue from the case.   In a sidebar, the following colloquy ensued:

> PETITIONER: Okay. Thank you. And when you landed at the off airport with Mr. Likes, how would you describe the landing or his landing?
>
> ADMINISTRATOR: Objection. Relevancy.
>
> JUDGE: Mr. Schulte, relevancy?
>
> PETITIONER: One of the issues in this case, Your Honor, is the appropriateness of the landing spot, and I just want to know what these landings were like off airport with this witness experience.
>
> ADMINISTRATOR: Your Honor, may we have a sidebar?

JUDGE: All right. Let's remove the observers, as well as Mr. Likes back into the waiting room or lobby. So Mr. Likes, we'll move you in the lobby. So just standby there, and we'll bring you back in the room after we've had this sidebar. We'll also remove Specialist Speeg and Mr. Richardson and Ms. Ebilane.

(Sidebar begins).

*   *   *

ADMINISTRATOR: Yes. Thank you, Your Honor. ***The appropriateness of the landing site is not an issue in this case***. The Petitioner yesterday testified that he had no intentions of landing. That his purpose was it was just a low pass, but he had no intentions for landing. So the appropriateness of the site is n– -- of the landing site is not an issue. The Petitioner did not raise as an affirmative defense that the flight operation was necessary for takeoff or landing. And confirmed yesterday in direct testimony, upon my questioning, that he had no intentions of landing. So the appropriateness of the landing site is not an issue before us.

JUDGE: Mr. Schulte, do you wish to respond – --

PETITIONER: Yeah, I do. ***If the FAA counsel is taking the position that the appropriateness of the landing site is not an issue in this case, then I happily withdraw the question***.

ADMINISTRATOR: May I respond, Your Honor?

JUDGE FUN: [YES].

ADMINISTATOR: Thank you. So the issue of whether or not appropriateness – -- of the landing site is an issue is directly tied to the [Petitioner's] direct testimony, and that is he had no intentions of landing during the low pass on November the 24th, 2019. It was strictly a low pass, not for intended landing. That's what drives the whether or not the issue of appropriateness of landing site is an issue. ***It beca– -- it no longer was an issue when the Petitioner said he had no intentions of landing yesterday***. He testified under oath when he said that.

JUDGE FUN: I think – you know, from my recollection, he testified he had no intention of landing after making a low pass. So it seems to me that he was making a low pass to determine the stability of the landing area. And so his decision, if my understanding of his testimony is correct, was made after making a low pass and making an evaluation of the airfield. From that standpoint, I do find that relevant. I also find it relevant in the sense that 91.119 has that prefatory clause in the statute with regards to whether or not it's necessary for landing or takeoff. I know that we still have a pending motion from the Petitioner as to whether or not the claim has been adequately stated from a complaint, based upon whether or not that prefatory clause is a burden or an element of the Administrator's case or the Petitioner's case. And so from that standpoint, I still find that relevant to resolve that issue as well. So I'll allow the question and the answer. All right. Let's go back into the main session and allow the witness and the observers back in. We'll remain on the record.

(Sidebar ends).

Tr. 301-304, *passim*.  (Emphasis added).

Pragmatically, a judicial admission "has the effect of withdrawing a fact from contention." *Martinez v. Balley's La., Inc.*, 244 F.3d 474, 476 (5th Cir.2001). Thus, the purported admission "must be made intentionally as a waiver, releasing the opponent from proof of fact." *United States v. Chavez-Hernandez*, 671 F.3d 494, 501 (5th Cir. 2012). The doctrine of judicial admissions excludes a party's present statement when the statement is "inconsistent with or contrary to" a past statement made in the same case. *GlobeRanger Corp. v. Software AG*, 27 F.Supp.3d 723, 744 (N.D. Tex. 2014).  See also *Merritt v. United Parcel Ser*vice, 956 A.2d 1196 (Del. 2022) (Workers' Compensation Board abused its discretion by disregarding UPS's

admission that Merritt's partial disability was "on-going," and by setting a six-week end date to Merritt's entitlement to partial disability benefits).

The due process requirement of a fair trial in a fair tribunal applies to administrative agencies which adjudicate, as well as to courts. *Utica Packing Co. v. Block,* 781 F.2d 71, 77 (6th Cir. 1986) (quoting *Withrow v. Larkin,* 421 U.S. 35, 46, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975)). The due process rights of an administrative litigant are violated when the risk of unfairness to that litigant is intolerably high. *Id.* at 78. Although the protesting litigant – here, the Petitioner – bears the burden of proving the existence of such a risk*, id.*, the litigant need not prove "actual partiality" to carry this burden. *Id.* at 77. See *Roadway Express v. Reich*, No. 93-3787, 1994 U.S. App. LEXIS 22924, at *13-14 (6th Cir. Aug. 22, 1994).

Here, the Administrator was quite clear that he no longer considered the appropriateness of the landing site an issue in this matter and withdrew it, thereby releasing Petitioner from that proof of fact. For his part, the Law Judge challenged the Administrator on his choice and reintroduced a factual issue otherwise withdrawn by him. Tr. 303, ln. 10-25, Tr. 304, ln. 1-3. By doing so, the Law Judge both abused his discretion and abandoned his role as an impartial fact finder. Indeed, he took the side of the Government by saving it from its own questionable litigation tactics, testimonial recall, and legal assumptions. He denied Petitioner due process of law as a result, and accordingly, erred.

31

2.     **The Record Evidence Established that the Intended Landing Site was Suitable and Was Otherwise Contrary to the Law Judge's Findings, Which Were Clearly Erroneous.**

There exist no standards on what constitutes a "suitable" or "appropriate" landing site.   And indeed, a Federal Appellate Court has expressed some concerns in that regard.   See *Essery v. Department of Trans.*, 857 F.2d 1286, 1289 (9th Cir. 1988).   Still, the only competent "evidence" of record on the suitability of Petitioner's intended landing site was offered by Petitioner and Mr. Likes.

Both men testified, without refutation, that Petitioner was capable of landing his Aircraft in less than 200 feet on what was otherwise 500 feet of landing surface, which was smooth and cleared by Mr. Likes himself.  Tr.  310, ln. 11-17. And again, Petitioner's Aircraft is a purpose-built aircraft designed to land at unimproved off-airport locations.  Tr. 484, ln. 2-7.  For his part, Specialist Speeg agreed that the "appropriateness" of a landing site is a function of the capability of the aircraft and the skills of the pilot.  Tr. 387, ln. 24-25; Tr. 388, ln. 1-3; Tr. 389, ln. 10-25; Tr. 390, ln. 1-7.  As he agreed, "it's all in the mix."  Tr. 389, 10-15,

While Specialist Speeg could not opine upon the capability of either Petitioner or his Aircraft, he did not dispute – and indeed, did not have the factual basis to dispute – those capabilities as testified to by Petitioner and Mr. Likes. Indeed, the Law Judge prohibited him from doing so, due to his lack of qualification/expertise. Tr. 345, ln. 2-7; Tr. 346, ln. 2-4.  Put simply, Specialist Speeg simply was not

32

competent to judge the "suitability" or "appropriateness" of Petitioner's intended landing site because he had no knowledge of Petitioner's Aircraft's capabilities or Petitioner's flying abilities, as he freely conceded.

For his part, the Law Judge cited the lack of "runway markings, lights, navigation aids, glideslope indicators or even a windsock,' as additional reasons why Petitioner's intended landing site was inappropriate. Tr. 730, ln. 17-25.  Apart from there existing no record evidence, testimony, or citation to any legal authority that, in order to be "suitable" or "appropriate," an off-airport location must be festooned with the accouterments of what otherwise are airport features, such reference suggests a gross misunderstanding of off-airport operations. "Off-airport" means exactly that – off airport.  Airports have "runway markings, lights, navigation aids, glideslope indicators [and even []windsock[s]." Deserts, gravel bars, expansive backyards and the wilderness do not, and nothing in the Federal Aviation Regulations or any Board decision requires that they do to render them "suitable" or "appropriate for landing."  Accordingly, the Law Judge's findings in that regard were legally bereft, factually erroneous, and it was an abuse of discretion for him to even consider such in his ruling.[15]

---

[15] The Law Judge too cited Petitioner's inability to identify the "touchdown point" as an additional reason why Petitioner's intended landing site was "inappropriate" or "not suitable."  Tr. 655, ln. 16-20.  That is among the reasons why inspection

3.    **The Law Judge Erroneously Relied Upon Incompetent and Hopelessly Biased Witness Testimony to Conclude that <u>Petitioner's Intended Landing Site was Inappropriate</u>**.

Specialist Speeg was hardly an impartial factfinder brought into court by the Administrator to offer his "vast" experience and knowledge to render an opinion upon a known set of facts. He derives all of his income from the Federal Aviation Administration – the most money he's ever made in his aviation career – and he boasts in his *curriculum vitae* of the "accolades, cash awards and time-off" that he receives when he does the Administrator's bidding. Tr. 615, ln. 13-19. Not only was the Specialist inherently biased and compromised, but institutionally so. Indeed, and under the law, he cannot testify for anyone other than the Federal Aviation Administration. See 49 U.S.C. § 9.7; Tr. 616, ln. 12-16. Specialist Speeg will never testify in an enforcement proceeding that an airman did nothing wrong or violated no regulation, lest he potentially sacrifice his "accolades, cash awards and time-off." Put simply, he is paid to put the imprimatur of "expert" upon a decision already made by the Administrator.

Where, as here, an expert becomes an advocate for a cause, he departs from the ranks of an objective expert witness, and any resulting testimony would be

---

passes are necessary for off-airport locations in the first place. Moreover, Petitioner never testified, as the Law Judge suggested that he did, that because he could not identify the touchdown point, that the landing site was not "suitable." That finding was clearly erroneous and inconsistent with Petitioner's testimony.

unfairly prejudicial and misleading. *See also*, Rule 403, Federal Rules of Evidence. *Viterbo v. Dow Chemical Co.*, 646 F. Supp. 1420, 1425-1426 (1986). See also *Johnston v. United States*, 597 F. Supp. 374, 411 (1984) (noting that where an "expert" has identified himself so closely and so consistently with one side in cases in which he appears as a witness, his testimony must be seen as lacking in credibility due to this obvious bias). Put simply, it was an abuse of discretion of the Law Judge to either credit or rely upon any of Mr. Speeg's testimony.

Moreover, the Law Judge relied upon numerous opinions of Specialist Speeg which the former previously found him unqualified to render, or which otherwise lacked basis in fact. As the Law Judge noted, Specialist Speeg "was not qualified as an expert in short field and takeoffs, nor was he qualified as an expert in the operation of Petitioner's aircraft, the Kitfox [V]" – which, coincidentally, is what this entire case is about. Tr. 670, ln. 5-7. Of course, none of this slowed Specialist Speeg.

For example, he testified:

- That he was "unsure if you could put the aircraft down safely 30 to 50 feet off the ground" and noted that "there would be an immediate loss of lift if there was a power failure in a steep bank." Tr. 671, 8-11. Specialist Speeg knew nothing of Petitioner's Aircraft and its relative performance. As he said, he was "unsure." Yet, the Law Judge credited his testimony.

- That "the only place to land would be a road in the subdivision if he had to land because of a problem and this would have created undue hazard to persons and property." Tr. 672, ln. 6-9. Every witness contradicted this testimony, Tr. 107, ln. 14-16, Tr. 151, ln. 15-18, Tr. 173, ln. 16-22, Tr. 256, ln. 19-21, including the Specialist himself, Tr. 675, 15-16, stating that everything to the left of Petitioner's flight path was nothing but open desert and scrub. Yet, the Law Judge credited Speeg's testimony.

- That "Petitioner was too low and that he had no room to see above the top of the grade based on his flight path." Tr. 673, ln. 18-20. There exists no basis in fact for this opinion, because the Specialist had no idea of what Petitioner could or could not see out of his Aircraft, because he knows nothing of the Aircraft. Further, the Specialist never traveled to the site and only used one-dimensional satellite imagery and photos of the intended landing area that are devoid of vertical terrain information. Tr. 416, ln. 18-25, Tr. 417, ln. 1. Yet, the Law Judge credited his testimony.

Indeed, the following exchange between the Administrator and Mr. Speeg speaks well to the quality of his opinions, such as they were, that he offered in this matter:

> ADMINISTRATOR: And so, do you have an opinion as to whether Petitioner operated November 318 Juliet Juliet at altitudes that would not allow if a power unit had failed, an emergency landing without undue hazards to persons or property on the surface?

SPECIALIST SPEEG: I have an opinion about his ability to do that because of the – you know, the height above the ground was somewhere between 30 and 50 feet. I think the only – well, I mean, I don't know where he -- I know where I would try to go, but I don't know where – what he was – you know, when we're operating low level altitude, when I was doing it, we were always trying to think where we would go if the engine quit. So I don't know – I can't – I'm not – wasn't in his head that day. I don't know -- I can't say where he would go, but I know in Mr. Likes' statement, he indicates that he could land anywhere in the roads in the subdivision. If that's the case, then if he was to go into any of the roads in the subdivision, he would create an undue hazard to anybody in or living in that neighborhood, for the simple fact that people who live in that neighborhood, a reasonable person is not going to expect an airplane to be coming down their street in a subdivision that's out in the middle of nowhere on ten-acre lots. Does that –

ADMINISTRATOR: Yes. That answers that question. So and I think you've – and you've indicated some basis for your opinion. Other than that this is a subdivision and there – people aren't expecting an airplane to be landing. Are there other bases for your opinion to determine that the – regarding your margin of error that you brought up at first? Any other factors involved as applied to the hazard that you mentioned earlier?

SPECIALIST SPEEG. Sure. You know, the regulation mentions power unit loss. But there are other – when we introduce bank into an airplane, we introduce G-forces, which are forces of gravity on an aircraft. And through primary training, all the way up through advanced training, we're taught that 60 degrees of bank is two times gravity. So – or 2 Gs. So when we have more forces acting on the structure on aircraft, and if it's done over a time, over a lot of time, and numerous occasions, it puts stress on the aircraft and you could have structural failure. So, you know, in that situation, you have no control if a wing falls off,[16] if a –

---

[16] What any of this conjecture has to do with this case is a mystery, as there is no allegation (much less evidence) that Petitioner's aircraft was structurally compromised such that it was in danger of having a "wing fall off."

ADMINISTRATOR: So, Specialist Speeg, what is the basis of your opinion that if the Petitioner had a power unit failure, he would not have been able to make an emergency landing? Or he would have – excuse me. Let me get to that. If he had an emergency – excuse me. If he had a power unit failure, that he was not – he was below an altitude allowing – if a – an emergency landing without undue hazard to persons or property on the surface.

SPECIALIST SPEEG: The basis of my opinion is all of my experience, all of my training, all of – everything I've done in the last nine years with my job, the testimony of the witnesses to determine the altitude above the ground, and just – I know any – so – and the statements made by the Petitioner, where he said that it was unsafe to land.[17] And he was kind of vague about it, so I'm assuming it was unsafe to land from what he was looking at, which was from what I – from the testimony was to the east side of his flight path. So if that was the case, the only place he could land is in the – on the roads in the subdivision. And if that's the case – I'm not disputing the fact that he couldn't land there. He could land there, but in doing so, he creates a hazard, an undue hazard to persons and property in that subdivision. A little kid riding his bicycle down the road isn't expecting an airplane to come, you know, hauling up the road. Mrs. Pena, backing out of her driveway, isn't expecting an airplane to be coming down to land. That's where I'm coming from.

So my opinion, again, is based on the testimony, the statements, the EIR package, everything we've listened to in the last two days. And if – we've established that his flight path was the pink line on the exhibit that we've seen several times, and that exhibit, if you brought it up, would show, you know, the 500 foot grid of the flight path, at least on one side of it – of the flight path. And we could go and look at that picture, and look at all the different things that he is within 500 feet of during that brief slight path on November 24th of '19.

Q. And do you have –

---

[17] That is NOT what Petitioner said.  Compare Tr. 507, ln. 5-10.

A. So the Penas' house, it was fences. Mr. Likes' house, powerlines. These are just things that I'm remembering from – that we talked about several times on that exhibit.

Q. Okay.

A. Each one of those is a violation.

Tr. 358-362, *passim*. This latter point made by Specialist Speeg is discussed immediately below.  Otherwise, the Specialist had no earthly idea about that of which he was speaking, which mostly was in circles on topics well-outside of his ken and expertise.  The Law Judge abused his discretion by crediting his clearly incompetent and institutionally biased testimony.[18]

### 4.    The Law Judge Abused his Discretion by Crediting the Legal Opinions of Specialist Speeg.

In addition to being designated by the Administrator only as an aviation "expert," Specialist Speeg too rendered his legal opinions in this matter over, of course, Petitioner's objections. Tr. 362, ln. 4-21, Tr. 366, ln. 16-25. Specifically, and apropos to the paragraph above, the Specialist specifically opined that the Petitioner violated 14 C.F.R. § 91.119(a) & (c). Tr. 362, ln. 4-18, Tr. 366, ln. 22-24, Tr. 367, *passim*, Tr. 405-406, *passim*.

---

[18] Petitioner also notes that Specialist Speeg never provided a written report as required by FRCP 26.1(a)(2).  For that reason alone, he never should have been allowed to testify.

Expert testimony regarding a legal conclusion can be problematic and is generally impermissible. *See Aguilar v. International Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (finding that reasonableness and foreseeability of plaintiff's reliance were matters of law for court's determination and therefore were inappropriate subjects for expert testimony); *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988) (holding that "Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions."); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) (expert's testimony consisting of legal conclusions construing contract was inadmissible).  See also *Burkhart v. Wash. Metro. Area Transit Auth.*, 324 U.S. App. D.C. 241, 112 F.3d 1207, 1212 (1997) (Whether expert opinion testimony is "otherwise admissible" depends, in part, on whether it will "assist the trier of fact" in either "understanding the evidence or … determining a fact in issue." *See* FED. R. EVID. 702. Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not "otherwise admissible." *See Torres v. County of Oakland,* 758 F.2d 147, 150 (6th Cir. 1985) (holding that expert testimony couched in terms of a "legal conclusion" is "not helpful to the jury"); *see also Weston v. WMATA,* 316 U.S. App. D.C. 321, 78 F.3d 682, 684 n.4 (D.C. Cir. 1996) (stating that "legal conclusions on domestic law … are outside [an expert] witness' area of expertise").

40

In his ruling, the Law Judge summarized, in part, the Specialist's testimony as follows:

> Specialist Speeg said that there can be no low passes over a runway unless the pilot is going to land. To clarify Specialist Speeg's testimony, I asked questions. Specialist Speeg said that an approach to land with an actual landing would not violate 119.119 if the pilot flew over residences even if there was a better alternative depending on the circumstances, such as a life flight that needed to land quickly. Specialist Speeg stated that a pilot must remain 500 feet away from people and structures during a low-level pass unless they are performing an approach to land.

Tr. 679, ln. 24-25, Tr. 680, ln. 1-9.

Not only were Mr. Speeg's observations in this regard simply "couched" legal conclusions, they too are also simply wrong. Nowhere does 14 C.F.R. § 91.119 remotely suggest that "a pilot must remain 500 feet away from people and structures during a low-level pass unless they are performing an approach to land." See, e.g., *Administrator v. Johnson*, 2 N.T.S.B. 1598, 1599-160l; and *Administrator v. McCollough*, 1993 NTSB LEXIS 242, *5 (noting that practice approaches, go-arounds and other similar practice maneuvers where landing is not intended are perfectly consistent with § 91.119). Nonetheless, the Law Judge credited the Specialist's legal opinions. Tr. 679, ln. 8-19. His decision to do so was an abuse of discretion, legally erroneous, and highly prejudicial to the Petitioner. It was for the Law Judge to determine the meaning of the subject regulations, not Mr. Speeg; who, for the most part, got it all wrong.

**D.    The Law Judge Erred by Not Dismissing the Proceedings in Light of the FAA's Sloppy Investigation.**

Due to a number of factors, not the least of which was the FAA's failure to secure (and indeed, intentional destruction of) valuable video evidence, and its failure to undertake basic measurements of, or even visit, the Likes property – Respondent's intended landing site – the Law Judge found that "the FAA's investigators were negligent and careless, and at worst reckless" in their investigation. Indeed, he mentioned the FAA's poor performance in its investigation at least three (3) times during the rendering of his oral opinion. Tr. 716-17, *passim*.

For his part, Respondent requested, in light of those findings, that the entire case be dismissed. Tr. 628, ln. 24-25, Tr. 629, ln. 1-7. The Law Judge declined to do so. Tr. 717 ln. 13-14.

Still, the Board has spoken to this issue in the context of Equal Access to Justice Claims. Indeed, "[t]he Administrator has the burden of proof and a poor investigation can result in dismissal of the complaint; Equal Access to Justice Act fees may also attach." *Admin v. Rounds,* EA-5359 at 9, citing *Admin. v. Moore*, EA-4992 at 8. See also *Application of Waingrow*, EA-2175 (1985) at 3-4 ("The law judge determined that the Administrator's position as a party to the proceeding was not substantially justified since it was based on an incomplete investigation of the basic facts surrounding the incident from which the charges arose. Having made the determination that is required by Section 504(a)(1) of the EAJA, and having

determined that the applicant is eligible to make a claim under the EAJA, the law judge determined that the applicant is entitled to the attorney fees, expert fees, and related expenses that he claimed.").

It cannot be sufficiently emphasized that the destruction of the video evidence by Inspector Green – while not malicious – had a profound effect upon these proceedings.  Indeed, every witness testified to what they observed on the excluded and missing video(s). References to and witness testimony about the video after exclusion occur at Tr. 80, ln. 19-25, Tr. 81, ln. 1-16; Tr. 128, ln. 10-11 and 22, Tr. 130, ln. 16; Tr. 13, ln. 3-5, 15-16; Tr. 140, ln. 22; Tr. 188, ln. 19-20; Tr. 189, ln. 2-6, 18-19; Tr. 226, ln. 9-10; Tr. 227, ln. 11-14, 19-25; Tr. 228, ln.1; Tr.  241, ln. 1-14; Tr. 242, ln. 1; Tr. 246, ln. 20-23; Tr. 248, ln. 10-12, 16-18; Tr. 249, ln. 6-8, 11-13; Tr. 292, ln. 12-14, 19-23; Tr. 346, ln. 18-19; Tr. 367, ln.12; Tr. 373 ln. 9-14; Tr. 375, ln. 5; Tr. 417 ln. 2-21; Tr. 418, ln. 1, Tr. 449; ln. 5-7; Tr. 453 ln. 1-6; Tr. 661, ln. 1-10; Tr. 662, ln. 4-6; Tr. 662, ln. 11-13; Tr. 663, ln. 6-20; Tr. 664, ln. 5-9; 17-25; Tr. 665, ln. 1-6, 13-17, 23-25; Tr. 667, ln. 7-10; Tr. 675, ln. 5-8; Tr. 680, ln. 22-25; Tr. 681, ln. 1-6; Tr. 712, ln. 25, and Tr. 713, ln. 1-3, 18-21.

References to the Pena's video camera and its location after the video's exclusion appear at Tr. 82, ln. 22, 25; Tr. 83, ln. 1-15; Tr. 84, ln. 18-21; Tr. 86, ln. 6-8; Tr. 87, ln.11-12; Tr. 88, ln. 22-24; Tr. 90, ln. 3-4; Tr. 91, ln. 2-4; Tr. 98, ln. 12-14; Tr. 100, ln. 14-15; Tr.142, ln. 4-6; Tr. 282, ln. 13-15; Tr. 285, ln. 6-25; Tr. 286,

ln. 1-5; Tr. 590, ln. 11-14; Tr. 646, ln. 20-22; Tr. 658, ln. 17-23; and Tr. 660, ln. 21-25.

While the Law Judge may have closed the front door to the video evidence, he left the back door wide open – and in it came through various witnesses, thereby infecting these proceedings from stem to stern.  The inability of the Respondent to refute these witness statements by use of the missing video evidence was highly prejudicial to the Respondent, was plain error, and was highly prejudicial.

More to the point, the "exclusion" of the video evidence did little to protect Respondent from the FAA's malfeasance.  Indeed, it appears that the FAA benefited from it, having ensured that Respondent would not be able to challenge witness statements with the actual native video that the Penas recorded, but which the FAA never secured during its "sloppy and careless" investigation. See e.g., FAA Order 2150-3(c) (duty of investigator is to preserve evidence at the start of investigation).[19] In short, this case never should have been brought; and when it was, it should have been dismissed out of hand due to the FAA's – to be charitable – lack of diligence

---

[19] According to the Law Judge, "[n]either Specialist Speeg nor Inspector Green were eye-witnesses, and both relied on the excluded video to form their opinions and conclusions of Respondent's flight path, altitude above ground level, and banking angle." Tr. 713, ln. 18-21.

in the investigation underlying its Complaint. It was error for the Law Judge not to have done so.

### E.    The Board's Deference to the FAA's Choice of Sanction Conflicts with Congressional Intent.

As Petitioner did, an airman may appeal to the NTSB an unfavorable result following an air safety proceeding.  The NTSB's congressionally-created authority is set forth in § 44709(d), which reads in relevant part:

**(d) Appeals.—**

**(1)**    A person adversely affected by an order of the Administrator under this section may appeal the order to the National Transportation Safety Board. After notice and an opportunity for hearing, the Board may amend, modify, or reverse the order when the Board finds—

> **(A)** if the order was issued under subsection (b)(1)(A) of this section, that safety in air commerce or air transportation and the public interest do not require affirmation of the order;
>
> _____

**(2)**    The Board may modify a suspension or revocation of a certificate to imposition of a civil penalty.

**(3)**    When conducting a hearing under this subsection, the Board is not bound by findings of fact of the Administrator.

There is nothing in this text that suggests that Congress intended the NTSB to defer to the FAA's choice of sanction. To the contrary, § 44709(d) allows the NTSB to "amend, modify, or reverse" an order of the FAA and further states that the NTSB

45

is *not* bound by the FAA's factual findings.  This Court's decision in *Pham v. Nat'l Transp. Safety Bd.*, 33 F.4th 576 (D.C. Cir. 2022), however, held that the NTSB owed deference to the FAA. To the extent the Board concluded it had no choice but to defer to the FAA's choice of sanction, it erred. This Court should reconsider *Pham* in light of the text of § 44709(d), which does not require the deference this Court said was owed. If this Court concludes a sanction is warranted, it should vacate the Board's sanction and remand the matter for the Board to determine that sanction in the first instance without deference to the FAA.

## CONCLUSION

For all of the reasons discussed above, Petitioner respectfully requests this Honorable Court vacate the FAA's Order of Suspension of the Petitioner's Airman Certificate and dismiss the Administrator's case against him with prejudice.

Dated: December 11, 2023

Respectfully submitted,

/s/ *Robert D. Schulte*
Robert D. Schulte
Schulte Booth P.C.
14 N. Hanson St.
Easton MD 21601
410-822-1200
rschulte@schultebooth.com

*Counsel for Petitioner*

46

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

 x     The brief contains 12,381 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

 x      The brief has been prepared in a proportionally spaced typeface using MS Word in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using MS Word 2002 in a ____ characters per inch_____ font.


_12/11/2023_____                    /s/ *Robert D. Schulte*
Date   Robert D. Schulte