**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals for the District of Columbia Circuit

## No. 23-1239

TRENTON J. PALMER,

*Petitioner,*

*v.*

FEDERAL AVIATION ADMINISTRATION/NATIONAL TRANSPORTATION SAFETY BOARD,

*Respondent.*

*Petition for Review from Federal Aviation Administration Order Suspending the Pilot Certificate of Trenton J. Palmer on April 6, 2022, Otherwise Affirmed by the National Transportation Safety Board on March 30, 2023*

# JOINT APPENDIX

JOY PARK, SENIOR ATTORNEY
FEDERAL AVIATION ADMINISTRATION
FAA Office of the Chief Counsel
800 Independence Avenue, SW
Washington, DC 20591
Tel.: (202) 267-3222
Fax: (202) 267-7617
joy.park@faa.gov

*Counsel for Respondent*

December 11, 2023

ROBERT D. SCHULTE
SCHULTE BOOTH, P.C.
14 North Hanson Street
Easton, Maryland 21601
Tel.: (410) 822-1200
Fax: (410) 822-1299
rschulte@schultebooth.com

*Counsel for Petitioner*

CP COUNSEL PRESS    (800) 4-APPEAL • (325339)

# <u>TABLE OF CONTENTS</u>

Certified Index of Record ........................................................................A1

Complaint.................................................................................................A8

Amended Complaint ................................................................................A14

Answer .....................................................................................................A19

Respondent's Motion to Dismiss for Failure to State a Claim ...............A23

Respondent's Compliance with Pre-Hearing Order ...............................A30

NTSB Official Transcript of Law Judge's Oral Opinion .......................A37

Relevant Portions of Hearing Transcripts Relied Upon by Petitioner...............A150

Relevant Portions of Hearing Transcript Relied Upon by Respondent..............A342

Hearing Exhibit R-2 ................................................................................A449

Hearing Exhibit A-2 ................................................................................A450

Hearing Exhibit A-3 ................................................................................A480

Hearing Exhibit A-4 ................................................................................A487

Hearing Exhibit A-17 ..............................................................................A490

Hearing Exhibit A-22 ..............................................................................A499

NTSB Order SE-30880 (EA-5956)
  Order Denying Petition for Reconsideration ......................................A511

NTSB Order SE-30880 (EA-5947) Opinion and Order .........................A513



# National Transportation Safety Board

Washington, D.C. 20594

**Office of General Counsel**

October 30, 2023

Mark Langer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals District of Columbia Circuit
E. Barrett Prettyman U.S. Courthouse and William B. Bryant Annex
333 Constitution Ave., NW
Washington, DC 20001

RE: No. 23-1239    <u>Trenton Palmer, Petitioner v. Michael Whitaker, Administrator, Federal Aviation Administration, Respondent.</u>

Dear Mr. Langer:

    Enclosed is the Certification of Record in the above-listed proceeding.[1] The original record is available for review in the National Transportation Safety Board's Office of General Counsel. If it is required, please notify Ms. Krishawn Graham, Paralegal, Office of General Counsel, Room 6300, 490 L'Enfant Plaza East, S.W., Washington, D.C. 20594. Her telephone number is (202) 314-6056.

    When the case is closed, please return the original record to Ms. Graham at the L'Enfant Plaza address. Thank you.

Sincerely,

WILLIAM
MCMURRY   <small>Digitally signed by WILLIAM MCMURRY Date: 2023.10.30 08.25.14 -04'00'</small>

William T. McMurry, Jr.
General Counsel

Enclosure

---

[1] The Federal Aviation Administration (FAA) is the real party in interest, inasmuch as this petition challenges an FAA decision that the National Transportation Safety Board (NTSB) upheld. The NTSB, an independent agency not within the U.S. Department of Transportation, performs a quasi-judicial role with respect to the FAA safety enforcement decisions, affording holders of certain FAA-issued certificates a forum for adjudicating administrative appeals from orders of the FAA Administrator affecting these certificates. Thus, the NTSB ordinarily will neither enter an appearance in court proceedings reviewing its decisions on FAA orders, nor otherwise participate in their defense. See <u>Hinson v. National Transp. Safety Bd. and Rolund</u>, F.3d (1144) D.C. Cir. 1995. In <u>Rolund</u>, the Court established that it will not accept the NTSB as a party in defense of NTSB decisions, despite the fact that the NTSB is the named defendant in most of these cases.

**UNITED STATES COURT OF APPEALS**
**DISTRICT OF COLUMBIA CIRCUIT**

TRENTON PALMER,

        Petitioner,

                           Court No. 23-1239

        v.

MICHAEL WHITAKER,
Administrator,
Federal Aviation Administration,

        Respondent.

## **CERTIFICATION OF RECORD**

    IT IS HEREBY CERTIFIED that the annexed list describes the material comprising the record in this proceeding. The complete original record is available for review upon request.

WILLIAM    Digitally signed by WILLIAM
MCMURRY    MCMURRY
               Date: 2023.10.30 08:26:23 -04'00'

William T. McMurry, Jr.
General Counsel
National Transportation Safety Board
(202) 314-6080
Email: Boardappeals@ntsb.gov

Dated this 30th day of October 2023, at Washington, D.C.

A2

Trenton Palmer v. Polly Trottenberg, Acting Administrator, Federal Aviation Administration
U.S. Court of Appeals for the District of Columbia Circuit, USCA Case No. 23-1239
NTSB Docket SE-30880, EA-5947 and EA-5956

**INDEX**

| ITEM | DATE | PAGE(S) |
|------|------|---------|
| FAA's Order of Suspension | October 8, 2020 | 1-4 |
| Certificate Holder's Notice of Appeal | October 8, 2020 | 5-10 |
| NTSB Office of Administrative Law Judges Acknowledgement of Receipt of Appeal | October 15, 2020 | 11 |
| FAA's Complaint | October 15, 2020 | 12-17 |
| Certificate Holder's Answer to Complaint | October 16, 2020 | 18-21 |
| FAA's First Set of Discovery Requests to Certificate Holder | February 8, 2021 | 22-28 |
| Certificate Holder's Request to FAA for Extension to Reply to First Set of Discovery Requests | March 12, 2021 | 29-32 |
| Certificate Holder's Responses to the FAA's First Set of Discovery Requests | March 19, 2021 | 33-62 |
| Certificate Holder's First Set of Interrogatories and Request for Production of Documents | March 26, 2021 | 63-68 |
| FAA's Responses to Certificate Holder's First Set of Discovery Requests | April 26, 2021 | 69-78 |
| Assignment of Case to Administrative Law Judge | July 13, 2021 | 79 |
| FAA's Amended Complaint | September 20, 2021 | 80-84 |
| FAA's Notice of Unavailability | October 27, 2021 | 85-86 |
| Certificate Holder's Notice of Appearance | December 29, 2021 | 87-88 |
| NTSB Office of Administrative Law Judges Internal Memo Docket to the File: Conference Call | January 13, 2022 | 89 |
| Notice of Hearing | January 20, 2022 | 90-92 |
| Prehearing Order (Waived Emergency) | January 20, 2022 | 93-97 |
| FAA's Initial Disclosures | January 24, 2022 | 98-107 |
| FAA's Application for Subpoenas | February 8, 2022 | 108-109 |
| FAA's Documents Only Subpoena for Gabriel Pena | February 9, 2022 | 110-111 |
| FAA's Testimony Subpoena for Gabriel Pena | February 9, 2022 | 112-113 |
| FAA's Testimony Subpoena for Julia Pena | February 9, 2022 | 114-115 |
| FAA's Testimony Subpoena for Russell Stanley | February 9, 2022 | 116-117 |
| Certificate Holder's Application for Subpoenas | March 3, 2022 | 118-119 |
| FAA's Compliance with Prehearing Order | March 8, 2022 | 120-130 |
| Certificate Holder's Compliance with Prehearing Order | March 8, 2022 | 131-137 |

A3

Trenton Palmer v. Polly Trottenberg, Acting Administrator, Federal Aviation Administration
U.S. Court of Appeals for the District of Columbia Circuit, USCA Case No. 23-1239
NTSB Docket SE-30880, EA-5947 and EA-5956

| ITEM | DATE | PAGE(S) |
|---|---|---|
| NTSB Office of Administrative Law Judges Internal Memo Docket to the File: Conference Call | March 10, 2022 | 138 |
| FAA's Notice of Objections to the Exhibits Designated by the Certificate Holder | March 21, 2022 | 139-141 |
| Certificate Holder's Notice of Objections to the Exhibits Designated by the FAA | March 21, 2022 | 142-153 |
| Email Correspondence re: Hearing to Proceed as Scheduled | March 22, 2022 | 154 |
| FAA's List of Participants | March 23, 2022 | 155-157 |
| Certificate Holder's List of Participants | March 23, 2022 | 158-159 |
| Certificate Holder's Testimony Subpoena for Jared Likes | March 23, 2022 | 160-161 |
| FAA's Supplemental List of Participants | March 24, 2022 | 162-163 |
| Email Correspondence re: FAA Exhibits | March 24, 2022 | 164-166 |
|  |  |  |
|  |  |  |
| NTSB Official Transcripts of Hearing – Vol 1 | March 29, 2022 | 167-372 |
| NTSB Official Transcripts of Hearing – Vol 2 | March 30, 2022 | 373-608 |
| NTSB Official Transcripts of Hearing – Vol 3 | April 1, 2022 | 609-742 |
| NTSB Official Transcripts of Hearing – Vol 4 | April 4, 2022 | 743-809 |
| Copy of Appeal Instructions | April 4, 2022 | 810 |
| Certificate Holder's Motion to Dismiss FAA's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted | April 4, 2022 | 811-817 |
| FAA's Response in Opposition to Certificate Holder's Motion to Dismiss the Complaint, as Amended, for Failure to State a Claim | April 4, 2022 | 818-823 |
| NTSB Official Transcript of Law Judge's Oral Initial Decision | April 6, 2022 | 824-936 |
|  |  |  |
|  |  |  |
| **FAA Exhibits from March 29, 2022 Hearing** |  |  |
|  |  |  |
| A2 – Certificate Holder's Response to the FAA's First Set of Discovery Requests | -- | 937-966 |
| A-3 – FAA Certified Inspectors Statement | -- | 967-973 |
| A-4 – FAA Certified Letter of Warning | -- | 974-976 |

A4

Trenton Palmer v. Polly Trottenberg, Acting Administrator, Federal Aviation Administration
U.S. Court of Appeals for the District of Columbia Circuit, USCA Case No. 23-1239
NTSB Docket SE-30880, EA-5947 and EA-5956

| ITEM | DATE | PAGE(S) |
|------|------|---------|
| A-5 – FAA Certified Notification of Investigation | -- | 977-983 |
| A-13 – House Photos | -- | 984-987 |
| A-16 – Email correspondence | -- | 988 |
| A-17 – Property Photos | -- | 989-1006 |
| A-22 – Off Airport Ops Guide | -- | 1007-1018 |
| A-28 – FAA Title 14 Civil Aviation Rules and Regulations | -- | 1019-1020 |
| | | |
| | | |
| **Certificate Holder Exhibits from March 29, 2022 Hearing** | | |
| | | |
| R-6 – FAA Form 1360-33 | -- | 1021 |
| | | |
| | | |
| Certificate Holder's Notice of Appeal of Oral Initial Decision | April 8, 2022 | 1022-1024 |
| FAA's Notice of Appeal from Law Judge's Oral Initial Decision | April 12, 2022 | 1025-1026 |
| FAA's Entry of Appearance | April 14, 2022 | 1027-1028 |
| Motion for Extension of Time to File Brief Perfecting Certificate Holder's Appeal of the Administrative Law Judge's Oral Initial Decision | April 22, 2022 | 1029-1031 |
| NTSB Board Extension Response – Granted | May 4, 2022 | 1032 |
| FAA's Appeal Brief | May 26, 2022 | 1033-1056 |
| Certificate Holder's Appeal Brief | June 9, 2022 | 1057-1092 |
| FAA's Unopposed Motion for an Extension of Time to File Reply Brief | June 22, 2022 | 1093-1095 |
| NTSB Board Extension Response – Granted | June 24, 2022 | 1096 |
| Certificate Holder's Reply Brief | June 27, 2022 | 1097-1110 |
| FAA's Reply Brief | August 10, 2022 | 1111-1145 |
| NTSB Order SE-30880 (EA-5947), Opinion and Order | March 30, 2023 | 1146-1308 |
| Certificate Holder's Petition for Rehearing, Reargument, Reconsideration or Modification of the National Transportation Safety Board's Opinion and Order | April 4, 2023 | 1309-1315 |

A5

Trenton Palmer v. Polly Trottenberg, Acting Administrator, Federal Aviation Administration
U.S. Court of Appeals for the District of Columbia Circuit, USCA Case No. 23-1239
NTSB Docket SE-30880, EA-5947 and EA-5956

| ITEM | DATE | PAGE(S) |
|---|---|---|
| FAA's Reply in Opposition to Petition for Reconsideration | April 12, 2023 | 1316-1320 |
| NTSB Order SE-30880 (EA-5956), Order Denying Petition for Reconsideration | July 12, 2023 | 1321-1372 |
| Certificate Holder's Motion to Stay Sanction Pending Judicial Review | July 27, 2023 | 1373-1377 |
| NTSB Order SE-30880 (EA-5960), Order Granting Stay | August 23, 2023 | 1378-1380 |

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, I electronically filed the foregoing Certification of Record with the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. I also certify that the following counsel of record is registered as a CM/ECF filer and will be served by the CM/ECF system:

Robert David Schulte
14 N. Hanson Street
Easton, MD 21601
rschulte@schultebooth.com

  /s/ Joy K. Park
Joy K. Park



U.S. Department
of Transportation
**Federal Aviation
Administration**

Office of the Chief Counsel

Enforcement Division
Western Team
777 S. Aviation Blvd, Suite 150
El Segundo, CA 90245

October 15, 2020

Office of Administrative Law Judges
National Transportation Safety Board
490 L'Enfant Plaza East, S.W., Room 4704
Washington, D.C.  20594

RE:     Administrator v. Trenton Joseph Palmer, NTSB Docket No. Unassigned;
          FAA Case No. 2020WP190306

Dear Judge:

On October 8, 2020, Trenton Joseph Palmer, through this attorney, Gregory S. Winton, filed a
notice of appeal from the Administrator's Order of Suspension issued on October 8, 2020.
Enclosed are an executed original and one copy of the Administrator's Order, suspending the
airman certificate held by Respondent Palmer for a period of 210 days.

The Administrator files the enclosed Order of Suspension as the <u>Complaint</u> in accordance with
section 821.31(a) of the Board's Rules of Practice in Air Safety Proceedings, 49 C.F.R. §
821.31(a).

The Administrator requests that the hearing be held in Reno, NV, and expects that the hearing in
this case will last one (1) day.  All correspondence[1] to the Administrator in this matter should be
directed to Lisa M. Toscano, at:

        Enforcement Division, Western Team
        777 S. Aviation Blvd, Suite 150
        Email:  Lisa.M.Toscano@faa.gov; 9-AGC300-Western-Team@faa.gov
        Telephone:     (424) 391-2723 (direct)
                           (424) 405-7050 (fax)

Respectfully,

*Lisa M. Toscano*
Lisa M. Toscano
Enforcement Division, Western Team
email:  Lisa.M.Toscano@faa.gov; 9-AGC300-Western-Team@faa.gov
Telephone:     (424) 391-2723 (direct)

---

[1] Due to the ongoing COVID-19 pandemic, related state and federal orders, and public health considerations, the
FAA's ability to retrieve and send mail is limited.  To the extent possible, please serve all documents on the
assigned FAA attorney by email.

A8



U.S. Department
of Transportation

**Federal Aviation
Administration**

Office of the Chief Counsel

Enforcement Division
Western Team
777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245

**U.S. CERTIFIED MAIL, RETURN-RECEIPT REQUESTED
and FIRST-CLASS MAIL**

October 8, 2020

TRENTON JOSEPH PALMER
15010 N RED ROCK RD
RENO, NV 89508-9530

RE:    Trenton J. Palmer, Case No. 2020WP190306

## ORDER OF SUSPENSION

The Federal Aviation Administration (FAA) notified you through a Notice of Proposed
Certificate Action dated April 29, 2020, that the FAA proposed to suspend your private pilot
certificate for 210 days for your alleged violation of 14 C.F.R. §§ 91.119(a), 91.119(c), and
91.13(a).

After considering all the evidence in this matter, including information provided during the
informal conference held on June 17, 2020, the Administrator has determined that:

1.  You hold Private Pilot Certificate No. 3786226.

2.  At all times relevant herein, you were the registered owner of N318JJ, a 1997 Johnson
    John T KITFOX V.

3.  On or about November 24, 2019, you operated as pilot in command N318JJ on a flight
    operation in the vicinity of 400 Desert Sun Lane and 300 Desert Sun Lane, Reno,
    Nevada.

4.  During the referenced flight operation, you operated N318JJ at altitudes less than 100 feet
    AGL  and

    a.  within approximately 50 feet of a stable, shed, and propane tank;
    b.  within approximately 100-150 feet of the residential home at 400 Desert Sun
        Lane;
    c.  within approximately 100-150 feet of an adult and a child who were outside the
        residential home at 400 Desert Sun Lane;
    d.  within approximately 300 feet of two adults and two children who were outside
        and near the western perimeter of the residential property at 400 Desert Sun Lane.

A9

2

5.  You operated N318JJ at altitudes that would not allow, if a power unit had failed, an emergency landing without undue hazard to persons or property.

6.  Your operation of N318JJ, in the manner and circumstances described above, was careless or reckless so as to endanger the life or property of another.

As a result, you violated the following Federal Aviation Regulations:

(a)  14 C.F.R. § 91.119(a), which states:  Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes: *Anywhere*.  An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

(b)  14 C.F.R. § 91.119(c), which states:  Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes: *Over other than congested areas*.  An altitude of 500 feet above the surface, except over open water or sparsely populated areas.  In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

(c)  14 C.F.R. § 91.13(a), which states that, no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

As a result of the foregoing, the Administrator has determined that safety in air commerce or air transportation and the public interest require the suspension of your Private Pilot Certificate No. 3786226.

IT IS THEREFORE ORDERED, pursuant to the Administrator's authority under 49 U.S.C. § 44709, that:

1)  Your Private Pilot Certificate No. 3786226, is suspended for a period of 210 days, effective October 28, 2020.

2)  You must surrender your Private Pilot Certificate No. 3786226 on or before October 28, 2020, to:  Lisa M. toscano, FAA Enforcement Attorney, 777 S. Aviation Blvd., El Segundo, CA  90245.

If you fail to surrender your certificate to FAA counsel as required by this order, the period of suspension will continue in effect for a period of 210 days from the date you surrender your certificate.  You will also be subject to further legal enforcement action, including a civil penalty of up to $1,501.00 a day for each day you fail to surrender your certificate as required by this order.

A10

3) No application for a new airman certificate shall be accepted from you, nor shall an airman certificate be issued to you during the period of suspension imposed by this Order.

Naomi Tsuda
Assistant Chief Counsel
    for Enforcement

By:    *Lisa M. Toscano*
    **Lisa M. Toscano**
    Enforcement Division, Western Team
    email:  Lisa.M.Toscano@faa.gov
    Telephone:    (424) 391-2723 (direct)
                          (424) 405-7050 (fax)

cc:    Gregory S. Winton, Esq. (via email greg@aviationlawexperts.com)
        RNO FSDO (Donald F. Morgan), AFS-800 (Roy Speeg), AFB-720

## <u>APPEAL</u>

You may appeal from this order within 20 days from the date it is served, which is October 8, 2020, by filing a Notice of Appeal with the Case Manager, Office of Administrative Law Judges, National Transportation Safety Board, 490 L'Enfant Plaza East, SW, Washington, DC 20594 (telephone (800) 854-8758 or (202) 314-6150; FAX (202) 314-6158).

The National Transportation Safety Board's (NTSB's) Rules of Practice in Air Safety Proceedings, 49 C.F.R. part 821, would apply to such an appeal and are available through the NTSB's website at http://www.ntsb.gov/legal/alj. An original and three (3) copies of your notice of appeal must be filed with the Board. In the event you appeal, a copy of your notice of appeal must also be sent to the FAA attorney at the address indicated in the Order.

Filing a timely notice of appeal will stay the effectiveness of the Order during the proceedings before the NTSB. If you appeal to the NTSB, a copy of this Order will be filed with the NTSB and will serve as the Administrator's complaint in this proceeding.

A11

4

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Order of Suspension in FAA Case No. 2020WP190306 has been sent this date by U.S. Certified Mail, return-receipt requested and First-Class Mail to:

TRENTON JOSEPH PALMER
15010 N RED ROCK RD
RENO, NV  89508-9530

Agnes Ebilane
Office of the Regional Counsel
FAA, Western Pacific Region

Date:   October 8, 2020

A12

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I served a copy of the foregoing Administrator's Complaint in Administrator v. Trenton Joseph Palmer, NTSB Docket No. Unassigned, FAA Case No. 2020WP190306 by e-mail to:

> Mr. Gregory S. Winton, Esq.
> Attorney for Mr. Palmer
> 1997 Annapolis Exchange Parkway Suite 300
> Annapolis, MD  21401
> Greg@AviationLawExperts.com

In addition, I hereby certify that on this date I sent the original and one copy of the foregoing by e-mail, to:

> National Transportation Safety Board
> Office of Law Judges
> Attn.: Case Manager
> 490 L'Enfant Plaza East, SW
> Washington, DC 20594
> e-mail:  ALJappeals@ntsb.gov

*Agnes Ebilane*

Agnes Ebilane
Office of the Regional Counsel
FAA, Western-Pacific Region

Date:   October 15, 2020

A13



U.S. Department
of Transportation

**Federal Aviation
Administration**

Office of the Chief Counsel

Enforcement Division
Western Team
777 S. Aviation Blvd, Suite 150
El Segundo, CA 90245

**BY ELECTRONIC TRANSMISSION**

**September 20, 2021**

Judge Darrell L. Fun
Office of Administrative Law Judges
National Transportation Safety Board
490 L'Enfant Plaza East, S.W., Room 4704
Washington, D.C.  20594

RE:    Administrator v. Trenton Joseph Palmer, NTSB Docket No. SE-308801

Dear Judge Fun:

The Administrator files the enclosed Amended Order of Suspension as the <u>Amended Complaint</u> in accordance with the Board's Rules of Practice in Air Safety Proceedings, 49 C.F.R. part 821. The Amended Order of Suspension changes the proposed 210-day suspension of Respondent's airman pilot certificate to proposed 120-day suspension.

Respectfully submitted,

*Lisa M. Toscano*
Lisa M. Toscano
Enforcement Division, Western Team
email:  <u>Lisa.M.Toscano@faa.gov;</u>
Telephone:    424-405-7065 (direct);
            424-391-2723 (cell)
            424-405-7073 (fax)



U.S. Department
of Transportation
**Federal Aviation
Administration**

Office of the Chief Counsel

Enforcement Division
Western Team
777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245

## ELECTRONIC TRANSMISSION

September 20, 2021

TRENTON JOSEPH PALMER
15010 N RED ROCK RD
RENO, NV 89508-9530
c/o Robert D. Schulte, Esq.
rschulte@schultebooth.com

RE:    Trenton J. Palmer, Case No. 2020WP190306

## AMENDED ORDER OF SUSPENSION

The Federal Aviation Administration (FAA) notified you through a Notice of Proposed Certificate Action dated April 29, 2020, that the FAA proposed to suspend your private pilot certificate for 210 days for your alleged violation of 14 C.F.R. §§ 91.119(a), 91.119(c), and 91.13(a).

After considering all the evidence in this matter, including information provided during the informal conference held on June 17, 2020, the Administrator has determined that:

1. You hold Private Pilot Certificate No. 3786226.

2. At all times relevant herein, you were the registered owner of N318JJ, a 1997 Johnson John T KITFOX V.

3. On or about November 24, 2019, you operated as pilot in command N318JJ on a flight operation in the vicinity of 400 Desert Sun Lane and 300 Desert Sun Lane, Reno, Nevada.

4. During the referenced flight operation, you operated N318JJ at altitudes less than 100 feet AGL and

   a. within approximately 50 feet of a stable, shed, and propane tank;
   b. within approximately 100-150 feet of the residential home at 400 Desert Sun Lane;
   c. within approximately 100-150 feet of an adult and a child who were outside the residential home at 400 Desert Sun Lane;
   d. within approximately 300 feet of two adults and two children who were outside and near the western perimeter of the residential property at 400 Desert Sun Lane.

A15

2

5.  You operated N318JJ at altitudes that would not allow, if a power unit had failed, an emergency landing without undue hazard to persons or property.

6.  Your operation of N318JJ, in the manner and circumstances described above, was careless or reckless so as to endanger the life or property of another.

As a result, you violated the following Federal Aviation Regulations:

(a)  14 C.F.R. § 91.119(a), which states:  Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:  *Anywhere*.  An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

(b)  14 C.F.R. § 91.119(c), which states:  Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes: *Over other than congested areas*.  An altitude of 500 feet above the surface, except over open water or sparsely populated areas.  In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

(c)  14 C.F.R. § 91.13(a), which states that, no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

As a result of the foregoing, the Administrator has determined that safety in air commerce or air transportation and the public interest require the suspension of your Private Pilot Certificate No. 3786226.

IT IS THEREFORE ORDERED, pursuant to the Administrator's authority under 49 U.S.C. § 44709, that:

1)  Your Private Pilot Certificate No. 3786226, is suspended for a period of 120 days, effective October 28, 2020.

2)  You must surrender your Private Pilot Certificate No. 3786226 on or before October 28, 2020, to:  Lisa M. Toscano, FAA Enforcement Attorney, 777 S. Aviation Blvd., El Segundo, CA  90245.
    If you fail to surrender your certificate to FAA counsel as required by this order, the period of suspension will continue in effect for a period of 120 days from the date you surrender your certificate.  You will also be subject to further legal enforcement action, including a civil penalty of up to $1,501.00 a day for each day you fail to surrender your certificate as required by this order.

A16

3) No application for a new airman certificate shall be accepted from you, nor shall an airman certificate be issued to you during the period of suspension imposed by this Order.

Naomi Tsuda
Assistant Chief Counsel
   for Enforcement

By:    *Lisa M. Toscano*
       **Lisa M. Toscano**
       Enforcement Division, Western Team
       email:  Lisa.M.Toscano@faa.gov
       Telephone:    (424) 391-2723 (direct)
                     (424) 405-7050 (fax)

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I have transmitted by email a true copy of the

Administrator's Amended Complaint in <u>Administrator v. Trenton J. Palmer,</u> NTSB Docket

No.  SE-308801, addressed as follows:

>   Judge Darrell L. Fund
>   Office of Administrative Law Judges
>   U.S. National Transportation Safety Board
>   490 L'Enfant Plaza East, SW
>   Washington, DC  20594
>   aljappeals@ntsb.gov
>
>   Robert D. Schulte, Esq.
>   Attorney for Mr. Palmer
>   Schulte Booth, P.C.
>   14 N. Hanson Street
>   Easton, MD  21673
>   rschulte@schultebooth.com

Dated:  September 20, 2021

*Lisa M. Toscano*
Lisa M. Toscano
Enforcement Division, Western Team

A18

UNITED STATES OF AMERICA
NATIONAL TRANSPORTATION SAFETY BOARD
WASHINGTON, D.C.

| | | |
|---|---|---|
| Administrator, | ) | |
| Federal Aviation Administration, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | NTSB Docket No.  SE-30880 |
| v. | ) | |
| | ) | Judge Assigned:  Not Yet Assigned |
| Trenton J. Palmer, | ) | |
| | ) | |
| Respondent. | ) | Hearing Date:  Not Yet Assigned |
| | ) | Hearing Location:  Not Yet Assigned |

## RESPONDENT'S ANSWER AND AFFIRMATIVE DEFENSES

COMES NOW, Trenton J. Palmer, Respondent herein, by and through undersigned counsel pursuant to Rule 821.31(b) of the Board's Rules of Practice [49 C.F.R. § 821.31] and hereby files his answer and affirmative defenses to the Administrator's Complaint filed on October 15, 2020.

In support thereof, Respondent states the following:

**Paragraph 1.** Admit.

**Paragraph 2.** Admit.

**Paragraph 3.** Admit.

**Paragraph 4.** Denied.

**Paragraph 5.** Denied.

**Paragraph 6.** Denied.

Any other allegations not specifically numbered by paragraph are hereby denied.

Respondent further denies that he violated 14 C.F.R. §§ 91.119(a), 91.119(c), or 91.13(a) of the Federal Aviation Regulations.

A19

Respondent denies that safety in air commerce or air transportation and the public interest require the suspension of his Private Pilot Certificate number 3786226.

## **AFFIRMATIVE DEFENSES**

1.      The Administrator has failed to state a claim upon which the Board may grant the relief requested.

2.      The Federal Aviation Administration's (FAA's) interpretation of its Federal Aviation Regulations in this case is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. § 706(2)(A).

3.      The FAA's interpretation of its aviation regulations is unconstitutionally vague.

4.      The FAA's application of its Federal Aviation Regulations in this case is contrary to the regulation's plain language.

5.      Respondent asserts that the Administrator lacks substantial basis in law and fact to continue prosecution of this matter against him.

6.      The Administrator's proposed sanction is contrary to agency policy, precedent and procedure.

7.      The Administrator's proposed sanction is contrary to the Pilot's Bill of Rights, Pub. L. 112-153 (Aug. 3, 2012).

WHEREFORE, Respondent respectfully requests that the Board reverse the Administrator's Order of Suspension filed as the Complaint in this matter on October 15, 2020.

A20

Dated:  October 16, 2020

Respectfully submitted,

*Gregory S. Winton*
_____
GREGORY S. WINTON, ESQ.
The Aviation Law Firm
1997 Annapolis Exchange Parkway, Suite 300
Annapolis, MD  21401
Tel: (301) 529-5660
Fax: (866) 568-9886
Greg@AviationLawExperts.com

3

A21

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date sent via electronic mail the foregoing *Respondent's*

*Answer and Affirmative Defenses* addressed to:

Case Manager
Office of Administrative Law Judges
National Transportation Safety Board
Room 4704
490 L'Enfant Plaza East, S.W.
Washington, DC 20594
Tel: 202 314-6150
Fax: 202 314-6158
ALJappeals@ntsb.gov

Lisa M. Toscano
Federal Aviation Administration
Enforcement Division, Western Team
777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245
Lisa.M.Toscano@faa.gov
Tel: (424) 391-2723
Fax: (424) 405-7050

Dated: October 16, 2020

Respectfully submitted,

*Gregory S. Winton*
_____
GREGORY S. WINTON, ESQ.
The Aviation Law Firm
1997 Annapolis Exchange Parkway, Suite 300
Annapolis, MD 21401
Tel: (301) 529-5660
Fax: (866) 568-9886
Greg@AviationLawExperts.com

4

A22

**UNITED STATES OF AMERICA**
**NATIONAL TRANSPORTATION SAFETY BOARD**
**WASHINGTON, D.C.**

| | |
|---|---|
| Billy Nolen, <br> Acting Administrator, <br> Federal Aviation Administration | ) <br> ) <br> ) <br> ) |
| Complainant, | ) NTSB Docket No. SE-30880 <br> ) |
| v. | ) Judge Assigned: Hon. Darrell L. Fun <br> ) |
| Trenton J. Palmer, | ) Hearing Date(s): March 29, 2022 <br> ) |
| Respondent. | ) Hearing Location: Zoom <br> ) |

# RESPONDENT'S MOTION TO DISMISS ADMINISTRATOR'S COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

ROBERT D. SCHULTE
SCHULTE BOOTH, P.C.
14 N. Hanson Street
Easton, Maryland 21610
(410) 850-4600
rschulte@schultebooth.com

*Counsel for Respondent*

1

A23

**Background**

The Administrator filed his initial Order of Suspension on October 15, 2020, subsequently amending it on September 20, 2021 (the "Complaint"). The Administrator's factual allegations did not change between his two (2) pleadings. He charged Respondent with violating various provisions of the Federal Aviation Regulations, including 14 CFR 91.119(a), 91.119(c) and, of course, the residual charge of 91.13(a) in connection with a flight that occurred on November 24, 2019.

Those regulations provide, in pertinent part:

**§ 91.119 Minimum safe altitudes: General.**

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

**(a) *Anywhere.*** An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

**(c) *Over other than congested areas.*** An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

**§ 91.13 Careless or reckless operation.**

**(a) *Aircraft operations for the purpose of air navigation.*** No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

The Rules of Practice in Air Safety Proceedings, and specifically, 49 CFR 821.31(b), state:

***Answer to complaint.*** The respondent shall … file with the Board an answer to the complaint … *The answer shall also identify any affirmative defenses that the respondent intends to raise at the hearing.*

On October 16, 2020, Respondent filed his Answer to the Administrator's Complaint (which the Court adopted as Respondent's Answer to the Administrator's Amended Order of Suspension dated September 20, 2021. In his Answer, the Respondent raised the following, albeit non-exclusive, affirmative defense to the Administrator's Complaint that he intended to raise at

2

A24

the hearing:

> 1. The Administrator has failed to state a claim upon which the Board may grant the relief requested.

In his Paragraph 4 of his Amended Order of Suspension, the Administrator made the following, and only the following, factual allegations relative to the alleged violations:

**4.      During the referenced flight operation, you operated N318JJ at altitudes less than 100 feet AGL and:**

> **a.      within approximately 50 feet of a stable, shed, and propane tank;**
>
> **b.      within approximately 100-150 feet of the residential home at 400 Desert Sun Lane;**
>
> **c.      within approximately 100-150 feet of an adult and a child who were outside the residential home at 400 Desert Sun Lane;**
>
> **d.      within approximately 300 feet of two adults and two children who were outside and near the western perimeter of the residential property at 400 Desert Sun Lane.**

The Administrator's Amended Order of Suspension otherwise simply recites elements of the various charged offenses. See Amended Order of Suspension, ¶¶ 5-6. The Administrator does not allege that the operation of which he complains was "not necessary for takeoff or landing," or, indeed, what flight operation was being conducted. He alleges no facts suggesting why, under the circumstances, Respondent could not have executed an emergency landing without undue hazard to persons or property on the surface if his engine had failed; or facts suggestive of why his operation was otherwise "careless and reckless."

**Argument**

1.      <u>The Administrator's Complaint is Fatally Flawed</u>

The Administrator's Complaint, first filed years ago, and amended in the Fall of 2021, suffers from a fatal dearth of factual *allegata*. As the Board said in *Admin. v. Scott*, EA-4030 (1993), '[b]ecause the complaint is the vehicle by which respondent is given fair notice of the charges he will be expected to defend against ***and*** which facts and circumstances underlie those

3

A25

alleged violations, we cannot give any weight to apparent violations which were not alleged in the Administrator's complaint." (Emphasis added). See also NTSB Order No. EA-4030 at 6 (1993); see also *Administrator v. MacGlashan*, 5 NTSB 1539, 1541 (1986) (the complaint establishes the parameters of the Administrator's case); *Administrator v. Robinson*, 5 NTSB 1690, 1692 (1987) (Board cannot redraft the complaint but must evaluate the evidence in light of the allegations).

With respect to Federal Pleading standards[1], *Aschcroft v. Iqbal*, 556 US 662 (2009) instructs:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," ***but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation***. *Id*., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (citing *Papasan* v. *Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). ***A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do***." 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id*., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads ***factual content*** that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*., at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (Brackets omitted.) (Emphasis added.).

*Iqbal*, 556 U.S. at 677-78.

*Iqbal* describes the Administrator's Complaint to a "T." It contains recitation of the elements of the alleged violations and little more. While there are limited factual allegations in the Administrator's Complaint relative to altitudes and distances from persons and structures on the surface, even taken as true – as this Court must – those allegations simply do not sufficiently

---

[1] As the Court knows, and as a result of the Pilot's Bill of Rights, as amended, the Federal Rules of Procedure must be used in these proceedings "where practicable."

inform his Honor that the Respondent is liable for the misconduct alleged.

Perhaps if the Administrator had alleged that the aircraft was simply 'buzzing' the Likes' residence or showing off; that he had no viable options in the event of an engine failure other than to crash into and harm or persons or property on the ground, or that such an event could or would cause a catastrophic fire; that he was conducting ill-advised low-altitude maneuvers/aerobatics at inappropriate airspeeds (say, like a "knife edge" or "60 degree bank"); that his choice of an intended landing site was "inappropriate;" that he was otherwise harassing a neighborhood at low altitude to scare or "traumatize" people on the ground, or that there were alternative ways to conduct his operation thereby rendering it "unnecessary," there may be a basis for the violations charged. Certainly, it is *possible* that the altitudes and distances alleged in the Administrator's Amended Complaint can be consistent with violations of FAR § 91.119(a) & (c) or even 91.13(a). But the Administrator's Amended Complaint "stops short of the line between possibility and plausibility." <u>556 U.S. at 678</u>.

Indeed, the nearly Four (4) days of hearings and the detailed evidence that the Administrator has pursued and attempted to put before the Court in this matter only makes Respondent's point. Rather than allege specific facts that would make his Complaint plausible on its face that the Respondent committed the offenses alleged, the former merely made a few references to altitudes and distances, cited the elements of FAR § 91.119(a), (c) and § 91.13, and then challenged Respondent to defend himself. Against what?

Low flight over persons, structures and the like is not necessarily a violation of any regulation, and certainly not necessarily of the regulations cited. Put simply, the Administrator's Complaint fails to "give fair notice of the charges the [Respondent] was expected to defend against ***and*** which facts and circumstances underlie those alleged violations." *Scott*, *supra*. It therefore fails to state a claim upon which relief can be granted.

5

A27

B.     14 C.F.R. § 91.119 Contains No Affirmative Defenses

Still, the Administrator urges that FAR § 91.119's prefatory "except as necessary for takeoff and landing" is in the nature of an affirmative defense. Respondent has been unable to find any authority on point.

That said, and in *Admin v. Wick*, SE-16105, the Administrator charged an airman with violations of 14 CFR § 91.119(c) and § 91.13(a) and specifically alleged "that [the airman] operated an aircraft ***when it was not necessary*** for take-off or landing closer than 500 feet to a person, vehicle or structure." *Wick*, pg. 3 (Emphasis added.).  If the Administrator believed that the prefatory language of FAR § 91.119 is an affirmative defense, he would not have alleged it as he did in *Wick*. Taken to its logical conclusion, the Administrator argues that every defense in fact must be pled as an affirmative defense. Respectfully, that makes little sense and would otherwise impose a burden upon respondents that they simply do not have.[2]

To the contrary, the prefatory language in FAR § 91.119 is an element of the offense, albeit a negative element, that must be pled because *that* is the regulatory violation with which Respondent is charged. If altitude and distances were merely all that need be alleged in these types of cases, then literally every takeoff and/or landing would be an offense against which an airman would have to defend himself. Respondent respectfully submits that the NTSB lacks the personnel that would be necessary to handle the avalanche of cases that would ensue with such an absurd application of the law.[3]

For these reasons, the Administrator's Amended Order of Suspension should be dismissed with prejudice.

_____

[2] Respondent also notes that, although the Administrator asserts that he suffers under no burden to plead or prove that point, the latter spent no small effort in his case-in-chief eliciting testimony about the "necessity" *vel non* of Respondent's inspection pass. He cannot have it both ways.

[3] Compare 14 CFR § 91.119 with § 91.3(b), the latter of which permits a pilot to "deviate from any rule of this part to the extent required to meet [an] emergency." *That* is an affirmative defense.

6

A28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have on this date filed and served **Respondent's Motion to Dismiss**

**Administrator's Complaint for Failure to State a Claim upon which Relief can be Granted**

via electronic mail to the following:

> Office of Administrative Law Judges
> National Transportation Safety Board
> Room 4704
> 490 L'Enfant Plaza East,
> S.W.
> Washington, DC 20594
> **ALJappeals@ntsb.gov**
>
> Lisa M. Toscano
> Federal Aviation Administration
> Enforcement Division, Western Team
> 777 S. Aviation Blvd., Suite 150
> El Segundo, CA 90245
> **Lisa.M.Toscano@faa.gov**
> Tel: (424) 391-2723
> Fax: (424) 405-7050

Dated: April 4, 2022

Respectfully submitted,

_____

Robert D. Schulte
Schulte Booth, P.C.
14 N. Hanson Street
Easton, Maryland 21601
(410) 822-1200
rschulte@schultebooth.com

*Counsel for Respondent*

A29

UNITED STATES OF AMERICA
NATIONAL TRANSPORTATION SAFETY BOARD
WASHINGTON, D.C.

| | |
|---|---|
| Administrator,<br>Federal Aviation Administration<br><br>Complainant,<br><br>v.<br><br>Trenton J. Palmer,<br><br>Respondent. | )<br>)<br>)<br>)<br>)  NTSB Docket No. SE-30880<br>)<br>)  Judge Assigned: Honorable Darrell L. Fun<br>)              Administrative Law Judge<br>)<br>)  Hearing dates:  TBD<br>)  Hearing location:  Zoom |

**RESPONDENT'S COMPLIANCE WITH**
**PREHEARING ORDER**

**COMES NOW**, Trenton J. Palmer, Respondent herein, by and through undersigned

counsel pursuant to the Prehearing Order served on January 20, 2022, and hereby states the

following in compliance therewith, without regard to any discovery requests that the parties made

to each other:

**(1) Witnesses:**  A list of the names and addresses of all witnesses the party expects to present

at the hearing, together with a short descriptive statement summarizing the principal points

expected to be provided in each of the witness' testimony:

1.  Trenton J. Palmer
    15010 N. Red Rock Road
    Reno, NV 89508-9530

Mr. Palmer's anticipated testimony concerns the allegations contained in the

Administrator's Complaint, as well as the affirmative defenses raised in his Answer. Specifically,

it is anticipated that his testimony will be that at all times as alleged in the Complaint, he operated

the Aircraft in a manner that was necessary for takeoff or landing and otherwise consistent with

1

A30

FAA Guidance. He will further testify that at no time did he operate the aircraft below an altitude allowing, if a power unit had failed, an emergency landing without undue hazard to persons or property on the surface. Moreover, Mr. Palmer will testify that the purpose of the Aircraft in question is to land in very short distances at off-airport locations.

2. Jared F. Likes
   300 Desert Sun Lane
   Reno, Nevada

Mr. Likes' anticipated testimony concerns the allegations contained in the Administrator's Complaint. Specifically, it is anticipated that his testimony will be that, at all times alleged in the Complaint, Mr. Palmer operated the aircraft in a manner that was necessary for takeoff or landing and that he otherwise gave permission to Mr. Palmer to land his Aircraft on Mr. Like's property.

3. Gabriel Peña
   400 Desert Sun Lane
   Reno, Nevada

Mr. Peña's anticipated testimony concerns the allegations contained in the Administrator's Complaint.

4. Julia Peña
   400 Desert Sun Lane
   Reno, Nevada

Ms. Peña's anticipated testimony concerns the allegations contained in the Administrator's Complaint.

5. Roger Pelham, MPA
   Senior Planning and Building Division Community Services
   Washoe County, Nevada

Mr. Pelham's anticipated testimony concerns the allegations contained in the Administrator's Complaint; as well as his statement contained in the FAA enforcement investigative report.

A31

**(2) Expert Witnesses:**

Respondent has not identified any expert witnesses, but Respondent may offer opinion testimony consistent with his personal knowledge of the Aircraft in question and its operational qualities.

**(3) Hearing Participants:**

1. Jared Likes
11050 Larson Ranch Road
Reno, NV 89508
775-690-5771

2. Mrs. Julia Pena
400 Desert Sun Lane
Reno, NV 89508
juliapenac@gmail.com
775-970-5647

3. Mr. Gabriel Pena
400 Desert Sun Lane
Reno, NV 89508
gpenanv@gmail.com
775-970-5647

4. Mr. Russell Stanley
1870 Harte Rd.
Reno, NV 89521-7447
pitrider24@earthlink.net
760-529-6426

5. FAA Aviation Safety Inspector Ronald R. Green
Nevada Flight Standards District Office – Reno
5466 Longley Lane
Reno, NV 89511
ronald.r.green@faa.gov
912-659-5860

6. Respondent, Trenton J. Palmer
Attn: Robert D. Schulte
rschulte@schultebooth.com
410-822-1200

A32

7. Expert Witness FAA Aviation Technical Specialist Roy J. Speeg, Jr.
AFS-850
roy.j.speeg-Jr@faa.gov
406-465-6088

8. Respondent's Attorney
Robert D. Schulte
Schulte Booth, P.C
14 N. Hanson Street
Easton, MD 21601
rschulte@schultebooth.com
410-822-1200

9. Complainant's Attorney
Lisa M. Toscano, Esq.
FAA Attorney
Western Team, Enforcement Division
AGC-300, Office of the Chief Counsel
777 S. Aviation Blvd., Suite 150
El Segundo, CA 90245
lisa.m.toscano@faa.gov
424-405-7065

**(4) <u>Exhibits:</u>**

Respondent intends to rely upon and introduce any and all exhibits identified or otherwise introduced by the Complainant in this matter. Additionally, Respondent intends to rely upon and introduce the following exhibits:

R-1: Federal Aviation Administration Off Airport Ops Guide

R-2: Respondent Aerial Diagram

R-3: Palmer STOL Competition Results

**(5) <u>Oversize, bulky, or heavy exhibits:</u>** If the Respondent offers any such exhibits into evidence, he will be prepared to provide a reasonable representation or depiction of the actual exhibit for inclusion in the record.

**(6) <u>Transcripts of tape recordings:</u>** Respondent does not intend to offer any tape records into the record.

4

A33

(7) **Objections to Exhibits:** Pursuant to the Prehearing Order, Respondent will file Notice of

Objections as to any of the Administrator's exhibits at the appropriate time.

(8) **Citations to Authority in Support of the Respective Party's Case and Supportive of Arguments Relative to the Appropriate Sanction:**

    (a)    **Citations to Authority in Support of the Respondent's Case:**

        i.    *Admin. v. Burton*, 3 N.T.S.B. 3357 (1981); NTSB Order EA-1570

        ii.    *Admin. v. Kachalsky*, NTSB Order No. EA-4847 (2000);

        iii.    *Admin. v. Bourgeois*, NTSB Order No. EA-5427 (2009);

        iv.    *Admin. v. Glinn,* NTSB Docket No. SE-18856 (2010)

        v.    *Admin. v. Paradowski,* NTSB Order EA-3962 (1993)

        vi.    *Admin. v. Lyngzeidetson,* NTSB Order EA-4296 (1994)

        vii.    *Admin. v. Johnson,* NTSB Docket No. EA-6530 (1985)

        viii.    *Admin. v. Haeg*, NTSB Order EA-5679 (2013)

        ix.    *Admin. v. Smith,* NTSB Order EA-2810 (1988)

        x.    *Admin. v. Sumler,* NTSB Order EA-5353 (2008)

        xi.    Nev. Rev. Stat. Ann. §493.050

        xii.    *Admin. v. Slovak*, 2 NTSB 743 (1974); NTSB Order EA-557

        xiii.    *Admin. v. Player*, 3 NTSB 3498 (1981); NTSB Order EA-1597

        xiv.    *Admin. v. Pearson*, 1 NTSB 900 (1969); NTSB Docket No. SE-1077

        xv.    *Admin. v. Latham,* NTSB Order EA-3506 (1992)

        xvi.    *Admin. v. Dudek,* 2 NTSB 2551 (1976); NTSB Order EA-935

    (b)    **Arguments Relative to the Appropriate Sanction:**

No sanction is warranted because the Airman was operating the Aircraft in accordance with

5

A34

FAA Guidance. Even assuming to the contrary, the sanction sought by the Administrator is grossly disproportionate to the offenses alleged, and is inconsistent with sanctions imposed by the Administrator for like alleged conduct and with prior decisions of the Board.

Dated: March 8, 2022

      Respectfully submitted,

                    */s/ Robert D. Schulte*

                    ROBERT D. SCHULTE, ESQ.
                    Schulte Booth, P.C.
                    14 N. Hanson Street
                    Easton, MD 21601
                    Tel: (410) 822-1200
                    Fax: (410) 822-1299

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this date served a copy of Respondent's Compliance with Prehearing Order via electronic mail addressed to:

> Honorable Stephen R. Woody
> Administrative Law Judge
> National Transportation Safety Board
> Room 4704
> 490 L'Enfant Plaza East, S.W.
> Washington, DC 20594
> **ALJappeals@ntsb.gov**

> Lisa M. Toscano
> Federal Aviation Administration
> Enforcement Division, Western Team
> 777 S. Aviation Blvd., Suite 150
> El Segundo, CA 90245
> **Lisa.M.Toscano@faa.gov**
> Tel: (424) 391-2723
> Fax: (424) 405-7050

> Respectfully submitted,

> */s/ Robert D. Schulte*

> _____
> ROBERT D. SCHULTE, ESQ.
> Schulte Booth, P.C.
> 14 N. Hanson Street
> Easton, MD 21601
> Tel: (410) 822-1200
> Fax: (410) 822-1299

7

A36

```
                         UNITED STATES OF AMERICA
                  NATIONAL TRANSPORTATION SAFETY BOARD
                   OFFICE OF ADMINISTRATIVE LAW JUDGES

* * * * * * * * * * * * * * * * * *
In the matter of:                  *
                                   *
BILLY NOLEN,                       *
ACTING ADMINISTRATOR,              *
FEDERAL AVIATION ADMINISTRATION,   *
                                   *
                 Complainant,      *
     v.                            *   Docket No.: SE-30880
                                   *   JUDGE FUN
TRENTON J. PALMER,                 *
                                   *
                 Respondent.       *
* * * * * * * * * * * * * * * * * *
```

                       Via Zoom videoconference


                       Wednesday,
                       April 6, 2022

     The above-entitled matter came on for Initial Oral

Decision, pursuant to notice at 1:00 p.m. Eastern Standard Time.

                BEFORE:   DARRELL L. FUN
                          Administrative Law Judge

                     FREE STATE REPORTING, INC.
                  Court Reporting  Transcription
                     D.C. Area 301-261-1902
                     Balt. & Annap. 410-974-0947

APPEARANCES:

On behalf of the Administrator:

LISA M. TOSCANO, ESQUIRE
Federal Aviation Administration
Enforcement Division - Western Team
777 South Aviation Boulevard, Suite 150
El Segundo, California 90245
(424) 391-2723
Lisa.m.toscano@faa.gov


On behalf of the Respondent:

ROBERT D. SCHULTE, ESQUIRE
Schulte Booth, PC
14 Hanson Street
Easton, Maryland 21601
(410) 822-1200
rschulte@schultebooth.com

636

1                    ORAL INITIAL DECISION AND ORDER

2                                              (1:50 p.m. EST)

3       JUDGE FUN:  Good afternoon, I am Administrative Law Judge

4  Darrell L. Fun and was assigned to hear the case of Billy Nolen,

5  Acting Administrator of the Federal Aviation Administration v.

6  Trenton J. Palmer, Docket Number SE-30880.

7       This is a proceeding before the National Transportation

8  Safety Board held pursuant to the provisions of the Federal

9  Aviation Act pertaining to the Administrator's Amended Order

10 suspending Respondent's private pilot certificate for 120 days.

11      Today is April 6, 2022.  Pursuant to the Board's Rules of

12 Practice, I am issuing my Initial Oral Decision.  Pursuant to

13 Notice, this case proceeded to a hearing on the merits, with

14 evidence and arguments presented over a 3-day period, on March

15 29th and the 30th, and April 1, 2022.  My decision is based on the

16 evidence presented during the hearing, as well as the pleadings in

17 this matter.

18      Present and representing the Administrator is Lisa M.

19 Toscano, an attorney with the Federal Aviation Administration,

20 Western Enforcement Team.  Attorney Robert D. Schulte represents

21 the Respondent Trenton J. Palmer, who were both present throughout

22 these proceedings.  Mr. Palmer waived his presence on April 4th

23 during closing statements and my decision on his motion to dismiss

24 for failure to state a claim.

25      The Amended Complaint alleges that the Respondent operated a

A39

637

1  1997 Johnson John T Kitfox with registration number November 31

2  8JJ (N3188J) at an altitude that would not allow for an emergency

3  landing without undue hazard to persons or property if a power

4  unit failed, in violation of 14 CFR, Section 91.119(a).

5      It is alleged he operated at altitudes of less than 100 feet

6  above ground level and, more specifically, operated within

7  approximately 50 feet of a stable, shed, or propane tank; within

8  approximately 100 to 150 feet of a residential home at 400 Desert

9  Sun Lane; within 100 to 150 feet of an adult and child outside of

10 the home; and within 300 feet of 2 adults and 2 children outside

11 of the home and near the perimeter of the property.

12     It is therefore alleged that he also violated 14 CFR, Section

13 91.119(c) in that he operated closer than 500 feet to any person,

14 vessel, vehicle or structure in a sparsely populated area.  As

15 stated in the regulation, the exception to operating below these

16 minimums is when it is necessary for takeoff or landing.

17     Finally, the Administrator alleges that these circumstances

18 violate 14 CFR, Section 91.13(a) in that Respondent operated in a

19 careless or reckless manner so as to endanger the life and

20 property of another.

21     The Respondent's answer admitted to paragraphs 1, 2 and 3.

22 He denied paragraphs 4, 5 and 6, as well violating the

23 regulations.  Respondent's admissions to paragraphs 1, 2 are

24 deemed to be conclusively established as undisputed fact.  The

25 Administrator, therefore, had the burden of proving paragraphs 4,

A40

638

1  5 and 6 by a preponderance of the evidence.  Respondent's answer

2  sets forth seven numbered affirmative defenses.

3      At the beginning of the first day, the Respondent moved to

4  dismiss the Amended Complaint for failure to state a claim upon

5  which relief can be granted.  The parties were afforded an

6  opportunity to submit briefs, which I considered.  I issued my

7  decision denying Respondent's motion to dismiss on April 4, 2022.

8  I do not repeat the basis of my ruling as it is already on the

9  record.

10      Due to the pandemic and at the request of the parties this

11  matter was heard virtually using the Zoom Program.  As a result,

12  parties and witnesses appeared and testified via video from their

13  respective locations during the hearing.  The parties were

14  afforded a full opportunity to make opening statements, to call

15  and question witnesses, to present evidence, and to make closing

16  arguments in support of their positions.

17      I have considered all of the evidence properly admitted, both

18  testimonial and documentary, in my decision.  However, I do not

19  intend to discuss all of the evidence in detail.  Any evidence

20  that I do not specifically mention or omit is viewed as being

21  either corroborative or not materially affecting the outcome of my

22  decision.

23      The following exhibits were admitted into evidence.  Exhibits

24  A-2 and A-6; pages 1 and 3 of A-13; pages 1, 3, 5, 7, 9, 11, 13,

25  15 and 17 of Exhibit A-17; A-19;  A-22;  A-23; and A-28.

A41

639

1       Exhibits A-3 and A-4 were admitted only for the limited

2   purpose of sanction to demonstrate notice or knowledge, as well as

3   to show progressive discipline, but not for purposes of

4   demonstrating aggravating circumstances.

5       Administrator's Exhibits A-7 and A-9 were not admitted.

6   Respondent objected.  Mr. Pena testified that he had provided the

7   FAA with a USB and possibly a CD, which was an actual copy of the

8   video from the DVR hard drive.  The Administrator was unable to

9   explain the whereabouts of either the USB or CD.

10      Additionally, Exhibit A-7 depicted a partial video that Mr.

11  Pena took using his iPhone while recoding what the DVR monitor was

12  playing.  He noted that when viewing Exhibit A-7 he could see the

13  roof attic trusses in the background behind the DVR monitor

14  screen, as well as the edge of the monitor.  I also noted that A-7

15  did monitor and appears to cut off the bottom portion of the

16  monitor, as well as part of the left side of the monitor.

17      Exhibit A-9 was similarly a partial video that Mr. Pena took

18  using his iPhone while recoding what the DVR monitor was playing.

19  These Exhibits were not the best evidence, especially in light of

20  the undisputed testimony that Mr. Pena provided the FAA with a USB

21  and perhaps CD of a copy of the original from the DVR, and the FAA

22  had several opportunities to obtain the original video during

23  multiple visits to the Penas.

24      The Administrator also failed to show that Mr. Pena's iPhone

25  fully captured what was being seen on the DVR monitor, in terms of

A42

640

1  the length of the video, as well as the full picture, so it was

2  not a fair and accurate depiction.  I excluded these exhibits

3  based on the best evidence rule and lack of foundation.

4      The Administrator offered Exhibit A-11, but did not further

5  seek its admission.  I find that there was no foundation for

6  Exhibit A-11 and it also fails the best evidence rule.  A-11

7  apparently consisted of two still photographs from Mr. Pena's

8  iPhone video recording, which I again noted was a recording of

9  another video.

10      The Administrator offered Exhibits A-29, A-30 and A-31.

11  Exhibit A-30 was essentially A-13 but with a certificate of

12  authenticity.  Respondent objected to these exhibits.  With

13  regards to Exhibits A-29 and A-31, they were untimely and had not

14  been listed as exhibits in the Administrator's prehearing

15  submission.

16      Exhibit A-21, excuse me, Exhibit A-29 is hearsay since it was

17  purported to be a summary of a telephone call that Inspector

18  Morgan wrote.

19      Exhibit A-31 was a flight path Inspector Green created based

20  on his review of the investigative file and witness statements.

21  Parts of the flight path were based on assumptions since no

22  witness saw the full flight path.  Additionally, parts of what was

23  depicted conflicted with eye-witness testimony.

24      Exhibit A-30 suffered from the same problems.

25      Furthermore, both exhibits contained hearsay statements on

1 them.  As such, these exhibits were neither reliable nor helpful.

2 For these reasons, I sustained the objection and excluded these

3 exhibits.

4     While there were several other exhibits identified in

5 prehearing submissions by both parties, they were neither offered

6 nor admitted so they were not considered.  Exhibits that were used

7 as demonstrative aids or used to refresh a witness' memory were

8 not admitted nor considered as evidence.

9     The Administrator's counsel presented the testimony of

10 Gabriel Pena, Julia Pena, Russell Stanley, Respondent Trent

11 Palmer, and FAA Inspector Ronald R. Green as a fact witnesses.

12 And FAA Technical Specialist Roy Speeg, Jr., as an expert witness.

13     The Respondent's counsel presented the testimony of Jared F.

14 Likes and Respondent Trent Palmer as fact witnesses.  All

15 witnesses testified under oath.

16     In summary, Gabriel Pena testified to living at 400 Desert

17 Sun Lane, Reno, Nevada, for approximately 5 years.   On

18 November 24, 2019, around noon, he was standing at the fence line

19 of his property due west of his house talking to his neighbor, Mr.

20 Russell Stanley.  He was shown Exhibit A-15, page 7, that depicts

21 a Google Earth satellite image of his residence and surrounding

22 property for demonstrative purposes.  He was standing with Mr.

23 Stanley, which was west of his house and in line with his fence

24 line to the north.  While talking to Mr. Stanley, his wife arrived

25 with their two kids.  His wife stopped and dropped off their

1  daughter with Mr. Pena and continued to garage to park the car.

2      The Penas' garage faces south.  Mr. Pena said that after his

3  wife parked, she began walking towards him while carrying their

4  son.  Mr. Pena stated he heard an incredible engine noise, and

5  that's in quotes, quote, "an incredible engine noise," end quote,

6  coming from the north as his wife passed near the front door.

7      Mr. Pena indicated he was startled by the noise and looked

8  towards where it was coming from, but could not see anything.  He

9  believes the airplane was too far away for him to see.  However,

10  he began yelling to his wife to run away from the house.  He did

11  this out of instinct because he thought something was going to

12  crash into their house.

13      He estimates that when he heard the airplane and began

14  yelling at his wife to run, she was approximately 140 to 150 feet

15  away.  Mr. Pena stated that when the airplane came into his view,

16  it was above the ridge line of his house and was making an

17  aggressive left bank maneuver, or a hard east banking maneuver.

18      He estimates that his wife was approximately 140 to 160 feet

19  away from the airplane's flight path as it came into his view

20  above the roof line of his house.  He estimates being 300 feet

21  away from the airplane's flight path when he saw it above the roof

22  line of his house.

23      In terms of height above the ground, Mr. Pena stated that the

24  ridge line of his roof is approximately 20 feet above the garage

25  grade, and the airplane was approximately 25 to 35 feet above the

643

1   grade of his garage.  He estimated the airplane's flight path as

2   being approximately 5 to 10 feet above the ridge line of his

3   house.

4       Mr. Pena testified that he could not initially see the flight

5   path since his house blocked his line of sight, so he only saw the

6   airplane after it came into view over the ridge of his house.  He

7   also did not see the airplane fly over the propane tank, which is

8   located southeast of his house, off the eastern corner of his

9   garage, since the house was between him and the propane tank,

10  which blocked his view.  However, Mr. Pena estimates that the

11  flight path as being above the propane tank based upon his

12  knowledge of his property and the location of the propane tank, as

13  well as the flight path he observed as the airplane came into his

14  view above the ridge line of his house making a left turn.

15      He also observed the aircraft straighten out towards his

16  neighbor's house to the south, which is Mr. Likes' house, and then

17  pull up.  Mr. Pena testified that he thought the airplane was

18  going to crash into his neighbor's house, but pulled up at the

19  last minute.

20      Mr. Pena stated he is fairly good at estimating distance

21  because he served 4 years with the Naval Construction Battalion,

22  or Seabees, as a MK-19 grenade launcher, which required him to

23  estimate distances for targeting.  He stated he used the ridge

24  line of his house and his familiarity with his property as guides

25  for calculating the distances.

A46

644

1     Mr. Pena testified that he was, that he has a security camera

2    that is located between the peak of his house above the garage,

3    which captured the flight path of the airplane as it passed by the

4    back of his house.  He identified Exhibit A-13, page 1, as a

5    photograph showing the security camera below the ridge line of his

6    house.  The security camera is approximately 18 feet above the

7    garage grade.  He has another security camera above the front door

8    of his house, which captures where his wife was standing.  He

9    identified Exhibit A-13, page 4, as a photograph showing the

10    security camera above the front door.

11    Mr. Pena said that these security cameras are constantly on

12    24 hours a day and 7 days week.  The cameras record to a

13    2 terabyte hard drive or a DVR, with an attached monitor for

14    viewing the recordings.  The recording system is located in the

15    attic.  He downloaded a portion of the recordings, approximately

16    10 to 15 seconds, from both the garage peak camera and front door

17    camera to a USB, which he says he gave to the FAA.

18    Mr. Pena says that there is no way to download a slow-motion

19    version of the DVR, so he used his iPhone to record a slow motion

20    playback being displayed on the DVR monitor.  He also stated he

21    used his iPhone to take two still photographs of the airplane

22    being displayed on the DVR monitor when he paused the playback.

23    The Administrator sought to offer and admit Exhibit A-7.

24    Respondent's Counsel objected.  During voir dire by Respondent's

25    counsel, Mr. Pena admitted that he did not provide the FAA the

FREE STATE REPORTING, INC.
Court Reporting Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A47

645

1  original recordings or DVR.  He did not provide the FAA the full

2  day that was recorded, but only approximately 10 to 15 seconds of

3  the recording.  In addition to a USB, which was a direct copy of

4  the DVR, he also gave the FAA a CD with the same copy of the

5  recording.  In addition to Exhibit A-7, Respondent objected to A-9

6  and A-11.  As previously stated, I excluded these exhibits.

7       Mr. Pena said that the FAA investigators came out to his

8  property to take photographs and measurements.  He was present

9  during this time, and explained to them locations where he saw the

10 airplane and its flight path.  Exhibit A-17, page 1, is a

11 photograph of the front of the garage, with Mr. Pena on the left

12 and Mr. Morgan from the FAA on the right.  They are looking at the

13 location of the garage peak camera.

14      Mr. Pena again said that the security camera is approximately

15 18 feet above the garage grade with the roof line at 20 feet.  The

16 garage doors face south.  To the east of the garage, or right side

17 of the photo, there is a dog kennel.  To the west, or left side of

18 the photo, is a bay window.  The front door is on the left side of

19 the bay window and the front door faces southwest.

20      Mr. Pena identified page 3 as a photograph showing a view

21 from the center line of the garage peak looking east, where the

22 propane tank is located and a shed just past the propane tank.

23 To the far left of the photograph, or north of the propane tank

24 and shed, the photo shows the corner roof of the chicken coop.

25      Mr. Pena was shown Exhibit A-17, page 5, which he testified

A48

646

1    was a photo from the center line of the garage peak to the area of

2    the flight path, which was 30 feet.

3        Referring to page 7, this is a photograph of the propane tank

4    and Inspector Morgan, with the shed behind the propane tank.  Mr.

5    Pena says it is approximately 18 feet from the wall of the house

6    to the propane tank.  It is a 500-gallon propane tank that he

7    keeps 80 percent full.

8        Page 11 is a photograph of the measurement from the center

9    line of the garage to the shed.

10        Page 15 shows the front concrete garage driveway looking

11    south towards Mr. Likes' property.  The measurement is from the

12    garage peak center line to the fence line, where an FAA employee

13    is standing.  Mr. Pena explained that the airplane's flight path

14    was from the north by northeast to the south by southwest.  The

15    airplane flew over his property, made a 90 degree bank to the

16    left, then flew straight before making a slight dip and climbing

17    to the south by southeast over Mr. Likes' house and into the

18    horizon.  Mr. Pena estimates that the airplane was approximately

19    30 feet above Mr. Likes' roof peak.

20        Mr. Pena was shown Exhibit A-13, page 3, which is a

21    photograph of the front porch and door, with the security camera

22    on the right side of the photograph.  The roof peak is the same

23    height as the garage peak on his house and the airplane was

24    approximately 5 to 10 feet, excuse me, was approximately 5 to

25    10 feet above the roof peak.  As the garage slopes away from his

A49

647

1  house, with the propane tank being 6 feet lower than the garage
2  grade, he estimates that the airplane was 30 feet above the
3  propane tank.

4      On cross-examination, Mr. Pena admitted that he had never
5  seen the aircraft before November 24th, but had seen it
6  afterwards.  He confirms that the airplane made a single pass.
7  That there were no, that there was no harm to any property, but he
8  felt his daughter and him were traumatized.  He admitted that
9  nobody in his family sought medical assistance for trauma.  And
10 although he is a combat veteran, his daughter was traumatized
11 more.

12     He admitted the airplane was not directly overhead of himself
13 or his wife.  He admitted that his house was between where he was
14 standing and the path of the airplane, so he could not see the
15 actual flight path.  He confirmed that beyond the shed to the east
16 is open land.  He did not know what kind of engine or propeller
17 the airplane had and stated he is not that familiar with
18 airplanes.

19     On redirect, Mr. Pena explained that his family was
20 traumatized by the aircraft flying so low and close to them.  They
21 were visibly shaken and afraid that the airplane was going to
22 crash into their house or the neighbors.  He stated his daughter,
23 who was 3 or 4 years old at the time, still asks about an airplane
24 crashing when she hears one nearby.  His son was a 1 year's old at
25 the time.

A50

648

1       I asked questions to clarify Mr. Pena's testimony.  When he

2  first heard the airplane but could not yet see it, his first

3  reaction was a fight or flight response.  He was startled by the

4  noise, but could not see the airplane.  He then began to yell at

5  this wife.  When the airplane came into view, he was in disbelief,

6  anger and shock.

7       Julia Pena testified lives at 400 Desert Sun Lane.   On

8  November 24th, she was coming home with her two kids.  Her husband

9  was at west fence line talking to their neighbor, Mr. Stanley.

10  She stopped briefly and let her daughter stay with her husband.

11  She then continued on to the house to park.  She began walking

12  back towards her husband carrying her son.

13       When she was near the front door of the house, she heard a

14  loud engine.  She could not see her husband yelling and waving,

15  but could, she could see her husband yelling and waving, but could

16  not hear him over the sound of the engine.  When she began looking

17  around, she saw the airplane.  She thought it was going to crash

18  into the neighbor's house and there was an emergency.  She says

19  she was dumbfounded, shocked, and it was a frightening scenario.

20  She filed a report with the FAA because of her concerns.

21       Mr. Pena, excuse me, Mrs. Pena said she could not initially

22  see the airplane because the house blocked her view of the

23  airplane until it passed the edge of the garage at the southern

24  end of the house.  She could not say how high it was when she saw

25  it, and guesses it was less than 100 feet above the ground and

649

1  maybe 50 feet above the ground.  She noted that the ground slopes

2  away from the house so she was using the gravel driveway just

3  south of the garage's driveway as a reference for her 50-foot

4  estimation.

5      She did not see the flight path behind the house nor could

6  she see the stable, shed, or propane tank as the house blocked her

7  view.  She believes that the airplane flew over the house, excuse

8  me.  She believes that the airplane flew over the horse stable,

9  shed, and propane tank given the path it was taking when it came

10 into her view.

11     When the airplane first came into her view, it was banked and

12 she saw the underside of the right wing.  The right wing was up

13 and the left wing was down.  The airplane was low enough that she

14 could see the red, white, and blue stripes.  The airplane then

15 turned straight over the gravel driveway and flew over the fence

16 line to the south, towards the neighbor's property.  She had a

17 good view of the airplane when it straightened out and saw it pull

18 up at the least, excuse me, and saw it pull up at the last minute

19 near the neighbor's house.

20     Mrs. Pena viewed Exhibit A-14, page 3, a Google Earth

21 satellite image for demonstrative purposes.  Her husband and

22 daughter were west of the house at the west fence line, talking to

23 Mr. Stanley.  When her husband was yelling and waving at her, she

24 could see his excitement, but did not know where to run as she

25 could not hear her husband, nor could she see the airplane.

A52

1    A-14 depicts a circular driveway with four pine trees in the

2    middle, which is the gravel runway, excuse me, the gravel driveway

3    she was referring to when she saw the airplane and estimated it as

4    being 50 feet above ground.  She says the airplane was at the same

5    level passing over the fence line until it reached the neighbor's

6    house and then pulled up quickly.

7        She could not recall if the airplane passed over Mr. Likes'

8    house, just nearby or over the swimming pool.  She remembered

9    focusing on the airplane and noting it flew straight after pulling

10   up and continued to the west horizon.  Mrs. Pena was shown Exhibit

11   A-7 to refresh her memory and recalled the airplane passing near

12   the eastern side of the swimming pool and the edge of the

13   neighbor's garage.

14       She identified the various structures and their locations in

15   Exhibit A-17, pages 1, 3, 7, 11 and 15.  She identified on page 15

16   the gravel roundabout and the measuring tape extending out to the

17   south fence line of Mr. Likes' property with his house shown in

18   the distance.

19       On cross-examination, Mrs. Pena admitted that when she first

20   saw the airplane it was in a left bank and turning away.  She

21   estimates seeing the airplane for 2 to 3 second as it came into

22   her view.   Referring to Exhibit A-14, page 3, she indicated the

23   area east of their property line is pasture or open field.  She

24   admitted to talking to Mrs. Toscano 2 to 3 times on the phone, but

25   that her husband was not with her or present on the call.  Mrs.

A53

1   Pena indicated that Mrs. Toscano did not independently speak to

2   her husband and that she, Mrs. Pena, passed information to her

3   husband about the timing of the trial.

4        She admitted that the Reno Stead Airport is approximately 20

5   minutes away or 7 nautical miles away, and that the Reno Air Races

6   are held there annually.  She has heard and seen airplanes

7   participate in the air races over the BLM land, over the mountain

8   range in the past.

9        Russell Stanley testified that was living at 4445 Desert Sun

10  Lane, Reno, Nevada, on November 24, 2019.  When he was living in

11  Reno, he was neighbors with the Penas and they would meet at the

12  fence line and talk.  Referring to Exhibit A-14, page 3, for

13  demonstrative purposes, he identified his house in the upper left

14  corner or the northwest, and Mr. Pena's in the upper right corner

15  or northeast.  He does not know the neighbor to the southeast, or

16  bottom right corner of the photograph.  Mr. Stanley testified that

17  to the north of his and Mr. Pena's property is BLM land and to the

18  east of Mr. Pena's is the mountain range.

19       On the 24th, he was at the fence line talking with Mr. Pena

20  for about an hour when he noticed an airplane fly by.  He first

21  saw the airplane to the far east near the mountain range coming

22  from the south.  He estimated the airplane being approximately a

23  mile away over BLM land.

24       He saw the airplane turn left, towards the property, and come

25  towards them at a lower altitude.  He didn't know how high the

A54

1  airplane was over the mountain range, but estimates it was 80 feet

2  above the ground after it turned towards the Pena's property.  His

3  80-foot estimate is based upon his familiarity with tall poles at

4  a golf driving range.  He explained that he is working at Big Shot

5  Golf in Texas, which is a driving range, and they have 80-foot and

6  140-foot tall poles, so this gave him a reference for those

7  heights.

8       Mr. Stanley described the airplane flying at the same level

9  of 80 feet with a steady altitude.  He could not see the airplane

10  coming towards the north end of Mr. Pena's house, excuse me, let

11  me rephrase that.  He could see the airplane come towards the

12  north end of Mr. Pena's house above the roof line.  He estimates

13  that the airplane was as far away from the house as it was high.

14  Mr. Stanley says the speed was constant.

15       As it got closer, he lost sight of it since the airplane was

16  too low for him to see above the top of the house.  After it

17  passed Mr. Pena's house to the south, he saw the airplane make a

18  left turn as he could see the bottom of the wing.  He stated that

19  if the airplane did not turn, it would have hit the neighbor's

20  house.  Mr. Stanley said it was a slight turn and not a drastic

21  turn.  The airplane then flew parallel to the neighbor's house

22  after the turn.  He said the airplane seemed to climb during the

23  turn and maybe gained 15 to 20 feet.  Mr. Stanley said that

24  Mr. Pena and he looked at each other with quizzical expressions.

25  Mr. Stanley stated he has seen this aircraft flying several times

A55

653

1 before, but this was the first time it was that low.  He said it

2 was a clear day on the 24th.

3      On cross-examination, Mr. Stanley agreed that east of Mr.

4 Pena's property line is open scrub brush.  Referring to Exhibit

5 A-14, page 3, he confirmed that the airplane was closer to the

6 mountain range than Mr. Pena's house when he first saw it.

7 However, he says he saw it turn inbound.  Mr. Stanley confirmed

8 that when the airplane flew past the property, it made a slight

9 left turn.  He considers the Penas friends, but has not talked to

10 them for some time.  He is not a pilot.  And he said he was not

11 particularly bothered by the fly-by.

12      The Administrator's counsel then called the Respondent Trent

13 Palmer to testify.  Respondent testified that the wingspan of his

14 Kitfox is 32 feet.  The cruising altitude is 100 miles per hour

15 and the landing speed is 32 miles per hour.  He confirmed having

16 900-plus hours as pilot-in-command of his Kitfox.

17      Referring to Exhibit A-3, page 6, Respondent admitted to

18 receiving a verbal counseling from Oscar Lee of the Reno Field

19 Service District Office, or FSDO.  There was a video showing

20 Respondent throwing a UAS, or unmanned aircraft system, out of his

21 Kitfox near a radio controlled or RC runway.

22      Respondent was counseled about careless or reckless

23 operations under CFR Section 91.19 and dropping objects from an

24 aircraft under Section 91.15.  Respondent stated that a CFI, or

25 Certified Flight Instructor, was the pilot-in-command of his

A56

654

1  Kitfox while he was a passenger flying a UAS.

2      Respondent also admitted to receiving a warning notification

3  for carrying passengers and water-skiing on Lake Tahoe.  Exhibit

4  A-4 is this warning letter.  He explained that water-skiing is

5  where you drag your wheels on the water.

6      Respondent did not recall the details of a conversation he

7  had with FAA Inspector Morgan on December 2nd.  He did not recall

8  saying he that he did not see anyone, and that he might have flown

9  over a hunter.  Respondent did recall meeting with the FAA

10 investigators the next day, December 3rd, where he was shown a

11 video from November 24th.  Respondent admits that he was the

12 pilot-in-command of his Kitfox, that he was operating in the

13 vicinity of 300 and 400 Desert Sun Lane, and that he had operated

14 less than 100 feet above ground level.

15     On November 24th, Respondent says he made a low pass

16 inspection of the RC runway that was in the backyard of his

17 friend's house in accordance with FAA's Off-field OPS Guide.  He

18 had permission of his friend to land, but he did not intend to

19 land on the first pass.  Respondent confirms he was alone on the

20 flight.  He stated the purpose of this low-level pass was to

21 ascertain the surface conditions and feasibility of the landing

22 site.  Respondent said he had not previously conducted, excuse me.

23 Respondent said he had previously conducted a prior high-level

24 pass and ground inspection.  He was vague about when such high-

25 level passes or ground inspection were conducted.

A57

655

1      Mr. Schulte?

2      MR. SCHULTE:  I'm here, Your Honor.  I'm sorry.

3      JUDGE FUN:  All right.

4      MR. SCHULTE:  I just glitched up.  That was my fault.

5      JUDGE FUN:  Okay.  Just wanted to make sure you were still

6  there.

7      MR. SCHULTE:  I'm still here.  I'm not going anywhere.

8      JUDGE FUN:  On the 24th, Respondent determined that the

9  runway was not suitable on his low level pass.  He was not at

10  cruise speed, but flying at 7 miles per hour so he could time the

11  distance traveled using the formula of 1 second per 100 feet at 70

12  miles per hour.  He testified he was in a stable flight and offset

13  to the right side center line of the runway so he could look out

14  his left window for a better view of the runway during the low

15  pass.

16      Respondent stated he was assessing the conditions and length

17  of the runway.  Respondent says he did not attempt a landing

18  because he decided that it was not suitable.  The primary reason

19  it was not suitable was because the touchdown location was hard to

20  spot and identify.  The Respondent explained that the --

21  Respondent explained that the operations guide states to touchdown

22  within one aircraft length of the touchdown location, but since he

23  could not identify the touchdown location he did not believe he

24  could do so within one aircraft length.  At the time of his low

25  level pass, Respondent says he was headed in a south to southwest

A58

656

1  direction.

2       When asked about conducting prior high level passes,

3  Respondent says that for this location he did so between 500 to

4  1,000 feet above ground level.  He was vague about when he

5  conducted a high level pass, saying he had done so on several

6  other flights and had done so earlier that day.   Respondent

7  explained that earlier that day he was near Fred's Mountain and

8  had looked out and seen the runway.  He considered this a high

9  level reconnaissance as he was looking for powerlines or

10  obstructions that precluded a low level pass.  He vaguely referred

11  to having conducted multiple high level passes during normal

12  operations when flying in the area in the past and that he is

13  often flying in that area.

14       When asked if he specifically performed a high level pass on

15  the 24th, Respondent again said he had previously done so about an

16  hour earlier when he was flying north to Bedell Flats.  Respondent

17  says there is a traffic corridor from Reno Stead Airport to Bedell

18  Flats, which takes you over 300 Desert Sun Lane.  When he flew

19  this routing, he was keeping it in mind to perform a low level

20  pass on his return.  When returning from Bedell Flats is when he

21  performed a low level pass of 300 Desert Sun Lane.  Respondent

22  again said he considered it high reconnaissance when he flew over

23  the area on several other occasions in the past and looked at the

24  area to assess it at a higher level.

25       When asked why he did not land, Respondent said his

A59

657

1    assessment was the RC runway had a northeast departure only, which

2    meant there was one-way in and one-way out.  He testified he did

3    not approach the area from the south because there are powerlines

4    and more houses.  As a result, he determined that the best

5    approach was up the draw to the RC landing strip.  Referring to

6    Exhibit A-14, page 3, Respondent confirmed that the RC runway

7    cannot be seen in the photograph and it is farther to the east.

8        When questioned by his attorney, Respondent explained that

9    water skiing is an approach to landing technique used for

10   backcountry landings on river banks or gravel bars, and that

11   dragging or skimming your tires on the surface of the water is

12   done to reduce speed for the best possible braking on shore.  On

13   the day in question, he was not water skiing.

14       Respondent confirmed that he uses the Off-Airport Ops Guide

15   as a baseline for the quality and feasibility of landing

16   off-airport.  He confirmed that he had Mr. Likes' permission to

17   land on his property prior to the 24th.

18       On the 24th, Respondent stated he was flying north of the

19   Desert Sun Lane area near Bedell Flats, which is off Bird Springs

20   Road.  This is an area he flies multiple times a week and he goes

21   through this area on almost every flight.  Respondent described it

22   as a corridor for aircraft to get to the area north of the Reno

23   Stead Airport.  He stated that he had Mr. Likes' permission to

24   land on his property.  Respondent explained he has flown models

25   with Mr. Likes and his son, and that Mr. Likes has an RC runway on

1  his property.  Mr. Likes' son had asked him to come and land.

2      The Administrator presented the testimony of FAA Inspector

3  Ronald Green.  Inspector Green testified he has worked for the FAA

4  for 2 1/2 years and is the Principal Operations Investigator and

5  Aviation Safety Inspector at the Reno Flight Standards District

6  Office.  His primary duties include managing certificates,

7  investigating accidents, and taking complaints involving aviation.

8  He holds various certificates and ratings including an ATP rotary

9  aircraft, commercial pilot single engine land and instrument

10 rating, CFI rotary and instrument, and remote pilot certificate.

11     Inspector Green was asked to assist Inspector Morgan with a

12 complaint of an aircraft flying too low on November 24th.  During

13 the investigation, they interviewed Mr. Pena and Mrs. Pena, Mr.

14 Stanley, and the Respondent.  They attempted to interview Mr.

15 Likes.  They also went to the location where the low flight

16 occurred and he took photographs.

17     Referring to Exhibit A-17, page 1, he identified the front of

18 the garage to the Penas' residence and the garage peak camera that

19 captured the video footage of the aircraft that flew by.  For a

20 beginning reference point for the measurements, they extended an

21 imaginary line from center line of the peak where the camera was

22 located down to the runway, excuse me, not runway, down to the

23 driveway.

24     Page 3 of A-17 is a photograph of Inspector Morgan standing

25 to the left side of the stable at the far end of a measuring tape

1  east of Penas' residence.  There is a propane tank in front of the

2  stable, and farther back there are mountains and a distant

3  residence.  This photograph was taken to provide a sense of scale

4  of how far 300 feet would be from the Penas' residence.

5      Page 5 shows the distance from the center line of the garage

6  to Inspector Morgan as being 300 feet and 6 inches.

7      Page 7 shows Inspector Morgan standing at the propane tank,

8  east of the Penas' driveway.

9      Page 9 shows that distance from the center line of the

10  driveway to the propane tank from the house being just over 56

11  feet.

12      Page 11 shows Inspector Morgan standing near the fenced area

13  by the stable.  Also depicted is a propane tank and shed.

14      Page 13 shows the distance from the center line of the garage

15  to where Inspector Morgan is standing near the stable as being 78

16  feet.

17      Page 15 is a photograph facing south from the Penas' garage

18  towards Mr. Likes' property.  Depicted is a tape measure going

19  from the center line of the garage to the fence line between Mr.

20  Penas' and Mr. Likes' property, with Mr. Likes' residence past the

21  fence line.  Farther in the distance and past Mr. Likes' residence

22  in the south are snow covered roofs of other houses.

23      On the right side of the photograph, to the southwest of the

24  garage, there is split rail fence that divides the circular drive

25  -- gravel driveway.  On the far right side of the photograph,

660

1    between two pine trees, a power line pole can be seen in the

2    distance, which is near the main street, Desert Sun Lane.

3    Inspector Morgan testified that there is an elevation change

4    leading up to Mr. Likes' house on the east side that he described

5    as a small hill.

6        Page 17 shows the distance from the center line of the garage

7    to the fence line where Mr. Pena is standing as being 226 feet and

8    6 inches.

9        Inspector Green said that there were no measurements taken on

10   Mr. Likes' property.  He did not recall if there was any

11   estimation of the distance to Mr. Likes' property.

12       Referring to page 1 of A-17, Inspector Green stated that the

13   distance from the center line of the garage to the white gutter on

14   the east side of the house was measured.  He could not remember

15   the distance and refreshed his memory with his notes in Exhibit

16   A-25, recalling that it was 15 feet.  Based on this, Inspector

17   Green determined that the distance from the edge of the house to

18   the propane tank would be 15 feet less, or 56 feet.  The distance

19   from the edge of the house to where Inspector Morgan is standing

20   would be 63 feet.

21       Inspector Green again testified that Respondent's flight path

22   was believed to be approximately 78 feet from the center line of

23   the garage based on the video footage received at the FSDO.  He

24   also testified that based on the video footage, they determined

25   the size of the aircraft and the size of the aircraft in

A63

1  relationship to the ground, which helped them determine the

2  vertical height.

3      He also stated the interviews of Mr. and Mrs. Pena and Mr.

4  Stanley's description of the events were considered.  He noted

5  that investigators determined the aircraft came from the northeast

6  area based on witness statements, but investigators could not

7  definitively determine the aircraft flight path since they, since

8  the witnesses lost sight of the aircraft behind the Penas' house

9  and before it emerged in the video over the Penas' property going

10  towards Mr. Likes' residence.

11      Inspector Green said there is a downward slope from the

12  Penas' garage as you go east and then the slope rises farther

13  east.  Inspector Green estimated that there was a 6 to 7 foot drop

14  from the Penas' garage out to 78 feet.  He based this on the fact

15  that Inspector Morgan is holding the measuring tape at eye level

16  standing 78 feet away.

17      Inspector Green concluded that the shed and stable are on

18  lower terrain.  In comparison, Inspector Green testified that

19  there is very little downgrade showing, shown on page 7, as you

20  can see Inspector Morgan's knees and shin area.  So he estimates

21  that downgrade to be a 1-foot drop.

22      Looking at A-18 as a demonstrative exhibit, Inspector Green

23  stated he created this exhibit using Google Earth and PowerPoint

24  to determine a 500-foot lateral limit.  The photograph is oriented

25  with the top to the north.  He identified the Stanley's house in

A64

662

1  the northwest.  The Penas' house is directly east of the

2  Stanley's.  South of the Penas' is Mr. Likes' residence.  He

3  identified locations of Mr. Pena, and Mr. Stanley, and Mrs. Pena.

4      He identified a pink line as being representative of flight

5  path, which was determined to be based on the video and witness

6  statements.  He further stated that the pink flight path behind

7  the Penas' house cannot be confirmed since nobody saw the

8  airplane's location or path behind the house.  Based on witness

9  statements, Inspector Green believes the airplane came from the

10 north.

11     There is a yellow line depicted on Inspector Green's

12 photograph, which depicts the estimated point where the airplane

13 came into the video footage from the garage peak camera.  However,

14 Inspector Green said that he could not be sure of the in-bound

15 heading.  He did not recall any witnesses stating that the

16 airplane made a left bank.  Inspector Green stated that the yellow

17 line was made using Google Earth's ruler tool, which he used to

18 measure the distance of 499 feet.

19     Inspector Green stated that using Google Earth, he could

20 identify powerline poles.  He has experience viewing military

21 grade satellite images and identifying surface items such as

22 powerline poles that pose a hazard to low level flying operations.

23 He identified two powerline poles on Exhibit A-18.

24     Respondent's counsel asked questions of Inspector Green.

25 Inspector Green admitted that Google Earth is not used by the

A65

1   military for tactical operations, that Google Earth is not updated

2   on regular basis, and its images can be several years old.  He

3   admitted that to the left of the pink line, or to the east, is

4   desert scrub brush.  He admitted that Respondent voluntarily came

5   to the FSDO to be interviewed.

6       When asked about the video he reviewed, Inspector Green

7   recalled receiving a video through a general email box on the FSDO

8   website.  He was not sure if someone outside the organization has

9   the ability to upload a video to the website.  As the FSDO

10  received the video before he was assigned to assist with the case,

11  he doesn't know how the FAA came into possession of the video.  He

12  did not know if the video was part of the complaint that was

13  emailed or they went to get it later from Mr. Pena.

14      Inspector Green admitted to receiving a copy of a video at

15  his email address, but did not know who sent it to him.  On

16  further questioning, Inspector Green stated that there were two

17  videos.  He did not receive or know of any flash drive or CD of

18  the videos.  He does not recall -- he does recall some discussion

19  that they did not have a flash drive capable device.  As a result,

20  he used an FAA issued camera to transfer the videos.

21      He explained using the FAA camera as a storage device to get

22  the still videos and photos from Mr. Pena.  Specifically, the FAA

23  camera has an SD card that he plugged, excuse me.  Specifically,

24  the FAA the camera has an SD card and he plugged the camera into

25  Mr. Pena's computer.  He then downloaded the videos to the

A66

1   camera's SD card.  He brought the camera back to the FSDO and then

2   uploaded the videos to the investigative file on the computer.

3        Inspector Green further admitted that the investigators did

4   not ask Respondent or have him present for his input when they

5   were making measurements and taking pictures.  He also admitted

6   that they calculated height or altitude of the aircraft using the

7   airframe of the aircraft, which was based on the video.

8   Investigators did not measure the size of the Penas' lot or Mr.

9   Likes' property.

10       Investigators did not measure the landing area.  Inspector

11  Green stated this was because Mr. Likes did not return phone

12  calls, did not respond to investigator's request for a statement,

13  and was not home when they went to his house.  Inspector Green

14  also said investigators did not get any information on the

15  location of the landing area as they could not get ahold of Mr.

16  Likes.

17       Concerning the videos, Inspector Green explained that the

18  videos were transferred from Mr. Pena's computer to the SD card on

19  the FAA camera.  He recalls seeing the video on Mr. Pena's

20  computer when he downloaded it, but did not recall if was the

21  original native version or was an iPhone recording of another

22  monitor playing the video.  He does recall seeing another video,

23  which he described as a video being taken of another video using

24  an iPhone to record.  He did not recall if the video that was

25  uploaded to the FAA investigative file was a copy of the native

665

1  original video or the iPhone video copy.  He did not know what

2  video was uploaded to the investigative file.

3      Inspector Green stated he was not aware of any thumb drives

4  or CDs of videos being given to the FAA, but he could not be sure

5  it did not happen.  He confirmed that when he reviewed the videos,

6  they contained no sound.

7      Inspector Green was shown a document marked as Exhibit R-1 to

8  refresh his memory.  He stated he was not present during the visit

9  to the Penas' residence on February 13, 2020 that is referenced in

10 the document, which was authored by Inspector Morgan.  He recalled

11 visiting the Penas' residence two or three times.

12     I asked questions to clarify Inspector Green's testimony.

13 Inspector Green stated that for purposes of calculating the

14 vertical height of the airplane above ground level, the video

15 footage was used.  The video showed the airplane in a steep bank,

16 so they used the wingspan of the airplane to determine how high it

17 was above the ground.

18     Concerning the distance from the Penas' house to the Likes'

19 house, since they did not have the permission -- since they did

20 not have permission to go on Mr. Likes' property, Inspector Green

21 admitted that there was no thought given to using a laser range

22 finder to get the distance.

23     Further concerning the videos, Inspector Green confirmed that

24 the videos were transferred from Mr. Pena's computer to the SD

25 card on the FAA camera.  He said this is digital camera and can be

1  used as a digital storage device.  The camera can be connected to

2  a computer to receive or transfer digital photos and videos to and

3  from a computer.  He recalled plugging the FAA camera's USB

4  connector into Mr. Pena's computer, which was located in the front

5  room of the house.  He did not go into the attic, nor did he get

6  the copy of the video off the DVR that was connected to the

7  security cameras in the attic.  He does recall seeing another

8  video, which he described as a video being taken of another video

9  using an iPhone to record.

10      Although he saw the video on Mr. Pena's computer when he

11  downloaded it, he stated could not recall if it was the original

12  native version or the iPhone recording.  He did not know what

13  video was uploaded to the investigative file, and does not know

14  where the original native version is or what version is in the

15  investigative file.

16      As to the version that was downloaded to the FAA camera's SD

17  card, he stated he deleted anything on the SD card after it was

18  downloaded to the investigative file so they would have space on

19  the SD card for other cases.

20      He recalled going to the Penas' residence three times.  The

21  first was after receiving the complaint and to obtain the videos,

22  the second was December 19th when investigators went to the Penas'

23  residence to obtain measurements and photos, and the third visit

24  was to try to contact Mr. Likes.

25      He recalled Inspector Morgan retiring December 31, 2021.  He

1  knows that Inspector Morgan had visited the Penas' without him,

2  which he thinks was between January and April.  He had no

3  knowledge of Inspector Morgan having or receiving a flash drive or

4  CD with the videos.

5      On redirect examination, Inspector Green reviewed Exhibit

6  A-15 and said that in addition to taking photos on December 19th,

7  he also received or downloaded Mr. Pena's videos.  Concerning the

8  investigator's vertical measurements, the investigators used the

9  video and witness statements.  He believes they used the iPhone

10  video and not the original native video.  In calculating vertical

11  height, investigators accounted for and included the downslope of

12  the terrain when assessing the aircraft's attitude, excuse me,

13  aircraft's altitude.

14      On cross examination, Inspector Green admitted that

15  investigators did not ask for the original native file that was on

16  the DVR.  He also admits that they could not -- he also admits

17  that they could have preserved the SD card from the camera, as it

18  was easily removable and replaceable, and he could have simply put

19  a new SD card into the camera if he needed space for other cases.

20      Finally, FAA Technical Specialist Roy J. Speeg, Jr.,

21  testified.  He summarized his experience, employment and training,

22  which is set forth in Exhibit A-19.  In brief, he has worked for

23  the FAA for 18 years.  He is a technical specialist with the EIR

24  Review Team.  He has worked as an Aviation Safety Inspector and

25  Operations Specialist.

668

1    He has also worked as a Regional Aviation Specialist or Air

2   Show Coordinator for the Northwest Mountain Region.  In this

3   capacity, he was responsible for airshow waivers for aerobatic

4   competitions, low flight races, cross-country races, and banner

5   towing.  He holds aerobatic competency to 500 feet above ground

6   level, ATP certificate for single and multi-engine land airplanes

7   with several type ratings, and Flight Instructor certificate for

8   single and multi-engine land airplane and instrument.  He has a

9   more than 6,500 total flying hours.

10    Respondent's counsel questioned Specialist Speeg about his

11   qualifications.  He admitted that the last time he flew aerobatics

12   was in 2000 or 22 years ago.  As for the numerous types of

13   aircraft he has flown, shown on page 8 of his resume, none of them

14   include the Kitfox 5.  While he has seen pictures of a Kitfox 5,

15   he has not conducted any inspection of Respondent's airplane.

16    He knows the propeller is composite based on pictures, but

17   does not know the kind of propeller.  He said the engine is a

18   Rotax, but does not know the model.  He has not examined the

19   aircraft's logbook and has no knowledge of the performance

20   specifications of Respondent's airplane.

21    Prior to hearing Respondent testify about his airplane.  He

22   had no knowledge as to the performance or specifications of the

23   Kitfox 5.

24    When asked about the fact that his employment history prior

25   to the FAA shows the pay he received, his FAA employment history

A71

1   is devoid of pay information.  Specialist Speeg explained he had

2   not noticed that.  He further explained that he combined two

3   resumes.  Information from one of the resumes was for a position

4   upgrade and required salary information.  His FAA salary is public

5   information and he disclosed it as $147,000 a year.  It is the

6   most he has received in comparison to his past jobs.

7       Specialist Speeg stated he has testified in no more than five

8   enforcement proceedings, and two prior times as an expert witness.

9   While he could not remember the nature of the cases, he remembered

10  one as being an aerobatic case.

11      Although Specialist Speeg has performed short landings and

12  takeoffs, he has not participated in any competitions for short

13  landings or takeoffs.  He described performing short landings and

14  takeoffs in various aircraft, including a Cessna 172 and 206.  He

15  has taught short takeoff and landings for instrument and

16  backcountry strips.  He has experience in landing various

17  aircraft, off-airport and on roads, frozen lakes, fields and corn

18  fields as he did so with aerobatic airplanes.  He did not know how

19  many short takeoffs and landings he performed, but believes it was

20  between 25 and 50.

21      While he could not remember all of the aircraft he flew in

22  the backcountry or all of the short takeoff and landings he made

23  off-airport, he confirmed that he would make several passes to

24  check for obstructions and obstacles, and to assess runway

25  conditions.  This would include a low level pass to assess runway

670

1  conditions, after which a decision would be made to land or not.

2     Specialist Speeg was qualified as an expert in general

3  aviation flight operations, including low flight and the

4  regulatory requirements under Section 119.19 for low flight.  He

5  was not qualified as an expert in short field and takeoffs, nor

6  was he qualified as an expert in the operation of Respondent's

7  aircraft, the Kitfox 5.

8     On the Administrator's questioning, Specialist Speeg stated

9  that during a low pass to land, the purpose is to check the runway

10  for obstructions, fallen trees or animals, particularly with

11  backcountry strips.  He stated that his low pass is done at less

12  than cruise speed but not necessarily a slow speed.  He also said

13  that the low approach, for purposes of Section 119.19, has to stay

14  500 feet from any person, vessel, vehicle, or structure.

15     As to Respondent's low pass, based on the statements of Mr.

16  and Mrs. Pena, Mr. Stanley, and the pictures and measurements, he

17  estimates that the Respondent was 50 feet above ground.  He also

18  opined that he was within 500 feet of people, vessel, vehicle or

19  structure.  He based this on when the airplane first came into

20  Mrs. Pena's view, as well as the measured 78 feet from the house

21  to the flight path.  Specialist Speeg said that from the center

22  line of the garage to the propane tank was measured 56 feet and

23  adding another 25 feet to the hay barn where Inspector Morgan was

24  standing is how he arrived at the 79 feet.

25     He also opined that the airplane when it first came in view

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A73

671

1  was 50 to 70 feet above ground, which included accounting for the

2  slope of the Penas' property.  Specialist Speeg concluded that

3  Respondent's altitude was not safe if a power unit failed.  He

4  explained that if there was a problem, there was a low margin of

5  error since Respondent would have to fly the airplane and decide

6  on a location to land, which could not be done without undue

7  hazard.

8      Specialist Speeg said he was not sure you could put the

9  aircraft down safely 30 to 50 feet off the ground, especially

10  while in a steep bank.  He noted that there would be an immediate

11  loss of lift if there was a power failure in a steep bank and a

12  STOL kit is useless if there is 60 degrees or more of bank.  He

13  opined that the airplane first came into view, it was in a steep

14  bank up to 60 degrees.

15      Specialist Speeg opined that Respondent was at an altitude

16  that if a power unit failed he could not make an emergency landing

17  without undue hazard to people or property on the ground.

18  Specialist Speeg said that any attempt to land on any of the roads

19  in the subdivision would create a hazard to people and structures

20  nearby.

21      Specialist Speeg testified that a banking turn introduces

22  G forces, and a 60-degree bank adds two times gravity, or 2-Gs, to

23  the structure of the airplane.  He opined that over time there can

24  be a structural failure with continued stress due to banking

25  forces on the airplane.

A74

1    He concluded that Respondent was below an altitude that did

2  not allow for an emergency landing safely if there was a problem.

3  He based this on his training and experience, as well as witness

4  testimony about Respondent's height above ground level of 30 to 50

5  feet.  Specialist Speeg noted that Respondent himself testified it

6  was unsafe to land on the RC runway, which means the only place to

7  land would be a road in the subdivision if he had to land because

8  of a problem and this would have created an undue hazard to

9  persons or property.  Referring to A-18 as a demonstrative aid,

10  Specialist Speeg stated that Respondent's approach to landing path

11  showed -- is shown with the pink line was not necessary for

12  takeoff or landing because he could have gone farther to the east

13  to avoid structures or people.

14    Specialist Speeg stated that Respondent's operations was less

15  than 100 feet above ground level and closer than 100 feet to the

16  Penas' house.  He used the photograph Inspector Green created with

17  the 500-foot, excuse me.  He used the photograph Inspector Green

18  created with a 500-foot grid to one side of the flight path to

19  make this determination.

20    Specialist Speeg said there were several structures,

21  including the Penas' house, powerlines, fences, and Mr. Likes'

22  house within the 500-foot bubble.  Referring to A-18 for

23  demonstrative purposes, Specialist Speeg said that a power unit

24  failure at any point along the pink line, which indicated

25  Respondent's flight path, made it unsafe to land anywhere west.

673

1  West of the flight path was a subdivision which contained houses,

2  people, fences, and powerlines, so an emergency landing to the

3  west would have created a hazard.  Specialist Speeg opined that

4  subsection (a) was violated as a result.

5      Specialist Speeg also testified that subsection (c)

6  essentially creates a 500-foot bubble around an aircraft when in a

7  sparsely populated area, and no person, vehicle, vessel or

8  structure can enter that bubble if it is not necessary for takeoff

9  or landing.  He opined that the subdivision area is sparsely

10  populated and in this case there were people, a shed, the barn, a

11  chicken coop, houses, fence, and powerlines within Respondent's

12  500-foot bubble.  He concluded that Respondent violated subsection

13  (c) of the regulation.

14      Specialist Speeg further opined that for purposes of

15  operating in a careless or reckless manner as to endanger life or

16  property of another, the maneuvers Respondent performed were not

17  necessary for landing.  In addition, the altitude above ground

18  level left him little margin for error.  Specialist Speeg also

19  stated that Respondent was too low and that he had no room to see

20  above the top of the grade based on his flight path if he was

21  going to land on the RC runway.

22      Specialist Speeg testified there is no operations manual and

23  nothing in the Off-airport Ops Manual that requires the amount of

24  bank Respondent was performing.  He opined that no pilot would fly

25  that low to the ground and at that angle of bank.  Specialist

674

1   Speeg stated that even if Respondent was attempting to evaluate
2   the runway, he disregarded his own safety and the safety of people
3   and structures by operating 50 feet -- by operating below 50 feet
4   and within 25 feet of structures.

5       As for aggravating and mitigating circumstances, Specialist
6   Speeg stated he considered flying at that angle of bank and that
7   low so close to structures to be aggravating.  He considered
8   Respondent's experience level as a private pilot with over 900
9   hours in that one aircraft as aggravating.  He considered the
10  intentional maneuvering as aggravating.  Finally, he considered it
11  aggravating that Respondent had notice of unsafe conduct that
12  violated the regulations when he previously received a warning and
13  counseling.

14      Specialist Speeg concluded that flying that low to the
15  ground, things can happen fast, and the fact that Respondent would
16  have to get control of the aircraft and get to a place on the
17  ground safely would be difficult.  He opined that a more
18  experienced pilot maybe could land safely, but it would be
19  difficult for a 900-hour private pilot without a significant
20  disregarded of safety.

21      On cross-examination, Specialist Speeg admitted he never met
22  Respondent, never flew with him, and never evaluated his flying
23  skills.  He also admitted that Section 119.19 makes no mention of
24  prohibiting any specific degrees of bank.  Specialist Speeg
25  confirmed that the FAA Off-airport Ops Manual is advisory and

A77

675

1   there is no violation if it is not followed.

2        When questioned about being at 60 degrees bank -- when

3   questioned about being at 60 degrees of bank, Specialist Speeg

4   admitted that an airplane can go past 60 degrees of bank and still

5   remain in control, such as a glider or aerobatic airplane.  When

6   determining that Respondent was up to 60 degrees of bank,

7   Specialist Speeg admitted that it was based on viewing the video

8   showing 2 to 3 seconds of flight.

9        Referring to A-18 as a demonstrative aid, Specialist Speeg

10  admitted that if Respondent was traveling from north to south in a

11  left banking turn at the point just past the garage, Respondent

12  would be flying away from people and homes to the west.  He

13  admitted that Respondent described an aggressive -- that witnesses

14  described an aggressive left bank or left turn.

15       Specialist Speeg further admitted that to the right side of

16  the pink line, or east, it is mostly scrub and desert.   He

17  further agreed that a 3 degree glide path puts a pilot 300 feet

18  above ground level if they are a mile away from touchdown, and 75

19  feet above ground if they are half a mile to touchdown.

20       MS. TOSCANO:  Judge Fun?  I hate to interrupt but --

21       JUDGE FUN:  Yes?

22       MS. TOSCANO:  Mr. Schulte has requested a quick comfort

23  break, yes.

24       JUDGE FUN:  Yes.  And I think that's in line.  We've gone for

25  about 2 1/2 hours, so we'll take a quick 15-minute comfort break.

A78

676

1  We'll pause the record, and you may mute and stop your videos for

2  15 minutes.

3        (Off the record at 2:27 p.m. EST)

4        (On the record at 2:42 p.m. EST)

5        JUDGE FUN:  We're back on the record after a short recess.  I

6  do apologize to the parties.  This is a very initial oral

7  decision, so we'll likely, might need to take another break.  If

8  we do, just get my attention if I'm distracted giving you my

9  decision.

10       All right.  I'm going to continue now with my decision and

11  the review of evidence.  Respondent's counsel then showed

12  Specialist Speeg a Google Earth picture of Linden Airport in New

13  Jersey as demonstrative aid, which depicted petrochemical storage

14  sites 537 meters from the runway's threshold, and people and homes

15  133 meters from the runway's threshold.  Specialist Speeg admitted

16  that an aircraft using this runway would come within 500 feet of

17  people and structures.  He also admitted, since he is an

18  Instrument CFI, he teaches pilots to fly to the minimum altitudes

19  on instrument approaches, which may bring the aircraft close to

20  people and structures at a developed airport.

21       Respondent's counsel also showed Specialist Speeg a Google

22  Earth picture of Kent Moore Airport, a fly-in community with a

23  grass field and structures 90 feet from the center line of the

24  runway.  Specialist Speeg admits that normal operations would put

25  a pilot within 500 feet of people and structures, but no violation

A79

1  would be found for an aircraft landing there.

2       Specialist Speeg agreed that pilot skills are perishable and

3  with practice skills can get better.  He also agreed that how and

4  where to fly depends on the skill and judgment of the pilot.  When

5  asked if he would recommend a pilot to land on a 1,000-foot runway

6  if the pilot is newly minted and just checked out in a F-33

7  Bonanza, Specialist Speeg would not.  He agreed that he might if

8  the runway was 4,000 foot long.

9       Under this hypothetical, Specialist Speeg agreed that some of

10  the factors in determining whether the pilot should land includes

11  the pilot's skillset and experience.  Specialist Speeg was not

12  familiar with the term balanced runway, but he knew of the concept

13  that the runway should be long enough for an airplane to

14  accelerate to full speed and still have enough runway remaining to

15  come to full stop.

16       Specialist Speeg agreed with Respondent's counsel that in

17  addition to the type of aircraft and conditions of the landing

18  site, the pilot's skill and performance of the aircraft are

19  factors in determining whether the regulation is violated.

20  Specialist Speeg admitted there is no regulation that specifically

21  prohibits off-airport operations and that the FAA has published an

22  Off-Airport Ops Guide for this purpose.

23       Specialist Speeg agreed that 91, excuse me, that 91.119 does

24  not apply during off-airport operations and explained this is

25  because a pilot can get a waiver of the regulations.  He stated

678

1  that absent a waiver, under no circumstances can a pilot drag a

2  runway during off-airport ops or come within 500 feet of persons,

3  vehicles, vessels, or structures if they are not landing or taking

4  off.

5      Specialist Speeg agreed that what is written on page 3 of the

6  Off-Airport Ops Guide is accurate.  He agreed that the guide

7  recommends a low level pass, and that there is no guidance in the

8  guide on what altitude to fly for the low level pass.  He also

9  agreed that the guide instructs that another pass be performed

10  with rolling one tire to get a feel for the landing surface,

11  suggesting multiple low level passes.

12      Specialist Speeg further agreed that there is nothing stated

13  in the guide referring to staying 500 feet away from people or

14  structures.  Specialist Speeg, nonetheless, stated that a pilot

15  can land off-airport in a sparsely populated area, and can fly

16  low, but must still remain 500 feet from people or property unless

17  it necessary for landing or taking off.

18      Respondent's counsel asked Specialist Speeg whether it is

19  careless and reckless if a pilot lands off-airport without first

20  conducting a low level pass and crashes with passengers.

21  Specialist Speeg said That he could not answer this hypothetical

22  because it would depend on the circumstances, such as whether the

23  pilot needed to land because of an emergency.  He said that each

24  situation is different depending on the circumstances.

25      On redirect examination, Specialist Speeg stated that

A81

679

1  3 degrees is an optimal approach angle to transition from approach
2  to landing, which is used at towered airports.  However, during
3  off-airport ops, it is not necessary to stick to the 3 degree
4  approach angle since locations are different.  As to the
5  hypothetical about a newly minted pilot flying an F-33 Bonanza,
6  Specialist Speeg stated that judgment is also a factor, which
7  cannot be taught nor assigned any criteria.

8       Specialist Speeg opined that there still would be a violation
9  if a pilot makes a low level pass below the minimum altitude
10 stated in 91.119 and does not land because the pilot determined it
11 was unsafe.  He explained that absent a waiver, a pilot that does
12 not land or takeoff cannot operate below the altitude specified in
13 the regulation.

14      Give me a moment here.  I'm going to check something real
15 quickly.  All right, I apologize for that brief interruption.

16      He further stated that a pilot must stay above the altitude
17 in the regulations if they are not landing or taking off.  Even
18 during a low level pass, the pilot is still required to stay 500
19 feet away from any person, vessel, vehicle, or structure.

20      Referring to Exhibit R-2, Specialist Speeg stated that
21 Respondent's flight path took him within proximity of Mr. Likes'
22 residence.  He testified that Respondent could have flown to the
23 other side of the runway during his southbound trip and could have
24 looked out his right side to assess the runway.  Specialist Speeg
25 said that there can be no low passes over a runway unless the

A82

1    pilot is going to land.

2        To clarify Specialist Speeg's testimony, I asked questions.

3    Specialist Speeg said that an approach to land with an actual

4    landing would not violate 119.19 if the pilot flew over residences

5    even if there was a better alternative depending on the

6    circumstances, such as a life flight that needed to land quickly.

7    Specialist Speeg stated that a pilot must remain 500 feet away

8    from people and structures during a low level pass unless they are

9    performing an approach to land.

10        Specialist Speeg stated that Section 199.19(a) refers to an

11   altitude anywhere as opposed to an approach path.  Specialist

12   Speeg explained that subsection (a) is to ensure a margin of error

13   for purposes of landing without undue hazard.  He testified that

14   subsection (a) applies anywhere, including off-airport operations.

15   As to subsection (c), Specialist Speeg stated that it establishes

16   distances from people, vehicle, vessels, or structures in sparsely

17   populated areas.

18        I asked Specialist Speeg if would be acceptable for a pilot

19   to fly over residences even if there is a better approach path

20   during an off-field landing.  Specialist Speeg said that it

21   depends on the circumstances, such as an emergency and there was a

22   need to land quickly.  Finally, when I asked Specialist Speeg what

23   video he saw in forming his opinions, he could not recall whether

24   it was the iPhone video recording of another video monitor or a

25   native copy of the original video from the garage peak.

1      The Administrator's counsel recalled Investigator Green, who

2   testified that being, excuse me, he testified that after getting

3   the video from the Penas, the investigators had Respondent come to

4   the FSDO.  He was present during the time when Respondent was

5   showing the video.  Respondent admitted it was his airplane and he

6   was the pilot-in-command.  When asked about the reason he was in

7   the vicinity of Desert Sun Lane, Respondent said he was doing an

8   approach to land at an RC airfield at Mr. Likes' property.  He had

9   also explained he was at Bedell Flats earlier that day and was

10  returning home.

11     On cross-examination, Investigator Green agreed that

12  Respondent contacted the FSDO promptly when they asked him to do

13  so.  And that he agreed to come to the FSDO when they asked him,

14  and that he did not deny it was him flying the airplane when

15  showed the video, and did not seek to be evasive in answering.

16  The Administrator rested its case-in-chief.

17     The Respondent presented his defense.  Mr. Jared Likes

18  testified and Respondent testified.  In summary, Jared Likes

19  testified that he lived at 300 Desert Sun Lane for 18 years and

20  was living there on November 24th.  In the 18 years he lived

21  there, he recalled aircraft flying in the area frequently.  He met

22  Respondent because, excuse me.  He met Respondent as Mr. Likes and

23  his son have an interest in aviation and they flew a RC aircraft,

24  or small electric airplanes, at the park with Respondent.

25     Mr. Likes gave Respondent permission to land on his property.

A84

1  Mr. Likes stated that on the south side of his garage, he has a

2  100 to 500-foot RC runway.  It is a graded runway that he keeps

3  clear of brush.  His son and him have been using this runway for

4  RC airplanes.  While he heard what happened, Mr. Likes stated he

5  was not home on the 24th.

6      He testified to flying with Respondent several times,

7  including when Respondent made off-airport landings.  He recalled

8  landing in a field that is a 20-minute drive north of his house.

9  He described Respondent's landings as safe and doable, and

10 Respondent was able to land in a short distance of approximately

11 100 feet with is Kitfox.  Mr. Likes, however, is not a pilot.  He

12 states that the last time he flew with the Respondent was about a

13 month before November 24th.

14     On cross-examination, Mr. Likes explained that RC airplanes

15 are remote controlled foam electric airplanes.  He did not

16 consider them models but radio-controlled.   He said that there is

17 approximately 10 acres of open space behind the RC runway.   In

18 terms of grade, he said it is flat, with an approximately

19 1 percent grade per 400 feet.   He admitted that there is a

20 swimming pool in the backyard and the RC runway is to the

21 southeast of the swimming pool.  He denied flying any drones from

22 the RC runway.  He stated that he and his son are friends with the

23 Respondent, but he has not recently flown with Respondent nor seen

24 him for a few years.

25     To clarify Mr. Likes testimony, I asked questions.  Mr. Likes

A85

1  said nobody was home on November 24th, neither him, nor his son.

2  Even though nobody was home on the 24th, Respondent did not

3  contact him that day or shortly before to reconfirm that he had

4  permission to land.  Mr. Likes said Respondent had permission to

5  land anywhere on his property at any time, and there were multiple

6  areas to land as he has trails and paths on the property that

7  Respondent could use in addition to the RC runway.

8      He gave his permission prior to November 24th, but does not

9  recall the circumstances or when.  He recalled it being only one

10  occasion when it was discussed.  Mr. Likes did not recall when the

11  RC runway was built, as it had been there for several years.  He

12  estimates the width to be 25 to 30 feet, and described it as a

13  cleared dirt runway that is oriented east to west.  He stated it

14  is located 500 feet or more away from the house.

15      Respondent Trent Palmer testified in his defense.  He has

16  been a pilot since 2014 or approximately 8 years.  While he has

17  flown a handful of different aircraft, he has mostly flown his

18  Kitfox 5 STi, which is a short take-off and landing, or STOL

19  modified airplane.  STOL modifications allow for off-airport

20  landings, which include rough and unimproved surfaces.

21      His airplane was built in 1997 and is a Johnson John T

22  Kitfox 5.  He rebuilt most of the airplane, including adding STOL

23  modifications.  Respondent testified that the airplane's maximum

24  cruise speed is 110 miles per hour, but his normal cruise speed

25  that he is comfortable with is 100 miles per hour.  The stall

A86

684

1   speed is 32 miles per hour and he flies a few miles per hour over

2   the landing, excuse me, he flies a few miles per hour over that

3   speed for landing.

4       The performance specifications for his aircraft are based

5   upon standard atmospheric conditions at sea level.  He stated that

6   he can take off and land within approximately 150 feet flying solo

7   and with his gas tank halfway full.  The shortest takeoff and

8   landing Respondent has performed was approximately one-half the

9   length of his aircraft, which he estimates as 30 to 50 feet since

10  he did not perform any measurements.

11      Respondent's counsel showed a YouTube video as a

12  demonstrative aid, which depicted Respondent making a short

13  takeoff and landing in his Kitfox.  The video was taken in 2017.

14  It shows his Kitfox, which is the same one he was flying on the

15  day in question.  He did change the cowling in 2018, so the 2017

16  video is showing the airplane with older cowling.

17      Respondent says the video is an accurate depiction of his

18  STOL performance and STOL engine noise.  I note that while I could

19  not hear the engine, I do not find this demonstrative -- I do not

20  find this demonstration of the actual engine sound, excuse me.

21  Let me rephrase that.  I note that while I could not hear the

22  engine, I do not find this demonstration of the actual engine

23  sound accurate since it was a video being played over the Zoom

24  program, and the volume settings and equipment can distort sound

25  perception.  I further noted that the video shows the airplane on

A87

685

1   an asphalt runway during the takeoff and landing.  Although

2   Respondent did not measure the STOL distance, he estimates it as

3   being 150 feet.

4        Respondent testified he spends a lot of time in the

5   backcountry and off-airport sites.  He estimates having performed

6   1,000 off-field takeoffs and landings.  During the November 2019

7   timeframe, he was flying 3 to 4 times a week, and estimated

8   performing 30 or more off-field takeoffs and landings in a week.

9        Respondent had modified his airplane for these purposes.

10  This included installing a different engine and propeller, and new

11  navigational equipment.  He has also modified the landing gear for

12  a higher take-off attitude.  He says all of this increased his

13  STOL performance.  Specifically, he has a Rotax turbo-charged

14  engine, which doubled his engine output for a shorter takeoff

15  roll.

16       While the engine added weight, he off-set that with a change

17  in angle of attack with a taller landing gear.  This is how the

18  Kitfox was equipped on November 24th.  Respondent said the engine

19  was built to European standards for quiet operation, as was the

20  propeller, which is a MTV-6-A.  He stated that the same engine and

21  propeller combination has been test certified to European aviation

22  standards of less than 72.8 decibels.

23       Respondent stated that if he is in a straight and level

24  flight at 100 miles per hour cruise, and lost power unit, lost a

25  power unit, he would lose thrust but not lift, nor control of the

686

1   aircraft.  He explained that because of the lack of engine thrust,

2   he would have to descend to maintain airflow over the wing and

3   would be able to glide.  He would be able to continue in the same

4   direction and would have enough forward inertia to turn within

5   reason without stalling or loss of control.

6       As to November 24th, he said he flew over to Bedell Flats

7   because a Fox Hunting Club had asked him to help find a missing

8   horse.  In the course of looking for the horse, he landed a few

9   times.  After finding the horse, he began returning home.  Desert

10  Sun Lane is in the vicinity of his return, so he decided to

11  perform a low level inspection pass as part of a safe operating

12  procedures in evaluating an off-airport landing site.

13      He performed a low level pass to determine the feasibility of

14  the landing site.  During the low level pass, he did not know his

15  airspeed, but was flying at 70 miles per hour ground speed.  He

16  speculates that his indicated airspeed might have been less given

17  the weather conditions.  He states he was at 70 miles per hour

18  because this is the speed in which he was performing the time and

19  distance calculation to determine the length of an off-airport

20  runway.  At 70 miles per hour, or 60 knots, the airplane travels

21  800 feet per second.

22      Respond states that he was unable to identify the touchdown

23  point on the runway, so he made a left turn to abort the operation

24  and left the area.  He stated that he did perform any time or

25  distance measurements because he decided against landing when he

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A89

1  could not identify the touchdown point.  He says it would have

2  been his standard operating procedure to calculate runway length,

3  which is why he believes he was flying at 70 miles per hour during

4  the low level pass.

5      Referring to A-18, Respondent acknowledged flying in the

6  vicinity of Desert Sun Lane.  He described his flight path as

7  coming from the top of the photograph, which is north, to the

8  bottom, which is south.  Respondent states if he lost his engine

9  during the low pass, he would have gone straight as there was a

10  vacant lot to the south of Mr. Likes' property.  He describe the

11  lot as being a 10-acre parcel of scrub brush, which he would have

12  only needed one-quarter of it to land.  Respondent says he would

13  not have landed on Desert Sun Lane, but would have gone to the

14  open area away from the houses if he lost his engine.

15      Respondent says he was in control at all times during the low

16  pass.  He opined that he would have been able to safely land in

17  the event of an engine failure.  He based this on a past

18  experience.  He explained that in 2018 he was flying his Kitfox at

19  cruise altitude from Idaho to Reno and crossing a mountain range

20  500 feet above ground level.  At that time, he had a catastrophic

21  engine failure.  He was able to find an open area and safely land

22  with a tailwind in a downward slope.  There was no airplane damage

23  and he suffered no injury.  He further opined that his experience

24  in off-field and backcountry takeoffs and landings accounted for

25  his safe landing with an engine failure.

1      Respondent stated he has never met, nor spoken to Specialist

2   Speeg.  When asked about Specialist Speeg's opinion that it would

3   have been safer to approach and inspect the landing site from the

4   east, Respondent disagrees because the RC runway would have been

5   on the right side of the airplane.  Respondent explained that

6   since he was flying from the left seat, his view of landing site

7   would not have been as good.  He stated he would have to look

8   across the right side and his view would be partially obstructed

9   by cowling, the right seat, and the floorboard.  Respondent said

10  it is a standard practice to offset from the landing site about

11  300 feet and to look out the left side of the aircraft for a good

12  view.

13      Referring to R-2 for demonstrative purposes, Respondent said

14  he created this picture using Google Earth and that he drew this

15  flight path shown in green with arrows.  He identified the yellow

16  line, which was marked as intended landing area -- he identified

17  the yellow land which was marked as, quote, "intended landing

18  area," end quote, as the RC runway he was assessing.  The RC

19  runway is depicted as running roughly north and south.

20      Respondent admitted that his flight path took him between the

21  RC runway and Mr. Likes' house.  Respondent explained that this

22  was so he could off-set the runway to his left side and look out

23  of the left window.  He stated that the RC runway is a one-way in

24  and one-way out for takeoff and landing.  He explained that the

25  there is a slight slope to the RC runway, with the north end being

689

1  lower than the south end.

2       Respondent said that when landing off-airport, you would want

3  to use an upward slope of landing site to help slow you down,

4  which meant landing to the north and rolling uphill to the south.

5  However, when taking off, you would want to use the downward

6  slope, which meant taking off from the south and heading north.

7       Respondent said if he had decided to land after the low pass,

8  he would have been set up for a left traffic pattern to land to,

9  land on the north end of the runway.  He explained after he made

10  his low pass with the landing site, excuse me.  He explained that

11  after he made his low pass with the landing site on the left side,

12  he would have then have climbed and turned left for a left

13  crosswind, placing him perpendicular to the runway.

14       He would have then turned left again for the left downwind

15  leg, coming back north, then making a left base, then a left turn

16  to a final approach.  However, Respondent said he did not do this

17  because he felt uncomfortable with being unable to identify the

18  touchdown point.  Since he made the decision that a safe landing

19  could not be made without more passes, he decided to continue on

20  his southbound flight return to the airport, which was

21  approximately 5 minutes away.

22       Respondent confirmed that sometime afterwards, Inspector

23  Morgan from the FSDO contacted him either by letter or voicemail

24  asking him to speak to him.  Respondent did contact Inspector

25  Morgan as he requested.  He could not recall the details of the

A92

1  conversation.  During the conversation, Respondent did not recall

2  flying past any houses because the conversation took place a week

3  after the 24th and he had since flown several times.

4      At the request of Inspector Morgan, Respondent went to the

5  FSDO.  He was shown a video and questioned.   Respondent readily

6  admitted that the video showed him flying his Kitfox 5 in the

7  vicinity of Desert Sun Lane, and that he did fly past the Penas'

8  and Likes' properties.   He admitted that he was planning an

9  approaching to land with medium power, but applied power to turn

10  and climb when he decided to depart the area.  He did not land.

11      On cross-examination, Respondent confirmed that his Kitfox

12  has dual controls.  Administrator's counsel questioned him as to

13  why he not plan on sitting in the right seat to make the low level

14  pass.  Respondent explained that all of his pilot-in-command time

15  has been from the left seat.  The primary instruments are on the

16  left.  And attempting to operate from the right seat would have

17  introduced a new variable that was unnecessary.  When asked about

18  the prior incident referenced in the 2017 counseling, Respondent

19  confirmed that he was in the left seat and that he was flying with

20  an instructor in the right seat.

21      When asked about his flight route through the area of Desert

22  Sun Lane to get to Bedell Flats from the Reno Stead Airport,

23  Respondent explained that Bedell Flats is a large area like a sink

24  and the Desert Sun Lane area is the lowest point in the path due

25  to the mountain range.  When asked about his prior high level

A93

1  inspections, he stated he had flown over the area at higher

2  altitudes in the past.  As he passed through the area, he would

3  look out and assess the feasibility of landing.  He said he would

4  have done this at approximately 500 feet above ground level.  He

5  could not remember the times he did this, but says it was when he

6  was flying over the area.  He considered these occasions as

7  performing a high-altitude reconnaissance.    The first time he

8  made a low level inspection pass was on November 24th.

9      When asked how he would approach the RC runway if he intended

10  on landing, Respondent stated he would not make any landing

11  approach from the south.  He explained that the RC runway slopes

12  downward towards the north, so when making an off-field landing,

13  he would have landed at the north end to take advantage of the

14  upward slope to the south.

15      He did not know the length of the RC runway, but guessed it

16  at 400 to 500 feet.  He stated that his southern flight path was

17  following a drainage, which led to the to the Likes' property.  He

18  admitted that farther south of the Likes' property are houses and

19  powerlines.  But his main reason for the manner of his approach

20  was because of the slope of the runway if he decided to land.  He

21  testified he began his left climbing turn away from the Likes'

22  house once he decided he was unsatisfied with being unable to

23  identify the touchdown point.

24      Respondent denied having flown any drones at the Likes'

25  property.  He said he had visited the property before, but it was

692

1  not to fly drones.  When asked about where the RC runway was

2  located, his response was that, it was that he was confused by Mr.

3  Likes' testimony that the runway was east to west since the one he

4  was looking at was north to south.

5      On cross-examination, Respondent denied flying so low that he

6  would have not have been able to see the touchdown point.  He

7  explained that the touchdown point was difficult to identify

8  because of the lack of identifying features and not because of

9  flying below the rise where the RC runway was located.  He also

10  said that it was an off-field runway so there are not a lot of

11  markings on it.

12      Referring to R-2, Respondent estimates that his altitude was

13  under -- 100 feet above ground level on his flight path between

14  Mr. Likes' house and the RC runway.  He could not recall the

15  lateral distance he was from Mr. Likes' house.  Although he would

16  have looked out of both windows, he states his focus was on the

17  landing site so he would have been mostly looking out of his left

18  window.

19      Respondent reiterates that he was making a low pass and did

20  not intend to land.  He made the decision during the low pass that

21  he was unable to identify any touchdown point, so decided to

22  leave.  He stated that if he had liked being able to identify the

23  touchdown point, he would have comeback and made another pass to

24  inspect the runway.  As he did not identify a touchdown point, he

25  began a climbing turn to leave the area.  He began his climbing

A95

1  turn just past Mr. Likes' house.  He did not know his altitude

2  since he was since he was climbing.

3      He admits that he passed by Mr. Pena's house on his route to

4  the low level pass.  Respondent claims that he did ask Mr. Likes

5  to call Mr. Pena on his behalf, excuse me, let me rephrase that.

6  Respondent confirms that he did ask Mr. Likes to call Mr. Pena on

7  his behalf and apologize, but this was because Inspector Morgan

8  had told Respondent that this incident warranted an apology.  He

9  did not recall telling Mr. Likes that he flew too close to Mr.

10 Pena's house.

11     Respondent admitted that if lost an engine at 100 feet above

12 ground level and was in a 40 degree bank, it would be factor in

13 the glide performance.  He explained that a bank angle adds drag

14 to the wing and less lift would be generated, which would mean it

15 would glide less in a turn.  He also admitted that the performance

16 numbers are based on sea level and at altitude, the performance is

17 different because the air is thinner.

18     On redirect, Respondent said he was at approximately 5,000

19 feet during the STOL demonstration video.  In comparison to the

20 area of Desert Sun Lane, which is 5,500 to 7,500 feet, Respondent

21 says that there is no noticeable difference on his aircraft's

22 performance.  He explained that it is standard for the pilot-in-

23 command to fly from the left seat unless they are instructing.  He

24 confirmed that he has no experience performing low level passes or

25 landing from the right seat.  He stated his belief that it is

694

1  necessary to perform a low level pass in order to evaluate the
2  suitability of the landing area.
3      I asked questions to clarify Respondent's testimony.  He
4  stated that the sound testing was not specific to his Kitfox, but
5  was for an airplane with a similar engine and propeller as his.
6  Before the engine failure he had previously while crossing the
7  mountain, he said there was little warning.  He recalled a buzzing
8  sound, but he wasn't sure where it was coming from since he was
9  listening to music with headphones.  He later learned that he had
10  a rod failure.
11      Respondent said he first met Mr. Likes and his son in 2012 at
12  an RC racing event.  Later in 2019, he hired Mr. Likes to perform
13  some plumbing work and his son to perform finish work at his
14  house.  During that time they began talking more, and Mr. Likes
15  son, Jacob, invited him to fly RC airplanes at their property, and
16  asked Respondent if he thought he could land his airplane on the
17  RC runway.   Respondent said he thought he could land on the RC
18  runway, so Jacob continued to ask him several times.
19      Respondent said his typical cruise altitude in the area is
20  6,000 to 6,500 feet above mean sea level, or 500 to 1,000 feet
21  above ground level if he was not flying cross-country.  He could
22  not recall his altitude because, excuse me.  He could not -- he
23  cannot recall his altitude as he was -- as he flew south to north
24  to Bedell Flats.  He could not recall at what point on his flight
25  back south that he decided to go and get a closer look at the RC

A97

1  runway and make a low level pass.  He could not recall his

2  altitude during his flight south.  He could not recall when or

3  where along his flight path he began his low pass.  He did not

4  recall where along his flight path he descended to 100 feet above

5  ground level.

6      He has a glass cockpit, or an electronic display.  He does

7  not recall either the highest or lowest altitude along his flight

8  path, and stated that he was not looking at his altimeter as he

9  flew near the Likes' house or along the path depicted with the

10  green line in R-22 -- R-2.  He could not recall at what point

11  along his flight path he reduced his speed to 70 miles per hour.

12      He could not recall when he visited Mr. Likes' property, but

13  knows it was sometime before the 24th.  He recalls identifying a

14  group of sage brush near runway during his visit, but could not

15  identify them from the air.  He said there is no windsock on the

16  property, but said the prevailing winds were calm.

17      He had not studied any navigational maps for the purposes of

18  landing at the RC runway.  He did not use any navigation aids to

19  identify the RC runway.  He was not able to identify the runway,

20  excuse me.  He was able to identify the runway, but was not able

21  to identify a touchdown point.  He was not sure of the runway's

22  length, but he thought it was roughly 400 feet.  He had evaluated

23  other locations on Mr. Likes' property since there were other

24  roads and trails, but this particular runway was the best.

25      Respondent testified that during low level -- during the low

696

1  level pass to assess the RC runway, he did not make any radio

2  calls on the common traffic frequency reporting his location.

3  Respondent's excuse was because there was no common traffic

4  advisory frequency for that area and there was no geographic

5  references he could point to for his position.  He said depending

6  on the circumstances, he doesn't know how many additional passes

7  he would have made if he was satisfied after his first low level

8  pass.  He stated he would typically make at least three more

9  passes.

10      I pointed out that instead of the flight path he took as

11  depicted with the green arrows on R-2 going north and south and

12  flying between Mr. Likes' house and the RC runway, he had an

13  alternative.  Specifically, instead of turning towards the houses

14  to look out his left side, as could flown farther south, while

15  staying farther east of the houses and over the open area.  After

16  going past the landing site, he could have then made a 180 degree

17  turn to come back north, and fly essentially a downwind leg for

18  his low pass, would still have allowed him to look out of his left

19  window without flying so close to Mr. Likes' house that was to the

20  west.  Respondent conceded that the did not consider that option.

21  Respondent, however, said that the ground was 20 to 30 feet higher

22  to the south, suggesting that it would have been difficult.

23      The Respondent rested his case-in-chief.  There was no

24  rebuttal evidence offered.

25      Having summarized the evidence, I will now make my findings

A99

1   and conclusions of law starting with the relevant regulations

2   alleged.  14 CFR, Section 91.119(a) states, and I quote:

3       "Except when necessary for takeoff or landing, no person may

4   operate an aircraft below an altitude allowing an emergency

5   landing without undue hazard to persons or property on the surface

6   if a power unit fails."  Actually, that is not a quote.  That's my

7   paraphrasing of Section 91.119.

8       Subsection (c) prohibits operating aircraft at an altitude of

9   500 feet above the surface, except over open water or sparsely

10  populated areas.  In those cases, the aircraft may not be operated

11  closer than 500 feet to any person, vessel, vehicle, or structure.

12      Section 91.13(a) is a residual violation that prohibits

13  operating an aircraft in a careless or reckless manner so as to

14  endanger the life or property of another.

15      I make the following findings of fact:

16      First, that Respondent holds a pilot -- private pilot's

17  certificate.

18      Two, that he is the registered owner of a 1997 Johnson John T

19  Kitfox 5, registration number N318JJ.

20      Three, that on November 24, 2019, he was the pilot-in-command

21  of his aircraft in the vicinity of 400 Desert Sun Lane and 300

22  Desert Sun Lane in Reno, Nevada.

23      Respondent admitted to paragraphs 1 to 3, and testimonial

24  evidence of Respondent, the Penas, and Mr. Stanley corroborate

25  these undisputed facts.  It has not been disputed that area in

A100

698

1   question is considered a sparsely populated area, and I find it is

2   a sparely populated area within the meaning of the regulations.

3       I also find that Respondent flew less than 100 feet above

4   ground level as stated in the first clause of paragraph 4.

5   Respondent admitted he was operating in the vicinity of 300 and

6   400 Desert Sun Lane, and that he had operated less than 100 feet

7   above ground level.  He also testified on cross-examination to

8   estimating that his altitude was under 100 feet above ground level

9   on his flight path between Mr. Likes' house and the RC runway.

10      It is undisputed that Mr. Likes' residence is 400 Desert Sun

11  Lane and south of the Penas' residence.  Respondent did not recall

12  where along his flight path he descended to 100 feet above ground

13  level.  He further did not recall his specific altitude during,

14  before, or after the low pass.  He did, however, clearly concede

15  to being 100 feet above ground level or less during his low pass

16  over the Likes' property.

17      The testimony of Mrs. Pena corroborates this.  She saw the

18  airplane before the Likes' property as it past the south end of

19  the Penas' garage, and guessed the airplane was 100 feet to 50

20  feet above ground level when she saw it banking and then climbing

21  near Mr. Likes' house.  Similarly, Mr. Pena places the airplane 25

22  to 35 feet above the grade of the garage, and accounting for a

23  6-foot slope away from the garage, put Respondent 31 to 46 feet

24  above the propane tank on their property.  Mr. Pena's assessment

25  is based on his military experience as an MK-19 gunner.

A101

699

1  This is further corroborated by Mr. Stanley's testimony, who

2 testified to first seeing the airplane 80 feet above ground level

3 and keeping a steady altitude until just before Mr. Likes' house

4 where it turned and climbed.  Mr. Stanley's assessment is based on

5 seeing poles of 140 feet and 80 feet at work.  While there is

6 inconsistency between the Penas' height estimation, as well as Mr.

7 Stanley's, they are all consistent that airplane's altitude above

8 ground level was 100 feet or less.  I therefore find that the

9 weight of the credible, relevant and persuasive evidence proves

10 Respondent operated at 100 feet or less above ground level.

11  Consistent with my findings, I modify the first clause of

12 paragraph 4 of the Amended Complaint by adding between the word

13 "altitudes" and the word "less", the phrase "of 100 feet AGL or"

14 so that the paragraph now reads, "4.  During the referenced flight

15 operation, you operated N318JJ at altitudes of 100 feet AGL or

16 less than 100 feet AGL."  I find that a preponderance of the

17 evidence proves this clause in paragraph 4 as modified.

18  However, what is disputed are the specific altitudes alleged

19 in the sub-paragraphs.  Specifically, he disputes operating:

20  (a) within approximately 50 feet of a stable, shed, and

21 propane tank;

22  (b) within 100 to 150 feet of a residential home at 400

23 Desert Sun Lane;

24  (c) within 100 to 150 feet of an adult and child outside of

25 the same residential home; and

A102

700

1      (d) within 300 feet of two adults and two children near the

2   perimeter of the same residential home.

3      Although the specific distances are disputed, the primary

4   issue for purposes of Section 91.119(c) is whether he flew within

5   500 feet of a residential home at 400 Desert Sun Lane and within

6   500 feet of adults and children outside of the same residential

7   home as alleged.

8      There is no dispute as the Penas and their children, as well

9   as Mr. Stanley, meet the definition of people under the

10  regulations.  Nor is there any dispute that the residential house

11  of 400 Sun Lane, stable, and shed are structures.  As to the

12  propane tank, Respondent disputes that a propane tank is a vessel.

13  While a propane tank is definitely not a person or  vehicle, it

14  could be a vessel depending on the definition.  It can be a vessel

15  in terms of container to hold items, or it can be a ship or

16  watercraft.

17     In context of the FARs, or Federal Aviation Regulations,

18  vessel refers to a ship or watercraft.  Therefore, a propane tank

19  is not a vessel under the regulations.  On the other hand, a

20  structure is commonly defined as a building or other object

21  constructed from several parts.  In *Administrator v. Scollan*,

22  S-C-O-L-L-A-N, at 2 NTSB 538, a 1973 case, the Board held that

23  electrical wires, including the poles between which wires are

24  strung, is reasonably construed as a structure when a pilot flew

25  within 500 feet of electrical wires.

A103

701

1    By analogy, I find it reasonable to construe the term

2    structure to include a propane tank.  It is clear that the purpose

3    of the regulation was to avoid the unnecessary hazards of a pilot

4    operating too close to certain categories of objects, including

5    propane tanks.  Therefore, I find that a propane tank is a

6    structure within the meaning of the regulations.

7    At this point, let me note paragraph 4 and sub-paragraphs

8    focus entirely on operating too close to 200 Desert Sun Lane,

9    excuse me, I misquoted that.  At this point, let me point out that

10   paragraph 4 and sub-paragraphs focus entirely on operating too

11   close to 400 Desert Sun Lane, the Penas' house.

12   Paragraph 3 is of little help since it is a general paragraph

13   that provides no allegation of distance, altitude or proximity in

14   violation of the regulations.  In short, there is no allegation

15   that Respondent operated within 500 feet of 300 Desert Sun Lane,

16   which is Mr. Likes' house.

17   Respondent admitted to flying between Mr. Likes' house and

18   the RC runway.  Mr. Likes testified that the RC runway is more

19   than 500 feet away from his house.  And while the Respondent did

20   not recall how close he was to the Likes' house, he testified

21   off-setting to the west side of the runway 300 feet so he could

22   view the runway out of his left window.  It is, therefore,

23   reasonable to assume that Respondent was within 200 to 500 feet

24   away from the Likes' house.

25   Respondent also testified at flying at an altitude below 100

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A104

1  feet above ground level during his low pass, which was over the

2  Likes' property.  The testimony of Mr. Stanley and the Penas

3  corroborate this as they testified to seeing Respondent pass the

4  Penas' house, make a left turn, fly towards Mr. Likes' house, and

5  climb and fly into the horizon.

6      Since the Amended Complaint fails to allege that Respondent

7  operated within 500 feet of 300 Desert Sun Lane in violation of

8  the regulations, my findings in this regard are made only for

9  purposes of making a determination of Respondent's flight path and

10  altitude prior to that point.

11      There is one other correction I need to make that I noticed.

12  In my prior discussion, I cited to Regulation Section 119.19 and

13  its sub-paragraphs.  That should actually be and the correct

14  citation is 14 CFR, Section 91.119(a) and (c).

15      Let me next address the issue of Respondent having permission

16  to attempt to land and takeoff from a private RC field in the

17  backyard of 300 Desert Sun Lane.

18      It is undisputed that Mr. Likes gave Respondent permission to

19  land, as Mr. Likes said, and I paraphrase, "anywhere on his

20  property at any time."  This specifically included the RC runway

21  according to Mr. Likes' testimony, as well as the Respondent's.

22  Additionally, Respondent cites to Nevada revised statute Section

23  493.050(c) allowing for aircraft over lands or waters of another

24  with his or her consent.

25      However, whether Respondent had Mr. Likes' consent or was in

703

1    compliance with Nevada's consent statute is largely irrelevant.

2    While it may have given Respondent a reason for flying over the

3    Desert Sun Lane area at a low altitude to consider a landing on

4    the RC runway, the relevant federal regulations in this matter can

5    be violated with or without the consent of the landowner.  That is

6    neither 19.119 nor 19.13 have any element or defense excusing a

7    violation because the landowner gave consent for a landing or

8    takeoff.  Therefore, I do not find Mr. Likes' consent to land on

9    the RC runway relevant for purposes of a violation.

10        Turning to the sub-paragraphs of paragraph 4.   There was

11   conflicting evidence between Respondent's testimony and the

12   testimony of the other eye-witnesses, particularly with regards

13   the flight path and altitude of the airplane above ground level.

14   Respondent testified he was coming back from Bedell Flats.  While

15   he was unsure of his exact flight path, he says he followed the

16   drainage which brought him from the northeast towards the Likes'

17   property.

18        On the other hand, Mr. Pena testified he was approximately

19   300 feet away -- on the other hand, Mr. Pena testified that the

20   Respondent was approximately 300 feet away when he saw the

21   airplane to the east and above the roof line of his house.  He

22   then described it disappearing below the roof line and seeing it

23   again as it came from behind the garage of his house to the south,

24   and then making a left banking turn towards the Likes' house to

25   the south.  Based on this, he believes the airplane came from the

A106

704

1  north and flew south above the propane tank, shed, and barn on the

2  east side of his house, even though he admits he did not see it.

3  Mr. Pena also testified to hearing the airplane but not seeing it

4  until it came from behind the garage of the house to the south

5  towards the Likes' house and then making a left banking turn.

6      The Penas' testimony was likely biased given their marital

7  relationship.  There was also some indication that the Penas' were

8  having problems with the Likes using drones to buzz their house,

9  and their belief that the airplane was in retaliation for

10 complaining about the drones.

11     Despite there not being any evidence of the Likes using

12 drones to buzz the Penas' house or the Respondent retaliating on

13 behalf of Mr. Likes, it is reasonable to believe that the Penas

14 would embellish their testimony.  However, I do not believe they

15 falsified their basic testimony about what they saw.

16     Mr. Stanley largely corroborates the flight path above the

17 ridge line of the Penas' and out from behind the garage at the

18 south going towards the Likes' at an altitude of less than 100

19 feet above ground level.  Mr. Stanley testified to talking to Mr.

20 Pena and seeing the airplane to the far east initially, which was

21 a mile away near the mountain range coming from the south.  He

22 then saw the airplane turn left towards the Penas' at a lower

23 altitude.  As the airplane approached the Penas' house at the

24 north end, he could see it above the house's ridge line.

25     Based on seeing 80-foot poles at work, he testified that the

705

1  airplane was 80 feet above ground level.  He also estimates that
2  the airplane was as far away from the house as it was high.  Mr.
3  Stanley says the speed was constant.  As it got closer, he lost
4  sight of airplane as it became hidden by the Penas' house, at
5  which point the airplane was too low for him to see above the roof
6  line of the house.  The next time he saw it, it was past the south
7  end of the Penas' house, but still steady at 80 feet above ground
8  level, but making a left turn and climb before the Likes' house.

9       Mr. Stanley was not shown to have an axe to grind.  Although
10 he was friendly with Mr. Pena, he had not talked to him for some
11 time as he had moved to Texas.  He did not appear to embellish his
12 testimony, saying the airplane's altitude was steady at 80 feet
13 above ground level with a constant speed, and made a slight left
14 turn and climb.  I find Mr. Stanley's testimony credible.

15      The preponderance of the evidence demonstrates that the
16 Respondent flew towards the Penas' house from the north or
17 northeast.  Respondent further corroborates that he was coming
18 from northeast, which is consistent with Mr. Pena and Mr. Stanley
19 seeing the airplane above the roof ridge line at the north end of
20 the house.  While the airplane went out of view because of the
21 house, both Mr. Pena and Mr. Stanley, as well as Mrs. Pena, all
22 testified to seeing the airplane coming out at the south end of
23 the house passed the garage and going towards the Likes' house.

24      Respondent admits going towards -- Respondent admits going
25 towards the Likes' house during his flight path.  This is

A108

706

1  consistent with the flight path of passing from the north end of

2  the Penas' property to the south.  Again, Respondent admitted to

3  being 100 feet or less above ground level during his low pass,

4  which is consistent with the witnesses' observations of the

5  airplane being low.

6      As to the distance away from the Penas' residence, the

7  preponderance of the evidence shows that he was less than 500 feet

8  from the Penas' residence and their stable, shed, and propane

9  tank.  As no witness actually saw the flight path behind the

10  Penas' house, the flight path must be inferred from the evidence.

11      Mr. Pena testified that he estimated being 300 feet away from

12  the airplane's flight path when he saw it above the roof line.

13  His wife and son were between him and the house, approximately 140

14  to 160 feet away.  Although he lost sight of the airplane behind

15  his house, he saw it come from behind the roof line of the garage

16  to the south.  He speculates that given the two locations he saw

17  the airplane, as well as his knowledge of the property, that the

18  airplane was above the propane tank, stable and shed to the east

19  of his house.

20      Mrs. Pena largely corroborates this saying that when she saw

21  the airplane appear from the edge of the garage at the southern

22  end of the house traveling towards the Likes' house.  She

23  concluded that the only reasonable path prior to her seeing the

24  airplane would be over the propane tank, stable and shed to the

25  east of their house.

1    Mr. Stanley saw the same thing, but did not testify to his

2  belief of the flight path when the airplane was out of his sight

3  behind the house.

4    Respondent denies these accounts.  He admitted to flying by

5  the Penas', but did not say how close he was to their house.

6  While investigators took various measurements from the house to

7  the various structures to the east, as well as the supposed flight

8  path of 78 feet from the center line of the garage or 63 feet from

9  the edge of the house, this was based on the Penas' accounts.  Let

10  me try that sentence again as my voice got a little rough there.

11  While investigators took various measurements from the house to

12  the various structures to the east, as well as the supposed flight

13  path of 78 feet from the center line of the garage or 63 feet from

14  the edge of the house, this was based upon the Penas' accounts.

15    There were really no eye-witness to the actual flight path

16  over the various structures.  Nevertheless, a preponderance of the

17  circumstantial evidence demonstrates that Respondent operated

18  closer than 500 feet on the west side of the Penas' residence.

19  This would have also placed him closer than 500 feet of the

20  various structures east of the house, which ranged in distances

21  from 41 to 63 feet from the edge of the house.  This is based on

22  the Penas' testimony, the measurements the investigators took, as

23  well as corroborated by Mr. Stanley's testimony of seeing the

24  airplane above the roof line at approximately 80 feet above ground

25  level, and that the airplane was as far away from the house as it

708

1  was high.

2      Thus, according to Mr. Stanley, the airplane would have been

3  80 feet away from the Penas' house.  Although Mr. Stanley was not

4  a pilot, his testimony was credible given his work experience of

5  seeing 80-foot and 140-foot tall poles.  He also did not embellish

6  or exaggerate his testimony.  It corroborated the Penas' testimony

7  as to airplane being approximately 78 feet from the center line of

8  the garage.

9      I, therefore, find a preponderance of the evidence shows that

10 Respondent operated closer than 500 feet to a stable, shed and

11 propane tank, and closer than 500 feet to a residential home at

12 400 Desert Sun Lane, which are all structures.

13     Consistent with my findings, I modify sub-paragraphs (a) and

14 (b) of sub-paragraph 4 of the Amended Complaint by striking the

15 words and figures of, quote, "within approximately 50," end quote,

16 and the words and figures, quote, "within approximately 100 to

17 150," end quote, and substituting the figures and phrase, quote,

18 "closer than 500".  Subparagraph (a) will now read, and I quote,

19 "closer than 500 feet of a stable, shed, and propane tank," end

20 quote.  And sub-paragraph (b) will now read, quote, "closer than

21 500 feet of a residential home at 400 Desert Sun Lane," end quote.

22 I find that a preponderance of the evidence proves sub-paragraphs

23 (a) and (b) as modified.

24     Concerning sub-paragraph (c), the preponderance of the

25 evidence shows that Mrs. Pena was holding her son near the front

1   door, on the walkway, near the -- near their house on the west

2   side.  While it is unknown how far away she was from house, it is

3   reasonable to infer that she and her son were closer than 500 feet

4   to the flight path.  This is based upon my finding that

5   Respondent's flight path was closer than 500 feet to the house.

6   More specifically, the weight of evidence shows the flight path

7   was 78 feet from the center line of the garage peak, which is the

8   same center line extending the length of the house.

9       Inspector Green also testified that the center line of the

10  garage to the edge of the house was 15 feet.  So it is reasonable

11  that front door of the house was 78 feet plus another 15 feet to

12  the west edge of the house.  This is approximately 407 -- this is

13  approximately 407 feet for purposes of being within the 500-foot

14  bubble of 19.9 -- within the bubble of 91.119(c).

15      While it is unknown how close Mrs. Pena was to the house

16  since investigators took no measurements, both she and Mr. Pena

17  testified that she was on the walkway just in front of the entry.

18  This was certainly closer than 400 feet and the evidence

19  reasonably supports the inference that Mrs. Pena and her son were

20  closer than 500 feet to Respondent's flight path.

21      I therefore find a preponderance of the evidence shows that

22  Respondent operated closer than 500 feet of an adult and a child.

23  Consistent with this finding, I modify sub-paragraph (c) of

24  paragraph 4 by striking the words and figures of, quote, "within

25  approximately 100 to 150," end quote, and substituting the phrase

710

1    and figures, quote, "closer than 500," end quote.  Sub-paragraph

2    (c) will now read, quote, "closer than 500 feet of an adult and a

3    child who were outside the residential home at 400 Desert Sun

4    Lane," end quote.  I find a preponderance of the evidence supports

5    and proves paragraphs -- paragraph 4(c) of the Amended Complaint

6    as modified.

7        As to Mr. Pena and his daughter, and Mr. Stanley at the

8    western fence line of their properties, the only testimony as to

9    their distance from the flight path was Mr. Pena's.  While he

10   testified to being 300 feet from the flight path, there was no

11   corroboration of this.

12       Mr. Stanley did not say how far he was from the flight path.

13   He only said how far he thought the flight path was from the

14   house.  The investigators did not measure any distances to the

15   western fence line where Mr. Stanley and Mr. Pena were standing.

16   Mr. Stanley did not say how far away Mrs. Pena or how far the

17   house was from him.

18       Finally, there was scant evidence that there were two

19   children near Mr. Stanley and Mr. Pena.  While Mr. Pena and Mrs.

20   Pena testified about their daughter being with Mr. Pena at the

21   fence line, Mr. Stanley did not mention this.  Furthermore, Mr.

22   Pena commented in passing that Mr. Stanley's child may have been

23   somewhere nearby.  But Mr. Stanley testified that after hearing he

24   airplane, his wife and child came out of the house.  Therefore, it

25   can be reasonably inferred a question whether or not there were

A113

1  two children with Mr. Pena and Mr. Stanley at the fence line.

2  Nonetheless, there is insufficient evidence that Respondent's

3  flight path was closer than 500 feet of the western fence line in

4  absence of any measurements or other testimony than Mr. Pena's

5  guess.

6      Therefore, I do not find the Administrator has sustained his

7  burden of proving by a preponderance of the evidence that

8  Respondent operated within 300 feet or closer than 500 feet of 2

9  adults and 2 children near the perimeter of 400 Desert Sun Lane.

10  The Administrator has not proven sub-paragraph (d) of paragraph 4

11  of the Amended Complaint.

12      While there was testimony as to other structures such as

13  fences, power poles, and a chicken coop, these other structures

14  were not alleged in the Amended Complaint.  In any event, findings

15  concerning these other structures does not materially alter my

16  findings, nor is aggravating under these circumstances.

17      As to the height of the airplane on its path, as I mentioned,

18  Respondent admitted to being 100 feet above ground level or less

19  during his low pass.  He testified that after his low pass, once

20  he determined he could not identify a touchdown point, he turned

21  and climbed to leave.  This suggests he was in a fairly level

22  flight during the low pass until he was next to or past the RC

23  runway, which was next to Mr. Likes' house.

24      This would be consistent with Mr. Stanley's testimony, who

25  testified that he saw the airplane lower at approximately 80 feet

712

1  above ground level and in a steady flight until it turned to avoid

2  Mr. Likes' house and climbed.  The Penas also testified to seeing

3  the airplane climb after it passed the south end of their garage,

4  which again suggests level flight during the low pass until

5  Respondent decided to depart the area.

6      While the Penas provided various heights of 25 to 35 feet

7  above the grade of this garage, approximately 5 to 10 feet above

8  the ridge line of the house, or approximately 30 feet above Mr.

9  Likes' roof peak, and 50 to 100 feet above the gravel driveway,

10 Mr. Stanley's testimony of 80 feet above ground level is more

11 credible.  Mr. Stanley's testimony is also corroborated by

12 Respondent's admission of being 100 feet or less above ground

13 level during his low pass.

14      I'll just briefly discuss the issue of the sound of the

15 aircraft.  I know there was testimony from the Penas concerning

16 the sound of the airplane, which the Respondent disputes.

17 Although I cannot determine the actual sound of Respondent's

18 Kitfox 5 and there was no positive evidence admitted as to the

19 sound levels of his Kitfox 5, I nevertheless find it information

20 relevant to a violation of the regulations.  The regulations

21 prohibit at least in this case a loud engine on an airplane.  The

22 gravamen of the violation is altitudes and distance, not noise.

23      Let me also briefly turn to the testimony of Inspector Green

24 and Specialist Speeg as it relates to their opinions of the flight

25 path and altitude above ground of the flight path.  Both Inspector

A115

1  Green and Specialist Speeg testified to relying on and using the

2  video in arriving at their opinions and conclusions.  While they

3  did say they also considered the witnesses' statements, it was

4  unclear if they were referring to the witnesses' written

5  statements or their testimony.

6      Moreover, both witnesses could not say whether they had seen

7  the original native video of the security camera or merely the

8  iPhone recording of a video monitor playing a part of the video.

9  Given my findings concerning the video, which I excluded from

10  evidence, I discounted both Inspector Green's and Specialist

11  Speeg's testimony concerning the flight path and altitude of the

12  airplane above ground level.

13      I also did not give any credence to Specialist Speeg's

14  testimony about the banking angle of Respondent's airplane as such

15  testimony was based on the video.  Similarly, his assessment of

16  airplane's height above ground level was based on the wingspan of

17  the airplane in relationship to the ground as shown in the video.

18  Neither Specialist Speeg nor Inspector Green were eye-witnesses,

19  and both relied on the excluded video to form their opinions and

20  conclusions of Respondent's flight path, altitude above ground

21  level, and banking angle.

22      During closing argument, Respondent's counsel urges the Board

23  to dismiss the Amended Complaint as investigators failed to

24  preserve evidence.  Respondent's counsel pointed out that

25  paragraph 9(b) in Chapter 4 of FAA Order 2150.3C directs that

714

1    investigative personnel preserve potentially relevant evidence and

2    that the duty to preserve arises at the start of the

3    investigation.  This paragraph further states, and I quote,

4    "Despite established record and retention schedules, potentially

5    relevant evidence is preserved until final action has been

6    completed and," in parens, "(in the case of legal enforcement

7    actions)," end parens, "investigative personnel have been released

8    from any applicable notice to preserve," end quote.

9        The FAA failed to obtain a copy of the native original video

10   recordings.  Or if they did, they either lost them or misplaced

11   them.  The FAA failed to seek out, secure, or copy the original

12   native video from the DVR record that was located in the Penas'

13   attic.

14       It is undisputed that Inspector Green downloaded two videos

15   from the Penas' computer located front room of the house, as

16   opposed to the DVR in the attic, to his digital camera or SD card.

17   Inspector Green did not know if the videos were copies of the

18   original native videos or the iPhone videos of a screen playing

19   the video.  He could not recall what videos were downloaded.

20       It is further undisputed that uploaded videos from the

21   digital camera to the case file -- it is further undisputed that

22   he uploaded videos from the digital camera to the case file and

23   then erased the SD card afterwards.  He did not know what videos

24   he uploaded to the case file.  There was no evidence or

25   documentation for the chain of custody at all.  And the FAA did

A117

715

1  not know of or recall receiving any CD or flash drive of the video

2  despite Mr. Pena testifying to giving the FAA one or both.

3      I further note that paragraph 10(b) of same chapter in Order

4  2150.3C also directs investigative personnel to promptly review

5  and obtain electronic material before it is lost, destroyed,

6  modified, or altered.  And when in doubt, such material should be

7  collected and preserved.  That was not done in this case with

8  regards to the video from the garage peak video camera or the

9  front door video camera.

10      Turning to the appropriate remedy for failing to preserve

11  evidence, Board Rule 19 provides that there may be a negative

12  inference against the party, a preclusion order, dismissal, or

13  other relief the judge deems appropriate.  Similarly, Rule 36(e)

14  of the Federal Rules of Civil Procedure provide similar remedies

15  when a party fails to take reasonable steps to preserve

16  electronically stored information that cannot be replaced through

17  reasonable discovery.  The Court can take necessary measures to

18  cure prejudice.  And when there is in intent to deceive a party of

19  useful information, this can include assuming the evidence was

20  unfavorable, dismiss the action or enter a default judgment.

21      Respondent argued that that failure to preserve or recover

22  the original DVR video or the SD card denied Respondent critical

23  evidence.  Specifically, the ability to determine the height and

24  speed of the aircraft, the ability to have his own expert review

25  it, and the ability to determine if there was sound recorded

A118

1  contrary to the Penas' testimony.  I find if there was sound
2  contrary to the Penas' testimony, it would have been impeaching,
3  but not exculpatory.  Further, as I mentioned, I did not find
4  evidence of the sound as being highly relevant for purposes of a
5  violation.
6      Furthermore, Respondent had a version of the video, albeit
7  the iPhone recording, that he could have had his expert examine to
8  see if the aircraft's altitude could be determined.  The
9  aircraft's speed is not directly relevant since the regulation
10 speaks to above ground altitude requirements and distance
11 requirements.  Finally, I note that Respondent could have served a
12 subpoena on the Penas to try to obtain the DVR or recover the
13 video, but did not do so.
14     In any event, I do not find maliciousness or ill intent to
15 deprive a party of useful information.  Instead, I find the
16 investigators were negligent and careless, and at worst reckless.
17 The simple fact that the native original videos were lost should
18 not, absent more, direct any adverse inference.  There was no
19 evidence of malfeasance by way of purposeful destruction of
20 evidence.
21     While Inspector Green intentionally erased the SD card, he
22 did so after downloading the contents to the case file and for the
23 purpose of reusing the SD card for other cases, as opposed to
24 purposefully depriving Respondent of potentially exculpatory
25 evidence.  There was no proof that anything inappropriate

717

1  occurred.  Instead, the FAA was negligent and careless.  In short,

2  the investigation was sloppy.

3      I also note that even though FAA inspectors did not have

4  permission to access the Likes' property for purposes of measuring

5  distances, they certainly could have used a laser range finder,

6  obtained survey records from the county, or sought out Mr. Likes

7  or the subsequent property owner to obtain permission during the

8  two plus years this case has been pending.  They could have even

9  used Google Earth and the measuring tool as they did for other

10  demonstrative exhibits.  I point this as it clearly demonstrates

11  their negligence and carelessness, and sloppiness on this

12  investigation.

13      I therefore find that the remedy of dismissal as Respondent's

14  counsel urges is not appropriate under these circumstances.

15  Instead, I precluded the video and any testimony concerning the

16  video's content.  Further, because portions of Inspector Green's

17  and Specialist Speeg's opinions, comments, and conclusions cannot

18  be separated from viewing the video, I find that the appropriate

19  remedy is to exclude any testimony that relied in whole or part

20  upon their viewing of the video.

21      Given this, I do not and did not rely upon, nor do I find,

22  excuse me.  Given this, I do not and did not rely upon, nor do I

23  further discuss Inspector Green's or Specialist Speeg's comments,

24  opinions, and conclusions related to Respondent's flight path,

25  altitude above ground level, or bank angle.

A120

718

1       While the video recording from the garage peak may have been

2   helpful, it was not necessary to the Administrator's case as there

3   were three eye-witnesses and Respondent's testimony about his

4   altitude and flight path, as I have discussed.  In short, the

5   video was not the only evidence.

6       As I discussed above, I considered and gave weight to the

7   measurements the investigators took, which are objective distances

8   to objects based upon eye-witness testimony and corroborates Mr.

9   Stanley and the Penas' testimony.

10      Now I return back to the issue of whether Respondent's low

11  pass of 100 feet above ground level was below an altitude that

12  allowed for an emergency landing without undue hazard to persons

13  or property on the surface in the event of a power unit failure.

14  In this regard, I weight to Specialist Speeg's opinion concerning

15  this since Specialist Speeg was qualified as an expert in general

16  aviation flight operations, including low flight and the

17  regulatory requirements for low flight, which did not necessarily

18  rely on the video.

19      Specialist Speeg testified that the low passes off-field are

20  not necessarily prohibited under the regulation, but it depends on

21  the circumstances.  He testified that the regulation does not

22  prohibit all off-airport landings, but describes the altitude for

23  low level operations.

24      Notably, as stated in the wording of subsection (a) of

25  Section 91.119, this regulation for operating at altitude -- this

A121

1  regulation is for operating at an altitude that would allow an

2  emergency landing without undue hazard to persons or property on

3  the surface if a power unit fails, quote, "anywhere," end quote.

4  This obviously includes off-airport locations.

5      When it comes to off-airport landings, Specialist Speeg

6  agreed that the Off-airport Ops Guide provides recommended

7  guidance.  Specialist Speeg testified that a low pass is done at

8  less than cruise speed, but not necessarily at slow speed.

9  Specialist Speeg opined that the purpose of Subsection (a) of the

10 regulation is to ensure a safe altitude if a power unit fails.  He

11 explained that if there was a problem, there was a low margin for

12 error as you operate lower to the ground.

13     In the vicinity of Desert Sun Lane, Specialist Speeg opined

14 that it is a sparsely populated area.  That if a power unit

15 failed, it would be difficult for Respondent to make an emergency

16 landing without undue hazard to people or property on the ground.

17 Specifically, Specialist Speeg said that any attempt to land on

18 any of the roads in the subdivision would create a hazard to

19 people and structures nearby.

20     Specialist Speeg noted that Respondent testified that the RC

21 runway was unsuitable, which meant landing on a road in the

22 subdivision if there was a problem and this would have created an

23 undue hazard to persons or property.  Specialist Speeg also

24 testified that Respondent could have gone farther to the east of

25 Desert Sun Lane to avoid structures or people.  I find Specialist

720

1   Speeg's testimony credible in this regard.

2        Respondent admitted when I questioned him that instead of

3   flying between the Likes' and the RC runway for purposes of

4   looking out his left window, that there was an alternative that

5   still allowed him to look out his left window while staying east

6   of the houses and the RC runway.  This would have been over an

7   open area of scrub brush to the east.

8        More specifically, Respondent could have flown farther south

9   along the mountain range, while staying farther east of the houses

10  and over the open area.  After going past the RC runway or the

11  landing site, he could have then made a 180 degree turn to come

12  back north, and fly essentially a downwind leg for his low level

13  pass.  He would then have been flying south to north and parallel

14  to the RC runway.  This would have still offset him from the RC

15  runway to the east and allow him to look out his left side and

16  away -- allowed him to look out the left side window.  It would

17  also have placed him away from the Likes' house that was farther

18  to the west.  This would have also placed him farther to the west

19  of the Penas' residence.

20       Respondent agreed that this would have worked even though he

21  did not consider it.  And this corroborates Specialist Speeg's

22  testimony concerning the hazard created when Respondent's low pass

23  took him between the Likes' house and the RC runway.  Respondent,

24  in an apparent afterthought excuse of why he did not take this

25  path, said that the ground was 20 to 30 feet higher to the south,

1  suggesting that it would have been difficult.  I do not find this
2  credible nor believable.

3      First, Respondent is a 900 hour plus private pilot in this
4  aircraft, and claims to having made thousands, if not hundreds
5  off-field takeoff and landings.  With this experience, he should
6  be experienced in evaluating safer options for low level his pass.
7  This particularly the case -- this is particularly the case as
8  Specialist Speeg testified that there is a lower margin of error
9  the lower you fly to the ground.

10      Respondent has also experienced an engine failure in the past
11  at 500 feet above ground.  In this situation, he was able to
12  safely land because he had 500 feet above ground, and was able to
13  take advantage of the descending slope of the mountain to prolong
14  his glide until locating a safe place to land.

15      Secondly, despite there being a 20 to 30 foot difference in
16  terrain height between the south and north, this was not as a
17  significant height difference in comparison to flying over a
18  mountain range.  Moreover, it was an altitude change that
19  Respondent could have easily accommodated with his 900 plus hours
20  experience and STOL performance of his Kitfox.  He certainly was
21  able to accommodate this terrain difference flying south to north
22  on his low pass, which was in the opposite direction with rising
23  terrain.

24      Therefore, I find that Respondent's flight path at an
25  altitude of 100 feet or less above ground level was an altitude

1   that did not allow for an emergency landing without undue hazard

2   to persons or property on the surface in the event of a power unit

3   failure.  He certainly could have flown higher and could have

4   taken a path for his low level pass placing him to the east of the

5   RC runway and away from the residences.

6        As for subsection (c) -- as for subsection (c) of 91.119,

7   Specialist Speeg testified that a pilot has to stay 500 feet away

8   from any person, vessel, vehicle, or structure in a sparsely

9   populated area unless landing or taking off.  Subsection (c)

10  creates a 500-foot bubble around an aircraft, and no person,

11  vehicle, vessel, or structure can enter that bubble if it is not

12  necessary for takeoff or landing.  Given the Respondent's flight

13  path coupled with being 100 feet or less above ground level during

14  his low level pass, demonstrates that he operated closer than 500

15  feet to any person, vessel, vehicle or structure.

16       Now turning to the issue of whether Respondent's low flight

17  operation, or his low pass as he phrased it, was necessary for

18  takeoff or landing under the prefatory language of the regulation.

19  As I have already ruled on Respondent's pre-hearing motion for

20  dismissal, I do not repeat the basis of that ruling.  However, in

21  brief summary, I found that it is the Respondent's burden of

22  proving that the prefatory language and clause applies to him in

23  order to avoid being found in violation.

24       More specifically, as the Administrator has made a prima

25  facie showing that Respondent operated below an altitude allowing

A125

723

1  for an emergency landing without undue hazard to persons or

2  property on the surface if a power unit fails, it is the

3  Respondent's burden of showing that the low altitude operation was

4  necessary for takeoff or landing with the exception to apply.

5  Similarly, once there is a prima facie showing that Respondent

6  operated closer than 500 feet to persons or structures under

7  Section 91.119(c), Respondent has a burden of showing the

8  exception applies.

9      In this case, Respondent denies he was intending to land

10  during his low level pass, but that he was merely seeking to

11  identify the touchdown point.  When he was unable to do so, he

12  turned and climbed to depart the area and return to the airport.

13  Given Respondent's assertion that he was not landing during his

14  low level pass, it is clear that his low pass falls outside the

15  prefatory exception.  I, therefore, find he was not landing and

16  the prefatory exception does not apply.  This means that

17  Respondent was required to maintain an altitude that allowed for

18  an emergency landing without undue hazard to persons or property

19  on the surface in the event of a power unit failure since he was

20  not taking off or landing.

21      In the alternative, I find that the circumstances of this

22  case demonstrate that Respondent's low pass does not excuse him

23  from a violation of 91.119.  This is because the prefatory

24  exception of being, quote, "necessary," end quote, for takeoff and

25  landing is fact-driven on a case-by-case basis.  There are a

A126

724

1   multitude of variables involved.  This is explained in the

2   interpretation and legislative history of Section 60.17, an older

3   predecessor to Section 91.119, which is Exhibit A-28.

4       The legislative history states, quote, "The matter of safety

5   of flight in terms of safe altitudes is dependent upon many

6   variables, including the type of aircraft flown, the weather

7   conditions at the time, and the terrain below.  An altitude which

8   may be wholly safe and desirable for cruising flight at one time

9   for one aircraft may be wholly unsafe for it under different

10  conditions, or for other aircraft under the same conditions.  For

11  these reasons, minimum safe altitudes for flight cannot be

12  described with the geometric particularity of a conveyance.  As a

13  consequence, the overriding minimums, i.e. altitude rule is

14  phrased in terms of performance of the particular aircraft related

15  to the terrain below."

16      Further, the comments to the regulation state, quote, "To

17  achieve the proper high level of safety, it is vital that every

18  pilot consistently with sound and conservative operating practices

19  take full advantage of the performance capabilities of his

20  aircraft so that as to spend as little time as possible at

21  altitudes below the minimums established for cruising flight.  The

22  'when necessary' language used in the current Section 60.17

23  achieves this result simply and directly.  It prohibits low

24  altitude flying except when a departure from otherwise applicable

25  minimum is necessary for landing or takeoff.  It prohibits

1    unnecessary low flying during the execution of those maneuvers.

2    At every point along the proper flight path for approach to

3    landing or climb after takeoff, an unnecessary dip would place the

4    pilot in potential violation of this regulation.  In effect, it

5    requires the pilot to do the best he can consistently with sound

6    flying practice and the machine at his disposal to avoid unduly

7    prolonged low flight."

8        The legislative history goes on to state to achieve the

9    proper high level of safety, it is vital that every pilot --

10   actually scratch that.  I've already said that.

11       In short, given the legislative history and the intent of the

12   regulation, while the type, performance and operating limits of

13   the aircraft have to be evaluated, this is done in the context of

14   terrain, weather, surface conditions, surrounding obstacles and

15   hazards.  The type of runway also needs to be considered including

16   the length, width, and surface material.  The experience,

17   training, and skills of the pilot-in-command are also

18   considerations.

19       For example, it might be acceptable for a trained and

20   experienced pilot to land a Supercub in a dry river bed to drop

21   off supplies to a resident, but it would not simply be --

22   similarly be acceptable for a low hour pilot to try to land a

23   Cirrus in the same location for a picnic.  This is an extreme

24   example, but I think it illustrates that not every situation is

25   the same.

1    In the context of Section 91.119, the key phrase is, quote,

2    "Except when necessary for takeoff and landing," end quote.  The

3    word necessary is critical because low flying over an area to

4    evaluate landing on a roadway due to an emergency or equipment

5    failure is a different circumstance than doing so just to see if

6    you can land on an RC runway.  The former can be considered

7    necessary when landing on a city street.  The latter would not be.

8    In this instance, the circumstances and the Respondent was

9    conducting a low pass, this is what determines if it was -- this

10   is what determines if it was, quote, "necessary," end quote, for

11   purposes of taking off or landing, whether or not he actually

12   landed.  Board precedent establishes that the site selected by a

13   pilot for landing must be a suitable and appropriate choice for

14   the exception of landing or taking off to apply.

15   The case of *Administrator v. Cobb and O'Connor* illustrates

16   this.  The Board concluded in that case that two pilots who landed

17   on a taxiway exercised poor judgment in choosing a landing site

18   that necessitated low flight over buildings, power lines, cars,

19   and people.  When addressing the pilot's argument that low

20   altitudes were excused under Section 91.79, which is now Section

21   91.119, the Board noted respondent's interpretation of the above

22   regulation would in effect excuse low flight as being necessary

23   for any takeoff or landing from any area anywhere, at any time.

24   Such interpretation is patently fallacious in that it would

25   excuse low flight regardless of the appropriateness of the landing

727

1   site or approach pathway and as a result -- and would result in
2   any low flight include, quote, "necessary," end quote, regardless
3   of the danger.  *Cobb and O'Connor* is found at 3 NTSB 98, which was
4   affirmed by the 9th Circuit Court of Appeals in 1997, which is
5   found at 572 F.2d 202.  Similarly, in *Administrator v. Kittleson*,
6   NTSB Order No. EA-4068, a 1994 case, and *Administrator v. Lewis &*
7   *Lewis*, at 3 NTSB 878, a 1978 case, the Board reaffirmed the
8   principal that, quote, "necessary for takeoff and landing," end
9   quote, under section 91.119(c) means, and I quote:
10      "Respondent could not simply choose any takeoff route or time
11  and call it necessary.  He must make a reasonable appropriate
12  choice or the regulation has no meaning.  We, thus, reject
13  respondent's contention that the rule does not apply simply
14  because he was conducting a takeoff."
15      In the context of balloon flights and Section 91.119, the
16  Board has similarly held that the appropriate of the landing site
17  in terms of the necessity for landing there is part of the
18  equation when evaluating a pilot's landing choice.  Those cases
19  include *Administrator v. Rees,* 4 NTSB 1323, a 1984 case;
20  *Administrator v. Cory*, 6 NTSB 536, a 1988 case; *Administrator v.*
21  *Prior*, NTSB Order EA-4416, a 1996 case; and *Administrator v.*
22  *Christ,* NTSB Order No. EA-4922, a 2002 case.  Thus, the Board has
23  clearly established that if the landing site is inappropriate
24  under the circumstances, then a low flight cannot be excused under
25  the regulations as being necessary for landing or takeoff.

A130

728

1    Although Respondent had the consent of the property owner,

2  Mr. Likes, consent of the property owner does not override

3  compliance with the regulations.  Consent of the property owner

4  only avoided trespass and Respondent was still required to

5  exercise reasonable judgment in selecting a landing site.  Whether

6  the Respondent had the consent of the property owner to attempt

7  the landing is irrelevant to the violation.  The focus of the

8  analysis is on necessity.  For instance, a landing may be excused

9  as being necessary under emergency circumstances, even though the

10  pilot did not have the homeowner's consent to land on the front

11  lawn.  Again, that's an extreme example, but I think there is a

12  could that circumstances dictate necessity.

13    In this case, it is very clear that there was no necessity

14  for the Respondent to conduct a low pass, whether or not he

15  decided to land on the RC runway.  I find that there were no other

16  constraints limiting his landing choices such as shortage of fuel,

17  mechanical emergency, or weather considerations dictating the

18  necessity of the low pass.  Instead, he deliberately and

19  intentionally chose this location because he thought he could land

20  and takeoff based on a conversation with his friends, the Likes.

21    Thus I find that the landing and takeoff exception to 91.119

22  does not apply under these facts since it was not necessary.  Even

23  though he did not land or says he did not intend on landing, the

24  landing site was nonetheless unsuitable from the very beginning.

25  His low flight altitude, below 100 feet above ground level, and

A131

1  his flight path closer than 500 feet to people and property was

2  simply not necessary within the meaning of the regulations.

3       Certainly, if this was going to be an emergency landing, it

4  may have been a suitable location if there were no alternatives.

5  However, under the circumstances presented here, I find there was

6  no emergency and Respondent had more appropriate and safer

7  alternatives for his low level pass, alternatives that were

8  clearly not near any residences, structures, or people to the east

9  and over an open area.

10      Respondent had the option to refrain from conducting a low

11  pass to evaluate the landing location, which was located in the

12  backyard of a residence in a sparsely populated area.  By

13  Respondent's own testimony, he was considering this landing site

14  during several high-level flights over the area and chose to make

15  a low level pass on the 24th at 100 feet or less behind a

16  residential home, among other structures.  Respondent exercised

17  poor judgment, and exhibited a disregard for his own safety, and

18  the safety of others, and property on the surface.

19      The case of *Administrator v. Walker*, at 3 NTSB 3478, a 1978

20  case, is similar to the circumstances before me.  In *Walker*, the

21  respondent conducted three low passes to survey the back parking

22  lot of a Safeway shopping center for a landing.  The owner of the

23  shopping center had no objection to the landing.  Respondent

24  wanted to promote general aviation with a static display of a

25  Piper PA-38 Tomahawk.  Although respondent conducted a ground

730

1  survey and aerial survey, after making three low passes he decided

2  against attempting to land.

3      The Board upheld a 60-day suspension finding that the site

4  the pilot selected was totally inappropriate for landing.  The

5  Board noted that any reasonable ground assessment would have

6  alerted the pilot of the hazards of a landing at this location and

7  dictated against the type of flight he conducted.  Further, the

8  pilot would not have been able to make an emergency landing

9  without causing undue hazards to persons or property on the

10 surface if he had an engine failure during the low passes.

11     For the same reasons as in *Walker*, I find that the RC runway

12 Respondent selected was inappropriate for a landing, even though

13 he made a single low level pass.  Any reasonable ground

14 assessment, or a navigation map, or even a Google Earth view would

15 have alerted him to nearby residences and structures on Desert Sun

16 Lane.

17     Further, according to Mr. Likes, it was a dirt runway 500

18 feet from his house.  While he cleared the brush with a tractor

19 and considered it fairly level, it was essentially a dirt runway

20 for RC-controlled airplanes.  Testimony also established that the

21 surrounding area to the east and a lot to the south of the Likes'

22 was scrub brush and desert.  The runway was 400 to 500 feet long

23 and 25 to 30 feet wide according to Mr. Likes.  There was no

24 evidence as to where -- there was no evidence of any runway

25 markings, lights, navigation aids, or glide slope indicators, or

 1  even a windsock.

 2      Mr. Likes testified he used it to fly RC foam electric

 3  aircraft, aircraft that contain no pilot, contain no passengers,

 4  and operate on electric -- operate on electricity and are made

 5  from foam.  While he said there were other trails and areas around

 6  his property which he used for this purpose as well.  All of the

 7  evidence establishes that the RC runway was made of dirt, as well

 8  as any of the surrounding rails, and they were unsuitable for

 9  landing under normal conditions or absent an emergency in

10  Respondent's aircraft.

11      Whether Respondent believes he could have landed and done so

12  safely isn't the issue because of the low level altitude passes

13  near structures and people.  Not only was the landing site

14  unsuitable, but he had other options for evaluating the site other

15  than the path he took while making a low level altitude pass.

16  While Respondent claims he was in the left seat and his approach

17  on the west side of the runway provided the best view, this

18  completely ignores the fact that he could have approached from the

19  opposite direction, flying south to north on the east side of the

20  runway to view the runway out of the left side.  As I mentioned,

21  this would have placed him farther from structures and people.

22      The Board has repeatedly stated that the prefatory exception

23  of 91.119 does not apply to cases where the landing site is

24  unsuitable.  These cases include *Administrator v. Hart*, 6 NTSB

25  899, and *Administrator v. McCollough*, NTSB Order EA-4020.  Now the

732

1   *Hart* case involved a practice rejected landing of a grass and dirt

2   airstrip by a Lockheed Electra.  And the *McCollough* case involved

3   a Learjet making a low level pass down a gravel airstrip, 50-feet

4   above ground level.

5       In both cases the runway was unsuitable for landing by the

6   type of aircraft involved.  As a result, the Board held that

7   exception set forth in the prefatory clause of 91.119 did not

8   apply and that the operations were practice approach maneuvers

9   were inappropriate.  The *Hart* case specifically made it clear that

10  if the airstrip is unsuitable for landing, it follows that a low

11  approach over the field which is prescribed by 91.74, the

12  predecessor to former 91.119, is similarly inappropriate.

13      And please bear with me.  Let's take a short recess here of

14  2 minutes just for a comfort break and then I'll continue with my

15  Initial Oral Decision.  Pause the record.

16      (Off the record at 4:27 p.m. EST)

17      (On the record at 4:40 p.m. EST)

18      JUDGE FUN:  Continuing with my Oral Initial Decision.  Again,

19  I apologize for the length of it.  I wanted to make sure I covered

20  all the various issues that were raised and to make sure I was

21  giving full consideration to the arguments cited by the parties.

22  But we're almost done.

23      Consistent with the above and based on the totality of the

24  evidence, I find that the Administrator has proven each and every

25  allegation in the complaint by a preponderance of reliable,

A135

733

1  probative and credible evidence.  As to paragraph 4, I

2  specifically find that on November 24, 2019, in the vicinity of

3  400 Desert Sun Lane and 300 Desert Sun Lane in Reno, Nevada,

4  Respondent operated N318JJ at altitudes of 100 feet above ground

5  level or less than 100 feet above ground level, which is below an

6  altitude allowing for an emergency landing without undue hazard to

7  persons or property on the surface if a power unit failed.

8      I further find a preponderance of the evidence proves that

9  Respondent's operation was closer than 500 of a stable, shed, and

10 propane tank, and closer than 500 feet of a residential home at

11 400 Desert Sun Lane for purposes of paragraphs 4(a) and (b) of the

12 Amended Complaint.

13     Additionally, a preponderance of the evidence proves that

14 Respondent operated closer than 500 feet of an adult and a child

15 who were outside the residential home at 400 Desert Sun Lane for

16 purposes of paragraph 4(c) of the Amended Complaint.  The

17 Administrator failed to prove paragraph 4(d).

18     As the Administrator has proven by a preponderance of the

19 evidence paragraphs 4(a), (b) and (c) as modified, I further find

20 that Respondent's low pass operation at 100 feet or less above

21 ground level and his flight path was not necessary for takeoff or

22 landing.  I, therefore, find that Respondent violated 14 CFR,

23 Section 91.119(a) in that he operated at altitudes of 100 feet

24 above ground level or less, an altitude which was below an

25 altitude allowing for an emergency landing without undue hazard to

A136

734

1  persons or property on the surface if a power unit failed.

2      I further find that that Respondent violated 14 CFR, Section

3  91.119(c) as his altitude and flight path was closer than 500 feet

4  to any person or structure.  Since he failed to prove that his

5  operation was necessary for takeoff or landing, the violations of

6  91.119 are complete.  Paragraph 5 of the Amended Complaint is

7  proven by a preponderance of the evidence.

8      Turning to the issue of whether these also a violation of

9  Section 91.13(a), I note that the while Section 91.119 contains

10  and exception for operating too low, that exception being for

11  purposes of takeoff and landing, there is no exception in Section

12  91.13.  Specifically, circumstances that show an airman operated

13  in a careless or reckless manner so as to endanger the life and

14  property of another would apply in all phases of air operations,

15  whether takeoff, en-route at cruising altitude, holding or

16  landing.  That is even if we assume that Respondent was conducting

17  a low level pass for purposes of inspecting the runway for a

18  possible landing and takeoff, it still cannot be done in a

19  careless and reckless manner.

20      The Board has made this clear in the case of *Administrator v.*

21  *Bourgeois,* spelled B-O-U-R-G-E-O-I-S.  In that case, they state

22  that a residual violation of Section 91.13(a) does not require

23  additional proof when an operational violation is found, nor does

24  it require proof of actual danger as the potential for

25  endangerment is sufficient.  Moreover, it can act as standalone

A137

735

1   violation as well.  This case is found at NTSB Order EA-5427 from

2   2009.

3       As result of these facts and circumstances, I find that the

4   preponderance of the reliable, credible and persuasive evidence

5   shows Respondent acted in a careless or reckless manner as to

6   endanger the life or property of another.  Respondent, therefore,

7   violated 14 CFR, Section 81.13(a).  Paragraph 6 of the Amended

8   Complaint is proven by a preponderance of the evidence.

9       I note that while there was testimony in this case concerning

10  the trauma that the Penas suffered, as well as Mr. Stanley being

11  concerned, under these circumstances and given the nature of the

12  statute I do not find it necessarily relevant to my findings, nor

13  does it materially affect my findings.

14      Now turning to Respondent's seven numbered affirmative

15  defenses.

16      Respondent's first affirmative defense is that the

17  Administrator fails to state a claim upon which the Board may

18  grant the relief requested.  I have already addressed this in my

19  previous ruling and I do not further discuss it here.  But for the

20  purposes of this affirmative defense, I reject it.  The

21  Administrator's complaint sufficiently states a claim, specific

22  violations of regulations are alleged, and there are facts to

23  support those allegations.

24      Respondent's second affirmative defense is that the

25  Administrator's interpretation of the relevant Federal Aviation

A138

736

1   Regulations are arbitrary, capricious, an abuse of discretion and

2   not in accordance with the law.  Respondent has presented no

3   evidence or arguments as to this second affirmative defense.  I

4   further find that the Administrator's interpretation of the FARs

5   is in accord with the Pilot's Bill of Rights and given

6   deference -- and in accord with the deference given to federal

7   agencies.  I, therefore, reject this second affirmative defense.

8        Respondent's third affirmative defense is the Administrator's

9   interpretation of the FARs is unconstitutionally vague.

10  Respondent again has presented no evidence or argument as to this

11  third affirmative defense.  I further find that the FARs are not

12  unconstitutionally vague, but give the Respondent reasonable

13  notice of the prohibited conduct and the sanction that may be

14  imposed for any violation.  I reject this affirmative defense.

15       Respondent's fourth affirmative defense is the

16  Administrator's application of the FARs is contrary to the

17  regulation's plain language.  Respondent presented no evidence or

18  argument as to this affirmative defense and I found compelled.

19  Even assuming the Administrator's enforcement of the regulation is

20  contrary to the plain language, Respondent has a right to contest

21  the allegations, which he has done through this hearing.  Thus,

22  Respondent's fourth affirmative defense is rejected since this

23  matter proceeded to a hearing, which makes this matter moot.

24       Respondent's fifth affirmative defense is the Administrator

25  lacks substantial basis in law and fact to continue prosecution of

A139

1    this matter.  As this matter has proceeded to hearing, with the

2    Administrator having the burden of proving the allegations, this

3    affirmative defense is moot.  I reject this affirmative defense.

4        Respondent's sixth affirmative defense is that the sanction

5    of suspension is contrary to policy, precedent, and procedure.

6    Respondent presented no evidence or argument as to this

7    affirmative defense.  I will talk about the preservation of

8    evidence, and mitigating and aggravating circumstances later.  But

9    for purposes of this affirmative defense, Respondent has not shown

10   how or in what manner the sanction is contrary to policy,

11   precedent, or procedure.  I also find, as discussed later in this

12   decision, the sanction of suspension is founded and authorized,

13   and not arbitrary, capricious, or not in accordance with the law.

14       As to Respondent's seventh affirmative defense, his counsel

15   withdrew this defense.

16       In summary, Respondent did not provide convincing credible

17   evidence proving his affirmative defenses by a preponderance of

18   the evidence.  I, therefore, find no merit in these defenses.  I

19   specifically find that the Respondent failed to meet the burden of

20   proving his affirmative defenses by a preponderance of the

21   evidence.  I, therefore, deny all affirmative defenses.

22       As the Administrator has proven the Respondent violated the

23   Federal Aviation Regulations as alleged in the Amended Complaint

24   by a preponderance of the evidence, and Respondent failed to prove

25   his affirmative defenses by a preponderance of the evidence, I now

738

1   turn to sanction in this matter.

2       The Administrator requests suspension of Respondent's private

3   pilot certificate for 120 days based upon air commerce, air

4   transportation and public interest.  Respondent argues that no

5   sanction is appropriate.  Respondent contends that no sanction is

6   warranted because he was operating within FAA Off-airport Ops

7   Guidance and specifically conducted a low level pass to determine

8   whether it was safe landing site.  He also argues that that the

9   FAA's failure to preserve evidence should be considered.  Finally,

10  he argues that a low level pass is necessary for landing at an

11  off-airport location.

12      On August 3, 2012, Public Law 112-153, known as the Pilot's

13  Bill of Rights, was signed into law.  This statute applies to all

14  cases before the National Transportation Safety Board where the

15  Board reviews actions of the Federal Aviation Administration to

16  amend, modify, suspend or revoke airman certification.

17      The Pilot's Bill of Rights specifically strikes certain

18  language from 49 United States Code Section 44703, 44709, and

19  44710.  The language that was stricken as stated by the Board is,

20  quote, "is bound by all validly adopted interpretations of law and

21  regulations the Administrator carries out unless the Board finds

22  an interpretation is arbitrary, capricious, or otherwise not

23  according to law," end quote.  As this language is stricken, I am

24  no longer bound to give deference to the FAA by statute.

25      However, that agency is still entitled to the judicial

A141

1  deference given to all Federal Administrative Agencies under the

2  Supreme Court decision of *Martin v. OSHRC*, 499 U.S. 144, a 1991

3  case.  In applying the principals of judicial deference to the

4  interpretations of law, regulations, and policies that the FAA

5  Administrator carries out, I must analyze and weigh the facts and

6  circumstances in each case to determine if the sanction the

7  Administrator is appropriate.

8       I have considered the Respondent's arguments as noted in my

9  detailed findings above.  However, for purposes of mitigation, I

10 also considered these arguments.   Respondent's argument that he

11 was operating within FAA Off-airport Operations Guide does not

12 excuse the circumstances surrounding his low pass.  As I found, he

13 was 100 feet or less above ground level and on a path that took

14 him closer than 500 feet of structures and people.  He was in

15 violation of the regulation.

16      While a low pass is recommended for -- while a low pass was

17 recommended in Ops Guidance, it still must comply with the

18 regulatory requirements of Section 91.119.  I did not find

19 Respondent's arguments or demonstrative exhibits of other

20 airports, with established runways for airplanes, that required

21 operation within 500 feet of structures and people during takeoff

22 or landing persuasive.  While accurate, it simply misses the point

23 that such operations below the minimums of Section 91.119 must

24 still be necessary for takeoff or landing under the circumstances.

25      Under the circumstances in this case, it was not necessary.

740

1  I, therefore, reject Respondent's argument that the Off-airport

2  Ops Guide excused his violation.  For the same reason, I reject

3  his argument that the low pass was necessary for landing at the

4  off-airport location even though he decided not to land under

5  these circumstances.

6      As for FAA's failure to preserve evidence should be

7  considered, I agree that such can and should be considered.  I do

8  not repeat my findings concerning those issues as I discussed them

9  in detail above.

10      I have further considered the Respondent's experience.  As

11 the Board has noted in low flight cases, there is precedent to

12 support a broad range of sanctions.  It is more important in

13 saying -- in setting the sanction to review the circumstances

14 surrounding an airman's actions than it would be to rely solely on

15 the number and provisions of the regulations determined to have

16 been violated.  The case of *Administrator v. Nazimek,* spelled N-A-

17 Z-I-M-E-K, at NTSB Order EA-2672, a 1988 case, supports this.

18      Therefore, while it is generally true that the more severe

19 sanction of 120 to 180 days are imposed in cases involving low

20 flights over congested areas, and that lesser sanctions are

21 imposed in cases involving low flights over non-congested areas,

22 particular when non-aggravated circumstances are involved.  The

23 Board has held -- upheld sanctions of up to 180 days suspension

24 for violations of the type of conduct the Respondent engaged in.

25 That can be found at *Administrator v. Cobb and O'Connor.*  I do not

741

1   find similar aggravating circumstances.  I also did not give much

2   credence to Specialist Speeg's opinion on aggravating

3   circumstances since his conclusions relied in part on viewing the

4   video.

5       Looking to Order 2150.3C, careless operation with a severity

6   level 2, which is encompassed by the failure to maintain the

7   required minimum altitude in an uncongested area, is between 60

8   and 120 days.  A suspension of 60 days is at the low end of the

9   moderate range, which is appropriate given all the circumstances

10  and accounting for Respondent's experience as a private pilot and

11  failure in judgment in conducting a low pass.  Certainly, if

12  Respondent was a CFI, ATP, or commercial pilot, a greater sanction

13  may be warranted.  Obviously, if he was over a congested area, a

14  greater sanction would also be warranted.

15      The lower end of the sanction further accounts for the FAA's

16  loss or failure to preserve evidence in violation of Order

17  2150.3C.  Finally, a 60-day suspension is consistent with the

18  *Walker* case I discussed above.

19      Based on the preponderance of the credible, persuasive and

20  reliable evidence in this case, as well as Board precedent and

21  appropriate judicial deference afforded the Administrator, I find

22  that the sanction of 60 days' suspension is reasonable and

23  appropriate given the facts of this case.  It is further warranted

24  in the public's interest in air commerce and air safety.

25      Consequently, I find that the Amended Emergency Order of

742

1  Suspension, with the modification to paragraph 4 and its

2  sub-paragraphs (a), (b) and (c), to conform to my findings, shall

3  be modified to a suspension of 60 days and it is otherwise

4  affirmed as issued.

5      I now ask the court reporter to start a new page with my

6  order on a separate page.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A145

743

1                              ORDER

2       It is therefore ordered that the Administrator's Amended

3  Order of Suspension is modified to conform to the evidence and my

4  findings.  Specifically, I order that:

5       1.  The first clause of paragraph 4 is modified to now read,

6  quote, "4. During the referenced flight operation, you operated

7  N318JJ at altitudes of 100 feet above ground level or less than

8  100 feet above ground level."

9       2.  Sub-paragraph (a) of Paragraph 4 is modified to now read,

10  quote, "closer than 500 feet of a stable, shed, and propane tank,"

11  end quote.

12       3.  Sub-paragraph (b) of paragraph 4 is modified to now read,

13  quote, "closer than 500 feet of a residential home at 400 Desert

14  Sun Lane, end quote."  And

15       4.  Sub-paragraph (c) of paragraph 4 is modified to now read,

16  quote, "closer than 500 feet of an adult and a child who were

17  outside the residential home at 400 Desert Sun Lane, end quote."

18       It is further ordered that the Amended Emergency Order of

19  Suspension is modified to a period of 60 days of suspension of

20  Respondent's private pilot certificate.

21       So entered this 6th Day of March, 2022, in Matthews, North

22  Carolina.

23

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A146

1                       APPEAL RIGHTS

2       Moving now just to address the parties with regards to appeal

3  rights.  I believe both parties have received by email a written

4  advisory of the appeal rights.

5       MS. TOSCANO:  Yes, Your Honor.

6       MR. SCHULTE:  We have, Your Honor.

7       JUDGE FUN:  Mr. Schulte, do you wish me to discuss your

8  clients appeal -- right to appeal or will you take care of that

9  afterwards?

10      MR. SCHULTE:  No, Judge, I will take care of that.  Fairly

11 certain that's what I'm paid for.

12      JUDGE FUN:  All right, very well.  Mr. Palmer, I'd like to

13 mention to you that your counsel will advise you about your right

14 to appeal.  Now certainly if you believe that I have made an error

15 in my decision, finding of law or procedure, you're certainly

16 welcome to appeal.

17      And if you do appeal, I must remind you, emphasize there are

18 strict deadlines regarding filing.  Those deadlines are set forth

19 in a written advisement.  If you miss those deadlines, you miss

20 the deadline to file a notice of appeal within 10 days of my Oral

21 Initial Decision, or you fail to perfect your appeal by filing a

22 timely brief, the NTSB Board will not hear your appeal.

23      So again I remind you that if you decide to appeal my

24 decision, please pay attention to those deadlines.

25      All right.  Are there any procedural or administrative

745

1  matters we need to discuss before we close the record?  Ms.

2  Toscano?

3       MS. TOSCANO:  No, Your Honor.  Thank you.

4       JUDGE FUN:  Mr. Schulte?

5       MR. SCHULTE:  No, sir.  Thank you very much.

6       JUDGE FUN:  All right.  I will, therefore, consider the

7  record closed.  We'll go off the record and we are adjourned.

8       (Whereupon, at 5:02 p.m. EST, the hearing in the above-

9  entitled matter was adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A148

1                        CERTIFICATE

2    This is to certify that the attached proceeding before the

3                NATIONAL TRANSPORTATION SAFETY BOARD

4    IN THE MATTER OF:        Trenton J. Palmer

5    DOCKET NUMBER:           SE-30880

6    PLACE:                   Via Zoom videoconference

7    DATE:                    April 6, 2022

8    was held according to the record, and that this is the original,

9    complete, true and accurate transcript which has been compared to

10   the recording accomplished at the hearing.

11

12

13                         *Marybeth Burke/BW*

14           _____

15                         Marybeth Burke-Dring,

16                         Official Reporter

17

18

19

20

21

22

23

24

25

A149

UNITED STATES OF AMERICA

NATIONAL TRANSPORTATION SAFETY BOARD

OFFICE OF ADMINISTRATIVE LAW JUDGES

```
* * * * * * * * * * * * * * * * * *
In the matter of:                  *
                                   *
BILLY NOLAN,                       *
ACTING ADMINISTRATOR,              *
FEDERAL AVIATION ADMINISTRATION,   *
                                   *
            Complainant,           *
    v.                             *    Docket No.:  SE-30880
                                   *    JUDGE FUN
TRENTON J. PALMER,                 *
                                   *
            Respondent.            *
* * * * * * * * * * * * * * * * * *
```

Via Zoom videoconference


Tuesday,
March 29, 2022

The above-entitled matter came on for hearing,

pursuant to notice at 9:00 a.m. Eastern Standard Time.

BEFORE:   DARRELL L. FUN
          Administrative Law Judge

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A150

13

1  evidence that again have nothing to do with this case and

2  certainly nothing to do with the allegations set forth in the

3  Administrator's complaint.

4       JUDGE FUN:  Ms. Toscano, which --

5       (Audio lapse)

6       MS. TOSCANO:  I'm sorry, can you repeat that?

7       JUDGE FUN:  Sure.  What is your intent?  What's the

8  relevance?

9       MS. TOSCANO:  Okay, the relevance is, is that it shows prior

10  compliance disposition which is an important element and as part

11  of our sanction guidance and policy that's published in the

12  2150.3(c) that there is a section in Exhibit A-23, there's a

13  section within the sanction guidance that the Administrator

14  considers aggravating and mitigating circumstances and so one of

15  the aggravating and mitigating circumstances is to evaluate the

16  compliance disposition of the Respondent.

17       And here the fact that he was issued a letter of warning that

18  it involved a 91.13(a) careless or reckless operation and the fact

19  that he was issued a letter of -- administrative letter of warning

20  shows once again that he was put on notice, you know, for his

21  careless or reckless operations and, in fact, the letter of

22  warning involved an operation that involved a regulation 14 CFR

23  91.119(a), in that he was warned about his low flight operation on

24  Lake Tahoe, water skiing with a passenger on board.

25       JUDGE FUN:  Mr. Schulte, any response to that in regards to

A151

1   anyway because I do want to take a closer look at this, so what

2   I'm going to do is I'm going to reserve ruling on that issue, but

3   I would like to go ahead and see where some of the preliminary

4   matters at this point just so we can be a little ahead if we need

5   to before I rule on that issue, but I'll reserve on it for now.

6        So let's just jump to a different topic completely and that

7   is have the parties reached any kind of stipulations on any of the

8   exhibits, other than the exhibits we've already talked about?

9        Any stipulations of fact that they intend on offering,

10  Ms. Toscano?

11       MS. TOSCANO:  No, Your Honor.

12       JUDGE FUN:  Mr. Schulte, any -- I assume no stipulations of

13  fact or other exhibits to be submitted?

14       MR. SCHULTE:  We have not discussed that, Your Honor, but I

15  think I can perhaps take some burden off the tribunal by at least

16  conceding a couple of points.  As Ms. Toscano noted as far as the

17  amended order of suspension, Items 1, 2 and 3 are conceded by

18  Mr. Palmer.

19       We do not concede any of the distances contained in Item 4.

20  However, we absolutely do concede that on the day in question and

21  during the flight in question, the Respondent did come within 500

22  feet of vehicles, vessels or structures.  We don't dispute that;

23  never have.  So that's not one of the allegations, the allegations

24  have very specific numbers that are well over 500 feet, but as far

25  as 119(c) goes, yes, the aircraft was in fact operated closer than

1    500 feet to vessels, vehicles or structures.

2       As far as the persons, we don't concede that, but for the

3    purposes of 119, I don't think it matters, it's a disjunctive

4    element so if you meet any one of those then arguably except as

5    necessary for takeoff and landing, you are in violation of 119(c).

6       We do not concede that if the aircraft had lost its power

7    plant there would have been undue hazards to persons or property

8    on the surface so again, the 500 foot rule, if we can paraphrase

9    it as that, we concede that the aircraft was operated less than

10    500 feet to vessels, vehicles or structures.  We do not concede

11    that the propane tank is a structure.

12       So if that helps things along, which I hope it will, we can

13    hopefully get to the nut of this case more quickly.

14       JUDGE FUN:  All right.  All right, so if I understand, what

15    you're saying is that you agree that Mr. Palmer operated within

16    500 feet of a vehicle, vessel or structure, but not within the

17    specific distances that have been alleged, the hundred feet, 150

18    feet, 200 feet.

19       MR. SCHULTE:  Correct, Your Honor.  In fact, it's irrelevant.

20       JUDGE FUN:  And the only other argument is that the propane

21    tank, you're arguing, is not considered a structure.

22       MR. SCHULTE:  Yes, Your Honor.

23       JUDGE FUN:  Okay, got it, all right.  All right, Mr. Schulte,

24    I don't know if that really relieves that much from me, but I do

25    appreciate your --

A153

45

1 Q.   And please tell us a little bit about yourself, your

2 background?

3 A.   My background, the biggest part of my background is I'm a

4 combat veteran from the United States Seabee's.  I'm also an

5 electrician, a husband and a father to three beautiful children.

6 Q.   And how long have you lived at 400 Desert Sun Lane in Reno,

7 Nevada?

8 A.   Oh, we're over five years now here.

9 Q.   And in terms of your military background can you go into that

10 a little bit more, like how many years were you in the military

11 and what specific experiences you have in the military?

12 A.   I was in service for four years.  I was a heavy machine

13 gunner in the 4th Battalion, 31st Regiment.  Mostly Mark 19

14 machinegun; that's the MK-19, it's a grenade launcher and most of

15 my training for that weapon was fields of fire and ranges because

16 if I couldn't put the grenades on the target, obviously they're

17 not effective.

18     So besides that, I had two deployments, one to Iraq for the

19 battle of Volusia and the other was to Cashmere in the controlled

20 part of the Himalayas.

21 Q.   And do you consider your experience with the military as

22 given, the experience in estimating distances?

23 A.   Yes.

24 Q.   Could you explain that?

25 A.   Yes.  Most of my training on the Mark 19 is as a grenade

A154

50

1  A.   She was, yes.

2  Q.   Okay.  And okay -- does this depiction -- can you point out

3  on this image approximately the route that your wife took in

4  walking with your son from the garage towards you?

5  A.   Yes.  As you can see the garage slab, you know, where you

6  park in front of the garage and so she used the concrete pathway

7  that goes to my front door.  And she was just past that pathway,

8  walking on what used to be our front lawn which you can see is the

9  concrete slab, and then that's when she heard -- that's when we

10  both heard the incredible engine noise coming from the north of

11  our property.

12  Q.   Okay.  So this depiction on -- points out that -- so I guess

13  she was near the area of the front door of the house and that

14  would be approximately below where the solar panels are shown on

15  this image?

16  A.   Yeah, it's depicted with the yellow dot on the picture.

17  Q.   Okay, so -- and then tell us -- bring us to the point that

18  you just testified about hearing an incredible loud noise?  Please

19  describe what you heard.

20  A.   Yes, we -- okay, yes.  So we -- I heard this incredible loud

21  engine noise --

22       MR. SCHULTE:  Objection.

23  A.   --  and when I turned to --

24       JUDGE FUN:  Hold on, Mr. Pena, we have an objection.

25       Mr. Schulte?

A155

1    MR. SCHULTE:  Yeah, there's no regulation of incredible loud

2  noises.  Could we just kind of stick with the facts?  That would

3  be my objection, Your Honor.

4    JUDGE FUN:  Ms. Toscano?

5    MS. TOSCANO:  Yes, Your Honor.  That is a fact and that's

6  part of the circumstances of what happened and it's an important

7  circumstance, not just visual, but it's also audio observation.

8    JUDGE FUN:  I'll overrule the objection.  It's Mr. Pena's

9  testimony; it's also his impression and his thought process as to

10  what he was hearing and describing, so I'll allow the testimony.

11    I do want to go back to Mr. Schulte's original objection

12  which is foundation for this photograph.  Are you going to lay a

13  foundation for the admission of this photograph or were you going

14  to admit this exhibit or would it just be demonstrative only.

15    MS. TOSCANO:  Demonstrative only.

16    JUDGE FUN:  All right, very well, you may proceed.

17    THE WITNESS:  Okay, so yes, I heard the incredible engine

18  noise which of course was startling because there should be no

19  reason for that.  So I looked to the direction where I could hear

20  it coming from and I was not able to see any aircraft or vehicle

21  that could be coming from, which told me that it was coming -- it

22  was so far -- flying so low to the ground and barely above the --

23  my land so I was even able to see it over the line of my house

24  yet.

25    And then so we were bracing and I started yelling towards my

1  wife to start running and it was at that point that the aircraft

2  came into my site and it had a very aggressive left bank maneuver,

3  as you can see it in the video clip, I think it's very --

4       MR. SCHULTE:  Objection.

5       JUDGE FUN:  What's your objection?

6       MR. SCHULTE:  Now we're referring to things that are not in

7  evidence.

8       JUDGE FUN:  Well, I do advise that there's been no evidence

9  of the video yet, but I will take Mr. Pena's testimony as to what

10 he's observing and what he did observe at the time.

11      Go ahead, Mr. Pena.

12      THE WITNESS:  Okay, so when I saw the aircraft when it came

13 into view, it looked to me like it was pretty much at the ridge

14 line of my house, which is about 20 feet off grade of my home, off

15 the grade of the garage.  And when I saw the aircraft it was

16 performing a hard eastward banking aggressive maneuver and then it

17 seems to straighten out as it dipped a little bit lower and then

18 it pulled up.  Actually, I thought it was going to crash into my

19 neighbor's --

20      MR. SCHULTE:  Objection.

21      JUDGE FUN:  What's your objection?

22      MR. SCHULTE:  Again, Your Honor, thought it was going to

23 crash.  I mean we're getting kind of far afield of the fact here.

24 What he thought that the airplane was doing, these opinions are

25 not factual in nature, it has nothing to do with the allegations

55

1  path, I would have to say that that flight path is more to the

2  east than my eyesight would say that it was.  And also that flight

3  path doesn't resemble the hard left bank maneuver that the

4  aircraft was performing when it came into view.

5  Q.   And could you see the propane tank from where you were

6  standing?

7  A.   No.

8  Q.   And so how do you know that the aircraft was over the propane

9  tank?

10  A.   The distance that it looked to be past my house and just how

11  familiar I am with my property.  And also my training that we've

12  talked about in range finding.  That is an estimate, but I would

13  say that's where I would squarely put my estimate is right over

14  the propane tank.

15  Q.   Okay.  And so -- okay.  And you indicated that you were

16  yelling to your wife and for what reason?

17  A.   To start running away from the incredible loud engine noise

18  that -- I couldn't see the aircraft.  I thought there was

19  something that was crash landing possibly into my house or in the

20  immediate area, so I yelled at her to start running away from --

21  run towards me, run away from the sound that was coming from the

22  east.

23      MS. TOSCANO:   Zoom Host, please display Exhibit A-7, the

24  garage peak video.

25                            (Document above referred to was marked

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A158

1   okay, so let me back that up.  Okay, so is your resident's

2   security camera system capture on video any of the circumstances

3   that you've so far described today?

4   A.   Yes, over my garage peak I have a video camera which copied

5   the airplane doing its maneuver.  When you first see it, you can

6   see the aggressive left banking pattern that it had to it and then

7   the --

8        MR. SCHULTE:  Objection, non-responsive.

9        JUDGE FUN:  Mr. Pena, if I could have you just answer the

10  question that's asked at this point, okay, by describing what the

11  video showed at this point.  Just answer the question that

12  Ms. Toscano is asking, all right?

13       THE WITNESS:  Okay.

14       JUDGE FUN:  Ms. Toscano.

15       MS. TOSCANO:  Thank you.

16       BY MS. TOSCANO:

17  Q.   Mr. Pena, so where are the security cameras at your home that

18  captured the videos?

19  A.   So I have one above the peak of my garage about 18 feet off

20  the grade of my house, which caught the aircraft.  And the other

21  one in question caught my wife's reaction and where she was during

22  the incident and that camera's located just in front of my front

23  door.

24  Q.   Okay.

25       MS. TOSCANO:  Zoom Host, please display Exhibit A-13.

70

1  system.

2  Q.    And you gave that video, I believe your words was ten second

3  video to the Administrator on a USB flash drive?

4  A.    USB and I think we also put it on a CD.

5  Q.    Okay.  And so one of those videos was from the garage peak

6  and the other was a front porch video.  And the front porch video,

7  you said, was provided in its native format, correct?

8  A.    I believe so.

9  Q.    Other than the ten seconds of the video that you gave to the

10  Administrator, did you provide any other videos to him?

11  A.    The one from my front porch of my wife.

12  Q.    And how long was that video in duration?

13  A.    Again, since the incident was pretty quick, I think it's ten,

14  15 seconds with the time stamp on it.

15        MR. SCHULTE:  That's all I have for Mr. Pena, Your Honor.

16  Mr. Pena, thank you.

17        JUDGE FUN:  Mr. Pena, if I understand you correctly, the --

18  you have this hard drive, two terabyte hard drive recorder and

19  from that recording you downloaded that recording to the regular

20  USB or did you have a computer in between?

21        THE WITNESS:  No, directly to USB.  It has a USB slot in the

22  back of the surveillance hard drive.

23        JUDGE FUN:  Okay, fine.  And it's something with the CD that

24  was created.  Does the hard drive surveillance system have a built

25  in CD burner or did you have to move it to something else to burn

A160

1   the CD off of?

2         THE WITNESS:  We transferred it from the hard drive that we

3   downloaded directly from the recorder to CD format.

4         JUDGE FUN:  Okay.  When you provided the CD to the FAA how

5   did you do that, did you mail it to them, did they come pick it up

6   and drop it off, how was it delivered?

7         THE WITNESS:  We handed it to them.

8         JUDGE FUN:  So they came to your house for that?

9         THE WITNESS:  Yes.  When they came to the house to do

10  measurements and to investigate, that's when we gave them the

11  material.

12        JUDGE FUN:  Okay.  Did the investigators ask to see the full

13  recording or to see more of it than what you had saved on to the

14  USB or CD?

15        THE WITNESS:  No, they asked me if there was anything else

16  and again it was a pretty quick incident so the only other

17  recording there would be would just be the skyline for, you know,

18  23 hours, 59 minutes of the day.

19        JUDGE FUN:  Why is it that your garage camera is directed at

20  the skyline?

21        THE WITNESS:  I was actually having an issue with my

22  neighbor.  He was dive bombing my house with his drones,

23  Mr. Likes.

24        JUDGE FUN:  Okay.

25        THE WITNESS:  So I had it at that angle just to be able to

A161

1  not just see if there were any obstructions in the air like

2  drones, but it also looks -- gives me a good look at the southeast

3  portion of the open field on my property.

4      JUDGE FUN:  All right.

5      THE WITNESS:  And my roundabout, my driveway.

6      JUDGE FUN:  Okay.  And when you downloaded to the USB, I see

7  that you picked the start time and end time for what part of the

8  video you were downloading and saving.

9      THE WITNESS:  That's correct, you have the clip.

10      JUDGE FUN:  All right.  Okay, thank you, Mr. Pena, I don't

11  have any further questions for you.

12      Ms. Toscano, I'll let you show the video with the

13  understanding that again this is foundational, I'm not going to

14  admit the video yet, I want to see it and I can recognize the

15  video and see if this is the correct lawn, so purely for

16  demonstrative purposes at this point.

17      MS. TOSCANO:  Thank you, Your Honor.

18      Zoom Host, please display Exhibit A-7, the garage peak video.

19  I should say please play.

20      MR. SCHULTE:  And Your Honor, just for the record, I do

21  object to the displaying of this video.  I know it's being used

22  for demonstrative purposes, but clearly it's not what it's

23  represented to be.

24      JUDGE FUN:  Well, I think that's what we're going to find out

25  here in a minute, Mr. Schulte.  And I need to look at this video

A162

80

1      JUDGE FUN:  I guess my question is, I mean, from looking at

2  this it looks like it's a video that was downloaded or created on

3  December 19th from Location T, which I assume is a hard drive.

4      I don't know that for sure so I guess I don't know -- I guess

5  I don't know that.  If this particular document relates to the

6  hard drive, if it relates to the video properties itself or if it

7  relates to this cellphone video that was taken or none of them.

8  So if you can kind of link that up and I guess I don't know where

9  you're exactly going with that.

10      MS. TOSCANO:  All right.  I think at this time -- that I

11  think that I'm going to move on and not ask any further questions

12  on Exhibit A-8 at this time and so I'd like to resume my

13  questioning with Mr. Pena.

14      JUDGE FUN:  All right, very well.

15      MR. SCHULTE:  So Judge, A-8 is not in at this time, correct?

16      JUDGE FUN:  That's correct.

17      BY MS. TOSCANO:

18  Q.  So Mr. Pina, when we looked at the -- at the video, Exhibit

19  A-7, the garage peak video, there was a house shown in the

20  distance.  Did you recognize that house?

21  A.  Yes, that was the house of Mr. Likes, the property to the

22  south of me at 300 Desert Sun Lane.

23  Q.  And did you notice in the video any fence line between -- the

24  fence line between your property and Mr. Likes' property?

25  A.  Yes, the property line?

1  Q.  Yes.

2  A.  Yes.

3  Q.  And that video shows the aircraft on the east side of your

4  property?

5  A.  That would be if you're going up that fence line whatever is

6  north of that fence line is my property and whatever's south of

7  that fence line is Mr. Likes' property.

8  Q.  And --

9  A.  In regards to the video, I guess, the bottom portion as you

10  see the fence line that's below it, behind it --

11  Q.  Yes.

12  A.  -- and then what's in front of it towards the skyline,

13  towards the horizon is Mr. Likes' property.

14  Q.  Okay.  And does -- did the video -- does this detect the

15  aircraft and a -- I believe you described it as a bank, in a bank

16  angle position?

17      MR. SCHULTE:  Your Honor, again I'm going to object.  Now

18  we're referring to evidence as specifically excluded by Your

19  Honor.

20      JUDGE FUN:  I'll sustain the objection.  That's describing

21  evidence that's not been admitted.

22      MS. TOSCANO:  Thank you, Your Honor.

23      BY MS. TOSCANO:

24  Q.  And Mr. Pena, did you -- did you with the FAA Inspectors have

25  an opportunity to take some measurements and photographs during --

82

1  you know, subsequent to the flight operation of the aircraft near

2  your house?

3  A.   Yes.

4  Q.   And how did you participate in taking measurements or taking

5  photographs?

6  A.   I was, I guess you could say, keeping them company as they

7  were asking me orientation of my property and what I saw and

8  angles and things like that.

9  Q.   And did you take any photographs while the inspectors

10  -- with your camera while you were there?

11  A.   Yes, we did.

12  Q.   Okay.

13      MS. TOSCANO:  Zoom Host, please display Exhibit A-17, which

14  are the photos of the measuring distances.

15      Okay, let the record reflect that we are displaying Exhibit

16  A-17 and we are currently on Page 1 of 18.

17      BY MS. TOSCANO:

18  Q.   And Mr. Pena, do you recognize -- can you identify this?

19  A.   Yes, that's in front of my garage.  I am the individual on

20  the left-hand side.  I believe Mr. Morgan, I believe that was his

21  name, he's on the right-hand side and we're going over the

22  location of the camera and that general area.

23  Q.   And you said Mr. Morgan.  Is he with the FAA?

24  A.   Yes, I believe he was heading it at the time.

25  Q.   Okay.  And you indicate that -- and where does he -- where on

A165

83

1  this picture does it display, I guess, the garage peak camera?

2  A.   Just about that window that's above the first roof flying

3  right over the garage, below the peak with the blue fascia board

4  on it.

5  Q.   And so what is -- if you know, what is the altitude or the

6  distance above the ground of the -- that the security camera is

7  at?

8  A.   The ceiling in the garage is ten feet and so I would say the

9  camera is anywhere from 17 -- and then you have an added space

10 which is heated and those are 2X6 and then from there the head

11 space is a little less than seven feet, so I'd give that no more

12 than 18 feet off the grade of the garage.

13 Q.   And do you know the height of the garage peak itself of the

14 roofline?

15 A.   I'd say just shy of 20 feet.

16 Q.   And you see the structure on the right-hand side of the

17 house.  Can you identify that?

18 A.   That's my dog kennel.

19 Q.   Okay.  And so the -- in terms of direction and orientation to

20 the right of the garage as we're looking at Page 1 of 18, that's

21 on the eastern side or I should say the northeastern side of your

22 house?

23 A.   In orientation from the garage, the garage is due east and

24 then just past that, if you can see, there's some grass, that's

25 actually my backyard where my children and myself play.

A166

84

1  Q.   So the orientation of the garage is due east?

2  A.   No, the kennel is due east from my garage.

3  Q.   Oh, okay.

4  A.   Yeah, the garage doors, they face south.

5  Q.   Okay.

6  A.   Those garage doors face south, yes.

7  Q.   And where would the -- in terms of direction, where would the

8  front door be?

9  A.   That would be southwest.

10 Q.   Okay, so looking at the picture, looking on the left side of

11 the picture, it looks like a short, like a window; maybe a bay

12 window.

13 A.   Bay window, yes.

14 Q.   And so in reference to that where would the front door be?

15 A.   The front door is just past that.  Just past that bay window

16 is the front porch and the front door is recessed from that point

17 about five feet.

18 Q.   Okay.  And did you measure the distance between the center of

19 your garage where your camera is to the edge of the house, to the

20 edge of the eastern side of the house?

21 A.   Yes.

22 Q.   And do you recall what that was?

23 A.   I believe that was 12 feet and the single bay door you can

24 see there is about -- it's no more than eight foot wide and so

25 it's about 12 maybe 14 feet to the actual eastern wall of the

A167

86

1  Q.   Please turn to Page 2 of 18 of Exhibit A-17.  Please turn to

2  Page 3.  Mr. Pena, can you identify -- excuse me, let's strike

3  that.  For purposes of the record we are now displaying Page 3 of

4  18 of Exhibit A-17.  Mr. Pena, can you identify what's depicted in

5  this photograph?

6  A.   Yes, that's the distance from the propane tank to the area

7  where I believe the aircraft was directly over to the center line

8  of the garage peak camera.

9  Q.   Okay, but can you identify what's depicted in this photo?

10  What are we looking at?

11  A.   You're looking at to the east of my house.  There's a propane

12  tank there almost to the left of the picture and behind that is

13  one of my sheds.

14  Q.   Okay.

15  A.   And to the left of that is my chicken coop.  You can see part

16  of the chicken coop in the rear right corner of it sticking out.

17  Q.   And so in terms of orientation what direction are we looking

18  at when we look at this photo at Page 3, what direction is it

19  depicting?

20  A.   That's east, yeah.

21  Q.   So the propane tank is closer to your house than the shed?

22  A.   That's correct.

23  Q.   Okay.  Do you have like a pen or a stable?

24  A.   I do.  The stable is to left of that chicken coop that you

25  can see the hip of the roofline which would be in orientation that

A168

1  would be a little more north of that chicken coop is stable.

2  Q.   I see.  So the stable is not depicted in this photo?

3  A.   It's not, no.  You have the chicken coop, one of my sheds.

4       MS. TOSCANO:  Please display Page 5.  Please

5  display --

6       BY MS. TOSCANO:

7  Q.   Well, cam you identify this photo, Mr. Pena?

8  A.   Yes, I believe that that's on my garage slab and I think the

9  tape line is going out to the area that we presume the airplane

10  was directly over and so you're looking at 30 feet on the marker

11  so that would be 30 feet from the center line of the garage peak

12  camera to the center of the flight path estimation.

13  Q.   Okay.  The tape measure shows 300 feet?

14  A.   No, that's 30 feet, I think that's 30 feet, zero inches.

15  Q.   Okay.

16       MS. TOSCANO:  So Host Monitor, can you return to Page 3 of

17  this exhibit?

18       Okay, so I offer Page 3 of Exhibit A-17.

19       JUDGE FUN:  Any objection?

20       MR. SCHULTE:  I object on the grounds of relevance.  I also

21  object on the grounds that the witness' testimony is inconsistent

22  with what the tape measure actually shows.  And granted, I don't

23  know the manufacturer of the tape measure, but that does appear to

24  be 300 feet to me, not 30 feet and I believe even Ms. Toscano

25  believes that it's 300 feet and not 30 feet, so those would be my

88

1   objections.

2       MS. TOSCANO:  So Your Honor, it is relevant because the

3   photograph depicts the structures on the ground in which the

4   Administrator has alleged that the Respondent has operated,

5   specifically at less than 200 feet in proximity to the aircraft's

6   flight path.

7       JUDGE FUN:  I'll admit Page 3 of 18 of Exhibit A-17.  It is

8   relevant to stick with the witness' testimony and the photograph

9   speaks for itself so I'll overrule the objection.

10                              (Document above referred to as

11                              Administrator's Exhibit A-17, Page

12                              3 was Identified and received into

13                              evidence.)

14      MS. TOSCANO:  Okay.  Host Monitor, please turn to Page 7 of

15  Exhibit A-17.  Let the record reflect that we are viewing the

16  Administrator's Exhibit A-17 at Page -- I'm sorry, what page is

17  this -- Page 7.

18      BY MS. TOSCANO:

19  Q.   Okay, Mr. Pena, can you identify the objects in this picture?

20  A.   Yes, that's the same propane tank from the previous picture

21  and that's Mr. Morgan from the FAA and that is my shed just behind

22  the propane tank and again, I believe they're measuring from the

23  center line of the garage peak camera, which is 12 feet from the

24  edge of the house, so that would put my propane tank at 18 feet

25  from the perimeter wall of my house.

A170

90

1  A.   Yes, that's part of the single door on my garage, the propane

2  tank and my shed and it looks like the tape measure is in between

3  my shed and my chicken coop and they were measuring the center

4  line of the garage peak camera to the shed.

5      MS. TOSCANO:  And for the record what's being displayed at

6  this point is Page 9 -- excuse me, Page 11 of 18 of Exhibit A-17.

7  I offer this exhibit at Page 11.

8      MR. SCHULTE:  No objection, Judge.

9      JUDGE FUN:  Page 11 of A-17 is admitted.

10                              (Document above referred to was

11                              Marked for identification as

12                              Administrator's Exhibit A-17, Page

13                              11, and was received into evidence.)

14     BY MS. TOSCANO:

15  Q.   Please turn to Page 13.  Please turn to Page 15.  Mr. Pena,

16  can you identify the objects in this -- depicted in this photo?

17  A.   Yes, that's the front part of my garage slab, the gravel of

18  my roundabout and those pine trees you see on the right are part

19  of my roundabout and the house you see is Mr. Likes' property.

20  Q.   And so give us a directional viewpoint.  What direction are

21  we looking at?

22  A.   That's due south.

23  Q.   So this is due south from the garage door of your house?

24  A.   That's correct.

25  Q.   And is -- there appears to be a person standing in the

A171

1  distance at the end of the tape measure.  Can you identify that?

2  A.   Yes, that's one of the FAA Inspectors and they're measuring

3  from the center line of the garage peak camera to the fence line

4  between Mr. Likes' property and my property.

5  Q.   And so can you give us an orientation of, you know,

6  directional orientation of that fence line?  Is it east/west,

7  north/south?

8  A.   It's east/west and that measuring tape is going south.  I

9  believe they were trying to get a measurement from the garage to

10  the --

11       MR. SCHULTE:  Objection.

12       JUDGE FUN:  We have an objection.  Mr. Schulte, what's your

13  objection?

14       MR. SCHULTE:  The witness is testifying about what his belief

15  is, it's not relevant.

16       JUDGE FUN:  Ms. Toscano?

17       MS. TOSCANO:  He participated in, you know, in this portion

18  of taking the pictures and so I think that there's enough --

19  there's enough foundation to support his statement as to his

20  belief and but more importantly is the fact that he's mentioning

21  the significance of, you know, where the person is standing in

22  terms of the structures and, you know, the obstructions and the

23  fence line.

24       JUDGE FUN:  All right, have we established who took these

25  photographs yet?  I mean there was some really long testimony, but

1    south?

2    A.    I would say it was a little northeast going southwest just a

3    little bit.

4    Q.    So can you describe that or relate to the fact to your

5    earlier testimony in observing the aircraft in a -- in an

6    aggressive maneuver and a left bank?

7        MR. SCHULTE:  Objection, leading.

8        JUDGE FUN:  Sustained.

9        BY MS. TOSCANO:

10    Q.    Mr. Pena, earlier -- your earlier testimony was that the

11    aircraft was in a left bank so can you describe the aircraft's

12    position at the time, the direction of flight that the aircraft

13    was in when you saw the aircraft in a left bank and then the

14    direction of flight after the aircraft if so came out of its left

15    bank?

16        MR. SCHULTE:  Same objection, Judge, but I've made my point.

17        JUDGE FUN:  That's the same objection.  Mr. Pena, can you

18    just explain to us the path that you observed of the airplane, the

19    path the airplane took, just describe the path the airplane took

20    for us?

21        THE WITNESS:  Sure.  So when I saw the aircraft, it was

22    performing a -- almost a 90 degree bank maneuver.  If you're

23    piloting the aircraft it would be turning to the left and then it

24    quickly straightened out, it dipped a little bit going south,

25    slightly southwest, and then it rose up a little bit and went over

94

1  Mr. Likes' house and then went off into the horizon so that that

2  hard left bank maneuver, when it came into my sight, would lead me

3  to believe that it was coming towards my house, I guess coming

4  from the east, which would make sense with the -- and then it did

5  a hard left bank to orientate itself more southerly and then it

6  dipped down and then rose above my neighbor's house.  It was

7  probably above his -- the peak of his roofline from what I saw,

8  maybe 30 feet over his house.

9       JUDGE FUN:  Ms. Toscano.

10      BY MS. TOSCANO:

11  Q.   Yes.  And did the path that the aircraft, as you described,

12  go over -- would it have taken it over the fence line that you

13  described and that is showing, depicted on Page 15 of Exhibit A-

14  17?

15  A.   Yes, over the fence line and about 30 feet or so above

16  Mr. Likes' roofline and then into the horizon.

17  Q.   All right.

18      MS. TOSCANO:  So I offer Exhibit A-17 at Page 15.

19      JUDGE FUN:  Any objection?

20      MR. SCHULTE:  No objection, Judge.

21      JUDGE FUN:  All right, I'll admit Exhibit -- Page 15, Exhibit

22  A-17, Page 15.

23                              (Document above referred to was

24                              marked for identification as

25                              Administrator's Exhibit A-17, Page

A174

98

1  security cameras, those were admitted, correct?

2      JUDGE FUN:  A-13 was not offered.  There was an objection to

3  it and there's no foundation yet laid for A-13.

4      MS. TOSCANO:  Okay.  I have a follow up question then, Your

5  Honor, to Exhibit A-13 at Page 3 of 4.

6      Please display Exhibit A-13 at Page 3 of 4?

7      Let the record reflect that we are displaying Exhibit A-13 at

8  Page 3 of 4.

9      BY MS. TOSCANO:

10 Q.  Mr. Pena, this is -- please describe what's depicted in this

11 photo?

12 A.  Yes, that's the front porch and front door of my house and in

13 the upper right-hand corner is the surveillance camera that caught

14 my wife's position during the incident.

15 Q.  And so your wife's position was close to this front door?

16 A.  Yes.

17 Q.  And I note that above on the roof there's solar panels you

18 had.  Are those solar panels that you had identified earlier on

19 the Google Earth image of your house?

20 A.  That's correct.  That's the only set of panels I have on my

21 roofline.

22 Q.  And is the roof peak the same height as the roof peak at the

23 garage?

24 A.  It is.

25      MS. TOSCANO:  I offer Exhibit A-13 at Page 3 of 4.

A175

100

1                   A F T E R N O O N    S E S S I O N

2                                              (1:50 p.m. EST)

3        JUDGE FUN:  We're back on the record after a short recess.

4   Mr. Pena was testifying on direct examination by Ms. Toscano.  We

5   just completed admitting Exhibit A-13, Page 3.

6        All right, Ms. Toscano, you may proceed.  You're on,

7   Ms. Toscano.

8        MS. TOSCANO:  Thank you.

9                        DIRECT EXAMINATION (Continued)

10       BY MS. TOSCANO:

11  Q.   These depict or show on the screen Exhibit A-13 at Page 1.

12       Mr. Pena, can you identify this photograph which is

13  previously marked as Exhibit A-13, at Page 1 of 4?

14  A.   Yes, that's the peak of my roof of my garage and that's the

15  camera that caught the aircraft during the incident.

16       MS. TOSCANO:  Your Honor, I offer Exhibit A-13 at Page 1.

17       JUDGE FUN:  Any objections?

18       MR. SCHULTE:  I know this isn't a criminal case obviously,

19  but it sure feels like fruit of the poisonous vine today.  We're

20  being asked to look at a picture of a video camera that took a

21  video that's not in evidence so I'm not sure what the relevance of

22  it is, but that would be my objection.

23       JUDGE FUN:  Overruled, I'll allow Page 1 of A-15 to be

24  admitted.

25                                  (Document above referred to was

A176

1  if you could take down the exhibit that would be helpful, please.

2                         CROSS EXAMINATION

3       BY MR. SCHULTE:

4  Q.   Mr. Pena, the aircraft that you saw fly over your property

5  that we're here about today, have you ever seen it fly over your

6  property before?

7  A.   No, but I did afterwards.

8  Q.   Okay, but my question was before so the answer's no, correct?

9  A.   That's correct.

10  Q.   And on the day in question the aircraft made one pass and

11  never came back, right?

12  A.   That's correct.

13  Q.   And as a result of that pass was there any harm done to your

14  property?

15  A.   About --

16       MS. TOSCANO:  Objection, relevance.

17       JUDGE FUN:  Mr. Schulte, what's the relevance?

18       MR. SCHULTE:  It goes to the sanction issue if there was any

19  harm.

20       JUDGE FUN:  I'll allow it, I'll overrule the objection.

21       BY MR. SCHULTE:

22  Q.   Sir, any harm to your property?

23  A.   Not to my property, but we were traumatized and my daughter

24  and myself pretty severely traumatized by it.

25  Q.   Okay, so the answer to my question, sir, is there was no harm

103

1  to your property, is that correct?

2  A.    That's correct.

3  Q.    You're a combat vet, is that correct?

4  A.    That is correct.

5  Q.    So your testimony is, is that you had gone through the trials

6  of combat, but an airplane flying over your head traumatized you,

7  is that correct?

8  A.    But it was traumatizing mostly for my daughter.

9  Q.    So just to be clear, you weren't traumatized, but your

10 testimony is that your daughter was traumatized?

11 A.    We were all traumatized.  She was traumatized the most.

12 Q.    Okay.  Did you seek any medical assistance for your daughter

13 due to her traumatization?

14 A.    No.

15 Q.    Same question vis-à-vis you and your wife?

16 A.    No, just therapy amongst ourselves.

17 Q.    Okay, thank you.  I spent seven years in service.

18 A.    Did you serve in combat?

19 Q.    Twice.

20 A.    Twice?

21 Q.    So wouldn't recommend it as I expect you know.

22 A.    Yes, I would.

23 Q.    So the Mark 19, a weapon again I'm somewhat familiar with,

24 when you fire that weapon you're sometimes walking in on a target,

25 correct?

A178

105

1   Q.   Same with respect to you and your daughter as well, correct?

2   A.   Yes, the aircraft was on the east side of the house.

3   Q.   Okay.  And you were on the west side of the house, so it's

4   fair to say that the house was between you and the aircraft?

5   A.   When I couldn't see it.

6   Q.   Okay.   So you're telling me -- forgive me, sir, I'm just

7   trying to u/d your testimony.  So you're telling me that when you

8   saw the aircraft there no longer was a house between you and the

9   aircraft?

10  A.   Once I see the aircraft, if you were to put a line that goes

11  straight from my eyes to the aircraft there was nothing but

12  airspace in that line.

13  Q.   So if I would draw a line straight out from your house along

14  the flight path of the aircraft, at no time did the aircraft cross

15  that line and be in a position where it is essentially over your

16  head, correct?

17       MS. TOSCANO:  Objection, vague.

18       JUDGE FUN:  The question is was there a point in time when

19  you the aircraft was directly overhead?

20       THE WITNESS:  No, the plane was not directly over my head at

21  any time.

22       JUDGE FUN:  Thank you.

23       BY MR. SCHULTE:

24  Q.   Are you a pilot?

25  A.   No, I'm not a pilot.

A179

1  Q.   Have you ever taken flight lessons?

2  A.   No.

3  Q.   Has your wife ever taken flight lessons?

4  A.   No.

5  Q.   So it's fair to say she also is not a pilot, correct?

6  A.   Correct.

7  Q.   Okay.  When this over-flight occurred did you call the

8  police?

9  A.   No, but we did file a report with the Sheriff.

10  Q.   Did the Sheriff do anything?

11  A.   Not that we know of.

12  Q.   Other than the FAA did you call any other authorities?

13  A.   Just the Sheriff.

14  Q.   Okay.  Did you, in fact, call the FAA in this matter?

15  A.   We did.

16  Q.   Did you call anybody from your local Zoning Department?

17  A.   No.

18       MR. SCHULTE:  Madam Reporter -- I'm sorry, I guess it's the

19  Zoom Host, could we pull up A-17 again, Page 11, which I'll note

20  for the record is in evidence?  And Madam Host, I'm looking for I

21  believe it's Page 3 of 18 and if I'm wrong about that, I

22  apologize.

23       MS. TOSCANO:  That's right.

24       BY MR. SCHULTE:

25  Q.   Mr. Pena, can you still hear me?

107

1  A.   Yes.

2  Q.   Okay.  You recall looking at this picture before, correct?

3  A.   I do.

4  Q.   And in the lower left-hand corner of this picture again,

5  which is A-17, Administrator's 17, Page 3 of 18, that is depicted

6  a shed and in front of the shed is a propane tank, correct?

7  A.   That is correct.

8  Q.   And that propane tank, would you agree, is the same color as

9  the scrub grass that surrounds it, correct, or ground color?

10 A.   I would say stands it out as a tank.

11 Q.   But that wasn't my question.  My question is basically it's

12 the same color as the surrounding grasses, yes?

13 A.   I wouldn't agree it's the same color, no.

14 Q.   Okay, fair enough.  And if you look beyond the shed what is

15 out there, is that just open desert land?

16 A.   Yes.

17 Q.   Okay.  Bear with me, I'm almost done, Mr. Pena.  With respect

18 to the aircraft in question do you know what kind of engine it

19 has?

20 A.   I don't.

21 Q.   Do you know what kind of propeller it has?

22 A.   I think it's denoted on the front.

23 Q.   Yes, but my question is do you know what kind of propeller it

24 has?

25 A.   No.

A181

112

1   I noticed it dipped a little bit lower after that so it came -- it

2   flew a little bit lower and then it started on an incline after

3   that.

4       JUDGE FUN:  Now, you mentioned that when you heard the

5   airplane, the aircraft, you really couldn't see it at the time and

6   eventually it came into view and you were able to observe it and

7   it flew over your property and dipped and then started to climb,

8   and during that time period you were yelling at your wife telling

9   her to run, what was going through your mind at that time?

10      First, to the airplane, just kind of walk me through what you

11  were thinking, what the thought process was, what your feelings

12  were like when you first start hearing the noise and then you saw

13  the airplane come into view?

14      THE WITNESS:  So immediately my feelings were fighter fly.

15  And especially being a combat veteran, taking not just initial

16  combat, but many instances where rockets were coming in and

17  mortars, obviously startled me and since I couldn't see it with

18  how loud it was, I thought for sure something was crash landing

19  either into my house or shortly, you know, somewhere around the

20  vicinity of my house.  So I thought something was either crashing

21  either into my house or behind it and that was before I could see

22  it.

23      JUDGE FUN:  When the plane came into view what was going

24  through your mind at that time?

25      THE WITNESS:  Disbelief, I couldn't believe somebody would

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A182

1  endanger all our lives and do something like that.  I've never

2  seen an airplane fly that low or that -- also I mentioned that

3  aggressive bank maneuver and I just remember thinking what an

4  aggressive style it had to it.  And I also wondered if it was

5  retribution for something that happened between me and my neighbor

6  a few weeks before when he was flying his drones over my house and

7  I asked him to respect my property and quit flying the drones over

8  my house.

9      And I mention that because a few days after this happened we

10  got a voicemail from Mr. Likes apologizing for Mr. Palmer and for

11  himself for what had happened and then I started to connect the

12  dots because I didn't know Mr. Palmer, but he is fly buddies with

13  Mr. Likes and --

14      MR. SCHULTE:  Your Honor -- forgive me, Mr. Pena, I'm going

15  to object and move to strike all of this testimony, Judge.  I know

16  you asked the question, I mean no disrespect of The Court, but

17  we're going off rails here.

18      JUDGE FUN:  And Mr. Pena, please tell me what was going

19  through your mind at that time, you know, when the airplane came

20  into view?  I know you put things together later on.

21      THE WITNESS:  Yeah.

22      JUDGE FUN:  But I want to focus on at the time you saw the

23  airplane after you heard it, what was in your mind at that time?

24      THE WITNESS:  Disbelief, shock, anger that somebody would do

25  something like that.

114

1          JUDGE FUN:  And at what point of time did you begin to yell

2     at your wife, was it after the plane came into view or before it

3     came into your view?

4          THE WITNESS:  Before when I heard the loud noise.  I'm not

5     sure if she even heard me over the noise.  We were about 150 feet

6     apart.

7          JUDGE FUN:  Now, did you think to yell at your wife or was it

8     more of an instinct?

9          THE WITNESS:  It was an instinct, yeah.

10         JUDGE FUN:  Now, after the aircraft kind of flew over the

11    flight path that you said over your property and started to dip

12    and then started to climb over your neighbor's property what were

13    your thoughts at that point, did it change or was there anything

14    different?

15         THE WITNESS:  I kept tracking the plan to make sure it didn't

16    come back and I was still just shocked and in disbelief and angry

17    about, you know, that somebody would do something like that.

18         JUDGE FUN:  And you said you had your daughter with you.

19    When this occurred did you see expressions of any kind of

20    emotions?

21         THE WITNESS:  She was very upset.

22         JUDGE FUN:  Well, when you say upset what do you mean by

23    that?

24         THE WITNESS:  So when it happened --

25         JUDGE FUN:  Did she --

A184

115

1     THE WITNESS:  Go ahead.

2     JUDGE FUN:  Did she cry or was she fearful?  I mean explain

3   to me what her emotion was?

4     THE WITNESS:  She was shaken up and asking me what was

5   happening and why the plane was going to crash into our house,

6   asking me why somebody would do something like -- why it was

7   happening, I guess.

8     JUDGE FUN:  All right, thank you, Mr. Pena, I don't have any

9   further questions for you.  Do Ms. Toscano or Mr. Schulte have any

10  follow up questions with regards to the questions I asked?

11  Ms. Toscano?

12    MS. TOSCANO:  So a follow up question on the low flight

13  occurrence after November 24th, 2019.

14              REDIRECT EXAMINATION (continued)

15    BY MS. TOSCANO:

16  Q.   Mr. Pena, you indicated to the Judge that you observed -- you

17  and your wife were in your backyard and you observed the same

18  aircraft flying south to north, is that correct?

19  A.   I believe so, yes.

20  Q.   And you indicated that it was 200 to 300 feet away from you

21  in your backyard.  Where in your backyard were you when this

22  occurred?

23  A.   We were on the grass, we call it the dog run, but it's the

24  grass section we have in the backyard.

25  Q.   Can you -- so in the backyard.  Is the backyard the area

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A185

1  from the garage which is on the eastern side of our house towards

2  where my husband and my daughter and our neighbor were all still

3  standing at the western side of our fence line.  And then I did

4  not make it to the fence line.  I was pretty much in the line with

5  the post of our front porch when I heard the sound of a very loud

6  engine and by loud I mean it was so loud to me that I could see my

7  husband trying to yell something to me and I had no idea what was

8  happened, obviously.

9      I could just see that he's moving his arms and I hear him

10 yelling, but I wasn't sure what he was saying because I could hear

11 an engine coming and that to me was a little bit unnerving because

12 when you hear something so loud, but you don't know where it's

13 coming from that breads that, you know, that adrenal spike

14 especially because I was holding my son and I was walking and it

15 totally caught me off guard because I couldn't see it.  All I

16 could hear was an engine coming from somewhere behind me and then

17 I looked towards where I could hear the engine sound moving

18 towards, which is coming more from south and I saw it come into

19 view past the garage peak, the roofline because I had a view of

20 the two different roofline sections.

21     And I saw it and I was immediately just kind of dumbfounded

22 because I couldn't believe how close it was to the house and how

23 close it was to the ground.  And then it continued going south

24 towards our neighbor's house at 300 Desert Sun and I actually -- I

25 was ready to watch it impact into the house because I thought

123

1   there was no reason that this plane was so low unless it was

2   having an emergency and so I thought for sure it was going to

3   crash into my neighbor's living room.

4        But at the last minute he pulled up and flew over the house

5   and kept going straight until he was out of view.  And then I

6   watched towards my husband.  We were all just in disbelief

7   because we couldn't believe what had just happened because that's

8   never happened before.  I can't think of too many situations in my

9   life where I've ever been that concerned about, you know, maybe

10  about a possible, you know, injury scenario especially because I

11  was holding my son and I didn't know where to go because it was

12  loud and I could just hear it coming towards the house.

13       So it was a frightening scenario and one that obviously let

14  us file a report with the FAA because we were very shocked that

15  someone would even consider doing that so close to our house where

16  we live and it was supposed to be our private residence, but it

17  was anything but private or safe at that moment so that's why we

18  filed our report.

19  Q.   Okay.  And then when the aircraft finally came into view can

20  you describe exactly where on your, I guess from your vision,

21  where did the aircraft first come into your view, was it before or

22  after -- I'm trying to think, did you see the aircraft come above

23  the roofline or was it --

24  A.   It was so loud that I didn't see it until it passed the

25  garage.  I didn't see it over the top of the house if that's what

A187

1  Q.   Okay.  And so what were the -- what distinguishable markings

2  did you observe?

3  A.   Red, white and blue stripes and definitely the red and white

4  they were the brightest and then I was pretty sure it was blue and

5  my husband told me afterwards, he said I think it was blue as

6  well.  And then when we reviewed the camera footage, because we

7  both were like after the incident we both said to ourselves

8  there's no way where he was at, this pilot, that the garage camera

9  didn't catch it.

10      So we both went and reviewed to see if that angle had been

11 caught by the camera because we both assumed that it probably

12 would have been and that's when we confirmed that it was a red,

13 white and blue undersides of the plane.

14 Q.   Okay.  And so okay, I just want to back up a little bit.

15 Thank you so much.  What was -- I'm sorry, I don't think I asked

16 you, but what was the altitude, what was your estimate of the

17 aircraft's altitude, you know, when it first came into view?

18 A.   I would say about 50 feet.

19 Q.   50 feet.

20 A.   About 50 feet.  And again, I used everything that I could see

21 in my view to make that judgment, the height that I know the house

22 is, you know, because when we first put in the cameras my husband

23 and I discussed, well, I've got to get a ladder to get up to this

24 height, you know, so that's somewhat of a decent measurement of

25 what our property structures are based on the work my husband and

130

1  flight path before he came into view.

2  Q.   And so then did you see -- from where you were -- so from

3  where you were in front of the front door, could you see the hay

4  barn or the set or anything?

5  A.   No, no.

6  Q.   None of it, okay.

7  A.   No.

8  Q.   Okay.  But once the aircraft came into your view, did you --

9  were there any -- I guess I'm trying to think here.  In terms of

10  the flight path of the aircraft after it came into view, so it was

11  in a turn.  Did it remain in the turn did you observe or did it

12  change?

13  A.   Yeah, when it came into view it was at that bank maneuver and

14  then it straightened out somewhere in between when it first came

15  into view and probably by the time it was above the property fence

16  line.  I'd have to review the footage to know what I saw, but from

17  my memory even without looking at the footage, it did straighten

18  out and that's when I thought it was going towards the neighbor's

19  house and into the neighbor's house.  And then at the last minute

20  he did pull up.

21  Q.   So his flight path took him over to your property fence line

22  that you share with Mr. Likes?

23  A.   Yes.

24  Q.   And so when you first saw the aircraft come into view it

25  hadn't gone over the fence line or had it already passed that

A189

1  Q.   So the aircraft was -- the wings were level at the time that

2  the aircraft reached the fence?

3  A.   To the best of my knowledge, yes.

4  Q.   And then approximately what altitude would you estimate that

5  the aircraft was above the fence line?

6  A.   You can see by the yellow dot where I was, by the time it got

7  to the fence line it was probably twice as far.  I would say it

8  was still the same height above the ground because it didn't start

9  pulling up until it got closer to Mr. Likes' residence so I would

10 say it was within 50 to 60 feet above the ground.

11 Q.   Okay.

12 A.   And again, I'm not perfect in my estimations; however, I can

13 say that when it was closer to me that is what I would estimate it

14 to be given my knowledge of the ground level and the height of the

15 garage and the fact that it didn't pull up until it was far past

16 the fence.

17 Q.   And once the aircraft pulled up was it a continuous pull up

18 or was it just a gradual pull up or was it just a short amount of

19 time it was pulled up?

20 A.   From my recollection it was pretty quick because -- so I

21 would say and again I'm no plane expert, but it looked to me like

22 it was a pretty quick pull up and then as soon as he got to the

23 altitude level he was attempting to reach, he looked like he

24 leveled out again and stayed at that as far as I could see.

25 Q.   And so did you see the aircraft's altitude above Mr. Likes'

1   itself or the contents of the video.

2       MS. TOSCANO:  Thank you, Your Honor.

3       Zoom Monitor, please depict Exhibit A-7, the garage peak

4   video.

5       THE WITNESS:  Okay, can I comment now?

6       JUDGE FUN:  Well, till there's a question asked of you.

7       THE WITNESS:  Oh, okay.

8       BY MS. TOSCANO:

9   Q.   Okay, so Mrs. Pena, --

10      MS. TOSCANO:  Zoom Host, can you take the video off the

11  screen?

12      BY MS. TOSCANO:

13  Q.   So Mrs. Pena, did that -- seeing the video did that refresh

14  your recollection as to the flight path of the aircraft after --

15  as it approached Mr. Likes' house?

16  A.   Yes, yes, that matches with what I initially told you which

17  was it likely at least went over the swimming pool so it looked to

18  me like it was slightly on the eastern side of the swimming pool

19  and it definitely falls at the edges of that garage.  He has a

20  very large section of garages that aren't attached to the house

21  and that's where those - that building was past the swimming pool.

22  And it looks to me like in that video just like it did that day,

23  like it went right across.

24  Q.   Okay.

25  A.   And then it kept going straight.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A191

141

1    Q.   Okay, thank you.  So now at the time that you first heard

2    that noise and you were holding your son and how old was your son

3    at that time?

4    A.   A year.

5         MR. SCHULTE:  Objection, leading, leading, leading.

6         MS. TOSCANO:  Okay.

7         BY MS. TOSCANO:

8    Q.   And then what was going through your mind at that time and

9    describe your feelings?

10        MR. SCHULTE:  Objection, relevancy, people's feelings are not

11   part of this case, Your Honor.  I'm sorry, but I'm going to keep

12   making that objection.  This case isn't about feelings, it's about

13   a regulatory violation, 91.119.  There's nothing in that

14   regulation about people's feelings.

15        JUDGE FUN:  Ms. Toscano?

16        MS. TOSCANO:  Your Honor, I can rephrase that question.

17        JUDGE FUN:  All right.

18        MS. TOSCANO:  Thank you.

19        BY MS. TOSCANO:

20   Q.   So Mrs. Pena, what were you -- what were you thinking at the

21   time when you heard the noise of the aircraft?

22   A.   Truthfully, I didn't know what to think because I saw my

23   husband yelling.  I only knew that it was something that was

24   bothering him, I couldn't hear what he was saying.  I think that

25   added to the confusion of just hearing something and not knowing

1   what's going to happen so holding my son, I thought I don't know

2   which --  because I heard the engine behind me I wanted to run,

3   but didn't exactly know where to go.

4       And if you look at the front porch video you can see I'm kind

5   of like stutter stepping because I didn't know where the plane was

6   coming from.  All I knew was it was too loud to not be of concern

7   to me because we've had planes fly over since we moved.  I mean

8   that airport isn't that far from us, you know, may be 20 minutes

9   down Red Rock Road so I'm not unfamiliar with planes flying over,

10  but the proximity sound of that engine put me into a state of

11  panic.  I was thinking I needed to get my son and run, but I did

12  not know where because I could not see it.

13  Q.   Okay.  And once the airplane came into view what were your

14  thoughts?

15  A.   I was thinking, okay, I'm safe, but is my neighbor's house

16  safe.  I thought with his trajectory that he was -- I thought

17  emergency, I thought he was crash landing because I couldn't think

18  of any other reason in my mind why a pilot would have any need to

19  be so close to the ground and so close to the proximity of our

20  roofline and that didn't make sense to me.  So I immediately

21  thought he was going to be crashing into something.

22      MR. SCHULTE:  Objection, move to strike, Judge, please.

23      JUDGE FUN:  What's the basis of your objection?

24      MR. SCHULTE:  This is opinion testimony.  It has nothing to

25  do with the allegations set forth in the Administrator's

A193

1 | complaint.  Can we -- I just want the facts, Your Honor, that's
2 | all.
3 |     JUDGE FUN:  I do think that's party speculation, but I do
4 | think it's partly relevant in terms of what was going on in this
5 | opinion is minor of the soft process of what she was thinking with
6 | regards to the noise of the engine and the height of it, but I
7 | don't think we need much more of that testimony.
8 |     MS. TOSCANO:  Thank you, Your Honor.
9 |     JUDGE FUN:  So move on to a different issue, Ms. Toscano.
10 |     MS. TOSCANO:  Okay.
11 |     BY MS. TOSCANO:
12 | Q.   And then, Mrs. Pena, did you contact the FAA following this?
13 | A.   I believe it was me, yes.  It was myself or my husband, but
14 | in my recollection pretty confident it was me, yes, and I spoke to
15 | Charles Geiger.
16 | Q.   Okay, and Charles Geiger at the FAA?
17 | A.   Yes, he was the one who answered my call.
18 | Q.   And when did you contact the FAA?
19 | A.   I am not 100 percent sure, but I think it was the next day or
20 | two days later.  I actually think it was the next day, but
21 | definitely within that week.
22 | Q.   And did you -- let's see -- was there any harm or distress
23 | suffered by you or any of your family members, you know, following
24 | from the incident?
25 |     MR. SCHULTE:  Objection, relevance.

144

1        JUDGE FUN:  Ms. Toscano?

2        MS. TOSCANO:  I'm sorry, did you ask my input?

3        JUDGE FUN:  Yes, to the objection as to relevance.

4        MS. TOSCANO:  It's very relevant as to the significance to

5    the house it posed in terms of -- for the dissention policy

6    guidance is that the hazard posed by the low flight is a factor in

7    aggravating or mitigating of the sanction and it also is one of

8    the regulatory requirement under 91.119(a) is that we have to

9    prove that there was undue hazard imposed by the low flight.

10       JUDGE FUN:  I understand about the evidence of undue hazard,

11   but I can't allow a lay witness to provide that kind of evidence.

12       MS. TOSCANO:  As to any harm or distress suffered as a result

13   thereof, I would --

14       JUDGE FUN:  I'm going to sustain the objection.  I think

15   Mrs. Pena did testify early on about what her thought process was

16   and what was going through her mind as she heard the engine and

17   the airplane came into view and the distress that she felt over

18   that.  She did testify to that so I think it's cumulative.

19       MS. TOSCANO:  Okay.

20       BY MS. TOSCANO:

21   Q.  Well, then, Mrs. Pena, did either your son or daughter

22   express any concern at the time of the low flight?

23       MR. SCHULTE:  Didn't we just cover this, Judge?  I thought

24   that's what was the objection that was just sustained.

25       JUDGE FUN:  I think it's a different question, like this is

A195

1  to the daughter and son expressing some emotion.

2      MR. SCHULTE:  Again, with respect, Judge, this is not

3  relevant to a regulatory violation.  This isn't a case about

4  emotional feelings.  I don't understand this line of questioning

5  at all.

6      JUDGE FUN:  Well, I'll allow a limited amount of it though.

7  Ms. Toscano, if you'd ask a question and then move on to a

8  different topic?

9      MS. TOSCANO:  Okay, all right, thank you.

10     BY MS. TOSCANO:

11 Q.  So Mrs. Pena, at the time of the low flight did either your

12 son or your daughter express any thoughts or any distress as a

13 result of the low flight?

14 A.  My son did start crying afterwards, but he's one year's old

15 so -- at that time he was one year old so he wasn't verbalizing

16 any trauma to me, but my daughter talked about it for months.  She

17 was very aware of how frightened, you know, it made all of us and

18 she continued to ask us about low flyers.  She even asks about it

19 today and she's six, so yes, it certainly did leave an impression

20 with my daughter especially.

21 Q.  Okay, thank you.

22     MS. TOSCANO:  One moment, Your Honor.

23     JUDGE FUN:  All right.

24     (Pause)

25     MS. TOSCANO:  Zoom Host, would you please show Exhibit A-17?

151

1       MR. SCHULTE:  And if you just move it up a little bit so we

2   can get the entire photograph?  Thank you, perfect.

3       BY MR. SCHULTE:

4   Q.   Mrs. Pena, have you seen this picture before today, correct?

5   A.   Yes.

6   Q.   And of course, we looked at it just a few minutes ago.  I

7   know we all kind of quibble about whether that pink line

8   represents the flight of the aircraft in question.  My question to

9   you with regard to this photograph, if you're looking from top to

10  bottom, as it's pictured now, to the right of that photograph what

11  is out there?  To the right of that pink line, forgive me?

12  A.   The eastern section of our property --

13  Q.   Right.

14  A.   -- and pasture area.

15  Q.   Okay, so to the right side of that pink line as we're looking

16  at this photograph that's just basically open field and scrubs, is

17  that correct?

18  A.   Yes.

19  Q.   Okay, thank you.  And you also testified that when it came to

20  contacting the FAA you're not sure whether you or your husband did

21  it, correct?

22  A.   I'm fairly positive it was me.

23  Q.   Okay.  Prior to your testimony today did you have any

24  conversations with Ms. Toscano?

25  A.   Yes.

A197

1  Q.   Mrs. Pena, when you saw the air -- can we agree that when the

2  aircraft went by it was maybe two or three seconds, the whole

3  event from beginning to end?

4  A.   Most likely, yes.

5  Q.   Okay.  And you testified before that you were looking at your

6  husband and he was waving his hands, but you couldn't hear him.

7  Did I understand your testimony correctly?

8  A.   Yes.

9  Q.   And your husband testified that this was a traumatic and

10 startling event.  Do you agree with that?

11 A.   Absolutely, yes.

12    MR. SCHULTE:  Okay, thank you; nothing further, Your Honor.

13    JUDGE FUN:  Any redirect, Ms. Toscano?

14    MS. TOSCANO:  No, Your Honor, thank you.  Oh, but I reserve

15 the witness, please.

16    JUDGE FUN:  You'd like to have her subject to recall?

17    MS. TOSCANO:  Yes.

18    JUDGE FUN:  All right.  All right, Mrs. Pena, I don't have

19 any further questions -- I don't have any question for you.  You

20 are subject to recall which really means you just make yourself

21 available, you know, around the house or near a phone where

22 Ms. Toscano can call you and let you know that you're recalled to

23 testify.

24    I will remind you not to discuss your testimony with your

25 husband or anyone else in this case until this case is complete.

159

1    I was living in Reno, I was running a restaurant inside a casino.

2    I was the general manager.  That was about two years ago prior to

3    this.  I was living in the location where the incident happened on

4    the 24th of -- was it November again?  I'm sorry --

5    A.    Yes.

6    Q.    And just living in the home next to the Pena's and we had

7    become pretty good neighbors and conversed quite a bit at the

8    fence line just as a normal say hello because our properties were

9    next to each other so that's all I've got.

10   Q.    Okay, very good.  And so what was your address then?

11   A.    It's 445 Desert Sun Lane.

12   Q.    445, okay.  And okay, and you are married and have children?

13   A.    Yes, ma'am.

14   Q.    Okay.

15   A.    Three children; married for 11 years.

16   Q.    And at the time of the November 24th, 2019 low flight

17   incident how long had you resided at 445 Desert Sun Lane?

18   A.    I believe we lived there for roughly six or seven months.  I

19   think it was we took ownership in June, I believe, of -- I can't

20   remember how many years there, 2018 I think it was.

21   Q.    Okay.  And -- okay then, turning your attention to November

22   24, 2019, approximately lunchtime, were you outside and what were

23   you doing?

24   A.    Yeah, from what I remember, like I said, me and Gabe Pena,

25   whenever each other was outside doing yard work, the other seems

A199

160

1  to, you know, meet up at the fence line and just kind of talk and

2  have conversation. And that day I can't really recall what he was

3  doing outside, but I'd walked across from my house over toward

4  where he was at and we met at the fence line and were just having

5  conversation.

6      I believe he was working on his fence or doing something out

7  there and I'd say we were probably out there talking for a good

8  hour or so when we noticed the fly by in question.

9  Q.   Okay. And so then at that time -- okay, so I'm trying to get

10 a location here, so you're talking about the shared property fence

11 line that's to the west of the Pena's house?

12 A.   Perhaps.

13 Q.   Okay.

14 A.   So my house is directly west of his property so we shared the

15 entire fence line from the BLM up to the end of the street.

16 Q.   And when you say BLM what do you mean?

17 A.   The Beer Line Management, list of Government land that's out

18 to the north of our properties.

19 Q.   And does the BLM property extend to the east after the

20 subdivision? Is there any part of the BLM that's to the east?

21 A.   Yeah, it runs all the way along I believe the whole -- the

22 whole east all the way up to the mountain range there on the east

23 side.

24 Q.   Okay. And then --

25      MS. TOSCANO: Zoom Host, could you please depict Exhibit A-13

1   that out.  When the aircraft turned, did he turn a right angle, a

2   complete right angle or was it just a slight turn?

3   A.   It was a slight turn, banked to the left and I saw the bottom

4   of his wing.  It wasn't a drastic turn, he wasn't -- he wasn't

5   turning to go back north, he was just, I guess, I don't know,

6   turning.  I'm not a pilot so I don't know what other way except

7   for east he's turning.

8   Q.   Okay.  Okay, and so when the plane left the area did it --

9   from your perspective did the aircraft come close to any of the --

10  not close, but any of the -- was it -- did it come -- did the

11  aircraft come close to the property or the structures of the

12  property that's on the house in the bottom right-hand corner?

13       MR. SCHULTE:  Objection as to the form.

14       JUDGE FUN:  I'll overrule the objection.  I think she's

15  introducing a new topic and the leading is provided to provide the

16  witness to the direction as to what question needs to be answered.

17       Go ahead.

18       MS. TOSCANO:  Okay, thank you, Your Honor.

19       BY MS. TOSCANO:

20  Q.   So Mr. Stanley, once the aircraft passed the Pena's house and

21  made the slight turn and the slight turn was away from the house

22  that's depicted on the bottom right-hand corner, correct, of this

23  Exhibit A-14?

24  A.   Yes.  And if you -- if I can clarify the direction he flew,

25  he flew in the direction of the purple line on this exhibit, A-14.

172

1  Q.   Okay.

2  A.   He flew parallel to the house after he made the turn.

3  Q.   Okay.  And do you know how close the aircraft's path was to

4  the structures of the house?

5  A.   I think his altitude was a little higher just because in the

6  turn he was apparently climbing as well.  Not by much, I would say

7  another 15, 20 feet higher.  It wasn't on a gradual climb, it was

8  just a turn and then he took off and then me and Mr. Pena looked

9  at each other and were like, serious, this guy just did that and

10  then the guy was gone.  So I don't remember where he went after

11  that.

12  Q.   Okay.  And do you recall approximately how close the aircraft

13  path -- the aircraft was to that property?

14       MR. SCHULTE:  Objection, asked and answered.

15       JUDGE FUN:  Overruled.

16       THE WITNESS:  Sorry, did I miss something?  Can I answer the

17  question?

18       JUDGE FUN:  Yes, answer the question, Mr. Stanley.

19       THE WITNESS:  Okay.  Sorry, I didn't see it overruled or hear

20  it.  So as far as the distance from that, the neighbor's house, I

21  would say he was pretty close to the same distance that he was

22  from Mr. Pena's house when he flew by it, maybe a hundred feet, 80

23  feet.

24       BY MS. TOSCANO:

25  Q.   Okay.

A202

1       MS. TOSCANO:  One moment, Your Honor.

2       (Pause)

3       MS. TOSCANO:  Okay, I have no more questions, but I reserve

4  this witness.

5       JUDGE FUN:  Mr. Schulte, do you have cross examination for

6  this witness?

7       MR. SCHULTE:  Very, very brief, Your Honor.

8       And, Madam Host, if you can leave that exhibit up that would

9  be very helpful.

10                         CROSS EXAMINATION

11      BY MR. SCHULTE:

12 Q.   Mr. Stanley, thank you for being here today, I know this is

13 an inconvenience for you, I'll be brief.  Referring back to the

14 exhibit that's on the screen, sir, Administrator's 14, Page 3 of

15 3, observing that pink line, if you're standing on the property

16 looking at the flight path, can we agree that everything to the

17 left side of the pink line is basically scrub brush and desert, is

18 that a fair statement?

19 A.   Aside from Mr. Pena's trees, yes.

20 Q.   There's nothing out there for miles?

21 A.   No, sir, they're small trees, but nothing that would, you

22 know, impede my vision.

23 Q.   All right, thank you.  And I think you also testified if you

24 can confirm that the flight was -- you know, when it went by it

25 was over in seconds, correct?

176

1        MS. TOSCANO:  I said vague; objection, vague.

2        JUDGE FUN:  Yes, I heard that.  Mr. Schulte, response to the

3   objection?

4        MR. SCHULTE:  I just asked if the gentleman's ever been to an

5   airport community.  Perhaps I didn't define that particularly

6   well.

7        JUDGE FUN:  What's the relevance to an airport community?

8        MR. SCHULTE:  I'll withdraw the question, Judge.

9        JUDGE FUN:  All right.

10        BY MR. SCHULTE:

11   Q.   Mr. Stanley, were you -- did you consider yourself to be

12   traumatized by this fly by or did it just bother you?

13   A.   It certainly bothered me.  I -- my wife and children came

14   running out of the house because they heard it and also Mr. Pena's

15   wife and child were disturbed, they came out of the house because

16   they thought the guy was going to crash into his house.

17   Q.   Yeah, but my question was did you, were you traumatized by

18   the event?

19   A.   I was disturbed.  Okay.  I didn't know somebody was allowed

20   to fly that close to home.

21   Q.   And we can agree that the aircraft didn't hit anybody's

22   house, correct?

23   A.   That's correct.

24        MR. SCHULTE:  All right, that's all I have, Your Honor.

25        JUDGE FUN:  Any redirect, Ms. Toscano?

A204

188

1  thing you might have misses would possibly be a hunter that you

2  didn't see?

3  A.   No, I don't recall the conversation, I'm sorry.

4  Q.   Do you recall any part of that conversation when you

5  contacted the Inspector in response to the letter of

6  investigation?

7  A.   I recall Mr. Morgan's disposition, I don't recall the

8  conversation.  I fly regularly like every day so and the area that

9  I primarily fly in is north of here, it's all open public land, so

10 that's part of, you know, pretty regular flight path for me, so

11 that's the only thing that I can think of that I didn't recall the

12 event.

13 Q.   Okay.  So it's possible that's what your answer was to the

14 Inspector?

15 A.   It's possible, but again I don't recall the conversation.

16 Q.   Okay.  And then do you recall going to the FSDO the next day,

17 December 3rd?

18 A.   I do.

19 Q.   And do you recall that you were shown the video of the low

20 flight of your aircraft?

21 A.   Yes, I do.

22 Q.   And you recall that you affirmed that that was your aircraft?

23 A.   Yes, I do.

24 Q.   And you affirmed that you were the pilot-in-command at that

25 time?

A205

189

1   A.   Yes, I do.

2   Q.   And the video showed your aircraft in the proximity of the

3   300 Desert Sun Lane and 400 Desert Sun Lane, correct?

4   A.   Correct.

5   Q.   And it showed your aircraft at less than 100 feet above the

6   ground level, correct?

7        MR. SCHULTE:  Objection.

8        JUDGE FUN:  What's the objection?

9        MR. SCHULTE:  The video speaks for itself although again,

10  it's not in evidence, but the video shows no altitude whatsoever

11  to the extent that it was used as a demonstrative exhibit.  It

12  shows an airplane flying by, that's it.  It shows no altitude

13  whatsoever.

14       JUDGE FUN:  Ms. Toscano?

15       MS. TOSCANO:  Yes, Your Honor.  That wasn't my question.

16  Respondent's already admitted he operated below 100 feet in the

17  vicinity of 300 and 400 Desert Sun Lane so all I'm establishing

18  that at that time that he went to the FSDO and he was shown the

19  video of the aircraft, that he affirmed that was his aircraft, and

20  that he affirmed that he was pilot-in-command.

21       MR. SCHULTE:  We don't dispute that, Judge.  The question was

22  does that video not show that aircraft at less than a hundred feet

23  and the answer to that question is no, it doesn't, it doesn't show

24  that at all.

25       JUDGE FUN:  I agree that was the question.  I'll sustain the

A206

217

1          BY MR. SCHULTE:

2    Q.   And you're familiar with that document?

3    A.   Yes, I am.

4    Q.   And is it of any value to you?

5    A.   Yes.  It's the baseline that I have always used for assessing

6    the quality of feasibility of a landing site.

7    Q.   Okay.  And were you using it as a guide for the operations in

8    question in this case?

9    A.   Yes, I was.

10   Q.   Okay.  We'll come back to that a little later.  Thank you.

11        MR. SCHULTE:  And we'll move Administrator's 22 into

12   evidence, Your Honor.

13        JUDGE FUN:  Any objection?

14        MS. TOSCANO:  No, Your Honor.

15        MR. SCHULTE:  Thank you, Judge.

16        JUDGE FUN:  All right.

17                              (Administrator's Exhibit A-22

18                               received into evidence.)

19        BY MR. SCHULTE:

20   Q.   Mr. Palmer, I think you testified earlier that Mr. Likes had

21   given you permission to land on his property.

22   A.   Yeah, that is correct.

23   Q.   Okay.  Do you know why he gave you permission to land on his

24   property?

25   A.   Both him, as well as his son, fly radio-controlled airplanes.

A207

224

1  District Office, here in Reno, Nevada.

2  Q.   And how long have you been employed with the FAA?

3  A.   I've been employed with the FAA about two and a half years.

4  Q.   Okay.  And what is your current position?

5  A.   My current position is principal operations inspector and

6  aviation safety inspector here at the Reno FSDO.

7  Q.   Okay.  And what do your duties generally include as principal

8  operations inspector and an aviation safety inspector?

9  A.   So my typical duties include managing certificates for both

10  organizations and airmen, and then also investing aircraft

11  accidents and taking complaints from the general public about

12  matters that involve aviation.

13  Q.   Okay.  And could you provide us a summary of your prior

14  aviation experience before joining the FAA?

15  A.   So prior to my joining the FAA, I was a career military

16  aviator.  I flew T-34 turbo mentor aircraft at naval flight

17  school, then flew C --

18       (Audio interference)

19  A.   -- 3 echo helicopters for the United States Marine Corps.

20  And then finally, I transitioned to flying the M-865 Dolphin for

21  the U.S. Coast Guard.

22  Q.   And approximately how much -- how many -- how much time did

23  that encompass?

24  A.   So I have approximately 4,500 hours, most in rotary wing.  I

25  have about 120 hours in fixed wing aircraft.

A208

225

1  Q.    Okay.  And so my question -- and I wasn't very clear, for how

2  long were you in the military as an aviator?

3  A.    I'm sorry.  I was in the military as an aviator for

4  approximately 20 years.

5  Q.    Okay.  And so what airmen certificates do you hold?

6  A.    So my current airmen certificates I hold include airline

7  transport pilot for rotorcraft helicopter, and I'm a commercial

8  pilot for airplane, single engine land, and instrument airplane.

9  I'm also a certificated flight instructor for rotorcraft

10 helicopter and instrument helicopter.  I also hold a remote pilot

11 certificate.

12 Q.    Okay.  And were you still employed as an aviation safety

13 inspector, principal operations inspector on November the 24th,

14 2019?

15 A.    Correct.  I was.  I had not yet been promoted to principal

16 operations inspector at that point.

17 Q.    Okay.  And what prompted the Reno FSDO investigation of the

18 respondent's operation on November 24th of '19?

19 A.    I'm sorry.  You broke up there.  Could you repeat the

20 question, please, Ms. Toscano?

21 Q.    Yes.  Yes.  Did the Reno FSDO -- did your office receive a

22 complaint of a low flying aircraft that occurred on November 24th,

23 2019?

24 A.    Yes, ma'am.  We did.

25 Q.    And did your management assign investigators to conduct an

A209

226

1  investigation?

2  A.    Yes, they did.  I was asked to provide assistance to

3  Inspector Don Morgan in the conduct of his investigation.

4  Q.    And is -- my understanding is Don Morgan is now retired?

5  A.    That is correct.

6  Q.    Okay.  And do you know what prompted the investigation and

7  the appointment of Inspector Morgan and you to assist in the

8  investigation?

9  A.    So what prompted us to begin the investigation was a video we

10 received in our general e-mail inbox of a low flying aircraft in

11 the North Valley areas here around Reno.

12 Q.    Okay.  And so in assisting Inspector Morgan, did you conduct

13 interviews of the complaining witnesses?

14 A.    I did.

15 Q.    And who did you interview?

16 A.    We interviewed the complainants, Mr. and Mrs. Pena.  We also

17 interviewed Mr. Stanley.  And attempted to interview Mr. Likes.

18 Q.    Okay.  And did you interview the respondent?

19 A.    We did.

20 Q.    Okay.

21      MS. TOSCANO:  Ms. Jefferson, please pull exhibit --

22 Administrator's Exhibit A-17.

23      BY MS. TOSCANO:

24 Q.    So, Inspector Green, I'm showing Exhibit A-17, page 1 of 18.

25 Can you identify this page 1 photograph?

A210

227

1   A.   Yes, ma'am.  That is the Likes' residence -- or correction,

2   that is the Pena's residence, with Mr. Pena and Mr. Morgan there

3   in front of the garage.

4                                   (Administrator's Exhibit A-17

5                                   marked for identification.)

6        BY MS. TOSCANO:

7   Q.   Okay.  And so were you present at the time?

8   A.   Yes, I was.  I am the one who took this picture.

9   Q.   Okay.  And what significance, if any, is depicted in this

10  photograph for purposes of your investigation?

11  A.   So for the purposes of the investigation, the reason we took

12  this photograph was to identify the location of the video camera

13  that was used to see the aircraft as it flew past the house.  That

14  camera is located in the peak of the roof there, and also to give

15  a sense of scale as to how big the driveway is.  Because from this

16  point, many measurements were taken from the center of the garage

17  -- where the garage meets the driveway in this picture.  In the

18  vicinity of the black covered object there.

19  Q.   Okay.  And so -- and why was the garage floor or -- okay.  So

20  my understanding is was the garage door or the garage camera the

21  center of all of the measurements that were taken?

22  A.   Correct.  So we extended a line -- in our mind, we extended a

23  line down from the center of the peak of the roof, to where the

24  garage meets the driveway.  We used that as a kind of reference

25  point for all of the measurements we would take as part of the

A211

228

1   investigation.

2   Q.    Okay.

3       MS. TOSCANO:  Ms. Jefferson, we go to page 3.

4       BY MS. TOSCANO:

5   Q.    Inspector Green, can you identify this photo, which is page 3

6   of 18 of Exhibit A-17?

7   A.    Yes, ma'am.  This is a picture taken of Inspector Morgan.

8   You can see him out in the middle of the picture, beyond the

9   stable that is just to the left of the picture here.

10  Q.    Okay.

11      MS. TOSCANO:  Ms. Jefferson, can you, using your mouse,

12  follow the measuring tape to the area where Inspector Green just

13  testified?

14      BY MS. TOSCANO:

15  Q.    So, Inspector Green, is that where Inspector Morgan is

16  standing?

17  A.    No, ma'am.  A little further up.  Correct.  Right there is

18  where Inspector Morgan is standing.

19  Q.    Okay.  And what else is depicted in this photo?

20  A.    So also in this photo is a -- the propane tank.  There is an

21  olive, drab, tannish propane tank just in front of where the shed

22  in the middle of the picture is.  And then also you can see the

23  mountains and the Pena's neighbor beyond where Mr. Morgan is in

24  the picture.  Also helps kind of give a sense of the environments

25  that the occurrence took place in with the desert scrub, and the

A212

229

1  mountains, and so on.

2  Q.   Okay.  And so those mountains, is that a particular mountain

3  range?  Is there a name?

4  A.   I'm sure it has one, but I don't recall right now what the

5  name of that mountain range is.

6  Q.   Okay.  And what was the significance, if any, for having Mr.

7  -- Inspector Morgan at that distance?

8  A.   So the reason Inspector Morgan is out there in the middle of

9  the picture was to give a sense of scale as to how far away 300

10 feet would be from the center of the driveway.  And I believe

11 that's page 5 of this exhibit, but I can't be sure.  But I see

12 we'll be getting to that here next if I'm not mistaken,

13 Ms. Toscano.

14 Q.   Okay.

15      MR. SCHULTE:  Your Honor, just to clarify.  Forgive me,

16 Ms. Toscano.  With respect to page 4 of 18 of Exhibit A-17, can we

17 agree that Mr. Morgan is not in this picture?

18      MS. TOSCANO:  We're looking at -- I'm sorry, Your Honor.

19      JUDGE FUN:  I think we're talking about page 3 of 18.

20      MR. SCHULTE:  Okay.  What's up on the screen is page 3 of 18.

21 Okay.  Forgive me.

22      JUDGE FUN:  Yes.

23      MR. SCHULTE:  Can we agree that Inspector Morgan is not in

24 this picture?

25      JUDGE FUN:  Hang on, Mr. Schulte.  You'll get a chance to

A213

230

1   cross-examine Inspector Green when the time comes.  So,

2   Ms. Toscano, please proceed.

3       MR. SCHULTE:  Forgive me, Your Honor.

4       BY MS. TOSCANO:

5   Q.   So before we move to the next picture, Inspector Green, so

6   Inspector Morgan is in the picture in page 3 of 18 of Exhibit A-

7   17, correct?

8   A.   Inspector Morgan is in this picture.

9   Q.   I'm sorry.  You broke up.

10  A.   Yes.  Inspector Morgan is in this picture.

11  Q.   And you indicated that he's in this picture, and that the

12  mouse arrow is directly on Mr. Morgan; is that correct?

13  A.   That is correct.  If I may ask a question, is it possible to

14  zoom in on this picture to better identify Mr. Morgan -- Inspector

15  Morgan?

16  Q.   Okay.  And --

17      JUDGE FUN:  Let the record reflect -- hang on, Ms. Toscano.

18  Let the record reflect that the hearing monitor, Ms. Stustak, has

19  zoomed in on that photograph.  A little bit closer.  All right.

20  We've zoomed in on that photograph now.  All right.  Go ahead,

21  Ms. Toscano.

22      MS. TOSCANO:  Okay.  Thank you, Your Honor.

23      BY MS. TOSCANO:

24  Q.   So, Inspector Green, now that the photo has been zoomed in

25  closer, can you please point out where Inspector Morgan is in the

A214

231

1   photo?

2   A.   Yes, ma'am.  Ms. Pena, if you could bring your mouse pointer

3   down.  Good.  That's excellent.  And a little bit to the left, and

4   now up.  There -- right about there.  That's Inspector Morgan.

5   Approximately 300 feet from the center of the garage.

6   Q.   Okay.

7        MS. TOSCANO:  And, Ms. Jefferson, would you turn to page 5 of

8   the exhibit?

9        JUDGE FUN:  No, before -- hang on.  Before we do that,

10  though, let me just clear the record here.  So let the record

11  reflect that the witness is depicting what appears to be a person

12  standing roughly in the middle of the photograph, midway between

13  the shed/propane tank and a residence to the far back end of the

14  photograph, near the mountains.  And the individual appears to be

15  wearing some sort of white clothing.  Is that accurate,

16  Ms. Toscano and Mr. Schulte?

17       MR. SCHULTE:  Yes, Your Honor.

18       MS. TOSCANO:  And, Your Honor, I just have a -- I have a

19  follow-up question on that.

20       BY MS. TOSCANO:

21  Q.   Inspector Green, what direction is depicted as we look

22  towards the mountains in this photo?

23  A.   As we look towards the mountains in this photo, we're facing

24  east.  Maybe a little east southeast.

25       MS. TOSCANO:  And, Ms. Jefferson, please go to page 5 of this

A215

1    exhibit.

2        BY MS. TOSCANO:

3    Q.    So, Inspector Green, can you identify this photograph, which

4    is Exhibit A-17 at page 5 of 18?

5    A.    Yes, ma'am.  This is the picture of the tape measure,

6    measuring the distance to where Inspector Morgan is in the

7    previous picture.

8    Q.    And so -- and what does the tape measure indicate?

9    A.    The tape measure indicates approximately 300 feet, 300 feet

10   and 4 inches to be precise, but for rounding purposes, 300 feet.

11   Q.    Okay.  And what was the starting point for the measurement?

12   A.    The starting point for this measurement is from the center of

13   the garage to where Inspector Morgan is located in the previous

14   picture.

15   Q.    Okay.

16        MS. TOSCANO:  Ms. Jefferson, could you please turn to page 7?

17        BY MS. TOSCANO:

18   Q.    Inspector Green, can you identify this photograph?

19   A.    Yes, ma'am.

20   Q.    And how can you identify this?

21   A.    So this is a picture taken of Inspector Morgan standing next

22   to the propane tank that is east of the driveway.

23   Q.    Okay.

24        MS. TOSCANO:  Ms. Jefferson, can you turn to page 9 of 18?

25        BY MS. TOSCANO:

A216

233

1  Q.   And, Inspector Green, what is this -- what is depicted in

2  this photograph?

3  A.   So this picture shows the distance from the center of the

4  driveway to where Inspector Morgan is standing in the previous

5  picture, a little over 56 feet.

6  Q.   Okay.

7       MS. TOSCANO:  Ms. Jefferson, can we go back, please, to page

8  7?

9       BY MS. TOSCANO:

10  Q.   Inspector Green, what is the significance, if any, for the

11  measurement that was taken from the center of the garage to the

12  propane tank?

13  A.   So the significance of this measurement was to show the

14  proximity of the propane tank to where we were standing in the

15  driveway, and therefore, the structure of the house.

16  Q.   Okay.

17       MS. TOSCANO:  Ms. Jefferson, can you turn to page 11?  For

18  the record, we're at Exhibit A-17, page 11 of 18.

19       BY MS. TOSCANO:

20  Q.   Inspector Morgan [sic], can you identify this photograph?

21  A.   So this photograph depicts Inspector Morgan standing near the

22  edge of the paddock, it is escaping me right now, the fenced in

23  area there, next to the stable, and just beyond the house there.

24  Q.   Okay.  Is the stable the building that's to the left of

25  Inspector Morgan?

A217

234

1  A.   The stable is the brown structure that has the brown roof on
2  the right side of the photograph.
3  Q.   Okay.  So just to be clear -- okay, so there are -- can you
4  identify the structures?  That would be helpful.
5  A.   Absolutely.  So in this picture, you have the edge of the
6  garage on the left side.  And then just beyond that is the tree,
7  and then down -- moving from left to right, across the picture,
8  you have Inspector Morgan down by the fence.  You have the propane
9  tank that is olive, drab, kind of tan colorish.  And then on the
10  other side of that propane tank is the stable.  Sitting above that
11  stable is the neighbors of the Penas to the east.
12  Q.   Okay.  Thank you.
13       MS. TOSCANO:  Ms. Jefferson, can you turn to page 13 of 18 of
14  this Exhibit A-17?
15       BY MS. TOSCANO:
16  Q.   Inspector Green, what is the significance of -- if any, with
17  respect to what is depicted in this photograph?
18  A.   So in this photograph, it's a picture of the measurements
19  from the center of the garage to where Inspector Morgan is
20  standing in the previous picture.
21  Q.   And what is the measurement that was taken?  Or that's shown
22  or depicted on this photograph?
23  A.   It's approximately 78 feet.  Just a little bit over.
24  Q.   So that's 78 feet from the center of the garage to the
25  stable.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A218

235

1  A.    Correct.  To where Inspector Morgan is standing in the

2  previous picture.

3  Q.    Okay.

4      MS. TOSCANO:  Ms. Jefferson, please display page 15 of

5  Exhibit A-17.  For purposes of the record, we are exhibiting

6  Exhibit A-17 at page 15 of 18.

7      BY MS. TOSCANO:

8  Q.    Inspector Green can you identify this photograph?

9  A.    Yes, ma'am.

10  Q.    Okay.  And how can you identify this photograph?

11  A.    So this is a photograph facing south at the center of the

12  garage towards the residence of Mr. Likes.  And in this photograph

13  you can see a figure in the middle of the frame.  And that

14  represents where the fence line, the property line is between the

15  Penas' house and the Likes' house.

16  Q.    Okay.  And are there any structures that -- besides

17  Mr. Likes' house, is there any other structures depicted in this

18  photo?

19  A.    So within this photo, you will have Mr. Likes' house, as you

20  already stated.  We also have a split rail fence that forms an

21  island in the Penas' driveway, and that's on the right side of

22  your photograph.  Mr. Pena is standing at the fence line.  They

23  have a fence that separates the two properties.  Then you also

24  have some fence structures on the other side of that fence line,

25  on the Likes' property.

A219

236

1      Also, if you look between the trees on the island, on the

2    right, you'll see powerline poles.  And then farther beyond the

3    Likes' residence, you have neighbors that are further to the south

4    there in the picture.  They have snow covered roofs.

5    Q.   Okay.  And the -- looking at the photograph, it appears that

6    the elevation -- there's a change in elevation just to the east of

7    the person standing at the end of the tape measure.  Is that an

8    elevation?

9    A.   Yes.  That's an accurate assessment.  There is a change in

10   elevation.  The elevation -- correction.  The terrain rises on

11   Mr. Likes' property.  So there's a little bit of a hill going up

12   on the left side of your picture, the east side of your picture.

13   Q.   Okay.

14       MS. TOSCANO:  Ms. Jefferson, would you please turn to page

15   17?  For the record, we're displaying Exhibit A-17, at page 17.

16       BY MS. TOSCANO:

17   Q.   Inspector Morgan [sic], can you identify this photograph?

18   A.   So this photograph shows the distance from the center of the

19   garage to where Mr. Pena is standing in the previous picture.

20   Q.   Okay.  And what is the significance, if any, with respect to

21   the distance that's displayed on this tape measure on this

22   photograph?

23   A.   So the distance shows on the tape measure is 226 feet, and

24   approximately 6 inches.  So approximately 226 feet.  And this is

25   from the center of the garage to the fence line, where Mr. Pena is

A220

237

1    standing in the previous picture.

2    Q.    Okay.

3         MS. TOSCANO:  Ms. Jefferson, can we go back to page 15?

4         BY MS. TOSCANO:

5    Q.    And, Inspector Green, during the FAA's investigation, did

6    either you or Inspector Morgan estimate or measure the distance

7    between the fence line, the shared property fence line that runs

8    east and west between the Penas' home and the Likes' home, which

9    is displayed on this page 15, did either one of you measure the

10   distance between that fence line to, let's say Mr. Likes' house?

11   A.    Let me make sure I understand the question.

12   Q.    Okay.

13   A.    Did we -- did Inspector Morgan or I measure the distance from

14   the property fence line to Mr. Likes' house?  Is that the question

15   you're asking, ma'am?

16   Q.    Correct.

17   A.    We did not.

18   Q.    Okay.  And did you estimate, either you or Inspector Morgan

19   estimate the distance?

20   A.    I understand the question.  I'm trying to recall.  I can't

21   recall right now if we did or not.

22   Q.    Okay.  And as part of your distance measuring, did you

23   measure the distance between the center of the garage to the edge

24   of the garage?

25   A.    We did.

A221

238

1   Q.   Okay.

2        MS. TOSCANO:  So, Ms. Jefferson, can we please go to page 1

3   of 18?

4        BY MS. TOSCANO:

5   Q.   And what was your measurement from the center of the garage

6   to -- when you say to the edge of the garage, or when I said to

7   the edge of the garage, could you point that out in looking at --

8   describe that in looking at this photograph that's on page 1?

9   A.   Yes, ma'am.  It is the distance we measured to the edge of

10  the garage is where the white gutter is on the right side of the

11  house.

12  Q.   Okay.  And what was your -- what was the results of your

13  measurement?

14  A.   Is there an exhibit with my statement with the measurements

15  available?

16  Q.   Would that help you to refresh your reflection?

17  A.   It would help refresh my recollection.  Yes, ma'am.

18       MS. TOSCANO:  Ms. Jefferson, can we pull up Exhibit A-25?

19                              (Administrator's Exhibit A-25

20                              marked for identification.)

21       BY MS. TOSCANO:

22  Q.   Okay.  So, Inspector Green, take a moment to take a look at

23  that.

24  A.   I'm good.  Thank you.

25  Q.   Okay.

A222

239

1      MS. TOSCANO:  So, Ms. Jefferson, can we go back to Exhibit A-

2  17, at page 1?

3      BY MS. TOSCANO:

4  Q.   Okay.  So, Inspector Green, what was the distance measured

5  from the center of the Penas' garage to the eastern edge of the

6  house at the white gutter?

7  A.   That distance is 15 feet.  15.

8  Q.   Okay.

9  A.   Yes, ma'am.

10  Q.   Okay.

11      MS. TOSCANO:  Ms. Jefferson, could we scroll down a couple

12  pages?  I need to find a particular photograph.  I don't recall

13  which page it's at.  Okay.  Keep going.  Okay.  That's good.  Page

14  7, please.

15      BY MS. TOSCANO:

16  Q.   And so, Inspector Green, you testified that the distance

17  measured that's depicted on page 7 of 18 of this exhibit was from

18  the center of the garage to the propane tank, and it was 78 feet.

19  And why is it that you measured again the -- is there a

20  significance to measuring the propane tank, other than knowing the

21  distance between the house and the propane tank?

22  A.   Was the distance to the propane tank 78 feet?  I thought it

23  was closer -- it should be on page 9 of this exhibit.

24      MS. TOSCANO:  Ms. Jefferson, can we go to page 9?  That's

25  correct.

A223

240

1        BY MS. TOSCANO:

2    Q.   So the distance between the center of the garage to the

3    propane tank was 56 feet.

4    A.   Yes, ma'am.

5    Q.   Okay.  So then the distance from the edge of the house to the

6    propane tank would be 56 minus 15?

7    A.   Correct.

8    Q.   Okay.  Okay.

9        MS. TOSCANO:  And then, Ms. Jefferson, can you scroll down?

10   Okay.  That's good.

11       BY MS. TOSCANO:

12   Q.   And, Inspector Green, what was the significance, if any, for

13   you and Mr. Morgan to measure the distance depicted in this

14   photograph, which is page 11 of 18?

15   A.   So this picture depicts 78 feet from center line of the

16   driveway to where Inspector Morgan is standing.  And this is

17   representative of where we believe the respondent's flight path

18   was.

19   Q.   Okay.  And again, the 78 feet is a distance measured from the

20   center of the garage?

21   A.   Yes, ma'am.

22   Q.   And so the actual distance -- measured distance from the edge

23   of the house at the white gutter that's shown in this picture

24   would be 78 minus 15?

25   A.   Correct.

A224

241

1  Q.   Okay.  And you testified that that was approximately the

2  respondent's flight path?

3  A.   That's what we believe the approximate flight path to be.

4  Yes, ma'am.

5  Q.   And what was that belief based on?

6  A.   So we believe that to be the center line, based on the video

7  we received here at the FSDO as part of the initial complaint.

8  Q.   Okay.  And anything else that you relied upon in considering

9  and concluding that this was the approximate lateral distance from

10  the house?

11  A.   So we based that off of the known size of the aircraft, and

12  its size in the frame in relation to the ground, and the height at

13  which the garage camera, or the camera at the peak of the garage

14  is located, 20 feet above the ground.

15  Q.   Okay.  And did you consider any of the information that you

16  received from any of the witnesses after interviewing the

17  witnesses?

18  A.   We did.

19  Q.   And can you explain?

20  A.   Absolutely.  So as part of the interview process, we

21  interviewed Mr. Pena, Mrs. Pena, Mr. Stanley, and those were the

22  interviewees we were able to get statements from.  And based on

23  their description of the events, we were able to figure out that

24  the respondent was flying from the northeast of the Pena's

25  residence and then at some point, they lost sight of him, and then

A225

1  he -- the respondent reappears in the video, flying over the

2  Penas' property and towards the Likes' residence.

3  Q.   Okay.

4      MS. TOSCANO:  Your Honor, at this time, I offer the entirety

5  of Exhibit A-17.

6      JUDGE FUN:  Is there -- Mr. Schulte?

7      MR. SCHULTE:  I don't know if we have covered all of the

8  entirety of A-17 in testimony.  I will certainly not object to the

9  pictures that were offered and discussed.  But to the extent of

10 anything that's in there that hasn't been discussed in testimony,

11 I would object to.

12     JUDGE FUN:  So it did appear, based upon looking at A-17 is

13 18 pages.  And we've discussed the photographs in the exhibit.

14 And Mr. Schulte is correct, there has been no discussion of the

15 other documents that we have not seen.  There's been no witness to

16 testify to those.

17     So I will admit the photograph, because there's no objection

18 to those.  And I have those found at page 5, 9, 13, and page 17.

19 I note that pages 1, 3, 7, 11, and 15 were previously admitted.

20     MS. TOSCANO:  Thank you, Your Honor.

21     JUDGE FUN:  All right.  Was that correct, Mr. Schulte, in

22 terms of the photographs?

23     MR. SCHULTE:  Yes, Your Honor.

24     JUDGE FUN:  All right.  Those photographs are so admitted.

25                          (Administrator's Exhibit A-17, in

A226

246

1  Q.  Yes.  Yes.

2  A.  Yes.  He is not beyond the building with the brown roof.

3  Q.  He's not further east?

4  A.  He's not further east.  Correct.

5  Q.  Okay.  Okay.

6  A.  Sorry for the confusion there.

7      MS. TOSCANO:  Ms. Jefferson, can you pull Exhibit A-18?

8      Ms. Jefferson, can we maybe scroll it down so it's more in

9  the -- the picture is more in the center?  If that's possible.

10 Okay.  Thank you.

11     For purposes of the record, we are now displaying Exhibit A-

12 18, page 1 of 1.

13     BY MS. TOSCANO:

14 Q.  Inspector Green, can you identify this?

15 A.  I can.

16 Q.  Okay.  Could you speak up?

17 A.  I'm sorry.  Yes, I can.

18 Q.  And how can you identify it?

19 A.  So this pdf slide was a product I developed using Google

20 Earth and PowerPoint.  I used this as the basis for ascertaining

21 where the approximate 500-foot lateral limit would be for where we

22 suspect flight path of the respondent's aircraft to have been,

23 based on statements and the video we were provided.

24                              (Administrator's Exhibit A-18

25                              marked for identification.)

A227

248

1  The blue X indicates the approximate location of where Mr. Pena

2  and his daughter were standing, talking with Mr. Stanley at the

3  time the respondent flew past the property.

4  Q.   Okay.  And then the red box?

5  A.   Yes.  The red box shows the approximate location of where

6  Mrs. Pena and her son were when the respondent flew past the

7  property.

8  Q.   Okay.  And what does -- okay, so what does the pink like --

9  the single pink line represent?

10  A.   Okay.  So the single pink line represents the approximate

11  flight path of the respondent that we ascertained between the

12  statements and the video.  So as part of that pink line, because

13  of some discussions within the statements, the pink line north of

14  the stable and the garage might be off, but we know that the

15  respondent was coming from north to south.

16      So from the garage south, that is where the video picks up,

17  and that is a fairly accurate representation of where the aircraft

18  was.

19  Q.   So what I'm understanding you to say is that the pink line at

20  the edge of the garage, not the cement pad, but the garage --

21  where the garage would be at the house, that if you were to cut a

22  straight line across to the east from that area, that the pink

23  line going north from that position is -- you're saying it's not

24  an estimate, or a rough estimate, or perhaps, you know, if you

25  could explain that better.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A228

249

1  A.    Sure.  So it -- based on the statement received from Mr. Pena

2  and Mr. Stanley, this is a rough estimation of where the flight

3  path was, knowing that within Mr. Pena's statements, the

4  respondent's aircraft flew near the stable, or the shed and the

5  propane tank.  But as far as the accuracy of the pink line prior

6  to the stable and the propane tank, we could be off.  We know that

7  the respondent was in a left bank when he was flying past, based

8  on the video.  So we know there's going to be a left bank

9  involved.  But as far as what direction and the heading he was

10  inbound on, we can't be sure of.

11  Q.    Okay.  So other than the video, did any of the statements

12  from any of the three eye witnesses mention a left bank?

13  A.    No, ma'am.  Not to my knowledge.

14  Q.    Okay.  All right.  And what is the significance, if any, of

15  the yellow line that appears to be running from east to west or

16  west to east?

17  A.    So the yellow line, the Google Earth has a ruler tool.  And I

18  used that in Google Earth to establish where that approximate 500-

19  foot measurement would be from the approximate flight path of the

20  respondent's aircraft.  There is a ruler box there on the

21  photograph, and that map length in the ruler box, 499.36 feet,

22  that's approximately 500 feet.  So that was the basis for the

23  measurement, and the 500-foot west lateral limit that followed.

24  Q.    Okay.  And then what are the multiple red lines that are also

25  running from west to east and east to west?

A229

256

1   Q.    I think that might have gotten that in some trouble had I

2   tried to do that when I was in.  So I appreciate the

3   clarification.  But you are familiar with Google Earth as a tool,

4   correct?

5   A.    Correct.  Yes, sir.

6   Q.    And would you agree with me that Google Earth images are not

7   updated on a regular basis, correct?

8   A.    Correct.

9   Q.    Right.  In fact, on any given image, it could be literally

10  years between an update of an image; do you agree?

11  A.    I agree.

12  Q.    Thank you.  You -- while we have this exhibit up on the

13  screen, and you can leave it that, Ms. Stustak.  We are looking at

14  -- well, in any event, you created this document, correct?

15  A.    I did.

16  Q.    Okay.  And can we agree that running along that pink line,

17  and we're looking at a photograph to the left -- I'm sorry, to the

18  right, or if you are actually standing on the ground and looking

19  at the alleged flight path, everything to the left of the property

20  is basically desert scrub, right?

21  A.    It is.

22  Q.    Okay.  Thank you.  You also testified that in conducting your

23  investigation, you spoke to Mr. and Mrs. Pena, and Mr. Stanley,

24  and I believe there was one other person.  I might have missed

25  their -- Pena, Stanley -- but you also spoke to my client, too,

A230

266

1  Q.   What I'm trying to ascertain, Mr. Green, and this is not

2  directed at you, you, as I understand your testimony, took a

3  native video, put it on an SD card.  That video was obtained from

4  the Penas' computer.  You took that SD card back to the FAA,

5  uploaded that video somewhere, and beyond that, have you seen it

6  again?

7  A.   So I have to -- I don't recall if I uploaded the native video

8  or the video taken by the iPhone of the video; if that makes

9  sense.

10  Q.   It does.  So what you're telling me is whatever you brought

11  back to the FAA, you don't know whether it was the native video or

12  the video of the video; fair statement?

13  A.   Yes, sir.  That's fair.

14  Q.   Okay.  Are you aware -- and I think we've already covered

15  this, and if we have, I apologize.  Are you personally aware of

16  any thumb drives or CDs containing videos of the incident that

17  we're talking about here today?

18  A.   I am not.

19  Q.   Okay.

20      MR. SCHULTE:  Court's indulgence, Your Honor.

21      JUDGE FUN:  Take your time.

22      (Pause)

23      MR. SCHULTE:  Your Honor, I'm going to attempt to screen

24  share to show the witness something.  May I do so now?

25      JUDGE FUN:  Yeah.  What's the purpose of showing the witness

A231

276

1  the video is important to that aspect of deciding whether or not

2  those opinions are credible, or how much weight they should be

3  given based upon them.

4      As I mentioned it there has been a lot of different testimony

5  about the videos, and I agreed that this appears to be the first

6  time there's been indications that the video was e-mailed to the

7  FSDO, as Mr. Pena had testified that he believed that he

8  downloaded it to a CD and/or a USB.  I seem to recall him saying

9  he did it to both the USB as well as a CD, and he provided that to

10  the FAA.

11      So I've got concerns about, again, where that original video

12  is.  Now, outside of that, the primary issue that Mr. Schulte is

13  seeking, which is the admission of Exhibit R-6.  Now, I agree that

14  it does have some relevancy, however, as to this witness, this

15  witness, specifically Mr. Green, testified that he was not

16  involved in that investigation report.  He was not part of that --

17  those events.  That that is Mr. Morgan's report that he signed

18  that -- and Mr. Morgan is now retired.

19      Therefore, it's not an impeaching statement of Mr. Green.

20  Now, it might be -- impeachment of the FAA in general, but that is

21  not the issue that's before me.

22      Additionally, I would find that Exhibit R-6, even if it does

23  have impeachment or inconsistent statement value, that it falls

24  within the collateral evidence rule.  And that is if there is

25  collateral evidence of an inconsistent statement or impeachment

A232

282

1  A.    Correct.

2  Q.    Okay.

3      MS. TOSCANO:  I have no further questions, but I reserve the

4  witness.

5      JUDGE FUN:  All right.  Inspector Green, I have a few

6  questions for you just to clarify some of your testimony.

7      You discussed taking some of these measurements at the Penas'

8  property, and that was on December the 19th of 2019.  You looked

9  at a lot of these photographs, showing the various distances, as

10  well as the tape measures that were photographed.  And what I want

11  to ask you is in one photograph, you showed a distance to

12  Mr. Morgan 300 feet and 6 inches, with a starting point of the

13  center line of the garage to Mr. Morgan, which you estimated that

14  as being the distance of the flight path of the aircraft from the

15  center line of the garage with the camera.

16      How do you know to go out 300 feet to take that photograph?

17      THE WITNESS:  So, Your Honor, the 300-foot picture with

18  Inspector Morgan was intended to show a sense of scale.  Where we

19  believed the Respondent's flight path to be was actually much

20  closer than that.  And that was the 78 foot -- approximate 78-foot

21  picture that was shown later on in the exhibit.

22      JUDGE FUN:  So why was the 300-foot distance selected, or was

23  it just a random selection just for scale?

24      THE WITNESS:  I hear you.  I understand the question.  I'm

25  trying to recall -- I think we used 300 feet just as a sense of

A233

283

1   scale.  There was no landmark out there, or any other reason we

2   would have picked it.  The only thing I can think of is we may not

3   have been able to get out to 500 feet to show where 500-foot would

4   have been.  But I can't recall specifically.

5        JUDGE FUN:  I guess the tape that you were using, do you know

6   whether or not it was a 500-foot or a shorter limit to how far the

7   tape would measure?

8        THE WITNESS:  I don't recall.  I know we have it here at the

9   office.  I can get that information for you, if you like.

10        JUDGE FUN:  No.  It's not that critical.  I was just curious

11   if you knew off the top of your head.  All right.

12        The other question I wanted to ask was, I mean, these are

13   measuring -- I understand it's difficult to measure vertical

14   distances in the open space, without some reference points.  But

15   these are vertical distances -- or I guess they're horizontal

16   distances, and not vertical distances.

17        Were you able to determine a vertical distance or an

18   altitude, or a height based upon these measurements?  Were you

19   grading calculations with that regard?

20        THE WITNESS:  So as far as vertical distance goes, the height

21   of the aircraft above the ground.  The videos were our basis for

22   approximating the altitude of the aircraft.  Knowing the

23   approximate dimensions of the aircraft, as it's in a sharp left

24   bank, which gives us almost a full expanse of the wingspan.

25        JUDGE FUN:  Do you recall the length of the wingspan of the

A234

285

1  question, and I don't think we ever discussed the potential of

2  using a range finder to obtain further measurements.

3      JUDGE FUN:  Okay.  So I assume no range finder would have

4  been used for that purpose.

5      THE WITNESS:  Correct.

6      JUDGE FUN:  All right.  Now, we have a lot of testimony

7  about the videos, and I want to make sure I understand clearly in

8  my mind the videos we're talking about.  Now, if I understand your

9  testimony correctly, there were essentially I guess two videos,

10  one showing the back -- well, one video that was taken from the

11  back peak of the garage camera, and one video of the front door

12  camera.

13      THE WITNESS:  That's correct, Your Honor.

14      JUDGE FUN:  On those two cameras, did you view or see or look

15  at any other video cameras around the property area?  Or were

16  those the only two camera videos that you saw?

17      THE WITNESS:  Those were the only two camera recordings I

18  saw, Your Honor.

19      JUDGE FUN:  Okay.  Now, for each of those, and I'll just --

20  just for this -- this state, we'll just talk about the garage peak

21  video for now.  Now, for that particular video, is my

22  understanding correct that there are essentially two separate

23  videos from the garage peak?  One being the actual original native

24  video that was captured on the security camera system; and then

25  another one that was e-mailed or provided to the FAA from a cell

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A235

286

1  phone or an iPhone?

2      THE WITNESS:  I hear you, Your Honor.  Yes.  There is --

3  there was the video that was e-mailed to the FAA, and there would

4  have been a separate native video that I don't know for sure why

5  that native video is not used in the first place.

6      JUDGE FUN:  But I assume that in preparation for this case,

7  you had an opportunity to review the administrator's exhibits,

8  which included the garage peak video and the front door video?

9      THE WITNESS:  Yes, Your Honor.

10      JUDGE FUN:  When you viewed those videos, it sounds to me

11  that that was not the native or the original video.  It was the

12  iPhone video that was taken.

13      THE WITNESS:  That is correct, Your Honor.

14      JUDGE FUN:  All right.  When you went to the Penas' residence

15  and obtained -- let me back up.  Let me ask -- go into that

16  question which is based on your testimony, it sounds to me that

17  you were the one who actually plugged in the FAA camera with the

18  USB port into the computer to download the videos; or did someone

19  else do that?

20      THE WITNESS:  From what I recall, Your Honor, I was the one

21  who plugged my camera in to the Penas' computer to download those

22  files.

23      JUDGE FUN:  Where was the Penas' computer located when you

24  did that?

25      THE WITNESS:  The Penas' computer is located in I'll call it

A236

287

1    the front living area.  It has a window that opens up to the front

2    of the house.  I recall that from our visit to the Penas' house.

3        JUDGE FUN:  All right.  Do you recall ever going into the

4    attic to download any videos or view any videos?

5        THE WITNESS:  I don't recall going into an attic at all.

6        JUDGE FUN:  Do you recall knowing about or the Penas talking

7    about that their security camera, or their DVR for the security

8    camera was located in the attic of the house?

9        THE WITNESS:  I don't recall that at all, actually.

10        JUDGE FUN:  All right.  The video that you downloaded onto

11    your FAA camera from the Penas' computer in the front room of the

12    house, after you downloaded them, did you have an opportunity to

13    review those videos again?

14        THE WITNESS:  Yes, Your Honor.  I reviewed those videos and

15    pictures, as I was uploading them to the FAA computer here in the

16    office.

17        JUDGE FUN:  Do you recall, when you were viewing those

18    videos, if they were the native videos or if they were the iPhone

19    videos of a computer screen?

20        THE WITNESS:  From what I recall, Your Honor, I believe they

21    were the videos taken by the iPhone from the computer that I

22    downloaded them from.

23        JUDGE FUN:  Do you recall the length of the videos?  Do you

24    recall if they were a couple of seconds, several seconds, minutes,

25    hours, or a full day?

A237

288

1       THE WITNESS:  From what I recall, Your Honor, the videos were

2  anywhere from three to ten seconds in length.  They were very

3  short videos.  Very short snippets.

4       JUDGE FUN:  Okay.  So when you downloaded those, they were

5  snippets that were already on the computer, as opposed to seeing

6  the actual security video footage that was recorded on that DVR.

7       THE WITNESS:  That is correct, Your Honor.

8       JUDGE FUN:  Okay.  Once you transferred those computer images

9  and videos to your FAA camera, what do you do to the memory banks

10  on that FAA camera?  Did you maintain them or did you erase them

11  once they were downloaded to the computer at the office?

12       THE WITNESS:  So those photographs and files, they were

13  erased once they were uploaded to the computers in the office.

14       JUDGE FUN:  Is that standard operating procedure?

15       THE WITNESS:  So the short answer is yes.  The reason being,

16  we want a fully memory available in the camera for other duties,

17  for you know, investigations and aircraft accidents.

18       JUDGE FUN:  So I also assume based upon just when you've told

19  us about this camera that it's a digital camera, as opposed to the

20  old style 35 millimeter film camera.

21       THE WITNESS:  That's correct, Your Honor.

22       JUDGE FUN:  You also indicated that you visited the Penas'

23  residence you think about two to three times.  So just in context

24  what I want to understand is you went to the Penas' residence on

25  December 19th of 2019, was that the first visit, the second visit,

A238

292

1        JUDGE FUN:  All right.  Thank you, Inspector Green.  I don't

2   have any further questions of you.

3        THE WITNESS:  Thank you, Your Honor.

4        JUDGE FUN:  All right.  Ms. Toscano, do you have any follow

5   up questions?

6        MS. TOSCANO:  Yes, Your Honor.  Thank you.

7                    FURTHER REDIRECT EXAMINATION

8        BY MS. TOSCANO:

9   Q.   Inspector Green, you indicated that in response to Your

10  Honor's questioning regarding the -- whether or not you made

11  vertical -- or the higher the aircraft above the ground level, and

12  your response was that you had -- that the video was the basis for

13  the approximate altitude for determining the altitude above the

14  ground level.  But I recall that in my direct examination of you,

15  I asked a similar question and your response was the witness

16  statements as well as the videos is what was the basis for your

17  determination about the -- your estimate of the height above the

18  ground.  Could you clarify that for us, please?

19  A.   Sure, Ms. Toscano.  Yes.  So the approximate altitude was

20  based off of a multitude of factors between the video that was

21  provided to us and then the statements provided by the witnesses

22  of the event.  That was how the determination -- the approximate

23  determination of the aircraft altitude is made.

24  Q.   And isn't it a true fact that another element --

25        MR. SCHULTE:  Judge, leading already.

                    FREE STATE REPORTING, INC.
                   Court Reporting  Transcription
                      D.C. Area 301-261-1902
                   Balt. & Annap. 410-974-0947

A239

301

1   airport, or a combination of the two?

2   A.   Off airport, basically off airport.

3   Q.   And where was that taking place, if you recall?

4   A.   The last time I remember was out in the Moon Rocks area,

5   basically in a field.

6   Q.   Okay.  Forgive me, I'm not familiar with that area.  Is it

7   somewhere near where you live?  An hour away?  Five hours away?

8   A.   Yes, it was probably 20 minutes north of my house, I'm

9   guessing.

10  Q.   When you say 20 minutes north, is that flight time or drive

11  time?

12  A.   Drive time.  Flight time is not even -- it was relatively

13  close.

14  Q.   Okay.  Thank you.  And when you landed at the off airport

15  with Mr. Likes, how would you describe the landing or his landing?

16       MS. TOSCANO:  Objection.  Relevancy.

17       JUDGE FUN:  Mr. Schulte, relevancy?

18       MR. SCHULTE:  One of the issues in this case, Your Honor, is

19  the appropriateness of the landing spot, and I just want to know

20  what these landings were like off airport with this witness

21  experience.

22       MS. TOSCANO:  Your Honor, may we have a sidebar?

23       JUDGE FUN:  All right.  Let's remove the observers, as well

24  as Mr. Likes back into the waiting room or lobby.  So Mr. Likes,

25  we'll move you in the lobby.  So just standby there, and we'll

A240

302

1  bring you back in the room after we've had this sidebar.  We'll

2  also remove Specialist Speeg and Mr. Richardson and Ms. Ebilane.

3      (Sidebar begins).

4      JUDGE FUN:  All right.  So the observers and the witness have

5  been removed.  It's just counsel, my office staff, Judge Tapia, as

6  well as Mr. Palmer, and the court reporter present.

7      Ms. Toscano?

8      MS. TOSCANO:  Yes.  Thank you, Your Honor.  The

9  appropriateness of the landing site is not an issue in this case.

10  The Respondent yesterday testified that he had no intentions of

11  landing.  That his purpose was it was just a low pass, but he had

12  no intentions for landing.  So the appropriateness of the site is

13  not -- of the landing site is not an issue.

14      The Respondent did not raise as an affirmative defense that

15  the flight operation was necessary for takeoff or landing.  And

16  confirmed yesterday in direct testimony, upon my questioning, that

17  he had no intentions of landing.  So the appropriateness of the

18  landing site is not an issue before us.

19      JUDGE FUN:  Mr. Schulte, do you wish to respond or --

20      MR. SCHULTE:  Yeah, I do.  If the FAA counsel is taking the

21  position that the appropriateness of the landing site is not an

22  issue in this case, then I happily withdraw the question.

23      MS. TOSCANO:  May I respond, Your Honor?

24      JUDGE FUN:  Ms. Toscano.

25      MS. TOSCANO:  Thank you.  So the issue of whether or not

A241

303

1   appropriateness is -- of the landing site is an issue is directly

2   tied to the Respondent's direct testimony, and that is he had no

3   intentions of landing during the low pass on November the 24th,

4   2019.  It was strictly a low pass, not for intended landing.

5   That's what drives the whether or not the issue of appropriateness

6   of landing site is an issue.

7       It became -- it no longer was an issue when the Respondent

8   said he had no intentions of landing yesterday.  He testified

9   under oath when he said that.

10      JUDGE FUN:  I think -- you know, from my recollection, he

11  testified he had no intention of landing after making a low pass.

12  So it seems to me that he was making a low pass to determine the

13  stability of the landing area.  And so his decision, if my

14  understanding of his testimony is correct, was made after making a

15  low pass and making an evaluation of the airfield.

16      From that standpoint, I do find that relevant.  I also find

17  it relevant in the sense that 91.119 has that prefatory clause in

18  the statute with regards to whether or not it's necessary for

19  landing or takeoff.

20      I know that we still have a pending motion from the

21  Respondent as to whether or not the claim has been adequately

22  stated from a complaint, based upon whether or not that prefatory

23  clause is a burden or an element of the Administrator's case or

24  the Respondent's case.  And so from that standpoint, I still find

25  that relevant to resolve that issue as well.

A242

304

1     So I'll allow the question and the answer.  All right.  Let's

2   go back into the main session and allow the witness and the

3   observers back in.  We'll remain on the record.

4     (Sidebar ends).

5     JUDGE FUN:  All right.  We appear to be back in the main

6   session.  We're still on the record.  Mr. Likes is on the witness

7   stand.  Sir, I remind you you're still under oath.  All right, Mr.

8   Schulte, you may proceed.

9     MR. SCHULTE:  Thank you, Your Honor.  Thank you, Your Honor.

10     BY MR. SCHULTE:

11  Q.   Mr. Likes, you testified that you've flown with my client a

12  number of times, correct?

13  A.   Yes, sir.

14  Q.   Can you estimate how many times you flew with my client?

15  A.   Like I said, a handful of times.

16  Q.   Okay.  And you landed off airport during the course of those

17  handful of times, correct?

18  A.   Yes.

19  Q.   Okay.  So my question that I asked you before we went offline

20  is how would you describe those landings?

21  A.   Very safe and doable.

22  Q.   Okay.  When you landed off airport with my client, did you --

23  when you touched down, did you roll a really long distance or a

24  short distance?

25  A.   Actually, a very short distance.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A243

306

1  A.   I wouldn't call it a model.  It's a radio controlled.

2  Q.   Radio controlled.  Okay.  So is that -- radio controlled

3  means you have -- is it a handheld device you hold to control the

4  aircraft?

5  A.   Yes, it is.

6  Q.   Okay.  And you indicated that the -- would you call that a

7  landing strip, or a place where you would stand and launch your

8  radio-controlled aircraft?

9  A.   I would call it a runway.  It's 400-foot strip of cleared

10 land that I take off and land.

11 Q.   Okay.  And you say 400 feet?

12 A.   Yeah.  If I had to guess, 4 to 500 feet possibly, with 10

13 acres behind it of open space.

14 Q.   And is it a flat grade space, or is it on a slope --

15 downslope, upslope?

16 A.   It's probably totally flat with maybe a one percent grade

17 difference in 400 feet.  So very, very flat.  Yes.

18 Q.   And is it -- is it behind the pool?  Is it north of the pool?

19 East of the pool?

20     MR. SCHULTE:  Can -- I'm just going to note an objection,

21 Your Honor.  I'm not sure -- well, I'm going to object to the form

22 of the question.  Can we clarify what pool we're talking about?

23     JUDGE FUN:  Sustained.

24     BY MS. TOSCANO:

25 Q.   So, Mr. Likes, is the remote-control runway that's in the

A244

310

1      THE WITNESS:  No.  I don't recall.

2      JUDGE FUN:  All right.  Now, you talked about the RC runway

3   that you graded and kept clear.  When did you build or grade that

4   RC runway?

5      THE WITNESS:  That runway has been on that property for

6   years.  Like I said, I've been out there at least 18 years, and I

7   flew all the time.  So it's been there a long time.

8      JUDGE FUN:  And do you know how wide it is?

9      THE WITNESS:  Probably I'm guessing 30 feet wide.  25 maybe

10  30 feet.

11     JUDGE FUN:  Now we're going into the surface conditions of

12  it, would you say it's -- it's obviously not paved or asphalt.  I

13  assume it's a dirt runway.  But can you give me an idea of the

14  conditions of the dirt runway?

15     THE WITNESS:  Yes.  It was totally smooth -- well, not

16  totally add a bit of scrub, but it was basically a cleared dirt

17  runway.

18     JUDGE FUN:  How far away from your home is this runway

19  located?

20     THE WITNESS:  You know, I've never measured it, but I'm

21  guessing at least 500 plus feet.

22     JUDGE FUN:  And I assume there's only one runway, so a single

23  line or a single runway?

24     THE WITNESS:  You know, actually, I'm sorry, I'm no pilot,

25  but you've got me thinking.  I don't know what the runway width

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A245

311

1  needs to be, but I told you what width it was, and I have multiple

2  areas in my backyard that have cleared brush, and roads, and

3  cleared paths everywhere.

4      JUDGE FUN:  Okay.  All right.  So that explains -- that's why

5  I was confused.  I wasn't sure if you had other locations that

6  might have been used or could be used for runways, other than the

7  RC runway.

8      THE WITNESS:  Yes, absolutely.  I had a complete perimeter

9  trail, path around that place with paths through my yard on ten

10  acres that I could land anywhere out there.

11      JUDGE FUN:  Now, this particular runway that we're talking

12  about that you kept cleared that was 400 to 500 feet long, what

13  directions is it oriented?

14      THE WITNESS:  I would have to say it goes west, going east.

15  East to west, in that direction.

16      JUDGE FUN:  I don't think I have any further questions for

17  you, Mr. Likes.

18      Mr. Schulte, do you have any follow-up questions for

19  Mr. Likes?

20      MR. SCHULTE:  Thank you, no, sir.

21      JUDGE FUN:  Ms. Toscano?

22                          RECROSS-EXAMINATION

23      BY MS. TOSCANO:

24  Q.  Mr. Likes, are you still good friends with Mr. Palmer?

25  A.  Yes, I am.

A246

318

1        THE WITNESS:  No, Your Honor.  I've heard it several times in
2    the last couple of days.  I'm very familiar with it, and I'm
3    comfortable with that if you are.
4        JUDGE FUN:  Very well.  So I'm going to go ahead and have you
5    state and spell your full name for the record?
6        THE WITNESS:  It's Roy J. Speeg, Jr.  It's R-O-Y, J like
7    Juliet, Speeg, S, like Sam, P, like Paul, E-E-G, like George, and
8    I'm a Jr.
9        JUDGE FUN:  Thank you.  All right, Ms. Toscano, your witness.
10       MS. TOSCANO:  Thank you, Your Honor.
11                         DIRECT EXAMINATION
12       BY MS. TOSCANO:
13   Q.   Okay.  Mr. Speeg, can you give us a summary of your
14   background experience?  We do have your resume into the record.
15   And if you could, please, focus on your summary of your aviation
16   background as it pertains to air space waivers, in conjunction
17   with aerobatics cross-country that's mentioned in your resume, and
18   any other qualifications and experience that you have pertaining
19   to low level flights, including waivers of the 91.119 flight
20   operations?
21   A.   Okay.  So this is my 18th year with the FAA.  I apologize for
22   the dogs barking in the background.
23       I've been at the regional or headquarters level for the last
24   9 years, headquarters level for the last 5 years.  Specifically
25   right now, I am in the EIR review team, and I do -- I work with

A247

319

1  the academy, the EIR course.  But to get to the point and save

2  time, as a regional aviation event specialist for the northwest

3  mountain region, up until -- from 2012 to 2017, that team, the

4  National Aviation Event Specialists, specifically deal with air

5  show waivers, the ACE program, which is the Aerobatic Competency

6  Evaluation program, who are the examiners for air show performers.

7  Air show performers have to hold statements of aerobatic

8  competency or low-level cards.  In addition to that, we also

9  reviewed waivers for banner-tow operations, and things like cross-

10  country air races.  There's a big -- the Ninety-Nine Women's

11  Organization every year does a cross-country air race, and they

12  require a waiver.

13      All of these waivers include 91.119(a).  So I'm very familiar

14  with that -- the verbiage in that regulation and the parts of the

15  regulation, and how they can be -- you know, it is a regulation

16  that can be waived.  And I'm -- you know, I've worked with that

17  for several years.

18      And prior to coming to the FAA, I held a statement of

19  aerobatic competency down to 500 feet.  And all of that

20  encompasses training for the margin of error that you have or

21  don't have when you're operating.  The lower you get to the

22  ground, the less margin of error you have if something were to go

23  wrong, if the airplane had a structural failure, if the engine

24  failed, etcetera, etcetera.

25      That's kind of it in a nutshell.  I don't know if you want me

A248

325

1    Q.    Is there -- are there any aircraft that you have flown that

2    are not indicated on this page?

3    A.    I'm sure there are.  I don't -- that's the best

4    representation to date.

5    Q.    Okay.  Thank you.  Is it fair to say that you've never flown

6    a Kitfox 5?

7    A.    That's correct.

8    Q.    And have you ever seen a Kitfox 5 fly?

9    A.    I've seen Kitfox.  I don't know if it was a 5 or not.

10   Q.    Have you ever seen or inspected my client's aircraft in any

11   way?

12   A.    No.

13   Q.    Okay.  Do you know --

14   A.    Well --

15   Q.    Go ahead.  After you.

16   A.    I've seen it in pictures.

17   Q.    Okay.

18   A.    I'm assuming you mean in person?

19   Q.    Yes, sir, I do.

20   A.    Okay.  No, I have not seen it in person.

21   Q.    Do you know what the kind of propeller the aircraft has?

22   A.    If I remember right, it's a composite propeller.  I can't

23   remember what kind exactly it is.

24   Q.    Okay.

25   A.    No, I don't know what kind it is.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A249

326

1  Q.   All right.  Thank you.  Same question vis-à-vis the engine.

2  Do you know what kind of engine my client's aircraft has?

3  A.   I do.  It's a Rotax engine.

4  Q.   Do you know what model Rotax it is?

5  A.   No, I don't.

6  Q.   Okay.  Have you ever examined the log books for my client's

7  aircraft?

8  A.   No.

9  Q.   Have you ever asked to see the log books of my client's

10 aircraft?

11 A.   I have not.

12 Q.   Can you tell me, other than the testimony that you've heard

13 in this case prior to eliciting that testimony, did you have any

14 knowledge of the performance characteristic of my client's

15 aircraft prior to the testimony in this case?

16 A.   No, I did not, prior to his testimony yesterday.

17 Q.   Okay.  So when you formed any opinions in this case that you

18 intend to offer today, you had no knowledge of the performance

19 characteristics of my client's aircraft; is that correct?

20 A.   That's correct.

21 Q.   Thank you.  If we could Ms. Stustak, could you go to page 5

22 of 8 of Alpha-19, please.  Specialist Speeg, I'm not going to ask

23 you to go through the entirety of your employment history.  I just

24 want to confirm a couple of things.  It appears to me that your

25 first paid job, if you will, as a pilot was a flight instructor

A250

329

1  October of '99, correct?

2  A.   That was an overlap deal too.  We just moved Gulfstreams

3  around.

4  Q.   Okay.  And that was the G-III, correct?

5  A.   G-III and I think there were some G-IVs were move too.

6  Q.   Okay.  Then you moved to Executive Jet Management in

7  Cincinnati, Ohio in December of '99 through April of '02, that's

8  2002, and you earned a salary of 47,000 annually?

9  A.   Correct.

10  Q.   And then it looks like there was some overlap in September of

11  '01 to April of 2002, where you were consulting for Rocky Mountain

12  College in Billings, Montana.  And you were paid fees of $7,000

13  during that period, right?

14  A.   Correct.  When I was at Executive Jet, I flew a seven on,

15  seven off schedule.  So I worked at the college on my seven days I

16  was home.  So that was an overlap.

17  Q.   Okay.  Thank you.  And it looks like you -- and don't let me

18  put words in your mouth -- from April of '02 to February of '04,

19  you moved to Rocky Mountain College, Billings, Montana, what I

20  assume was a full-time position; is that correct?

21  A.   Correct.  I left Executive Jet Management when Rocky Mountain

22  College asked me to be their director of flight operations and

23  chief flight instructor.

24  Q.   Okay.  And this is all flight school 141 type of work,

25  correct?  You were overseeing the flight school?

A251

330

1    A.    Yes.  That's correct.

2    Q.    All right.  And these were primary students, instrument

3    students, commercial, all of the above?

4    A.    All the way through instructor.

5    Q.    Okay.

6    A.    All levels of instructor.

7    Q.    And then when you concluded your time at Rocky Mountain

8    College, starting in August of 2004, that's when you moved to the

9    FAA; is that correct?

10   A.    Correct.

11   Q.    And you've been there ever since, for the last 18 years,

12   correct?

13   A.    That's correct.  Well, it'll be 18 years in August.

14   Q.    And I note that once you moved to the FAA, and as we go from

15   -- backwards from pages 3 -- or rather 4 to 3 to 2, and indeed all

16   the way to page 1, there's no further mention of your salary; is

17   that correct?

18   A.    That's a good observation.

19   Q.    So --

20   A.    Okay.  So let me explain.  So in creating this -- trying to

21   bring my resume up to date for this purpose, I combined resumes.

22   And one of the positions that I recently -- or it wasn't a

23   position, I was applying for a leadership program with the FAA,

24   and part of that requirement was you had to include what -- your

25   salary for each job.

A252

331

1       So the stuff that you're looking at that's newer, I had

2   copied from a different resume, and the other stuff came from the

3   resume that I just talked about, that had to have.  So that's a

4   good catch.  I didn't catch it.  I should have had you review it

5   before I submitted it anywhere.

6   Q.   It's fine, sir.  I --

7   A.   No, thanks.

8   Q.   Why the omission was there.  I'm sorry I asked, but it's a

9   matter of public record anyway.

10  A.   That's fine.

11  Q.   And can you tell me what your salary at the FAA today is?

12  A.   I'm a Step 10, and I believe I'm 147,500.  I don't know

13  exactly.  I'd have to look.

14  Q.   Okay.  So roughly $147,000 a year; can we say that?

15  A.   Correct.  Yeah.  That's all public record too.

16  Q.   Sure.  And during the course of your aviation career, is it

17  fair to say that the most money you've ever made in your

18  professional career is in fact working for the FAA?

19  A.   Yes.

20       MS. TOSCANO:  Your Honor, I'm going to object to this line of

21  questioning.  It's irrelevant.

22       JUDGE FUN:  Counsel, what's the relevance of salary

23  information?

24       MR. SCHULTE:  I'm exploring the bona fides of this client.

25  Of course, salary information, of course, goes to bias.  If Your

A253

332

1   Honor thinks that I should ask these questions later on in the

2   testimony, I can certainly do that.  I was just trying to cover

3   all my questions about Specialist Speeg's resume without having to

4   get -- jump back and forth to the document.  That's all.

5           JUDGE FUN:  All right.  Yeah.  I think it is relevant because

6   an expert and what their pay might go to their bias.  However, I

7   do also agree that this is outside the scope of -- the purpose of

8   the voir dire.  But in the interest of saving time and

9   administrative efficiency, I'll allow some questions with regards

10  to resume since we're already there.

11          MR. SCHULTE:  Okay.

12          JUDGE FUN:  You may go ahead.

13          MR. SCHULTE:  Thank you, Your Honor.  And I really don't have

14  many more.

15          BY MR. SCHULTE:

16  Q.   Specialist Speeg, in your current -- well, during the time --

17  your time at the FAA, you've testified in a number of proceedings

18  like this, correct?

19  A.   Not a lot, but yes, I have.

20  Q.   Can you give me a rough estimate as to how many enforcement

21  proceedings you've testified in, either as inspector or as an

22  expert witness?

23  A.   No more than five.

24  Q.   No more than five.  Okay.  Was that -- is that all

25  enforcement actions or -- that's a bad question.  I'll strike

A254

334

 1  A.   Several.  172 stol aircraft, Cessna 206s.  Oh my goodness.

 2  I'd have to bring out my list of aircraft to cover them all.

 3  Q.   So --

 4  A.   But I've flown several.

 5  Q.   Okay.

 6  A.   I mean, I've taught in the mountains here, and we fly into

 7  backcountry strips all the time.  I haven't in a couple of years,

 8  but --

 9  Q.   So you say you fly into backcountry strips.  How many off

10  airport, not strips, off airport operations have you personally

11  flown?

12  A.   Several.  I've landed on frozen lakes.  I've landed on

13  roadways.  I've landed on -- in fields at ranches.  I've done

14  plenty of off airport operations.

15  Q.   How many is plenty, sir?

16  A.   I've landed in cornfields during my aerobatic times.  We'd

17  practice -- had several pilots who owned farms, and we would land

18  in their cornfield, and they would have their aerobatic box set up

19  over their property.

20  Q.   Okay.  So again, I want to --

21  A.   I can't tell you exactly how many, but it's been a lot.

22  Q.   Well, forgive me.  We have to put a number on that or at

23  least get close.  Is it more than a hundred, less than a hundred?

24  A.   I'd say between 25 and 50.

25  Q.   25 and 50 times.  Okay.  Thank you.  And when you landed off

A255

335

1   airport, did you just simply drop into the surface, or did you do

2   an overflight to make sure the surface was clear of obstructions

3   and the area was otherwise suitable for landing?

4   A.   To go over and check it for, like you said, obstructions,

5   obstacles, towers, powerlines, fences, you know, the condition of

6   the runway.  Yeah.

7   Q.   Sure.

8   A.   Assess the situation.

9   Q.   In order to examine the condition of the runway, you've got

10  to get fairly low, do you not, sir?

11  A.   Correct.

12  Q.   Okay.  Thanks.  And once you assess the condition of the

13  runway, you go out, you take a pass, look at the condition, and

14  come back in and land; is that correct?

15  A.   Correct.

16  Q.   Okay.  Thanks.  Can you tell me what the landing distance of

17  a STOL aircraft would be?  That's a bad question.  Forgive me.

18  You said you flew a 172 STOL.  That means a 172 would have been

19  modified, correct?

20  A.   That's correct.

21  Q.   Okay.  And what would the 172 be modified with?

22  A.   It would have a STOL fence on it.  It would have different

23  wearing tips on it.  Sometimes they would have vortex generators

24  on the wings.  Things like that.

25  Q.   Okay.  How many --

A256

344

1    But I agree that he's got to be some kind of expert with

2  regards to short field or take off landings.  He perhaps might

3  have some experience in that area, but I don't think that

4  necessarily qualified him as an expert in that area, and same with

5  regards to the Kitfox 5.  And in the combatants aircraft he did

6  not have the experience in that aircraft.  So he cannot be

7  qualified as an expert in regards to that particular airplane.

8    But I do recognize that he does have some experience in short

9  field take off and landings in other airplanes, and I will

10  consider that when I consider the weight to give his testimony

11  throughout this area.

12    And just in general speaking, let me just go back to some

13  arguments that were brought up by Ms. Toscano concerning the

14  factors to be considered.  And I agree again, I will decide if it

15  will be an issue whether or not it was an appropriate landing site

16  or not, and what evidence needs to be proven of that.  I think the

17  board has spoken on that issue.  And one of those issues does

18  include not only the surface area, the location of the landing,

19  but also weather conditions, the experience of the pilot, the type

20  of aircraft, and his performance, specifications for the aircraft.

21    For example, obviously, it would be inappropriate for a

22  Gulfstream to land in a riverbed in Alaska, but for a Super Cub

23  with oversized tires, that may be certainly appropriate under

24  certain circumstances.

25    So, you know, it does appear that that is a relevant factor.

A257

1  Having said all that, I just want to let the parties know where

2  I'm at with that process, but also I will find Specialist Speeg

3  qualified as an expert in general aviation, flight operations,

4  general area of low flight operations, and regulatory requirements

5  under the FAA as he's experiencing those areas.

6      But again, I don't find that he's going to be qualified for

7  short field takeoff or landing with regard to the Kitfox 5.

8      All right.  Any additional comments.  I'd like to ask for

9  further argument, or any other additions we need to address with

10  regards to the qualifications of Specialist Speeg as an expert.

11      MR. SCHULTE:  No, Your Honor.

12      JUDGE FUN:  Ms. Toscano?  Ms. Toscano?  You're on mute.

13      MS. TOSCANO:  Thank you.

14               DIRECT EXAMINATION (continued)

15      BY MS. TOSCANO:

16  Q.  Specialist Speeg, you heard the testimony yesterday --

17      JUDGE FUN:  Before we continue, do you have any questions on

18  my ruling?  Do you have any questions about my ruling?

19      MS. TOSCANO:  Just one.  Just one.  Just for a clarification.

20  So Specialist Speeg cannot testify as to the performance ability

21  of the STOL Kitfox as to take off and landings, but is Specialist

22  Speeg limited to talking about, based on his experience, on take

23  offs and landings in the STOL type of -- a STOL type of aircraft,

24  which he operated?  If it was a modified 206, and I think it was a

25  modified 172 for STOL aircraft take off and landings.  Is he

346

1   limited?

2       JUDGE FUN:  Ms. Toscano, my ruling is that I'm not going to

3   find him qualified as an expert in short field takeoff and landing

4   with regard to the Kitfox 5.  Now, certainly go ahead and offer us

5   testimony from a lay perspective, or a general aviation

6   perspective, that's fine.  But when it comes to opinions as to

7   short field take off and landings with the Kitfox 5, I'm not

8   likely going to allow that.  Or if testimony does come in, I will

9   consider the fact that if he doesn't have experience in the Kitfox

10  5.

11      MS. TOSCANO:  Thank you, Your Honor, for the clarification.

12      JUDGE FUN:  All right.  All right, you may proceed now.

13      MS. TOSCANO:  Thank you, Your Honor.

14      BY MS. TOSCANO:

15  Q.   You heard today, Specialist Speeg, that as Inspector Green

16  was being cross-examined, one of the questions was what the

17  respondent had stated to the Reno FSDO inspectors on December the

18  3rd, at a meeting in which the -- a video the Penas' video was

19  provided and shown to the -- Mr. Palmer.  Do you recall that

20  testimony from this morning?

21  A.   Generally, yes.

22  Q.   Okay.  And do you recall, then, that the Respondent's

23  response, once he agreed that it was his aircraft that was shown

24  in the video, and that he was operating the aircraft as pilot

25  command, that the Respondent indicated that he was approaching to

A259

353

1   standing between the tank and the hay barn, so that's where they

2   came up with that roughly 78 feet from the house.

3   Q.   Okay.  And, you know, be sure at any time you need to refresh

4   your recollection of, you know, exhibits, you're welcome to ask.

5   But okay, and so then let's go to the next point along the path of

6   the aircraft.

7        The witnesses -- there are several witnesses that indicated

8   that the aircraft had a -- was in a --

9        MR. SCHULTE:  Your Honor, I'm going to object again.  We're

10  back in the same place we were before.  We now have counsel

11  testifying again.  And we're going to be here for a week if we

12  keep replowing the same old ground.  We have conceded from the

13  beginning of this case that Mr. Palmer flew within 500 feet of

14  vessels, structures, and likely persons on the ground.  We do not

15  dispute that.  We can have another six hours of that, but we don't

16  dispute it.

17       Can we at least get to some opinions and not keep

18  retestifying about that which has been testified about before?

19       JUDGE FUN:  Ms. Toscano, what's your intent with asking the

20  question?

21       MS. TOSCANO:  Well, my intent is to lay the information,

22  because it's not -- yeah, I understand that the Respondent has,

23  you know, as of yesterday conceded that he was less than 500 feet

24  to structures, people, and persons on the ground, except for a

25  propane tank, which is not a vessel or a structure according to

A260

358

1      THE WITNESS:  I'm sorry.

2      MR. SCHULTE:  I'd like to wait for a question before the

3  witness just starts --

4      THE WITNESS:  Well, I was continuing what the previous

5  question is what I was doing.

6      JUDGE FUN:  You may continue, Specialist Speeg.

7      THE WITNESS:  I'll wait for another -- I'm sorry?

8      JUDGE FUN:  You were explaining your -- continuing on with

9  the extension of your answer to the question.  That's fine.  You

10  can answer.

11      THE WITNESS:  Well, thinking about it, I might have been

12  going somewhere else, so I better wait.

13      JUDGE FUN:  All right.  Ms. Toscano?

14      BY MS. TOSCANO:

15  Q.  Okay.  And so do you have an opinion as to whether Respondent

16  operated November 318 Juliet Juliet at altitudes that would not

17  allow if a power unit had failed, an emergency landing without

18  undue hazards to persons or property on the surface?

19  A.  I have an opinion about his ability to do that because of the

20  -- you know, the height above the ground was somewhere between 30

21  and 50 feet.  I think the only -- well, I mean, I don't know where

22  he -- I know where I would try to go, but I don't know where --

23  what he was -- you know, when we're operating low level altitude,

24  when I was doing it, we were always trying to think where we would

25  go if the engine quit.  So I don't know -- I can't -- I'm not --

A261

359

1  wasn't in his head that day.  I don't know -- I can't say where he

2  would go, but I know in Mr. Likes' statement, he indicates that he

3  could land anywhere in the roads in the subdivision.

4      If that's the case, then if he was to go into any of the

5  roads in the subdivision, he would create an undue hazard to

6  anybody in or living in that neighborhood, for the simple fact

7  that people who live in that neighborhood, a reasonable person is

8  not going to expect an airplane to be coming down their street in

9  a subdivision that's out in the middle of nowhere on ten-acre

10  lots.  Does that --

11  Q.   Yes.  That answers that question.  So and I think you've --

12  and you've indicated some basis for your opinion.  Other than that

13  this is a subdivision and there -- people aren't expecting an

14  airplane to be landing.  Are there other bases for your opinion to

15  determine that the -- regarding your margin of error that you

16  brought up at first?  Any other factors involved as applied to the

17  hazard that you mentioned earlier?

18  A.   Sure.  You know, the regulation mentions power unit loss.

19  But there are other -- when we introduce bank into an airplane, we

20  introduce G-forces, which are forces of gravity on an aircraft.

21  And through primary training, all the way up through advanced

22  training, we're taught that 60 degrees of bank is two times

23  gravity.  So -- or 2 Gs.

24      So when we have more forces acting on the structure on

25  aircraft, and if it's done over a time, over a lot of time, and

A262

360

1  numerous occasions, it puts stress on the aircraft and you could

2  have structural failure.  So, you know, in that situation, you

3  have no control if a wing falls off, if a --

4       MR. SCHULTE:  Judge, I've got to object.  This has nothing to

5  do with this case.  This has nothing to do with the disclosures

6  that counsel has given us about this testimony.  We're not here

7  about the structural failures of this aircraft.  This has nothing

8  to do with this case.  His aircraft structure didn't fail.  Is he

9  testifying that if you turn the airplane left, it's going to fall

10 apart?

11      More importantly, he doesn't know anything about this

12 airplane.  This is getting absurd.

13      JUDGE FUN:  Ms. Toscano?

14      MS. TOSCANO:  Yes, Your Honor.  I can move on.  I think my

15 question wasn't very clear as to undue hazards.

16      JUDGE FUN:  All right.  Go ahead.

17      BY MS. TOSCANO:

18 Q.  So, Specialist Speeg, what is the basis of your opinion that

19 if the Respondent had a power unit failure, he would not have been

20 able to make an emergency landing?  Or he would have -- excuse me.

21 Let me get to that.  If he had an emergency -- excuse me.  If he

22 had a power unit failure, that he was not -- he was below an

23 altitude allowing -- if a -- an emergency landing without undue

24 hazard to persons or property on the surface.

25      MR. SCHULTE:  Objection.  Asked and answered.

A263

1      MS. TOSCANO:  So I'm asking what is the basis of your

2  opinion, Specialist Speeg.

3      JUDGE FUN:  Overruled.  I'll allow the question.

4      THE WITNESS:  The basis of my opinion is all of my

5  experience, all of my training, all of -- everything I've done in

6  the last nine years with my job, the testimony of the witnesses to

7  determine the altitude above the ground, and just -- I know any --

8  so -- and the statements made by the Respondent, where he said

9  that it was unsafe to land.  And he was kind of vague about it, so

10  I'm assuming it was unsafe to land from what he was looking at,

11  which was from what I -- from the testimony was to the east side

12  of his flight path.  So if that was the case, the only place he

13  could land is in the -- on the roads in the subdivision.  And if

14  that's the case -- I'm not disputing the fact that he couldn't

15  land there.  He could land there, but in doing so, he creates a

16  hazard, an undue hazard to persons and property in that

17  subdivision.

18      A little kid riding his bicycle down the road isn't expecting

19  an airplane to come, you know, hauling up the road.  Mrs. Pena,

20  backing out of her driveway, isn't expecting an airplane to be

21  coming down to land.  That's where I'm coming from.

22      BY MS. TOSCANO:

23  Q.   Okay.  And do you have an opinion as to whether or not the

24  Respondent operated his aircraft below -- at an altitude of less

25  than 500 feet, while he was -- he concedes he was at 100 feet

362

1   above the surface, less than 100 feet above the surface, and that

2   he operated closer than 100 -- that he operated closer than -- or

3   less than 100 feet to the -- the Penas' house.

4   A.    So my opinion, again, is based on the testimony, the

5   statements, the EIR package, everything we've listened to in the

6   last two days.  And if -- we've established that his flight path

7   was the pink line on the exhibit that we've seen several times,

8   and that exhibit, if you brought it up, would show, you know, the

9   500 foot grid of the flight path, at least on one side of it -- of

10  the flight path.  And we could go and look at that picture, and

11  look at all the different things that he is within 500 feet of

12  during that brief slight path on November 24th of '19.

13  Q.    And do you have --

14  A.    So the Penas' house, it was fences.  Mr. Likes' house,

15  powerlines.  These are just things that I'm remembering from --

16  that we talked about several times on that exhibit.

17  Q.    Okay.

18  A.    Each one of those is a violation.

19  Q.    Okay.  So --

20      MR. SCHULTE:  Objection, Judge.  That's a legal conclusion.

21  That's impermissible.

22      JUDGE FUN:  I'll allow the response to stand, and consider

23  that in my evaluation of Specialist Speeg's testimony.  Go ahead,

24  Ms. Toscano.

25      MS. TOSCANO:  Thank you, Your Honor.  Ms. Jefferson, can you

A265

366

1    JUDGE FUN:  Well, I'll let Ms. Toscano -- I haven't heard the

2  witness see -- if she wants to present that evidence herself.  She

3  may do so if she wants to, or agree to your concession.  That's

4  fine as well.

5    MR. SCHULTE:  Okay.

6    JUDGE FUN:  Go ahead, Ms. Toscano.

7    MS. TOSCANO:  Yes.

8    BY MS. TOSCANO:

9  Q.   So, Inspector -- I mean, Specialist Speeg, the propane tank,

10 is -- was that structure the one that's the closest to the house?

11 A.   Yes.  If we're talking about the -- all the pictures that

12 were shown with the measuring tape and everything, that was the

13 closest to the house that I recall.

14 Q.   Okay.  And any -- okay.

15 A.   You mean to the house?  Well, I'm not going to answer that.

16 Q.   Yeah.  And so it's your opinion that this was a structure.

17 A.   Whether it was a structure or vessel, either way, it was

18 within, you know, 25 feet of it, I think, what the measurement

19 was.

20 Q.   Okay.

21 A.   Whatever you want to call it.

22 Q.   Okay.  And with respect to the 91.119(a) violation, do you

23 have an opinion as to whether or not that violation was --

24 Respondent's violation was careless or reckless?

25    MR. SCHULTE:  Objection.  That's a legal conclusion.

A266

367

1        JUDGE FUN:  Overruled.  Go ahead.

2        THE WITNESS:  Well, in my opinion, the maneuvers that were

3   being made were not necessary for landing by any means.  And I

4   think the height above the ground would not leave any room to be

5   able to see the top of the grade where he may have been wanting to

6   land.  I don't know how he could have seen that.  I don't know --

7   every landing operation or low-pass operation that I've read about

8   in pilot operating handbooks, or any of the manuals, the off

9   airport do not require degrees of bank in order to get to an area

10  to assess a possible landing area.

11       And so from what the witnesses have stated, and from what

12  they've seen, and you know, the video that we've seen, those were

13  reckless -- that was reckless behavior.  It was intentional

14  behavior and, you know, no pilot is going to fly low to the ground

15  with that kind of banking accidentally.

16       So in my opinion, to answer your question, that was reckless.

17       BY MS. TOSCANO:

18  Q.   Okay.  And with respect to the 91.119(c) violation, which is

19  the low altitude over other than congested areas, do you have an

20  opinion as to whether or not that was careless or reckless?

21  A.   Absolutely.  I think the manner in which that aircraft was

22  operated in an attempt to get to -- to assess an airport showed

23  significant disregard for the safety and the pilot himself, the

24  people on the ground, the structures on the ground.  I mean, we

25  came below possibly 50 feet within 25 feet of the structures.

A267

370

1      MS. TOSCANO:  Okay.  I have no further questions at this

2  time.  Reserve the witness.

3      JUDGE FUN:  Mr. Schulte, any cross-examination?

4      MR. SCHULTE:  Yes, Your Honor.  Thank you.

5                          CROSS-EXAMINATION

6      BY MR. SCHULTE:

7  Q.   Mr. -- I'm sorry, Specialist Speeg, do you need a break for a

8  moment or anything?

9  A.   I'm good.  Thanks.

10 Q.   Okay.  Bear with me here.  A couple of quick questions.

11 You've -- other than these proceedings, and you've seen Mr. Palmer

12 there on the screen, you've never met him before, have you, sir?

13 A.   I have not.  Maybe -- I don't know if you need that picture.

14 I could probably see everybody better if that picture wasn't --

15 Q.   Yeah.  I'm actually going to refer to that in a moment.

16 A.   Okay.  No problem.

17 Q.   Thank you.  So you've never met my client.  You've never

18 flown with my client, correct?

19 A.   No.

20 Q.   Never had an opportunity to evaluate his flying skills?

21 A.   I have not.

22 Q.   Okay.  Can you show me in 91.119 where in mentions anything

23 about bank angle?

24 A.   No.

25 Q.   Okay.

A268

373

1  recall that testimony?

2  A.   I recall that testimony.

3  Q.   And you give it no credit.  That's what you're saying,

4  correct?

5  A.   That's correct.

6  Q.   Okay.  And so rather than give that testimony credit, you

7  give credit to the Penas' testimony that my client that my client

8  was in a steep, aggressive bank; is that correct?

9  A.   I'm basing my opinion on the bank on the video that I saw.

10 Q.   Okay.  And that was a one or two second video, right?

11 A.   It only takes a fraction of a second for me to look at an

12 airplane and tell that it's in a degree of bank that's not

13 necessary, especially that close to houses and structures for

14 landing.

15 Q.   Respectfully, just answer my question.  I'm --

16 A.   I'm answering your question.

17 Q.   No, you're not.  You're opining.  I asked you a simple

18 question.

19 A.   Okay.

20 Q.   I asked you how you got the information relative to the bank

21 of the aircraft.  You testified that you did not recall or you did

22 not credit Mr. Stanley's comment that it was in a slight bank, but

23 rather you credit the Penas' testimony that it was an aggressive

24 bank.  And then you mentioned the video, which of course we don't

25 have the actual native video at all.  So that's all I asked you.

A269

375

1   east than the Penas' house.

2   Q.   Right.  But my question, sir, is you seem to make much to the

3   fact that my client's aircraft was banked to the left.  Do you

4   agree that that was your testimony?

5   A.   When he first came into view, yes.

6   Q.   Right.  And so if an aircraft is banked to the left, that by

7   definition means, unless he's cross-controlling it, and I assume

8   you know what that means.

9   A.   I do.

10  Q.   That the aircraft will be turning to the left, correct?

11  A.   Correct.

12  Q.   So if the aircraft is banked to the left and turning to the

13  left, and his flight trajectory was from top to bottom in this

14  photograph, that means that the aircraft was moving away from the

15  persons and property on the ground; does it not?

16       MS. TOSCANO:  Objection.  I'm sorry.  That misstates the

17  testimony.  Specialist Speeg did not agree that the flight path

18  north of the garage is, as depicted by the pink line, is

19  established.

20       MR. SCHULTE:  I don't -- I'll let you rule, Your Honor.

21  Forgive me.

22       JUDGE FUN:  I'll overrule the objection.  I heard the

23  testimony.  I know what Specialist Speeg had testified to, got to

24  assess whether or not it's a mischaracterization of the testimony.

25  Go ahead.

A270

376

1    BY MR. SCHULTE:

2    Q.    So, Specialist Speeg, I just want to clarify that if an

3    aircraft is banked left, absent some unusual rutter inputs by the

4    pilot, it's going to be turning left, correct?

5    A.    Yes.  While it's banked.

6    Q.    Of course.  All right.  And so if the aircraft is

7    aggressively banked, then it will be aggressively turning to the

8    left; is that a fair characterization?

9    A.    I agree.

10    Q.    Okay.  And can we also agree that on the -- looking at this

11    photograph, to the right side of that pink line, based on the

12    testimony of all the witnesses, is nothing but scrub and desert

13    out there, correct?

14    A.    I heard a couple of them say that, but I don't know.  It's

15    kind of a general -- I don't know about the whole area there.

16    Q.    Well, I mean, granted there's some stuff on here, but let's

17    assume for the sake of argument that that's just acres and acres

18    of scrub out there.  Why couldn't, if my client's aircraft lost an

19    engine, just keep on going left, and drop out there in the scrub

20    and the desert, without posing any threat to those persons and

21    property on the ground there.

22    A.    Well, there's a house over there to the -- right below Fred's

23    Mountain.  So that would be an object.  And for some reason,

24    you're -- the Respondent deemed it unsafe to land there.  So --

25    Q.    When did he testify to that, sir?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

380

1    sitting here just now.  This is Linden Airport, New Jersey.  Ever

2    flown in there before, sir?

3    A.    Not Linden.

4    Q.    Okay.  Can we agree where my cursor is the thresh tilt of the

5    runway, correct?

6    A.    Correct.

7    Q.    And if I deploy the ROR (ph.) tool, which you've heard

8    mentioned in this testimony before, if I go straight out here,

9    I'll get to a series of what appear to be petrol chemical tanks.

10   Do you see those?

11   A.    Yeah.

12   Q.    And can we agree that the tool here is showing that the first

13   one is roughly 537 meters, roughly say, 1,600 feet, agreed?

14   A.    Agreed.

15   Q.    And at a quarter of a mile of the end of that runway, if

16   you're on a three degree, to use your words, stabilized approach,

17   you're 75 feet over that petrol chemical tank, correct?

18   A.    I would assume so.  Yes.

19   Q.    Okay.  And here, we have what appears to be residences off

20   the side of the runway, 133 meters approximately, which I think we

21   can agree is something less than 400 feet, correct?

22   A.    Yes.

23   Q.    So again, all these houses are in very close proximity to the

24   operation of aircraft.  What I'm getting at, sir, and here's my

25   ultimate question.  Aircraft operate in close proximity to persons

A272

381

1  and property well below 500 feet all the time during the course of

2  landings, correct?

3  A.    They do, but --

4  Q.    No.  No buts.  The answer is yes, correct?  So if -- and

5  you're an instrument instructor, correct?

6  A.    Correct.

7  Q.    And --

8       MS. TOSCANO:  Your Honor -- Your Honor, I'm sorry.  Counsel,

9  could you advise counsel not to interrupt the Specialist.

10       JUDGE FUN:  Mr. Schulte is asking his questions.  So

11  Ms. Toscano, you're certainly welcome to redirect Specialist Speeg

12  if there needs to be an explanation of his answer, or he needs to

13  further clarify his answers.

14       Go ahead, Mr. Schulte.

15       MS. TOSCANO:  Thank you.

16       MR. SCHULTE:  Thank you, Your Honor.

17       BY MR. SCHULTE:

18  Q.    Specialist Speeg, when -- I'm sorry.  You're an instrument

19  instructor, correct?

20  A.    Right.

21  Q.    And during the course of instrument instruction, you're

22  flying glide paths.  That's the point of instrument instruction,

23  correct?

24  A.    Yes.

25  Q.    And part of instrument instruction is getting instrument

A273

382

1   students comfortable with coming down to minimums.  Agreed?

2   A.   Agreed.

3   Q.   And when you come down in minimums on an instrument approach,

4   you are getting very close to the ground, and in many cases, very

5   close to buildings and structures, correct?

6   A.   Yes.

7   Q.   Okay.  That's normal fare.

8   A.   At a developed airport, yes.

9   Q.   Sure.  And can we also agree that God forbid if a student is

10  flying in a single-engine airplane, and they're coming down to

11  minimums, and they're 50, 75, maybe 100 feet off the ground, a

12  mile out, they're not going to make that airport, are they?

13  They're going to crash.

14  A.   I don't know about that.

15  Q.   Okay.  So is it your testimony if an aircraft is a quarter of

16  a mile from the runway at 75 feet, you believe that they might be

17  able to make it?

18  A.   They might.

19  Q.   They might not either, too, right?

20  A.   Yeah, maybe.  A lot of maybes.

21  Q.   A lot of maybes, agreed.  Okay.  I just want to show you

22  another picture here, sir.  Bear with me.  I'm going to show you

23  what is an airport community, sir, known as Kentmore.  It is

24  located near where I live.  I'll zoom out a little bit so you can

25  see it more clearly.

A274

383

1      Now, can we agree Kentmore is a grass field, correct?

2  A.   It looks that way.

3  Q.   Okay.  And if you see where my cursor is, can we agree those

4  are structures that are lining the grass field?

5  A.   Yes.

6  Q.   Okay.  And can we also agree that -- I'll just take one at

7  random here.  If I mark this house and come out, the center of the

8  runway is about 90 feet from that house, right?

9  A.   Yes.

10  Q.   And can we agree that in normal operations at an airfield

11  like this, you're going to have low flying aircraft all the time.

12  Correct, sir?

13  A.   Correct.

14  Q.   Okay.  And during those operations, those aircraft are coming

15  within that 500-foot bubble that you talked about a little while

16  ago, correct?

17  A.   That bubble has to do with sparsely populated areas.  This is

18  not a sparsely populated area.

19  Q.   Okay.  A thousand-foot bubble then.  Still coming within

20  that.  Correct, sir?

21  A.   Yeah.

22  Q.   Okay.  And -- bear with me one second.

23      MR. SCHULTE:  Court's indulgence, Your Honor.  Thanks.  Bear

24  with me, folks.  I'm sorry.

25      BY MR. SCHULTE:

A275

387

1    out.

2    A.    Okay.  So I -- yeah, so I assumed that was -- the way you

3    asked the question was that was going to be the first time he was

4    going to land that strip, correct?

5    Q.    Correct.  Correct.

6    A.    Yeah.  I wouldn't --

7    Q.    Your answer would be he shouldn't do that?

8    A.    Right.

9    Q.    Because he's not familiar with the aircraft and he doesn't

10   have the necessary experience to do that.

11   A.    Right.

12   Q.    All right.  And if we change the facts a little bit, and

13   let's add say 40,000 feet to that runway, it's probably not a big

14   deal, correct?

15   A.    Correct.

16   Q.    All right.  So we can agree that the experience, performance,

17   and judgment of the pilot is a factor in determining whether he

18   should or should not put an aircraft somewhere or not, correct?

19        MS. TOSCANO:  Objection.  Vague.

20        JUDGE FUN:  Overruled.  I allow the question.  If you can

21   answer that, Specialist Speeg.

22        THE WITNESS:  Restate the question again, please.

23        BY MR. SCHULTE:

24   Q.    Of course.  Can we agree that the determination as to whether

25   or not a pilot should put an aircraft on this place or that place,

A276

388

1  or land at this location or that runway is a function, in part, of

2  their skillset and experience?

3  A.    Yes.

4  Q.    Okay.  Now, let's marry that to the aircraft itself.  You

5  stated in your resume that you fly or have flown a Gulfstream III,

6  correct?

7  A.    Correct.  As co-pilot.

8  Q.    As co-pilot.  Do you know what the term balanced field means?

9  A.    Balanced field?  No.

10  Q.    Okay.  Are you familiar with the notion that in certain

11  circumstances, an aircraft should be capable of accelerating to

12  take off speed, and then stopping on all -- on the remaining

13  runway?

14  A.    Yes.

15  Q.    Okay.

16  A.    Accelerate stop distance.  Yes.

17  Q.    Can we agree that's what a balanced field is?

18  A.    Yes.

19  Q.    Okay.  And having flown the Gulfstream III, I assume that you

20  are familiar with its operating characteristics and capabilities,

21  correct?

22  A.    I was familiar with them a long time ago.

23  Q.    All right.  But that would be part of your job?

24  A.    Yeah.

25  Q.    Okay.  And so you would not land a Gulfstream III on a 1,500

A277

389

1    foot asphalt strip, is that correct?

2    A.    That's correct.

3    Q.    And you would not do that because the airplane's capabilities

4    and performance specifications would not allow that to safely

5    occur.

6    A.    Well, you couldn't do it per the manual.

7    Q.    Right.  The airplane is simply not capable of doing it,

8    correct?

9    A.    Correct.

10    Q.    Okay.  And that's part and parcel of its specifications.  So

11    what I'm driving at, Specialist, is that the analysis, the

12    determination of where an aircraft should land is a function of

13    the pilot's skill, and a function of the performance of the

14    aircraft.  It's all in the mix.  Is it not?

15    A.    Yes.

16    Q.    Okay.  So it's fair to say that where one aircraft may be

17    able to go, another aircraft may not be able to go, correct?

18    A.    Correct.

19    Q.    And ditto with the pilot.  Where one pilot may be able to go,

20    another pilot may not be able to go, because of their relative

21    skillsets?

22    A.    And where the regulations allow them to go, yes.

23    Q.    Okay.  But it's -- all of that's in the mix, agreed?

24    A.    Agreed.

25    Q.    Okay.  And so when making a determination about where a

A278

390

1   person should or should not be, or what kind of hazards they might

2   pose or not pose during the course of their operations, is a

3   function of all of that.  It's not just one thing or another.

4   It's a combination of the regulatory environment.  It's a

5   combination of the aircraft itself and the skill of the pilot or

6   pilots operating the aircraft.  Can we agree on that?

7   A.    I agree.  But we have to be very careful that we do

8   everything within accordance with the regulations and within the

9   performance capabilities of the pilot and the air craft, etcetera,

10  etcetera.

11  Q.    Okay.  Thank you.  There is no prohibition on off airport

12  operations, correct?

13  A.    Correct.

14  Q.    And are you familiar with the FAA's off airport operations

15  guide?

16  A.    I am.

17  Q.    Did you review it in connection with this case?

18  A.    I did.

19  Q.    Okay.

20      MR. SCHULTE:  Ms. Stustak -- I'll stop sharing the screen,

21  folks.  Thank you.

22      Ms. Stustak, could you pull up what I believe is

23  Administrator No. A-22, Alpha 22?

24      BY MR. SCHULTE:

25  Q.    And, Specialist Speeg, I'm showing what is marked as Exhibit

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A279

405

1       BY MS. TOSCANO:

2   Q.   Okay.  So if a pilot did not do any reconnaissance and just

3   landed off airport, and there was an accident -- I think I need to

4   give you a different scenario.  That's just too many facts.

5       If -- let's see here.  Okay.  So let's -- the hypothetical

6   I'm giving to you is if a pilot does do a low level reconnaissance

7   and does -- and lands off -- at an off airport runway -- okay.

8   Then that's not a very good hypothetical either.  Let's just take

9   what happened -- what Respondent had stated, like you said earlier

10  in your cross-examination, that -- or may have been direct.

11      Okay.  So then Mr. Palmer indicated that he was doing a low

12  pass, assessing the runway, and he decided that it wasn't safe for

13  landing.  If --

14      MR. SCHULTE:  Objection.  Your Honor, that was not his

15  testimony.

16      JUDGE FUN:  Specialist Speeg, in the hypothetical that might

17  be posed, go ahead.

18      BY MS. TOSCANO:

19  Q.   If the Respondent hadn't made that determination that it was

20  not safe for landing, and landed within the distance of the --

21  okay.  That's not a very good question either.

22      MS. TOSCANO:  I'm sorry, Your Honor.

23      BY MS. TOSCANO:

24  Q.   So we'll go back to the Respondent.  The Respondent does the

25  low pass and decides that the landing site is unsuitable.  Under

A280

406

1  those circumstances, would the Respondent have violated 91.119(a)

2  and 91.119(c)?

3      MR. SCHULTE:  Objection.  That calls for a legal conclusion.

4      JUDGE FUN:  Overruled.  I'll allow it as a hypothetical.  You

5  can answer the question, Specialist Speeg.

6      THE WITNESS:  So the regulation says except for takeoff and

7  landing, you must stay -- you know, I only have that in front of

8  me, but -- so if he did a pass and then land, then I would say, in

9  my opinion, that the rule would apply.

10      BY MS. TOSCANO:

11  Q.   Okay.  I'm not really understanding you.  So my question was

12  if there wasn't a landing --

13  A.   Correct.

14  Q.   Let's say there was no landing, but there was just a low

15  pass, and the decision that the landing would not be safe -- the

16  landing site would not be safe.  However, in conducting the low

17  pass, the aircraft comes within the -- goes below the minimum

18  altitudes of 91.119(a) and 91.119(c).  So because the -- do you

19  understand the question?  So the pilot goes below those two

20  altitudes, the minimum altitudes under 91.119, incident to a low

21  pass, where the pilot decides that it's not safe for landing --

22  that the landing is safe.

23  A.   So if he's not -- according to the rule, except for takeoff

24  and landing, the rule applies.  So if he's just doing a low pass,

25  just like my -- when I was describing my qualifications, and

A281

416

1  takeoff and landing.  So my question really is for purposes of a

2  low pass, is there anything in the regulations that sets the

3  specific altitude or the minimums for a low pass?

4       THE WITNESS:  Yeah.  91.119(c).

5       JUDGE FUN:  Okay.

6       THE WITNESS:  Well, with regard to altitudes over objects and

7  people on the ground.

8       JUDGE FUN:  And this is sparsely populated areas, which I

9  understand.

10      THE WITNESS:  Correct.  Correct.

11      JUDGE FUN:  All right.  So a low pass, in your opinion,

12 should not be conducted within 500 feet of any person, vessel,

13 vehicle, or structure?

14      THE WITNESS:  In a sparsely populated area.

15      JUDGE FUN:  In a sparsely populated area.  Okay.  All right.

16 The other question I would ask you, Specialist Speeg, is I do see

17 on Exhibit R-2 that there's a yellow marking called intended

18 landing area.  Did you conduct any kind of on the ground, physical

19 surveillance of that area or satellite imaging, or did you just

20 look at what was presented on the photo?

21      THE WITNESS:  No.  I'm at headquarters office, so I'm not in

22 the district office there.  That would have been Inspector Green.

23 So no, I did not do a site visit.

24      JUDGE FUN:  Okay.

25      THE WITNESS:  I've just gone off of the exhibits and the

A282

417

1    testimony, sir.

2        JUDGE FUN:  Okay.  All right.  You also testified about

3    seeing the video with the aircraft, the Kitfox in the steep bank,

4    which you indicated was on cross-examination, included a bank of

5    zero to 60 degrees.  So from zero to 60, but estimated up to 60

6    degrees.

7        When you saw that video, do you recall what video you saw?

8    If you saw the native format video or if you saw in your testimony

9    about this iPhone video?

10       THE WITNESS:  Sir, I don't know which one it was.  I just

11   remembered seeing a video of the airplane flying by.

12       JUDGE FUN:  Okay.  Do you recall when you saw that video?

13   Was it prior to the hearing that began --

14       THE WITNESS:  Well, it was part of the enforcement package.

15   So I saw it way back when I reviewed the case.

16       JUDGE FUN:  Okay.

17       THE WITNESS:  Before it ever went to legal.  And then I've

18   seen it several times since then.

19       JUDGE FUN:  Do you recall ever seeing the native format

20   video, or a video that wasn't the iPhone video of the monitor?

21       THE WITNESS:  I don't.

22       JUDGE FUN:  All right.  I don't think I have any further

23   questions for you, Specialist Speeg.

24       THE WITNESS:  I guess I should say I don't know if it was

25   native or, you know, the one generated on the phone.  I don't

A283

418

1 know.  I just -- like I said, I remember seeing a video.  I don't

2 know what the source was.

3         JUDGE FUN:  All right.  Thank you, Specialist Speeg.  I don't

4 have any further questions.

5         Ms. Toscano, did you have any follow-up questions?

6         MS. TOSCANO:  Yes, Your Honor.  Thank you.

7                         REDIRECT EXAMINATION (continued)

8         BY MS. TOSCANO:

9 Q.   Looking at Exhibit R-2, Specialist Speeg, it's -- let's

10 propose that the -- given the flight path that's depicted on this

11 chart, and instead of a landing, it's an approach to landing, not

12 a low pass, but an approach to landing, and I think you testified

13 on my direct examination of you that given that approach path,

14 that that would violate -- if that was a -- let's say it was an

15 approach path, not a low pass, but an approach path, that that

16 path would violate 91.119(c) because it came too close to the

17 Likes' residence.

18         MR. SCHULTE:  Objection.  Calles for a legal conclusion.

19 Again.

20         MS. TOSCANO:  So my question to you --

21         JUDGE FUN:  Hang on.  There's an objection pending.

22         MS. TOSCANO:  Okay.

23         JUDGE FUN:  I'm going to overrule the objection.  Go ahead,

24 Ms. Toscano, with your question.

25         MS. TOSCANO:  Okay.

A284

425

1  Q.   I know it's been a long afternoon.  I appreciate your

2  patience and your sharing your knowledge with us today.  The FAA

3  off airport's guide provides a recommended technique for

4  determining the safety and suitability of an off airport landing

5  site, correct?

6  A.   Correct.

7  Q.   And can we agree that 91.119 does not mention off airport

8  operations at all, correct?

9  A.   That does not.

10  Q.   Meaning that whether on airport, off airport, around

11  airports, 14 C.F.R. 91.119 doesn't exempt any of those operations

12  from its dictates, correct?

13  A.   I'm not sure I understand the question.  I'm sorry.

14  Q.   Sure.  That's okay.  It was a poor question.  I agree.  My

15  question is 91.119 does not differentiate between on airport

16  operations and off airport operations, correct?

17  A.   That's correct.

18  Q.   And the FAA off airport ops guide provides guidance on how to

19  safely conduct and prudently conduct an off airport landing,

20  correct?

21  A.   Correct.  Advisory in nature.

22  Q.   Advisory in nature, that's right.  And so when it comes to

23  aviation safety, safety by definition is necessary; don't you

24  agree?

25  A.   Yeah.

A285

426

1    Q.    Okay.  And so in order to safely determine whether or not

2    it's safe to land at an off airport location, it would be prudent

3    to follow the FAA's off airport ops guide, correct?

4    A.    As long as you're doing it in accordance with the regulation.

5    Q.    Well, I'm asking you a simple question, that in order to

6    conduct off airport operations safely, it would be prudent to do

7    it in accordance with the off airport ops guide, correct?

8    A.    As part of your -- yes.

9    Q.    Sure.  And whatever is prudent in aviation is, by definition,

10   necessary; don't you agree?

11   A.    Possibly.

12        MR. SCHULTE:  I have nothing further for the witness, Your

13   Honor.

14        JUDGE FUN:  All right.  Specialist Speeg, I did have a few

15   questions that I think came up as you were testifying again.  And

16   you mentioned that when you look at 91.119(a), that references an

17   altitude versus (c), which is more concerned with distance.

18        THE WITNESS:  Right.

19        JUDGE FUN:  And so when we look at subsection (a), is your

20   reading of that requirement, that particular regulatory

21   requirement applies anywhere operations are occurring, except when

22   necessary for takeoff or landing, meaning whether it's over a

23   rural area, a sparsely populated area, water, anything else?

24        THE WITNESS:  Yes.  Because it addresses, you know, congested

25   areas, sparsely populated area, over water.  You know, it would

A286

427

1  probably be best to pull up the regulation and look at it if you

2  want to do that, but -- because we're just -- we're talking about

3  a regulation without really looking at it.  You know.

4      JUDGE FUN:  All right.  Well, let's pull up for demonstrative

5  purposes the Administrator's complaint that was filed in this

6  case.

7      MR. SCHULTE:  Your Honor, at the risk of offending the Court,

8  and I mean no disrespect, Mr. Speeg was put up as an expert on

9  this regulation.  And throughout the course of his testimony, he

10  couldn't even tell us exactly what the regulation said.

11      So to allow him now to read the regulation and opine on it,

12  in my judgment, respectfully, is kind of giving him a second bite

13  at the apple.  He was put up as the man who understood this

14  regulation inside and out.  And now he sits there and tells us,

15  I'm not really sure what it says.  So I think, respectfully,

16  we're, you know, giving the expert a little more help than I think

17  under these circumstances he's entitled to.

18      JUDGE FUN:  I'm going to overrule your objection, counsel.

19  Again, I don't expect any witness to memorize every single

20  regulation and can be discussed word for word.  I certainly don't

21  expect Specialist Speeg to have a photographic memory, even though

22  he might be an expert.

23      So I'm going to overrule your objection.  And I think it's

24  important for me to understand his testimony, as well as the

25  positions of both parties.  In order for me to do so, it's

A287

1  it looks like we could proceed on Monday, but Tuesday and Friday

2  there already is another hearing scheduled via Zoom.  And we may

3  not have enough staff, nor enough licensing agreements that'll

4  hold simultaneously two Zoom hearings during the same week.  So if

5  we do go past Monday of next week, we're going to have to pick

6  some other days to resume the proceedings.

7      MR. SCHULTE:  Judge, I want to bring something to the

8  attention of the Court.  It may or may not matter, but I did want

9  to be candid about it.  I very well may be leaving the country in

10  the morning.

11      JUDGE FUN:  Okay.

12      MR. SCHULTE:  I will have full internet connectivity where

13  I'm going.  I just wanted the Court to be aware that I may be

14  overseas on Monday.  Perfectly happy to conduct the hearing.  I

15  just want you to be aware of it.

16      JUDGE FUN:  All right.  But and so we'll cross that bridge

17  when we get there.  You know, so if there's internet connectivity

18  problems or issues, then we'll try to --

19      MR. SCHULTE:  There won't be.

20      JUDGE FUN:  All right.  So it sounds like at least you're

21  going to a developed country?

22      MR. SCHULTE:  That's fair.

23      JUDGE FUN:  All right.  Very well.  The other thing that I

24  want to -- obviously we have a different court reporter today.

25  That's Ms. Michelle Morales-Bonilla.  And she is filling in for

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A288

443

1      MR. SCHULTE:  That sounds like collateral evidence to me,
2  Your Honor.
3      JUDGE FUN:  Yeah.  Yeah, it sounds like hearsay to me.  So
4  sounds like that there's going to be an objection to that one.
5  What other exhibits do you have at this late our, Ms. Toscano,
6  that you're asking to be submitted?
7      MS. TOSCANO:  Okay.  Then the other one is a -- the true copy
8  of exhibit A-18.  It's a certificate of true copy of exhibit A-18.
9      JUDGE FUN:  Okay.  Are you marking that as A-30 or --
10     MS. TOSCANO:  30.
11     JUDGE FUN:  Oh.
12     MS. TOSCANO:  A-30.  I'm still waiting for the certificate of
13  true copy.  And I also have exhibit A-31, which will be the
14  certificate of true copy of the flight path that Inspector Green
15  prepared.
16                          (Administrator's Exhibits A-30 & 31
17                                marked for identification.)
18     MR. SCHULTE:  Forgive me Ms. Toscano and Your Honor, I'm a
19  little confused.  Is A-18 and A-30 basically the same thing?
20     MS. TOSCANO:  Yes, Your Honor.
21     JUDGE FUN:  Okay.  So the difference is that one is a -- one
22  will have a certificate of authenticity, or is it just a copy?
23  The same copy, just --
24     MS. TOSCANO:  It'll have a certificate of true copy attached
25  to it.

A289

474

1   to, Mr. Schulte?

2       MR. SCHULTE:  No.  I -- forgive me, Your Honor.  Again,

3   because there's multiple new exhibits flying around, I was a tad

4   confused.  I do object to it for the simple reason that in very

5   brief that he testified, Mr. Stanley basically said I can't tell

6   if part of this exhibit accurately represents the flight path.

7   That's what he just said.  So I'm not sure what it depicts, but

8   according to Mr. Stanley it may or may not be accurate.  So on

9   that basis I'm going to object to it, because I don't think it's

10  necessarily consistent with own testimony.  And he didn't create

11  it.

12      JUDGE FUN:  All right.  So I did he object to exhibit A-30

13  slash A-18 as well.  I'm going to make my ruling on exhibit A-30

14  or which also is known as A-18, as well as A-31.  I'm going to

15  sustain the objections and exclude these exhibits.

16      They are summarized charts that Inspector Green created.

17  He's not an expert witness.  He was testifying as a lay witness.

18  He complied these based upon statements of the witnesses.  And it

19  was unclear if he complied them based upon their written

20  statements to the investigators, or the testimony that was

21  presented by the witnesses, or all of the above.

22      There is hearsay statements on the documents themselves.

23  That is the Google photographs.  There is some inconsistency

24  between what Inspector Green believes the flight path was, and

25  what some of the witnesses say the flight path was.  And of course

A290

1   there has been no eyewitness that can testify to the full flight

2   paths that are depicted on these diagrams.  And therefore it's

3   based on assumptions and suppositions of the FAA Investigator.

4        For those reasons, I'm excluding these exhibits in evidence.

5   I will still consider exhibit A-18 for purposes of a demonstrative

6   exhibit, which was not admitted, but I'll exclude exhibit A-30 and

7   A-31.  All right.  Ms. Toscano, anything further on your case in

8   chief?

9        MS. TOSCANO:  Yes, Your Honor.  I apologize.  I think that we

10  also had a -- you conditionally admitted exhibits A-3, A-4 and A-

11  5.

12       JUDGE FUN:  Mr. Schulte, any objections?  Do you still

13  maintain objections to A-3, 4 and 5?

14       MR. SCHULTE:  So A-5 is the FSDO's notice of investigation to

15  Respondent.  Not sure what it's relevance is.  So on that basis

16  I'll object.  And same for A-3 and A-4.  These certificates, or

17  these letters of warning and statement of counseling have nothing

18  to do with the allegations set forth in the Administrator's

19  complaint.

20       The letter or warning warns my client about something that is

21  not prohibited.  So I'm not sure what value that has, as to

22  sanction.  As far as the statement of counseling, again we're

23  talking about uncharged and unproven conduct.  It's highly

24  prejudicial.  It's inflammatory.  And it's meant to stink up these

25  proceedings and suggest that my client is some kind of scofflaw.

480

1  the Administrator went through a letter of counseling and a letter
2  or warning with the Respondent.

3      JUDGE FUN:  Yeah.  I do recognize that.  That you're not
4  arguing  that it's for aggravation or aggravating circumstances,
5  but just to show that he had notice, and there was progression and
6  discipline.  So again, for purposes of notice I'll accept that.  I
7  also recognize that the conduct in some cases is not necessarily
8  similar to the conduct in question.  Although some of the
9  regulations cite it, it seemed to be parallel to this one.

10     MS. TOSCANO:  Thank you.

11     JUDGE FUN:  Anything else, Ms. Toscano?

12     MS. TOSCANO:  May I have a moment just to check my exhibit
13 list, just to make sure?

14     JUDGE FUN:  All right.  Very well.

15     MR. SCHULTE:  Your Honor, perhaps -- I mean it sounds like
16 the Government is about to rest.  And if so, obviously we'll be
17 calling my first witness.  Maybe this might be a good time to take
18 a comfort break?

19     JUDGE FUN:  Yeah.  I would agree.  Let's go ahead and take a
20 15 minute break, since we've going for a bit here.  And then when
21 we come back on, Ms. Toscano we'll review your exhibits, and if
22 you have anything further at this point.

23     MS. TOSCANO:  Thank you.

24     JUDGE FUN:  All right.  So we'll reconvene 15 minutes past
25 the hour.  Again, I just remind everyone to mute and go off

A292

481

1  camera, but do not leave.  If you leave, you'll have to be

2  readmitted.  And we're in recess and off the record.

3       (Off the record at 1:15 p.m. EST)

4       (On the record at 1:32 p.m. EST)

5       JUDGE FUN:  Okay.  We're now on the record after a short

6  recess in the matter of Administrator versus Palmer.  We resume on

7  the Administrator's case in chief.

8       Ms. Toscano, do you have anything further?

9       MS. TOSCANO:  No.  Thank you, Your Honor.  The Administrator

10 rests.

11      JUDGE FUN:  All right.  The Administrator has rested.

12 Mr. Schulte?

13      MR. SCHULTE:  Yes, Your Honor.

14      JUDGE FUN:  You may proceed.

15      MR. SCHULTE:  Thank you.  For the Respondent, Your Honor,

16 we'll call Trent Palmer.

17      JUDGE FUN:  All right.  All right Mr. Palmer, you've been

18 called to the witness stand.  All right.  I'm going to go ahead

19 and swear you in again.  I'll have you raise your right hand and

20 take the oath.

21 (Whereupon,

22                      TRENTON PALMER

23 was recalled as a witness by and on behalf of the Respondent and,

24 having been first duly sworn, was examined and testified on his

25 oath, as follows:)

A293

482

1        JUDGE FUN:  All right.  Thank you.  Again, you've been

2   sitting through the proceeding.  So I'm not going to cover my

3   admonishments I normally give to witnesses at this point.

4   Mr. Schulte, you may question your witness.

5        MR. SCHULTE:  Thank you, Your Honor.  And before I do so,

6   forgive me Your Honor, I don't want to elongate this issue, but I

7   do want to revisit something very briefly.

8        JUDGE FUN:  All right.  Very well.

9        MR. SCHULTE:  Just before we went off the air, with respect

10  to exhibits A-3 and A-4, the warnings letters if you will,

11  respecting the fact that Your Honor has already conditionally

12  admitted them, I would just like to point out that Ms. Toscano

13  specifically said that they should not be used and they are not

14  using them for the purposes of aggravation of sanction.  That's

15  the only purpose that they can be used for.  And therefore, while

16  I'm not asking Your Honor to overrule himself, but I would ask you

17  to give them absolutely no weight whatsoever.

18       If they're not being used for the purposes of sanction, then

19  the only possible reason that they're in evidence is for the

20  reasons that I discussed; that they're there to prejudice this

21  witness and to ruin these proceedings.  I won't say any more.  I

22  know Your Honor has made a decision.  But I did want to put that

23  in there for the record.

24       JUDGE FUN:  Okay.  Well, I will consider your argument and I

25  will consider that argument as part of your closing, as to those

A294

488

1  continuously run it?  That was a terrible question.  Strike that.

2      So did you operate the -- how did you operate the camera?

3  Let's do it that way.

4  A.   I can't recall exactly, but I'm pretty sure I just hit record

5  and walked away.

6  Q.   All right.  I'm going to play it.  And watch the video, and

7  then after it concludes I'll have some questions for you.  Okay.

8  A.   Okay.  And you are at the end of the video.

9  Q.   Yes, I am.  Thank you.  Again, I'll give you part of my

10  salary for today.  Okay.  Here we go.

11      (Video is played)

12      MR. SCHULTE:  Okay.  Do you need to see that again, sir?

13      THE WITNESS:  No.

14      MR. SCHULTE:  Your Honor, do you need to see it again?

15      JUDGE FUN:  No.

16      MR. SCHULTE:  Thank you, Your Honor.

17      BY MR. SCHULTE:

18  Q.   Now Mr. Palmer, does that video accurately depict the

19  performance of your aircraft at the time the video was taken?

20  A.   Yes.

21  Q.   Okay.  And if you know, can you tell us -- well, what did the

22  video just show us?  Let's do it that way.

23  A.   It was a short takeoff and landing of -- that I did in my

24  aircraft.

25  Q.   Okay.  And in terms of noise level, and in terms of

497

1 generally agree that's the vicinity in which you were flying on

2 November 24th?

3 A.    Yes.

4 Q.    Okay.  And can we agree that -- well, you tell me, the flight

5 path, did you come from the bottom to the top of the -- that

6 magenta line, without regard to the line itself, or did you come

7 from the top to the bottom in your flight path?

8 A.    It was from the top to the bottom.  I was coming from the

9 north, heading southbound.

10 Q.    Okay.  So I want to ask you a hypothetical question.  If you

11 had lost your engine during any portion of this maneuver, what

12 would you have done?

13 A.    I would have pointed straight forward.  There's a vacant lot

14 to the south of Mr. Likes' property.  And I would have just landed

15 out in the sagebrush there.

16 Q.    Okay.  And your familiar with this area, are you not?

17 A.    Yes, very.

18 Q.    How much room is out there to conduct an emergency landing of

19 the type you just described?

20 A.    I mean plenty.  I don't know exactly.  They're 10 acre

21 parcels.  I think the average is about 600 and something feet on

22 each end.  So I don't need even a quarter of that to land.

23 Q.    Okay.

24 A.    Yeah.

25 Q.    Had you lost your engine, would you have attempted to land on

1  necessary for takeoff or landing, as stated in the prefatory

2  clause of Section 91.119.  Specifically, the prefatory clause

3  starts with the phrase quote, except when necessary for takeoff or

4  landing, end quote.  And the amended complaint makes no factual

5  allegation that Respondent's low operation was not necessary for

6  takeoff or landing.  The Administrator's reply is that it is the

7  Respondent's burden of proving that the exception to a 91.19

8  violation applies.

9      The Administrator also contends that the prefatory exception

10  is an affirmative defense that must be pled and proven.  That is

11  Respondent has to allege and prove that his low altitude operation

12  was necessary for takeoff or landing.  As such, the Administrator

13  contends that the prefatory clause of 91.119 is not required to be

14  alleged.

15      Finally, the Administrator argued that the Respondent had

16  adequate notice of the regulation, as cited and quoted in the

17  admitted complaint, of the principals of reasonable notice.  Rule

18  17(a) of the Board's rule provides that a motion to dismiss a

19  complaint may be filed in lieu of an answer within the time limit

20  for filing an answer.  Turning to Board rule 14(b), that rule

21  states that motions shall be made in writing unless made during a

22  hearing.  Motions introduced during a hearing may be made orally

23  on the record, unless the Law Judge directs otherwise.

24      Now, in this instance Respondent's motion to dismiss was made

25  orally at the beginning of the hearing.  Although the Board rules

A297

1    unsuitable.  In the McCollough case a pilot of a Learjet was found

2    in violation, when he was practicing approaches and missed

3    approaches at an airport with a gravel runway.  The aircraft was

4    simply not equipped to land on a gravel runway, and there were

5    persons, buildings and aircraft within 500 feet of the runway.

6        Now, as I mentioned these are just a few of the cases that

7    discuss whether a low altitude operation was necessary for takeoff

8    or landings under Section 91.119, or its predecessor Section

9    91.79.  Now, in all these cases the Board makes it abundantly

10   clear that the prefatory exception of 91.119 does not apply if the

11   landing site, whether or not there was an actual landing, is

12   unsuitable.  Now in short, in order for exception to apply the

13   landing site has to be suitable under the circumstances.

14       Now, in these cases it is notable that it was also the

15   Respondent that argued the applicability of the exception to the

16   violation.  As I mentioned, none of these cases are direct and on

17   point, and *Wick* is dicta.  However, given the Board's precedent,

18   along with the Board's statement in the *Wick* case, I find that it

19   is the Respondent's burden of proving that any low flight

20   operation falls within the ambient of the prefatory language of a

21   violation of Section 91.119.  Respondent has provided no

22   convincing authority otherwise.

23       Now perhaps this case if appealed will conclusively resolve

24   the question of which party bears the burden of proving a

25   prefatory exception in the regulation.  However, as set I am bound

587

1    the entirety of the aircraft's flight operation happened pretty

2    fast.

3         Mr. Stanley testified -- excuse me, Your Honor.  Mr. Stanley

4    testified that after the aircraft passed the Pena's home heading

5    south, the aircraft made a slight left turn and he saw the bottom

6    part of the wing.  Mr. Stanley stated the aircraft flew pair [sic]

7    to the neighbor's house, to the south of the Pena's.  That the

8    craft -- aircraft was close -- as close as to the neighbor's

9    house, as it was the Pena's house; 80 to 100 feet.  And that the

10   aircraft's altitude at that point was approximately 15 to 20 feet

11   higher.

12        Mr. Stanley stated he was with Mr. Pena, standing outside

13   near their shared western fence line when he made his

14   observations.  And that he was approximately 150 feet west of the

15   Pena's house.

16        Respondent testified that November 318 Juliet-Juliet's

17   wingspan is approximately 32 feet.  That the cruse speed is

18   approximately 100 miles per hour and the landing speed is 32 miles

19   per hour.  Respondent stated that at the time this low flight

20   operation, he had approximately 900 hours as pilot in command in

21   his aircraft November 318 Juliet-Juliet.

22        Respondent testified that on the -- that his flight operation

23   below 100 feet on November 24th 2019 in the vicinity of 400 and

24   300 Desert Sun Lane was a low pass at 70 miles per hour to assess

25   the visibility of a landing site which he determined was not

A299

1        Here's why:  this video is the centerpiece of the

2   Government's case.  Now, I mentioned this during the course of

3   testimony.  The Administrator said oh no, it's not the centerpiece

4   of our case.

5        Every witness testified about the video.  The Government

6   attempted multiple times to reintroduce the video into evidence,

7   after Your Honor excluded it under the best evidence rule.  The

8   video started this proceeding.  It's inherent in anything about

9   this case.

10       The FAA went out to the Pena's home on no less than three

11  occasions.  On at least one of those visits Inspector Green -- who

12  by the way before I say anything about him, let me say this:  I

13  think he's a decent, honorable man who's a good FAA employee.

14  Anything that follows is not a personal attack upon him or a

15  pejorative in any fashion.  I don't mean it in that way.

16       But on one occasion Inspector Green went out there, and he

17  downloaded a video file from the Pena's computer.  He then said he

18  took that video file, which by the way was recorded on an SD card

19  in that government-issued computer.

20       This is an SD card.  I know Your Honor knows what it is.

21  They're small, they sell they by the pound, and they're cheap.

22       And Inspector Green took the card back to the FAA, and

23  testified that he uploaded it to a FAA computer somewhere.  I

24  don't know what that means.  He wasn't clear.

25       But what he was clear about was what he did afterwards.  And

A300

606

1   what he did afterwards was to take that camera with the SD card,

2   and in order in his testimony to make room for additional videos

3   and photographs on the camera, he took deleted the file on it that

4   he downloaded from the Pena's computer.  It wasn't an accident.

5   He didn't stumble and inadvertently hit the delete key.  It was a

6   purposeful act.  Of that there is no meaningful dispute.

7       Now, I suppose one could argue it's no big deal; it was a

8   small, immaterial collateral piece of evidence.  But it wasn't,

9   Judge.  It was the centerpiece of the Government's case.

10      Now, you recall that when I pressed Mr. Pena in his

11  deposition he first said that the video that the Government

12  attempted to introduce was the native video, the original video.

13  Not a recording of a recording.  But as he was giving that

14  testimony, we're all sitting here looking at it, and that even a

15  five year old could see what he was saying as not true.

16      So on three occasions the Government went to the Pena's home.

17  On three -- two occasions they may or may not have secured the

18  native video.  And on one occasion, whatever video they did secure

19  they brought it back to the FAA and deleted it.

20      Madame Host, could you pull up Administrator's number 23,

21  which is excerpts from FAA Order 2150-3(c)?  Ma'am, disregard

22  that.  I see it's excerpts.  It's not the entire thing.

23      Your Honor, may I share my screen, please?

24      JUDGE FUN:  Yes.  Go ahead.

25      MR. SCHULTE:  Thank you, Judge.  Okay.  Apparently, screen

A301

1       That's not how people speak, Judge.  That's how people

2  rehearse.  Mr. Pena, who freely conceded he's got a grudge against

3  his neighbor Jared Likes.  Mr. Pena who testified that he put up

4  that security camera, to catch Mr. Likes flying drones over his

5  house, or to use his expression dive-bombing his house.

6       He doesn't like Mr. Likes.  And I expect that this was one

7  way to get at him, by going after his friend.  His conceded

8  friend, Mr. Palmer.  So Mr. Pena's testimony, already out of the

9  gate has some problems.

10      Now, Mr. Pena who counsel mentioned is an Iraqi war veteran,

11 I would never take that away from him.  He and I have chewed some

12 of the same dirt.  We have.

13      But he participated in one of the bloodiest battles that this

14 country has seen in a very long time; the fight for Fallujah,

15 Iraq.  It was violent, Judge.  Mr. Pena was a Mark 19 Grenadier.

16 I don't think I have to emphasize, for the purpose of that weapon,

17 what it does, how it works.  It doesn't shoot machine gun bullets.

18 It spits out grenades in very rapid succession.  It's essentially

19 a grenade machine gun.

20      When you're firing it, it's loud.  When those rounds land,

21 it's louder.  It's mean to be scary.  That's kind of the point.

22      And yet Mr. Pena testified that this two to three second

23 flyby traumatized him.  It's hard to square those things, Judge.

24 So it is difficult to concede how this combat war vet would be

25 traumatized by a two to three second flyby of an airplane.

618

1    He freely conceded, when I asked him cross-examination, Mr.
2    Speeg, don't you agree that the appropriateness of any given
3    operation is a function of aircraft performance and pilot skill?
4    Yes.  He agreed.  Absolutely agreed to that.

5    But yet, he doesn't know those things, but is prepared to
6    comment on what?  This operation.  You can have a cake recipe,
7    Judge.  But if you eliminate two critical ingredients, you don't
8    have a cake.  That's all I'm saying here.

9    Mr. Speeg is just another pilot in this instance.  He has no
10   particular qualification to comment about this particular
11   operation by this particular pilot.  He just doesn't.

12   He may be a phenomenal Gulfstream pilot.  He may be a great
13   Bonanza pilot.  He knows nothing about the Kitfox V airplane.
14   Nothing about it.

15   So how he can testify as to what might have happened, if this
16   aircraft's engine failed, is beyond comprehension.  He doesn't
17   know.  Thinks he knows, but he doesn't.

18   And he knows nothing about Mr. Palmer's piloting skills,
19   which I might suggest to Your Honor, and we'll get to Mr. Palmer
20   eventually, are quite formidable.  The man actually has lost an
21   engine before, and as he testified he plopped own in an open area,
22   stopped in a couple hundred feet.  So I am not sure on what basis
23   Inspector Speeg can comment about anything on this operation.

24   Now bear in mind too, that Inspector Speeg was put up as the
25   expert for 91.119.  Now, I questioned him about the words of the

A303

1    regulation.  And Your Honor rightfully said well, we certainly

2    can't expect everyone to remember all the rules verbatim.  I

3    agree.

4        But the Government put up Mr. Speeg as an expert on this

5    particular regulation.  And time and time again, during the course

6    of his testimony, he misstated what the regulation said.  So as

7    far as his qualification to be an expert in this case, I would

8    respectfully submit is highly suspect.

9        If he wants to talk about the operation of a Gulfstream III

10   aircraft, fine.  But as far as how to land a Kitfox V off airport

11   under these particular set of circumstances, he's not qualified.

12   He's just not.

13       Ditto on the basis for his opinion.  He does not know what

14   the landing site was.  He only knows what was around it.

15       If the argument is well, it was simply the proximity of the

16   structures, he conceded every day aircraft fly within 500 feet of

17   structures, and persons, and vehicles on the ground.  Virtually

18   every airport has a perimeter road.  And as aircraft are landing,

19   they're flying over top of those vehicles, and over other

20   structures.

21       If you're within a mile of the runway, and you're flying a

22   three degree glide slope, you're within 300 feet of persons, and

23   property, and structures on the ground.  It happens every day all

24   the time.  It's not unusual.

25       And that's why we have the regulation, except -- and let me

A304

636

1                    ORAL INITIAL DECISION AND ORDER

2                                             (1:50 p.m. EST)

3         JUDGE FUN:  Good afternoon, I am Administrative Law Judge

4    Darrell L. Fun and was assigned to hear the case of Billy Nolen,

5    Acting Administrator of the Federal Aviation Administration v.

6    Trenton J. Palmer, Docket Number SE-30880.

7         This is a proceeding before the National Transportation

8    Safety Board held pursuant to the provisions of the Federal

9    Aviation Act pertaining to the Administrator's Amended Order

10   suspending Respondent's private pilot certificate for 120 days.

11        Today is April 6, 2022.  Pursuant to the Board's Rules of

12   Practice, I am issuing my Initial Oral Decision.  Pursuant to

13   Notice, this case proceeded to a hearing on the merits, with

14   evidence and arguments presented over a 3-day period, on March

15   29th and the 30th, and April 1, 2022.  My decision is based on the

16   evidence presented during the hearing, as well as the pleadings in

17   this matter.

18        Present and representing the Administrator is Lisa M.

19   Toscano, an attorney with the Federal Aviation Administration,

20   Western Enforcement Team.  Attorney Robert D. Schulte represents

21   the Respondent Trenton J. Palmer, who were both present throughout

22   these proceedings.  Mr. Palmer waived his presence on April 4th

23   during closing statements and my decision on his motion to dismiss

24   for failure to state a claim.

25        The Amended Complaint alleges that the Respondent operated a

A305

645

1  original recordings or DVR.  He did not provide the FAA the full

2  day that was recorded, but only approximately 10 to 15 seconds of

3  the recording.  In addition to a USB, which was a direct copy of

4  the DVR, he also gave the FAA a CD with the same copy of the

5  recording.  In addition to Exhibit A-7, Respondent objected to A-9

6  and A-11.  As previously stated, I excluded these exhibits.

7     Mr. Pena said that the FAA investigators came out to his

8  property to take photographs and measurements.  He was present

9  during this time, and explained to them locations where he saw the

10  airplane and its flight path.   Exhibit A-17, page 1, is a

11  photograph of the front of the garage, with Mr. Pena on the left

12  and Mr. Morgan from the FAA on the right.  They are looking at the

13  location of the garage peak camera.

14     Mr. Pena again said that the security camera is approximately

15  18 feet above the garage grade with the roof line at 20 feet.  The

16  garage doors face south.  To the east of the garage, or right side

17  of the photo, there is a dog kennel.  To the west, or left side of

18  the photo, is a bay window.  The front door is on the left side of

19  the bay window and the front door faces southwest.

20     Mr. Pena identified page 3 as a photograph showing a view

21  from the center line of the garage peak looking east, where the

22  propane tank is located and a shed just past the propane tank.

23  To the far left of the photograph, or north of the propane tank

24  and shed, the photo shows the corner roof of the chicken coop.

25     Mr. Pena was shown Exhibit A-17, page 5, which he testified

A306

1    I asked questions to clarify Mr. Pena's testimony.  When he

2  first heard the airplane but could not yet see it, his first

3  reaction was a fight or flight response.  He was startled by the

4  noise, but could not see the airplane.  He then began to yell at

5  this wife.  When the airplane came into view, he was in disbelief,

6  anger and shock.

7    Julia Pena testified lives at 400 Desert Sun Lane.   On

8  November 24th, she was coming home with her two kids.  Her husband

9  was at west fence line talking to their neighbor, Mr. Stanley.

10  She stopped briefly and let her daughter stay with her husband.

11  She then continued on to the house to park.  She began walking

12  back towards her husband carrying her son.

13    When she was near the front door of the house, she heard a

14  loud engine.  She could not see her husband yelling and waving,

15  but could, she could see her husband yelling and waving, but could

16  not hear him over the sound of the engine.  When she began looking

17  around, she saw the airplane.  She thought it was going to crash

18  into the neighbor's house and there was an emergency.  She says

19  she was dumbfounded, shocked, and it was a frightening scenario.

20  She filed a report with the FAA because of her concerns.

21    Mr. Pena, excuse me, Mrs. Pena said she could not initially

22  see the airplane because the house blocked her view of the

23  airplane until it passed the edge of the garage at the southern

24  end of the house.  She could not say how high it was when she saw

25  it, and guesses it was less than 100 feet above the ground and

1      A-14 depicts a circular driveway with four pine trees in the

2   middle, which is the gravel runway, excuse me, the gravel driveway

3   she was referring to when she saw the airplane and estimated it as

4   being 50 feet above ground.  She says the airplane was at the same

5   level passing over the fence line until it reached the neighbor's

6   house and then pulled up quickly.

7      She could not recall if the airplane passed over Mr. Likes'

8   house, just nearby or over the swimming pool.  She remembered

9   focusing on the airplane and noting it flew straight after pulling

10  up and continued to the west horizon.  Mrs. Pena was shown Exhibit

11  A-7 to refresh her memory and recalled the airplane passing near

12  the eastern side of the swimming pool and the edge of the

13  neighbor's garage.

14     She identified the various structures and their locations in

15  Exhibit A-17, pages 1, 3, 7, 11 and 15.  She identified on page 15

16  the gravel roundabout and the measuring tape extending out to the

17  south fence line of Mr. Likes' property with his house shown in

18  the distance.

19     On cross-examination, Mrs. Pena admitted that when she first

20  saw the airplane it was in a left bank and turning away.  She

21  estimates seeing the airplane for 2 to 3 second as it came into

22  her view.   Referring to Exhibit A-14, page 3, she indicated the

23  area east of their property line is pasture or open field.  She

24  admitted to talking to Mrs. Toscano 2 to 3 times on the phone, but

25  that her husband was not with her or present on the call.  Mrs.

A308

1  Pena indicated that Mrs. Toscano did not independently speak to

2  her husband and that she, Mrs. Pena, passed information to her

3  husband about the timing of the trial.

4      She admitted that the Reno Stead Airport is approximately 20

5  minutes away or 7 nautical miles away, and that the Reno Air Races

6  are held there annually.  She has heard and seen airplanes

7  participate in the air races over the BLM land, over the mountain

8  range in the past.

9      Russell Stanley testified that was living at 4445 Desert Sun

10  Lane, Reno, Nevada, on November 24, 2019.  When he was living in

11  Reno, he was neighbors with the Penas and they would meet at the

12  fence line and talk.  Referring to Exhibit A-14, page 3, for

13  demonstrative purposes, he identified his house in the upper left

14  corner or the northwest, and Mr. Pena's in the upper right corner

15  or northeast.  He does not know the neighbor to the southeast, or

16  bottom right corner of the photograph.  Mr. Stanley testified that

17  to the north of his and Mr. Pena's property is BLM land and to the

18  east of Mr. Pena's is the mountain range.

19      On the 24th, he was at the fence line talking with Mr. Pena

20  for about an hour when he noticed an airplane fly by.  He first

21  saw the airplane to the far east near the mountain range coming

22  from the south.  He estimated the airplane being approximately a

23  mile away over BLM land.

24      He saw the airplane turn left, towards the property, and come

25  towards them at a lower altitude.  He didn't know how high the

1  airplane was over the mountain range, but estimates it was 80 feet

2  above the ground after it turned towards the Pena's property.  His

3  80-foot estimate is based upon his familiarity with tall poles at

4  a golf driving range.  He explained that he is working at Big Shot

5  Golf in Texas, which is a driving range, and they have 80-foot and

6  140-foot tall poles, so this gave him a reference for those

7  heights.

8      Mr. Stanley described the airplane flying at the same level

9  of 80 feet with a steady altitude.  He could not see the airplane

10 coming towards the north end of Mr. Pena's house, excuse me, let

11 me rephrase that.  He could see the airplane come towards the

12 north end of Mr. Pena's house above the roof line.  He estimates

13 that the airplane was as far away from the house as it was high.

14 Mr. Stanley says the speed was constant.

15     As it got closer, he lost sight of it since the airplane was

16 too low for him to see above the top of the house.  After it

17 passed Mr. Pena's house to the south, he saw the airplane make a

18 left turn as he could see the bottom of the wing.  He stated that

19 if the airplane did not turn, it would have hit the neighbor's

20 house.  Mr. Stanley said it was a slight turn and not a drastic

21 turn.  The airplane then flew parallel to the neighbor's house

22 after the turn.  He said the airplane seemed to climb during the

23 turn and maybe gained 15 to 20 feet.  Mr. Stanley said that

24 Mr. Pena and he looked at each other with quizzical expressions.

25 Mr. Stanley stated he has seen this aircraft flying several times

653

1  before, but this was the first time it was that low.  He said it

2  was a clear day on the 24th.

3       On cross-examination, Mr. Stanley agreed that east of Mr.

4  Pena's property line is open scrub brush.  Referring to Exhibit

5  A-14, page 3, he confirmed that the airplane was closer to the

6  mountain range than Mr. Pena's house when he first saw it.

7  However, he says he saw it turn inbound.  Mr. Stanley confirmed

8  that when the airplane flew past the property, it made a slight

9  left turn.  He considers the Penas friends, but has not talked to

10  them for some time.  He is not a pilot.  And he said he was not

11  particularly bothered by the fly-by.

12       The Administrator's counsel then called the Respondent Trent

13  Palmer to testify.  Respondent testified that the wingspan of his

14  Kitfox is 32 feet.  The cruising altitude is 100 miles per hour

15  and the landing speed is 32 miles per hour.  He confirmed having

16  900-plus hours as pilot-in-command of his Kitfox.

17       Referring to Exhibit A-3, page 6, Respondent admitted to

18  receiving a verbal counseling from Oscar Lee of the Reno Field

19  Service District Office, or FSDO.  There was a video showing

20  Respondent throwing a UAS, or unmanned aircraft system, out of his

21  Kitfox near a radio controlled or RC runway.

22       Respondent was counseled about careless or reckless

23  operations under CFR Section 91.19 and dropping objects from an

24  aircraft under Section 91.15.  Respondent stated that a CFI, or

25  Certified Flight Instructor, was the pilot-in-command of his

A311

1  Kitfox while he was a passenger flying a UAS.

2      Respondent also admitted to receiving a warning notification

3  for carrying passengers and water-skiing on Lake Tahoe.  Exhibit

4  A-4 is this warning letter.  He explained that water-skiing is

5  where you drag your wheels on the water.

6      Respondent did not recall the details of a conversation he

7  had with FAA Inspector Morgan on December 2nd.  He did not recall

8  saying he that he did not see anyone, and that he might have flown

9  over a hunter.  Respondent did recall meeting with the FAA

10 investigators the next day, December 3rd, where he was shown a

11 video from November 24th.  Respondent admits that he was the

12 pilot-in-command of his Kitfox, that he was operating in the

13 vicinity of 300 and 400 Desert Sun Lane, and that he had operated

14 less than 100 feet above ground level.

15     On November 24th, Respondent says he made a low pass

16 inspection of the RC runway that was in the backyard of his

17 friend's house in accordance with FAA's Off-field OPS Guide.  He

18 had permission of his friend to land, but he did not intend to

19 land on the first pass.  Respondent confirms he was alone on the

20 flight.  He stated the purpose of this low-level pass was to

21 ascertain the surface conditions and feasibility of the landing

22 site.  Respondent said he had not previously conducted, excuse me.

23 Respondent said he had previously conducted a prior high-level

24 pass and ground inspection.  He was vague about when such high-

25 level passes or ground inspection were conducted.

655

1      Mr. Schulte?

2      MR. SCHULTE:  I'm here, Your Honor.  I'm sorry.

3      JUDGE FUN:  All right.

4      MR. SCHULTE:  I just glitched up.  That was my fault.

5      JUDGE FUN:  Okay.  Just wanted to make sure you were still

6   there.

7      MR. SCHULTE:  I'm still here.  I'm not going anywhere.

8      JUDGE FUN:  On the 24th, Respondent determined that the

9   runway was not suitable on his low level pass.  He was not at

10  cruise speed, but flying at 7 miles per hour so he could time the

11  distance traveled using the formula of 1 second per 100 feet at 70

12  miles per hour.  He testified he was in a stable flight and offset

13  to the right side center line of the runway so he could look out

14  his left window for a better view of the runway during the low

15  pass.

16      Respondent stated he was assessing the conditions and length

17  of the runway.  Respondent says he did not attempt a landing

18  because he decided that it was not suitable.  The primary reason

19  it was not suitable was because the touchdown location was hard to

20  spot and identify.  The Respondent explained that the --

21  Respondent explained that the operations guide states to touchdown

22  within one aircraft length of the touchdown location, but since he

23  could not identify the touchdown location he did not believe he

24  could do so within one aircraft length.  At the time of his low

25  level pass, Respondent says he was headed in a south to southwest

A313

657

1    assessment was the RC runway had a northeast departure only, which

2    meant there was one-way in and one-way out.  He testified he did

3    not approach the area from the south because there are powerlines

4    and more houses.  As a result, he determined that the best

5    approach was up the draw to the RC landing strip.  Referring to

6    Exhibit A-14, page 3, Respondent confirmed that the RC runway

7    cannot be seen in the photograph and it is farther to the east.

8        When questioned by his attorney, Respondent explained that

9    water skiing is an approach to landing technique used for

10   backcountry landings on river banks or gravel bars, and that

11   dragging or skimming your tires on the surface of the water is

12   done to reduce speed for the best possible braking on shore.  On

13   the day in question, he was not water skiing.

14       Respondent confirmed that he uses the Off-Airport Ops Guide

15   as a baseline for the quality and feasibility of landing

16   off-airport.  He confirmed that he had Mr. Likes' permission to

17   land on his property prior to the 24th.

18       On the 24th, Respondent stated he was flying north of the

19   Desert Sun Lane area near Bedell Flats, which is off Bird Springs

20   Road.  This is an area he flies multiple times a week and he goes

21   through this area on almost every flight.  Respondent described it

22   as a corridor for aircraft to get to the area north of the Reno

23   Stead Airport.  He stated that he had Mr. Likes' permission to

24   land on his property.  Respondent explained he has flown models

25   with Mr. Likes and his son, and that Mr. Likes has an RC runway on

660

1  between two pine trees, a power line pole can be seen in the

2  distance, which is near the main street, Desert Sun Lane.

3  Inspector Morgan testified that there is an elevation change

4  leading up to Mr. Likes' house on the east side that he described

5  as a small hill.

6      Page 17 shows the distance from the center line of the garage

7  to the fence line where Mr. Pena is standing as being 226 feet and

8  6 inches.

9      Inspector Green said that there were no measurements taken on

10  Mr. Likes' property.  He did not recall if there was any

11  estimation of the distance to Mr. Likes' property.

12      Referring to page 1 of A-17, Inspector Green stated that the

13  distance from the center line of the garage to the white gutter on

14  the east side of the house was measured.  He could not remember

15  the distance and refreshed his memory with his notes in Exhibit

16  A-25, recalling that it was 15 feet.  Based on this, Inspector

17  Green determined that the distance from the edge of the house to

18  the propane tank would be 15 feet less, or 56 feet.  The distance

19  from the edge of the house to where Inspector Morgan is standing

20  would be 63 feet.

21      Inspector Green again testified that Respondent's flight path

22  was believed to be approximately 78 feet from the center line of

23  the garage based on the video footage received at the FSDO.  He

24  also testified that based on the video footage, they determined

25  the size of the aircraft and the size of the aircraft in

1   relationship to the ground, which helped them determine the

2   vertical height.

3       He also stated the interviews of Mr. and Mrs. Pena and Mr.

4   Stanley's description of the events were considered.  He noted

5   that investigators determined the aircraft came from the northeast

6   area based on witness statements, but investigators could not

7   definitively determine the aircraft flight path since they, since

8   the witnesses lost sight of the aircraft behind the Penas' house

9   and before it emerged in the video over the Penas' property going

10  towards Mr. Likes' residence.

11      Inspector Green said there is a downward slope from the

12  Penas' garage as you go east and then the slope rises farther

13  east.  Inspector Green estimated that there was a 6 to 7 foot drop

14  from the Penas' garage out to 78 feet.  He based this on the fact

15  that Inspector Morgan is holding the measuring tape at eye level

16  standing 78 feet away.

17      Inspector Green concluded that the shed and stable are on

18  lower terrain.  In comparison, Inspector Green testified that

19  there is very little downgrade showing, shown on page 7, as you

20  can see Inspector Morgan's knees and shin area.  So he estimates

21  that downgrade to be a 1-foot drop.

22      Looking at A-18 as a demonstrative exhibit, Inspector Green

23  stated he created this exhibit using Google Earth and PowerPoint

24  to determine a 500-foot lateral limit.  The photograph is oriented

25  with the top to the north.  He identified the Stanley's house in

662

1  the northwest.  The Penas' house is directly east of the

2  Stanley's.  South of the Penas' is Mr. Likes' residence.  He

3  identified locations of Mr. Pena, and Mr. Stanley, and Mrs. Pena.

4      He identified a pink line as being representative of flight

5  path, which was determined to be based on the video and witness

6  statements.  He further stated that the pink flight path behind

7  the Penas' house cannot be confirmed since nobody saw the

8  airplane's location or path behind the house.  Based on witness

9  statements, Inspector Green believes the airplane came from the

10 north.

11      There is a yellow line depicted on Inspector Green's

12 photograph, which depicts the estimated point where the airplane

13 came into the video footage from the garage peak camera.  However,

14 Inspector Green said that he could not be sure of the in-bound

15 heading.  He did not recall any witnesses stating that the

16 airplane made a left bank.  Inspector Green stated that the yellow

17 line was made using Google Earth's ruler tool, which he used to

18 measure the distance of 499 feet.

19      Inspector Green stated that using Google Earth, he could

20 identify powerline poles.  He has experience viewing military

21 grade satellite images and identifying surface items such as

22 powerline poles that pose a hazard to low level flying operations.

23 He identified two powerline poles on Exhibit A-18.

24      Respondent's counsel asked questions of Inspector Green.

25 Inspector Green admitted that Google Earth is not used by the

A317

1   military for tactical operations, that Google Earth is not updated

2   on regular basis, and its images can be several years old.  He

3   admitted that to the left of the pink line, or to the east, is

4   desert scrub brush.  He admitted that Respondent voluntarily came

5   to the FSDO to be interviewed.

6       When asked about the video he reviewed, Inspector Green

7   recalled receiving a video through a general email box on the FSDO

8   website.  He was not sure if someone outside the organization has

9   the ability to upload a video to the website.  As the FSDO

10  received the video before he was assigned to assist with the case,

11  he doesn't know how the FAA came into possession of the video.  He

12  did not know if the video was part of the complaint that was

13  emailed or they went to get it later from Mr. Pena.

14      Inspector Green admitted to receiving a copy of a video at

15  his email address, but did not know who sent it to him.  On

16  further questioning, Inspector Green stated that there were two

17  videos.  He did not receive or know of any flash drive or CD of

18  the videos.  He does not recall -- he does recall some discussion

19  that they did not have a flash drive capable device.  As a result,

20  he used an FAA issued camera to transfer the videos.

21      He explained using the FAA camera as a storage device to get

22  the still videos and photos from Mr. Pena.  Specifically, the FAA

23  camera has an SD card that he plugged, excuse me.  Specifically,

24  the FAA the camera has an SD card and he plugged the camera into

25  Mr. Pena's computer.  He then downloaded the videos to the

1  original video or the iPhone video copy.  He did not know what
2  video was uploaded to the investigative file.

3      Inspector Green stated he was not aware of any thumb drives
4  or CDs of videos being given to the FAA, but he could not be sure
5  it did not happen.  He confirmed that when he reviewed the videos,
6  they contained no sound.

7      Inspector Green was shown a document marked as Exhibit R-1 to
8  refresh his memory.  He stated he was not present during the visit
9  to the Penas' residence on February 13, 2020 that is referenced in
10 the document, which was authored by Inspector Morgan.  He recalled
11 visiting the Penas' residence two or three times.

12     I asked questions to clarify Inspector Green's testimony.
13 Inspector Green stated that for purposes of calculating the
14 vertical height of the airplane above ground level, the video
15 footage was used.  The video showed the airplane in a steep bank,
16 so they used the wingspan of the airplane to determine how high it
17 was above the ground.

18     Concerning the distance from the Penas' house to the Likes'
19 house, since they did not have the permission -- since they did
20 not have permission to go on Mr. Likes' property, Inspector Green
21 admitted that there was no thought given to using a laser range
22 finder to get the distance.

23     Further concerning the videos, Inspector Green confirmed that
24 the videos were transferred from Mr. Pena's computer to the SD
25 card on the FAA camera.  He said this is digital camera and can be

1 is devoid of pay information.  Specialist Speeg explained he had

2 not noticed that.  He further explained that he combined two

3 resumes.  Information from one of the resumes was for a position

4 upgrade and required salary information.  His FAA salary is public

5 information and he disclosed it as $147,000 a year.  It is the

6 most he has received in comparison to his past jobs.

7     Specialist Speeg stated he has testified in no more than five

8 enforcement proceedings, and two prior times as an expert witness.

9 While he could not remember the nature of the cases, he remembered

10 one as being an aerobatic case.

11     Although Specialist Speeg has performed short landings and

12 takeoffs, he has not participated in any competitions for short

13 landings or takeoffs.  He described performing short landings and

14 takeoffs in various aircraft, including a Cessna 172 and 206.  He

15 has taught short takeoff and landings for instrument and

16 backcountry strips.  He has experience in landing various

17 aircraft, off-airport and on roads, frozen lakes, fields and corn

18 fields as he did so with aerobatic airplanes.  He did not know how

19 many short takeoffs and landings he performed, but believes it was

20 between 25 and 50.

21     While he could not remember all of the aircraft he flew in

22 the backcountry or all of the short takeoff and landings he made

23 off-airport, he confirmed that he would make several passes to

24 check for obstructions and obstacles, and to assess runway

25 conditions.  This would include a low level pass to assess runway

1    conditions, after which a decision would be made to land or not.

2        Specialist Speeg was qualified as an expert in general

3    aviation flight operations, including low flight and the

4    regulatory requirements under Section 119.19 for low flight.  He

5    was not qualified as an expert in short field and takeoffs, nor

6    was he qualified as an expert in the operation of Respondent's

7    aircraft, the Kitfox 5.

8        On the Administrator's questioning, Specialist Speeg stated

9    that during a low pass to land, the purpose is to check the runway

10   for obstructions, fallen trees or animals, particularly with

11   backcountry strips.  He stated that his low pass is done at less

12   than cruise speed but not necessarily a slow speed.  He also said

13   that the low approach, for purposes of Section 119.19, has to stay

14   500 feet from any person, vessel, vehicle, or structure.

15       As to Respondent's low pass, based on the statements of Mr.

16   and Mrs. Pena, Mr. Stanley, and the pictures and measurements, he

17   estimates that the Respondent was 50 feet above ground.  He also

18   opined that he was within 500 feet of people, vessel, vehicle or

19   structure.  He based this on when the airplane first came into

20   Mrs. Pena's view, as well as the measured 78 feet from the house

21   to the flight path.  Specialist Speeg said that from the center

22   line of the garage to the propane tank was measured 56 feet and

23   adding another 25 feet to the hay barn where Inspector Morgan was

24   standing is how he arrived at the 79 feet.

25       He also opined that the airplane when it first came in view

1   was 50 to 70 feet above ground, which included accounting for the

2   slope of the Penas' property.  Specialist Speeg concluded that

3   Respondent's altitude was not safe if a power unit failed.  He

4   explained that if there was a problem, there was a low margin of

5   error since Respondent would have to fly the airplane and decide

6   on a location to land, which could not be done without undue

7   hazard.

8        Specialist Speeg said he was not sure you could put the

9   aircraft down safely 30 to 50 feet off the ground, especially

10  while in a steep bank.  He noted that there would be an immediate

11  loss of lift if there was a power failure in a steep bank and a

12  STOL kit is useless if there is 60 degrees or more of bank.  He

13  opined that the airplane first came into view, it was in a steep

14  bank up to 60 degrees.

15       Specialist Speeg opined that Respondent was at an altitude

16  that if a power unit failed he could not make an emergency landing

17  without undue hazard to people or property on the ground.

18  Specialist Speeg said that any attempt to land on any of the roads

19  in the subdivision would create a hazard to people and structures

20  nearby.

21       Specialist Speeg testified that a banking turn introduces

22  G forces, and a 60-degree bank adds two times gravity, or 2-Gs, to

23  the structure of the airplane.  He opined that over time there can

24  be a structural failure with continued stress due to banking

25  forces on the airplane.

A322

689

1   lower than the south end.

2       Respondent said that when landing off-airport, you would want

3   to use an upward slope of landing site to help slow you down,

4   which meant landing to the north and rolling uphill to the south.

5   However, when taking off, you would want to use the downward

6   slope, which meant taking off from the south and heading north.

7       Respondent said if he had decided to land after the low pass,

8   he would have been set up for a left traffic pattern to land to,

9   land on the north end of the runway.  He explained after he made

10  his low pass with the landing site, excuse me.  He explained that

11  after he made his low pass with the landing site on the left side,

12  he would have then have climbed and turned left for a left

13  crosswind, placing him perpendicular to the runway.

14      He would have then turned left again for the left downwind

15  leg, coming back north, then making a left base, then a left turn

16  to a final approach.  However, Respondent said he did not do this

17  because he felt uncomfortable with being unable to identify the

18  touchdown point.  Since he made the decision that a safe landing

19  could not be made without more passes, he decided to continue on

20  his southbound flight return to the airport, which was

21  approximately 5 minutes away.

22      Respondent confirmed that sometime afterwards, Inspector

23  Morgan from the FSDO contacted him either by letter or voicemail

24  asking him to speak to him.  Respondent did contact Inspector

25  Morgan as he requested.  He could not recall the details of the

A323

1  inspections, he stated he had flown over the area at higher

2  altitudes in the past.  As he passed through the area, he would

3  look out and assess the feasibility of landing.  He said he would

4  have done this at approximately 500 feet above ground level.  He

5  could not remember the times he did this, but says it was when he

6  was flying over the area.  He considered these occasions as

7  performing a high-altitude reconnaissance.   The first time he

8  made a low level inspection pass was on November 24th.

9      When asked how he would approach the RC runway if he intended

10  on landing, Respondent stated he would not make any landing

11  approach from the south.  He explained that the RC runway slopes

12  downward towards the north, so when making an off-field landing,

13  he would have landed at the north end to take advantage of the

14  upward slope to the south.

15      He did not know the length of the RC runway, but guessed it

16  at 400 to 500 feet.  He stated that his southern flight path was

17  following a drainage, which led to the to the Likes' property.  He

18  admitted that farther south of the Likes' property are houses and

19  powerlines.  But his main reason for the manner of his approach

20  was because of the slope of the runway if he decided to land.  He

21  testified he began his left climbing turn away from the Likes'

22  house once he decided he was unsatisfied with being unable to

23  identify the touchdown point.

24      Respondent denied having flown any drones at the Likes'

25  property.  He said he had visited the property before, but it was

1   necessary to perform a low level pass in order to evaluate the
2   suitability of the landing area.

3        I asked questions to clarify Respondent's testimony.  He
4   stated that the sound testing was not specific to his Kitfox, but
5   was for an airplane with a similar engine and propeller as his.
6   Before the engine failure he had previously while crossing the
7   mountain, he said there was little warning.  He recalled a buzzing
8   sound, but he wasn't sure where it was coming from since he was
9   listening to music with headphones.  He later learned that he had
10  a rod failure.

11       Respondent said he first met Mr. Likes and his son in 2012 at
12  an RC racing event.  Later in 2019, he hired Mr. Likes to perform
13  some plumbing work and his son to perform finish work at his
14  house.  During that time they began talking more, and Mr. Likes
15  son, Jacob, invited him to fly RC airplanes at their property, and
16  asked Respondent if he thought he could land his airplane on the
17  RC runway.   Respondent said he thought he could land on the RC
18  runway, so Jacob continued to ask him several times.

19       Respondent said his typical cruise altitude in the area is
20  6,000 to 6,500 feet above mean sea level, or 500 to 1,000 feet
21  above ground level if he was not flying cross-country.  He could
22  not recall his altitude because, excuse me.  He could not -- he
23  cannot recall his altitude as he was -- as he flew south to north
24  to Bedell Flats.  He could not recall at what point on his flight
25  back south that he decided to go and get a closer look at the RC

1    question is considered a sparsely populated area, and I find it is

2    a sparely populated area within the meaning of the regulations.

3        I also find that Respondent flew less than 100 feet above

4    ground level as stated in the first clause of paragraph 4.

5    Respondent admitted he was operating in the vicinity of 300 and

6    400 Desert Sun Lane, and that he had operated less than 100 feet

7    above ground level.  He also testified on cross-examination to

8    estimating that his altitude was under 100 feet above ground level

9    on his flight path between Mr. Likes' house and the RC runway.

10        It is undisputed that Mr. Likes' residence is 400 Desert Sun

11    Lane and south of the Penas' residence.  Respondent did not recall

12    where along his flight path he descended to 100 feet above ground

13    level.  He further did not recall his specific altitude during,

14    before, or after the low pass.  He did, however, clearly concede

15    to being 100 feet above ground level or less during his low pass

16    over the Likes' property.

17        The testimony of Mrs. Pena corroborates this.  She saw the

18    airplane before the Likes' property as it past the south end of

19    the Penas' garage, and guessed the airplane was 100 feet to 50

20    feet above ground level when she saw it banking and then climbing

21    near Mr. Likes' house.  Similarly, Mr. Pena places the airplane 25

22    to 35 feet above the grade of the garage, and accounting for a

23    6-foot slope away from the garage, put Respondent 31 to 46 feet

24    above the propane tank on their property.  Mr. Pena's assessment

25    is based on his military experience as an MK-19 gunner.

1      This is further corroborated by Mr. Stanley's testimony, who

2   testified to first seeing the airplane 80 feet above ground level

3   and keeping a steady altitude until just before Mr. Likes' house

4   where it turned and climbed.  Mr. Stanley's assessment is based on

5   seeing poles of 140 feet and 80 feet at work.  While there is

6   inconsistency between the Penas' height estimation, as well as Mr.

7   Stanley's, they are all consistent that airplane's altitude above

8   ground level was 100 feet or less.  I therefore find that the

9   weight of the credible, relevant and persuasive evidence proves

10  Respondent operated at 100 feet or less above ground level.

11      Consistent with my findings, I modify the first clause of

12  paragraph 4 of the Amended Complaint by adding between the word

13  "altitudes" and the word "less", the phrase "of 100 feet AGL or"

14  so that the paragraph now reads, "4.  During the referenced flight

15  operation, you operated N318JJ at altitudes of 100 feet AGL or

16  less than 100 feet AGL."  I find that a preponderance of the

17  evidence proves this clause in paragraph 4 as modified.

18      However, what is disputed are the specific altitudes alleged

19  in the sub-paragraphs.  Specifically, he disputes operating:

20      (a) within approximately 50 feet of a stable, shed, and

21  propane tank;

22      (b) within 100 to 150 feet of a residential home at 400

23  Desert Sun Lane;

24      (c) within 100 to 150 feet of an adult and child outside of

25  the same residential home; and

700

1       (d) within 300 feet of two adults and two children near the

2   perimeter of the same residential home.

3       Although the specific distances are disputed, the primary

4   issue for purposes of Section 91.119(c) is whether he flew within

5   500 feet of a residential home at 400 Desert Sun Lane and within

6   500 feet of adults and children outside of the same residential

7   home as alleged.

8       There is no dispute as the Penas and their children, as well

9   as Mr. Stanley, meet the definition of people under the

10  regulations.  Nor is there any dispute that the residential house

11  of 400 Sun Lane, stable, and shed are structures.  As to the

12  propane tank, Respondent disputes that a propane tank is a vessel.

13  While a propane tank is definitely not a person or  vehicle, it

14  could be a vessel depending on the definition.  It can be a vessel

15  in terms of container to hold items, or it can be a ship or

16  watercraft.

17      In context of the FARs, or Federal Aviation Regulations,

18  vessel refers to a ship or watercraft.  Therefore, a propane tank

19  is not a vessel under the regulations.  On the other hand, a

20  structure is commonly defined as a building or other object

21  constructed from several parts.  In *Administrator v. Scollan*,

22  S-C-O-L-L-A-N, at 2 NTSB 538, a 1973 case, the Board held that

23  electrical wires, including the poles between which wires are

24  strung, is reasonably construed as a structure when a pilot flew

25  within 500 feet of electrical wires.

A328

1    feet above ground level during his low pass, which was over the

2    Likes' property.  The testimony of Mr. Stanley and the Penas

3    corroborate this as they testified to seeing Respondent pass the

4    Penas' house, make a left turn, fly towards Mr. Likes' house, and

5    climb and fly into the horizon.

6        Since the Amended Complaint fails to allege that Respondent

7    operated within 500 feet of 300 Desert Sun Lane in violation of

8    the regulations, my findings in this regard are made only for

9    purposes of making a determination of Respondent's flight path and

10   altitude prior to that point.

11       There is one other correction I need to make that I noticed.

12   In my prior discussion, I cited to Regulation Section 119.19 and

13   its sub-paragraphs.  That should actually be and the correct

14   citation is 14 CFR, Section 91.119(a) and (c).

15       Let me next address the issue of Respondent having permission

16   to attempt to land and takeoff from a private RC field in the

17   backyard of 300 Desert Sun Lane.

18       It is undisputed that Mr. Likes gave Respondent permission to

19   land, as Mr. Likes said, and I paraphrase, "anywhere on his

20   property at any time."  This specifically included the RC runway

21   according to Mr. Likes' testimony, as well as the Respondent's.

22   Additionally, Respondent cites to Nevada revised statute Section

23   493.050(c) allowing for aircraft over lands or waters of another

24   with his or her consent.

25       However, whether Respondent had Mr. Likes' consent or was in

A329

1  compliance with Nevada's consent statute is largely irrelevant.

2  While it may have given Respondent a reason for flying over the

3  Desert Sun Lane area at a low altitude to consider a landing on

4  the RC runway, the relevant federal regulations in this matter can

5  be violated with or without the consent of the landowner.  That is

6  neither 19.119 nor 19.13 have any element or defense excusing a

7  violation because the landowner gave consent for a landing or

8  takeoff.  Therefore, I do not find Mr. Likes' consent to land on

9  the RC runway relevant for purposes of a violation.

10         Turning to the sub-paragraphs of paragraph 4.   There was

11  conflicting evidence between Respondent's testimony and the

12  testimony of the other eye-witnesses, particularly with regards

13  the flight path and altitude of the airplane above ground level.

14  Respondent testified he was coming back from Bedell Flats.  While

15  he was unsure of his exact flight path, he says he followed the

16  drainage which brought him from the northeast towards the Likes'

17  property.

18         On the other hand, Mr. Pena testified he was approximately

19  300 feet away -- on the other hand, Mr. Pena testified that the

20  Respondent was approximately 300 feet away when he saw the

21  airplane to the east and above the roof line of his house.  He

22  then described it disappearing below the roof line and seeing it

23  again as it came from behind the garage of his house to the south,

24  and then making a left banking turn towards the Likes' house to

25  the south.  Based on this, he believes the airplane came from the

1  consistent with the flight path of passing from the north end of

2  the Penas' property to the south.  Again, Respondent admitted to

3  being 100 feet or less above ground level during his low pass,

4  which is consistent with the witnesses' observations of the

5  airplane being low.

6      As to the distance away from the Penas' residence, the

7  preponderance of the evidence shows that he was less than 500 feet

8  from the Penas' residence and their stable, shed, and propane

9  tank.  As no witness actually saw the flight path behind the

10 Penas' house, the flight path must be inferred from the evidence.

11     Mr. Pena testified that he estimated being 300 feet away from

12 the airplane's flight path when he saw it above the roof line.

13 His wife and son were between him and the house, approximately 140

14 to 160 feet away.  Although he lost sight of the airplane behind

15 his house, he saw it come from behind the roof line of the garage

16 to the south.  He speculates that given the two locations he saw

17 the airplane, as well as his knowledge of the property, that the

18 airplane was above the propane tank, stable and shed to the east

19 of his house.

20     Mrs. Pena largely corroborates this saying that when she saw

21 the airplane appear from the edge of the garage at the southern

22 end of the house traveling towards the Likes' house.  She

23 concluded that the only reasonable path prior to her seeing the

24 airplane would be over the propane tank, stable and shed to the

25 east of their house.

1        Mr. Stanley saw the same thing, but did not testify to his

2   belief of the flight path when the airplane was out of his sight

3   behind the house.

4        Respondent denies these accounts.  He admitted to flying by

5   the Penas', but did not say how close he was to their house.

6   While investigators took various measurements from the house to

7   the various structures to the east, as well as the supposed flight

8   path of 78 feet from the center line of the garage or 63 feet from

9   the edge of the house, this was based on the Penas' accounts.  Let

10  me try that sentence again as my voice got a little rough there.

11  While investigators took various measurements from the house to

12  the various structures to the east, as well as the supposed flight

13  path of 78 feet from the center line of the garage or 63 feet from

14  the edge of the house, this was based upon the Penas' accounts.

15       There were really no eye-witness to the actual flight path

16  over the various structures.  Nevertheless, a preponderance of the

17  circumstantial evidence demonstrates that Respondent operated

18  closer than 500 feet on the west side of the Penas' residence.

19  This would have also placed him closer than 500 feet of the

20  various structures east of the house, which ranged in distances

21  from 41 to 63 feet from the edge of the house.  This is based on

22  the Penas' testimony, the measurements the investigators took, as

23  well as corroborated by Mr. Stanley's testimony of seeing the

24  airplane above the roof line at approximately 80 feet above ground

25  level, and that the airplane was as far away from the house as it

A332

1  Green and Specialist Speeg testified to relying on and using the

2  video in arriving at their opinions and conclusions.  While they

3  did say they also considered the witnesses' statements, it was

4  unclear if they were referring to the witnesses' written

5  statements or their testimony.

6       Moreover, both witnesses could not say whether they had seen

7  the original native video of the security camera or merely the

8  iPhone recording of a video monitor playing a part of the video.

9  Given my findings concerning the video, which I excluded from

10  evidence, I discounted both Inspector Green's and Specialist

11  Speeg's testimony concerning the flight path and altitude of the

12  airplane above ground level.

13       I also did not give any credence to Specialist Speeg's

14  testimony about the banking angle of Respondent's airplane as such

15  testimony was based on the video.  Similarly, his assessment of

16  airplane's height above ground level was based on the wingspan of

17  the airplane in relationship to the ground as shown in the video.

18  Neither Specialist Speeg nor Inspector Green were eye-witnesses,

19  and both relied on the excluded video to form their opinions and

20  conclusions of Respondent's flight path, altitude above ground

21  level, and banking angle.

22       During closing argument, Respondent's counsel urges the Board

23  to dismiss the Amended Complaint as investigators failed to

24  preserve evidence.  Respondent's counsel pointed out that

25  paragraph 9(b) in Chapter 4 of FAA Order 2150.3C directs that

1  occurred.  Instead, the FAA was negligent and careless.  In short,

2  the investigation was sloppy.

3      I also note that even though FAA inspectors did not have

4  permission to access the Likes' property for purposes of measuring

5  distances, they certainly could have used a laser range finder,

6  obtained survey records from the county, or sought out Mr. Likes

7  or the subsequent property owner to obtain permission during the

8  two plus years this case has been pending.  They could have even

9  used Google Earth and the measuring tool as they did for other

10  demonstrative exhibits.  I point this as it clearly demonstrates

11  their negligence and carelessness, and sloppiness on this

12  investigation.

13      I therefore find that the remedy of dismissal as Respondent's

14  counsel urges is not appropriate under these circumstances.

15  Instead, I precluded the video and any testimony concerning the

16  video's content.  Further, because portions of Inspector Green's

17  and Specialist Speeg's opinions, comments, and conclusions cannot

18  be separated from viewing the video, I find that the appropriate

19  remedy is to exclude any testimony that relied in whole or part

20  upon their viewing of the video.

21      Given this, I do not and did not rely upon, nor do I find,

22  excuse me.  Given this, I do not and did not rely upon, nor do I

23  further discuss Inspector Green's or Specialist Speeg's comments,

24  opinions, and conclusions related to Respondent's flight path,

25  altitude above ground level, or bank angle.

718

1     While the video recording from the garage peak may have been

2  helpful, it was not necessary to the Administrator's case as there

3  were three eye-witnesses and Respondent's testimony about his

4  altitude and flight path, as I have discussed.  In short, the

5  video was not the only evidence.

6     As I discussed above, I considered and gave weight to the

7  measurements the investigators took, which are objective distances

8  to objects based upon eye-witness testimony and corroborates Mr.

9  Stanley and the Penas' testimony.

10    Now I return back to the issue of whether Respondent's low

11  pass of 100 feet above ground level was below an altitude that

12  allowed for an emergency landing without undue hazard to persons

13  or property on the surface in the event of a power unit failure.

14  In this regard, I weight to Specialist Speeg's opinion concerning

15  this since Specialist Speeg was qualified as an expert in general

16  aviation flight operations, including low flight and the

17  regulatory requirements for low flight, which did not necessarily

18  rely on the video.

19    Specialist Speeg testified that the low passes off-field are

20  not necessarily prohibited under the regulation, but it depends on

21  the circumstances.  He testified that the regulation does not

22  prohibit all off-airport landings, but describes the altitude for

23  low level operations.

24    Notably, as stated in the wording of subsection (a) of

25  Section 91.119, this regulation for operating at altitude -- this

A335

720

1  Speeg's testimony credible in this regard.

2      Respondent admitted when I questioned him that instead of

3  flying between the Likes' and the RC runway for purposes of

4  looking out his left window, that there was an alternative that

5  still allowed him to look out his left window while staying east

6  of the houses and the RC runway.  This would have been over an

7  open area of scrub brush to the east.

8      More specifically, Respondent could have flown farther south

9  along the mountain range, while staying farther east of the houses

10 and over the open area.  After going past the RC runway or the

11 landing site, he could have then made a 180 degree turn to come

12 back north, and fly essentially a downwind leg for his low level

13 pass.  He would then have been flying south to north and parallel

14 to the RC runway.  This would have still offset him from the RC

15 runway to the east and allow him to look out his left side and

16 away -- allowed him to look out the left side window.  It would

17 also have placed him away from the Likes' house that was farther

18 to the west.  This would have also placed him farther to the west

19 of the Penas' residence.

20     Respondent agreed that this would have worked even though he

21 did not consider it.  And this corroborates Specialist Speeg's

22 testimony concerning the hazard created when Respondent's low pass

23 took him between the Likes' house and the RC runway.  Respondent,

24 in an apparent afterthought excuse of why he did not take this

25 path, said that the ground was 20 to 30 feet higher to the south,

A336

721

1  suggesting that it would have been difficult.  I do not find this

2  credible nor believable.

3      First, Respondent is a 900 hour plus private pilot in this

4  aircraft, and claims to having made thousands, if not hundreds

5  off-field takeoff and landings.  With this experience, he should

6  be experienced in evaluating safer options for low level his pass.

7  This particularly the case -- this is particularly the case as

8  Specialist Speeg testified that there is a lower margin of error

9  the lower you fly to the ground.

10     Respondent has also experienced an engine failure in the past

11 at 500 feet above ground.  In this situation, he was able to

12 safely land because he had 500 feet above ground, and was able to

13 take advantage of the descending slope of the mountain to prolong

14 his glide until locating a safe place to land.

15     Secondly, despite there being a 20 to 30 foot difference in

16 terrain height between the south and north, this was not as a

17 significant height difference in comparison to flying over a

18 mountain range.  Moreover, it was an altitude change that

19 Respondent could have easily accommodated with his 900 plus hours

20 experience and STOL performance of his Kitfox.  He certainly was

21 able to accommodate this terrain difference flying south to north

22 on his low pass, which was in the opposite direction with rising

23 terrain.

24     Therefore, I find that Respondent's flight path at an

25 altitude of 100 feet or less above ground level was an altitude

A337

723

1  for an emergency landing without undue hazard to persons or

2  property on the surface if a power unit fails, it is the

3  Respondent's burden of showing that the low altitude operation was

4  necessary for takeoff or landing with the exception to apply.

5  Similarly, once there is a prima facie showing that Respondent

6  operated closer than 500 feet to persons or structures under

7  Section 91.119(c), Respondent has a burden of showing the

8  exception applies.

9      In this case, Respondent denies he was intending to land

10  during his low level pass, but that he was merely seeking to

11  identify the touchdown point.  When he was unable to do so, he

12  turned and climbed to depart the area and return to the airport.

13  Given Respondent's assertion that he was not landing during his

14  low level pass, it is clear that his low pass falls outside the

15  prefatory exception.  I, therefore, find he was not landing and

16  the prefatory exception does not apply.  This means that

17  Respondent was required to maintain an altitude that allowed for

18  an emergency landing without undue hazard to persons or property

19  on the surface in the event of a power unit failure since he was

20  not taking off or landing.

21      In the alternative, I find that the circumstances of this

22  case demonstrate that Respondent's low pass does not excuse him

23  from a violation of 91.119.  This is because the prefatory

24  exception of being, quote, "necessary," end quote, for takeoff and

25  landing is fact-driven on a case-by-case basis.  There are a

A338

724

 1  multitude of variables involved.  This is explained in the

 2  interpretation and legislative history of Section 60.17, an older

 3  predecessor to Section 91.119, which is Exhibit A-28.

 4      The legislative history states, quote, "The matter of safety

 5  of flight in terms of safe altitudes is dependent upon many

 6  variables, including the type of aircraft flown, the weather

 7  conditions at the time, and the terrain below.  An altitude which

 8  may be wholly safe and desirable for cruising flight at one time

 9  for one aircraft may be wholly unsafe for it under different

10  conditions, or for other aircraft under the same conditions.  For

11  these reasons, minimum safe altitudes for flight cannot be

12  described with the geometric particularity of a conveyance.  As a

13  consequence, the overriding minimums, i.e. altitude rule is

14  phrased in terms of performance of the particular aircraft related

15  to the terrain below."

16      Further, the comments to the regulation state, quote, "To

17  achieve the proper high level of safety, it is vital that every

18  pilot consistently with sound and conservative operating practices

19  take full advantage of the performance capabilities of his

20  aircraft so that as to spend as little time as possible at

21  altitudes below the minimums established for cruising flight.  The

22  'when necessary' language used in the current Section 60.17

23  achieves this result simply and directly.  It prohibits low

24  altitude flying except when a departure from otherwise applicable

25  minimum is necessary for landing or takeoff.  It prohibits

1  unnecessary low flying during the execution of those maneuvers.

2  At every point along the proper flight path for approach to

3  landing or climb after takeoff, an unnecessary dip would place the

4  pilot in potential violation of this regulation.  In effect, it

5  requires the pilot to do the best he can consistently with sound

6  flying practice and the machine at his disposal to avoid unduly

7  prolonged low flight."

8      The legislative history goes on to state to achieve the

9  proper high level of safety, it is vital that every pilot --

10  actually scratch that.  I've already said that.

11      In short, given the legislative history and the intent of the

12  regulation, while the type, performance and operating limits of

13  the aircraft have to be evaluated, this is done in the context of

14  terrain, weather, surface conditions, surrounding obstacles and

15  hazards.  The type of runway also needs to be considered including

16  the length, width, and surface material.  The experience,

17  training, and skills of the pilot-in-command are also

18  considerations.

19      For example, it might be acceptable for a trained and

20  experienced pilot to land a Supercub in a dry river bed to drop

21  off supplies to a resident, but it would not simply be --

22  similarly be acceptable for a low hour pilot to try to land a

23  Cirrus in the same location for a picnic.  This is an extreme

24  example, but I think it illustrates that not every situation is

25  the same.

1    probative and credible evidence.  As to paragraph 4, I

2    specifically find that on November 24, 2019, in the vicinity of

3    400 Desert Sun Lane and 300 Desert Sun Lane in Reno, Nevada,

4    Respondent operated N318JJ at altitudes of 100 feet above ground

5    level or less than 100 feet above ground level, which is below an

6    altitude allowing for an emergency landing without undue hazard to

7    persons or property on the surface if a power unit failed.

8        I further find a preponderance of the evidence proves that

9    Respondent's operation was closer than 500 of a stable, shed, and

10   propane tank, and closer than 500 feet of a residential home at

11   400 Desert Sun Lane for purposes of paragraphs 4(a) and (b) of the

12   Amended Complaint.

13       Additionally, a preponderance of the evidence proves that

14   Respondent operated closer than 500 feet of an adult and a child

15   who were outside the residential home at 400 Desert Sun Lane for

16   purposes of paragraph 4(c) of the Amended Complaint.  The

17   Administrator failed to prove paragraph 4(d).

18       As the Administrator has proven by a preponderance of the

19   evidence paragraphs 4(a), (b) and (c) as modified, I further find

20   that Respondent's low pass operation at 100 feet or less above

21   ground level and his flight path was not necessary for takeoff or

22   landing.  I, therefore, find that Respondent violated 14 CFR,

23   Section 91.119(a) in that he operated at altitudes of 100 feet

24   above ground level or less, an altitude which was below an

25   altitude allowing for an emergency landing without undue hazard to

26

1  anyway because I do want to take a closer look at this, so what

2  I'm going to do is I'm going to reserve ruling on that issue, but

3  I would like to go ahead and see where some of the preliminary

4  matters at this point just so we can be a little ahead if we need

5  to before I rule on that issue, but I'll reserve on it for now.

6       So let's just jump to a different topic completely and that

7  is have the parties reached any kind of stipulations on any of the

8  exhibits, other than the exhibits we've already talked about?

9       Any stipulations of fact that they intend on offering,

10  Ms. Toscano?

11       MS. TOSCANO:  No, Your Honor.

12       JUDGE FUN:  Mr. Schulte, any -- I assume no stipulations of

13  fact or other exhibits to be submitted?

14       MR. SCHULTE:  We have not discussed that, Your Honor, but I

15  think I can perhaps take some burden off the tribunal by at least

16  conceding a couple of points.  As Ms. Toscano noted as far as the

17  amended order of suspension, Items 1, 2 and 3 are conceded by

18  Mr. Palmer.

19       We do not concede any of the distances contained in Item 4.

20  However, we absolutely do concede that on the day in question and

21  during the flight in question, the Respondent did come within 500

22  feet of vehicles, vessels or structures.  We don't dispute that;

23  never have.  So that's not one of the allegations, the allegations

24  have very specific numbers that are well over 500 feet, but as far

25  as 119(c) goes, yes, the aircraft was in fact operated closer than

A342

1  500 feet to vessels, vehicles or structures.

2      As far as the persons, we don't concede that, but for the

3  purposes of 119, I don't think it matters, it's a disjunctive

4  element so if you meet any one of those then arguably except as

5  necessary for takeoff and landing, you are in violation of 119(c).

6      We do not concede that if the aircraft had lost its power

7  plant there would have been undue hazards to persons or property

8  on the surface so again, the 500 foot rule, if we can paraphrase

9  it as that, we concede that the aircraft was operated less than

10  500 feet to vessels, vehicles or structures.  We do not concede

11  that the propane tank is a structure.

12      So if that helps things along, which I hope it will, we can

13  hopefully get to the nut of this case more quickly.

14      JUDGE FUN:  All right.  All right, so if I understand, what

15  you're saying is that you agree that Mr. Palmer operated within

16  500 feet of a vehicle, vessel or structure, but not within the

17  specific distances that have been alleged, the hundred feet, 150

18  feet, 200 feet.

19      MR. SCHULTE:  Correct, Your Honor.  In fact, it's irrelevant.

20      JUDGE FUN:  And the only other argument is that the propane

21  tank, you're arguing, is not considered a structure.

22      MR. SCHULTE:  Yes, Your Honor.

23      JUDGE FUN:  Okay, got it, all right.  All right, Mr. Schulte,

24  I don't know if that really relieves that much from me, but I do

25  appreciate your --

1   again.

2       (Pause)

3       JUDGE FUN:  It was Administrator versus May, 1-NTSB-1243, a

4   1971 case.  And it goes first to the fact that there has to be

5   evidence that the location of the site was suitable for landing or

6   takeoff, but doesn't really address whether or not it has to be

7   pled as part of the next day element to the complaint.

8       Most of the cases you seem to suggest are that the Respondent

9   was using the exception and mostly to address that as to whether

10  or not it's an appropriate exception for the circumstances or

11  whether or not there was sufficient evidence for the exception,

12  but it doesn't directly address who has the burden in that

13  particular case.

14      I think rather than not making a ruling on this matter, I'm

15  going to reserve a ruling on it and give the parties time to

16  research and brief this.  The parties are welcome to submit

17  written brief on this matter the next day or two.  I would ask you

18  to simply limit your brief to no more than five pages single

19  spaced to address that issue that we're discussing here.

20      And so rather than taking the time off right now to do that,

21  I think we'll go ahead and proceed with the hearing with the

22  understanding that that issue is still reserved and the parties

23  will be given an opportunity to brief and again make brief

24  arguments on that issue at a later time.

25      Also, that any evidence with regards to takeoff and landing

1       Thank you, Your Honor.

2       JUDGE FUN:  Thank you, Ms. Toscano.  Mr. Schulte, would you

3  like to make an opening statement now or would you like to reserve

4  that?

5       MR. SCHULTE:  No, I'll make a brief one, Your Honor, and it

6  will be brief.

7           OPENING STATEMENT ON BEHALF OF THE RESPONDENT

8       MR. SCHULTE:  As I said before, the Respondent has never

9  denied that he flew the aircraft in question on the day in

10 question and that he operated it below 500 feet as necessary for

11 takeoff and landing.  He's been clear on that point since before

12 this investigation began versus before these proceedings began,

13 rather, but that he operated the aircraft in accordance with the

14 FAA's own published guidelines, those guidelines being contained

15 in the document again published by the FAA called the Off Airport

16 Ops Guide, which is very specific about how somebody needs to fly

17 an aircraft to determine suitability of a landing site.

18      He, in his discretion, made the pass, didn't like what he saw

19 and he left the area.  He made exactly one pass and one pass only.

20 And by the way, what he did in this case is almost identical to

21 the underlying facts set forth in the Wick decision that we

22 discussed earlier.

23      All that being said, the evidence will show that there were

24 no regulatory violations; that Mr. Palmer operated his aircraft

25 exactly as he should have.  With that we will rest.

45

1  Q.   And please tell us a little bit about yourself, your

2  background?

3  A.   My background, the biggest part of my background is I'm a

4  combat veteran from the United States Seabee's.  I'm also an

5  electrician, a husband and a father to three beautiful children.

6  Q.   And how long have you lived at 400 Desert Sun Lane in Reno,

7  Nevada?

8  A.   Oh, we're over five years now here.

9  Q.   And in terms of your military background can you go into that

10  a little bit more, like how many years were you in the military

11  and what specific experiences you have in the military?

12  A.   I was in service for four years.  I was a heavy machine

13  gunner in the 4th Battalion, 31st Regiment.  Mostly Mark 19

14  machinegun; that's the MK-19, it's a grenade launcher and most of

15  my training for that weapon was fields of fire and ranges because

16  if I couldn't put the grenades on the target, obviously they're

17  not effective.

18      So besides that, I had two deployments, one to Iraq for the

19  battle of Volusia and the other was to Cashmere in the controlled

20  part of the Himalayas.

21  Q.   And do you consider your experience with the military as

22  given, the experience in estimating distances?

23  A.   Yes.

24  Q.   Could you explain that?

25  A.   Yes.  Most of my training on the Mark 19 is as a grenade

46

1   launcher so the -- a lot of the training is field ranges so you

2   need to be able to estimate the range of your target.  Also, you

3   need to -- you need to include windage, elevations and all those

4   things go together so that you can get the grenades on target.

5   Q.    Okay.  And -- okay, so turning your attention to Sunday,

6   November 24th, 2019, approximately 12:00 noon, do you recall what

7   you were doing at that time and date?

8   A.    Yes, I was talking to my neighbor on my fence line.  That

9   would be the western line of my property.

10  Q.    Okay.  And as you were talking with your neighbor -- what's

11  this here?

12       MS. TOSCANO:  Okay, Zoom Host, please display Exhibit A-15 at

13  Page 7 of 7?

14                                  (Document above referred to was

15                                  marked for identification as

16                                  Administrator's Exhibit A-15.)

17       MS. TOSCANO:  Let the record reflect that we are all viewing

18  Exhibit A-15 at Page 7 of 7.

19       BY MS. TOSCANO:

20  Q.    So Mr. Pena, do you see on the display the exhibit itself?

21  A.    Yeah, I see mostly the paragraph and a little bit of the

22  image.

23  Q.    Okay.

24  A.    Yeah.  I see the image now.

25  Q.    Okay, thank you.  So looking at the image, do you recognize

A347

1    what's shown in here?

2    A.    Yeah, that's the estimated flight pattern.

3          MR. SCHULTE:  Objection.

4          BY MS. TOSCANO:

5    Q.    Okay, so do you recognize --

6          JUDGE FUN:  Wait.  You have an objection, Mr. Schulte?

7          MR. SCHULTE:  There was, Your Honor.

8          JUDGE FUN:  What's your objection?

9          MR. SCHULTE:  Foundation, estimated flight pattern of what?

10   There's no foundation for this testimony.

11         JUDGE FUN:  I believe Ms. Toscano will be getting into that

12   so I'll overrule the objection subject to additional evidence.

13         BY MS. TOSCANO:

14   Q.    So Mr. Pena, do you recognize any structures on the ground?

15   A.    I do; I recognize my house and my neighbor's house to the

16   west, my driveway, my backyard and my propane tank, my dog kennel,

17   my two stable areas and my chicken coop.

18   Q.    And which one of the structures is your home, if you could

19   describe that?

20   A.    My home's on the eastern part of the picture, the one on the

21   right side, the one that has solar panels on it facing south.

22   Q.    And then your neighbor's house that you indicated, who is

23   your neighbor?

24   A.    His name's Russell Stanley.

25   Q.    Okay, so is that Mr. Russell Stanley's house to the east of

A348

48

1   your house?

2   A.   Yes, that's correct.

3   Q.   And then you indicated that the depiction shows the

4   structures of your propane tank and then I think you said two

5   sheds and where is that in relation to your house, where are those

6   structures?

7   A.   They're in close proximity to the east of my house.

8   Q.   Okay, so east would be to the right of the picture?

9   A.   To the right, correct.

10   Q.   And then north is to the top of the picture?

11   A.   That's right.

12   Q.   And you indicated -- you just testified that you were outside

13   on approximately noon talking with your neighbor and who is that

14   neighbor that you were talking to again?

15   A.   Mr. Stanley.

16   Q.   And so can you point out where you were talking with

17   Mr. Stanley outdoors on that morning?

18   A.   It's represented by the green dot.

19   Q.   And so that's the western fence line of where you were

20   standing?

21   A.   That's correct.  You'll see it also lines up with my entrance

22   road and if you look towards the top of my property, you can also

23   see the same western line with the fence I have in the northern

24   half.

25   Q.   Okay.  Also, so taking you back to the time that you were

A349

1   talking with Mr. Stanley, who was with you as you were talking to

2   Mr. Stanley?

3   A.   My wife pulled up in her vehicle and she let my daughter out

4   because my daughter wanted to come see me and talk to the

5   neighbor.  And then my wife proceeded to go to the garage, park

6   the vehicle and start walking towards my direction to also meet us

7   and talk to the neighbor.

8   Q.   And when you say the neighbor you're talking about

9   Mr. Stanley?

10  A.   Mr. Stanley, yes.

11  Q.   And did Mr. Stanley have anyone else with him?

12  A.   I believe he had one of his sons was kind of running around

13  in close proximity.

14  Q.   And you indicated that your wife dropped your daughter off

15  and then drove the car to the garage.  Does this image display or

16  depict your garage and if it does, can you point out where?

17  A.   Yes, it's in the southeast corner.  You can see the garage

18  slab and then the concrete walkway that goes west and north just

19  below the solar panels.

20  Q.   Okay.  And you indicated that your wife parked the car and

21  then -- so you were observing your wife as she parked the car?

22  A.   I was talking to my neighbor, looking back and forth as she

23  was driving.  She opened the garage door and she was driving to go

24  park it and come meet us.

25  Q.   And she was just carrying your son?

50

1  A.   She was, yes.

2  Q.   Okay.  And okay -- does this depiction -- can you point out

3  on this image approximately the route that your wife took in

4  walking with your son from the garage towards you?

5  A.   Yes.  As you can see the garage slab, you know, where you

6  park in front of the garage and so she used the concrete pathway

7  that goes to my front door.  And she was just past that pathway,

8  walking on what used to be our front lawn which you can see is the

9  concrete slab, and then that's when she heard -- that's when we

10 both heard the incredible engine noise coming from the north of

11 our property.

12 Q.   Okay.  So this depiction on -- points out that -- so I guess

13 she was near the area of the front door of the house and that

14 would be approximately below where the solar panels are shown on

15 this image?

16 A.   Yeah, it's depicted with the yellow dot on the picture.

17 Q.   Okay, so -- and then tell us -- bring us to the point that

18 you just testified about hearing an incredible loud noise?  Please

19 describe what you heard.

20 A.   Yes, we -- okay, yes.  So we -- I heard this incredible loud

21 engine noise --

22      MR. SCHULTE:  Objection.

23 A.   --  and when I turned to --

24      JUDGE FUN:  Hold on, Mr. Pena, we have an objection.

25      Mr. Schulte?

A351

1    MR. SCHULTE:  Yeah, there's no regulation of incredible loud

2  noises.  Could we just kind of stick with the facts?  That would

3  be my objection, Your Honor.

4    JUDGE FUN:  Ms. Toscano?

5    MS. TOSCANO:  Yes, Your Honor.  That is a fact and that's

6  part of the circumstances of what happened and it's an important

7  circumstance, not just visual, but it's also audio observation.

8    JUDGE FUN:  I'll overrule the objection.  It's Mr. Pena's

9  testimony; it's also his impression and his thought process as to

10  what he was hearing and describing, so I'll allow the testimony.

11    I do want to go back to Mr. Schulte's original objection

12  which is foundation for this photograph.  Are you going to lay a

13  foundation for the admission of this photograph or were you going

14  to admit this exhibit or would it just be demonstrative only.

15    MS. TOSCANO:  Demonstrative only.

16    JUDGE FUN:  All right, very well, you may proceed.

17    THE WITNESS:  Okay, so yes, I heard the incredible engine

18  noise which of course was startling because there should be no

19  reason for that.  So I looked to the direction where I could hear

20  it coming from and I was not able to see any aircraft or vehicle

21  that could be coming from, which told me that it was coming -- it

22  was so far -- flying so low to the ground and barely above the --

23  my land so I was even able to see it over the line of my house

24  yet.

25    And then so we were bracing and I started yelling towards my

52

1  wife to start running and it was at that point that the aircraft

2  came into my site and it had a very aggressive left bank maneuver,

3  as you can see it in the video clip, I think it's very --

4      MR. SCHULTE:  Objection.

5      JUDGE FUN:  What's your objection?

6      MR. SCHULTE:  Now we're referring to things that are not in

7  evidence.

8      JUDGE FUN:  Well, I do advise that there's been no evidence

9  of the video yet, but I will take Mr. Pena's testimony as to what

10  he's observing and what he did observe at the time.

11      Go ahead, Mr. Pena.

12      THE WITNESS:  Okay, so when I saw the aircraft when it came

13  into view, it looked to me like it was pretty much at the ridge

14  line of my house, which is about 20 feet off grade of my home, off

15  the grade of the garage.  And when I saw the aircraft it was

16  performing a hard eastward banking aggressive maneuver and then it

17  seems to straighten out as it dipped a little bit lower and then

18  it pulled up.  Actually, I thought it was going to crash into my

19  neighbor's --

20      MR. SCHULTE:  Objection.

21      JUDGE FUN:  What's your objection?

22      MR. SCHULTE:  Again, Your Honor, thought it was going to

23  crash.  I mean we're getting kind of far afield of the fact here.

24  What he thought that the airplane was doing, these opinions are

25  not factual in nature, it has nothing to do with the allegations

A353

1   in question and he's not qualified to say -- no evidence has been

2   offered that he's qualified to opine whether or not the airplane

3   was in the process of crashing.

4        JUDGE FUN:  So your objection is speculation -- speculative?

5        MR. SCHULTE:  Indeed, Your Honor.

6        JUDGE FUN:  Ms. Toscano?

7        MS. TOSCANO:  Again, Your Honor, this witness is giving his

8   sense impressions and as a homeowner and with -- he certainly can

9   give the sense impression that given what he's observing that the

10  aircraft, he thought, was going to crash.

11       JUDGE FUN:  I'm going to allow it.  Your objection,

12  Mr. Schulte, he is not testifying as an expert, I do realize that,

13  but I also realize that he's testifying to what was going through

14  his mind when this process was --  his understanding of what was

15  happening based upon his observations, so go ahead, Ms. Toscano.

16       MS. TOSCANO:  Thank you, thank you, Your Honor.

17       BY MS. TOSCANO:

18  Q.   So Mr. Pena, what was -- what is -- what was the distance

19  between you and the -- the distance between you and your home from

20  where you were standing?

21  A.   I would say that distance was probably -- I know from me to

22  where my wife was standing I would say was about 140, 150 feet.

23  And then from where my wife was standing to where I saw the

24  aircraft and its trajectory and its -- you know, the flight path,

25  I would say another 140 to 160 feet.  So from myself to the actual

54

1  aircraft, I'd say no more than 300 feet.

2  Q.   Okay.

3  A.   And about 20 to 25 feet above the grade of my house.  It was

4  very low.

5  Q.   I'm sorry, 25 feet above or below?

6  A.   From the grade of my house, the concrete slab of my garage, I

7  would say, according to my ridge line, it was just a few feet

8  above the ridge line and my ridge line's 20 feet, so I'd say 25 to

9  30 feet above the grade of my house or five to ten feet above the

10  ridge peak of my roof.

11  Q.   Okay.  And so does the grade of your property change from

12  your house going east?

13  A.   It drops off a little bit, yes, past the -- my dog kennel

14  that is just north of that garage slab to the right where the

15  propane tank is.  It probably drops where the propane tank is it

16  drops another five or six feet and then down to the bottom of my

17  stables is probably another six to eight feet.

18  Q.   And so from where you were standing did you -- how did you

19  estimate the -- okay, so in the end, I'm sorry, strike that.

20     Did you estimate, Mr. Pena, the distance above the ground

21  that the aircraft flew as it -- as you were observing the aircraft

22  above the peak of your house?

23  A.   Yes, I used the ridge line peak of my roof as the measure and

24  then the distance, like I've said before.  I would put it right

25  over my propane tank, but if we're concerning the plane flight

A355

55

1  path, I would have to say that that flight path is more to the

2  east than my eyesight would say that it was.  And also that flight

3  path doesn't resemble the hard left bank maneuver that the

4  aircraft was performing when it came into view.

5  Q.   And could you see the propane tank from where you were

6  standing?

7  A.   No.

8  Q.   And so how do you know that the aircraft was over the propane

9  tank?

10  A.   The distance that it looked to be past my house and just how

11  familiar I am with my property.  And also my training that we've

12  talked about in range finding.  That is an estimate, but I would

13  say that's where I would squarely put my estimate is right over

14  the propane tank.

15  Q.   Okay.  And so -- okay.  And you indicated that you were

16  yelling to your wife and for what reason?

17  A.   To start running away from the incredible loud engine noise

18  that -- I couldn't see the aircraft.  I thought there was

19  something that was crash landing possibly into my house or in the

20  immediate area, so I yelled at her to start running away from --

21  run towards me, run away from the sound that was coming from the

22  east.

23      MS. TOSCANO:   Zoom Host, please display Exhibit A-7, the

24  garage peak video.

25                              (Document above referred to was marked

A356

59

1  prove the time unless the rules of Federal Statute provides

2  otherwise.  Can you point to anything that says that there's an

3  exception in this case?

4      MS. TOSCANO:  Yeah, I'm not -- okay, so if the original video

5  that came directly from the security camera that was directly fed

6  to the computer, the home computer, if let's say a CD was placed

7  in the computer and that was downloaded to a CD how is that

8  different from downloading from the computer to, let's say, an

9  iPhone?

10     JUDGE FUN:  It's not.  I think what Mr. Schulte is saying is

11 that is not the case.  His point, I mean I haven't heard any

12 evidence, I don't know how this video was created that's being

13 depicted, but it was submitted, so I don't know how that refers to

14 someone video recording a computer screen, right?  It looks like

15 it was transferred from a security camera to a computer on to a CD

16 or on to a cellphone directly, but it looks like a recording, a

17 secondary recording and I guess you could call that hearsay from

18 that standpoint although we're talking about a recording here.

19     And so it would seem to me that it would not meet the

20 duplicate exception under 1003 which indicates that the duplicate

21 is admissible as an original unless it came in question as to the

22 authenticity of the original or it was unfair under the

23 circumstances.  But I think Mr. Schulte is raising both of those

24 issues that, you know, there might be a question as to the

25 authenticity.  It's not the original nor is it the duplicate copy

60

1  as well as the unfairness of it and it appears that we may not

2  have the full video that was taken of that.

3      And so when I look back at some of these videos, I'm going to

4  look at the improvised video again which is 7.

5      MR. SCHULTE:  Your Honor, and I would also just note too if

6  you look at that garage video it appears to be accelerated to me.

7  Now, I don't know one way or the other.

8      JUDGE FUN:  Yeah, it did look like -- it's a partial screen

9  shot it did look like.  The upper part of the video was completely

10  blacked out and then there's half of the image on a screen on the

11  lower half with a time/date stamp, but it doesn't show the bottom

12  of the full image.  And then we get the front portion of the video

13  which is denied.  You can actually see on the bottom some controls

14  are being recorded and some movement while it's being recorded off

15  of a screen so I think we have an issue of completeness as well

16  during that time.

17      We have the complete videos and whether or not the video's

18  made to show other things that may be relevant.  I don't know, I

19  don't have any evidence of that, but I guess that's a question

20  that might be raised as well.  So but what I don't know at this

21  point is where these videos came from, how they got created, who

22  took them.  I understand that Mr. Pena might have taken them, but

23  I don't know how they were created.  It does not appear to be

24  exact duplicates under 1003.

25      Ms. Toscano, do you want to address that with your witness or

65

1  furtherance of creating the videos?

2  A.    So I thought -- I backtracked to around the time of the

3  incident and then I discovered the -- you know, the parts of the

4  video where he incident actually happened and then I downloaded

5  them so we could have them on file and that was it.

6      I also recorded them on to my phone as well when I did slow

7  motion with them because you can't download while you're doing

8  slow motion.  It will just play, so one of the videos I gave is

9  actually the direct surveillance monitor and I'm using my

10  cellphone recording the monitor that's part of the surveillance

11  system as I click the mouse so that I can see the aircraft in slow

12  motion so it can be studied more easily.

13  Q.    Okay.  So the video that you provided to the FAA was not --

14  was a direct copy from what you downloaded to the USB, correct?

15  A.    Yes, it was a direct copy.  And I also included the video

16  from my cellphone that I talked about so I could display it in

17  slow motion.

18  Q.    Okay.  And when you made -- when you downloaded the videos

19  straight from the USB device did you crop any of the pictures; did

20  you add any additional information?

21  A.    No.

22  Q.    So Mr. Pena, the duplicate that you made downloaded straight

23  from the hard drive to the USB was a true duplicate copy, correct?

24  A.    Correct.

25  Q.    And I'm sorry, if you could explain again, so at any time did

A359

1  you -- do the videos contain or depict the -- are the -- were the

2  videos created from taking -- say using an iPhone looking at your

3  monitor?

4  A.    One of them was; the one that I mentioned that shows the

5  aircraft in slow motion.

6  Q.    Okay, could you repeat that answer, please?

7  A.    Yes.  One of the videos I submitted you can see the aircraft

8  in slow motion and that was taken -- I took my iPhone and I

9  recorded it as I was using the surveillance hard drive and playing

10 it in slow motion on the surveillance monitor and then recording

11 the slow motion on the surveillance monitor with my iPhone camera

12 because it doesn't download in slow motion, so I downloaded it in

13 its normal play mode and then I took a recording of it in slow

14 motion, which I have to actually use the surveillance hard drive

15 to do that.

16 Q.    And what about the two still pictures that were provided --

17 A.    Those still --

18 Q.    Go ahead.

19 A.    Those still shots, like I said, the surveillance hard drive,

20 it downloads, it's a plain movie so those were also still shots

21 that I took off the surveillance monitor as I was able to pause it

22 using the surveillance hard drive and then I took the picture with

23 my iPhone.

24 Q.    So the still shots are picture from the iPhone?

25 A.    Yes.

1  office.

2      JUDGE FUN:  I'll sustain the objection.  I don't think an

3  adequate foundation for the authenticity of this has been laid and

4  there are just concerns the FAA received the actual downloaded

5  version on USB or CD, why that has not been presented as yet,

6  which is distinctly a video or a screen.  It appears the best

7  evidence would apply in this case.

8      This is not the best evidence since we do -- since the FAA is

9  in possession of a USB or a CD, an exact duplicate copy of the

10  video.  Although we can see the airplane slide by, it appears to

11  be a partial screen version of what is being shown on the monitor.

12  I know Mr. Pena's not a real photographer, but there's going to be

13  some questions, I think, that may be raised as to whether the

14  matters might be relevant that can be depicted in that video.

15      I'll sustain the objection.  A-7 will not be admitted at this

16  time.

17      MR. SCHULTE:  Your Honor, there's another video, not a video

18  but another Exhibit A-8 which is garage peak video file

19  properties.  Since A-7 is not being admitted, I would argue that

20  A-8 should not be admitted as it is no longer relevant.

21      JUDGE FUN:  We haven't gotten to A-8 yet and Mr. Pena has not

22  seen A-8 yet or Alpha 8 yet, so I'll reserve on ruling on A-8 at

23  this time.

24      All right, Ms. Toscano, please proceed.

25      MS. TOSCANO:  Okay, thank you, Your Honor.

82

1  you know, subsequent to the flight operation of the aircraft near

2  your house?

3  A.   Yes.

4  Q.   And how did you participate in taking measurements or taking

5  photographs?

6  A.   I was, I guess you could say, keeping them company as they

7  were asking me orientation of my property and what I saw and

8  angles and things like that.

9  Q.   And did you take any photographs while the inspectors

10  -- with your camera while you were there?

11  A.   Yes, we did.

12  Q.   Okay.

13      MS. TOSCANO:  Zoom Host, please display Exhibit A-17, which

14  are the photos of the measuring distances.

15      Okay, let the record reflect that we are displaying Exhibit

16  A-17 and we are currently on Page 1 of 18.

17      BY MS. TOSCANO:

18  Q.   And Mr. Pena, do you recognize -- can you identify this?

19  A.   Yes, that's in front of my garage.  I am the individual on

20  the left-hand side.  I believe Mr. Morgan, I believe that was his

21  name, he's on the right-hand side and we're going over the

22  location of the camera and that general area.

23  Q.   And you said Mr. Morgan.  Is he with the FAA?

24  A.   Yes, I believe he was heading it at the time.

25  Q.   Okay.  And you indicate that -- and where does he -- where on

83

1  this picture does it display, I guess, the garage peak camera?

2  A.    Just about that window that's above the first roof flying

3  right over the garage, below the peak with the blue fascia board

4  on it.

5  Q.    And so what is -- if you know, what is the altitude or the

6  distance above the ground of the -- that the security camera is

7  at?

8  A.    The ceiling in the garage is ten feet and so I would say the

9  camera is anywhere from 17 -- and then you have an added space

10  which is heated and those are 2X6 and then from there the head

11  space is a little less than seven feet, so I'd give that no more

12  than 18 feet off the grade of the garage.

13  Q.    And do you know the height of the garage peak itself of the

14  roofline?

15  A.    I'd say just shy of 20 feet.

16  Q.    And you see the structure on the right-hand side of the

17  house.  Can you identify that?

18  A.    That's my dog kennel.

19  Q.    Okay.  And so the -- in terms of direction and orientation to

20  the right of the garage as we're looking at Page 1 of 18, that's

21  on the eastern side or I should say the northeastern side of your

22  house?

23  A.    In orientation from the garage, the garage is due east and

24  then just past that, if you can see, there's some grass, that's

25  actually my backyard where my children and myself play.

A363

1   Q.   So the orientation of the garage is due east?

2   A.   No, the kennel is due east from my garage.

3   Q.   Oh, okay.

4   A.   Yeah, the garage doors, they face south.

5   Q.   Okay.

6   A.   Those garage doors face south, yes.

7   Q.   And where would the -- in terms of direction, where would the

8   front door be?

9   A.   That would be southwest.

10  Q.   Okay, so looking at the picture, looking on the left side of

11  the picture, it looks like a short, like a window; maybe a bay

12  window.

13  A.   Bay window, yes.

14  Q.   And so in reference to that where would the front door be?

15  A.   The front door is just past that.  Just past that bay window

16  is the front porch and the front door is recessed from that point

17  about five feet.

18  Q.   Okay.  And did you measure the distance between the center of

19  your garage where your camera is to the edge of the house, to the

20  edge of the eastern side of the house?

21  A.   Yes.

22  Q.   And do you recall what that was?

23  A.   I believe that was 12 feet and the single bay door you can

24  see there is about -- it's no more than eight foot wide and so

25  it's about 12 maybe 14 feet to the actual eastern wall of the

1  garage which is part of the kennel wall.

2  Q.   Okay, so when you say the bay -- the bay window, are you

3  talking about the window that's near the front door?

4  A.   Yes, that's the bay window.

5      MS. TOSCANO:  I offer Exhibit A-17 at Page 1.

6      JUDGE FUN:  Any objection?

7      MR. SCHULTE:  Other than relevance, Judge, I don't understand

8  the relevance of this, but no objection.

9      JUDGE FUN:  All right.  And I take it Page 1 of 18 pages is

10  being offered as an exhibit.  Is that correct, Ms. Toscano?

11      MS. TOSCANO:  I'm sorry, can you repeat that, I didn't hear

12  you?

13      JUDGE FUN:  Sure.  Only Page 1 of the 18 pages?

14      MS. TOSCANO:  Well, I offer all 18 pages of Exhibit A-17.

15      MR. SCHULTE:  So in that case I object, Judge, because I have

16  no idea what's in there.

17      JUDGE FUN:  Obviously not, the remaining pages.  I will admit

18  Page 1.

19      MS. TOSCANO:  Okay.

20      JUDGE FUN:  Which has been offered without objection.

21                          (Document above referred to was

22                          marked for identification as

23                          Administrator's Exhibit A-17, Page

24                          1, and was received into evidence.)

25      BY MS. TOSCANO:

86

1  Q.   Please turn to Page 2 of 18 of Exhibit A-17.  Please turn to

2  Page 3.  Mr. Pena, can you identify -- excuse me, let's strike

3  that.  For purposes of the record we are now displaying Page 3 of

4  18 of Exhibit A-17.  Mr. Pena, can you identify what's depicted in

5  this photograph?

6  A.   Yes, that's the distance from the propane tank to the area

7  where I believe the aircraft was directly over to the center line

8  of the garage peak camera.

9  Q.   Okay, but can you identify what's depicted in this photo?

10  What are we looking at?

11  A.   You're looking at to the east of my house.  There's a propane

12  tank there almost to the left of the picture and behind that is

13  one of my sheds.

14  Q.   Okay.

15  A.   And to the left of that is my chicken coop.  You can see part

16  of the chicken coop in the rear right corner of it sticking out.

17  Q.   And so in terms of orientation what direction are we looking

18  at when we look at this photo at Page 3, what direction is it

19  depicting?

20  A.   That's east, yeah.

21  Q.   So the propane tank is closer to your house than the shed?

22  A.   That's correct.

23  Q.   Okay.  Do you have like a pen or a stable?

24  A.   I do.  The stable is to left of that chicken coop that you

25  can see the hip of the roofline which would be in orientation that

87

1    would be a little more north of that chicken coop is stable.

2    Q.    I see.  So the stable is not depicted in this photo?

3    A.    It's not, no.  You have the chicken coop, one of my sheds.

4         MS. TOSCANO:  Please display Page 5.  Please

5    display --

6         BY MS. TOSCANO:

7    Q.    Well, cam you identify this photo, Mr. Pena?

8    A.    Yes, I believe that that's on my garage slab and I think the

9    tape line is going out to the area that we presume the airplane

10   was directly over and so you're looking at 30 feet on the marker

11   so that would be 30 feet from the center line of the garage peak

12   camera to the center of the flight path estimation.

13   Q.    Okay.  The tape measure shows 300 feet?

14   A.    No, that's 30 feet, I think that's 30 feet, zero inches.

15   Q.    Okay.

16        MS. TOSCANO:  So Host Monitor, can you return to Page 3 of

17   this exhibit?

18        Okay, so I offer Page 3 of Exhibit A-17.

19        JUDGE FUN:  Any objection?

20        MR. SCHULTE:  I object on the grounds of relevance.  I also

21   object on the grounds that the witness' testimony is inconsistent

22   with what the tape measure actually shows.  And granted, I don't

23   know the manufacturer of the tape measure, but that does appear to

24   be 300 feet to me, not 30 feet and I believe even Ms. Toscano

25   believes that it's 300 feet and not 30 feet, so those would be my

A367

88

1  objections.

2      MS. TOSCANO:  So Your Honor, it is relevant because the

3  photograph depicts the structures on the ground in which the

4  Administrator has alleged that the Respondent has operated,

5  specifically at less than 200 feet in proximity to the aircraft's

6  flight path.

7      JUDGE FUN:  I'll admit Page 3 of 18 of Exhibit A-17.  It is

8  relevant to stick with the witness' testimony and the photograph

9  speaks for itself so I'll overrule the objection.

10                              (Document above referred to as

11                              Administrator's Exhibit A-17, Page

12                              3 was Identified and received into

13                              evidence.)

14      MS. TOSCANO:  Okay.  Host Monitor, please turn to Page 7 of

15  Exhibit A-17.  Let the record reflect that we are viewing the

16  Administrator's Exhibit A-17 at Page -- I'm sorry, what page is

17  this -- Page 7.

18      BY MS. TOSCANO:

19  Q.  Okay, Mr. Pena, can you identify the objects in this picture?

20  A.  Yes, that's the same propane tank from the previous picture

21  and that's Mr. Morgan from the FAA and that is my shed just behind

22  the propane tank and again, I believe they're measuring from the

23  center line of the garage peak camera, which is 12 feet from the

24  edge of the house, so that would put my propane tank at 18 feet

25  from the perimeter wall of my house.

A368

89

1   Q.   Okay.

2   A.   It's a 500 gallon tank just for the record.

3   Q.   And was the 500 gallon tank empty, partially full at the time

4   on November the 24th, 2019?

5   A.   We keep it topped off.  So the most you can put in a propane

6   tank is you don't go above the 80 percent mark so we like to keep

7   it topped off at 80.

8        MS. TOSCANO:  I offer Exhibit A-17 at Page 7.

9        MR. SCHULTE:  No objection, Your Honor.

10       JUDGE FUN:  Page 7 of A-17.

11                              (Document above referred to was

12                              Marked for identification as

13                              Administrator's Exhibit A-17, Page

14                              7, and was received into evidence.)

15       MS. TOSCANO:  I'm sorry, where are we?

16       JUDGE FUN:  Your direct examination of Mr. Pena.

17       MS. TOSCANO:  Oh, okay, so what was the objection?

18       JUDGE FUN:  There was no objection.

19       MS. TOSCANO:  Oh, I'm sorry, I thought I -- I'm sorry, I

20   didn't hear that.  I apologize.

21       MS. TOSCANO:  Host Monitor, please turn to Page 9 of Exhibit

22   A-17?  Please turn to Page 11.

23       BY MS. TOSCANO:

24   Q.   Mr. Pena, can you identify the objects that are depicted in

25   this photograph?

A369

90

1  A.   Yes, that's part of the single door on my garage, the propane

2  tank and my shed and it looks like the tape measure is in between

3  my shed and my chicken coop and they were measuring the center

4  line of the garage peak camera to the shed.

5       MS. TOSCANO:  And for the record what's being displayed at

6  this point is Page 9 -- excuse me, Page 11 of 18 of Exhibit A-17.

7  I offer this exhibit at Page 11.

8       MR. SCHULTE:  No objection, Judge.

9       JUDGE FUN:  Page 11 of A-17 is admitted.

10                              (Document above referred to was

11                              Marked for identification as

12                              Administrator's Exhibit A-17, Page

13                              11, and was received into evidence.)

14      BY MS. TOSCANO:

15 Q.   Please turn to Page 13.  Please turn to Page 15.  Mr. Pena,

16 can you identify the objects in this -- depicted in this photo?

17 A.   Yes, that's the front part of my garage slab, the gravel of

18 my roundabout and those pine trees you see on the right are part

19 of my roundabout and the house you see is Mr. Likes' property.

20 Q.   And so give us a directional viewpoint.  What direction are

21 we looking at?

22 A.   That's due south.

23 Q.   So this is due south from the garage door of your house?

24 A.   That's correct.

25 Q.   And is -- there appears to be a person standing in the

A370

1  distance at the end of the tape measure.  Can you identify that?

2  A.   Yes, that's one of the FAA Inspectors and they're measuring

3  from the center line of the garage peak camera to the fence line

4  between Mr. Likes' property and my property.

5  Q.   And so can you give us an orientation of, you know,

6  directional orientation of that fence line?  Is it east/west,

7  north/south?

8  A.   It's east/west and that measuring tape is going south.  I

9  believe they were trying to get a measurement from the garage to

10  the --

11      MR. SCHULTE:  Objection.

12      JUDGE FUN:  We have an objection.  Mr. Schulte, what's your

13  objection?

14      MR. SCHULTE:  The witness is testifying about what his belief

15  is, it's not relevant.

16      JUDGE FUN:  Ms. Toscano?

17      MS. TOSCANO:  He participated in, you know, in this portion

18  of taking the pictures and so I think that there's enough --

19  there's enough foundation to support his statement as to his

20  belief and but more importantly is the fact that he's mentioning

21  the significance of, you know, where the person is standing in

22  terms of the structures and, you know, the obstructions and the

23  fence line.

24      JUDGE FUN:  All right, have we established who took these

25  photographs yet?  I mean there was some really long testimony, but

1  I'm unclear if Mr. Pena took these photographs or if the FAA

2  Investigator or someone else took them.

3      MS. TOSCANO:  Your Honor, I can ask that question.

4      BY MS. TOSCANO:

5  Q.  Mr. Pena, so Mr. Pena, did you take this photograph?

6  A.  No.

7  Q.  Okay.

8      JUDGE FUN:  Do you know who took the photograph, Mr. Pena?

9      THE WITNESS:  One of the FAA Inspectors.

10     JUDGE FUN:  Okay, all right.  As to the issue of Mr. Pena's

11  belief about what's occurring in this photo, I'll allow the

12  testimony subject to the photograph itself and subject to further

13  evidence from other witnesses as to what's being depicted in the

14  photo or what's occurring.

15     Go ahead, Ms. Toscano.

16     BY MS. TOSCANO:

17  Q.  So Mr. Pena, when you observed the aircraft what -- did you

18  observe the direction of flight and the route -- the direction of

19  the flight and what the aircraft flew over as it passed your home?

20  A.  Yes, the direction of the flight was north, coming from the

21  north flying south and it skimmed my house.  It dropped a little

22  bit right around the roundabout, the pine trees and then it lifted

23  up again and flew into the horizon.

24  Q.  Okay.  So now you indicate that the route of flight was from

25  north to south.  Was it a direct, you know, path from north to

A372

1    south?

2    A.    I would say it was a little northeast going southwest just a

3    little bit.

4    Q.    So can you describe that or relate to the fact to your

5    earlier testimony in observing the aircraft in a -- in an

6    aggressive maneuver and a left bank?

7         MR. SCHULTE:  Objection, leading.

8         JUDGE FUN:  Sustained.

9         BY MS. TOSCANO:

10   Q.    Mr. Pena, earlier -- your earlier testimony was that the

11   aircraft was in a left bank so can you describe the aircraft's

12   position at the time, the direction of flight that the aircraft

13   was in when you saw the aircraft in a left bank and then the

14   direction of flight after the aircraft if so came out of its left

15   bank?

16        MR. SCHULTE:  Same objection, Judge, but I've made my point.

17        JUDGE FUN:  That's the same objection.  Mr. Pena, can you

18   just explain to us the path that you observed of the airplane, the

19   path the airplane took, just describe the path the airplane took

20   for us?

21        THE WITNESS:  Sure.  So when I saw the aircraft, it was

22   performing a -- almost a 90 degree bank maneuver.  If you're

23   piloting the aircraft it would be turning to the left and then it

24   quickly straightened out, it dipped a little bit going south,

25   slightly southwest, and then it rose up a little bit and went over

1   Mr. Likes' house and then went off into the horizon so that that

2   hard left bank maneuver, when it came into my sight, would lead me

3   to believe that it was coming towards my house, I guess coming

4   from the east, which would make sense with the -- and then it did

5   a hard left bank to orientate itself more southerly and then it

6   dipped down and then rose above my neighbor's house.  It was

7   probably above his -- the peak of his roofline from what I saw,

8   maybe 30 feet over his house.

9        JUDGE FUN:  Ms. Toscano.

10       BY MS. TOSCANO:

11   Q.   Yes.  And did the path that the aircraft, as you described,

12   go over -- would it have taken it over the fence line that you

13   described and that is showing, depicted on Page 15 of Exhibit A-

14   17?

15   A.   Yes, over the fence line and about 30 feet or so above

16   Mr. Likes' roofline and then into the horizon.

17   Q.   All right.

18       MS. TOSCANO:  So I offer Exhibit A-17 at Page 15.

19       JUDGE FUN:  Any objection?

20       MR. SCHULTE:  No objection, Judge.

21       JUDGE FUN:  All right, I'll admit Exhibit -- Page 15, Exhibit

22   A-17, Page 15.

23                           (Document above referred to was

24                           marked for identification as

25                           Administrator's Exhibit A-17, Page

1                    marked for identification as

2                    Administrator's Exhibit A-13, Page 1

3                    and was received into evidence.)

4    MS. TOSCANO:  Thank you, Your Honor.

5    BY MS. TOSCANO:

6    Q.   Mr. Pena, on direct examination before we took our break, you

7    indicated that the peak of the house is 20 feet and that the

8    aircraft as it passed by your residence passed over the propane

9    tank and the shed.  And I'm not certain I asked you what was the

10   altitude of the aircraft at that time or what did you estimate the

11   aircraft at that time that it passed over the propane tank and the

12   shed?

13   A.   So from my vantage point, I would say that above the roof

14   peak there is my garage there.  The aircraft was just a little bit

15   above that, maybe five to ten feet, and there's a six foot drop to

16   the propane tank.  So if you add up the 20 foot peak, plus the

17   about five feet that he was above it, plus about a five foot drop

18   to the propane tank, I'd say from the grade of the propane tank,

19   which is the area I thought was the center line of his flight, I

20   would say about 30 feet.

21   Q.   Okay, thank you.

22        MS. TOSCANO:  I have no further questions at this time, Your

23   Honor, but I do reserve the witness.

24        JUDGE FUN:  Very well.  Cross examination.

25        MR. SCHULTE:  Yes, Your Honor, thank you and, Madam Reporter,

102

1   if you could take down the exhibit that would be helpful, please.

2                      CROSS EXAMINATION

3        BY MR. SCHULTE:

4   Q.   Mr. Pena, the aircraft that you saw fly over your property

5   that we're here about today, have you ever seen it fly over your

6   property before?

7   A.   No, but I did afterwards.

8   Q.   Okay, but my question was before so the answer's no, correct?

9   A.   That's correct.

10  Q.   And on the day in question the aircraft made one pass and

11  never came back, right?

12  A.   That's correct.

13  Q.   And as a result of that pass was there any harm done to your

14  property?

15  A.   About --

16       MS. TOSCANO:  Objection, relevance.

17       JUDGE FUN:  Mr. Schulte, what's the relevance?

18       MR. SCHULTE:  It goes to the sanction issue if there was any

19  harm.

20       JUDGE FUN:  I'll allow it, I'll overrule the objection.

21       BY MR. SCHULTE:

22  Q.   Sir, any harm to your property?

23  A.   Not to my property, but we were traumatized and my daughter

24  and myself pretty severely traumatized by it.

25  Q.   Okay, so the answer to my question, sir, is there was no harm

A376

103

1  to your property, is that correct?

2  A.    That's correct.

3  Q.    You're a combat vet, is that correct?

4  A.    That is correct.

5  Q.    So your testimony is, is that you had gone through the trials

6  of combat, but an airplane flying over your head traumatized you,

7  is that correct?

8  A.    But it was traumatizing mostly for my daughter.

9  Q.    So just to be clear, you weren't traumatized, but your

10  testimony is that your daughter was traumatized?

11  A.    We were all traumatized.  She was traumatized the most.

12  Q.    Okay.  Did you seek any medical assistance for your daughter

13  due to her traumatization?

14  A.    No.

15  Q.    Same question vis-à-vis you and your wife?

16  A.    No, just therapy amongst ourselves.

17  Q.    Okay, thank you.  I spent seven years in service.

18  A.    Did you serve in combat?

19  Q.    Twice.

20  A.    Twice?

21  Q.    So wouldn't recommend it as I expect you know.

22  A.    Yes, I would.

23  Q.    So the Mark 19, a weapon again I'm somewhat familiar with,

24  when you fire that weapon you're sometimes walking in on a target,

25  correct?

A377

1  Q.  Okay.  Do you know what generally causes noise to be made by

2  a piston propeller, propeller driven aircraft?

3  A.  With a combustion?

4  Q.  That's your answer?

5  A.  No.  The combustion is the fuel of the engine.

6  Q.  Okay, that's your belief that that's what causes the airplane

7  to make noise, is that correct?

8      MS. TOSCANO:  Objection, Your Honor, argumentative.

9      MR. SCHULTE:  I'm just asking what his testimony is.

10      JUDGE FUN:  Well, I think it is argumentative, but I also

11  think it's speculative.  I don't know if Mr. Gabriel is -- he's

12  obviously not a pilot, he's not knowledgeable about aircraft or

13  engines or how noise is produced.  I'll sustain the objection.

14      MR. SCHULTE:  Fair enough, Your Honor.

15      That's all I have, Mr. Pena.

16      JUDGE FUN:  All right.

17      Redirect, Ms. Toscano?

18      MS. TOSCANO:  Yes, Your Honor, I just have a few questions.

19                    REDIRECT EXAMINATION

20      BY MS. TOSCANO:

21  Q.  Mr. Pena, you indicated that there was a -- that you were all

22  traumatized.  Do either of you, any of your family members that

23  were there, your daughter or your son or your wife, do they to

24  this day, anybody bring up the incident two years, two and a half

25  years after it?

1    A.   Yes, each time we have an aircraft that flies over our house

2    or that we can hear flying, you know, in close proximity, my

3    daughter gets visibly shaken up, she asks me if it's going to

4    crash into our house or if it's going to crash and my son asks the

5    same questions too.

6    Q.   So at the time of the low flight over your house, November

7    24th, a Sunday, November 24th, 2019, your wife was carrying your

8    son.  Approximately how old was your son at that time?

9    A.   He is three, I think he's just past three and a half and it

10   was almost two and a half years ago, so he was around one year

11   old.

12   Q.   And your daughter who was standing with you on the western

13   perimeter fence line with you at the time, how old was she then?

14   A.   She was between three and four.

15   Q.   Okay.  And when you called the Sheriff's Office did you give

16   them a witness statement?

17   A.   Yes, we did.  We also submitted on line.

18   Q.   Okay.

19   A.   At that time there was no way to know who was flying the

20   aircraft so --

21        MR. SCHULTE:  Objection, there's no question pending, Judge.

22        JUDGE FUN:  I'll sustain the objection.

23        MS. TOSCANO:  I'm sorry, Judge, did you say sustained to the

24   objection?

25        JUDGE FUN:  Yes.

1    I noticed it dipped a little bit lower after that so it came -- it
2    flew a little bit lower and then it started on an incline after
3    that.
4        JUDGE FUN:  Now, you mentioned that when you heard the
5    airplane, the aircraft, you really couldn't see it at the time and
6    eventually it came into view and you were able to observe it and
7    it flew over your property and dipped and then started to climb,
8    and during that time period you were yelling at your wife telling
9    her to run, what was going through your mind at that time?
10        First, to the airplane, just kind of walk me through what you
11    were thinking, what the thought process was, what your feelings
12    were like when you first start hearing the noise and then you saw
13    the airplane come into view?
14        THE WITNESS:  So immediately my feelings were fighter fly.
15    And especially being a combat veteran, taking not just initial
16    combat, but many instances where rockets were coming in and
17    mortars, obviously startled me and since I couldn't see it with
18    how loud it was, I thought for sure something was crash landing
19    either into my house or shortly, you know, somewhere around the
20    vicinity of my house.  So I thought something was either crashing
21    either into my house or behind it and that was before I could see
22    it.
23        JUDGE FUN:  When the plane came into view what was going
24    through your mind at that time?
25        THE WITNESS:  Disbelief, I couldn't believe somebody would

A380

1  endanger all our lives and do something like that.  I've never

2  seen an airplane fly that low or that -- also I mentioned that

3  aggressive bank maneuver and I just remember thinking what an

4  aggressive style it had to it.  And I also wondered if it was

5  retribution for something that happened between me and my neighbor

6  a few weeks before when he was flying his drones over my house and

7  I asked him to respect my property and quit flying the drones over

8  my house.

9      And I mention that because a few days after this happened we

10 got a voicemail from Mr. Likes apologizing for Mr. Palmer and for

11 himself for what had happened and then I started to connect the

12 dots because I didn't know Mr. Palmer, but he is fly buddies with

13 Mr. Likes and --

14     MR. SCHULTE:  Your Honor -- forgive me, Mr. Pena, I'm going

15 to object and move to strike all of this testimony, Judge.  I know

16 you asked the question, I mean no disrespect of The Court, but

17 we're going off rails here.

18     JUDGE FUN:  And Mr. Pena, please tell me what was going

19 through your mind at that time, you know, when the airplane came

20 into view?  I know you put things together later on.

21     THE WITNESS:  Yeah.

22     JUDGE FUN:  But I want to focus on at the time you saw the

23 airplane after you heard it, what was in your mind at that time?

24     THE WITNESS:  Disbelief, shock, anger that somebody would do

25 something like that.

114

1     JUDGE FUN:  And at what point of time did you begin to yell

2  at your wife, was it after the plane came into view or before it

3  came into your view?

4     THE WITNESS:  Before when I heard the loud noise.  I'm not

5  sure if she even heard me over the noise.  We were about 150 feet

6  apart.

7     JUDGE FUN:  Now, did you think to yell at your wife or was it

8  more of an instinct?

9     THE WITNESS:  It was an instinct, yeah.

10    JUDGE FUN:  Now, after the aircraft kind of flew over the

11 flight path that you said over your property and started to dip

12 and then started to climb over your neighbor's property what were

13 your thoughts at that point, did it change or was there anything

14 different?

15    THE WITNESS:  I kept tracking the plan to make sure it didn't

16 come back and I was still just shocked and in disbelief and angry

17 about, you know, that somebody would do something like that.

18    JUDGE FUN:  And you said you had your daughter with you.

19 When this occurred did you see expressions of any kind of

20 emotions?

21    THE WITNESS:  She was very upset.

22    JUDGE FUN:  Well, when you say upset what do you mean by

23 that?

24    THE WITNESS:  So when it happened --

25    JUDGE FUN:  Did she --

A382

115

1      THE WITNESS:  Go ahead.

2      JUDGE FUN:  Did she cry or was she fearful?  I mean explain

3  to me what her emotion was?

4      THE WITNESS:  She was shaken up and asking me what was

5  happening and why the plane was going to crash into our house,

6  asking me why somebody would do something like -- why it was

7  happening, I guess.

8      JUDGE FUN:  All right, thank you, Mr. Pena, I don't have any

9  further questions for you.  Do Ms. Toscano or Mr. Schulte have any

10  follow up questions with regards to the questions I asked?

11  Ms. Toscano?

12      MS. TOSCANO:  So a follow up question on the low flight

13  occurrence after November 24th, 2019.

14                    REDIRECT EXAMINATION (continued)

15      BY MS. TOSCANO:

16  Q.   Mr. Pena, you indicated to the Judge that you observed -- you

17  and your wife were in your backyard and you observed the same

18  aircraft flying south to north, is that correct?

19  A.   I believe so, yes.

20  Q.   And you indicated that it was 200 to 300 feet away from you

21  in your backyard.  Where in your backyard were you when this

22  occurred?

23  A.   We were on the grass, we call it the dog run, but it's the

24  grass section we have in the backyard.

25  Q.   Can you -- so in the backyard.  Is the backyard the area

A383

121

1  sort of -- okay, so you're married and how many children do you

2  have and how long have you been living in this current residence?

3  A.   Okay, I work from home.  I have three children with Mr. Pena.

4  We have lived in this property for over five years now.  That's

5  about it.  Is that okay?

6  Q.   No, that's very good, thank you.  And so your home is 400

7  Desert Sun Lane in Reno, Nevada, correct?

8  A.   Correct.

9  Q.   Okay.  And turning your attention to November the 19th, 2000

10 -- excuse me -- November 24th, a Sunday, 2019 and could you please

11 describe, you know, what you were doing before you observed or

12 heard the aircraft?

13 A.   I had been out in town and I was just coming home with two of

14 my children and my husband was standing at our western fence line

15 with our neighbor, Mr. Stanley, and I had a brief conversation

16 with them because I was still in the car and my daughter said, oh,

17 I want to get out.

18      So I let her out and we were there for a couple of minutes.

19 I came home probably at 11:50 a.m.  And then my daughter stayed

20 with my husband and then I drove my car from that western fence

21 line going east towards the house and I either parked in the

22 garage or on the grass slab, I don't remember which one, but

23 either way I parked my car near the garage.  And I took my son out

24 and dropped my stuff.

25      That took me a few minutes and then I proceeded to walk back

A384

1  from the garage which is on the eastern side of our house towards

2  where my husband and my daughter and our neighbor were all still

3  standing at the western side of our fence line.  And then I did

4  not make it to the fence line.  I was pretty much in the line with

5  the post of our front porch when I heard the sound of a very loud

6  engine and by loud I mean it was so loud to me that I could see my

7  husband trying to yell something to me and I had no idea what was

8  happened, obviously.

9      I could just see that he's moving his arms and I hear him

10 yelling, but I wasn't sure what he was saying because I could hear

11 an engine coming and that to me was a little bit unnerving because

12 when you hear something so loud, but you don't know where it's

13 coming from that breads that, you know, that adrenal spike

14 especially because I was holding my son and I was walking and it

15 totally caught me off guard because I couldn't see it.  All I

16 could hear was an engine coming from somewhere behind me and then

17 I looked towards where I could hear the engine sound moving

18 towards, which is coming more from south and I saw it come into

19 view past the garage peak, the roofline because I had a view of

20 the two different roofline sections.

21     And I saw it and I was immediately just kind of dumbfounded

22 because I couldn't believe how close it was to the house and how

23 close it was to the ground.  And then it continued going south

24 towards our neighbor's house at 300 Desert Sun and I actually -- I

25 was ready to watch it impact into the house because I thought

1  there was no reason that this plane was so low unless it was

2  having an emergency and so I thought for sure it was going to

3  crash into my neighbor's living room.

4      But at the last minute he pulled up and flew over the house

5  and kept going straight until he was out of view.  And then I

6  watched towards my husband.  We were all just in disbelief

7  because we couldn't believe what had just happened because that's

8  never happened before.  I can't think of too many situations in my

9  life where I've ever been that concerned about, you know, maybe

10  about a possible, you know, injury scenario especially because I

11  was holding my son and I didn't know where to go because it was

12  loud and I could just hear it coming towards the house.

13      So it was a frightening scenario and one that obviously let

14  us file a report with the FAA because we were very shocked that

15  someone would even consider doing that so close to our house where

16  we live and it was supposed to be our private residence, but it

17  was anything but private or safe at that moment so that's why we

18  filed our report.

19  Q.   Okay.  And then when the aircraft finally came into view can

20  you describe exactly where on your, I guess from your vision,

21  where did the aircraft first come into your view, was it before or

22  after -- I'm trying to think, did you see the aircraft come above

23  the roofline or was it --

24  A.   It was so loud that I didn't see it until it passed the

25  garage.  I didn't see it over the top of the house if that's what

124

1  you're asking?

2  Q.    Yes.

3  A.    And pretty much level with my view of the garage.

4  Q.    And as level with the view of the garage, you're talking

5  about the top of the garage door, not the garage peak?

6  A.    The peak, because I didn't see it, I only saw it at the top

7  because the garage comes out at a hit from the house so from where

8  I was standing it somewhat blocks --  I'd say from where my

9  husband was standing he probably would have seen it first because

10  he had more of a clear shot whereas I was kind of back, recessed

11  behind where the garage cuts off my view of where the propane tank

12  and the hay side would be, so I didn't see it until it passed the

13  garage.

14  Q.    And so when it passed the garage it -- was it at the -- what

15  level above the house was it or was it the same level as the peak

16  of the house or was it the same level as the top of the garage

17  door?

18  A.    I don't -- I wouldn't be able to tell you that specifically

19  because I was in such a state of shock.  I would say that I know

20  for sure that it was under a hundred feet and I know very

21  confidently it was around 50 feet above the ground that the plane

22  was flying over.  Because of my view, I didn't see where the plane

23  would have been before it passed the garage, I only know what I

24  saw once it passed the garage and that was approximately 50 feet

25  above that section of ground because our property does slope past

1  know, northeast so when I saw the gravel, again that's the circle

2  that I base that off of because I have to keep something level

3  because then it starts to slope so right there at that gravel, if

4  you had drawn a line from the trajectory he was coming from, I

5  didn't see him make any quick maneuvers left or right.  So

6  assuming that he was going pretty straight, it would be that he

7  would have gone right over where the propane tank was.

8  Q.   So I understand what you're explaining, so you're explaining

9  the, how you determined the altitude of the aircraft, you're not

10  describing the path of the aircraft, is that correct?

11  A.   I think maybe I crossed the lines a little bit with both the

12  altitude and the path.  The altitude, like I said, I give that my

13  eye based on where I see a level gravel path and where he was in

14  regards to that.  You know what I mean because it's not -- it

15  slopes past that, but I'm using that as my point of reference.

16  And then you asked me if he flew over the propane tank and I said

17  given the trajectory that I saw him go once he came into view, in

18  my mind I'm fairly confident that there is no path he could have

19  taken but over that propane tank vicinity.

20  Q.   Okay.  And so what landmarks did you say that he was flying

21  over?

22  A.   If I had to assume where he was flying before he came into my

23  view, which would be fairly easy because I've seen airplanes fly,

24  I know they don't -- you know, I didn't see a quick turn or

25  anything.  According to my best judgment I would say he probably

1  came right over the horse stables and then he drove on straight

2  over the propane tank and/or the hay shed.

3  Q.  And then at -- what landmarks were you using to determine his

4  flight path once the aircraft came into view?

5  A.  The -- like I said, the gravel and then the fact that he

6  stayed pretty much on that same, you know, straight line going

7  towards the neighbor's house.

8  Q.  Okay.

9  A.  And I mean he just kept on a straight line.  So assuming that

10  he came at a somewhat straight line, I know he came and banked

11  because I could see the underside of the wing, but I would, based

12  on what I saw, it looked like a pretty straight stop to be at that

13  angle where I saw him.

14  Q.  Okay.  When you say he came and banked, how do you know he

15  came in and banked?

16  A.  Because I saw the underside of the wing.

17  Q.  So the moment the aircraft came into view, the aircraft was

18  in a banked attitude and you're saying that you determined that

19  because you could see the belly of the aircraft?

20  A.  Right, yes, but I don't know I described it to my husband

21  afterwards because if he hadn't been on his side even a little

22  bit, but he wasn't a little bit, it was a pretty good angle and if

23  I hadn't seen the underbelly of the plane I wouldn't have seen

24  such distinguishable markings of the plane, I would have just seen

25  the side angle of the wing.

128

1   Q.   Okay.  And so what were the -- what distinguishable markings

2   did you observe?

3   A.   Red, white and blue stripes and definitely the red and white

4   they were the brightest and then I was pretty sure it was blue and

5   my husband told me afterwards, he said I think it was blue as

6   well.  And then when we reviewed the camera footage, because we

7   both were like after the incident we both said to ourselves

8   there's no way where he was at, this pilot, that the garage camera

9   didn't catch it.

10      So we both went and reviewed to see if that angle had been

11  caught by the camera because we both assumed that it probably

12  would have been and that's when we confirmed that it was a red,

13  white and blue undersides of the plane.

14  Q.   Okay.  And so okay, I just want to back up a little bit.

15  Thank you so much.  What was -- I'm sorry, I don't think I asked

16  you, but what was the altitude, what was your estimate of the

17  aircraft's altitude, you know, when it first came into view?

18  A.   I would say about 50 feet.

19  Q.   50 feet.

20  A.   About 50 feet.  And again, I used everything that I could see

21  in my view to make that judgment, the height that I know the house

22  is, you know, because when we first put in the cameras my husband

23  and I discussed, well, I've got to get a ladder to get up to this

24  height, you know, so that's somewhat of a decent measurement of

25  what our property structures are based on the work my husband and

163

1   looked out to the BLM range and saw him turn to the left and then
2   started coming back to us, towards us at a lower altitude or level
3   than he was when he was heading out over the BLM and really just
4   -- from what I recall, it kind of a little bit better
5   verification, where I work right now we have big tall poles on our
6   driving range.  The lowest pole is 80 feet, the highest pole is
7   140 feet and I kind of really, you know, started going back over
8   my notes.
9       I kind of wanted to see what 80 feet was and I can say it was
10  pretty accurate to how high on those 80 foot poles are was about
11  how high he was flying over Mr. Pena's house.  And I would say
12  that purple line that's right over there is about how far away he
13  was from the house.  I consider that pretty accurate and he was
14  about 80 feet off the ground.
15  Q.   Okay.  And so I just want to take you back.  So it was coming
16  from the south and it was heading north and you said over the
17  ridge line, is that like a range of mountains?
18  A.   Yes.
19  Q.   And so -- and what would you estimate the distance between
20  where you were and let's say the aircraft was over the range of
21  mountains?
22  A.   I think that mountain range, I've never really gaged it
23  because I never drove up the road, it's probably maybe about a
24  mile or so away, could be a little less.  I've never measured it.
25  Q.   Okay.

A391

166

1  height that he flew by our homes.

2  Q.   Okay.  So when the -- after -- so when, at what point did the

3  aircraft lower the altitude -- lower its altitude?

4  A.   When he -- after he passed us originally from the south to

5  the north, when he turned left to come back towards us, he lowered

6  his altitude and then sustained that altitude because we were

7  watching him, me and Mr. Pena turned out and looked out over the

8  BLM and saw him make that turn and then he started coming back the

9  other way.  And that's when our attention really was drawn to him

10  was when he made that turnout over the BLM.

11  Q.   Okay, okay.  And so once it turned, made the U turn and

12  started heading south, what altitude above the ground was he --

13  did you or would you or did you estimate?

14  A.   I would say roughly at 80 feet, just based off of what I

15  realized when I actually had something to measure by with those

16  poles I work.  It was no more than 100 feet at any point in time,

17  as soon as he came out of that left turn.

18  Q.   And was there -- at any time the aircraft -- okay, so then

19  what happened as the -- did you see the path of the aircraft, did

20  you see the aircraft the entire time as it flew past?

21  A.   Yeah.  Well, when he originally passed us in the mountain

22  range it was just like kind of south of the plane and then I lost

23  my attention for a little bit because I was talking to Mr. Pena

24  and then, like I said, when he made his left turn, you know, I

25  don't know, if an airplane makes a louder sound when it makes a

A392

1  turn or maybe just because of the direction of the engine and the

2  sound that it was making, it just -- it sounded a little louder

3  which maybe, you know, turned my attention to where the airplane

4  was at and then that's when I watched him make that left turn and

5  then go get it to a lower altitude and just buzz right by the

6  house.

7  Q.    So when it got to -- so it was at approximately 80 t \o make

8  an accurate turn to go back south.

9  A.    Correct.

10  Q.    Then it dropped more, is that what you're recalling?

11  A.    No, he dropped -- he dropped from his higher altitude when he

12  was going from the south to the north and then he dropped his

13  altitude when he made the left turn, like he dipped down towards

14  the ground and then he pulled up and leveled off and then flew

15  from the north back to the south in that direction of that purple

16  line on the screen.

17  Q.    And you may have already answered this, but so after he made

18  a left turn and dipped towards the earth, is that when you

19  estimate he was at 80 feet?

20  A.    Correct.

21  Q.    Okay.  And then as far as -- as you know, as far as from your

22  recollection, what you perceived was that aircraft's altitude

23  remained pretty much steady?

24  A.    Correct.

25  Q.    And then -- okay, my previous question to you was and I

1 if it was above it, north of the yellow line?

2 A.   It would be south of the yellow line.

3 Q.   Okay.

4 A.   I think it was more -- if he would have kept going straight,

5 he might have -- he might have come close to hitting the roof of

6 the neighbor's house if he had been any lower.

7        MR. SCHULTE:  Objection.

8        JUDGE FUN:  Objection?

9        MR. SCHULTE:  Yes, Your Honor.

10        JUDGE FUN:  What's your basis?

11        MR. SCHULTE:  Relevancy and again, this is lay opinion that

12 has nothing to do with the allegata of this case.

13        JUDGE FUN:  Ms. Toscano?

14        MS. TOSCANO:  This is witness is just stating his present

15 sense impressions and his observations of the aircraft position at

16 different points of the flight as he watched the aircraft.

17        JUDGE FUN:  I'll overrule the objection; I'll allow the

18 testimony understanding that it's lay testimony of observation.

19        BY MS. TOSCANO:

20 Q.   So just to clarify, it's your testimony, Mr. Stanley, that

21 the aircraft turned to the left before reaching the neighbor's

22 house or structures to the house that's on the -- that's depicted

23 on the bottom right-hand corner of Exhibit A-14, Page 3 of 3?

24 A.   That's correct.

25 Q.   Okay.  And Mr. Stanley, once -- when the -- well, I'll back

1   expert here.

2       MS. TOSCANO:  Okay.

3       JUDGE FUN:  So please, whatever you have to say can we move

4   on?

5       MS. TOSCANO:  Yes, I will move this.

6       (Pause)

7       JUDGE FUN:  Do you have a question, Ms. Toscano?

8       MS. TOSCANO:  Yes, I do, I'm formulating my question right

9   now.

10      BY MS. TOSCANO:

11  Q.   So Mr. Palmer, what were you doing on November 24th, 2019 in

12  the vicinity of 400 Desert Sun Lane and 300 Desert Sun Lane?

13  A.   I was making a low inspection pass at an RC runway that was

14  in the backyard of my friend's house as part of a safe landing

15  procedure as outlined in the off airport ops guide that the FAA

16  has released.

17  Q.   This says that you were just making a low pass.

18  A.   Yes, as part of my landing procedure at a new off field

19  location that would be a necessary step.

20  Q.   Okay, so you weren't intending to land at the time?

21  A.   Not on that pass.

22  Q.   And you were -- I'm sorry, you've testified that you were

23  making a low pass over the remote control landing site?

24  A.   Yes, it would be a low inspection pass to assess the surface

25  condition as well as basically getting a feel for the feasibility

192

1   of the landing site.  It was one of multiple pass throughs; there

2   was a higher up reconnaissance pass and I had been on the ground

3   there to assess the surface conditions prior.

4   Q.   So you're saying that day you did a high reconnaissance pass?

5   A.   I believe it was that day, I don't -- I didn't -- it was one

6   of those, I wasn't circling.  As much as it might not appear that

7   way, I'm not out there just trying to stir up noise and upset

8   people.  So I had looked at it while flying overhead, normally

9   like I said from the airport going north to the BLM area that we

10  normally fly around it.

11  Q.   You're saying that on that day you did an over pass -- you

12  did a hybrid reconnaissance pass?

13  A.   Yeah, I'm sure I looked down on it when I was flying north to

14  my flight operations prior to the low pass.

15  Q.   And that is a hybrid -- so you consider that a hybrid

16  reconnaissance pass?

17  A.   When I flew over it at a high level, yes.  No, the one you're

18  -- if you're asking about the one in question that was a low

19  inspection pass; that was one of the lower ones.

20  Q.   Okay, so there was more than one lower pass?

21  A.   No, there was one low pass and I found the landing site was

22  not suitable for what I had expected and I moved on.

23  Q.   So on that low pass you were -- you were at cruise speed?

24  A.   No, I was not.

25  Q.   You were at landing speed?

1   A.    No.  A low inspection pass has to be conducted at 70 miles an
2   hour at 16 knots ground speed.  It's going to put you one second
3   for every hundred feet over the ground so I always set up on a
4   stabilized approach at 70 miles an hour ground speed.  I will
5   offset to the right of the runway's intended center line so I can
6   look out my left window since I sit left seat.  That gives me the
7   ability to both inspect the touchdown point and the condition of
8   the strip as well as have a good assessment of the length of the
9   strip.
10  Q.    And what made you decide that it was not safe to land in?
11  A.    The intended touchdown spot that I had identified from the
12  bounds was much harder to start on my final approach that I
13  anticipated and going back to the off airports ops guide from the
14  FAA you should be able to touch down within one aircraft length of
15  your intended touchdown.  And given that I couldn't identify it
16  clearly enough I decided it was not a wise spot so I made a left
17  climbing turn and left the area.
18  Q.    And did you have anyone on board with you?
19  A.    No, I did not.
20  Q.    And so when you're saying you were offset to your selected
21  landing spot you're offset to the west?
22  A.    In this case, yes, I would fly to the right of the center
23  line to place the landing -- you know, planned center line of the
24  strip off my left side so I can see it out of my left window.  If
25  I flew directly over it, it would be under my nose and I wouldn't

194

1   be able to see it.

2   Q.    And what was the directional heading generally of this

3   landing spot that you selected?

4   A.    Roughly southbound.  I don't -- I couldn't tell you a

5   magnetic heading so maybe southwest.

6   Q.    So are you stating that you wouldn't have approached -- you

7   would not typically, because you're sitting in the left seat, you

8   would not approach a landing spot from the right side of the

9   aircraft because you're in the left seat?

10  A.    Yes.  I would place the intended landing site off my left

11  side so I could see it better from the left window for a low

12  inspection pass.

13  Q.    But again, this is a low inspection pass, you didn't intend

14  to land?

15  A.    No, this is part of a pass glance to the safety and

16  feasibility of the landing site.

17  Q.    So if you in your high reconnaissance, which you stated that

18  -- how high typically is your high reconnaissance?

19  A.    It varies depending on the spot, but in that area I would

20  have been probably in the realm of 500 to a thousand feet HEFL.

21        MR. SCHULTE:  Can we have a sidebar for a moment?

22        JUDGE FUN:  We'll go into a breakout room.  Did you want --

23        MR. SCHULTE:  Yes, please.

24        JUDGE FUN:  Let's go into a private breakout room with

25  Mr. Combs, Ms. Stustak and Ms. Jefferson from my office.

A398

220

1   and Bedell Flats, as well as the Air National Guard is flying

2   Black Hawks and Schnook helicopters, and then obviously, the air

3   race planes like Mustangs, and P6s, and all the other race-style

4   aircraft.

5       BY MR. SCHULTE:

6   Q.   Have you personally observed some or all of these operations?

7   A.   Yes, all of them.

8   Q.   Okay.  And have you observed any aircraft flying at so-called

9   low altitude?

10  A.   Yes.  And to clarify, I do live two miles south of where the

11  Desert Sun Lane area is; and I'm in the same valley.  And it's not

12  uncommon for the Air National Guard aircraft to come through at

13  200 AGL at any hour of the day or night.

14  Q.   And just to clarify, when you say AGL, what do you mean?

15  A.   Above ground level.

16  Q.   Okay.  Thank you.

17      MR. SCHULTE:  That's all I have for Mr. Palmer right now.

18  Your Honor, obviously, we would reserve the right to call him in

19  our case in chief.

20      JUDGE FUN:  All right.  Very well.  Ms. Toscano, do you have

21  any redirect?

22      MS. TOSCANO:  No, Your Honor.

23      JUDGE FUN:  And, Mr. Palmer, how do you spell Bedell Flats?

24  Is that with a B as in Bravo?

25      THE WITNESS:  Yeah.  I think it's Bravo Echo Delta E-Echo

A399

226

1  investigation?

2  A.    Yes, they did.  I was asked to provide assistance to

3  Inspector Don Morgan in the conduct of his investigation.

4  Q.    And is -- my understanding is Don Morgan is now retired?

5  A.    That is correct.

6  Q.    Okay.  And do you know what prompted the investigation and

7  the appointment of Inspector Morgan and you to assist in the

8  investigation?

9  A.    So what prompted us to begin the investigation was a video we

10  received in our general e-mail inbox of a low flying aircraft in

11  the North Valley areas here around Reno.

12  Q.    Okay.  And so in assisting Inspector Morgan, did you conduct

13  interviews of the complaining witnesses?

14  A.    I did.

15  Q.    And who did you interview?

16  A.    We interviewed the complainants, Mr. and Mrs. Pena.  We also

17  interviewed Mr. Stanley.  And attempted to interview Mr. Likes.

18  Q.    Okay.  And did you interview the respondent?

19  A.    We did.

20  Q.    Okay.

21       MS. TOSCANO:  Ms. Jefferson, please pull exhibit --

22  Administrator's Exhibit A-17.

23       BY MS. TOSCANO:

24  Q.    So, Inspector Green, I'm showing Exhibit A-17, page 1 of 18.

25  Can you identify this page 1 photograph?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A400

228

1  investigation.

2  Q.   Okay.

3       MS. TOSCANO:  Ms. Jefferson, we go to page 3.

4       BY MS. TOSCANO:

5  Q.   Inspector Green, can you identify this photo, which is page 3

6  of 18 of Exhibit A-17?

7  A.   Yes, ma'am.  This is a picture taken of Inspector Morgan.

8  You can see him out in the middle of the picture, beyond the

9  stable that is just to the left of the picture here.

10 Q.   Okay.

11      MS. TOSCANO:  Ms. Jefferson, can you, using your mouse,

12 follow the measuring tape to the area where Inspector Green just

13 testified?

14      BY MS. TOSCANO:

15 Q.   So, Inspector Green, is that where Inspector Morgan is

16 standing?

17 A.   No, ma'am.  A little further up.  Correct.  Right there is

18 where Inspector Morgan is standing.

19 Q.   Okay.  And what else is depicted in this photo?

20 A.   So also in this photo is a -- the propane tank.  There is an

21 olive, drab, tannish propane tank just in front of where the shed

22 in the middle of the picture is.  And then also you can see the

23 mountains and the Pena's neighbor beyond where Mr. Morgan is in

24 the picture.  Also helps kind of give a sense of the environments

25 that the occurrence took place in with the desert scrub, and the

A401

233

1  Q.   And, Inspector Green, what is this -- what is depicted in
2  this photograph?
3  A.   So this picture shows the distance from the center of the
4  driveway to where Inspector Morgan is standing in the previous
5  picture, a little over 56 feet.
6  Q.   Okay.
7       MS. TOSCANO:  Ms. Jefferson, can we go back, please, to page
8  7?
9       BY MS. TOSCANO:
10 Q.   Inspector Green, what is the significance, if any, for the
11 measurement that was taken from the center of the garage to the
12 propane tank?
13 A.   So the significance of this measurement was to show the
14 proximity of the propane tank to where we were standing in the
15 driveway, and therefore, the structure of the house.
16 Q.   Okay.
17      MS. TOSCANO:  Ms. Jefferson, can you turn to page 11?  For
18 the record, we're at Exhibit A-17, page 11 of 18.
19      BY MS. TOSCANO:
20 Q.   Inspector Morgan [sic], can you identify this photograph?
21 A.   So this photograph depicts Inspector Morgan standing near the
22 edge of the paddock, it is escaping me right now, the fenced in
23 area there, next to the stable, and just beyond the house there.
24 Q.   Okay.  Is the stable the building that's to the left of
25 Inspector Morgan?

A402

234

1    A.    The stable is the brown structure that has the brown roof on

2    the right side of the photograph.

3    Q.    Okay.  So just to be clear -- okay, so there are -- can you

4    identify the structures?  That would be helpful.

5    A.    Absolutely.  So in this picture, you have the edge of the

6    garage on the left side.  And then just beyond that is the tree,

7    and then down -- moving from left to right, across the picture,

8    you have Inspector Morgan down by the fence.  You have the propane

9    tank that is olive, drab, kind of tan colorish.  And then on the

10   other side of that propane tank is the stable.  Sitting above that

11   stable is the neighbors of the Penas to the east.

12   Q.    Okay.  Thank you.

13        MS. TOSCANO:  Ms. Jefferson, can you turn to page 13 of 18 of

14   this Exhibit A-17?

15        BY MS. TOSCANO:

16   Q.    Inspector Green, what is the significance of -- if any, with

17   respect to what is depicted in this photograph?

18   A.    So in this photograph, it's a picture of the measurements

19   from the center of the garage to where Inspector Morgan is

20   standing in the previous picture.

21   Q.    And what is the measurement that was taken?  Or that's shown

22   or depicted on this photograph?

23   A.    It's approximately 78 feet.  Just a little bit over.

24   Q.    So that's 78 feet from the center of the garage to the

25   stable.

A403

235

1  A.    Correct.  To where Inspector Morgan is standing in the

2  previous picture.

3  Q.    Okay.

4       MS. TOSCANO:  Ms. Jefferson, please display page 15 of

5  Exhibit A-17.  For purposes of the record, we are exhibiting

6  Exhibit A-17 at page 15 of 18.

7       BY MS. TOSCANO:

8  Q.    Inspector Green can you identify this photograph?

9  A.    Yes, ma'am.

10  Q.    Okay.  And how can you identify this photograph?

11  A.    So this is a photograph facing south at the center of the

12  garage towards the residence of Mr. Likes.  And in this photograph

13  you can see a figure in the middle of the frame.  And that

14  represents where the fence line, the property line is between the

15  Penas' house and the Likes' house.

16  Q.    Okay.  And are there any structures that -- besides

17  Mr. Likes' house, is there any other structures depicted in this

18  photo?

19  A.    So within this photo, you will have Mr. Likes' house, as you

20  already stated.  We also have a split rail fence that forms an

21  island in the Penas' driveway, and that's on the right side of

22  your photograph.  Mr. Pena is standing at the fence line.  They

23  have a fence that separates the two properties.  Then you also

24  have some fence structures on the other side of that fence line,

25  on the Likes' property.

A404

236

1       Also, if you look between the trees on the island, on the

2    right, you'll see powerline poles.  And then farther beyond the

3    Likes' residence, you have neighbors that are further to the south

4    there in the picture.  They have snow covered roofs.

5    Q.    Okay.  And the -- looking at the photograph, it appears that

6    the elevation -- there's a change in elevation just to the east of

7    the person standing at the end of the tape measure.  Is that an

8    elevation?

9    A.    Yes.  That's an accurate assessment.  There is a change in

10   elevation.  The elevation -- correction.  The terrain rises on

11   Mr. Likes' property.  So there's a little bit of a hill going up

12   on the left side of your picture, the east side of your picture.

13   Q.    Okay.

14       MS. TOSCANO:  Ms. Jefferson, would you please turn to page

15   17?  For the record, we're displaying Exhibit A-17, at page 17.

16       BY MS. TOSCANO:

17   Q.    Inspector Morgan [sic], can you identify this photograph?

18   A.    So this photograph shows the distance from the center of the

19   garage to where Mr. Pena is standing in the previous picture.

20   Q.    Okay.  And what is the significance, if any, with respect to

21   the distance that's displayed on this tape measure on this

22   photograph?

23   A.    So the distance shows on the tape measure is 226 feet, and

24   approximately 6 inches.  So approximately 226 feet.  And this is

25   from the center of the garage to the fence line, where Mr. Pena is

A405

237

1  standing in the previous picture.

2  Q.    Okay.

3       MS. TOSCANO:  Ms. Jefferson, can we go back to page 15?

4       BY MS. TOSCANO:

5  Q.    And, Inspector Green, during the FAA's investigation, did

6  either you or Inspector Morgan estimate or measure the distance

7  between the fence line, the shared property fence line that runs

8  east and west between the Penas' home and the Likes' home, which

9  is displayed on this page 15, did either one of you measure the

10 distance between that fence line to, let's say Mr. Likes' house?

11 A.    Let me make sure I understand the question.

12 Q.    Okay.

13 A.    Did we -- did Inspector Morgan or I measure the distance from

14 the property fence line to Mr. Likes' house?  Is that the question

15 you're asking, ma'am?

16 Q.    Correct.

17 A.    We did not.

18 Q.    Okay.  And did you estimate, either you or Inspector Morgan

19 estimate the distance?

20 A.    I understand the question.  I'm trying to recall.  I can't

21 recall right now if we did or not.

22 Q.    Okay.  And as part of your distance measuring, did you

23 measure the distance between the center of the garage to the edge

24 of the garage?

25 A.    We did.

A406

240

1    BY MS. TOSCANO:

2    Q.   So the distance between the center of the garage to the

3    propane tank was 56 feet.

4    A.   Yes, ma'am.

5    Q.   Okay.  So then the distance from the edge of the house to the

6    propane tank would be 56 minus 15?

7    A.   Correct.

8    Q.   Okay.  Okay.

9        MS. TOSCANO:  And then, Ms. Jefferson, can you scroll down?

10   Okay.  That's good.

11       BY MS. TOSCANO:

12   Q.   And, Inspector Green, what was the significance, if any, for

13   you and Mr. Morgan to measure the distance depicted in this

14   photograph, which is page 11 of 18?

15   A.   So this picture depicts 78 feet from center line of the

16   driveway to where Inspector Morgan is standing.  And this is

17   representative of where we believe the respondent's flight path

18   was.

19   Q.   Okay.  And again, the 78 feet is a distance measured from the

20   center of the garage?

21   A.   Yes, ma'am.

22   Q.   And so the actual distance -- measured distance from the edge

23   of the house at the white gutter that's shown in this picture

24   would be 78 minus 15?

25   A.   Correct.

A407

241

1  Q.   Okay.  And you testified that that was approximately the

2  respondent's flight path?

3  A.   That's what we believe the approximate flight path to be.

4  Yes, ma'am.

5  Q.   And what was that belief based on?

6  A.   So we believe that to be the center line, based on the video

7  we received here at the FSDO as part of the initial complaint.

8  Q.   Okay.  And anything else that you relied upon in considering

9  and concluding that this was the approximate lateral distance from

10  the house?

11  A.   So we based that off of the known size of the aircraft, and

12  its size in the frame in relation to the ground, and the height at

13  which the garage camera, or the camera at the peak of the garage

14  is located, 20 feet above the ground.

15  Q.   Okay.  And did you consider any of the information that you

16  received from any of the witnesses after interviewing the

17  witnesses?

18  A.   We did.

19  Q.   And can you explain?

20  A.   Absolutely.  So as part of the interview process, we

21  interviewed Mr. Pena, Mrs. Pena, Mr. Stanley, and those were the

22  interviewees we were able to get statements from.  And based on

23  their description of the events, we were able to figure out that

24  the respondent was flying from the northeast of the Pena's

25  residence and then at some point, they lost sight of him, and then

A408

242

1  he -- the respondent reappears in the video, flying over the

2  Penas' property and towards the Likes' residence.

3  Q.   Okay.

4       MS. TOSCANO:  Your Honor, at this time, I offer the entirety

5  of Exhibit A-17.

6       JUDGE FUN:  Is there -- Mr. Schulte?

7       MR. SCHULTE:  I don't know if we have covered all of the

8  entirety of A-17 in testimony.  I will certainly not object to the

9  pictures that were offered and discussed.  But to the extent of

10 anything that's in there that hasn't been discussed in testimony,

11 I would object to.

12      JUDGE FUN:  So it did appear, based upon looking at A-17 is

13 18 pages.  And we've discussed the photographs in the exhibit.

14 And Mr. Schulte is correct, there has been no discussion of the

15 other documents that we have not seen.  There's been no witness to

16 testify to those.

17      So I will admit the photograph, because there's no objection

18 to those.  And I have those found at page 5, 9, 13, and page 17.

19 I note that pages 1, 3, 7, 11, and 15 were previously admitted.

20      MS. TOSCANO:  Thank you, Your Honor.

21      JUDGE FUN:  All right.  Was that correct, Mr. Schulte, in

22 terms of the photographs?

23      MR. SCHULTE:  Yes, Your Honor.

24      JUDGE FUN:  All right.  Those photographs are so admitted.

25                         (Administrator's Exhibit A-17, in

A409

257

1  correct?

2  A.    I did.

3  Q.    Mr. Palmer, right.  And in fact, he said your request came in

4  for an interview; did he not?

5  A.    He did.

6  Q.    And when you showed him the video, he conceded that that was

7  him, correct?

8  A.    Correct.

9  Q.    Okay.  Now, with respect to the video that you showed him,

10  you testified that you received it -- I don't mean to mean you,

11  but the FAA received it in a general mailbox.  What do you mean by

12  that?

13  A.    So we have an external facing website, or an aerial -- a

14  website where you can click on a hyperlink that takes you to a

15  general e-mail box.

16  Q.    And does a person who is accessing that from outside the FAA

17  have the ability to upload files to that box?

18  A.    I'm not sure, to be honest with you.

19  Q.    Okay.  Well, you mentioned that the FAA received a video that

20  during the course of your interview with Mr. Palmer, you showed

21  Mr. Palmer.  I guess my question is, how did you come into

22  possession of that video?

23  A.    So we received the video here at the FSDO.  And I'm -- since

24  before I was assigned to the case, I am not sure what avenue was

25  used to get the video.  I'm not sure if there was an e-mail to the

A410

269

1    MR. SCHULTE:  Okay.  Sure.

2    BY MR. SCHULTE:

3  Q.   Mr. Green, you would agree that you and Mr. Morgan were in

4  contact with Gabriel and Juliet Pena at approximately 10:00 a.m.

5  on -- forgive me, I can't see that part of the document, on

6  February 13th of 2020, correct?  Or was that when this document

7  was created?

8  A.   So during this particular visit, I was not present.

9  Q.   You were not.  Okay.  How many times did you visit the Penas'

10 home?

11 A.   To the best of my recollection, two to three times.

12 Q.   And prior to today, have you seen this document before?

13 A.   I've seen it as part of the EIR.  Yes, sir.

14 Q.   Okay.  And you're fully familiar with EIR, or familiar well

15 enough with EIR, correct?

16 A.   Yes.

17 Q.   Okay.  And based on your knowledge of the EIR, and based upon

18 your knowledge of this investigation, having read this document

19 today, do you believe it fairly depicts the interaction between

20 the Penas and the FAA?

21 A.   I believe so.  Yes.

22 Q.   All right.

23    MR. SCHULTE:  I'd like to move Respondent's 6 into evidence,

24 Your Honor.

25    MS. TOSCANO:  Your Honor, I'm going to object.  First of all,

A411

282

1  A.    Correct.

2  Q.    Okay.

3      MS. TOSCANO:  I have no further questions, but I reserve the

4  witness.

5      JUDGE FUN:  All right.  Inspector Green, I have a few

6  questions for you just to clarify some of your testimony.

7      You discussed taking some of these measurements at the Penas'

8  property, and that was on December the 19th of 2019.  You looked

9  at a lot of these photographs, showing the various distances, as

10  well as the tape measures that were photographed.  And what I want

11  to ask you is in one photograph, you showed a distance to

12  Mr. Morgan 300 feet and 6 inches, with a starting point of the

13  center line of the garage to Mr. Morgan, which you estimated that

14  as being the distance of the flight path of the aircraft from the

15  center line of the garage with the camera.

16      How do you know to go out 300 feet to take that photograph?

17      THE WITNESS:  So, Your Honor, the 300-foot picture with

18  Inspector Morgan was intended to show a sense of scale.  Where we

19  believed the Respondent's flight path to be was actually much

20  closer than that.  And that was the 78 foot -- approximate 78-foot

21  picture that was shown later on in the exhibit.

22      JUDGE FUN:  So why was the 300-foot distance selected, or was

23  it just a random selection just for scale?

24      THE WITNESS:  I hear you.  I understand the question.  I'm

25  trying to recall -- I think we used 300 feet just as a sense of

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A412

288

1      THE WITNESS:  From what I recall, Your Honor, the videos were

2  anywhere from three to ten seconds in length.  They were very

3  short videos.  Very short snippets.

4      JUDGE FUN:  Okay.  So when you downloaded those, they were

5  snippets that were already on the computer, as opposed to seeing

6  the actual security video footage that was recorded on that DVR.

7      THE WITNESS:  That is correct, Your Honor.

8      JUDGE FUN:  Okay.  Once you transferred those computer images

9  and videos to your FAA camera, what do you do to the memory banks

10  on that FAA camera?  Did you maintain them or did you erase them

11  once they were downloaded to the computer at the office?

12      THE WITNESS:  So those photographs and files, they were

13  erased once they were uploaded to the computers in the office.

14      JUDGE FUN:  Is that standard operating procedure?

15      THE WITNESS:  So the short answer is yes.  The reason being,

16  we want a fully memory available in the camera for other duties,

17  for you know, investigations and aircraft accidents.

18      JUDGE FUN:  So I also assume based upon just when you've told

19  us about this camera that it's a digital camera, as opposed to the

20  old style 35 millimeter film camera.

21      THE WITNESS:  That's correct, Your Honor.

22      JUDGE FUN:  You also indicated that you visited the Penas'

23  residence you think about two to three times.  So just in context

24  what I want to understand is you went to the Penas' residence on

25  December 19th of 2019, was that the first visit, the second visit,

A413

294

1  Q.   Okay.  Do you know if Mr. Morgan ever asked the Penas for the

2  native video file or files?

3  A.   I can't recall if he did or not.

4  Q.   Okay.  You testified before that the download, in response to

5  the Judge's question, the download that you personally took from

6  the Penas' computer onto the FAA-issued camera, that you uploaded

7  it to the FAA, but whatever you downloaded has since been deleted,

8  is that correct?

9  A.   That is correct, sir.

10  Q.   Okay.  The camera that you're talking about, does it have

11  resident memory or does it received SD cards?

12  A.   It is an SD card-type camera.

13  Q.   Okay.  So if you wanted to, I think you testified, maintain

14  room for lack of a better word on the camera, you could just

15  simply insert a blank SD card in that camera and preserve the

16  other SD card with the information that was otherwise on it.  Is

17  that a fair statement?

18  A.   That is correct.

19  Q.   Thank you.

20      MR. SCHULTE:  That's all I have for Mr. Green, Your Honor.

21  Thank you.  Thank you, Mr. Green.

22      THE WITNESS:  Thank you, Mr. Schulte.

23      JUDGE FUN:  All right, Inspector Green, I believe that

24  Ms. Toscano has reserved you for recall, which just means that I

25  have to subject to recall.  Go about your normal business.  Play

A414

300

1   airplanes.

2   Q.   And did you create any area on your property to conduct

3   those types of operations?

4   A.   Yes.  On the south side of my garage, I have probably

5   guessing to 4 to 500 foot landing area that we fly all the time

6   out there.

7   Q.   Did you grade it?  Did you smooth it over?  I mean, how did

8   you create that landing area, if you did anything?

9   A.   Yes.  In the past, I have a loader that I have always kept it

10  graded and clear because we all fly right there.  And that's where

11  I've been flying for years.  And since then, it's probably all

12  overgrown bushes now, but it's all cleared.

13  Q.   When you say it was all cleared, it would have been all

14  cleared on 11 of 2019?

15  A.   Absolutely.

16  Q.   When did you move from 300 Desert Sun Lane?

17  A.   I believe I left there -- it's probably been three years ago

18  maybe.  I'm guessing.  I've moved three times since then, so I'm

19  assuming.

20  Q.   Fair enough.  Have you ever flown with my client in his

21  aircraft?

22  A.   Yes, I have.

23  Q.   How many times would you say you've done that?

24  A.   A good handful of times.

25  Q.   And when you flew with him did you land at an airport, off

A415

305

1   Q.   And how short would you say it was in your estimation?

2   A.   I mean, I'm no pilot by any means, but I'm guessing within

3   100 feet maybe.

4        MR. SCHULTE:  Okay.  I have nothing else for this witness,

5   Your Honor.  Thank you, Mr. Likes.  I appreciate your time.

6        THE WITNESS:  Thank you.

7        JUDGE FUN:  All right.  Ms. Toscano, any cross-examination?

8        MS. TOSCANO:  Yes, Your Honor.

9                         CROSS-EXAMINATION

10       BY MS. TOSCANO:

11  Q.   Mr. Likes, you weren't home on the day of November 24th,

12  2019.  Were you a passenger on Mr. Likes' aircraft that day?

13  A.   First off, it was Mr. Palmer's aircraft.  And no, I was not.

14  Q.   Okay.  Thank you.  I'm sorry about that.  So how recently

15  before November -- if you recall, the last time that you flew with

16  Mr. Palmer before November the 24th, 2019?

17  A.   I'm guessing a month before, maybe.

18  Q.   Okay.  And you indicated that the -- so a remote -- it's not

19  a remote control, but a radio-controlled aircraft; is that

20  correct?

21  A.   It is a remote-controlled electronic foam RC airplane.

22  Q.   Foam.  Okay.  Okay.  Remote control.  I'm sorry.  Can you say

23  that again?

24  A.   Electric RC foam airplane.

25  Q.   Is that also what you would call a model aircraft?

A416

307

1    backyard of your former property at 300 Desert Sun Lane, is that

2    north and east of the -- your swimming pool that you had there at

3    that -- at your home?

4    A.    The runway that I had there is southeast of my pool.

5    Q.    Okay.  So that area -- is that closer to -- is the pool area

6    -- would -- is the pool located in a backyard?  Do you call that

7    the backyard of your property?  Or was that in the front yard of

8    your property?

9    A.    The pool would be in my backyards of my property.

10   Q.    Okay.  So was the remote control -- or RC, I'm sorry, the

11   electric RC runway, was that between the pool and the house -- the

12   back of the house?

13   A.    It's not in between.  No, it is not.

14   Q.    Okay.  And you indicated that the electric RC runway was

15   southeast of the pool; is that correct?

16   A.    Yes, it is.

17   Q.    Okay.  Okay.  And do you also fly drones from that same area?

18   Do you use the runway -- the electric RC runway also for launching

19   drones?

20   A.    I do not even own a drone.

21   Q.    Okay.  Have you ever launched a drone?

22   A.    No.  I do not own a drone.  My nephew might have, but I have

23   not.

24   Q.    Okay.  So you've never used a drone?

25   A.    No, I have not.

A417

310

1      THE WITNESS:  No.  I don't recall.

2      JUDGE FUN:  All right.  Now, you talked about the RC runway

3  that you graded and kept clear.  When did you build or grade that

4  RC runway?

5      THE WITNESS:  That runway has been on that property for

6  years.  Like I said, I've been out there at least 18 years, and I

7  flew all the time.  So it's been there a long time.

8      JUDGE FUN:  And do you know how wide it is?

9      THE WITNESS:  Probably I'm guessing 30 feet wide.  25 maybe

10  30 feet.

11      JUDGE FUN:  Now we're going into the surface conditions of

12  it, would you say it's -- it's obviously not paved or asphalt.  I

13  assume it's a dirt runway.  But can you give me an idea of the

14  conditions of the dirt runway?

15      THE WITNESS:  Yes.  It was totally smooth -- well, not

16  totally add a bit of scrub, but it was basically a cleared dirt

17  runway.

18      JUDGE FUN:  How far away from your home is this runway

19  located?

20      THE WITNESS:  You know, I've never measured it, but I'm

21  guessing at least 500 plus feet.

22      JUDGE FUN:  And I assume there's only one runway, so a single

23  line or a single runway?

24      THE WITNESS:  You know, actually, I'm sorry, I'm no pilot,

25  but you've got me thinking.  I don't know what the runway width

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

A418

319

1   the academy, the EIR course.  But to get to the point and save

2   time, as a regional aviation event specialist for the northwest

3   mountain region, up until -- from 2012 to 2017, that team, the

4   National Aviation Event Specialists, specifically deal with air

5   show waivers, the ACE program, which is the Aerobatic Competency

6   Evaluation program, who are the examiners for air show performers.

7   Air show performers have to hold statements of aerobatic

8   competency or low-level cards.  In addition to that, we also

9   reviewed waivers for banner-tow operations, and things like cross-

10  country air races.  There's a big -- the Ninety-Nine Women's

11  Organization every year does a cross-country air race, and they

12  require a waiver.

13      All of these waivers include 91.119(a).  So I'm very familiar

14  with that -- the verbiage in that regulation and the parts of the

15  regulation, and how they can be -- you know, it is a regulation

16  that can be waived.  And I'm -- you know, I've worked with that

17  for several years.

18      And prior to coming to the FAA, I held a statement of

19  aerobatic competency down to 500 feet.  And all of that

20  encompasses training for the margin of error that you have or

21  don't have when you're operating.  The lower you get to the

22  ground, the less margin of error you have if something were to go

23  wrong, if the airplane had a structural failure, if the engine

24  failed, etcetera, etcetera.

25      That's kind of it in a nutshell.  I don't know if you want me

A419

345

1    Having said all that, I just want to let the parties know where

2    I'm at with that process, but also I will find Specialist Speeg

3    qualified as an expert in general aviation, flight operations,

4    general area of low flight operations, and regulatory requirements

5    under the FAA as he's experiencing those areas.

6        But again, I don't find that he's going to be qualified for

7    short field takeoff or landing with regard to the Kitfox 5.

8        All right.  Any additional comments.  I'd like to ask for

9    further argument, or any other additions we need to address with

10   regards to the qualifications of Specialist Speeg as an expert.

11       MR. SCHULTE:  No, Your Honor.

12       JUDGE FUN:  Ms. Toscano?  Ms. Toscano?  You're on mute.

13       MS. TOSCANO:  Thank you.

14                  DIRECT EXAMINATION (continued)

15       BY MS. TOSCANO:

16   Q.  Specialist Speeg, you heard the testimony yesterday --

17       JUDGE FUN:  Before we continue, do you have any questions on

18   my ruling?  Do you have any questions about my ruling?

19       MS. TOSCANO:  Just one.  Just one.  Just for a clarification.

20   So Specialist Speeg cannot testify as to the performance ability

21   of the STOL Kitfox as to take off and landings, but is Specialist

22   Speeg limited to talking about, based on his experience, on take

23   offs and landings in the STOL type of -- a STOL type of aircraft,

24   which he operated?  If it was a modified 206, and I think it was a

25   modified 172 for STOL aircraft take off and landings.  Is he

A420

353

1  standing between the tank and the hay barn, so that's where they

2  came up with that roughly 78 feet from the house.

3  Q.   Okay.  And, you know, be sure at any time you need to refresh

4  your recollection of, you know, exhibits, you're welcome to ask.

5  But okay, and so then let's go to the next point along the path of

6  the aircraft.

7        The witnesses -- there are several witnesses that indicated

8  that the aircraft had a -- was in a --

9        MR. SCHULTE:  Your Honor, I'm going to object again.  We're

10  back in the same place we were before.  We now have counsel

11  testifying again.  And we're going to be here for a week if we

12  keep replowing the same old ground.  We have conceded from the

13  beginning of this case that Mr. Palmer flew within 500 feet of

14  vessels, structures, and likely persons on the ground.  We do not

15  dispute that.  We can have another six hours of that, but we don't

16  dispute it.

17        Can we at least get to some opinions and not keep

18  retestifying about that which has been testified about before?

19        JUDGE FUN:  Ms. Toscano, what's your intent with asking the

20  question?

21        MS. TOSCANO:  Well, my intent is to lay the information,

22  because it's not -- yeah, I understand that the Respondent has,

23  you know, as of yesterday conceded that he was less than 500 feet

24  to structures, people, and persons on the ground, except for a

25  propane tank, which is not a vessel or a structure according to

A421

357

1    318 Juliet Juliet at altitudes that would not allow if a power

2    unit had failed an emergency landing?

3    A.    You know, if the power unit failed at 30 to 50 feet, the

4    margin for error is very slight.  You -- one would have to react

5    immediately.  One would have to be able to turn the energy that he

6    had created into -- he'd have to do it real quickly, being able to

7    do a number of things.

8        He would have to first fly the airplane.  He would have to

9    figure out where he was going to put the airplane down.  And he

10   would have to be able to do all of that without creating undue

11   hazard to the persons or property on the surface.  And I'm not

12   sure that that could have been done from 30 to 50 feet above the

13   ground in a steep bank, because if the engine quits in a steep

14   bank, you're going to have an immediate loss of width, because the

15   wings are sideways.  They're not level with the horizon.  Whether

16   they have STOL additions to the wing or not.  But STOL additions

17   to the wing are useless if they're in, you know, six feet or more

18   degrees of bank.

19   Q.    Okay.  And so you're talking about the moment in time when

20   the aircraft was in a bank angle.

21   A.    When it first came into view from what -- from the testimony

22   of the witnesses.

23   Q.    Okay.  Okay.  And so what is -- and --

24   A.    Another thing that I would say there is after we --

25        MR. SCHULTE:  Your Honor, can we --

A422

1       MS. TOSCANO:  So I'm asking what is the basis of your

2   opinion, Specialist Speeg.

3       JUDGE FUN:  Overruled.  I'll allow the question.

4       THE WITNESS:  The basis of my opinion is all of my

5   experience, all of my training, all of -- everything I've done in

6   the last nine years with my job, the testimony of the witnesses to

7   determine the altitude above the ground, and just -- I know any --

8   so -- and the statements made by the Respondent, where he said

9   that it was unsafe to land.  And he was kind of vague about it, so

10  I'm assuming it was unsafe to land from what he was looking at,

11  which was from what I -- from the testimony was to the east side

12  of his flight path.  So if that was the case, the only place he

13  could land is in the -- on the roads in the subdivision.  And if

14  that's the case -- I'm not disputing the fact that he couldn't

15  land there.  He could land there, but in doing so, he creates a

16  hazard, an undue hazard to persons and property in that

17  subdivision.

18      A little kid riding his bicycle down the road isn't expecting

19  an airplane to come, you know, hauling up the road.  Mrs. Pena,

20  backing out of her driveway, isn't expecting an airplane to be

21  coming down to land.  That's where I'm coming from.

22      BY MS. TOSCANO:

23  Q.   Okay.  And do you have an opinion as to whether or not the

24  Respondent operated his aircraft below -- at an altitude of less

25  than 500 feet, while he was -- he concedes he was at 100 feet

A423

368

1  That's reckless, to answer your question.

2  Q.   Okay.  And were there any aggravating or mitigating factors

3  that you considered in arriving at your opinions?

4       MR. SCHULTE:  Objection, Judge.  This has nothing to do with

5  91.119.  It's binary.

6       JUDGE TOSCANO:  I agree.  It does go to sanction, but I'll

7  overrule the objection.  Go ahead.

8       THE WITNESS:  What was the question again?

9       BY MS. TOSCANO:

10 Q.   Okay. So in terms of the policy sanction guidance with

11 respect to aggravating and mitigating factors, were there any

12 factors within the list of aggravating or mitigating factors that

13 are relevant pertaining to the Respondent?

14 A.   Absolutely.  Again, the degree of hazard that he created by

15 flying that low and that close to people and structures on the

16 ground would certainly aggravate the situation for the sanction

17 considerations.  Mr. Palmer's experience level, as far as I

18 remember, he's a private pilot with 900 hours.  That's a lot of

19 time in one airplane, but overall, it's low time.  It's

20 considered, you know, industry-wide.  Again, it was an intentional

21 maneuvering done by Mr. Palmer, and he had previously been put on

22 notice for similar actions.

23 Q.   Okay.

24 A.   With the warning notice and the counseling, yet he continues

25 to operate his aircraft in this manner.

A424

485

1   110.

2   Q.   All right.  And you're nominal cruise speed you said is 100

3   miles per hour?

4   A.   Correct.

5   Q.   Okay.  What is the slowest you can fly your aircraft, and

6   stay in the air, and for our purposes not stall the aircraft?

7   A.   My stall speed would be around 32.  So give me a few miles an

8   hour over that and I can --

9   Q.   So --

10  A.   -- sustain flight.

11  Q.   Okay.  So say 35 miles per hour?

12  A.   Correct.

13  Q.   Okay.  Now, you mentioned a moment ago that your aircraft is

14  capable of short take off and landings.  Can you give the Court an

15  idea, when you say short take off what you're talking about in

16  terms of takeoff roll?

17  A.   My standard take off distance solo, meaning just me and say

18  half a tank of gas would be about 150 feet.

19  Q.   150 feet.  Okay.  And same question with respect to landing.

20  A.   It's about the same; 150 feet.

21  Q.   Okay.  Have you --

22  A.   Obviously, this is at sea level on a standard day.

23  Obviously, there's a lot of variables, but pretty regularly even

24  up here at 5,000 feet, I'm well under 200 feet.

25  Q.   Okay.  What is the shortest distance you've ever landed your

A425

486

1  aircraft in?

2  A.   Oh, I don't know that I've ever measured, but with a stiff

3  headwind it's been maybe a length and a half of the airplane.  Say

4  30 to 50 feet.

5  Q.   Okay.  Shortest takeoff roll?

6  A.   Oh, right there.  Again, this is with a, you know, 15 to 20

7  mile an hour or more wind.  But yeah, it's -- it can get really

8  short.

9  Q.   I'm going to show you a demonstrative video.  And I'm just

10  going to ask you a couple of questions.  And I'm going to share

11  the screen here, so bear with me.

12  A.   Okay.

13  Q.   Now, you've heard a lot of testimony in this case about your

14  airplane, right?

15  A.   Yes.

16  Q.   Have you seen any pictures of your airplane, during the

17  course of this case?

18  A.   No, I have not.

19      MR. SCHULTE:  Okay.  The Court's indulgence, Your Honor.

20      JUDGE FUN:  Take your time.

21      MR. SCHULTE:  Thank you, Judge.

22      BY MR. SCHULTE:

23  Q.   Okay.  Mr. Palmer, do you recognize the aircraft in this

24  frame?

25  A.   Yes, I do.

A426

487

1  Q.  And what aircraft is in this frame?

2  A.  That is my aircraft, my Kitfox 5.

3  Q.  Okay.  Do you know roughly when this picture was taken?

4  A.  Yeah.  2017, but also there's a date stamp down on the video.

5  But I can tell too, it has an older cowling and engine than my

6  current configuration, which was changed in 2018.

7  Q.  Okay.  But this -- so is this the aircraft that you currently

8  own?

9  A.  Yes, it is.

10  Q.  Okay.  And is this the aircraft that you were flying -- and

11  forgive me, I keep forgetting the date for the life of me.

12  A.  Yes, on November 24th 2019.

13  Q.  Yeah.  Thank you for doing my job for me.  So I'm going to

14  play this video, and I want you to watch it.  Okay?

15  A.  Okay.

16  Q.  And it's not terribly long.  It appears to be 20 seconds.  Do

17  you agree?

18  A.  Yes.

19  Q.  And before I play it, do you know how this video came about?

20  A.  Yes.  I recorded the video.

21  Q.  And how did you record the video?

22  A.  I believe I set the camera on a tripod, offset from this

23  location or the place I was taking off and landing.

24  Q.  Okay.  Were you operating the camera with a remote control,

25  or did it just, you know, record as -- or did you like

A427

1   continuously run it?  That was a terrible question.  Strike that.

2       So did you operate the -- how did you operate the camera?

3   Let's do it that way.

4   A.   I can't recall exactly, but I'm pretty sure I just hit record

5   and walked away.

6   Q.   All right.  I'm going to play it.  And watch the video, and

7   then after it concludes I'll have some questions for you.  Okay.

8   A.   Okay.  And you are at the end of the video.

9   Q.   Yes, I am.  Thank you.  Again, I'll give you part of my

10   salary for today.  Okay.  Here we go.

11       (Video is played)

12       MR. SCHULTE:  Okay.  Do you need to see that again, sir?

13       THE WITNESS:  No.

14       MR. SCHULTE:  Your Honor, do you need to see it again?

15       JUDGE FUN:  No.

16       MR. SCHULTE:  Thank you, Your Honor.

17       BY MR. SCHULTE:

18   Q.   Now Mr. Palmer, does that video accurately depict the

19   performance of your aircraft at the time the video was taken?

20   A.   Yes.

21   Q.   Okay.  And if you know, can you tell us -- well, what did the

22   video just show us?  Let's do it that way.

23   A.   It was a short takeoff and landing of -- that I did in my

24   aircraft.

25   Q.   Okay.  And in terms of noise level, and in terms of

489

1  performance does it accurately depict both of those things on the

2  day that you took that video?

3  A.    Yes, on that date it does.

4  Q.    Okay.  And can you tell the Court in the video that we just

5  saw, what your approximate landing distance was?

6  A.    I would say again 150 feet approximately.  I don't recall

7  walking that out --

8  Q.    Okay.

9  A.    -- or measuring.

10  Q.    Do you have any reason to believe it was significantly longer

11  than that?

12  A.    No.

13  Q.    Okay.  Same question with respect to the takeoff.

14  A.    That would be -- it looked to me about the same.

15  Q.    Okay.  So somewhere between -- 150 feet roughly, correct?

16  A.    Yeah.

17  Q.    Okay.

18  A.    Correct.

19  Q.    Thank you.  Generally speaking, if you had to describe the

20  type of flying that you do, how would you describe it?

21  A.    I spend a lot of time flying in the back country, at both

22  unimproved strips, as well as off airport operations.

23  Q.    Okay.  And can you tell me how many off airport operations

24  you have conducted?  And when I say off airport operations, what

25  I'm asking you is how many times have you landed your Kitfox 5

A429

490

1  aircraft off airport?

2  A.   I don't keep perfect track, but it has to be north of 1,000.

3  Q.   Okay.

4       MS. TOSCANO:  Your Honor, can we have the screen removed?

5       MR. SCHULTE:  Oh, of course.  Sorry about that.  My

6  apologies, Ms. Toscano.  Mr. Palmer, on any given week, how many

7  times a day would you say you fly?

8       THE WITNESS:  Lately, I've been flying less, but back in, you

9  know, 2018-2019 it was three or four days a week.

10       BY MR. SCHULTE:

11  Q.   Okay.  And during those three or four days a week, is it fair

12  to say that you landed multiple times a day in various places?

13  A.   Yeah.  It's not uncommon for me to land 30 plus times off

14  field.

15  Q.   Okay.  Now, as configured -- well, from the time you took

16  that video to the time of the incident that we're discussing here

17  today, did you make any changes to your aircraft?

18  A.   Yes, I did.  I put a different engine and propeller

19  configuration, and all new avionics.  And the landing gear might

20  have been slightly modified to help with the angle of attack at

21  takeoff attitude.

22  Q.   Did those modifications increase or decrease the performance

23  of your aircraft, relative to take off and landing?

24  A.   They increased the performance.

25  Q.   Okay.  How did it increase performance relative to takeoff?

A430

494

1  you're just -- you're going to have full and complete control of

2  the aircraft, yes?

3  A.   Correct.  Yes.

4  Q.   Okay.  So let's go to the November 24th incident that we

5  spent the last couple of days talking about.  Can you tell us what

6  you were doing, before you overflew the properties in question?

7  A.   I was Mr. Morgan over in Bedell Flats.  To my recollection, I

8  had been asked by a local fox hunting club to help look for a

9  missing horse.  So I was out there maneuvering.  And I believe I

10 landed one or two places.  And I did find the missing horse.  And

11 then I was heading back to Reno Stead, when I flew near or in the

12 vicinity of 300 Desert Sun.

13 Q.   Now, when you flew in the vicinity of Desert Sun, what was

14 your intention?

15 A.   My intention was to make a low inspection pass, as part of a

16 necessary safe procedure, as off -- as outlined, I should say, in

17 the Off Airport Ops Guide by the FAA.  So I was making a low pass

18 to assess the feasibility of the landing site.

19 Q.   Okay.  And when you flew past those properties, do you recall

20 what your airspeed was?

21 A.   I don't recall my airspeed at that point.  On an inspection

22 pass like that, I would be referencing ground speed, which was 70

23 miles an hour.

24 Q.   Okay.  And would your ground speed be substantially different

25 than your airspeed?

A431

507

1   A.   I did not.

2   Q.   On November 24th.

3   A.   Correct.

4   Q.   Why did you not land?

5   A.   I was uncomfortable or unsatisfied with my ability to

6   appropriately locate the touchdown point, as well as the intended

7   center line of the runway.  And without having that, I didn't feel

8   a safe landing could be conducted without more passes.  And at

9   that point I didn't feel it was necessary to do that.  For lack of

10  a better word, I just decided to carry on.

11  Q.   Okay.  And when you say carry on, what do you mean by that?

12  A.   Move out of the area.  I believe I just flew back to the

13  Stead Airport and landed.

14  Q.   Okay.  And how long did it take you, once you decided that

15  you did not want to land, to move back -- to fly back to Stead

16  Airport?

17  A.   It's five minutes from the airport.

18  Q.   You testified a moment ago that your airplane had certain --

19  well, you testified that your engine and prop combination, I think

20  your word was quiet.  Agreed?

21  A.   Yes.

22  Q.   All right.  Can you tell me why you chose that particular

23  engine/prop combination?

24  A.   Well --

25       MS. TOSCANO:  Objection, relevance.

A432

523

1    altitude were you at?

2         THE WITNESS:  It's Mr. Palmer.  And --

3         MS. TOSCANO:  Oh, I'm sorry.

4         THE WITNESS:  -- I don't know exactly.

5         BY MS. TOSCANO:

6    Q.   I'm sorry, Mr. Palmer.

7    A.   Yeah.  I --

8    Q.   You don't know exactly?

9    A.   No.  I would guess somewhere under 100 feet.

10   Q.   And what would you -- would you -- what was your lateral

11   distance from the Likes' property, Mr. Palmer?

12   A.   I don't recall.  I would guess 100 and -- 100 feet, 150 feet,

13   but I honestly can't recall very well.  Also, I would have been,

14   at that point, looking out my left window.

15   Q.   Okay.  So but at that point you had already made the decision

16   to abort your landing, correct?

17   A.   And to clarify, it was never an intended landing.  It was a

18   low pass.

19   Q.   Okay.  So but at that point you had already aborted the low

20   pass?

21   A.   I had made the decision that I did not like the -- my ability

22   to spot the landing site.  So yes, I made that decision, but there

23   was no this pass was intended as an inspection pass.  I would have

24   -- if I liked it, I would have done the same thing and came back.

25   I had made the decision not to come back somewhere shortly after

A433

542

1  flight, at which point I would climb much higher.  This is just -

2  -

3      JUDGE FUN:  Okay.

4      THE WITNESS:  -- if I'm only transitioning for five minutes

5  and to another landing.

6      JUDGE FUN:  Understood.  All right.  So on November 24th,

7  when you traveled northbound from Stead Airport to Bedell Flats,

8  do you recall how high above ground level you were transitioning?

9      THE WITNESS:  I don't recall exactly.

10      JUDGE FUN:  After you helped the hunting club locate their

11  horse, you indicated you came back southbound towards -- basically

12  you were headed back to the airport.

13      THE WITNESS:  Correct.

14      JUDGE FUN:  At what point do you recall deciding to get

15  closer to the Likes' property, to conduct a low level pass?

16      THE WITNESS:  I don't recall exactly.

17      JUDGE FUN:  Okay.

18      THE WITNESS:  Yeah.

19      JUDGE FUN:  All right.  On your southbound travels back to

20  the airport, do you remember -- do you recall what altitude above

21  ground level you were at, before you decided to get a closer look

22  at the RC runway?

23      THE WITNESS:  Not exactly, no.

24      JUDGE FUN:  Okay.  And when you're traveling northbound to

25  Bedell Flats, do you remember how far away you were from

A434

543

1    Mr. Likes' property?

2        THE WITNESS:  No, I don't recall that.

3        JUDGE FUN:  Coming back southbound, were you flying the same

4    route initially that you had taken northbound earlier that day?

5    Or were you on different flight --

6        THE WITNESS:  I don't recall exactly.  There is one road,

7    Bird Springs Road, which is just a dirt road, and that's often

8    what I follow --

9        JUDGE FUN:  Okay.

10       THE WITNESS:  -- just because it's good coordination practice

11   to kind of follow the road, but I don't recall if I did that day

12   or not.

13       JUDGE FUN:  All right.  Now there was some testimony that you

14   were -- you think you were 100 feet above ground level, as you

15   were making your low pass.  Do you recall when you began you low

16   pass, or when you descended to the 100 feet above ground level?

17       THE WITNESS:  No, I don't.

18       JUDGE FUN:  During your low pass, were you able to identify -

19   - I mean know you talked about not being able to positively

20   identify the touchdown point, but could you identify the north end

21   and the south end of the runway?

22       THE WITNESS:  I don't recall exactly.  I knew the general

23   vicinity of where the -- my intended strip would have been, but I

24   can't recall if I could identify the start and the end of it.

25       JUDGE FUN:  During your low pass, were you able to -- you

A435

1  to see it.  So I would have been offset, if I'm going north to the

2  east, and if I'm going south to the west.

3      JUDGE FUN:  But you also indicated you had previously gone to

4  the Likes' residence and that property.  And you had -- if I

5  understand you correctly, you had physically seen the runway that

6  you were considering?

7      THE WITNESS:  Yeah, yes.

8      JUDGE FUN:  Do you remember when that occurred or when you

9  had done that?

10      THE WITNESS:  I don't.  It was not immediately before this

11  overflight.  It was some time before then.

12      JUDGE FUN:  Now I know that this was an off airport location.

13  And you did indicate that there was no marking out there.  But do

14  you recall any distinctive landmarks?  Because often in some of

15  these locations there might be like a pile of rocks, or wood, or

16  rocks that are oriented, you know, in a direction.  Did you -- do

17  you recall seeing anything like that?

18      THE WITNESS:  I don't recall exactly, but I do know that that

19  was -- I had previously noted, I think, a group of sagebrush or

20  something that was at an intersection of one of the other little

21  roads in his backyard.  But what I had identified previously, I

22  was unable to identify from the air.  But I can't recall exactly

23  what it was.

24      JUDGE FUN:  Okay.  Do you recall if there was a windsock at

25  that --

549

1  landing area is pretty much open scrub area, the mountains.  There

2  might be a house out there, but it's more open than it is to the

3  west.

4      THE WITNESS:  Yes.  That's correct.  There are houses out to

5  the east.

6      JUDGE FUN:  Yeah.

7      THE WITNESS:  Which is why I think part of the reason why it

8  wouldn't have made sense for me to do that pass out to the east,

9  is it wouldn't have pulled me farther than 500 feet from houses.

10  I still would have been within that of structures.

11      JUDGE FUN:  Okay.  So I understand.  So my question is if we

12  start at the top of your flight path, at the north east corner,

13  where you start coming in towards Mr. Likes' property, did you

14  have any thought of basically heading directly south from that

15  point?  So as opposed to heading southeast -- excuse me.  That's

16  wrong.  Not southeast.  Southwest, but basically going directly

17  south from that point?

18      THE WITNESS:  Which would --

19      JUDGE FUN:  And then --

20      THE WITNESS:  -- have placed be to the east?

21      JUDGE FUN:  Yeah.  To the -- basically to the east of the

22  intended landing area.  Making a 180 turn farther south, then

23  flying back northbound at your low pass, which would offset you to

24  the east of the intended landing area?  Does that makes sense?

25      THE WITNESS:  Yes, it does now.  So you --

A437

550

1        JUDGE FUN:  Okay.

2        THE WITNESS:  -- mean conducting my low pass in the opposing

3    direction to my intended landing direction?

4        JUDGE FUN:  Exactly, but offset the landing area off to your

5    left, so again you're looking out your left --

6        THE WITNESS:  Yeah.

7        JUDGE FUN:  -- window.

8        THE WITNESS:  I'm familiar with what you're talking about.

9    Very steep strips where there's no go-around is the only way to

10   inspect them.  I don't believe I thought of that.

11       JUDGE FUN:  Okay.  Could you have done that, do you think?  I

12   mean was there anything that would have obstructed you or

13   prevented you from making that sort of maneuver to the east?

14       THE WITNESS:  Just due to the fact that the terrain does rise

15   to the south probably another 30 or 40 feet MSL, it wouldn't have

16   been as effective of a low inspection pass.  And there were --

17   like I said, there are houses and power lines down there.  So I

18   don't think I would have been able to inspect it as well as I

19   would from the other direction, if that makes sense.

20       JUDGE FUN:  Okay.  So you think the ground rises farther to

21   the south?

22       THE WITNESS:  Yeah.  Not by much, but I know --

23       JUDGE FUN:  Okay.

24       THE WITNESS:  -- it's yeah, 20-30 feet, as you go a quarter

25   mile south.

A438

578

1    have known of the existence of the snowmobiles, end quote.

2        The Board reversed the ALJ's award of EAJA fees and expenses.

3    In doing do, the Board held that it was a mistake to interject a

4    knowledge requirement into Section 91.119.  Specifically, any

5    analysis of whether the pilot could or should have seen the

6    snowmobilers, while relevant to sanction, was not germane to

7    whether he flew within 500 feet of people, in violation of Section

8    91.119(c).

9        The Board went on to say quote, it was Respondent's burden of

10   proving such exculpatory claims, including his defense that any

11   low flight fell within the ambient of the except for landings

12   exception to the prescription contained in FAR Section 91.19(c),

13   end quote.  Now, the Board cited *Administrator versus Hart*, 6

14   NTSB 899, a 1988 case, that found the prefatory exception clause

15   to the regulation does not apply to low approaches to an

16   unsuitable landing site.

17       Although this dicta, the Board did make the pronouncement

18   that it is the Respondent's burden to prove that any low flight

19   fell within the exception of the regulation.  Now, this seems to

20   be consistent with several other cases that address a respondent

21   seeking to apply the exception to an alleged violation.  Some of

22   these cases -- and I will not cite all of them since there were

23   many of them, but some of these cases include *Administrator versus*

24   *Cog and O'Connor*, at 3 NTSB 98 from 1997, holding that landing on

25   a diagonal strip connecting two runways was not excused by the

A439

579

1  prefatory exception language, since it was an inappropriate and

2  unnecessary landing site.

3      *Administrator versus Prior*, which is NTSB order EA-4416 from

4  1996, holding that if a landing site is inappropriate under the

5  circumstances, than a low flight cannot be excused under the

6  regulation as necessary for landing.  *Administrator versus Christ*,

7  which is NTSB order EA-4922 in 2001, finding that landing on a

8  road, because the pilot though the police were trying to pull him

9  over did not excuse him from a violation, because there were more

10  suitable and less crowded landing locations nearby, and there was

11  no emergency making the landing on the road necessary.

12      *Administrator versus Daves*, which is D-A-V-E-S, which is

13  found at 3 NTSB 649 from 1978 finding that a low flight over the

14  ramp area of an airport was not necessary for landing or takeoff,

15  even if executing a missed approach, since there were other

16  options readily available that avoided flying over the ramp area

17  with structures and people.  *Administrator versus Hart*, which I've

18  mentioned, at 6 NTSB 899 from a 1988 case, holding that simulating

19  landing approaches in a rejected landing to a grass/dirt/sod

20  airstrip with a Lockheed L-188 violated the regulation, because it

21  was unsuitable to land that type of aircraft on the runway under

22  normal circumstances.

23      And *Administrator versus McCollough*, NTSB order EA-4020 from

24  1993 finding that the prefatory clause of Section 91.119 did not

25  apply to a practice landing approach, when the landing site was

A440

580

1   unsuitable.  In the McCollough case a pilot of a Learjet was found

2   in violation, when he was practicing approaches and missed

3   approaches at an airport with a gravel runway.  The aircraft was

4   simply not equipped to land on a gravel runway, and there were

5   persons, buildings and aircraft within 500 feet of the runway.

6       Now, as I mentioned these are just a few of the cases that

7   discuss whether a low altitude operation was necessary for takeoff

8   or landings under Section 91.119, or its predecessor Section

9   91.79.  Now, in all these cases the Board makes it abundantly

10  clear that the prefatory exception of 91.119 does not apply if the

11  landing site, whether or not there was an actual landing, is

12  unsuitable.  Now in short, in order for exception to apply the

13  landing site has to be suitable under the circumstances.

14      Now, in these cases it is notable that it was also the

15  Respondent that argued the applicability of the exception to the

16  violation.  As I mentioned, none of these cases are direct and on

17  point, and *Wick* is dicta.  However, given the Board's precedent,

18  along with the Board's statement in the *Wick* case, I find that it

19  is the Respondent's burden of proving that any low flight

20  operation falls within the ambient of the prefatory language of a

21  violation of Section 91.119.  Respondent has provided no

22  convincing authority otherwise.

23      Now perhaps this case if appealed will conclusively resolve

24  the question of which party bears the burden of proving a

25  prefatory exception in the regulation.  However, as set I am bound

A441

1  by the Board's pronouncement in *Wick*, albeit dicta, given the

2  absence of contrary authority.  Consequently, taking the factual

3  allegations true for purposes of a motion of failure to state a

4  complaint, the amended complaint sufficient -- is sufficient to

5  establish a prima facie case that Respondent one, violated Section

6  91.119(a) by operating at an altitude at which an emergency

7  landing could not have been made, without undue hazards to persons

8  or property if a power unit failed.  And two, violated Section

9  91.119(c) by operating within 500 feet of persons, vessels,

10  vehicle or structures in a sparsely populated area.

11      As I mentioned, there is that -- the residual violation under

12  91.13, which I don't address separately, given it is a residual

13  violation.  I therefore deny the Respondent's motion to dismiss

14  based on failure to state a claim upon which relief can be

15  granted.  The Administrator has alleged sufficient facts in the

16  amended complaint that if proven show that the Administrator is

17  entitled to relief sought.

18      In find that under the *Wick* case, it is the Administrator's

19  burden to prove his operation was within the exception.  He must

20  prove his low altitude operation was necessary for takeoff or

21  landing, to avoid being found in violation of the regulation.

22      Therefore, it is ordered that Respondent's motion to dismiss

23  the Administrator's complaint is denied.  So entered this fourth

24  day of April 2022 in Charlotte, North Carolina.

25      All right.  So I've issued by decision and order on the

A442

600

1    intentional, it is high.  And in this case, the Respondent's

2    conduct was reckless or intentional.  The flight operation was

3    intentional or reckless.

4        And then turning your attention, Your Honor, to figure 9-2

5    which is the sanction ranges table.  And the very first item in

6    the column is the sanction range for an individual certificate

7    holder, such as the Respondent.  And recall that we assessed a

8    high sanction matrix for the severity two, based on the reckless

9    or intentional conduct of the Respondent, and we arrive at a range

10    -- a recommended range of a 90 to 150 days.

11        The Administrator chose the middle of the range.  Neither

12    aggravating or mitigating the sanction.  And the middle of the

13    range is 120 days suspension.

14        The 120 days suspension not be mitigated, given the degree of

15    hazard posed by the Respondent's flight operation, and the level

16    of Respondent's experience in at least operating his aircraft

17    November 318 Juliet-Juliet.  He indicated that typically he flies

18    three to four times a week in his aircraft.

19        And -- oh, let me go back.  So the 120 days should not be

20    mitigated, given the degree of hazard posed by the Respondent's

21    flight operation, the level of the Respondent's experience in

22    operating November 318 Juliet-Juliet, and in concluding that

23    Respondent's violations rose to the level of recklessness or

24    intentional conduct, and Respondent's record of poor compliance

25    disposition.  Specific and a general deterrence will be served by

A443

601

1   the 120 day suspension of Respondent's private pilot's

2   certificate.

3       So I'm not certain I was clear, but I'm stating that the 120

4   days range, which is -- the 120 days proposed sanction is neither

5   aggravated nor mitigated.  And we urge Your Honor not to mitigated

6   the penalty.  There are no grounds to mitigate the penalty.

7       49 USC -- Ms. Jefferson, you can take the screen down,

8   please.  Thank you.  49 USC 44709 gives the FAA the authority to

9   take certificate actions.  The Administrator implemented that

10  authority through our regulations and policy guidance in FAA order

11  2150.3(c) including Chapter 9.

12      In setting the sanction ranges, the FAA considered the safety

13  implications of the violations in a relevant precedent and the

14  deterrent effect of the sanction.  In our order suspension, the

15  Administrator has -- in our order of suspension, the Administrator

16  has carried out the authority he has under Section 44709(b), and

17  interpreted what sanction he finds appropriate for the violation,

18  in view of applicable regulations and policy.  The sanction is not

19  arbitrary, capricious or not otherwise in accordance with the law.

20      Your Honor, the Administrator respectfully requests deference

21  to the sanction in the Administrator's order of suspension in this

22  case, and respectfully requests deference to its validly-adopted

23  interpretations, and to its interpretations through litigation.

24  Congress' removal and the pilot bill -- in the Pilot's Bill of

25  Rights of the deference language in 49 USC 44709(d)(3) did not

1   eliminate the requirement that the Board defer to the

2   Administrator's reasonable sanction determinations set forth in

3   the enforcement orders issued under 49 USC 44709(b).

4       Both Senate and House floor debates that occurred just prior

5   to passage of the law made clear that the language in 44709(d) was

6   eliminated only because it was redundant of what is already

7   required under the law.  Under the principals of judicial

8   deference set forth in *Martin versus OSHRC* 499 US 140 -- 144, a

9   1991 case, the Board is required to defer to the FAA's sanction

10  determination, as set forth in its enforcement orders issued under

11  49 USC 44709(b)(1)(a), if the determination reflects reasoned

12  consideration and is supported by evidence.

13      The principals of judicial deference articulated in *Martin*

14  apply to the statutory power vested in an agency to choose an

15  appropriate remedy to address the matters that Congress has

16  delegated to the Agency.  See *Butz versus Glover Livestock*

17  *Commission Company*.  And the case cite is 411 US 182 at page 185.

18  That's a 1973 case.

19      And just as a follow up to the exhibit A-23, there is a

20  provision in exhibit A-23.  There are portions of Chapter 9 --

21  well, in addition to the pages that are identified and spoke to,

22  address as to how we calculated the sanction, in following the

23  2150.3(c), exhibit A-23 also contains pages from the 2150.3(c) at

24  Chapter 9 having to do with aggravating and mitigating

25  circumstances.

1    So -- and that is where the Administrator is urging that the

2  sanction not be mitigated.  And also that -- to point out that the

3  Respondent's low -- the Respondent's prior counseling, and the

4  Respondent's prior letter of warning were testified to and raised,

5  for the purpose of showing that the Respondent was put on notice.

6  Not to aggravate the sanction, not to mitigate the sanction, but

7  to show that the Respondent was put on notice.  Thank you, Your

8  Honor.

9    JUDGE FUN:  All right.  Thank you, Ms. Toscano.  Mr. Schulte?

10    MR. SCHULTE:  Yes, Your Honor.  I just -- for the record, I

11  was off camera, so I didn't distract Ms. Toscano from her

12  argument.  I meant no disrespect to Your Honor.  Thought perhaps

13  my head moving around might be a distraction to her.

14    Should I proceed?

15    JUDGE FUN:  Please.

16    MR. SCHULTE:  Before I get into the underlying merits of the

17  case, Your Honor, such as they are, I do want to address an issue

18  that at least in my mind has clouded this proceeding from the

19  beginning.  And I do want to focus on one discrete area of

20  testimony, but before I do let me start by saying when the

21  Government goes back its business, we expect that it will do it in

22  a transparent, even-handed and fair manner.  That the Government

23  when it asks us to follow the rules, it would do the same.

24    When it ceases to do that or fails to do that, then people

25  lose faith in government, they lose trust in government.  Just

A446

1  operation on November 24, 2019, when everybody concedes he was

2  following the published guidance on how to do it.  Guidance

3  published by the FAA itself.

4      And what's very frustrating to me, Your Honor, intellectually

5  is this:  had Mr. Palmer on that day just dropped in on Mr. Likes'

6  property, didn't do a low pass, came straight in one direction or

7  the other, and there was logs, or gullies, or rocks, or whatever

8  kind of obstruction one could imagine on that runway, and Mr.

9  Palmer landed, and flipped his aircraft over, and God forbid if he

10  had a passenger and injured that passenger, guess what the

11  Government's argument would have been then?  91.31(a), you engaged

12  in a careless and reckless operation of an aircraft, because why?

13  You didn't follow the Off Airport Operations Guide that we

14  published.  What is wrong with you?  That would have been

15  worrying.

16      And so what we're left with in the Government's case is

17  simply this:  here's how you conduct an air -- off airport

18  operation.  Here's how you do it.  But God help you if you do.

19  That's where we are.  That is the Government's case.

20      So I won't take a lot of Your Honor's time.  You've been very

21  patient.  But I'll just summarize by saying this:  the Government

22  destroyed material evidence in this case.  That's not in dispute.

23  It did.

24      And to the extent it did, I think to send a message, to

25  perhaps suggest gently that the Government should not do that, and

1  it shouldn't, dismissal of this case is warranted.  It was

2  purposeful, it denied my client critical evidence, and it

3  corrupted what was otherwise the centerpiece of the Government's

4  case.  I am not suggesting for a moment that Mr. Green did it

5  intentionally, in the sense that he intended to corrupt the case,

6  but his act was intentional.  The deletion of the evidence was

7  intentional.  There's no dispute on that.

8      Otherwise, as far as the necessity for takeoff and landing,

9  no one disputes that dragging the field, doing a low inspection

10  pass is necessary to land at an off airport location.  No one

11  disputes that.

12      Everything else beyond that, as far as I'm concerned, becomes

13  irrelevant.  And so if the FAA concedes its necessary, if Mr.

14  Speed, Specialist Speeg conceded it was necessary, then whether my

15  client flew one foot from a house or 100 feet from a house, it

16  doesn't matter, because once the prefatory phrase is satisfied,

17  once that burden of proof is met, and I submit that is, then the

18  rest of the minimum altitudes do not matter.

19      And it is true that the Pena's may be upset, they may be mad

20  and all that.  And that may be a basis for tort liability, but

21  it's not a basis for regulatory liability.  The fact of the matter

22  is that what my client was doing on November 24, 2019 was

23  perfectly permissible, not only under the law, but under the FAA's

24  own published guidance.

25      That they don't like it, a regulatory violation does not



UNITED STATES OF AMERICA
NATIONAL TRANSPORTATION SAFETY BOARD
WASHINGTON, D.C.

| | | |
|---|---|---|
| Stephen M. Dickson, | ) | |
| Administrator, | ) | |
| Federal Aviation Administration, | ) | |
| | ) | |
| Complainant, | ) | |
| | ) | NTSB Docket No.  SE-30880 |
| v. | ) | |
| | ) | |
| Trenton J. Palmer, | ) | Judge Assigned:  Judge Not Yet Assigned |
| | ) | |
| Respondent. | ) | Hearing Date(s):  Not Yet Assigned |
| | ) | Hearing Location:  Not Yet Assigned |

**RESPONDENT'S RESPONSES TO THE
COMPLAINANT'S FIRST SET OF DISCOVERY REQUESTS**

**COMES NOW**, Respondent, Trenton J. Palmer, by and though undersigned counsel pursuant to

Federal Rules of Civil Procedure 33 and 34, as well as Rule 821.19 of the Board's Rules of Practice (49

C.F.R. Part 821), and hereby provides the following responses to the Administrator's First Set of

Discovery Requests.

**REQUESTS FOR ADMISSIONS**

**Request for Admission No. 1.**  Admit that at all times mentioned in the Complaint, you held Private

Pilot Certificate No. 3786226.

**RESPONSE:**          Admit.

**Request for Admission No. 2.**  Admit that at all times mentioned in the Complaint, you were the registered

owner of N318JJ, a 1997 Johnson John T KITFOX V.

**RESPONSE:**          Admit.

**Request for Admission No. 3.**  Admit that on November 24, 2019, you operated as pilot in command

N318JJ on a flight operation in the vicinity of 400 Desert Sun Lane and 300 Desert Sun Lane, Reno,

Nevada.

    **RESPONSE:**       Admit.

**Request for Admission No. 4.**  Admit that during the flight you operated N318JJ at altitudes less than 100 feet height above ground level (AGL).

    **RESPONSE:**       Admit.

**Request for Admission No. 5.**  Admit that during the flight you operated N318JJ within approximately 100 feet of a stable.

    **RESPONSE:**       Denied.

**Request for Admission No. 6.**  Admit that during the flight you operated N318JJ within approximately 100 feet of a shed.

    **RESPONSE:**       Denied.

**Request for Admission No. 7.**  Admit that during the flight you operated N318JJ within approximately 100 feet of a propane tank.

    **RESPONSE:**       Denied.

**Request for Admission No. 8.**  Admit that during the flight you operated N318JJ within approximately 200 feet of the residential home at 400 Desert Sun Lane.

    **RESPONSE:**       Denied.

**Request for Admission No. 9.**  Admit that during the flight you operated N318JJ within approximately 200 feet of persons who were outside the residential home at 400 Desert Sun Lane.

    **RESPONSE:**       Denied.

**Request for Admission No. 10.**  Admit that during the flight you operated N318JJ within approximately 400 feet of persons who were outside and near the western perimeter of the residential property at 400 Desert Sun Lane.

    **RESPONSE:**       Denied.

EXHIBIT A-2
2

A451

**Request for Admission No. 11.**  Admit that you operated N318JJ at altitudes that would not allow, if a power unit had failed, an emergency landing without undue hazard to persons or property.

> **RESPONSE:**         Denied.

**Request for Admission No. 12.**  Admit that your operation of N318JJ, in the manner and circumstances described in the Complaint, was careless or reckless so as to endanger the life or property of another.

> **RESPONSE:**         Denied.

## INTERROGATORIES

**Interrogatory No. 1.**  State all facts upon which you base your denial, if so, of requests for admissions #1.

> **RESPONSE:**         N/A.

**Interrogatory No. 2.**  State all facts upon which you base your denial, if so, of requests for admissions #2.

> **RESPONSE:**         N/A.

**Interrogatory No. 3.**  State all facts upon which you base your denial, if so, of requests for admissions #3.

> **RESPONSE:**         N/A.

**Interrogatory No. 4.**  State all facts upon which you base your denial, if so, of requests for admissions #4.

> **RESPONSE:**         N/A.

**Interrogatory No. 5.**  State all facts upon which you base your denial, if so, of requests for admissions #5.

EXHIBIT A-2
3

A452

**RESPONSE:**        During the flight, aircraft registration number N318JJ was not operated within approximately 100 feet of a stable.

**Interrogatory No. 6.** State all facts upon which you base your denial, if so, of requests for admissions #6.

**RESPONSE**:        During the flight, aircraft registration number N318JJ was not operated within approximately 100 feet of a shed.

**Interrogatory No. 7.** State all facts upon which you base your denial, if so, of requests for admissions #7.

**RESPONSE:**        During the flight, aircraft registration number N318JJ was not operated within approximately 100 feet of a propane tank.

**Interrogatory No. 8.** State all facts upon which you base your denial, if so, of requests for admissions #8.

**RESPONSE:**        During the flight, aircraft registration number N318JJ was not operated within approximately 200 feet of the residential home at 400 Desert Sun Lane.

**Interrogatory No. 9.** State all facts upon which you base your denial, if so, of requests for admissions #9.

**RESPONSE:**        During the flight, aircraft registration number N318JJ was not operated within approximately 200 feet of persons who were outside the residential home at 400 Desert Sun Lane.

**Interrogatory No. 10.** State all facts upon which you base your denial, if so, of requests for admissions #10.

**RESPONSE:**        During the flight, aircraft registration number N318JJ was not operated within approximately 400 feet of persons who were outside and near the western perimeter of the residential property at 400 Desert Sun Lane.

EXHIBIT A-2
4

A453

**Interrogatory No. 11.**  State all facts upon which you base your denial, if so, of requests for admissions #11.

  **RESPONSE:**  During the flight, aircraft registration number N318JJ was not operated at altitudes that would not allow, if a power unit had failed, an emergency landing without undue hazard to persons or property.

**Interrogatory No. 12.**  State all facts upon which you base your denial, if so, of requests for admissions #12.

  **RESPONSE:**  During the flight, aircraft registration number N318JJ was not operated in a careless or reckless manner so as to endanger the life or property of another.

  **Interrogatory No. 13.** Identify by name, address, and telephone number all persons whom you know to have personal knowledge of the matters alleged in the Complaint.

  **RESPONSE:**

Trenton J. Palmer
15010 N. Red Rock Road
Reno, NV 89508-9530

Jared F. Likes
300 Desert Sun Lane
Reno, Nevada

Gabriel Pena
Julia Pena
400 Desert Sun Lane
Reno, Nevada

Roger Pelham, MPA
Senior Planning and Building Division Community Services
Washoe County, Nevada

**Interrogatory No. 14.** Identify by title, date, author, present custodian, and content, all documents,

5

A454

including correspondence, obtained by you or in your possession, relating to the assertions in the Complaint, your appeal, your answer, and any affirmative defenses which you anticipate raising in this matter. See Request for Production No. 1.

**RESPONSE:**       Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Interrogatory No. 15.**  Identify by name, address, and telephone number, all persons whom you intend to have testify as a factual or expert witness in your defense at the hearing in this matter, and for factual witnesses, provide a detailed summary of each person's anticipated testimony.

**RESPONSE:**

Trenton J. Palmer
15010 N. Red Rock Road
Reno, NV 89508-9530

Mr. Palmer's anticipated testimony concerns the allegations contained in the Administrator's Complaint, as well as the affirmative defenses raised in his Answer. Specifically, it is anticipated that his testimony will be that at all times alleged in the Complaint, he operated the aircraft in a manner that was necessary for takeoff or landing. He will further testify that at no time did he operate the aircraft below an altitude allowing, if a power unit had failed, an emergency landing without undue hazard to persons or property on the surface.

Investigation continues.


Jared F. Likes
300 Desert Sun Lane

6

Reno, Nevada

Mr. Likes' anticipated testimony concerns the allegations contained in the Administrator's Complaint. Specifically, it is anticipated that his testimony will be that, at all times alleged in the Complaint, Mr. Palmer operated the aircraft in a manner that was necessary for takeoff or landing.

Investigation continues.

Gabriel Peña
400 Desert Sun Lane
Reno, Nevada

Mr. Peña's anticipated testimony concerns the allegations contained in the Administrator's Complaint.

Investigation continues.

Julia Peña
400 Desert Sun Lane
Reno, Nevada

Ms. Peña's anticipated testimony concerns the allegations contained in the Administrator's Complaint.

Investigation continues.

Roger Pelham, MPA
Senior Planning and Building Division Community Services
Washoe County, Nevada

Mr. Pelham's anticipated testimony concerns the allegations contained in the Administrator's Complaint; as well as his statement contained in the FAA enforcement investigative report.

Investigation continues.

**Interrogatory No. 16.**  Identify by title, date, author, present custodian, and content, all documents that you anticipate offering into evidence or using at the hearing in this matter. See Request for Production No. 2.

7

A456

**RESPONSE:**      Respondent anticipates offering into evidence or using at the hearing in this matter any and all documents and things offered or otherwise used by the Administrator at the hearing in this matter, as well as any and all documents and things contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents and things exchanged or otherwise identified by the parties during the informal conference and discovery.

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Interrogatory No. 17.** With respect to each expert witness identified in response to Interrogatory No. 15, specify each expert's specific area of expertise and provide a synopsis of each expert's credentials, background, training, and experience.

**RESPONSE:**      No experts have been identified in response to Interrogatory No. 15.

Investigation continues.

**Interrogatory No. 18.** With respect to each expert you expect to call as a witness, state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and provide a summary of the grounds for each such opinion.

**RESPONSE:**      Respondent has not yet identified any expert witness at this time.

Investigation continues.

**Interrogatory No. 19.** Describe with specificity all facts, which you anticipate presenting in the course of the hearing in this matter pertaining to the avoidance or mitigation of the sanction sought by the FAA in this case.

**RESPONSE:**      Respondent anticipates presenting in the course of the hearing in this matter pertaining to the avoidance or mitigation of the sanction sought by the FAA in this case, any and all documents and things offered or otherwise used by the Administrator at the hearing in this matter, as well

8

as any and all documents and things contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents and things exchanged or otherwise identified by the parties during the informal conference and discovery, as well as the FAA Order 2150.3C.

Investigation continues.

**Interrogatory No. 20.** Describe with specificity and in detail any and all affirmative defenses you intend to assert at the NTSB administrative hearing in this matter.

**RESPONSE:** Respondent intends to assert the following affirmative defenses at the NTSB administrative hearing in this matter:

1.     The Administrator has failed to state a claim upon which the Board may grant the relief requested.

2.     The Federal Aviation Administration's (FAA's) interpretation of its Federal Aviation Regulations in this case is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. § 706(2)(A).

3.     The FAA's interpretation of its aviation regulations is unconstitutionally vague.

4.     The FAA's application of its Federal Aviation Regulations in this case is contrary to the regulation's plain language.

5.     Respondent asserts that the Administrator lacks substantial basis in law and fact to continue prosecution of this matter against him.

6.     The Administrator's proposed sanction is contrary to agency policy, precedent and procedure.

7.     The Administrator's proposed sanction is contrary to the Pilot's Bill of Rights, Pub. L. 112-153 (Aug. 3, 2012).

**Interrogatory No. 21.** Describe with specificity all facts you intend to rely upon in support of your denial of the allegations in paragraph 4.a. of the Complaint. See Request for Production No. 3.

EXHIBIT A-2
9

**A458**

**RESPONSE:**    During the referenced flight operation, Respondent did not operate N318JJ at altitudes less than 100 feet AGL and within 50 feet of a stable, shed, or propane tank.

**Interrogatory No. 22.** Describe with specificity all facts you intend to rely upon in support of your denial of the allegations in paragraph 4.b. of the Complaint. See Request for Production No. 4.

**RESPONSE:**    During the referenced flight operation, Respondent did not operate N318JJ at altitudes less than 100 feet AGL and within 100-150 feet of the residential home at 400 Desert Sun Lane.

Investigation continues.

**Interrogatory No. 23.** Describe with specificity all facts you intend to rely upon in support of your denial of the allegations in paragraph 4.c. of the Complaint. See Request for Production No. 5.

**RESPONSE:**    During the referenced flight operation, Respondent did not operate N318JJ at altitudes less than 100 feet AGL and within 100-150 feet of an adult and a child who were outside the residential home at 400 Desert Sun Lane.

Investigation continues.

**Interrogatory No. 24.** Describe with specificity all facts you intend to rely upon in support of your denial of the allegations in paragraph 4.d. of the Complaint. See Request for Production No. 6.

**RESPONSE:**    During the referenced flight operation, Respondent did not operate N318JJ at altitudes less than 100 feet AGL and within 300 feet of two adults and two children who were outside and near the western perimeter of the residential property at 400 Desert Sun Lane.

Investigation continues.

**Interrogatory No. 25.** Describe with specificity all facts you intend to rely upon in support of your denial of the allegations in paragraph 5 of the Complaint. See Request for Production No. 7.

**RESPONSE:**        During the flight, aircraft registration number N318JJ was not operated at altitudes that would not allow, if a power unit had failed, an emergency landing without undue hazard to persons or property.

Investigation continues.

**Interrogatory No. 26.** Describe with specificity all facts you intend to rely upon in support of your denial of the allegations in paragraph 6 of the Complaint. See Request for Production No. 8.

**RESPONSE:**        During the flight, aircraft registration number N318JJ was not operated in a careless or reckless manner so as to endanger the life or property of another.

Investigation continues.

## REQUESTS FOR PRODUCTION

**Request for Production No. 1.** Provide a copy of all documents that support your answer to Interrogatory No. 14.

**RESPONSE:**        Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Request for Production No. 2.** Provide a copy of all documents that support your answer to Interrogatory No. 16.

**RESPONSE:**        Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

11

EXHIBIT A-2
11

A460

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Request for Production No. 3.**  Provide a copy of all documents that support your answer to Interrogatory No. 21.

      **RESPONSE:**     Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Request for Production No. 4.**  Provide a copy of all documents that support your answer to Interrogatory No. 22.

      **RESPONSE:**     Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Request for Production No. 5.**  Provide a copy of all documents that support your answer to Interrogatory No. 23.

      **RESPONSE:**     Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

EXHIBIT A-2
12

A461

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Request for Production No. 6.**  Provide a copy of all documents that support your answer to Interrogatory No. 24.

     **RESPONSE:**     Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Request for Production No. 7.**  Provide a copy of all documents that support your answer to Interrogatory No. 25.

     **RESPONSE:**     Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

**Request for Production No. 8.**  Provide a copy of all documents that support your answer to Interrogatory No. 26.

     **RESPONSE:**     Respondent identifies any and all documents contained in the FAA Enforcement Investigative Report (EIR) prepared in this matter, as well and any and all documents exchanged or otherwise identified by the parties during the informal conference and discovery.

EXHIBIT A-2
13

A462

The Administrator is presently in possession and control of all documents and things identified above.

Investigation continues.

Dated: March 19, 2021

Respectfully submitted,

*/s/ Gregory S. Winton*

_____
GREGORY S. WINTON, ESQ.
The Aviation Law Firm
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD  21401
Local: (301) 294-8550
Fax: (866) 568-9886

14

A463

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of Respondent's Responses to the Administrator's Initial Discovery Requests via electronic mail to the following:

> Office of Administrative Law Judges
> National Transportation Safety Board
> Room 4704
> 490 L'Enfant Plaza East, S.W.
> Washington, DC  20594
> **ALJappeals@ntsb.gov**
> Tel: 202-314-6150
> Fax: 202-314-6158
>
> Lisa M. Toscano
> Federal Aviation Administration
> Enforcement Division, Western Team
> 777 S. Aviation Blvd., Suite 150
> El Segundo, CA 90245
> **Lisa.M.Toscano@faa.gov**
> Tel: (424) 391-2723
> Fax: (424) 405-7050

Dated: March 19, 2021

> Respectfully submitted,
>
> */s/ Gregory S. Winton*
>
> _____
> GREGORY S. WINTON, ESQ.
> The Aviation Law Firm
> 1997 Annapolis Exchange Parkway
> Suite 300
> Annapolis, MD  21401
> Local: (301) 294-8550
> Fax: (866) 568-9886
>
> *Counsel for Respondent*



# THE AVIATION LAW FIRM

GREGORY S. WINTON, ESQ.
ADMITTED IN MD, NY, PA, CT, AND D.C.
GREG@AVIATIONLAWEXPERTS.COM

1997 ANNAPOLIS EXCHANGE PARKWAY
SUITE 300
ANNAPOLIS, MD 21401

1-877-4-AIR-LAW · 301-294-8550
866-568-9886 FAX
301-294-2525 FAX
WWW.THEAVIATIONLAWFIRM.COM

July 31, 2020

**Via electronic mail ONLY: Lisa.M.Toscano@faa.gov**
Lisa M. Toscano
Enforcement Division, Western Team
1200 District Avenue
Burlington, MA  01803

Re:  Trenton J. Palmer, Case No. 2020WP190306

Dear Ms. Toscano:

Thank you for your time and attention during the telephonic informal conference concerning this matter on June 17, 2020.  This will serve as a follow-up to our discussions.  As you will recall, Mr. Palmer has been charged with a violation of 14 C.F.R. § 91.119 (a) and (c), as well as a residual charge of 14 C.F.R. § 91.13(a), related to a flight on or about November 24, 2019, when he attempted a landing on the property located at 300 Desert Sun Lane, Reno, Nevada, with the permission of the landowner.

## Background Information

The property owner, Jared Likes and his son, fly radio controlled (RC) planes from the unpaved runway surface situated behind their home located at 300 Desert Sun Lane, Reno, Nevada.  Prior to the flight involving Mr. Palmer on  November 24, 2019, Mr. Likes had called Mr. Palmer to ask if he could land his aircraft on the runway behind his home.  Mr. Palmer's Kitfox aircraft is unique in its short takeoff and landing (STOL) capabilities, which enable him to utilize short runway requirements for takeoff and landing.  In fact, Mr. Palmer is the recipient of national awards for his outstanding performances in the STOL Invitational competition for the past 2 years at the annual Experimental Aircraft Association (EAA) AirVenture Oshkosh airshow, where he demonstrated a landing ground roll of 165 feet and a takeoff ground roll of 151 feet in his KITFOX aircraft.

## Federal Aviation Administration *Ojf Airport Ops Guide*

Prior to attempting a landing at 300 Desert Sun Lane, Mr. Palmer followed the Federal Aviation Administration (FAA) recommended procedures published in the *Ojf Airport Ops Guide* concerning TECHNIQUES FOR OFF AIRPORT OPERATIONS, which suggests techniques and procedures to improve the safety of off airport operations. *See* Off Airport Ops Guide.  Specifically, the FAA suggests that when evaluating a new landing site, "make at least 3 recon passes at different levels before attempting a landing and don't land unless you're sure you have enough room to take off."  Furthermore, the FAA guidance for off airport operations suggests making "a pass in both directions along either side of the runway to check for obstructions and runway length" in order to "check for rock size" and  "note the location of the touchdown area and roll-out area." *See* Off Airport Ops Guide (attached).

Lisa M. Toscano
Re: Trenton J. Palmer, Case No. 2020WP190306
July 31, 2020
Page 2

The FAA also suggests associating landmarks with the landing area in order to "have a good sight picture to be used on final approach." Most notably, the FAA techniques and procedures to improve the safety of off airport operations suggest making "a pass to check for cuts in gravel, rocks, dips, bumps, etc., that can't be seen from directly above. It is important to be at an angle to the runway, not above it. Certain light conditions can make a bad site seem good. Check and double check any area not used before, or locations that have had high water since the last landing. Make another pass and roll one tire for a few feet to get a feel for the landing surface." *See* Off Airport Ops Guide.

Based upon the FAA suggested techniques and procedures to improve the safety of off airport operations, Mr. Palmer conducted a high-altitude observation of the landing site at 300 Desert Sun Lane in order to determine the safest place to land and takeoff. During the high-altitude observation of the landing site, Mr. Palmer identified a road on the property that was adequate in length to land and takeoff safely without endangering the life or property of others. In fact, he flew a pass along the side of the runway to check for obstructions and runway length and he noted the location of the touchdown area and roll-out area.

As depicted on the video contained in the FAA enforcement investigative report (EIR), prior to the attempted landing, Mr. Palmer made another low-level observation pass at 70 miles per hour (mph) ground speed to get a feel for the landing surface, as is recommended by the FAA in its Off Airport Ops Guide. Mr. Palmer's explained reason for flying the observation pass at 70mph (or 60 knots) groundspeed is that he is traveling at an approximate 100 feet per second, so he was able to count the seconds to obtain an accurate understanding of the landing distance.

At the time of the alleged violation, Mr. Palmer's approach to landing was from the north-northeast of the intended landing area. Based upon his understanding of the landing site, he was required to make a slight left turn to line up with the intended touchdown spot. He purposely offset the flightpath to the right side of the intended landing area during the observation pass, because he occupies the left seat of the aircraft. As a result, he is best able to inspect the landing site from the left side window. At approximately 1,000 feet prior to reaching the landing site, Mr. Palmer determined that there wasn't a safe departure path for takeoff, even though he felt confident about the landing. At that time, he also noticed power lines to the south-southwest that could potentially make a go around (i.e., aborted landing) unsafe if any issues arose during the landing sequence.

Pursuant to the FAA Off Airport Ops Guide, "Each pass should result in you becoming more comfortable with your chosen landing area. If you are becoming less comfortable, abandon the site and seek a more suitable landing area." Accordingly, Mr. Palmer made a decision to abort the landing, add power, and made a climbing left turn in order to establish a positive rate of climb and avoid getting close to nearby persons or property on the surface. The video depiction of Mr. Palmer's aircraft is a recording of the aborted landing during the time when he had initiated a climbing turn.

According to the *Baker* Interpretation from the FAA Chief Counsel (2003), "Enforcement actions taken on the basis of a violation of FAR Section 91.119, as with any FAR, are made on a case-by-case determination of the facts in each instance and case precedent as issued through decisions of the National Transportation Safety Board (NTSB)." See Legal Interpretation to *Baker*. Furthermore, the *Kilcullen* Interpretation (2012) stated that "Section 91.119, which establishes the general minimum safe altitudes for part 91 operations has a similar exception in the rule allowing operations below the established minimum altitudes when necessary for takeoff or landing."

EXHIBIT A-2
17

Lisa M. Toscano
Re:  Trenton J. Palmer, Case No. 2020WP190306
July 31, 2020
Page 3

In interpreting § 91.119, relating to minimum safe altitudes over congested areas, the FAA noted longstanding policy on the need for pilots to "take full advantage of the performance capabilities of his aircraft so as to spend as little time as possible at altitudes below the minimums established from cruising flight."  According to the Federal Register "the matter of safety of flight in terms of safe altitudes is dependent upon many variables, including the type of aircraft flown, the weather conditions at the time, and the terrain below. An altitude which may be wholly safe and desirable for cruising flight at one time for one aircraft may be wholly unsafe for it under different conditions, or for other aircraft under different conditions…As a consequence the overriding minimum safe altitude rule is phrased in terms of performance of the particular aircraft related to the terrain below – or that "altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface." To achieve the proper high level of safety, it is vital that every pilot, consistently with sound and conservative operating practices, take full advantage of the performance capabilities of his aircraft so as to spend as little time as possible at altitudes below the minimums established for cruising flight.  See 19 Fed. Reg 4602 (July 27, 1954).  Thus, **"whether a maneuver is necessary for takeoff or landing is by necessity a factual determination."**  See Legal Interpretation to *Kilcullen* (2012).

In *Administrator v. Johnson*, NTSB Order No. EA-4307 (1995), the FAA alleged that respondent flew too fast and too low over an Airport runway in violation of 14 C.F.R. §§ 91.119(a) and (c), 91.13(a), and 61.3(a).  Respondent explained that he was unhappy with his landing approach, and had determined to do an aborted landing (i.e., go-around).  The Chief Administrative Law Judge (ALJ) credited respondent's testimony and found as a matter of fact that respondent was truly executing a go-around, not buzzing the airport. The law judge dismissed other charges and reduced the proposed suspension from 180 days to 60 days.  The respondent appealed and the NTSB granted the appeal and dismissed the Administrator's order of suspension. Likewise, in the present case, all of the evidence establishes a finding that Mr. Palmer was truly executing a go-around, rather than intentionally flying too low over the home located at 400 Desert Sun Lane, Reno, Nevada in violation of 14 C.F.R. §§ 91.119(a), 91.119(c), 91.13(a) as alleged by the Administrator.

Based upon the above, the Administrator's alleged violation of 14 C.F.R. §§ 91.119 (a), 91.119 (c), and 91.13(a) lacks substantial justification.  Therefore, I respectfully request that you withdraw the Notice of Proposed Certificate Action dated April 29, 2020.

Sincerely,

*Gregory S. Winton*

Gregory S. Winton

cc:  Trenton J. Palmer

A467



# Off Airport Ops Guide



## TECHNIQUES FOR OFF AIRPORT OPERATIONS

**Note:** This document suggests techniques and procedures to improve the safety of off-airport operations. It assumes that pilots have received training on those techniques and procedures and is not meant to replace instruction from a qualified and experienced flight instructor.

**General Considerations:** Off-airport operations can be extremely rewarding; transporting people and gear to locations that would be difficult or impossible to reach in any other way. Operating off-airport requires high performance from pilot and aircraft and acquiring the knowledge and experience to conduct these operations safely takes time. Learning and practicing off-airport techniques under the supervision of an experienced flight instructor will not only make you safer, but also save you time and expense. Once you've acquired off airport skills you must use them continuously or you'll lose them. Regular practice is essential to staying at the top of your game.

**Go lightly when operating off-airport.** Operating at gross weight reduces aircraft performance, increases the probability of aircraft damage and may, in extreme cases, lead to structural failure. More trips with lighter loads are safer than fewer trips loaded to the maximum.

When evaluating a new landing site, or practicing before conducting seasonal operations, fly without passengers or cargo. Stow your survival gear as far aft as possible to avoid a forward center of gravity, while respecting the weight and balance limitations for your aircraft. Always file a flight plan detailing the specific locations you intend to explore. Make at least 3 recon passes at different levels before attempting a landing and don't land unless you're sure you have enough room to take off.

**High Level:** Circle the area from different directions to determine the best possible landing site in the vicinity. Check the wind direction and speed using pools of water, drift of the plane, branches, grass, dust, etc. Observe the landing approach and departure zone for obstructions such as trees or high terrain.

**Intermediate:** Level: Make a pass in both directions along either side of the runway to check for obstructions and runway length. Check for rock size. Note the location of the touchdown area and roll-out area. Associate landmarks with your landing area, to have a good sight picture to be used on final approach. Early morning or late afternoon sun casts shadows that yield the best conditions for determining rock size and, landing conditions. Similar to ski flying with an overcast sky condition, landing areas are very difficult to evaluate without shadows.

**Low Level:** Make a pass to check for cuts in gravel, rocks, dips, bumps, etc., that can't be seen from directly above. It is important to be at an angle to the runway, not above it. Certain light conditions can make a bad site seem good. Check and double check any area not used before, or locations that have had high water since the last landing. Make another pass and roll one tire for a few feet to get a feel for the landing surface.       EXHIBIT A-2

21

# Technique & Proficiency

Each pass should result in you becoming more comfortable with your chosen landing area.

If you are becoming less comfortable, abandon the site and seek a more suitable landing area.

EXHIBIT A-2
22

A471

USCA Case #23-1239      Document #2030892      Filed: 12/11/2023      Page 474 of 564



EXHIBIT A-2
23

Each pass should result in you becoming more comfortable with your chosen landing area. If you are becoming less comfortable, abandon the site and seek a more suitable landing area.

**Approach:** Maintain a normal approach speed and no more than climb flaps until established on the final approach. Do not cut the final short. Make a stabilized short field approach, long enough to capture the landing zone site picture. Evaluate your approach and departure path before you commit to landing and insure that you have a safe escape path in case you need to go around. Align the approach to the runway, add full flaps, and slow to 1.3 Vso.

**Landing:** Maintain manufacturer's recommended speed or no more than 1.3 Vso all of the way to the touchdown unless wind gusts require more speed. Excessive speed on final will compromise short field landing performance. If you can't land within one airplane length of your selected touch down spot – Go Around – and try an approach again.

**Touchdown:** Touch down in a tail-low attitude one aircraft length beyond the threshold. Reduce all power at the time the wheels touch the ground.

**Roll-out:** Steer to avoid obstructions, use minimal braking to prevent rock damage to the tail surfaces, and stop in a straight line when possible. Maintain aircraft directional control throughout the roll-out. Never relax until the aircraft has stopped. The most crucial time is usually just prior to coming to a complete stop. The aircraft decelerates faster, settling into the soft terrain. Be prepared to

add power while holding the pitch control all the way back. The airflow from the propeller will assist in blowing the tail down to prevent nosing over. DO NOT USE BRAKES AT THIS TIME. Braking, if used at all, should only be done early in the landing roll.

**Preparing the Site After Landing:** Check the length by stepping off the usable area. Remove any obstructions, branches, or large rocks from the runway and turn areas. Fill in holes and level high spots if possible. Mark the obstructions that are not movable with natural materials of dissimilar color. Mark thresholds with branches or marks on the ground.

**Turning:** Make all turns with a minimum of power after proceeding forward. Never turn from a stopped position. It takes too much power, and propeller damage can occur. Shutting down and turning the airplane by hand is a good practice.

**Unloading and Loading:** Unload the plane after stopping on roll-out. Do not taxi a loaded plane in loose gravel. Load the plane at the takeoff point. Do not load and then taxi into position.

**Before Take-Off:** Calculate takeoff and climb performance. This is not a time for guessing. You have to know what your performance will be before you commit to taking off. Be sure to calculate density altitude—remember: Hot –High –Humid, Density Altitude decreases aircraft performance.

EXHIBIT A-2
24

A473



25

For normally aspirated engines with Fixed Pitch Props—increase the sea level standard day takeoff distances by 15% for every 1000 feet of density altitude up to 8000 feet.

For Constant Speed Props– increase the sea level standard day takeoff distances by 12% for every 1000 feet of density altitude up to 6000 feet.

If you don't have the means to weigh your moose meat in the bush you may find yourself wishing for more takeoff performance. Fortunately increased performance is easy to come by—just reduce the takeoff weight. Making more trips with lighter loads is safer than flying at max gross weight. More trips means more fuel though so be sure to have enough gas for the mission plus reserve.

Establish and mark a go/no go decision point for takeoff. One way to do this is to clearly mark the halfway point of your available takeoff area. Calculate 70% of your lift off speed i.e. 50 mph x .70 = 35 mph. Check your airspeed as you approach the decision point and if you're less than 70% of lift off speed—abort. Reduce your load, lengthen your runway, or wait for more favorable takeoff conditions. For obstructed departures divide your takeoff area into thirds and mark the end of the first third. You now must have 70% of lift off speed at this point in order to clear a 50 foot obstacle at the end of the takeoff area.

**Take-Off:** Use the short or soft field techniques as listed in the aircraft flight manual. Climb straight ahead when possible using the best angle of climb until all obstacles are cleared, then continue as normal.

A474



If you can't land within one airplane length of your

touchdown spot Go Around

and try the approach again.

## Practice Safety

EXHIBIT A-2
27

A476

## CALCULATING YOUR SHORT FIELD PERFORMANCE

Instructions: Fly to an airport with a dirt or gravel strip. Load your aircraft to near maximum gross weight including typical gear such as your survival kit, and compute weight & balance for the test flight. Compute density altitude and note wind conditions. The loading should be at or slightly above your planned bush operating weight.

Fly several short field approaches & landings followed by short field takeoffs. Make full stop landings and taxi back to the same starting point. Have an observer note landing and take off distances. Compute an average for takeoff and landing performance and note this performance in the Short Field Performance Chart. Higher temperatures, elevations, and aircraft weights will decrease performance.

We suggest you document and record your short field performance annually. This exercise will also give you a chance to practice before going to the bush.

| My Short Field Performance | | | |
|---|---|---|---|
| Aircraft | Gross Weight | | Test Weight |
| Airfield | Elevation | | Density Alt. |
| Wind Direction | Wind Speed | | X-Wind Comp |
| IAS | Landing Dist. | | Flap Setting |
| | | | |
| Takeoff Flap | Rotation Speed | | |
| Rotation Speed x.70 | Vx | | Vy |
| Distance to Rotation | Distance to 50' | | |

EXHIBIT A-2
28

A477

## EFFECTIVE RUNWAY AND CROSSWIND COMPONENT CHARTS

To determine the useful runway length, fly the length of your selected runway at one of the ground speeds listed on the chart. Read the runway length under the time in seconds column. In planning your required takeoff distance, consider a 50% safety margin. If performance for the situation requires a take off distance of 600 feet to clear obstacles, add 300 feet for a safety margin.

| Ground Speed | Time in Seconds | | | | |
|---|---|---|---|---|---|
| mph (kts) | 10 | 20 | 30 | 40 | 50 |
| 50 (43) | 730 ft | 1460 ft | 2200 ft | 2930 ft | 3360 ft |
| 60 (52) | 880 ft | 1760 ft | 2640 ft | 3520 ft | 4400 ft |
| 70 (61) | 1020 ft | 2050 ft | 3080 ft | 4100 ft | 5130 ft |
| 80 (70) | 1170 ft | 2340 ft | 3520 ft | 4690 ft | 5860 ft |
| 90 (78) | 1320 ft | 2640 ft | 3960 ft | 5280 ft | 6600 ft |
| 100 (87) | 1460 ft | 2930 ft | 4400 ft | 5860 ft | 7330 ft |

**My Crosswind Component is...**

| Crab Angle Relative to Landing Strip Centerline | Aircraft Indicated Airspeed | | | | | |
|---|---|---|---|---|---|---|
| | 50 | 60 | 70 | 80 | 90 | 100 |
| 5 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 9 | 10 | 12 | 14 | 16 | 17 |
| 15 | 13 | 16 | 18 | 21 | 23 | 26 |
| 20 | 17 | 21 | 24 | 27 | 31 | 34 |
| 25 | 21 | 25 | 30 | 34 | 38 | 42 |
| 30 | 25 | 30 | 35 | 40 | 45 | 50 |
| 35 | 29 | 34 | 40 | 46 | 52 | 57 |

My maximum demonstrated crosswind component is: _____

This reference table will estimate your crosswind component if you know your indicated airspeed and your crab angle relative to the landing strip centerline.

EXHIBIT A-2
29

A478

USCA Case #23-1239     Document #2030892     Filed: 12/11/2023     Page 481 of 564



# Off Airport Ops Guide

**Alaskan Region FAASTeam
222 W. 7th Ave, #14
Anchorage, Alaska 99513**
www.FAA.gov/Go/FlyAlaska
T. 866 357 4704



EXHIBIT A-2
30

# Federal Aviation Administration

## CERTIFICATE OF TRUE COPY

I HEREBY CERTIFY that the attached is a true copy of my Inspectors Statement, which I signed on May 6, 2020.  This is a summary of the PTRS WP 19201801305 record downloaded from the FAA Safety Analysis Performance System database (SPAS) for an occurrence investigation and subsequent compliance action and counseling of Trenton J. Palmer on 12/07/2017, reference Item of Proof Number 30 of FAA Case No 2020WP190306.

Signed and dated at <u>Reno Flight Standards District Office</u>

This <u>7th</u> (day) of <u>March </u>(month) 2022,

by **LEE A OSCAR** Digitally signed by LEE A OSCAR
Date: 2022.03.07 10:08:05 -08'00'
_____

(Signature of Lee A. Oscar)

<u>    Administrative Officer, Reno FSDO    </u>

(Title of Lee A. Oscar)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I HEREBY CERTIFY that <u>Lee A. Oscar,</u> who signed the foregoing certificate is now, and was, at the time of signing an FAA Administrative Officer at the Reno Flight Standards District Office (FSDO) and that full faith and credit should be given her certificate as such.

IN WITNESS WHEREOF, I have hereunto

Subscribed my name and Federal Aviation

Administration digital signature to be affixed this

<u>7th</u> day of <u>March</u>, 2022,

at <u>Reno Flight Standards District Office    </u>

CHARLES W Digitally signed by
CHARLES W GEYER JR
GEYER JR Date: 2022.03.07
10:56:28 -08'00'
_____

(Signature of Charles W. Geyer)

<u>    Front Line Manager, Reno FSDO    </u>
(Title)

A480

# MYFAA
## Employee Site   MyFAA Home



SPAS

| PROFILES | FLAG WIZARD | FLAG DISPLAY | FLAG VIEWS | ANALYSIS TOOLS | PROXY | PREFERENCES |



RECORD LIST    QUERY    START OVER

Generated on

December 18, 2019

**NPTRS Data Sheet for**
**WP19201801305**

Record 1 of 1

Show Tabs

## Section I - Transmittal (1)

| | |
|---|---|
| **Record ID**<br>WP19201801305 | **Office**<br>WP19 |
| **FFS Division:** | **FFS Division Description:** |
| **Industry Sector Code:** | **Industry Sector Code Description:** |
| **Size Category:** | **Size Category Description:** |
| **Inspector Code/Name**<br>WP19LAO - OSCAR, LEE A (FAA) | **Inspector Unit**<br>AW |
| **Inspector Phone**<br>(775) 858-7700 | **Inspector Type**<br>ASI |
| **Activity Number**<br>5720 - INVSTG/OCCURENCE | **14 CFR PART (FAR)**<br>91 |
| **Call-Up Date** | **Planned**<br>N |
| **Start Date**<br>11/28/2017 | **NPG** |
| **Closed Date**<br>12/11/2017 | **Status**<br>Closed |
| **ATA Chapter** | **Result**<br>Completed |

## Section I - Transmittal (2)

| | |
|---|---|
| **Designator** | **Affiliated Designator/Name** |
| **A/C Registration #**<br>N318JJ | **OTNA Office** |
| **Location/Point of Departure**<br>RNO - RENO/TAHOE INTL | **Point of Arrival**<br>- |
| **Flight #** | **Complaint #** |

EXHIBIT A-3
2 of 7

A481

| Make/Model/Series | Occurrence # |
| HOME-AMTR | OWP1920180005 |
| **Simulator Device ID** | **Incident #** |
| **Non-Cert Activity Name/Company** | **EIR #** |
| | **Accident #** |

## Section I - Transmittal (3)

| Airman Certificate Number | Airman Name |
| 003786226 | PALMER, TRENTON J. |
| **Examiner Certificate Number** | **Examiner Name** |
| **Applicant Certificate Number** | **Applicant Name** |
| **Recommending Instructor Certificate Number** | **Recommending Instructor Name** |
| **Pass/Fail** | **Exam Kind** |
| **Foreign Certificate** | |
| N | **8430 13#** |

## Section I - Transmittal (4)

| Tracking | Miscellaneous |
| **Local Use** | **Numerical Miscellaneous** |
| **Regional Use** | **Activity Time** |
| **National Use** | **Assessment** |
| **Last District Office Update** | **Travel Cost** |
| 04/04/2018 | 00000.00 |
| **Download Office(s)** | **Trigger(s)** |
| **Related Record ID** | **Geographic** |
| | N |
| **Originating Inspector** | **Foreign** |
| | N |
| | **Process Date** |
| | 04/04/2018 |

## Section II - Personnel

**No Data**

## Section III - Equipment

**No Data**

EXHIBIT A-3
3 of 7

A482

| Section IV - Comments |
|---|

**H399I (H-Aircraft 399-Records/Reports I-Information)**
My email response to Mr. Palmer on 12/11/17 as follows;Hello Trent, Thanks for letting me
know about this recording of our personal conversation. I didn't know you were recording
our telephone conversation. Had you told me that was your intention, I would have asked
you not to record it. I am not comfortable with you posting in a public domain what I
believed was a private conversation. Of course, you are free to talk about your experience
dealing with the FAA as you see fit. Please acknowledge that you received this email.
Regards, Lee A. Oscar Aviation Safety InspectorOn 12/11/17 at about 1045 I received a
call from Mr. Palmer stating I thought so and that I will not post the video. But that he
wanted to get the word out and that my words were do so well. I explained that he can
talk all he wants about the conversation but do not use my unauthorized recording. I
ended the call.

**H399P (H-Aircraft 399-Records/Reports P-Potential Problem)**
Our office received an email from our office email general delivery about an Occurrence
that happened in our district. The email only had a video link to YouTube. The video
showed an aircraft that landed at a small RC airport. I recognized the airport and located
the presidents phone number and called him on 11/28. I asked if he know of or approved
anyone to land an aircraft at his club? He stated no he did not. He knows of other aircraft
that are landing and the club was amiss in not marking X's at the ends of the runways. I
ended the call. I received a phone call at my desk about 1610, on 12/07/17 from Mr.
Trent Palmer. Mr. Palmer was returning my email message to call about his sUAS video.
This video shows Mr. Palmer throwing a wing type of sUAS out of his Kit Fox aircraft
N318JJ near a Radio Control airport in Sparks NV. I explained that there was a complaint
we received about his video. I talked to Mr. Palmer about these issues of CFR 91.13
careless or reckless operation, CFR 91.15 dropping objects out of an aircraft and that
State Laws may require permissions to land an aircraft on private property at the RC
airport in his video. I explained that these CFR's were written in blood or injuries and that
I did not want to go to another accident were I knew the pilot. I spoke about the scene in
his video were both pilots were distracted by the loss of sight for the sUAS for several
minutes. I talked about the scene were Mr. Palmer released the sUAS and it quickly went
aft and down. I informed Mr. Palmer that he could release the sUAS 9 times and nothing
happens but the 10th time it my hit a flight control and the aircraft could loss control and
then an incident happened. I have had several positive interactions in the past with this
pilot dealing with his 333 Exemption for sUAS. The NAS is safe the pilot has a compliant
attitude and will not repeat this action in the future. I stated to the pilot that this was an
education moment with our new Compliance Philosophy and will be documented as a
Compliance Action and Oral Counseling and is closed.On 12/09/17I had an email message
from Mr. Palmer stating the following; Hi Lee, I called on Friday to touch base with you
about a video I was thinking of making but you were out for the day. So I figured I would
go ahead, make the video to send to you to get your thoughts before I post anything. I
think I mentioned on the phone what my goal is with my youtube videos; to get people
excited about aviation and to share my experiences. I knew my interaction with you was
going to be an experience that would interest my viewers so I had filmed myself during
our phone call, mainly to reference for when I was going to explain our conversation in the
actual video when I made it. And if I am honest, after hearing many pilots' stories of their
experience with the FAA, I was slightly nervous going into the call as I was worried that I
was in trouble or that you guys would be seeking some sort of enforcement action. The
actual phone call was totally different than I expected and I thought it shined some good
light on the fact that you guys aren't always out to get us in trouble, and are in fact here
to help us (pilots) and keep us safe. After watching back the video of me on the phone I
realized that you touched on some good points that were better coming from you than
from me repeating them back on camera later. So I went ahead and cut together an edit
that included some of our phone call, I made sure to remove anything that contained your

name to respect your identity, however I realized that I never mentioned that I was filming myself during the call so I didn't want to post something like this without first clearing it with you. If you would like I am happy to remove the parts that contain the actual phone call with your voice in it, however like I said I believe it actually helps the video a lot, and quite honestly, shows that you guys are good people and here to help keep us safe. Let me know your thoughts and if you are alright with me using the phone call in the video or if you would prefer that I remove those parts. Here's the video, its set as "unlisted" on youtube so it doesn't show up to anyone aside from people who have the direct link, so it isn't visible to anyone but you and I. Please excuse the stupid "youtube" parts where I tell people to subscribe and somewhat dramatize the conversion, at the end of the day it is for youtube viewers and you gotta know the audience: xxxxxxxxxxxx Cheers, Trent Palmer530.913.1313

| Subactivities |
| --- |
| **No Data** |

| Query Criteria |
| --- |
| **Record ID:** WP19201801305 |

SPAS Feedback
For Official Use Only
Public availability to be determined under 5 U.S.C. 552


Federal Aviation
Administration

Gov Sites
USA.gov
DOT
Intranet

Readers &
Viewers


Updated: July 2019

EXHIBIT A-3
5 of 7

https://home.spas.faa.gov/DN35/qb/NPTRS/NPTRSDatasheet.aspx?UID=nptrs-1&RTS=...   12/18/2019

Inspectors Statement

Our office received an email from our office email general delivery on November 27, 2017, about an occurrence that happened in our district. The email only had a video link to YouTube. The video showed an aircraft that landed at a small RC airport. I recognized the airport and located the club president's phone number and called him on 11/28. I asked if he knew of or approved anyone to land an aircraft at his club. He stated no he did not. He knows of other aircraft that are landing and the club was amiss in not marking X's at the ends of the runways. I ended the call.

I received a phone call at my desk about 1610, on 12/07/17 from Mr. Trent Palmer. Mr. Palmer was returning my email message to call about his sUAS video. This video shows Mr. Palmer throwing a wing type of sUAS out of his Kit Fox aircraft N318JJ near a Radio Control airport in Sparks NV. I explained that there was a complaint we received about his video. I counseled Mr. Palmer about these issues of CFR 91.13 careless or reckless operation, CFR 91.15 dropping objects out of an aircraft and that State Laws may require permissions to land an aircraft on private property at the RC airport in his video. I explained that these CFR's were written in blood or injuries and that I did not want to go to another accident were I knew the pilot. I spoke about the scene in his video where both pilots were distracted by losing sight of the sUAS for several minutes.

I talked about the scene were Mr. Palmer released the sUAS and it quickly went aft and down. I informed Mr. Palmer that he could release the sUAS 9 times and nothing happens but the 10th time it might hit a flight control and the aircraft could lose control and then an incident happened. I have had several positive interactions in the past with this pilot dealing with his 333 Exemption for sUAS.

"The NAS is safe and the pilot has a compliant attitude and will not repeat this action in the future." I stated to the pilot that this was an education moment with our new Compliance Philosophy and will be documented as a Compliance Action and Oral Counseling and is closed.

December 09, 2017 I was sent an email from Mr. Palmer stating that he was making a video of our conversation I had with him about his interaction with the FAA dealing with this occurrence and Mr. Palmer.

On 12/11/17 at about 1045 I received a call from Mr. Palmer stating that he will not post the video. But that he wanted to get the word out and that "my words were put so well in our conversation...."

I explained that he can talk all he wants about the conversation but do not use my unauthorized recording. I ended the call.

I sent an email response on 12/11/17 to Mr. Palmer's 12/09/17 email. I thanked Mr. Palmer for notifying me about this recording of our conversation dealing with the

A485

counseling session that I conducted with Mr. Palmer in accordance with the current FAA guidance on Compliance Philosophy. I didn't know that he was recording our telephone conversation. Had he informed me that was his intention, I would have asked him not to record the conversation. I was not comfortable with his posting in a public domain what I believed was a counseling session. After he explained in his email that he would not post the recording. I did explain the he was free to talk about his experience dealing with the FAA as he had seen fit.

A486

# Federal Aviation Administration

## CERTIFICATE OF TRUE COPY

I HEREBY CERTIFY that the attached is a true copy of the Letter of Warning, originally signed by Aviation Safety Inspector Donald F. Morgan, sent on March 27, 2018 to Mr. Trent J. Palmer. This letter is maintained in the Reno Flight Standards District Office (FSDO) Electronic Correspondence Archive CY2018 and is Item of Proof Number 31 of FAA Case No. 2020WP190306.

Signed and dated at <u>Reno Flight Standards District Office</u>

This <u>4th</u> (day) of <u>March</u> (month) 2022,

by **KIM M MILLS** Digitally signed by KIM M MILLS
Date: 2022.03.04 11:25:29
-08'00'

(Signature of Kim M. Mills)

<u>Administrative Officer, Reno FSDO</u>

(Title of Kim M. Mills)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I HEREBY CERTIFY that <u>Kim M. Mills,</u> who signed the foregoing certificate is now, and was, at the time of signing an FAA Administrative Officer at the Reno Flight Standards District Office (FSDO) and that full faith and credit should be given her certificate as such.

IN WITNESS WHEREOF, I have hereunto

Subscribed my name and Federal Aviation

Administration digital signature to be affixed this

<u>4th</u> day of <u>March</u>, 2022,

at <u>Reno Flight Standards District Office</u>

**CHARLES W GEYER JR** Digitally signed by
CHARLES W GEYER JR
Date: 2022.03.04
11:41:27 -08'00'

(Signature of Charles W. Geyer)

<u>Front Line Manager, Reno FSDO</u>

(Title)

A487



U.S. Department
of Transportation
**Federal Aviation
Administration**

Western-Pacific Region
Nevada Flight Standards District Office
Reno Flight Standards Office

5466 Longley Lane
Reno, NV  89511
Phone:  (775) 858-7700 ext. 240
Fax:  (775) 858-7737

March 26, 2018

**CERTIFIED MAIL—RETURN RECEIPT REQUESTED**

Mr. Trenton J. Palmer
2295 Peavine Valley Road
Reno, Nevada  89523

Dear Mr. Palmer:

On 01/13/2018, when acting as pilot-in-command of Experimental Amateur-Built KitFox V, N318JJ you performed a waterskiing activity on Lake Tahoe with a passenger onboard the aircraft.  During this activity, you did not have personal protective equipment on board the aircraft and KitFox V, N318JJ is not a seaplane or equipped with floats.

On 02/15/2018, we met at the Nevada Flight Standards District Office, Reno and discussed the above activity reviewed 14 CFR section 91.119 (a) and 91.13 (a) of the Federal Aviation Regulations.

As you are aware, the danger with waterskiing in open water is that you are creating an unnecessary risk for no cognizable operation need.

While all flying involves some risk, during a waterskiing activity, you unnecessarily increase that risk beyond a predictable level endangering your passenger, yourself and your aircraft.

On 01/13/2018, you violated 14 CFR section 91.13 (a) of the Federal Aviation Regulations when he operated KitFox V, N318JJ in a reckless manner endangering the life of your passenger.

On 01/13/2018, you violated 14 CFR section 91.119 (a) of the Federal Aviation Regulations when he operated KitFox V, N318JJ on the surface of Lake Tahoe at an altitude so low that if the engine failed, you would create a hazard to your passenger.

| CONCURRENCES | | |
|---|---|---|
| ROUTING SYMBOL ASA- | | |
| INITIALS/SIG | | |
| DATE | | |
| ROUTING SYMBOL ASI | | |
| INITIALS/SIG | | |
| DATE | | |
| ROUTING SYMBOL | | |
| INITIALS/SIG | | |
| DATE | | |
| ROUTING SYMBOL FLM | | |
| INITIALS/SIG | | |
| DATE | | |
| ROUTING SYMBOL MANAGER | | |
| INITIALS/SIG | | |
| DATE | | |
| ROUTING SYMBOL | | |
| INITIALS/SIG | | |
| DATE | | |
| ROUTING SYMBOL ASA | | |
| INITIALS/SIG | | |
| DATE | | |
| ROUTING SYMBOL | | |
| INITIALS/SIG | | |
| DATE | | |

EXHIBIT A-4
2 of 3

A488

2

After a discussion with you concerning this matter, we have concluded that the matter does not warrant legal enforcement action. In lieu of such action, we are issuing this letter of warning which will be made a matter of record for a period of two years, after which, the record will be expunged.

In closing, if you wish to add any information in explanation or mitigation, please write me at the above address. We expect your future compliance with the regulations.

Sincerely,



Donald F. Morgan
Aviation Safety Inspector

Enclosure:  Privacy Act Notice


8030.1:DFMorgan:INITIALS:ext 240:03/26/2018: (WP:T\ Correspondence
\Submitted\8030.1 DFM T. Palmer Warning Letter.doc

EXHIBIT A-17
Page 1 of 18



12/19-2019 13:38

EXHIBIT A-17
Page 3 of 18





EXHIBIT A-17
Page 7 of 18

USCA Case #23-1239   Document #2030892   Filed: 12/11/2023   Page 496 of 564

A494



EXHIBIT A-17
Page 11 of 18

12/19/2019  13:48

USCA Case #23-1239    Document #2030892    Filed: 12/11/2023    Page 498 of 564

EXHIBIT A-17
Page 13 of 18

12/19/2019 13:48

A496

EXHIBIT A-17
Page 15 of 18





EXHIBIT A-17
Page 17 of 18

A498

EXHIBIT A-22
Page 1 of 12



# Off Airport Ops Guide

A499



A500

# TECHNIQUES FOR OFF AIRPORT OPERATIONS

**Note:** This document suggests techniques and procedures to improve the safety of off–airport operations. It assumes that pilots have received training on those techniques and procedures and is not meant to replace instruction from a qualified and experienced flight instructor.

**General Considerations:** Off–airport operations can be extremely rewarding; transporting people and gear to locations that would be difficult or impossible to reach in any other way. Operating off–airport requires high performance from pilot and aircraft and acquiring the knowledge and experience to conduct these operations safely takes time. Learning and practicing off–airport techniques under the supervision of an experienced flight instructor will not only make you safer, but also save you time and expense. Once you've acquired off airport skills you must use them continuously or you'll lose them. Regular practice is essential to staying at the top of your game.

**Go lightly when operating off–airport.** Operating at gross weight reduces aircraft performance, increases the probability of aircraft damage and may, in extreme cases, lead to structural failure. More trips with lighter loads are safer than fewer trips loaded to the maximum.

When evaluating a new landing site, or practicing before conducting seasonal operations, fly without passengers or cargo. Stow your survival gear as far aft as possible to avoid a forward center of gravity, while respecting the weight and balance limitations for your aircraft. Always file a flight plan detailing the specific locations you intend to explore. Make at least 3 recon passes at different levels before attempting a landing and don't land unless you're sure you have enough room to take off.

**High Level:** Circle the area from different directions to determine the best possible landing site in the vicinity. Check the wind direction and speed using pools of water, drift of the plane, branches, grass, dust, etc. Observe the landing approach and departure zone for obstructions such as trees or high terrain.

**Intermediate Level:** Make a pass in both directions along either side of the runway to check for obstructions and runway length. Check for rock size. Note the location of the touchdown area and roll–out area. Associate landmarks with your landing area, to have a good sight picture to be used on final approach. Early morning or late afternoon sun casts shadows that yield the best conditions for determining rock size and, landing conditions. Similar to ski flying with an overcast sky condition, landing areas are very difficult to evaluate without shadows.

**Low Level:** Make a pass to check for cuts in gravel, rocks, dips, bumps, etc., that can't be seen from directly above. It is important to be at an angle to the runway, not above it. Certain light conditions can make a bad site seem good. Check and double check any area not used before, or locations that have had high water since the last landing. Make another pass and roll one tire for a few feet to get a feel for the landing surface.

A501

# Technique & Proficiency

Each pass should result in you becoming more comfortable with your chosen landing area.

If you are becoming less comfortable, **abandon the site and seek a more suitable landing area.**

A502

A503

Each pass should result in you becoming more comfortable with your chosen landing area. If you are becoming less comfortable, abandon the site and seek a more suitable landing area.

**Approach:** Maintain a normal approach speed and no more than climb flaps until established on the final approach. Do not cut the final short. Make a stabilized short field approach, long enough to capture the landing zone site picture. Evaluate your approach and departure path before you commit to landing and insure that you have a safe escape path in case you need to go around. Align the approach to the runway, add full flaps, and slow to 1.3 Vso.

**Landing:** Maintain manufacturer's recommended speed or no more than 1.3 Vso all of the way to the touchdown unless wind gusts require more speed. Excessive speed on final will compromise short field landing performance. If you can't land within one airplane length of your selected touch down spot – Go Around – and try an approach again.

**Touchdown:** Touch down in a tail-low attitude one aircraft length beyond the threshold. Reduce all power at the time the wheels touch the ground.

**Roll-out:** Steer to avoid obstructions, use minimal braking to prevent rock damage to the tail surfaces, and stop in a straight line when possible. Maintain aircraft directional control throughout the roll-out. Never relax until the aircraft has stopped. The most crucial time is usually just prior to coming to a complete stop. The aircraft decelerates faster, settling into the soft terrain. Be prepared to add power while holding the pitch control all the way back. The airflow from the propeller will assist in blowing the tail down to prevent nosing over. DO NOT USE BRAKES AT THIS TIME. Braking, if used at all, should only be done early in the landing roll.

**Preparing the Site After Landing:** Check the length by stepping off the usable area. Remove any obstructions, branches, or large rocks from the runway and turn areas. Fill in holes and level high spots if possible. Mark the obstructions that are not movable with natural materials of dissimilar color. Mark thresholds with branches or marks on the ground.

**Turning:** Make all turns with a minimum of power after proceeding forward. Never turn from a stopped position. It takes too much power, and propeller damage can occur. Shutting down and turning the airplane by hand is a good practice.

**Unloading and Loading:** Unload the plane after stopping on roll-out. Do not taxi a loaded plane in loose gravel. Load the plane at the takeoff point. Do not load and then taxi into position.

**Before Take-Off:** Calculate takeoff and climb performance. This is not a time for guessing. You have to know what your performance will be before you commit to taking off. Be sure to calculate density altitude—remember: Hot -High -Humid, Density Altitude decreases aircraft performance.

A504

For normally aspirated engines with Fixed Pitch Props—increase the sea level standard day takeoff distances by 15% for every 1000 feet of density altitude up to 8000 feet.

For Constant Speed Props— increase the sea level stand-ard day takeoff distances by 12% for every 1000 feet of density altitude up to 6000 feet.

If you don't have the means to weigh your moose meat in the bush you may find yourself wishing for more takeoff performance. Fortunately increased performance is easy to come by—just reduce the takeoff weight. Making more trips with lighter loads is safer than flying at max gross weight. More trips means more fuel though so be sure to have enough gas for the mission plus reserve.

Establish and mark a go/no go decision point for takeoff. One way to do this is to clearly mark the halfway point of your available takeoff area. Calculate 70% of your lift off speed i.e. 50 mph x .70 = 35 mph. Check your airspeed as you approach the decision point and if you're less than 70% of lift off speed—abort. Reduce your load, lengthen your runway, or wait for more favorable takeoff conditions. For obstructed departures divide your takeoff area into thirds and mark the end of the first third. You now must have 70% of lift off speed at this point in order to clear a 50 foot obstacle at the end of the takeoff area.

**Take-Off:** Use the short or soft field techniques as listed in the aircraft flight manual. Climb straight ahead when possible using the best angle of climb until all obstacles are cleared, then continue as normal.



A505

EXHIBIT A-22
Page 8 of 12



A506

USCA Case #23-1239      Document #2030892      Filed: 12/11/2023      Page 509 of 564

If you can't land within one airplane length of your touchdown spot Go Around and try the approach again.

## Practice Safety

A507

## CALCULATING YOUR SHORT FIELD PERFORMANCE

Instructions: Fly to an airport with a dirt or gravel strip. Load your aircraft to near maximum gross weight including typical gear such as your survival kit, and compute weight & balance for the test flight. Compute density altitude and note wind conditions. The loading should be at or slightly above your planned bush operating weight.

Fly several short field approaches & landings followed by short field takeoffs. Make full stop landings and taxi back to the same starting point. Have an observer note landing and take off distances. Compute an average for takeoff and landing performance and note this performance in the Short Field Performance Chart. Higher temperatures, elevations, and aircraft weights will decrease performance.

We suggest you document and record your short field performance annually. This exercise will also give you a chance to practice before going to the bush.

| My Short Field Performance | | | |
|---|---|---|---|
| Aircraft | Gross Weight | | Test Weight |
| Airfield | Elevation | | Density Alt. |
| Wind Direction | Wind Speed | | X-Wind Comp |
| IAS | Landing Dist. | | Flap Setting |
| | | | |
| Takeoff Flap | Rotation Speed | | |
| Rotation Speed x.70 | Vx | | Vy |
| Distance to Rotation | Distance to 50' | | |

A508

## EFFECTIVE RUNWAY AND CROSSWIND COMPONENT CHARTS

To determine the useful runway length, fly the length of your selected runway at one of the ground speeds listed on the chart. Read the runway length under the time in seconds column. In planning your required takeoff distance, consider a 50% safety margin. If performance for the situation requires a take off distance of 600 feet to clear obstacles, add 300 feet for a safety margin.

| Ground Speed mph (kts) | Time in Seconds | | | | |
|---|---|---|---|---|---|
| | 10 | 20 | 30 | 40 | 50 |
| 50 (43) | 730 ft | 1460 ft | 2200 ft | 2930 ft | 3360 ft |
| 60 (52) | 880 ft | 1760 ft | 2640 ft | 3520 ft | 4400 ft |
| 70 (61) | 1020 ft | 2050 ft | 3080 ft | 4100 ft | 5130 ft |
| 80 (70) | 1170 ft | 2340 ft | 3520 ft | 4690 ft | 5860 ft |
| 90 (78) | 1320 ft | 2640 ft | 3960 ft | 5280 ft | 6600 ft |
| 100 (87) | 1460 ft | 2930 ft | 4400 ft | 5860 ft | 7330 ft |

### My Crosswind Component is...

| | | Aircraft Indicated Airspeed | | | | | |
|---|---|---|---|---|---|---|---|
| | | 50 | 60 | 70 | 80 | 90 | 100 |
| Crab Angle Relative to Landing Strip Centerline | 5 | 4 | 5 | 6 | 7 | 8 | 9 |
| | 10 | 9 | 10 | 12 | 14 | 16 | 17 |
| | 15 | 13 | 16 | 18 | 21 | 23 | 26 |
| | 20 | 17 | 21 | 24 | 27 | 31 | 34 |
| | 25 | 21 | 25 | 30 | 34 | 38 | 42 |
| | 30 | 25 | 30 | 35 | 40 | 45 | 50 |
| | 35 | 29 | 34 | 40 | 46 | 52 | 57 |

My maximum demonstrated crosswind component is: _____

This reference table will estimate your crosswind component if you know your indicated airspeed and your crab angle relative to the landing strip centerline.

A509

USCA Case #23-1239    Document #2030892    Filed: 12/11/2023    Page 512 of 564

# Off Airport Ops Guide



**Alaskan Region FAASTeam**
**222 W. 7th Ave, #14**
**Anchorage, Alaska 99513**
**www.FAA.gov/Go/FlyAlaska**
T 866 357 4704

A510

SERVED: July 12, 2023

NTSB Order No. EA-5956

UNITED STATES OF AMERICA
**NATIONAL TRANSPORTATION SAFETY BOARD**
WASHINGTON, D.C.

Adopted by the NATIONAL TRANSPORTATION SAFETY BOARD
at its office in Washington, D.C.
on the 12th day of July, 2023

|  |  |  |
|---|---|---|
| POLLY TROTTENBERG,<br>Administrator,<br>Federal Aviation Administration,<br><br>    Complainant,<br><br>  v.<br><br>TRENTON J. PALMER,<br><br>    Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Docket SE-30880 |

## ORDER DENYING PETITION FOR RECONSIDERATION

Respondent filed a timely petition for reconsideration of NTSB Order No. EA-5947, served on March 30, 2023. Respondent contends that the Board erroneously: 1) affirmed the law judge's finding that the respondent's chosen landing site was inappropriate; and 2) found that the law judge concluded that respondent had an "'alternative' path [that] would have kept [r]espondent and his aircraft more than 500 feet away from persons or structures on the ground." For the reasons stated below, we deny respondent's petition for reconsideration.

Section 821.50 of our Rules of Practice (49 C.F.R. part 821) governs the submission and our review of petitions for rehearing, reargument, reconsideration, or modification of an order of the Board. Section 821.50(c) requires the petitioner to explain why the Board's decision was erroneously decided and provides that the Board will not consider arguments a party could have made on appeal or in reply briefs received prior to the Board's decision. In addition, § 821.50(d) states, "[r]epetitious petitions will not be entertained by the Board, and will be summarily dismissed." Here, respondent's argument that that the Board erred in determining that

70412

respondent's intended landing site was inappropriate was previously raised in respondent's appeal to the Board. The Board already considered, and rejected, respondent's allegation that the Administrator withdrew the claim concerning the appropriateness of the landing site and that respondent was not required to prove that the landing site was appropriate. Our rules do not require us to consider this argument and therefore, we summarily dismiss the repetitious claim.

Further, respondent's argument that the Board mistakenly interpreted the law judge's finding concerning respondent's alternative path lacks merit. Citing select portions of the law judge's decision, respondent posits that the law judge did not state that another path would have kept respondent and his aircraft more than 500 feet from persons or structures on the ground. However, respondent does not consider the whole of the law judge's decision and ignores the context in which the law judge discussed the alternative path. The law judge was assessing whether another path existed that would have allowed respondent to comply with the applicable regulation and the Board reasonably read the law judge's finding to mean that respondent had an alternative option that was consistent with the regulation.

Moreover, on appeal from the law judge's decision, the Board reviews the case *de novo*,[1] assessing the record as a whole and drawing our own conclusions based on the evidence.[2] Thus, the Board acted within its authority in interpreting the entire record as it pertains to the alternative flight path addressed at the hearing and in the law judge's decision. Respondent offers no convincing reason to reconsider our conclusions.

### ACCORDINGLY, IT IS ORDERED THAT:

Respondent's petition is denied.

HOMENDY, Chair, LANDSBERG, Vice Chairman, GRAHAM and CHAPMAN, Members

of the Board, concurred in the above opinion and order.

---

[1] *Administrator v. Smith*, NTSB Order No. EA-5646 at 8 (2013); *Administrator v. Frohmuth and Dworak,* NTSB Order No. EA-3816 at 2 n.5 (1993); *Administrator v. Wo.f*, NTSB Order No. EA-3450 (1991); *Administrator v. Schneider*, 1 N.T.S.B. 1550 (1972) (in making factual findings, the Board is not bound by the law judge's findings).

[2] "The NTSB has plenary review authority with respect to ALJ decision making." *Singer v. Garvey*, 208 F.3d 555, 558 (6th Cir. 2000).

A512

SERVED: March 30, 2023

NTSB Order No. EA-5947

UNITED STATES OF AMERICA
**NATIONAL TRANSPORTATION SAFETY BOARD**
WASHINGTON, D.C.

Adopted by the NATIONAL TRANSPORTATION SAFETY BOARD
at its office in Washington, D.C.
on the 30th day of March, 2023

| | |
|---|---|
| BILLY NOLEN,<br>Acting Administrator,<br>Federal Aviation Administration,<br><br>Complainant,<br><br>v.<br><br>TRENTON J. PALMER,<br><br>Respondent. | Docket SE-30880 |

**OPINION AND ORDER**

*1. Background*

Respondent and the Administrator appealed the Oral Initial Decision of Administrative Law Judge Darrell L. Fun, issued on April 6, 2022, in which the law judge affirmed the regulatory violations in the Administrator's amended order, but reduced the sanction from a 120-day suspension to a 60-day suspension. The law judge ruled that the Administrator proved by a preponderance of the evidence that respondent operated a low altitude flight in violation of 14 C.F.R. §§ 91.119(a), (c) and 91.13(a) but identified mitigating factors justifying a reduced

69543

2

penalty.[1] Both parties timely appealed. For the reasons set forth below, we deny respondent's appeal and grant the Administrator's appeal.

A. *Facts*

Respondent holds a Private Pilot Certificate and is the registered owner of N318JJ, a 1997 Johnson John T KITFOX V.[2] On November 24, 2019, respondent operated N318JJ as the pilot-in-command near 300 Desert Sun Lane and 400 Desert Sun Lane in Reno, Nevada.[3] While conducting a low inspection pass during the flight, respondent operated the aircraft within 500 feet of persons, vessels, vehicles, and structures,[4] and at an altitude of 100 feet or less than 100 feet above ground level.[5] During the flight near the residences, three adults and two children were outside and witnessed respondent's pass.

B. *Procedural Background and Witness Testimony*

On October 8, 2020, the Administrator issued an Order of Suspension, which became the complaint in this case, alleging respondent violated 14 C.F.R. §§ 91.119(a), (c) and 91.13(a). Respondent timely appealed the order on October 8, 2020, and filed an answer to the complaint on October 16, 2020. The Administrator amended the complaint on September 20, 2021, suspending respondent's certificate for 120 days. The law judge conducted a three-day hearing from March 29, 2022, to April 1, 2022, and issued an oral initial decision on April 6, 2022. The parties cross-appealed. Respondent timely appealed on April 8, 2022, and filed a supporting brief

---

[1] A copy of the law judge's initial decision is attached.
[2] Amended Compl. at ¶¶ 1-2; Answer at ¶¶ 1-2.
[3] Amended Compl. at ¶ 3; Answer at ¶ 3.
[4] Amended Compl. at ¶ 4(a)-(c); Tr. 26-27, 353; Oral Initial Decision at 708, 710.
[5] Amended Compl. at ¶ 4; Tr.190; Oral Initial Decision at 699.

3

on June 9, 2022.[6] The Administrator filed a reply brief on August 10, 2022.[7] The Administrator

timely appealed on April 12, 2022, and filed a perfecting brief on May 26, 2022. Respondent

filed a reply brief on June 27, 2022.

At the hearing before the law judge, the following witnesses testified on the

Administrator's behalf: Gabriel Pena; Julia Pena; Russell Stanley; respondent; Inspector Ronald

Green, Principal Operations Inspector and Aviation Safety Inspector at the FAA Flight Standards

District Office (FSDO); and Jared Likes. Roy Speeg, Jr., FAA Technical Specialist, testified for

the Administrator as an expert in general aviation and flight operations. Respondent also testified

on his own behalf.

Mr. Pena testified that he had resided at 400 Desert Sun Lane in Reno, Nevada for over

five years.[8] He stated that he is an electrician and a combat veteran from the United States

Seabees, serving for four years.[9] Mr. Pena explained that he was a heavy machine gunner, mostly

on the MK19 machine gun, and was deployed twice, once to Iraq and once to Kashmir.[10]

According to Mr. Pena, using the MK19 provided him with experience in estimating distances,

stating because the weapon is a grenade launcher, he was required to estimate the distance of the

target.[11]

Mr. Pena testified that on Sunday, November 24, 2019, at 12:00 p.m., he was talking to

his neighbor, Russell Stanley, on his fence line.[12] Referring to a photograph, he described the

---

[6] On May 4, 2022, the General Counsel extended the time for respondent to a file an appeal brief to June 9, 2022.
[7] On June 24, 2022, the General Counsel extended the Administrator's deadline to file a reply brief to August 10, 2022.
[8] Tr. 45.
[9] *Id.*
[10] *Id.*
[11] *Id.* 45-46.
[12] *Id.* 46, 48.

4

structures on and near his property and where they are located, including his and Mr. Stanley's

houses, his driveway, backyard, propane tank, dog kennel, two stable areas, and chicken coop.[13]

Mr. Pena stated that while he was talking to Mr. Stanley, his wife pulled up in a car to drop off

their daughter, and then his wife drove into the garage, parked, and began walking toward them

while carrying their son.[14] Mr. Pena stated that his wife was walking past an area near the front

door when he heard a loud engine noise coming from the north of the property, but because he

could not see any aircraft or vehicle, Mr. Pena believed the aircraft was flying low to the ground

and below the line of his house.[15] Mr. Pena testified that he yelled at his wife to start running,

explaining,

> [S]o when I saw the aircraft when it came into view, it looked to me like it was pretty
> much at the ridge line of my house, which is about 20 feet off grade of my home, off the
> grade of the garage. And when I saw the aircraft it was performing a hard eastward
> banking aggressive maneuver and then it seems to straighten out as it dipped a little bit
> lower and then it pulled up. Actually, I thought it was going to crash into my neighbor's
> [….][16]

Mr. Pena estimated that the aircraft was no more than 300 feet from where he was standing, and

25 to 30 feet above the grade of his house, or five to ten feet above the ridge peak of his roof.[17]

Mr. Pena also surmised that the aircraft flew over his propane tanks based on their location on his

property.[18] Mr. Pena described photographs taken when the FAA measured the distances between

his property structures on December 19, 2019.[19] Mr. Pena stated that he observed the aircraft fly

northeast to southeast, further explaining,

> So when I saw the aircraft, it was performing a – almost a 90 degree bank maneuver. If

---

[13] *Id.* 47-48.
[14] *Id.* 49-50.
[15] *Id.* 50-51.
[16] *Id.* 52.
[17] *Id.* 53-54.
[18] *Id.* 55.
[19] *Id.* 82-94; Exh. A-17.

5

you're piloting the aircraft it would be turning to the left and then it quickly straightened out, it dipped a little bit going south, slightly southwest, and then it rose up a little bit and went over [my neighbor] Mr. Likes' house and then went off into the horizon so that that hard left bank maneuver, when it came into my sight, would lead me to believe that it was coming towards my house, I guess coming from the east, which would make sense with the – and then it did a hard left bank to orientate itself more southerly and then it dipped down and then rose above my neighbor's house. It was probably above his – the peak of his roofline from what I saw, maybe 30 feet over his house.[20]

Mr. Pena further estimated that the aircraft flew about 30 feet above his propane tank.[21]

On cross-examination, Mr. Pena testified that he had not observed the aircraft fly over his property before the incident in question, although he had seen it fly over once after the incident.[22] He also testified that as a result of the one pass the aircraft made, there was no damage to his property.[23] However, Mr. Pena stated that he, his wife, and daughter were traumatized by the incident, although they did not seek medical treatment.[24] At no time was the aircraft directly over Mr. Pena's head.[25] Mr. Pena testified that neither he nor his wife is a pilot and that they reported the incident to the sheriff and the FAA.[26]

On re-direct, Mr. Pena asserted that two and a half years after the incident, his daughter is visibly shaken when an aircraft flies over the house or in close proximity, and both of his children ask questions, such as whether the aircraft is going to crash into their house.[27] At the time of the incident, Mr. Pena's son was one year old and his daughter was between three and four years old.[28]

---

[20] Tr. 93-94.
[21] *Id.* 101.
[22] *Id.* 102.
[23] *Id.* 102-03.
[24] *Id.* 103.
[25] *Id.* 105.
[26] *Id.* 105-06.
[27] *Id.* 109.
[28] *Id.*

6

Upon questioning from the law judge, Mr. Pena stated that he and his wife saw the aircraft flying low again a few weeks later and they wondered whether the flight was "some type of intimidation tactic or harassment."[29] Mr. Pena and his wife were in their backyard when they observed the aircraft, which he estimated was 200 to 300 feet from them. While Mr. Pena did not report the second flight to the FAA, he mentioned it to the FAA Inspector.[30] Further, Mr. Pena clarified that during the November 24th flight, he estimated that the aircraft was 50 feet above his propane tank at the moment it first came into view and then it dipped a bit lower.[31] When Mr. Pena first heard the aircraft, he stated that he initially thought something was crashing into or near his house and as a combat veteran, the sound startled him.[32] When he initially saw the aircraft, Mr. Pena stated that his thoughts were, "[d]isbelief, shock, anger that somebody would do something like that."[33]

Ms. Pena, Mr. Pena's wife, testified that she works from home and has lived at 400 Desert Sun Lane in Reno, Nevada for over five years.[34] On November 24, 2019, Ms. Pena states that she had returned home with two of her children at around 11:50 a.m. when she saw her husband speaking with their neighbor, Mr. Stanley.[35] Her daughter asked to get out of the car and after speaking with her husband and Mr. Stanley for a few minutes, Ms. Pena drove toward the house and parked either in or near the garage.[36] Ms. Pena stated that she took her son out of the car and dropped off her belongings, and then while holding her son, began walking toward her

---

[29] *Id.* 110.
[30] *Id.* 111.
[31] *Id.* 111-12.
[32] *Id.* 112.
[33] *Id.* 113.
[34] *Id.* 121.
[35] *Id.*
[36] *Id.*

7

husband, daughter, and Mr. Stanley.[37] Before she reached them, Ms. Pena testified that she heard

a "very loud engine" and although she could see that her husband was yelling, she could not hear

him.[38] Ms. Pena described her observations as,

> All I could hear was an engine coming from somewhere behind me and then I looked towards where I could hear the engine sound moving towards, which is coming more from south and I saw it come into view past the garage peak, the roofline because I had a view of the two different roofline sections.

> And I saw it and I was immediately just kind of dumbfounded because I couldn't believe how close it was to the house and how close it was to the ground. And then it continued going south towards our neighbor's house at 300 Desert Sun and I actually – I was ready to watch it impact into the house because I thought there was no reason that this plane was so low unless it was having an emergency and so I thought for sure it was going to crash into my neighbor's living room.

> But at the last minute he pulled up and flew over the house and kept going straight until he was out of view.[39]

She testified that the experience was frightening, leading the Penas to report the incident to the

FAA.[40] Ms. Pena stated that she did not see the aircraft until it passed the garage and estimated

that it was 50 feet above the ground while passing over the garage.[41] When Ms. Pena observed

the aircraft, she testified that it did not make any quick turns and therefore, she assumed it was

flying straight ahead, over the horse stables, propane tank and/or the hay shed.[42]

She also explained that when she saw the aircraft, she believed it banked because she

viewed the underside of the wing.[43] Ms. Palmer stated that she saw red and white markings, and

possibly blue markings, on the underside of the airplane.[44] She and her husband reviewed the

---

[37] *Id.* 121-22.
[38] *Id.* 122.
[39] *Id.* 122-23.
[40] *Id.* 123.
[41] *Id.* 124-26.
[42] *Id.* 126-27.
[43] *Id.* 127.
[44] *Id.* 128.

8

camera footage from the garage camera and confirmed the markings.[45] Ms. Pena stated that the

right side of the aircraft tilted upward, and then the aircraft straightened as it flew over the Penas'

property fence line that they share with Mr. Likes.[46] Ms. Pena testified that once the aircraft

came into her view, it was near the propane tank and/or hay shed, and the wings were level at the

time it reached the fence between hers and Mr. Likes' properties.[47] Ms. Pena estimated that the

aircraft was still 50 to 60 feet in altitude as it flew over the fence line.[48] Ms. Pena stated that the

airplane pulled up once it flew closer to Mr. Likes' residence, describing the movement as a

"pretty quick pull up," then leveling out and staying at the same altitude for the duration of Ms.

Pena's observation.[49] Ms. Pena recalled that the aircraft continued flying in a straight path until

she lost sight of it.[50]

        After viewing a video depicting part of the flight that the law judge declined to admit into

evidence, Ms. Pena recollected that the aircraft flew over the eastern side of Mr. Likes'

swimming pool and at the edge of his garage.[51] Ms. Pena stated that when she heard the aircraft,

she was in a state of panic and wanted to run, but did not know in which direction to run because

she initially could not see the airplane.[52] Once the airplane was in her view, she thought she was

safe, but believed that the aircraft was going to crash into her neighbor's house.[53] Ms. Pena

recalled that she and her husband contacted the FAA the same week in which they observed the

---

[45] *Id.* 128.
[46] *Id.* 129-30.
[47] *Id.* 134-35.
[48] *Id.* 135.
[49] *Id.*
[50] *Id.* 136.
[51] *Id.* 140.
[52] *Id.* 141-42.
[53] *Id.* 142.

9

flight.[54] Ms. Pena testified that her one-year-old son cried when the aircraft flew overhead and that her daughter talked about the low-flying airplane for months and continued to do so at the time the hearing took place.[55]

On cross-examination, Ms. Pena stated that when she first saw the aircraft, it was flying away from her in a left bank, but moving in a straight line.[56] Ms. Pena testified that her observation of the flight at issue lasted two or three seconds.[57] She also acknowledged that jets from the Reno air races fly close enough to her property to hear and see them, but that they "turn around out in the field."[58]

Mr. Stanley testified that on November 24, 2019, he resided at 445 Desert Sun Lane, next door to the Penas.[59] He stated that on that date around lunchtime, he was at the fence between his and the Penas' property, speaking with his neighbor, Mr. Pena.[60] Mr. Stanley identified the properties, including his and the Penas', on an unadmitted photograph.[61] Mr. Stanley recalled that Ms. Pena and her children were on their property, but could not remember their exact location.[62] Regarding respondent's aircraft, Mr. Stanley testified that,

> I noticed the airplane flying on the eastern side of the valley, up along the mountain range or ridge line or whatever you want to call it. He was coming from the south so it would have been my right. I was facing the east. And then he came and was flying down across that ridge line to the left, over the BLM [Bureau of Land Management land north of the properties][63] … which is on the left-hand side.
>
> Kind of really didn't think much of it and then kind of I looked out to the BLM range and

---

[54] *Id.* 143.
[55] *Id.* 145.
[56] *Id.* 149-50.
[57] *Id.* 155.
[58] *Id.* 154.
[59] *Id.* 159.
[60] *Id.* 159-60.
[61] *Id.* 161-62.
[62] *Id.* 162.
[63] *Id.* 160.

10

saw him turn to the left and then started coming back to us, towards us at a lower altitude or level than he was when he was heading out over the BLM…[64]

Mr. Stanley estimated that the aircraft was 80 feet above the ground when flying over the Penas' house.[65] Mr. Stanley further explained that it was a clear day and the mountain range is likely a mile or less from his home.[66] He stated that he recognized the aircraft because it had flown over their properties multiple times, "but this one was specifically just a little bit too low for our comfortableness."[67] Mr. Stanley stated that the aircraft made a U-turn after flying over the mountain range, and flew south, heading back toward him and Mr. Pena at a sustained, lower altitude.[68] Mr. Stanley also noted that the aircraft grew louder when it turned and moved to a lower altitude.[69] In addition, the witness explained that the aircraft was briefly out of sight when his view was obscured by trees and the Penas' house.[70] Mr. Stanley also testified that after flying over the Penas' house, the aircraft made a "little bit of a left turn" during which he saw the bottom side of the wing, and then "it just took off."[71] Mr. Stanley observed the aircraft turn left before reaching Mr. Likes' house, noting that the airplane also increased in altitude by 15 to 20 feet as it turned.[72] However, according to Mr. Stanley, the airplane was approximately the same distance above Mr. Likes' house as it was when flying over the Penas' house – about 80 to 100 feet.[73]

---

[64] *Id.* 162-63.
[65] *Id.* 163.
[66] *Id.* 163-64.
[67] *Id.* 164.
[68] *Id.* 165-66.
[69] *Id.* 166-67.
[70] *Id.* 168.
[71] *Id.* 169.
[72] *Id.* 170, 172.
[73] *Id.* 172.

A522

11

On cross-examination, Mr. Stanley testified that he has never taken flying lessons.[74]

When asked whether he considered himself to be traumatized by the flight, Mr. Stanley

responded that it bothered him and he was disturbed, explaining that his wife and children ran

out of the house when they heard the aircraft.[75] He acknowledged that the airplane did not hit

anyone's house.[76]

Respondent testified that the wing-span of his aircraft, N318JJ, is 32 feet, its true speed is

100 miles per hour, and the landing speed is approximately 32 miles per hour.[77] Respondent

stated that as of November 24, 2019, he had 900 hours as the pilot-in-command in the aircraft.[78]

He acknowledged that on or about December 7, 2017, he received counseling from the FAA,

Reno FSDO concerning the use of an unmanned aircraft system outside of N318JJ, noting that he

was not the pilot-in-command at that time.[79] He also received a letter of warning from the FAA

regarding a flight for which he was the pilot-in-command and was carrying a passenger.[80] During

that flight, respondent engaged in water skiing on Lake Tahoe, which respondent described as

dragging the airplane tires on the water.[81]

Respondent testified that he received a letter of investigation from FAA Reno Inspector

Morgan concerning his November 24, 2019, operation of N318JJ in the vicinity of 300 and 400

Desert Sun Lane.[82] In response, respondent stated that he contacted Mr. Morgan, but was unable

---

[74] *Id.* 174-75.
[75] *Id.* 176.
[76] *Id.*
[77] *Id.* 179.
[78] *Id.*
[79] *Id.* 180-82; Exh. A-3.
[80] Tr. 184; Exh. A-4.
[81] Tr. 184.
[82] *Id.* 186; Exh. A-5.

12

to recall that conversation.[83] Respondent also testified that he went to the Reno FSDO on

December 3, 2019, and viewed a video of his November 24th flight.[84] Respondent stated that he

confirmed that the aircraft was his and that he was the pilot-in-command during the flight.[85]

Respondent admitted that the video showed that he flew in the proximity of 300 and 400 Desert

Sun Lane and acknowledged that he flew less than 100 feet from the ground while operating the

aircraft.[86] Regarding the flight, respondent testified, "I was making a low inspection pass at an

RC [(remote controlled)] runway that was in the backyard of my friend's house as part of a safe

landing procedure as outlined in the off airport ops guide that the FAA has released."[87] He further

explained that a low inspection pass has to be conducted at 70 miles an hour at 16 knots ground

speed and that he determined that the intended land site was not safe for landing because he

could not identify the intended touchdown spot clearly enough when viewing it from his left

window.[88] Respondent stated that because this was a low inspection pass, he assessed the safety

and feasibility of the landing site, but did not intend to land during the pass.[89] Respondent stated

that he flew over the nearby mountains at an altitude of 500 to 1,000 feet, but disputed Mr.

Stanley's testimony that respondent made a left turn over the mountains; rather, respondent

stated that he maneuvered north of the area.[90]

According to respondent, an hour earlier, he was heading toward Bedell Flats and to the

Reno Stead Airport, and flying in a straight line meant flying over the Desert Sun Lane housing

---

[83] Tr. 186-88.
[84] *Id.* 188.
[85] *Id.* 188-89.
[86] *Id.* 189-90.
[87] *Id.* 191.
[88] *Id.* 193.
[89] *Id.* 194.
[90] *Id.* 198-99.

A524

13

development.[91] He clarified that at the lowest point in the pass, flying over the center meant flying over 300 Desert Sun Lane.[92] When he typically conducts a high reconnaissance pass over the Desert Sun Lane area at about 500 to 1,000 feet, respondent testified that,

> I had observed the Likes' backyard had a large flat graded area that they used for flying the open toe airplanes. It was pointing roughly north/northeast would be the departure path. You would approach from the north/northeast. My assessment of it was that it was a one way in/one way out which is fairly typical for off airport landings, the only reason being that the approach or departure from the south would put you over powerlines and even closer to other houses whereas the approach from the north had you over open BLM land.

> Also to the east of all the Google map images that you've shown there is a draw on the back side of what would be the Pena's [sic] property that sets a lower terrain, so I was – made the assessment from above that my best approach would be up that draw towards the RC landing strip. It really was just the clearest spot in that backyard.[93]

On cross-examination, respondent again testified that he understood the term "water skiing" to mean dragging the aircraft's tires on the water, explaining that it is a landing technique, but that he was not water skiing during the November 24, 2019 flight.[94] Moreover, respondent testified that Mr. Likes had granted him permission to land on his property because Mr. Likes and his son fly radio-controlled airplanes, stating that this was part of the reason for respondent's operation on November 24th.[95] Respondent testified that he flies over the flats and near the residential properties multiple times per week, noting that the Bedell Flats area is frequented by aircraft for training and maneuvering, and given that the Reno Stead Airport is used for air races, he has observed F-5's, the Air National Guard, Black Hawks and Schnook helicopters, and air race planes, such as Mustangs and P6s, in the area.[96] Respondent further

---

[91] *Id.* 199-201.
[92] *Id.* 201.
[93] *Id.* 202-03.
[94] *Id.* 215-16.
[95] *Id.* 217-18.
[96] *Id.* 219-20.

14

stated that he lives two miles south of Desert Sun Lane, asserting that it is not uncommon for the Air National Guard to fly through the area during the day or night at 200 feet above the ground.[97]

Respondent further testified that his aircraft, N318JJ, is capable of takeoff and landing at 150 feet while at sea level on a "standard day."[98] He estimated that the shortest landing he has made was at 30 to 50 feet.[99] Respondent stated that he often flies in the "back country," at unimproved strips and off airport operations.[100] Respondent estimated that he has landed his aircraft off-airport more than 1,000 times.[101] He also stated that during the 2018-2019 time period, he flew approximately three to four times per week, noting that it was not uncommon for him to land 30 plus times off-field per week.[102] Respondent explained that after making changes to the aircraft before November 24, 2019, it is quieter, guessing that the plane was measured at 71.8 decibels at takeoff.[103] Respondent surmised that if his engine suddenly failed, he would lose thrust, but would not suddenly lose lift and the aircraft would not career out of control.[104] Rather, respondent testified that he would have to descend to maintain proper airflow over the wing to sustain lift, and assuming no other structural failures, he would have "full and complete" control over the aircraft.[105]

On November 24, 2019, respondent stated that his intention was to make a low inspection pass to assess the feasibility of the landing site, as outlined in the FAA Off Airport Ops Guide.[106]

---

[97] *Id.* 220.
[98] *Id.* 485.
[99] *Id.* 486.
[100] *Id.* 489.
[101] *Id.* 489-90.
[102] *Id.* 490.
[103] *Id.* 492.
[104] *Id.*
[105] *Id.* 493-94.
[106] *Id.* 494.

15

Respondent explained that while he would normally fly over the strip to assess its length, "on the later portion of my approach to the strip, I was unable to identify my touchdown point. At which point I made a slight left turn and aborted the operation."[107] Respondent testified that had he lost his engine during the November 24th flight, he would have landed in the sagebrush in a vacant lot near Mr. Likes' property, noting that he is very familiar with the area in which he was flying.[108] According to respondent, there was plenty of room to effect an emergency landing.[109] Respondent stated he was in control of his aircraft at all times during the November 24th operation.[110] Respondent disagreed with Inspector Speeg's suggestion[111] that respondent could have taken a better approach path, stating,

> The primary [path] I placed myself off to the right of my landing site, so that I can view it out of my window and door on my left side, since I sit in the left seat. If I were to place it off the right, my panel and cowling would be covering that, as well as my passenger seat floorboard. And specifically the distance he showed inspecting it from would have been insufficient to gather really any useful data on the landing site. I think he had me offset by something like 300 feet. And it would just be ineffective.[112]

Respondent testified that he used a Google Earth image to draw his flight path and intended landing site on Mr. Likes' land.[113] Respondent further explained that he placed his aircraft to the right of the runway, between the proposed landing area and Mr. Likes' house so that he could inspect the surface conditions and landing site off of his left wing and through the window.[114] Respondent testified that had he identified a landing site, he would have performed a

---

[107] *Id.* 495.
[108] *Id.* 497.
[109] *Id.*
[110] *Id.* 498.
[111] *See infra* summary of Inspector Speeg's testimony.
[112] Tr. 501-02.
[113] *Id.* 503 (discussing Exh. R-2).
[114] *Id.* 503-04.

16

"left crosswind" turn to land.[115] Rather, respondent stated that after he chose not to land, he flew to Stead airport and landed.[116] Respondent testified that Mr. Morgan from FSDO contacted him about the November 24th flight and during their conversation, respondent stated that he did not remember flying over houses because he was flying often and could not recall that flight.[117] Respondent testified that he met with three or four people at FSDO, including Mr. Morgan and Inspector Green.[118] At the meeting, respondent was shown a video of his aircraft and he informed the attendees that the video depicted him flying the aircraft.[119]

On additional cross-examination, respondent acknowledged that his aircraft has dual controls so that he could operate the airplane from the left or right seat.[120] However, he testified that he could not have operated from the right seat during the November 24th flight because all of his hours in the aircraft have been in the left seat, switching seats would have added another variable to consider, and his primary gauges are on the left side.[121] Respondent explained that on November 24th, he flew over the potential landing site on Mr. Likes' property at over 500 feet above the ground and had he landed there, he would have approached to the south because the land slopes downhill to the north and he would use the "up slope" toward the south to assist in stopping.[122] Respondent also testified that another reason to avoid approaching from the south is the presence of houses and power lines, although his primary concern was the runway's slope.[123]

---

[115] *Id.* 505-06.
[116] *Id.* 507.
[117] *Id.* 508-09.
[118] *Id.* 510.
[119] *Id.*
[120] *Id.* 511.
[121] *Id.* 512.
[122] *Id.* 517-19. *See also* Exh. R-2.
[123] Tr. 519-20. *See also* Exh. R-2.

17

Respondent stated that he decided not to land shortly before he executed his left turn.[124]

Respondent stated that he had been to his intended landing area before and disagreed with Mr.

Likes' testimony that the runway runs from east to west.[125]

On cross-examination, respondent did not recall informing the FAA during the December

3rd meeting that he opted not to land at his intended landing site because he deemed the site

unsafe.[126] Respondent denied that he could not identify the landing site because his altitude was

too low, but stated that, "It was much harder to identify from the perspective that you would have

on the approach than I had anticipated. And there were just not enough identifying features to the

terrain."[127] Moreover, respondent asserted that he did not recall whether he spotted the fence line

separating the Penas' and Likes' houses.[128] Although respondent stated he did not recall his

lateral distance from Mr. Likes' property, he estimated that the distance was 100 to 150 feet.[129]

Respondent also clarified that he was not intending to land, but was executing a low pass.[130]

Respondent explained that while flying at 100 feet in altitude at 70 miles per hour at a 40 degree

bank, the bank would add load to the wing, "With added load, it adds drag and your lift vector is

no longer in the vertical position. So yeah, you wouldn't be able to glide as far in a turn, as you

can flat and level or with level wings."[131] Respondent testified that while flying over the Desert

Sun Lane area, his aircraft would require a slightly longer runway for takeoff and landing

because of the thinner air at the higher altitude.[132]

---

[124] Tr. 520. *See also* Exh. R-2.
[125] Tr. 521. *See also* Exh. R-2.
[126] Tr. 521.
[127] *Id.* 522.
[128] *Id.*
[129] *Id.* 523.
[130] *Id.* 523-25.
[131] *Id.* 537.
[132] *Id.* 538.

A529

18

On re-direct, respondent testified that the Penas' and Likes' properties are at about 5,500 to 5,700 feet above sea level, but the altitude difference from his takeoff and landing point did not materially affect his aircraft's performance.[133] When asked whether the pass he made on November 24th was necessary for him to evaluate the landing area for suitability for landing, respondent replied, "Absolutely, yes."[134]

In response to the law judge's questioning, respondent confirmed that he routinely flies over the Desert Sun Lane area, usually at 6,000 to 6,500 feet above mean sea level.[135] He further testified that above ground level, his standard cruise altitude over sparely populated, rural areas was 500 to 1,000 feet "if I'm only transitioning for five minutes and to another landing."[136] Respondent stated he did not recall on November 24th how high above ground level he was transitioning, or his altitude above ground level when he decided to get a closer look at the runway on the Likes' property, or how far away he was from the Likes' property when he traveled northbound to Bedell Flats.[137] He also did not recall when he began his low pass or descended to 100 feet above ground level.[138] Respondent did not recall any landmarks to assist him in locating the runway, stating that he believed there was sagebrush "or something" at the intersection of one of the roads in the Likes' backyard, but respondent could not identify it from the air.[139] For purposes of landing on the runway on the Likes' property, respondent testified that he did not study any navigational or aviation maps.[140] Explaining why he chose not to land or

---

[133] *Id.* 538-39.
[134] *Id.* 540.
[135] *Id.* 540-41.
[136] *Id.* 541-42.
[137] *Id.* 542-43.
[138] *Id.* 543.
[139] *Id.* 545.
[140] *Id.* 546.

conduct additional inspection passes, respondent stated,

> I think there was a multitude of reasons that I decided it was not worth going back. And within that was not being able to identify that, but also I did factor in the proximity of [the] house and if that landing, you know, was worth me inspecting over and over. So I chose – to move on.[141]

The law judge asked respondent whether he considered conducting his low pass in the opposing direction to the intended landing site facing northward, while offsetting the landing site to respondent's left, and respondent stated that he had not thought of that.[142] Respondent elaborated that the terrain rises to the south by 20 to 30 feet, so the low inspection pass would have been less effective.[143]

Respondent testified that he has likely known Mr. Likes since 2012, explaining that he raced radio-controlled cars with Mr. Likes and Mr. Likes' son, both of whom worked on respondent's house.[144] Respondent recalled that he received permission to land on the Likes' property before September 2019.[145] Prior to conducting the low pass during the November 24th flight, respondent stated that he was not in contact with Mr. Likes or his son.[146] Respondent also stated that he did not make any radio calls as he made the low pass or approached the vicinity of Desert Sun Lane because there were not enough recognizable landmarks to identify his location.[147] Finally, respondent reiterated that the only reason he made the low pass on November 24th was to determine the suitability of the landing location.[148]

Inspector Ronald Green testified that he is the Principal Operations Inspector and

---

[141] *Id.*
[142] *Id.* 549-50. *See also* Exh. R-2.
[143] Tr. 550.
[144] *Id.* 553.
[145] *Id.* 554.
[146] *Id.*
[147] *Id.* 555.
[148] *Id.* 556.

Aviation Safety Inspector at the FAA Reno FSDO and has been employed by the FAA for two and a half years.[149] He described his duties as managing certificates for both organizations and airmen, investigating aircraft accidents, and taking complaints from the general public about matters that involve aviation.[150] Prior to joining the FAA, Inspector Green served in the U.S. military for 20 years as an aviator and has approximately 4,500 hours of flight time.[151] Inspector Green stated that he holds the following airmen certificates: airline transport pilot for rotorcraft helicopter; commercial pilot for airplane, single engine land, and instrument airplane; flight instructor for rotorcraft helicopter and instrument helicopter; and remote pilot.[152]

On November 24, 2019, Inspector Green stated that he served as an Operations Inspector and Aviation Safety Inspector, but had not yet been promoted to as a Principal Operations Inspector.[153] He explained that his office received a video of a low-flying aircraft in the North Valley areas around Reno and Inspector Green was assigned to assist now-retired Inspector Morgan with his investigation.[154] As part of the investigation, the inspectors interviewed the Penas, Mr. Stanley, Mr. Likes, and respondent.[155] Inspector Green testified regarding a photograph of the Penas' garage that Inspector Green took to depict the security camera that captured respondent's aircraft as it flew near the Penas' house and to give a sense of scale because the FAA took many measurements from the center of the garage.[156] Inspector Green also identified a photograph of an area on the Penas' property including Inspector Morgan, the Penas'

---

[149] *Id.* 223-24.
[150] *Id.* 224.
[151] *Id.* 224-25.
[152] *Id.* 225.
[153] *Id.*
[154] *Id.* 225-26.
[155] *Id.* 226.
[156] *Id.* 227; Exh. A-17 at 1.

21

propane tank, and the nearby mountains, explaining that the photograph was taken to depict a distance of 300 feet from the Penas' driveway to where Inspector Morgan stood.[157] Inspector Green also explained that a photograph of Inspector Morgan standing next to the propane tank was taken to demonstrate the proximity of the tank to the Penas' driveway and house, which was a little over 56 feet.[158] Inspector Green also identified a photograph of Inspector Morgan standing approximately 78 feet from the center of the Penas' garage and a fence, which also showed the propane tank, the stable, and the Penas' neighbor's home to the east and testified the photograph was taken because he and Inspector Morgan believed it represented the location of respondent's flight path.[159] Further, the witness identified a photograph taken from the center of the garage facing south toward Mr. Likes' residence and including Mr. Pena at the fence line between his and Mr. Likes' properties.[160] Inspector Green testified that the photograph contains Mr. Penas' driveway, Mr. Likes' house, fences on Mr. Likes' property, powerline poles, and other neighbors' houses, and noted that the elevation rises on Mr. Likes' property.[161] He also testified that in the photograph, Mr. Pena was approximately 226 feet from the center of his driveway.[162] Further, Inspector Green stated that the distance from the center of the garage to eastern edge of the house at the white gutter was 15 feet.[163]

       To determine the location of respondent's flight path, Inspector Green stated that he relied on the video received with the initial complaint, as well as "the known size of the aircraft, and its size in the frame in relation to the ground, and the height at which the garage camera, or the

---

[157] Tr. 228-29, 232; Exh. A-17 at 3, 5.
[158] Tr. 232-33; Exh. A-17 at 7, 9.
[159] Tr. 234-35, 240; Exh. A-17 at 11, 13.
[160] Tr. 235; Exh. A-17 at 15.
[161] Tr. 235-36; Exh. A-17 at 15.
[162] Tr. 236-37; Exh. A-17 at 15, 17.
[163] Tr. 239.

22

camera at the peak of the garage is located, 20 feet above the ground."[164] Moreover, he stated

that he relied on the witnesses' description of the flight.[165] Inspector Green testified that he and

Inspector Morgan considered the slope of certain parts of the properties, including the downslope

from the Penas' garage toward the east, which rises again to the east, but stated that they did not

assess the grade of slope for the propane tank.[166] Inspector Green pointed out the location of

power poles northwest of the Likes' driveway in the photograph of Mr. Pena standing at the line

between his and Mr. Likes' property and on a slide Inspector Green created using Google Earth

and PowerPoint to demonstrate respondent's flight path and the structures and witnesses within

the 500 foot lateral limit of the path.[167] According to Inspector Green, the power poles were

contained within in the 500 foot lateral limit.[168]

On cross-examination, Inspector Green agreed that Google Earth images are not updated

on a regular basis.[169] On the image that Inspector Green created, everything to the right of the

flight path is desert scrub.[170] Inspector Green also stated that he interviewed respondent and

when he showed him the video of the flight, respondent conceded that he was in the video.[171]

Inspector Green further explained that he received a total of two videos as part of his

investigation into respondent's flight, and while he believed that the FAA received the video

from the garage security camera via email, he was unsure of the exact method used to submit the

video.[172] He did not recall seeing a flash drive or CD of the videos, but expounded that while at

---

[164] *Id.* 241.
[165] *Id.* 241-42.
[166] *Id.* 243.
[167] *Id.* 246, 250-54; Exhs. A-17 at 15; A-18.
[168] Tr. 254.
[169] *Id.* 256.
[170] *Id.* 256; Exh. A-18.
[171] Tr. 257.
[172] *Id.* 257-58.

23

the Penas' house, he connected his FAA-issued camera to the Penas' computer to upload the videos to the camera, which he took back to his office to upload to the investigation file.[173] Inspector Green stated that he viewed the version of the security camera video that he uploaded to his camera, but does not know whether the video was in its native format.[174] Finally, Inspector Green testified that to his knowledge, the videos obtained as part of the investigation did not have sound.[175]

Moreover, Inspector Green acknowledged that the bulk of the measurements he and Inspector Morgan took were based on their interviews with the Penas and Mr. Stanley.[176] Inspector Green testified that he did not measure the size of the Penas' or Likes' lots and did not measure the distance of any potential landing area on Mr. Likes' lot because they were unable to reach Mr. Likes to obtain a statement or get permission to access his property.[177]

On re-direct, Inspector Green testified that he and Inspector Morgan visited the Penas on December 19, 2019, and took the discussed photographs, measurements, and retrieved the video.[178] He clarified that to obtain the video from the Penas' computer, he used a USB connection to direct connect the camera with the computer.[179] Inspector Green testified that he also used the USB connection to transfer the video and photographs from his camera to a shared drive at his office.[180] On the shared drive, the files are labeled using the enforcement investigative report (EIR) number for the case.[181]

---

[173] *Id.* 258-60.
[174] *Id.* 266.
[175] *Id.* 279.
[176] *Id.* 261.
[177] *Id.* 262-63.
[178] *Id.* 279-80.
[179] *Id.* 280.
[180] *Id.* 281.
[181] *Id.*

24

Upon questioning from the law judge, Inspector Green explained that they took a photograph of Inspector Morgan approximately 300 feet from the center of the Penas' garage to obtain a sense of scale. Although they believed that respondent's flight path was approximately 78 feet from where the photo was taken, Inspector Green recalled that they were unable to measure 500 feet, so they selected 300 feet to get a sense of the scale given the lack of landmarks.[182] Inspector Green testified that he and Inspector Morgan assessed the aircraft's altitude using the videos of the flight and approximate dimensions of the aircraft.[183] Inspector Green did not recall discussing the use of a laser range finder to obtain measurements on Mr. Likes' property.[184]

Inspector Green agreed that there were two videos obtained as part of the investigation – one from the garage peak camera and one from the front door camera, clarifying that those were the only two videos he viewed.[185] He testified that when reviewing the case file, he viewed the garage peak and front door videos taken using an iPhone, rather than the native files.[186] Additionally, Inspector Green stated that he viewed the videos he stored on his camera as he uploaded it onto the FAA shared drive, and he recalls that they were the videos taken with the iPhone.[187] Inspector Green remembered that the videos were short, about three to ten seconds in length.[188] Once he uploaded the files from the camera to the shared drive, Inspector Green stated that he deleted the files from his camera so that he had adequate storage capacity for his other

---

[182] *Id.* 282-83.
[183] *Id.* 283.
[184] *Id.* 284-85.
[185] *Id.* 285.
[186] *Id.* 286.
[187] *Id.* 287.
[188] *Id.* 287-88.

25

duties.[189] Inspector Green stated that he and Inspector Morgan visited the Penas three times, and the December 19, 2019 visit was the second visit; they first met with the Penas shortly after receiving the initial complaint and the third visit was after Christmas or in early January 2020.[190] Inspector Green testified that Inspector Morgan visited the Penas a few times on his own between January and April 2020.[191]

On further re-direct, Inspector Green clarified that he and Inspector Morgan determined the approximate altitude of respondent's aircraft using various factors, including the garage video, witness statements, and the downgrade slope of the property east of the Penas' house.[192]

On re-cross examination, Inspector Green confirmed that when he stated that he based respondent's approximate altitude on the garage peak video, he was referring to the video of the video, not the native file.[193] He also testified that he did not ask the Penas for the native file of the video and was unaware whether Inspector Morgan requested the native file.[194] Finally, Inspector Green acknowledged that after downloading the video file to the FAA shared drive, he could have saved a copy on his camera's SD card.[195]

After being recalled as a witness, Inspector Green further testified that he attended the third meeting with respondent at the Reno FSDO and that respondent stated that he was conducting an approach to a radio-controlled airfield on Mr. Likes' property.[196] According to Inspector Green, respondent stated that he did not land on Mr. Likes' property because he

---

[189] *Id.* 288.
[190] *Id.* 289-90.
[191] *Id.* 291.
[192] *Id.* 292-93.
[193] *Id.* 293.
[194] *Id.* 293-94.
[195] *Id.* 294.
[196] *Id.* 449.

26

deemed it unsafe.[197] In addition, he testified that during the meeting with respondent, Inspector

Green and Mr. Morgan showed respondent the video of the aircraft and respondent admitted that

he was flying.[198]

Jared Likes testified that on November 24, 2019, he resided at 300 Desert Sun Lane and

had lived there for 18 years.[199] He stated that while living at that residence, he observed aircraft

flying over the desert area "quite a bit."[200] Mr. Likes testified that he granted respondent

permission to land on his property, but mentioned that he was not home during respondent's

November 24th flight.[201] Mr. Likes stated that he and his son fly electric remote controlled

airplanes and created an area on his property for conducting the operations with a 400 to 500 feet

landing area.[202] Mr. Likes also testified that he has flown with respondent in his aircraft a

"handful" of times and they landed off-airport, including in an area a 20 minutes' drive north of

his home.[203] When he flew with respondent, Mr. Likes described the landings as "[v]ery safe and

doable," estimating that after touchdown, the aircraft rolled a short distance, about 100 feet.[204]

On cross-examination, Mr. Likes testified that he was not in respondent's aircraft on

November 24, 2019.[205] Mr. Likes stated that he flew with respondent about a month before

November 24th.[206] He further explained that when operating his radio-controlled aircraft, he used

---

[197] *Id.* 449-50.
[198] *Id.* 464.
[199] *Id.* 298.
[200] *Id.* (Mr. Likes initially testified that he did not observe aircraft flying over "that area" when he resided at 300 Desert Sun Lane).
[201] *Id.* 299.
[202] *Id.* 299-300.
[203] *Id.* 300-01.
[204] *Id.* 304-05.
[205] *Id.* 305.
[206] *Id.*

27

a 400 to 500 foot clearing as a runway, with approximately 10 acres of open space behind it.[207] Mr. Likes denied ever flying a drone in that area, but acknowledged that his nephew may have.[208] Furthermore, Mr. Likes reiterated that no one was at his home during respondent's flight on November 24th.[209]

Upon questioning from the law judge, Mr. Likes recalled giving respondent permission to land on his runway on his property at least a month before November 24, 2019, informing respondent that he could use the runway if he ever needed it and believed that he granted respondent the permission a single time.[210] Mr. Likes clarified that he granted respondent permission to land on his property at any time respondent needed to land and did not limit the permission to any specific dates or times.[211] Mr. Likes stated that the runway had been on his property for years and estimated that it was 25 to 30 feet wide, describing it as a smooth dirt runway with a bit of scrub.[212] Mr. Likes guessed that the runway was at least 500 feet from his home and was oriented east to west.[213] He also testified that there are other areas on his property that could be used as runways, stating, "I had a complete perimeter trail, path around that place with paths through my yard on ten acres that I could land anywhere out there."[214]

On recross-examination, Mr. Likes testified that he and his son are still good friends with respondent and have flown with respondent, but not recently because both Mr. Likes and his son have been busy.[215] Mr. Likes moved about eight miles down the street from his 300 Desert Sun

---

[207] *Id.* 306.
[208] *Id.* 307-08.
[209] *Id.* 308.
[210] *Id.* 308-09.
[211] *Id.* 309.
[212] *Id.* 310.
[213] *Id.* 310-11.
[214] *Id.* 311.
[215] *Id.* 311-12.

28

Lane residence and respondent lives about eight miles "down the road."[216]

Over respondent's objection, Roy Speeg, Jr. testified as an expert in general aviation and flight operations, with a particular focus on low flight operations, and the FAA regulatory requirements for low flight operations.[217]  He testified that he has worked for the FAA for 18 years and is currently on the EIR review team.[218] Inspector Speeg stated he was a Regional Aviation Event Specialist for the Northwest Mountain Region from 2012 to 2017, dealing with waivers for air shows, banner-tow operations, cross-country air races, and aerobatic competitions under section 91.119(a).[219] He asserted that he is very familiar with the regulation and when waivers are permitted.[220] Inspector Speeg stated that prior to joining the FAA, he held a "statement of aerobatic competency down to 500 feet."[221] Inspector Speeg noted that he possesses the following airmen certificates: airline transport pilot, single and multi-engine land with type ratings in all the citation 500 series business jets, the Airbus A-320 series, and the Embraer 171-90 series; and flight instructor with instrument airplane and multi-engine instructor ratings.[222] He further testified that he has a little more than 6,500 hours of flight time as a pilot-in-command.[223]

Inspector Speeg explained that during a low pass, a pilot ensures that there are no animals, fallen trees, or other obstacles on the runway and performs the low pass at a slower than

---

[216] *Id.* 312.
[217] *Id.* 343-45. The law judge found that Inspector Speeg was not qualified as an expert in short field take off and landings with regarding to the Kitfox 5 aircraft.
[218] *Id.* 318.
[219] *Id.* 318-19, 321.
[220] *Id.* 319.
[221] *Id.*
[222] *Id.* 321.
[223] *Id.*

29

cruise speed.[224] According to Inspector Speeg, if the runway is clear, the pilot would "come back around and land."[225] He also testified that considering the statements from the Penas and Mr. Stanley and the photographs and measurements, respondent's aircraft was an estimated 50 feet in altitude during the low pass on November 24th.[226] He also estimated that based on the evidence presented at hearing, when Mr. Pena first spotted the aircraft, it was 78 feet in lateral distance from the Penas' house and 30 to 50 feet above the ground.[227] Inspector Speeg further opined that respondent flew at altitudes that would not allow him to react timely in an emergency, stating,

> He would have to first fly the airplane. He would have to figure out where he was going to put the airplane down. And he would have to be able to do all of that without creating undue hazard to the persons or property on the surface. And I'm not sure that that could have been done from 30 to 50 feet above the ground in a steep bank, because if the engine quits in a steep bank, you're going to have an immediate loss of width, because the wings are sideways. They're not level with the horizon. Whether they have STOL additions to the wing or not. But STOL additions to the wing are useless if they're in, you know, six feet or more degrees of bank.[228]

He also stated that in an emergency, respondent's attempts to land would create an undue hazard to those residing in the neighborhood, and noted that banking the aircraft could result in structure failure.[229] Inspector Speeg explained that respondent himself made statements indicating that it was unsafe to land on the east side of his flight path, meaning that the only place to land would have been in the residential subdivision – creating an undue hazard to people and property.[230] Inspector Speeg testified that, referring to the map that Inspector Green created, the propane tank was the structure closest to the Penas' home.[231] Moreover, Inspector Speeg opined that

---

[224] *Id.* 348.
[225] *Id.* 348-49.
[226] *Id.* 350.
[227] *Id.* 353-54.
[228] *Id.* 357.
[229] *Id.* 359-60.
[230] *Id.* 361.
[231] *Id.* 365-66 (discussing Exh. A-18). Respondent's counsel conceded that the propane tank is a

30

respondent's aviation maneuvers were not necessary for landing, elaborating that banking is not required to "get to an area to assess a possible landing area."[232] He concluded that respondent engaged in intentionally reckless behavior in violation of section 91.119(a).[233]

Inspector Speeg further testified that respondent violated section 91.119(c) by flying recklessly at low altitudes with disregard for the safety of people and structures.[234] Inspector Speeg identified aggravating factors he considered in reaching his opinions, including: the degree of hazard respondent created; respondent's experience level, which the witness considered to be generally low; the intentional nature of respondent's actions; and the prior warnings the FAA issued to respondent.[235] Inspector Speeg further expounded that, "[t]he margin for error when you're operating that low to the ground, things happen fast. ... like I said if the engine quit, a lot of things have to happen real fast in order to get that airplane to a place where you can land it, let alone get on the ground."[236] He expressed a lack of confidence that respondent could respond in an emergency given respondent's level of experience, reiterating his opinion that respondent showed a significant disregard for safety.[237]

On cross-examination, Inspector Speeg testified that he had never met respondent or had an opportunity to assess his flying skills prior to the instant case.[238] He also acknowledged that section 91.119 does not mention an aircraft's bank angle and that an FAA pilot flying handbook is advisory, rather than mandatory.[239] Inspector Speeg further testified that respondent's maneuvers

_____

structure. *Id.* 365.
[232] *Id.* 367.
[233] *Id.*
[234] *Id.* 367-68.
[235] *Id.* 368.
[236] *Id.* 369.
[237] *Id.*
[238] *Id.* 370.
[239] *Id.* 370-71.

31

during the November 24th flight were not necessary for normal flight, traffic pattern operations, or to observe a possible landing spot, and that based on the video he viewed, he estimated that respondent's aircraft banked at up to 60 degrees.[240] Inspector Speeg agreed with respondent's counsel that on a three-degree glide slope, an aircraft that is one mile from a runway is 300 feet from the ground, and an aircraft one-quarter of a mile from a runway is 75 feet from the ground.[241] Respondent's counsel then questioned the expert witness concerning a photograph of the Linden, NJ airport, showing that the airport is near several houses, and asserting that airplanes operate in close proximity to persons and properties well below 500 feet during landing.[242] In response to whether such an assertion is correct, Inspector Speeg responded, "They do, but …" before respondent's counsel interrupted him.[243] Inspector Speeg opined that during instrument instruction "at a developed airport," students aim to become comfortable "coming down to minimums," where they are flying close to the ground, buildings, and structures.[244] Inspector Speeg agreed that a low-flying aircraft may operate in an airfield regularly in sparsely populated areas, adding, "[t]his is not a sparsely populated area."[245] He also acknowledged that how well a pilot flies is based on skill and experience, as well as judgment.[246] In addition, he agreed that where an aircraft lands depends on the pilot's skill, the aircraft's capabilities, and applicable regulations.[247]

Referring to the FAA Off Airport Ops Guide, Inspector Speeg testified that making a pass to examine the landing surface is permissible when performed correctly, and while the pass

---

[240] *Id.* 371-73.
[241] *Id.* 376-78.
[242] *Id.* 379-81.
[243] *Id.* 380-81.
[244] *Id.* 381-82.
[245] *Id.* 383.
[246] *Id.* 384-85.
[247] *Id.* 389.

32

requires a low altitude, Inspector Speeg opined that, "[y]ou have to be at an altitude that takes you higher than the intended point of landing."[248] Inspector Speeg also explained that a pilot must conduct a higher level pass to determine whether there are obstructions to landing and in a sparsely populated area, a pilot may fly low to the ground, but must remain 500 feet from persons, property, vessels, and vehicles.[249]

> On re-direct, Inspector Speeg testified that under the applicable regulations,
>
> except for takeoff and landing, you have to stay above the altitudes indicated in the regulation. So if you're doing a pass over it, that's not landing or take off, and I think that's been interpreted previously. But so if you do a low pass and decide not to land, you have to stay, you know, 500 feet above persons, property on the ground. You have to be able to land without causing undue hazard if you lost an engine.[250]

Moreover, Inspector Speeg identified alternative flight paths respondent could have taken that would not have violated the regulations.[251]

> In response to questioning from the law judge, Inspector Speeg opined that under the regulations, an aircraft may fly within 500 feet of persons, property, structures, vessels or vehicles if it was done for purposes of landing.[252] Further, the Inspector stated that the pilot exercises judgment when determining which flight path to take and the regulation applies regardless of whether there are other, safer approaches for landing.[253] Inspector Speeg also explained that there is a difference between a low pass and an approach to land because during a low pass, no landing is actually performed.[254] Finally, Inspector Speeg stated that he did not view respondent's intended landing area in person, but formed his opinion based on the exhibits and

---

[248] *Id.* 393-94; Exh. A-22 at 3.
[249] Tr. 394-97.
[250] *Id.* 407.
[251] *Id.* 409-12.
[252] *Id.* 412-13.
[253] *Id.* 414.
[254] *Id.* 415.

33

testimony.[255] He also testified that he did not know whether he viewed the native video of respondent's flight or a copy.[256]

On additional re-direct, Inspector Speeg testified that if respondent's flight path was necessary for landing and he could ensure a landing without causing an undue hazard to persons or property on the ground, then respondent would not have violated section 91.119(a).[257]

On re-cross examination, Inspector Speeg testified that section 91.119 does not differentiate between on airport and off airport operations and FAA's off airport operations guidance is advisory.[258] Furthermore, Inspector Speeg stated that it is "prudent" to conduct off airport operations in accordance with FAA's guidance, so long as it is consistent with the regulations.[259]

Upon additional questioning from the law judge, Inspector Speeg opined that, except when necessary for takeoff or landing, section 91.119(a) sets forth altitude limits on flights, explaining "we have to be at an altitude that allows[,] if a power unit fails a landing, an emergency landing without undue hazard."[260] Inspector Speeg testified that section 91.119(c) addresses distances.[261]

Prior to issuing his decision, the law judge denied respondent's motion to dismiss the case for failure to state a claim upon which relief can be granted.[262] Respondent argued that the Administrator's amended complaint failed to allege that the low pass operation was not

---

[255] *Id.* 416-17.
[256] *Id.* 417.
[257] *Id.* 424.
[258] *Id.* 425.
[259] *Id.* 426.
[260] *Id.* 429.
[261] *Id.* 426.
[262] *Id.* 580-81.

34

necessary for takeoff or landing, as stated in the prefatory clause of Section 91.119.[263] The

Administrator asserted that whether the low altitude operation was necessary for takeoff or

landing is an affirmative defense that respondent must prove.[264] In denying the motion, the law

judge cited Board precedent and determined that respondent has the burden of proving the low

operation was necessary for takeoff or landing.[265]

   C. *Law Judge's Oral Initial Decision*

   In the April 6, 2022, Oral Initial Decision, the law judge determined that the

Administrator proved respondent violated 14 C.F.R. §§ 91.119(a), (c) and 91.13(a) by operating

his aircraft at low altitudes, but mitigated the sanction from a 120-day suspension to a 60-day

suspension. In making this determination, the law judge cited the regulatory violations alleged in

the complaint, noted respondent's admissions and denials in his answer, listed the admitted

exhibits, summarized the witness testimony, and addressed respondent's affirmative defenses.

The law judge modified the complaint and found that the Administrator proved by a

preponderance of the evidence most allegations in the modified complaint.

   The law judge made several findings of fact and conclusions of law. The law judge found

that: respondent holds a private pilot certificate; he is the registered owner of a 1997 Johnson

John T Kitfox 5, registration number N318JJ; on November 24, 2019, respondent was the pilot-

in-command of his aircraft in the vicinity of 400 Desert Sun Lane and 300 Desert Sun Lane in

Reno, Nevada; and respondent flew less than 100 feet above ground level during his low pass.[266]

The law judge modified paragraph 4 of the Administrator's amended complaint so that it reads,

---

[263] *Id.* 570-71.
[264] *Id.* 571.
[265] *Id.* 580. Although the law judge acknowledged that respondent's motion to dismiss was untimely, the law judge declined to dismiss the motion on those grounds. *Id.* 572.
[266] Oral Initial Decision at 698-99.

35

"During the referenced flight operation, you operated N318JJ at altitudes of 100 feet AGL or less than 100 feet AGL."[267] The law judge further found that the propane tank on the Penas' property is a structure under the regulations.[268] The law judge held that the preponderance of the evidence showed that respondent flew less than 500 feet from the Penas' residence and their stable, shed, and propane tank.[269] The law judge determined that while the Penas' testimonies were likely biased and embellished because of their marital relationship, the problems they had with Mr. Likes flying drones near their home, and their belief that respondent retaliated against them on Mr. Likes' behalf, the law judge did not believe that they falsified their testimonies about what they saw on November 24th.[270] Further, the law judge found Mr. Stanley's testimony to be credible, noting that he corroborated the Penas' testimonies concerning the fight path, his testimony was not embellished, and he did not have an "axe to grind."[271]

Based on his findings, the law judge modified the amended complaint as follows: paragraph 4(a) will now read, "closer than 500 feet of a stable, shed, and propane tank"; paragraph 4(b) will now read "closer than 500 feet of a residential home at 400 Desert Sun Lane"; and paragraph 4(c) will now read "closer than 500 feet of an adult and a child who were outside the residential home at 400 Desert Sun Lane."[272] The law judge found that the Administrator failed to prove paragraph 4(d), alleging that respondent operated within 300 feet or closer than 500 feet of two adults and two children near the perimeter of 400 Desert Sun Lane.[273]

---

[267] *Id.* at 699.
[268] *Id.* at 701.
[269] *Id.* at 706, 708.
[270] *Id.* at 704.
[271] *Id.* at 705.
[272] *Id.* at 708, 710.
[273] *Id.* at 711.

36

The law judge criticized the Administrator for failing to obtain or preserve the native video from the Penas' garage peak camera showing respondent's aircraft on November 24th.[274] However, the law judge declined to apply an adverse inference and instead, excluded copies of the video taken with an iPhone and other evidence relying on the video, and gave no weight to Inspector Speeg's and Inspector Green's testimonies based on the excluded video copy.[275]

In evaluating whether respondent's low pass at 100 feet above ground level allowed for an emergency landing without undue hazard to persons or property in the event of a power unit failure, the law judge credited Inspector Speeg's testimony concerning respondent's ability to land in an emergency, which was not based the excluded video and which the law judge found credible.[276] The law judge cited Inspector Speeg's opinion that respondent could have flown an alternate route further to the east to avoid structure or people, noting that during the law judge's questioning, respondent acknowledged that he could have taken another path, but did not consider it.[277] The law judge found not credible respondent's reasons for declining to take another route or fly at a higher altitude.[278] Thus, the law judge determined that respondent flew at an altitude that did not allow for an emergency landing without undue hazard to persons or property on the surface in the event of a power unit failure, in violation of section 91.119(a).

In finding that respondent violated section 91.119(c), which prohibits flying within 500 feet from any person, vessel, vehicle, or structure in a sparsely populated area unless landing or taking off, the law judge found that, as respondent admitted, respondent flew within 100 feet or

---

[274] *Id.* at 714-17.
[275] *Id.* at 712-13, 716-17.
[276] *Id.* at 718-20.
[277] *Id.* at 719-21.
[278] *Id.* at 721-22.

37

less from any person, vessel, vehicle or structure.[279] Further, the law judge determined that respondent has the burden of proving that his low altitude operation was necessary for takeoff or landing, and citing respondent's testimony, the legislative history of the regulation, and Board precedent, found respondent failed to meet this burden given that the landing site was inappropriate under the circumstances.[280] The law judge found that the Administrator proved every allegation in the complaint, as modified, by a preponderance of reliable, probative and credible evidence, except for paragraph 4(d).[281] Further the law judge concluded that respondent violated 14 C.F.R. §§ 91.119(a) and (c), and 14 C.F.R. § 91.13(a).[282]

The law judge rejected the following affirmative defenses given that respondent failed to offer convincing credible evidence to support them: the Administrator fails to state a claim upon which the Board may grant the relief requested; the Administrator's interpretation of the relevant Federal Aviation Regulations (FARs) is arbitrary, capricious, an abuse of discretion and not in accordance with the law; the Administrator's interpretation of the FARs is unconstitutionally vague; the Administrator's application of the FARs is contrary to the regulation's plain language; the Administrator lacks substantial basis in law and fact to continue prosecution of this matter; and that the sanction of suspension is contrary to policy, precedent, and procedure.[283]

The law judge examined the Administrator's sanction of revocation under the deference provided in the Pilot's Bill of Rights[284] and the Supreme Court's decision in *Martin v. Occupational Safety and Health Review Commission*.[285] The law judge considered aggravating

---

[279] *Id.* at 722.
[280] *Id.* at 722-32.
[281] *Id.* at 732-34.
[282] *Id.* at 733-34.
[283] *Id.* at 735-37.
[284] Public Law 112-153 (2012).
[285] 499 U.S. 144 (1991).

38

and mitigating circumstances in assessing the Administrator's 120-day suspension and determined that while there were no aggravating factors supporting a longer sanction, the Administrator's failure to preserve the native video in the case was mitigating.[286] The law judge noted that the FAA sanction guidance, FAA Order 2150.3C, provided a sanction range of a 60- to a 120 day-suspension for careless operation with a severity level 2, which encompasses the failure to maintain the required minimum altitude in an uncongested area. The law judge reduced respondent's sanction from a 120-day suspension to a 60-day suspension based on the Administrator's failure to preserve evidence and Board precedent.[287] Further, the law judge explained, "[a] suspension of 60 days is at the low end of the moderate range, which is appropriate given all the circumstances and accounting for [r]espondent's experience as a private pilot and failure in judgment in conducting a low pass."[288]

   D. *Issues on Appeal*

   The parties cross-appealed different aspects of the law judge's decision. On appeal, respondent argues that the law judge erred by: 1) not dismissing the Administrator's Amended Order of Suspension for failure to state a claim upon which relief can be granted; 2) misinterpreting and misapplying 14 C.F.R. § 91.119 because a low inspection pass is "necessary" in conjunction with an off-airport landing; 3) finding respondent's intended landing site was inappropriate or not suitable; 4) not dismissing the proceedings in light of the FAA's sloppy investigation; and 5) committing numerous and other prejudicial errors, including amending the Administrator's complaint, relying on an unpled allegation in his decision, and relying on discredited testimony. The Administrator argues on appeal that the law judge erred in

---

[286] Oral Initial Decision at 740-41.
[287] *Id.*
[288] *Id.* at 741.

39

reducing the sanction from a 120-day suspension to a 60-day suspension.

*2. Decision*

While we give deference to our law judge's rulings on certain issues, such as credibility determinations,[289] we review the case under *de novo* review.[290]

*A. The law judge did not err in denying respondent's motion to dismiss.*

We affirm the law judge's denial of respondent's motion to dismiss for failure to state a claim. Respondent alleges that the Administrator's complaint was deficient because it did not include the prefatory language to 14 C.F.R. § 91.119, "[e]xcept when necessary for takeoff or landing." Respondent also makes a vague assertion that the complaint fails to specify the "facts and circumstances" giving rise to the alleged regulatory violations. The law judge found that the complaint provided respondent with sufficient notice of the allegations and that the prefatory clause of § 91.119 is an affirmative defense that respondent must prove.

"[W]e have long held that in our proceedings, 'notice pleading' principles require the Administrator to 'give only a short and plain statement of the claim showing that the pleader is entitled to relief, and not a complete detailing of all the facts.'"[291] Further, the Board has stated, "[b]ecause the complaint is the vehicle by which respondent is given fair notice of the charges he will be expected to defend against and which facts and circumstances underlie those alleged violations, we cannot give any weight to apparent violations which were not alleged in the

---

[289] *Administrator v. Porco*, NTSB Order No. EA-5591 at 13 (2011), *aff'd sub nom.*, *Porco v. Huerta*, 472 Fed. App'x 2 (D.C. Cir. 2012) (per curiam).
[290] *Administrator v. Smith*, NTSB Order No. EA-5646 at 8 (2013); *Administrator v. Frohmuth and Dworak,* NTSB Order No. EA-3816 at 2 n.5 (1993); *Administrator v. Wolf*, NTSB Order No. EA-3450 (1991); *Administrator v. Schneider*, 1 N.T.S.B. 1550 (1972) (in making factual findings, the Board is not bound by the law judge's findings).
[291] *Administrator v. Siegel*, NTSB Order No. EA-5838 at 11-12 (2018) (quoting *Administrator v. Robert*, NTSB Order No. EA-5556 at 10-11 (2010); Black's Law Dictionary 1271 (9th ed. 2009); *Administrator v. Darby*, NTSB Order No. EA-5521 at 8 (2010)).

A551

40

Administrator's complaint."[292] We find that the Administrator's amended complaint was sufficient to place respondent on notice about the charges, itemizing the specific flight, altitudes, and distances at issue, and citing the specific regulations that respondent violated. Respondent was provided sufficient information necessary to prepare a defense and an exchange of additional detail was more appropriate during the discovery and hearing phases. Further, respondent has not demonstrated how the supposed lack of specificity in the amended complaint prejudiced him.[293] Regarding respondent's claim that the absence of § 91.119's prefatory language was fatal, the amended complaint advised respondent of which regulations he was accused of violating and nothing prevented him from referring to those regulations.[294] Moreover, respondent was on notice that the prefatory language of § 91.119 was at issue given that both before and during the hearing, he asserted as an affirmative defense that his low altitude flight

---

[292] *Siegel*, *supra* note 291, at 12 (quoting *Administrator v. Scott*, NTSB Order No. EA-4030 at 6 (1993)).

[293] *See e.g.*, *Administrator v. Ringer*, NTSB Order No. EA-1699 (1981) (finding that the complaint was sufficiently pled, noting that respondent could avail himself of discovery procedures for more details and "has made no attempt to indicate how any alleged lack of specificity in the complaint adversely affected his ability to respond to it in any respect either before or during the hearing."). *See also Administrator v. Bates*, NTSB Order No. EA-1484 (1980) (rejecting respondent's assertion that the complaint was deficient, stating, "[t]he primary purpose of the complaint is to apprise a [r]espondent of the charges so that he can prepare a defense.").

[294] *Administrator v. Richard, et al.*, NTSB Order No. EA-2575 (1987) (Although the complaint failed to specify a prerequisite to violating the regulation – that the excess crewmember hours occurred while in air carrier service – the Board affirmed the law judge's dismissal of respondent's motion for a judgment on the pleadings. The Board explained, "It is well settled that the purpose of modern pleadings is to satisfy the notice-giving function and to dispense with the rigid formalism of the common law. There could be no violation of the only regulation cited in the complaint unless the flight time was in air carrier service, and taken as a whole, the complaints provided respondents with fair notice that an element of the violation which the Administrator would have to prove was that the flight time was in air carrier service…it is apparent that the parties understood before the hearing that an essential element the Administrator had to prove and which respondents would be expected to defend against was that all of the flight time was in or could be applied to the 100-hour limit for air carrier service.").

41

was necessary for landing.[295] His claim that the amended complaint was inadequate is unconvincing and we affirm that law judge's dismissal of respondent's motion to dismiss.

The law judge did not err in finding that respondent had the burden of establishing applicability of the prefatory language in § 91.119. The law judge's conclusion is consistent with Board precedent, albeit sparse. The Board has noted that the burden of proving the applicability of § 91.119's prefatory clause rests with a respondent.[296] Respondent offers no contrary authority or other reason to refute the law judge's decision and thus, we have no basis to overturn the law judge's finding that respondent, not the Administrator, must establish that his low altitude flight was necessary for takeoff or landing.

> B. *The law judge did not misinterpret 14 C.F.R. § 91.119 and did not err in finding respondent's intended landing site was inappropriate.*

Respondent posits that the law judge misinterpreted § 91.119 in finding that a low inspection pass is not necessary for an off-airport landing, but the law judge did not issue such a finding. Rather, the law judge determined that respondent did not prove his affirmative defense that he met the prefatory clause – that his low inspection pass was necessary for landing during the November 24th flight.[297] The law judge reasoned that respondent had other alternatives for

---

[295] *See* Respondent's Compliance with Prehearing Order at 1-2; Tr. 41 (respondent's opening statement).

[296] *Application of Wick*, NTSB Order No. EA-5038 (2003) (rejecting respondent's EAJA claim and finding that the Administrator was substantially justified in bringing the matter to a hearing, noting "[i]t was respondent's burden of proving such exculpatory claims, including his defense that any low flight fell within the ambit of the except for landings exception to the proscriptions contained in FAR section 91.119(c)"); *Administrator v. Essery*, NTSB Order No. EA-2221 at 6 (1985) ("In order to show that a low altitude was 'necessary for takeoff or landing,' a respondent must show that the landing site was an appropriate one"), *aff'd* 857 F.2d 1286 (9th Cir. 1988). *See also Administrator v. Chemello*, Docket No. SE 18472 (NTSB 2009) ("The exception is in Section 91.119(b), if necessary for takeoff or landing imposes the burden on the proponent of the exception to show that the exception applies"), *aff'd* NTSB Order No. EA-5503 (2010).

[297] *See* Oral Initial Decision at 722-32.

42

conducting the low inspection pass that did not violate the regulation by flying within 500 feet to any person, vessel, vehicle, or structure. Given that the law judge did not find that a low inspection pass is not necessary for an off-airport landing, he did not misinterpret the regulation as respondent suggests.

Further, respondent argues that the law judge erroneously concluded that respondent's intended landing site was inappropriate, claiming that: the Administrator abandoned the argument that the landing site was not suitable and in considering it, the law judge violated respondent's due process; the record shows that the landing site was suitable; the law judge relied on Inspector Speeg's "incompetent" and "biased" testimony; and the law judge abused his discretion in crediting Inspector Speeg's legal conclusions.

Although the Administrator objected to respondent's questioning concerning the suitability of the landing site, the law judge acted within his purview and consistent with Board precedent in evaluating the landing site to determine whether respondent's operation was necessary for landing, as required under § 91.119. Our law judges have significant discretion in making evidentiary rulings. In this regard, we will only overturn a law judge's evidentiary ruling when the appealing party can show the law judge's ruling amounted to an abuse of discretion, after a party can show such a ruling prejudiced him or her.[298] Respondent has not shown the law judge's decision to consider the suitability of the landing site caused him prejudice, but merely

---

[298] *See, e.g., Administrator v. Kolodzi̇ejczyk*, NTSB Order No. EA-5909 ay 49 (2021) (citing *Administrator v. Wright*, NTSB Order No. EA-5872 (2020)); *Administrator v. Tarola*, NTSB Order No. EA-5858 (2019); *Administrator v. Leyner*, NTSB Order No. EA-5732 at 4 n.19 (2014) (citing *Administrator v. Walker*, NTSB Order No. EA-5656 at 15 n.39 (2013)); *Administrator v. Gⱼfin*, NTSB Order No. EA-5390 at 12 (2008) (citing *Administrator v. Bennett*, NTSB Order No. EA-5258 (2006)); *Administrator v. Martz*, NTSB Order No. EA-5352 (2008); *Administrator v. Zink*, NTSB Order No. EA-5262 (2006); *Administrator v. Van Dyke*, NTSB Order No. EA-4883 (2001).

43

asserts that it violated his due process because the Administrator "withdrew" the claim.

However, under our case law, we have long examined the suitability of the intended landing site when assessing whether the operation at issue fell under the prefatory clause of § 91.119. In rejecting respondents' assertion of the regulation's exception, we have held,

> We cannot accept respondents' proposition that the low altitudes at which their aircraft were operated were excused by the prefatory clause of section 91.[119]. As the law judge stated, respondents' interpretation of the above regulation would in effect excuse low flight where necessary for "any takeoff or any landing from any area anywhere at any time" … Such an interpretation is patently fallacious in that it would excuse low flight regardless of the appropriateness of the landing site.[299]

Further, we have explained that "[r]espondent could not simply choose any takeoff route or time and call it necessary. He must make a reasonable, appropriate choice, or the regulation has no meaning."[300] Moreover, we have rebuffed allegations of a due process violation in considering a landing site's suitability when assessing a § 91.119 violation.[301] Thus, the law judge properly considered the appropriateness of respondent's intended landing site to determine whether the operation was necessary for landing under § 91.119's prefatory clause. Respondent has not addressed whether consideration of the landing site's suitability caused him prejudice. Because

---

[299] *Administrator v. Cobb, et al.*, NTSB Order No. EA-962 (1977), aff'd, 572 F.2d 202 (9th Cir. 1977). *See also Administrator v. Prior*, NTSB Order No. EA-4416 at 9 (1996) (finding respondent's flights were not suitable, noting he had other landing options and therefore, the operations were not necessary for landing under the meaning of section 91.119); *Administrator v. McCollough*, NTSB Order No. EA-4020 at 5 (1993) ("We have long held, however, that the exception is inapplicable in cases where an unsuitable landing site is used").

[300] *Prior, supra* note 299, at 7 (quoting *Administrator v. Kittleson*, NTSB Order No. EA-4068 (1994)).

[301] *McCollough, supra* note 299, at 6-7 ("we have noted respondent's contention that, as no landing site suitability requirement appears in the language of the prefatory clause of section 91.119, the imposition of that requirement upon his operation deprived him of due process. We must, however, point out that the United States Court of Appeals for the Ninth Circuit expressly considered and rejected such an argument in *Essery v. Department of Transportation, supra*, holding that the suitability requirement represented a reasonable administrative interpretation of the low flight regulation and that previous decisions setting forth that requirement provided airmen with adequate notice of its applicability.").

44

respondent has not demonstrated that the law judge's analysis of the landing site prejudiced him, we do not reach the issue of whether the law judge abused his discretion.

Additionally, we have no reason to overturn the law judge's finding that the intended landing site was unsuitable. The law judge made the determination based on the credible testimony of the witnesses and the evidence before him, and respondent offers no support for his claim that the site was suitable. Rather, respondent merely asserts that he and his aircraft were capable of landing on the runway.[302] Respondent himself testified that during his low inspection pass, he decided against landing at the landing site because he could not identify the touchdown point or center line of the runway.[303] Given the lack of evidence backing respondent's claim that the landing site was suitable, there is no basis to refute the law judge's conclusion. Further, the law judge found credible the testimony of the Administrator's witnesses supporting the unsuitability of the landing site, and as discussed, we must defer to the law judge's credibility findings. Such credible testimony further supports the law judge's conclusion that the landing site was not suitable.

Further, the law judge did not rely on Inspector Speeg's testimony in determining that the landing site was inappropriate and respondent did not suffer prejudice as a result of the law judge's consideration of Inspector Speeg's testimony pertaining to other matters.[304] Respondent was aware in advance that the Administrator planned to call Inspector Speeg as an expert[305] and had the opportunity to conduct a *voir dire* examination and cross-examine him.[306] Respondent

---

[302] Respondent's Appeal Br. at 25.
[303] Tr. 507, 523.
[304] Oral Initial Decision at 728-32 (relying mostly on Mr. Likes' testimony).
[305] *See* Complainant's Compliance with Prehearing Order at 5-7; Complainant's Initial Disclosures.
[306] *See, e.g.*, *Administrator v. Decruz*, NTSB Order No. EA-5827, at 30 (2017) (finding the law judge did not abuse his discretion in admitting expert testimony because the Administrator

45

presents no convincing argument that Inspector Speeg's testimony was biased, other than

respondent's disagreement with the expert's responses and his displeasure with the law judge's

conclusions. According to respondent's logic, no federal employee could testify without bias

where he or she is paid by his or her respective agency and testifies on that employer's behalf.

Respondent's arguments are nonsensical. The fact that Inspector Speeg receives his salary and

awards from the FAA does not diminish his expertise. Moreover, there is no evidence that the

law judge credited legal conclusions from Inspector Speeg. Instead, he weighed the expert's

opinion regarding the applicable regulations. In fact, the law judge limited his reliance on

Inspector Speeg's testimony, deciding not to credit testimony concerning respondent's flight

path, altitude above ground level, or bank angle because such testimony was based on the

excluded video.[307] We find that the law judge's reliance on Inspector Speeg's expert testimony

did not prejudice respondent and thus, we do not determine whether the law judge abused his

discretion in giving weight to portions of Inspector Speeg's testimony.

> C.  *The law judge did not err in refusing to dismiss the proceedings as a result of the flaws in the FAA's investigation.*

Respondent argues that the law judge should have dismissed the case as a result of the

Administrator's "sloppy" investigation and in particular, the failure to preserve the native video

from the Pena's security camera.[308] Rather than dismiss the entire case, the law judge excluded

the non-native video and did not consider any testimony relying on the excluded video.

Respondent has not demonstrated that the law judge's decision caused him prejudice given that

---

provided advance notice to respondent, identified the witness as an expert witness, and proffered
the scope of his testimony in pretrial disclosures and at hearing, respondent had the opportunity
to object to questions and cross-examine the witness).
[307] Oral Initial Decision at 717.
[308] Respondent's Appeal. Br. at 31-33.

46

the excluded evidence did not impact the law judge's ruling on the case and the non-native video was not the only evidence supporting the Administrator's complaint. Moreover, the law judge's decision to exclude certain evidence, instead of dismissing the entire case, is consistent with Board precedent. We have held that in the absence of malfeasance, dismissal of the case or an adverse inference are not appropriate to remedy missing evidence, particularly where other evidence exists.[309] The law judge rectified the lost native video by excluding certain evidence, and respondent is not entitled to an additional remedy, especially since the law judge found that the Administrator did not intentionally destroy evidence. We reject respondent's contention that the law judge erred in refusing to dismiss the case.

> D. *We reject respondent's arguments that the law judge committed numerous and other*
> *prejudicial errors.*

Respondent argues, without support, that the law judge committed a prejudicial error in amending the Administrator's complaint when issuing the Oral Initial Decision.[310] We disagree. The statute governing appeals to the Board expressly grants the law judge the authority to "amend, modify, or reverse the [Administrator's] order."[311] Thus, the law judge acted within his authority in amending the complaint.

Respondent also claims that although the law judge found "no allegation [in the Administrator's Complaint] that [r]espondent operated within 500 feet of 300 Desert Sun Lane,

---

[309]*See Administrator v. Abiraman*, NTSB Order No. EA-4978 (2002) (denying request for adverse inference because while the lost communications with air traffic control were the best evidence, they were not the only evidence, and there was no purposeful destruction of the evidence); *Administrator v. Stricklen*, NTSB Order No. EA-3814 (1993) (rejecting adverse inference for missing radar data, noting respondent took no steps to ensure its preservation); *Administrator v. Rauhofer*, NTSB Order No. EA-3268 (1991) (declining to dismiss the case or draw an adverse inference over missing computer data, which was not critical evidence, and communications with air traffic control, which would not have changed the outcome of the case).
[310] Respondent's Appeal Br. at 34.
[311] 49 U.S.C. § 44709(d).

47

which is Mr. Likes' house," the law judge considered this fact in his decision.[312] Respondent misconstrues the law judge's opinion. The law judge actually explained, "[s]ince the Amended Complaint fails to allege that [r]espondent operated within 500 feet of 300 Desert Sun Lane in violation of the regulations, my findings in this regard are made only for purposes of making a determination of [r]espondent's flight path and altitude prior to that point."[313] Respondent does not allege that he was prejudiced by the law judge's application of this finding and because the finding regarding 300 Desert Sun Lane did not impact the outcome of the case, we conclude that respondent was not prejudiced.

Finally, respondent claims that the law judge credited the Penas' testimonies, despite stating that they were biased and their testimonies embellished.[314] On the contrary, the law judge appropriately weighed the Penas' testimonies. The law judge explained that their testimonies were likely biased because of their marital relationship and likely embellished given their view of Mr. Likes and their belief that respondent retaliated against them on Mr. Likes' behalf. Nevertheless, the law judge explicitly added, "However, I do not believe they falsified their basic testimony about what they saw."[315] Once again, respondent provides no evidence that the law judge caused him prejudice and does not allege that the law judge's credibility determinations were erroneous.[316] Respondent's assertion that the law judge improperly weighed the Penas' testimonies is meritless.

---

[312] Respondent's Appeal Br. at 34 (citing Oral Initial Decision at 701).
[313] Oral Initial Decision at 702.
[314] Respondent's Appeal Br. at 34.
[315] Oral Initial Decision at 704.
[316] Even if respondent alleged that we should overturn the law judge's credibility determinations, we decline to do so. We will not overturn a law judge's credibility determination unless a party can establish the determination was arbitrary and capricious. *Porco, supra* note 289, at 20-21. The law judge based his credibility findings on the record before him and respondent provides no reason to disturb the findings.

48

*E.  We reverse the law judge's mitigation of the Administrator's sanction.*

The Administrator argues that the law judge erred in reducing respondent's sanction from a 120-day suspension to a 60-day suspension. We agree. As discussed, *supra*, the law judge assessed the Administrator's choice of sanction using the standard set forth in *Martin v. Occupational Safety and Health Review Commission* and after weighing the mitigating factors, including the Administrator's failure to preserve the native security video. However, since the law judge's decision, the United States Court of Appeals for the District of Columbia Circuit has clarified the deference we must afford the Administrator's sanction selection. The Circuit Court held that the Board should only overturn the Administrator's sanction if it is "unwarranted in law or without justification in fact."[317] Specifically, in that case, the Circuit Court determined that the Administrator had justification for its selection of the remedy, citing the applicable regulations and statute.[318]

Here, respondent has provided no convincing mitigating factors demonstrating the Administrator's choice of sanction was unjustified in fact and/or unwarranted in law. Rather, the Administrator's sanction is supported by its sanction guidance, FAA Order 2150.3C, which provides for a sanction of a 90- to a 150-day suspension for a failure to maintain a minimum altitude in an uncongested area where the severity is high, or reckless or intentional.[319] Given the absence of aggravating or mitigating factors, the Administrator selected a sanction within the midpoint of the range – a 120-day suspension.[320] The Administrator provided a reasonable

---

[317] *Pham v. Nat'l Transp. Safety Bd.*, et al., 33 F.4th 576, 583 (D.C. Cir. 2022) (citing *Amer. Power & Light Co. v. SEC*, 329 U.S. 90, 112-13 (1946)).

[318] *Pham, supra* note 317 at 583.

[319] Exh. A-23 at 3-4.

[320] Tr. 600; Administrator's Appeal Br. at 14. It is not clear why the law judge referred to the sanction guidance's penalty range for a careless operation, rather than a reckless or intentional operation, under which the FAA determined respondent's conduct fell. Oral Initial Decision at

A560

49

explanation for determining that respondent's conduct fell within the high severity category, citing respondent's testimony regarding his flight experience, the level of risk posed, and his prior warnings from the FAA regarding his conduct.[321]

Further, there are no mitigating circumstances warranting a reduction in the penalty. The law judge considered the Administrator's failure to preserve evidence as mitigating, but as previously discussed, the law judge remedied that error by excluding certain evidence and testimony. Thus, the missing native security video is not a mitigating factor requiring a reduction in the sanction and more importantly, such a factor does not render the Administrator's penalty choice unjustified in fact or unwarranted in law. We reverse the law judge's reduction of the sanction and affirm the Administrator's 120-day suspension of respondent's certificate.

**ACCORDINGLY, IT IS ORDERED THAT:**

1. Respondent's appeal is denied;

2. The Administrator's appeal is granted;

3. The law judge's reduction in the sanction is reversed; and

4. The Administrator's 120-day suspension of respondent's Private Pilot Certificate is affirmed.

---

741. The law judge stated that the penalty range for a careless operation was a suspension between 60 and 120 days and explained that a sanction at the lower end of that range was appropriate in this case. However, the law judge did not explicitly invalidate the Administrator's conclusion that respondent's operation was reckless or intentional. We find that the Administrator's finding that the conduct was reckless or intentional and that a sanction in the middle of the range for such conduct – a 90 to 150 day suspension – was justified in fact and warranted in law.
[321] Tr. 601-03.

A561

50

HOMENDY, Chair, LANDSBERG, Vice Chairman, GRAHAM and CHAPMAN, Members

of the Board, concurred in the above opinion and order.