**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-1239**

<hr>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————

TRENTON J. PALMER,

Petitioner,

v.

MICHAEL G. WHITAKER, Administrator,
FEDERAL AVIATION ADMINISTRATION,

and

NATIONAL TRANSPORTATION SAFETY BOARD,

Respondents.

—————————————

On Petition for Review of an Order of the
National Transportation Safety Board

—————————————

BRIEF FOR THE RESPONDENTS

—————————————

JOY K. PARK
*Senior Attorney*
*Aviation Litigation Division*
*Federal Aviation Administration*
*800 Independence Avenue SW*
*Washington, DC 20591*
*(202) 267-7617*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing in this court are listed in the Brief for Petitioner. The Aircraft Owners and Pilots Association, the Experimental Aircraft Association, and the Alaska Airmen's Association are participating as amici in support of Petitioner.

### B.    Rulings Under Review

Palmer seeks review of NTSB Order No. EA-5947, served on March 30, 2023, and NTSB Order No. EA-5956, served on July 12, 2023, in *Administrator v. Palmer*, which affirmed the Administrator's

order suspending Palmer's pilot certificate.[1] These orders are reprinted in the Joint Appendix at A511-562.[2]

### C.    **Related Cases**

This case has not previously been before this Court or any other court. Counsel for the FAA is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Joy K. Park*
JOY K. PARK

---

[1] The National Transportation Safety Board performed a quasi-judicial function in this case by adjudicating Palmer's appeal from the FAA's order of suspension. The FAA is the real party in interest because it is the enforcement of the FAA's order that Palmer challenges. The NTSB ordinarily does not enter an appearance during judicial review of its decisions, 49 C.F.R. § 821.64(a), and it did not participate in the preparation of this brief. This brief is submitted on behalf of the FAA, who "shall be made a party to the judicial review proceedings" under 49 U.S.C. § 44709(f).

[2] The notation "A" refers to the Joint Appendix filed by Palmer pursuant to D.C. Cir. R. 30. Palmer refers to the Joint Appendix as "A," so the FAA does the same for consistency.

# TABLE OF CONTENTS

**Page**

GLOSSARY ................................................................................x

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION ...............................................1

STATEMENT OF THE ISSUES ....................................................2

PERTINENT STATUTES AND REGULATIONS ...........................2

STATEMENT OF THE CASE .......................................................2

I.     Nature of the Case ...........................................................2

II.    The Evidence ...................................................................3

       A.    Palmer's November 24, 2019 Flight .......................3

       B.    FAA Investigation .................................................6

       C.    Hearing Before the Administrative Law Judge ......7

III.   ALJ's Oral Initial Decision ............................................13

IV.    NTSB's Decision ............................................................18

SUMMARY OF THE ARGUMENT ...............................................24

STANDARD OF REVIEW ...........................................................28

ARGUMENT ..............................................................................30

I.     The NTSB's Determination that Palmer's Landing Site Was
       Not Suitable Is Supported By Substantial Evidence ..................30

       A.    Section 91.119's Requirements ...............................31

       B.    Palmer Violated 14 C.F.R. § 91.119 .......................34

C.     The NTSB's Finding that Palmer Failed to Prove His Affirmative Defense is Supported by Substantial Evidence. ................................................... 34

    1.    Palmer Misinterprets the NTSB and ALJ's Decision Regarding "Necessary" .......................................... 37

    2.    The NTSB Correctly Rejected Palmer's Challenges to Inspector Speeg's Testimony ................................. 38

II.    The NTSB's Rulings as to Palmer's Remaining Legal Arguments Are in Accordance with Law and Not Arbitrary or Capricious ................................................................. 42

A.    The FAA's Complaint Meets the Low Threshold for Notice Pleading, and the NTSB Properly Affirmed the Denial of Palmer's Motion to Dismiss ......................................... 43

    1.    The FAA's Complaint Satisfied Notice Pleading Principles ............................................................... 43

    2.    Palmer Understood What Was Being Alleged and Asserted an Affirmative Defense ......................... 47

B.    The NTSB Correctly Affirmed the ALJ's Denial of Palmer's Request for Dismissal Upon the Unavailable Native Video ........ 50

C.    The NTSB Properly Applied *Pham* and Deferred to the FAA's Choice of Sanction ............................................. 52

III.   The Court Should Disregard Amici's Attempt to Raise New Issues on Appeal .................................................................. 54

CONCLUSION ............................................................................. 57

CERTIFICATE OF COMPLIANCE ...................................................... 58

CERTIFICATE OF SERVICE .............................................................. 59

iv

## TABLE OF AUTHORITIES

**Cases**

*Adm'r v. Abiraman*,
   NTSB Order No. EA-4978, 2002 WL 1301399 (2002)..........................51

*Adm'r v. Bates*, 3 NTSB 2871 (1980) ......................................................44

*Adm'r v. Chemello*,
   Docket No. SE 18472, 2009 WL 2172521 (June 10, 2009) .................48

*Adm'r v. Chemello*,
   NTSB Order No EA-5503, 2010 WL 333632 (2010)............................48

*Adm'r v. Cobb & O'Connor*, 572 F.2d 202 (9th Cir. 1977) .....................32

*Adm'r v. Cobb & O'Connor*, 3 NTSB 98 (1977) .......................................32

*Adm'r v. Darby*,
   NTSB Order No. EA-5521, 2010 WL 2393714 (2010).........................43

*Adm'r v. Decruz*,
   NTSB Order No. EA-5827, 2017 WL 4404282 (2017).........................41

*Adm'r v. Essery*, 5 NTSB 609 (1985)........................................................48

*Adm'r v. Kittelson*,
   NTSB Order No. EA-4068, 1994 WL 43359 (1994)............................32

*Adm'r v. Prior*, NTSB Order No. EA-4416, 1996 WL 900906 (1996) .....32

*Adm'r v. Rauhofer*,
   NTSB Order No. EA-3268, 1991 WL 320183 (1991)...........................51

*Adm'r v. Ringer*, 3 NTSB 3946, 3949, (1981) .........................................45

*Adm'r v. Roberts*,
   NTSB Order No. EA-5556, 2010 WL 4253063 (2010).........................43

*Adm'r v. Siegel,*
  NTSB Order No. EA-5838, 2018 WL 2733938 (2018)..........................43

*Adm'r v. Siwarski,*
  NTSB Order No. EA-5729, 2014 WL 6085329 (2014).........................41

*Adm'r v. Stricklen,*
  NTSB Order No. EA-3814, 1993 WL 76816 (1993)............................51

*Adm'r v. Van De Hoef*, 5 NTSB 1050 (1986)....................................32, 33

*Adm'r v. Walker,* 3 NTSB 3478 (1981).................................................33

*Adm'r v. Willauer,*
  NTSB Order No. EA-3944, 1993 WL 295067 (1993)...........................33

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946).........................29, 52

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................47, 55

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................44

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ..............................................................................29

*Chritton v. NTSB*, 888 F.2d 854 (D.C. Cir. 1989) ..................................29

*Conley v. Gibson*, 355 U.S. 41 (1957) .....................................................44

*Decruz v. Elwell*, 751 F. App'x 1 (D.C. Cir. 2018) .................................41

*Dickson v. NTSB*, 639 F.3d 539 (D.C. Cir. 2011) ...................................29

*Eldred v. Ashcroft*, 255 F.3d 849 (D.C. Cir. 2001)..................................54

*Essery v. Dep't of Transp.*, 857 F.2d 1286 (9th Cir. 1988) ...............32, 48

*Fed. Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37 (1948)..................49

*Huerta v. Ducote*, 792 F.3d 144, 153 (D.C. Cir. 2015)............................28

vi

*Howard v. FAA*, 17 F.3d 1213 (9th Cir. 1994)........................................56

*In re Wick*, NTSB Order No. EA-5038,
    2003 WL 21107129 (2003)..................................................12, 31, 47-49

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) ............................53

*Martin v. Occupational Safety & Health Review Comm'n*,
    499 U.S. 144 (1991) ......................................................................53, 54

*McBride v. Merrell Dow and Pharm.*,
    800 F.2d 1208 (D.C. Cir. 1986) ...........................................................22

*Michel v. Anderson*, 14 F. 3d 623 (D.C. Cir. 1994)................................54

*Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*,
    158 F.3d 1335 (D.C. Cir. 1998) ...........................................................54

*Pham v. NTSB*,
    33 F.4th 576 (D.C. Cir. 2022)............................22, 27, 29, 30, 42, 52-54

*Singleton v. Wulff*, 428 U.S. 106 (1976)...........................................40, 55

*Town of Barnstable, Mass. v. FAA*, 629 F.3d 28 (D.C. Cir. 2011) ..........31

*United States v. First City Nat. Bank of Houston*,
    386 U.S. 361 (1967) ..............................................................................49

*United States v. Regenerative Sci., LLC*,
    741 F.3d 1314 (D.C. Cir. 2014) ............................................................49

*Western Air Line, Inc. v. C.A.B.*, 495 F.2d 145, 152 (D.C. Cir. 1974).....29

*Whitehouse Hotel Ltd. Partnership v. C.I.R.*, 615 F.3d 321
    (5th Cir. 2010)........................................................................................41

*Window Specialists, Inc. v. Forney Enters., Inc.*,
    47 F. Supp. 3d 53 (D.D.C. 2014) ..........................................................41

## Statutes

5 U.S.C. § 706(2)(A) ........................................................... 28

49 U.S.C. § 1133(1) ............................................................. 1

49 U.S.C. § 1153(a) ............................................................ 2

49 U.S.C. § 1153(b)(3) ........................................................ 29

49 U.S.C. § 44709 .......................................................... 53, 54

49 U.S.C. § 44709(b) ........................................................... 1

49 U.S.C. § 44709(d) .................................................. 1, 53, 54

49 U.S.C. § 44709(f) ..................................................... ii, 2, 29

49 U.S.C. § 46110(a) ........................................................... 2

Pub. L. 112-153, § 2(a) .................................................. 28, 56

## Regulations

14 C.F.R. § 91.13(a) ........................................ 3, 7, 13, 23, 44, 46

14 C.F.R. § 91.119
........................... 3, 8, 12, 16, 18-20, 25, 26, 31, 33, 34, 37, 43, 47, 49, 50

14 C.F.R. § 91.119(a) ............ 3, 7, 11, 13, 15, 16, 23, 24, 30, 31, 34, 44, 46

14 C.F.R. § 91.119(c) ....................... 3, 7, 13, 24, 25, 30, 31, 34, 44, 46, 47

49 C.F.R. § 821.64(a) ........................................................ ii

## Other Authorities

Black's Law Dictionary 1271 (9th ed. 2009) ........................... 43

FAA Order 2150.3C ..................................................... 22, 52

Fed. R. Civ. Proc. 8(a)(2) ................................................... 44, 55

Fed. R. Civ. Proc. 26(a)(2)(B) .................................................. 41

Fed. R. Civ. Proc. 26(a)(2)(C) .................................................. 41

Fed. R. Evid. 702 .................................................................. 55

Fed. R. Evid. 703 .................................................................. 55

Fed. R. Evid. 1002 ................................................................ 12

## GLOSSARY

| | |
|---|---|
| A | Joint Appendix |
| ALJ | Administrative Law Judge |
| FAA | Federal Aviation Administration |
| NTSB | National Transportation Safety Board |

## INTRODUCTION

On November 24, 2019, Petitioner Trenton Palmer (Palmer), an experienced pilot with over 900 hours of flight time, operated a low flight at an altitude of less than 100 feet above ground level and within 500 feet of a mother and her child, a home, a stable, a shed, and a 500-gallon propane tank. In conducting this low flight, Palmer violated FAA regulations, "exercised poor judgment, and exhibited a disregard for his own safety, and the safety of others, and property on the surface." A132.

## STATEMENT OF JURISDICTION

Pursuant to statutory authority in 49 U.S.C. § 44709(b), the Administrator of the Federal Aviation Administration (FAA) issued an order suspending Palmer's pilot certificate for violation of FAA safety regulations. The National Transportation Safety Board (NTSB or Board) had authority to hear Palmer's appeal of the FAA's order under 49 U.S.C. §§ 1133(1), 44709(d).

On March 30, 2023, the NTSB issued a final order affirming the FAA's order of suspension, *Administrator v. Palmer*, NTSB Order No. EA-5947, A513-62, and on July 12, 2023, issued an order denying Palmer's Petition for Reconsideration, NTSB Order No. EA-5956. A511-

12. This Court has jurisdiction to review a final order of the NTSB when a petition for review is filed within 60 days. 49 U.S.C. §§ 1153(a), 44709(f), 46110(a). Palmer timely filed a petition for review in this Court on September 8, 2023.

## STATEMENT OF THE ISSUES

1. Whether the NTSB's determination that Palmer's landing site was unsuitable is supported by substantial evidence.

2. Whether the NTSB's decisions rejecting Palmer's other periphery legal arguments are in accordance with law and not arbitrary or capricious.

3. Whether this Court should dismiss amici's attempt to raise a new argument not made by Palmer in this appeal.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    Nature of the Case

This matter is before the Court on petition for review of the NTSB's affirmance of the FAA's September 20, 2021 amended order suspending Palmer's pilot certificate for 120 days for violating FAA

2

regulations. A15-17. The FAA's order charged Palmer with 1) operating a low altitude flight that did not allow for an emergency landing without undue hazard to persons or property in the event of a power unit failure in violation of 14 C.F.R. § 91.119(a) and 2) operating a low flight below 500 feet and within 500 feet of people, vessels, vehicles, or structures in violation of 14 C.F.R. § 91.119(c). The FAA's order also alleged that residual to these violations, Palmer operated his plane in a careless or reckless manner so as to endanger the life or property of another in violation of 14 C.F.R. § 91.13(a). Palmer admitted below, and does not challenge on appeal, the essential elements underlying these violations but instead claims that his low flight was "necessary for takeoff and landing" and thus falls within the exception provided in the prefatory language of § 91.119.

## II.    The Evidence

### A. Palmer's November 24, 2019 Flight

Palmer is an experienced private pilot and is the owner of N318JJ, a 1997 Johnson John T KITFOX V aircraft. A15, 19, 429-30; *see* 124, 523 (noting that Palmer has approximately 900 flying hours and has made hundreds of off-airport takeoffs and landings). On November 24,

3

2019, Palmer decided to fly his plane in a sparsely populated area near Desert Sun Lane in Reno, Nevada. A100-01, 450-51. On that day, around noon, Gabriel Pena, who lives at 400 Desert Sun Lane, was outside talking with his neighbor Russell Stanley. A346-47. Mr. Pena's wife, Julia, pulled up in their driveway, dropped off their daughter with Mr. Pena and continued up the driveway with their son. A350. Suddenly, Mr. Pena heard "incredible engine noise." A351. Mr. Pena looked in the direction of the noise but was not able to see any plane or vehicle. However, Mr. Pena "thought there was something that was crash landing possibly into [his] house or in the immediate area," A356, so he began yelling at his wife, who was now standing outside of her vehicle, to run. A352-53.

A plane was flying so low to the ground that Mr. Pena initially was not able to see it over the line of his house. A352. When the plane came into view, it was approximately five to ten feet above the ridge peak of Mr. Pena's roof. A355. Mr. Pena believed that it was coming towards his house, but then the aircraft did a "hard left bank maneuver," then dipped down, and then rose above the house of another neighbor, Mr. Jared Likes. A374. Mr. Pena estimated that the aircraft

flew approximately 30 feet above his 500-gallon propane tank and approximately 300 feet from where he was standing. A354-55, 375. Mr. Pena is a former heavy machine gunner for the Army and had training as a grenade launcher. A346-47. Much of his training involved estimating field ranges to ensure that the grenade was on target and his estimates were based upon his military training. A347, 356.

Julia Pena was standing outside near the house with her one-year-old son when the low flight occurred. A384-85. Mrs. Pena also "heard the sound of a very loud engine" and saw her husband waving his arms at her and yelling something, but she was unable to hear him over the engine noise. A385. The aircraft came into view when it passed her home's garage peak. She "couldn't believe how close it was to the house and how close it was to the ground." A385. She estimated the aircraft to be about 50 feet above the ground, A387, and "was ready to watch it impact into [the neighbor's, Mr. Likes'] house because [she] thought there was no reason that this plane was so low unless it was having an emergency." A385-86. She then saw the aircraft banking and was able to see the markings underneath the plane's wing. A389-90. Mrs. Pena stated that "it was a frightening scenario." A386. The Penas

5

had an outdoor security camera, which captured Palmer's low flight. A159.

Russell Stanley, the Penas' neighbor, was talking outside with Mr. Pena and witnessed the low flight. A160. Mr. Stanley's child was also playing nearby. A350. Based upon Mr. Stanley's work with 80-feet-tall poles, he estimated the plane to be flying at about 80 feet above the ground. A391-92. He saw the plane "buzz right by the house," A393, and it "might have come close to hitting the roof of [Mr. Likes'] house if [Palmer] had been any lower." A394.

### B.    FAA Investigation

Aviation Safety Inspector Ronald Green and another FAA inspector, who retired prior to the hearing, conducted an investigation of Palmer's low flight. A400. Inspector Green went to the Penas' house two to three times, interviewed witnesses, and took measurements of the property. A400, 411, 490-98. Using these measurements, Inspector Green was able to estimate Palmer's flight path and show that Palmer operated within 500 feet of Mr. Stanley, the Penas and their children, and the Penas' home, propane tank, shed, and stable. A407-09. Palmer does not dispute that he operated his plane at an altitude of less than

6

100 feet above ground level and within 500 feet of vessels, vehicles, or structures. A15, 19, 152-53, 451.

## C.    Hearing Before the Administrative Law Judge

Following the investigation, the FAA issued an order suspending Palmer's pilot certificate because his low flight violated 14 C.F.R. § 91.119(a) and (c).[3] A15-17. The FAA's order also found that residual to these violations, Palmer operated his plane in a careless or reckless manner so as to endanger the life or property of another in violation of 14 C.F.R. § 91.13(a). A16. Palmer appealed the FAA's order and, after discovery and pretrial litigation, the matter came before the Administrative Law Judge (ALJ) for a full evidentiary hearing from March 29, 2022, to April 4, 2022. At the hearing, Mr. and Mrs. Pena, Mr. Stanley, Inspector Green, Inspector Speeg, Mr. Likes, and Palmer testified.

At the outset of the hearing, Palmer's counsel conceded "that the aircraft was operated less than 500 feet to vessels, vehicles, or

---

[3] In these enforcement cases, the FAA's order serves as the complaint before the NTSB. *See* A8, 14. The FAA issued the original order on October 8, 2020. A9-11. The only change in the FAA's amended order/complaint was a reduction in the suspension from 210 days to 120 days.

7

structures." A152-53; *see* A345 (stating that Palmer "has never denied that he flew the aircraft in question on the day in question and that he operated it below 500 feet"). Palmer also admitted that he operated at altitudes less than 100 feet above ground level. A451. Notwithstanding, Palmer argued that his low flight was "necessary for landing," and thus fell within § 91.119's exception. A345. Palmer argued that he flew at this low altitude in accordance with the FAA's Off Airport Ops Guide and that he was making what he testified was "a low inspection pass to assess the surface condition as well as basically getting a feel for the feasibility of [a] landing site," a dirt runway in the backyard of Mr. Jared Likes. A395-96.[4] Mr. Likes, who is friends with Palmer, made a

---

[4] The FAA's Off Airport Ops Guide, A499-510, is a non-regulatory guidance document that provides suggested "techniques and procedures to improve the safety of off-airport operations." A501. The Guide advises pilots to "[a]lways file a flight plan detailing the specific locations you intend to explore" and to "[m]ake at least 3 recon[naissance] passes at different levels before attempting a landing." A501. The three recon passes that pilots should conduct before attempting an off-airport landing are: a high level pass, an intermediate level pass, and a low level pass. A 501. For the high level pass, the Guide advises pilots to "[c]ircle the area from different directions to determine the best possible landing site in the vicinity," to "[c]heck the wind direction and speed," and to "[o]bserve the landing approach and departure zone for obstructions such as trees or high terrain." A501. For the intermediate level pass, the Guide advises pilots to "[m]ake a pass in both directions along either side of the runway to check for obstructions and runway

dirt runway in the backyard of his home at 300 Desert Sun Lane. A415. Mr. Likes testified that the runway was a "cleared dirt runway," approximately 400- to 500-feet long and 25- to 30-feet wide. A415, 418. Mr. Likes used the runway for remote-controlled electronic foam airplanes (*i.e.*, airplanes without any persons on board controlled by a handheld device). A244, 416.

Palmer testified that on the day in question, he was out flying because a hunting club asked for his help in locating a missing horse. A431. On his way back to Reno, Palmer conducted what he called a "low inspection pass," the low flight at issue in this case. A431. Palmer did not recall when he decided to conduct the low flight. A434. While Palmer testified that he was operating pursuant to the FAA's Off Airport Ops Guide, he was vague about whether and when he had conducted additional reconnaissance passes in accordance with the Guide. A395-96. Palmer stated that "there was a higher up reconnaissance pass," but then said that he "believe[s] it was that day,"

---

length." A501. During the low level pass, pilots should "[m]ake a pass to check for cuts in gravel, rocks, dips, bumps, etc., that can't be seen from directly above." A501. Ultimately, "[e]ach pass should result in [a pilot] becoming more comfortable with [their] chosen landing area." A502-03.

and that he was "sure that [he] looked down on it when [he] was flying north." A396. Palmer also testified that he previously went to the Likes' home and had physically seen the runway, A396, but he could not remember when and stated that "[i]t was not immediately before this overflight. It was some time before then." A436. Palmer's counsel stated that on the day in question, Palmer "made exactly one pass and one pass only." A345; *see* A396.

Palmer ultimately did not land on the runway because he "found the landing site was not suitable." A396. According to Palmer, "the intended touchdown spot that [he] had identified from the bounds was much harder to start on [his] final approach." A397. When questioned by the ALJ, Palmer admitted that he could have utilized an alternate flight path for his low pass – approaching the runway from the opposite direction – which would have allowed him to inspect the runway out of his left-side window while his plane was over an open area, and not in between the runway and the homes on Desert Sun Lane; in other words, he could have conducted a low inspection pass without being within 500 feet of the Penas or their home. A437-38.

Roy Speeg, an inspector and specialist with the FAA, testified at the hearing and was qualified as an expert in general aviation, flight operations, general area of low flight operations, and regulatory requirements under the FAA. A420.[5] With regard to 14 C.F.R. § 91.119(a), Speeg testified that based on his lateral and vertical estimations of Palmer's flight path, in the event of a power failure, the only place Palmer could have landed was on the roads of the subdivision, near people and their homes. A423. In addition, Speeg testified that the lower the aircraft is to the ground, the lower the margin of error is if something were to go wrong. A419. Because Palmer's altitude was approximately 30 to 50 feet as he approached, if the power unit failed, "the margin for error is very slight." A261, 422. Speeg concluded that Palmer would have had to react immediately. A422.

The Penas' outdoor security camera captured Palmer's low flight. A159. At the hearing, the FAA attempted to enter this video into evidence. A356. However, the video that the FAA had in its

---

[5] Speeg was not qualified as an expert for short field takeoff or landing with regard to the Kitfox 5, Palmer's plane. A420.

11

investigative record and attempted to enter into evidence is a video that Mr. Pena recorded and was not the "native" original video. A360. Mr. Pena used his iPhone to record a video of the original video, but in slow motion (a video of the video). A360. Ultimately, upon objection by Palmer, the ALJ excluded the video under Federal Rule of Evidence 1002, the best evidence rule, as the video was a copy of the original video, the FAA did not lay an adequate foundation for the authenticity of the video, and either failed to obtain original copies of the native video or misplaced them. A361.

At the start of the hearing, Palmer also orally moved to dismiss the FAA's amended complaint. *See* A41. Palmer argued that the complaint failed to give fair notice of the charges and failed to allege facts regarding whether the low flight was "necessary for takeoff or landing" (the prefatory language of 49 C.F.R. § 91.119). *See* A344. The ALJ requested briefing, and after consideration of the briefs, denied the motion. A41, 344, 442. Relying upon *In re Wick*, NTSB Order No. EA-5038, 2003 WL 21107129 (2003), the ALJ held that it is Palmer's burden to prove that his low flight fell within the exception in the prefatory language of § 91.119 and that the amended complaint was

12

sufficient to establish a prima facie case that Palmer violated 49 C.F.R.

§ 91.119(a) and (c). A439, 442.

### III. ALJ's Oral Initial Decision

On April 6, 2022, the ALJ provided his Oral Initial Decision and

found that the Administrator proved that Palmer violated 14 C.F.R.

§§ 91.119(a), (c), and 91.13(a), A136-38. After providing a summary of

the evidence and testimony presented at the hearing, *see* A44-99, the

ALJ highlighted the undisputed facts: that the area in question is a

sparsely populated area, A100-01, that Palmer flew his plane in the

vicinity of Desert Sun Lane on November 24, 2019, A100, and that

Palmer operated less than 100 feet above ground level. A101-02.

The ALJ stated that while the Penas' testimony was likely

"biased" given their marital relationship and the indication that the

Penas had some problems with the Likes, the ALJ did "not believe they

falsified their basic testimony about what they saw." A107. In addition,

the ALJ found "Mr. Stanley's testimony credible." A108. Relying on this

credible testimony, the measurements from the FAA investigators, and

Palmer's admissions, the ALJ found that Palmer operated his plane less

than 100 feet above ground level and within 500 feet of the Penas'

home, stable, shed, and propane tank. A109-11. In addition, the ALJ found that the evidence showed that Palmer operated closer than 500 feet to Mrs. Pena and her son.[6] A111-12.

Regarding the missing native video from the Penas' outdoor camera, the ALJ rejected Palmer's demand, made during closing argument, that the case be dismissed as a remedy for the unavailability of the original video. A120. While "the FAA was negligent and careless," the ALJ found that there was no evidence of "maliciousness or ill intent to deprive a party of useful information." A119-20. The ALJ "precluded the video and any testimony concerning the video's content," and excluded "any testimony that relied in whole or in part upon their viewing of the video," specifically "portions of Inspector Green's and Specialist Speeg's opinions, comments, and conclusions [that] cannot be separated from viewing the video." A120. Thus, the ALJ did not rely upon and did not "further discuss Inspector Green's or Specialist Speeg's comments, opinions, and conclusions related to [Palmer's] flight path, altitude above ground level, or bank angle." A120.

---

[6] The ALJ found that the FAA did not prove that Palmer operated within 500 feet of Mr. Pena, Mr. Stanley, and two other children. A114.

14

Turning then to the alleged violation of 14 C.F.R. § 91.119(a), the ALJ reiterated that Palmer admitted to being 100 feet or less above ground level during his low pass and noted that Mr. Stanley's testimony corroborated this. A115 (finding also that Mr. Stanley's testimony was credible). Since Speeg was qualified as an expert in general aviation flight operations, including low flight, and since these opinions were not based upon the excluded video evidence, the ALJ gave some weight to Speeg's testimony as to whether Palmer was operating at an altitude that if a power unit failed, he would not have been able to conduct an emergency landing without undue hazard to persons or property. A121. Speeg explained that "if there was a problem, there was a low margin for error as you operate lower to the ground." A122. Speeg also testified that Palmer could have utilized a different path to avoid structures or people, and the ALJ found this testimony credible. A122-23. The ALJ noted that Palmer's excuse for not using an alternate path was that it would have been more difficult, but the ALJ did "not find this credible nor believable." A123-24. Ultimately, the ALJ found that Palmer's flight path and operation at an altitude of 100 feet or less violated 14 C.F.R.

15

§ 91.119(a) because it did not allow for an emergency landing without undue hazard to persons or property in the event of a power unit failure. A124-25.

Turning to Palmer's affirmative defense, that his flight fell within the exception in the prefatory language of § 91.119 because it was necessary for takeoff or landing, the ALJ found that Palmer failed to prove his affirmative defense by a preponderance of the evidence. A125-35. The ALJ found that "it is very clear that there was no necessity for [Palmer] to conduct a low pass, whether or not he decided to land on the RC runway . . . . Instead, he deliberately and intentionally chose this location because he thought he could land and takeoff based on a conversation with his friends, the Likes." A131. Thus, "under the circumstances presented here," the ALJ found that "there was no emergency and [Palmer] had more appropriate and safer alternatives for his low level pass, alternatives that were clearly not near any residences, structures, or people to the east and over an open area." A132. Palmer also "had the option to refrain from conducting a low pass to evaluate the landing location, which was located in the backyard of a residence in a sparsely populated area." A132. The ALJ concluded that,

16

"[Palmer] exercised poor judgment, and exhibited a disregard for his own safety, and the safety of others, and property on the surface." A132.

Regarding the suitability of the runway, the ALJ found that the RC runway "was inappropriate for a landing." A133. The ALJ noted that the runway was used for "RC foam electric aircraft, aircraft that contain no pilot, contain no passengers . . .and operate on electricity and are made from foam." A134. In addition, the ALJ found that "[a]ny reasonable ground assessment, or a navigation map, or even a Google Earth view would have alerted [Palmer] to nearby residences and structures on Desert Sun Lane." A133. Therefore, the ALJ determined that the runway was "unsuitable for landing under normal conditions or absent an emergency in [Palmer's] aircraft." A134. The ALJ also held that Palmer's argument that he was operating within FAA's Off-Airport Operations Guide did not excuse his violation of FAA regulations. A142. Notwithstanding, the ALJ mitigated Palmer's suspension from 120 days to 60 days. A144.

17

## IV.  NTSB's Decision

Palmer appealed the ALJ's decision to the full NTSB.[7] On appeal,

Palmer asked the NTSB to reverse the ALJ's decision based on a host of

asserted errors:

> 1) not dismissing the Administrator's Amended Order of
> Suspension for failure to state a claim upon which relief can
> be granted; 2) misinterpreting and misapplying 14 C.F.R. §
> 91.119 because a low inspection is "necessary" in conjunction
> with an off-airport landing; 3) finding respondent's intended
> landing site was inappropriate or not suitable; 4) not
> dismissing the proceedings in light of the FAA's sloppy
> investigation; and 5) committing numerous and other
> prejudicial errors, including amending the Administrator's
> complaint, relying on an unpled allegation in his decision,
> and relying on discredited testimony.

A550. The NTSB denied Palmer's appeal. A561.

The NTSB affirmed the ALJ's denial of Palmer's oral motion to

dismiss based on notice pleading principles. The NTSB referenced its

longstanding precedent that "'notice pleading' principles require the

Administrator to 'give only a short and plain statement of the claim

showing that the pleader is entitled to relief, and not a complete

detailing of all the facts.'" A551 (citations omitted). The NTSB found

that the Administrator's amended complaint was "sufficient to place

---

[7] The FAA also cross-appealed the ALJ's reduction of the
suspension from 120 to 60 days.

[Palmer] on notice about the charges, itemizing the specific flight, altitudes, and distances at issue, and citing the specific regulations that [Palmer] violated." A552. In addition, the NTSB found that Palmer had "sufficient information to prepare a defense and an exchange of additional detail was more appropriate during the discovery and hearing phases." A552. Finally, the NTSB held that Palmer did not demonstrate how he was prejudiced by the "supposed lack of specificity." A552.

With regard to the prefatory language of § 91.119 the NTSB found that the amended complaint clearly stated the regulatory violations and that Palmer "was on notice that the prefatory language was at issue given that both before and during the hearing, he asserted as an affirmative defense that his low altitude flight was necessary for landing." A552-53. In addition, the NTSB held that Palmer had the burden of establishing his affirmative defense that his flight was necessary for takeoff or landing as set out in the prefatory language of § 91.119. A553.

Second, the NTSB rejected Palmer's claim that the ALJ had misinterpreted 14 C.F.R. § 91.119 and erred in finding that Palmer's

intended landing site was inappropriate. A553. The NTSB noted that contrary to Palmer's assertion, the ALJ did not find that a low inspection pass could never be necessary for an off-airport landing; rather, the ALJ determined that Palmer did not meet his burden to show that his low flight was necessary for landing. A553.

In addition, the NTSB upheld the ALJ's finding that Palmer's intended landing site was inappropriate. A554. The NTSB found that Palmer did not show how he was prejudiced by the ALJ's evaluation of the suitability of the landing site, and thus the Board did not reach the question of whether the ALJ abused his discretion. A554-56. Moreover, the Board noted that under their case law, the NTSB has "long examined the suitability of the intended landing site when assessing whether the operation at issue fell under the prefatory clause of § 91.119." A555. Therefore, the NTSB found that the ALJ appropriately considered the landing site's suitability. A555.

Third, the NTSB held that it had no reason to overturn the ALJ's finding that the intended landing site was unsuitable. A556. The NTSB found that the ALJ made this "determination based on the credible testimony of the witnesses and the evidence before him" to which the

20

NTSB deferred. A556. The NTSB also noted that Palmer offered "no support for his claim that the site was suitable," A556, concluding that "[g]iven the lack of evidence backing [Palmer's] claim that the landing site was suitable, there is no basis to refute the law judge's conclusion." A556.

In response to Palmer's argument that the ALJ erroneously relied upon Speeg's testimony, the NTSB found that, contrary to Palmer's claim, the ALJ did not rely on Speeg's testimony in determining that the landing site was unsuitable, A556, and that "there is no evidence that the law judge credited legal conclusions from Inspector Speeg." A557.

Fourth, the NTSB found that the ALJ did not err in refusing to dismiss the proceedings as demanded by Palmer due to the unavailable native video from the Penas' outdoor camera. A558. The NTSB found that the ALJ's "decision to exclude certain evidence, instead of dismissing the entire case, is consistent with Board precedent," and thus the ALJ properly "rectified the lost native video by excluding certain evidence, and [Palmer] is not entitled to an additional remedy,

especially since the law judge found that the Administrator did not intentionally destroy evidence." A558.[8]

Finally, with regard to the sanction determination, the NTSB reversed the ALJ's mitigation of the suspension. A560. The NTSB discussed this Court's decision in *Pham v. NTSB*, 33 F.4th 576 (D.C. Cir. 2022) and recognized that "the Board should only overturn the Administrator's sanction if it is 'unwarranted in law or without justification in fact.'" A560 (citing *Pham*, 33 F.4th at 583). The NTSB found that the Administrator's sanction was "supported by its sanction guidance, FAA Order 2150.3C, which provides for a sanction of a 90- to a 150-day suspension for a failure to maintain a minimum altitude in an uncongested area where the severity is high, or reckless or intentional." A 560. The NTSB determined that the Administrator appropriately selected a 120-day suspension, a sanction within the

---

[8] Palmer also raised a fifth argument alleging that the ALJ committed various other errors by amending the complaint, relying on an unpled allegation, and relying on discredited testimony. The NTSB rejected all of Palmer's allegations. A558-59. Palmer does not appeal this portion of the NTSB's order and thus has waived these arguments. *See McBride v. Merrell Dow and Pharm.,* 800 F.2d 1208, 1210-11 (D.C. Cir. 1986) (holding that this Court "generally will not entertain arguments omitted from an appellant's opening brief").

22

midpoint of the range, and the "Administrator provided a reasonable explanation for determining that [Palmer's] conduct fell within the high severity category, citing [Palmer's] testimony regarding his flight experience, the level of risk posed, and his prior warnings from the FAA regarding his conduct."[9] A560-61. Thus, the NTSB reversed the ALJ's reduction of the sanction and affirmed the Administrator's 120-day suspension of Palmer's pilot certificate. A561.

Palmer petitioned the Board to reconsider two issues: 1) the NTSB's affirmation of the ALJ's finding that the landing site was inappropriate and 2) the ALJ's conclusion that Palmer had an alternative path that would have placed Palmer more than 500 feet away from persons or structures. *See* A5. The Board denied Palmer's

---

[9] In the hearing, the FAA argued that the 120-day suspension should not be mitigated, in part, because of Palmer's record of poor compliance disposition. A443. The FAA noted that in 2017, Palmer had undergone compliance action and counseling by the FAA when he posted a video showing him dropping a drone out of his aircraft, which is contrary to FAA regulations. A483-84. During that counseling, the FAA talked to Palmer about 14 C.F.R. § 91.13 and careless or reckless operations. In addition, in 2018, the FAA issued a warning letter to Palmer for a low flight over Lake Tahoe, where Palmer "performed a waterskiing activity on Lake Tahoe with a passenger onboard the aircraft." A488. The FAA met with Palmer and reviewed 14 C.F.R. §§ 91.119(a) and 91.13(a) – the precise regulations at issue in this case. A488.

23

petition. A511-12. On August 23, 2023, the NTSB granted Palmer's request for a stay of the FAA's order of suspension and noted that the stay will continue until a court of appeals rules on the petition. *See* A6.

## SUMMARY OF THE ARGUMENT

On November 24, 2019, Palmer conducted a low flight at an altitude of less than 100 feet above ground level and within 500 feet of a mother and her child, a home, a stable, a shed, and a 500-gallon propane tank. The plane was so low that witnesses thought that the plane was going to crash into a home. In addition, the low flight frightened one of the neighbors. Not only did Palmer's low flight violate the minimum safe altitudes provided in FAA's regulations, but in the words of the ALJ, Palmer also "exercised poor judgment, and exhibited a disregard for his own safety, and the safety of others, and property on the surface." A132.

**I.** 14 C.F.R. § 91.119(a) prohibits pilots from operating at an altitude that would not allow for an emergency landing without undue hazard to persons or property in the event of a power unit failure. In addition, 14 C.F.R. § 91.119(c) prohibits pilots from operating below 500 feet and within 500 feet of people, vessels, vehicles, or structures.

In this case, Palmer admits that he flew at an altitude of less than 100 feet above ground level and within 500 feet of vehicles, vessels, or structures. In essence, Palmer admits the essential elements of a violation of 14 C.F.R. § 91.119(c). Thus, the only remaining issue is whether Palmer's low flight falls within § 91.119's prefatory language, which provides an exception for operations "necessary for takeoff or landing."

Palmer argues that he conducted his low flight to inspect the runway in Mr. Likes' backyard. The runway in Mr. Likes' backyard was located approximately 500 feet from Mr. Likes' home, near other homes, structures, and power lines. It was a dirt runway, created by Mr. Likes for remote controlled aircraft. Based upon the substantial evidence in the record and credible witness testimony, the NTSB properly upheld the ALJ's finding that this runway was not a suitable landing site. The only evidence Palmer points to in response is a mere assertion that he and his aircraft were capable of landing on the dirt runway. However, Palmer's ability to land on the runway is not a factor in determining whether the runway itself was suitable. Therefore, the NTSB's finding

that the runway was not a suitable landing site, is supported by substantial evidence and should be upheld.

**II.** Palmer also challenges various procedural issues decided by the ALJ and NTSB, but all of Palmer's arguments lack merit. First, Palmer argues that the complaint is deficient and should have been dismissed. However, the FAA's amended complaint more than meets the low threshold for notice pleading and provided Palmer with sufficient notice about the violations alleged by the FAA. Palmer also argues in this vein that the complaint should have alleged a negative— that Palmer's flight was not necessary for takeoff or landing. However, it is Palmer's burden to assert and prove the affirmative defense that his low flight fell within the exception of § 91.119's prefatory language because it was "necessary" for landing. Palmer was on notice that the prefatory language was an issue given that it was specifically referenced in the FAA's complaint, and he even asserted as an affirmative defense that his low flight was necessary for landing. Palmer's argument that the amended complaint was deficient is meritless, and the NTSB did not err in affirming the ALJ's denial of Palmer's Motion to Dismiss.

26

Second, the NTSB was not arbitrary or capricious in affirming the ALJ's evidentiary ruling as to the unavailable native video from the Penas' outdoor security camera. While the native video was not available to the parties, there was no evidence of malfeasance or that the FAA intentionally destroyed the video. The ALJ's decision to exclude the non-native video and any testimony given in reliance upon the video was appropriate, and the NTSB was not arbitrary or capricious in affirming the ALJ's refusal to dismiss the FAA's case because of the unavailable native video.

Third, Palmer and amici's attempts to use this case as a vehicle to revisit this Court's decision in *Pham v. NTSB* are inappropriate and demonstrate no error by the NTSB, which faithfully applied *Pham*. A panel of this Court cannot overturn a decision by another panel of this Court, yet this is what Palmer and amici ask this Court to do. Not only is *Pham* precedent in this Circuit, but this Court already entertained and denied a Petition for Rehearing En Banc in that case. This Court properly decided *Pham* and should not revisit that decision.

**III.** Finally, this Court should dismiss amici's attempt to raise a new argument in this case. Amici raise a broad challenge to the NTSB's

27

application of the Federal Rules of Civil Procedure and the Federal Rules of Evidence. However, Palmer never raised this issue before the ALJ or NTSB, and the NTSB's decision does not address this argument. Not only is it incredible that amici are attempting to raise a new issue on appeal, but they are also raising broad and serious arguments regarding the NTSB's adjudicatory role in a forum in which the NTSB does not have the opportunity to respond. Even if amici's arguments were properly before this Court, the Pilot's Bill of Rights does not mandate that the NTSB use the Federal Rules of Civil Procedure and the Federal Rules of Evidence, but instead states that the NTSB should use these rules "to the extent practicable."

## STANDARD OF REVIEW

"This court will uphold a decision of the National Transportation Safety Board unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Huerta v. Ducote*, 792 F.3d 144, 153 (D.C. Cir. 2015) (quoting 5 U.S.C. § 706(2)(A)). A reviewing court applying this standard of review must "defer to the wisdom of the agency, provided its decision is reasoned and rational, and even 'uphold a decision of less than ideal clarity if the agency's path may reasonably

28

be discerned.'" *Chritton v. NTSB*, 888 F.2d 854, 856 (D.C. Cir. 1989) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *see also Pham v. NTSB*, 33 F.4th 576, 581 (D.C. Cir. 2022). In addition, "[f]indings of fact by the Board, if supported by substantial evidence, are conclusive." 49 U.S.C. § 1153(b)(3); *accord* 49 U.S.C. § 44709(f). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Dickson v. NTSB*, 639 F.3d 539, 542 (D.C. Cir. 2011) (quoting *Chritton*, 888 F.2d at 856). "Thus, a 'conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.'" *Chritton*, 888 F.2d at 856 (quoting *Western Air Line, Inc. v. C.A.B.*, 495 F.2d 145, 152 (D.C. Cir. 1974).

With regard to sanction determinations, "the Supreme Court has held that courts should overturn an agency's choice of remedy only if it 'is unwarranted in law or is without justification in fact.'" *Pham*, 33 F.4th at 583 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 112-13 (1946)). This Court has also found that the Board should accord

appropriate "deference to FAA's enforcement guidelines and sanction

determination." *Pham*, 33 F.4th at 583.

## ARGUMENT

## I.    The NTSB's Determination that Palmer's Landing Site Was Not Suitable Is Supported By Substantial Evidence

Palmer admitted to flying within 500 feet of structures and flying

below 100 feet above ground level. A343, 345, 451. These admissions

established Palmer's violation of 14 C.F.R. § 91.119(c). In addition, the

ALJ found that Palmer's low flight did not allow for an emergency

landing without undue hazard to persons or property in the event of a

power unit failure in violation of 14 C.F.R. § 91.119(a). A125. Palmer

does not challenge these findings on appeal. Thus, the FAA has already

met its burden in establishing the essential elements for violations of

§ 91.119(a) and (c). The only remaining issue is whether Palmer proved

his affirmative defense that his low flight was necessary for takeoff or

landing. The NTSB's finding that Palmer's landing site was not suitable

and thus that his low flight was not necessary for landing is supported

by substantial evidence, and Palmer's remaining complaints regarding

other periphery issues are meritless.

30

## A.    Section 91.119's Requirements

For the safety of people, property, pilots, and planes, § 91.119 provides minimum safe altitudes for aircraft operations. 14 C.F.R. § 91.119(a) prohibits low altitude flights that would prevent a pilot from conducting an emergency landing without undue hazard to persons or property, while § 91.119(c) prohibits low altitude flights within 500 feet of any person, vessel, vehicle, or structure in non-congested areas. *See Town of Barnstable, Mass. v. FAA*, 659 F.3d 28, 35-36 (D.C. Cir. 2011) (noting that § 91.119 requires a 500-foot distance between an aircraft and any structure).

Section 91.119 provides an exception to these altitude and distance restrictions only "when necessary for takeoff or landing." 14 C.F.R. § 91.119. As an exception to the general rule, the burden is on the pilot to show that a low flight was necessary for takeoff or landing. *In re Wick*, NTSB Order No. EA-5038, 2003 WL 21107129, at *2 (2003); *see infra* Part II.A.2. Moreover, this exception does not provide a catch-all for any low flight claimed to be post-facto related to a takeoff or landing. Otherwise, the prefatory language "would in effect excuse low flight where necessary for 'any takeoff or any landing from any area

31

anywhere at any time'. . . .Such an interpretation is patently fallacious in that it would excuse low flight regardless of the appropriateness of the landing site." *Adm'r v. Cobb & O'Connor,* 3 NTSB 98, 100 (1977), *aff'd* 572 F.2d 202 (9th Cir. 1977) (addressing the predecessor regulation 14 CF.R. § 91.79)). Thus, a pilot "must make a reasonable, appropriate choice, or the regulation has no meaning." *Adm'r v. Kittelson*, NTSB Order No. EA-4068, 1994 WL 43359, at *2 (1994).

Moreover, in determining whether a flight is necessary for takeoff or landing, the NTSB has consistently examined the appropriateness or suitability of the intended landing site. *See Essery v. DOT*, 857 F.2d 1286, 1289 (9th Cir. 1988) (finding that the NTSB's consideration of the suitability of the landing site to be reasonable and giving deference to the FAA's interpretation of its own regulations). "If the landing site is inappropriate under the circumstances, then the low flight cannot be excused under the regulation as necessary for landing." *Adm'r v. Prior*, NTSB Order No. EA-4416, 1996 WL 900906, at *3 (1996) (finding that hot air balloon had other more suitable options for landing rather than a congested area in close proximity to power lines, buildings, and trees); *see Adm'r v. Van De Hoef*, 5 NTSB 1050, 1052 (1986) (finding that both

the takeoff site near the Space Needle and landing site in a residential area were inappropriate and thus not excused as necessary for takeoff and landing); *Adm'r v. Willauer*, NTSB Order No. EA-3944, 1993 WL 295067, at *3 (1993) (stating that "Board precedent is clear that the prefatory language of 91.79 [91.119's predecessor regulation] will not serve to excuse a pilot unless the evidence establishes that the chosen landing site was suitable" and finding that alfalfa field was not a suitable landing site because of its proximity to an operating quarry).

For example, in *Administrator v. Walker,* 3 NTSB 3478 (1981), a pilot attempted to land an aircraft behind a Safeway shopping center. 3 NTSB at 3479. After three low passes at altitudes below 100 feet, the pilot decided not to land. *Id.* The pilot argued that his low flights were necessary for landing, but the NTSB rejected this argument and found that the "site selected by respondent was totally inappropriate for a landing. Any reasonable ground assessment of the area should have alerted respondent of the hazards of a landing and dictated against the type of flight conducted by him." [10] *Id.* Thus, § 91.119's prefatory clause

---

[10] In proceedings before the NTSB, the airman (here, Palmer) is the "respondent."

does not excuse every low flight that a pilot asserts is for the purpose of takeoff or landing; one aspect of determining if the flight is "necessary" rests on the factual question of whether the landing site is suitable.

### B.    Palmer Violated 14 C.F.R. § 91.119

The FAA met its burden in establishing that Palmer violated the essential elements in 14 C.F.R. § 91.119(a) and (c). Regarding 14 C.F.R. § 91.119(a), the ALJ found that Palmer's low flight did not allow for an emergency landing without undue hazard to persons or property in the event of a power unit failure, A125, and Palmer does not challenge this finding on appeal. Furthermore, with regard to 14 C.F.R. § 91.119(c), Palmer admitted to flying within 500-feet of structures and flying below 100-feet above ground level. A343, 345, 451. These facts and findings are not in dispute in this case. Thus, Palmer violated 14 C.F.R. § 91.119(a) and (c), and his defense at hearing required him to establish the affirmative defense that his low flight was necessary for landing.

### C.    The NTSB's Finding that Palmer Failed to Prove His Affirmative Defense is Supported by Substantial Evidence

The NTSB properly found that Palmer's low flight was not necessary for landing because the runway in Mr. Likes' backyard was

unsuitable and inappropriate.[11] As the NTSB recognized, the "law judge made the determination [that the landing site was not suitable] based on the credible testimony of the witnesses and the evidence before him." A556. Mr. Likes testified that the runway was in his backyard, approximately 500 feet from his home. A245. Inspector Green testified that there were power lines nearby and, using Google Earth, showed nearby structures. *See* A534. Evaluating the witness testimony and evidence before him, the ALJ found that "[a]ny reasonable ground assessment, or a navigation map, or even a Google Earth view would have alerted [Palmer] to nearby residences and structures on Desert Sun Lane." A133.[12] Moreover, the runway "was basically a cleared dirt

---

[11]The ALJ noted that whether a low flight is necessary for takeoff or landing is "fact-driven on a case-by-case basis," and [t]here are a multitude of variables involved." A126-27. Palmer's appeal only focuses upon the suitability of the landing site. However, the ALJ also found that "there was no emergency and [Palmer] had more appropriate and safer alternatives for his low level pass, alternatives that were clearly not near any residences, structures, or people to the east and over an open area." A132. Moreover, the ALJ found that Palmer "had the option to refrain from conducting a low pass to evaluate the landing site." A132. These unchallenged findings by the ALJ provide further substantial evidence for the conclusion that Palmer's flight was not "necessary" for landing.

[12] Palmer testified that he lived two miles south of Desert Sun Lane, A399, and that he had previously gone to Mr. Likes' property and seen the runway. A436. Thus, Palmer should have already been aware

runway," that Mr. Likes created using a loader, A415, 418, and which

he typically used for "remote-controlled electronic foam RC airplane[s]."

A416. Based upon the evidence, the ALJ found that the landing site was

not suitable, and the NTSB properly held that it had "no reason to

overturn the law judge's finding." A556.

Moreover, the NTSB recognized that Palmer offered no counter

evidence to show that the runway was suitable. A556. Palmer merely

argued "that he and his aircraft were capable of landing on the

runway." A556; Pet'r's Br. 32. But, as the ALJ noted, "[w]hether

[Palmer] believes he could have landed and done so safely isn't the issue

because of the low level altitude passes near structures and people."

A134. Furthermore, despite Palmer's alleged capability of landing on

the runway, the NTSB noted that Palmer in fact did not land on the

runway. A556; *see* A432-33.[13] And, indeed, Palmer testified that "he

found the landing site was not suitable." A396. Thus, "[g]iven the lack of

---

of the nearby residences and structures on Desert Sun Lane, and yet he
still chose to conduct the low flight.

    [13] Palmer argues that one of the reasons for conducting low
inspection passes is to identify the touchdown point. While that may be
true, Palmer misses the larger point, which is that considering the
totality of the circumstances, he never should have attempted this
particular low inspection pass. A134; *see supra* nn.11-12.

evidence backing [Palmer's] claim that the landing site was suitable"
and the irrelevance of Palmer's capabilities, the NTSB appropriately
found that Mr. Likes' runway was not a suitable landing site, and this
decision is supported by substantial evidence. A556.[14]

### 1. Palmer Misinterprets the NTSB and ALJ's Decision Regarding "Necessary"

Palmer spends three pages of his brief arguing that low inspection
passes are necessary for off-airport landings and argues that the ALJ
misinterpreted § 91.119 by finding that a low inspection pass is not
necessary for an off-airport landing. Pet'r's Br. 25-27. However, contrary
to Palmer's assertion, the NTSB found that "the law judge did not find

---

[14] Palmer also argues that the ALJ inappropriately considered the
lack of "runway markings, lights, navigation aids, glideslope indicators
or even a windsock" and argues that there is no legal authority that an
off-airport location must have these "accouterments" [sic] to be suitable.
Pet'r's Br. 33; *see* A133-34. While there is no requirement that off-
airport runways have these navigation aids, this was just one of many
points that the ALJ found in arriving at his conclusion that the landing
site was not suitable. *See* A133-35; *see supra* n.11. Furthermore, the
NTSB specifically upheld the ALJ's finding that the intended landing
site was unsuitable because the ALJ "made the determination based on
the credible testimony of the witnesses and the evidence before him,"
and because "respondent offers no support for his claim that the site
was suitable." A556. With or without these navigation aids, there is
substantial evidence supporting the NTSB's decision that the runway
was not suitable.

that a low inspection pass is not necessary for an off-airport landing."
A554. Rather, the NTSB explained that the "law judge determined that
[Palmer] did not prove his affirmative defense that he met the prefatory
clause – that his low inspection pass was necessary for landing." A553.
In addition, the NTSB found that the ALJ "reasoned that [Palmer] had
other alternatives for conducting the low inspection pass that did not
violate the regulation by flying within 500 feet to any person, vessel,
vehicle, or structure." A553-54; *see* A512. It is the NTSB's decision that
is under review by this Court, not the ALJ's, and Palmer says precisely
nothing regarding the NTSB's sound explanation.

Depending on the circumstances, low level passes may be
necessary for landing at an off-airport landing site. *See* A501. However,
where a low level pass violates FAA safety regulations related to
minimum distance from people and property and minimum altitude, the
circumstances of the low flight, including the suitability of the landing
site, must be evaluated – which is precisely what the ALJ and the
NTSB, in accordance with established law, did here.

### 2. The NTSB Correctly Rejected Palmer's Challenges to Inspector Speeg's Testimony

The NTSB properly disposed of Palmer's illogical assertions

about Inspector Speeg, his testimony, and its impact on the ALJ's

decision. *See* Pet'r's Br. 34-41. First, Palmer argues that because Speeg

is an employee of the FAA, he is "inherently biased and compromised."

Pet'r's Br. 34. As the NTSB pointed out, "[a]ccording to [Palmer's] logic,

no federal employee could testify without bias where he or she is paid

by his or her respective agency and testifies on that employer's behalf.

[Palmer's] arguments are nonsensical." A557. The NTSB's reasoning is

sound, and Palmer offers no argument as to why the NTSB's conclusion

is arbitrary or capricious. Indeed, since essentially all expert testimony

involves payment by a litigant to an expert testifying on their behalf,

Palmer's argument would require the elimination of most expert

testimony as we know it as "biased and compromised." This is neither

logical nor workable, and the Court should reject Palmer's argument.

Second, and contrary to Palmer's assertions, Pet'r's Br. 34-39, the

NTSB properly found that the ALJ did not rely upon Inspector Speeg's

testimony in determining that the landing site was inappropriate.

A556. Omitting context, Palmer misleadingly quotes the ALJ to imply

that the ALJ relied upon Speeg's testimony in evaluating the suitability

of the landing site, Pet'r's Br. 35-36, but these quotes are from the

portion of the ALJ's decision in which he is simply summarizing the testimony of all the witnesses at the hearing. *See* A99 (ALJ stating that "having summarized the evidence" he will now begin to make his findings and conclusions and thus showing that everything leading up to A99 was a summary). The ALJ's decision regarding the suitability of the landing site occurs from the end of A125 to A135, and Speeg is not mentioned a single time in that section. Thus, the NTSB correctly found that the ALJ did not rely upon Inspector Speeg's testimony in arriving at his decision regarding the suitability of the landing site.

Finally, Palmer and amici attempt to argue that the ALJ relied upon Inspector Speeg's legal conclusions, Pet'r's Br. 39-41, Amicus Br. 10-12,[15] but the NTSB correctly noted that "there is no evidence that the law judge credited legal conclusions from Inspector Speeg."[16] A557.

---

[15] "Amicus Br." refers to the amicus brief filed by the Aircraft Owners and Pilots Association, the Experimental Aircraft Association, and the Alaska Airmen's Association.

[16] Palmer, in a footnote, alleges that Specialist Speeg never should have been allowed to testify because he did not provide a written expert report. Pet'r's Br. 39 n.18. Palmer never raised this issue before the NTSB and thus has waived the argument. *Singleton v. Wulff,* 428 U.S. 106, 120 (1976) (stating that "[i]t is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below"). Notwithstanding, the NTSB has held that FAA employees are not required to provide expert reports because they are not retained or

As Palmer admits, the quotation in Palmer's Brief, at 41, is merely the ALJ's summary of the hearing testimony. Palmer does not point to any quotations or page citations where the ALJ credited or relied upon Inspector Speeg's legal conclusions in arriving at his decision and does not address the NTSB's decision noting this lack of reliance in any way.[17] In addition, as the NTSB found, "the law judge limited his

---

specially employed to provide expert testimony. *Adm'r v. Siwarski*, NTSB Order No. EA-5729, 2014 WL 6085329, at *4 (2014); *see also* Fed. R. Civ. Proc. 26(a)(2)(B) and (C) (discussing circumstances where written expert report required). In addition, Palmer was aware that the Administrator planned to call Inspector Speeg as an expert, A557, and was able to conduct a *voir dire* examination and cross-examination. *See Adm'r v. Decruz,* NTSB Order No. EA-5827, 2017 WL 4404282 (2017) (finding that ALJ did not abuse his discretion in permitting expert testimony because the Administrator provided advance notice, identified witness as an expert witness and the scope of testimony in pretrial disclosures), *aff'd sub nom. Decruz v. Elwell*, 751 F. App'x 1 (D.C. Cir. 2018).

[17] Generally, experts should not be allowed to provide legal conclusions due to the potential for improperly influencing the trier of fact. However, "the importance of the trial court's gatekeeper role is significantly diminished in bench trials . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010); *see also Window Specialists, Inc. v. Forney Enter., Inc.*, 47 F. Supp. 3d 53, 60 (D.D.C. 2014) (denying motion to exclude expert testimony that allegedly provided legal conclusions because the "case will be tried to the Court," and thus "there is no danger of jury confusion" and "the Court will make its own findings of fact and conclusions of law").

reliance on Inspector Speeg's testimony, deciding not to credit testimony concerning [Palmer's] flight path, altitude above ground level, or bank angle." A557; *see* A120. Therefore, the NTSB properly rejected Palmer's various allegations regarding Inspector Speeg's testimony.[18]

## II.    The NTSB's Rulings as to Palmer's Remaining Legal Arguments Are in Accordance with Law and Not Arbitrary or Capricious

Palmer's remaining arguments are unrelated to the primary allegations in this case, instead focusing on various procedural and legal issues. Palmer argues that the NTSB should have dismissed the FAA's enforcement action case because of purported deficiencies in the FAA's Complaint and because the native video from the Penas' outdoor camera was not available. Palmer also argues that this Court should reconsider and overturn its decision in *Pham*, 33 F.4th 576. As discussed below, Palmer's arguments are without merit.

---

[18] Palmer also argues that the Administrator "abandoned" the issue of the suitability of the landing site, Pet'r's Br. 28-31, but his citations are to objections made by FAA counsel during the hearing; Palmer does not explain how the FAA's objections result in "abandonment" or "withdrawal" of a legal issue. And as the NTSB held, the ALJ "acted within his purview and consistent with Board precedent in evaluating the landing site." A554. In addition, as the Board noted, Palmer made no attempt to demonstrate how the ALJ's consideration of the landing site prejudiced him. A554-56.

### A. The FAA's Complaint Meets the Low Threshold for Notice Pleading, and the NTSB Properly Affirmed the Denial of Palmer's Motion to Dismiss

The NTSB's decision affirming the ALJ's denial of Palmer's Motion to Dismiss is not arbitrary or capricious. Palmer argues that the FAA's complaint is deficient and that the Administrator was required to plead the "prefatory language" provided in 14 C.F.R. § 91.119. Pet'r's Br. 20-24. However, as discussed more fully below, the FAA's amended complaint easily satisfied notice pleading principles, and it is Palmer's burden, not the FAA's, to plead affirmative defenses. Therefore, the NTSB properly affirmed the ALJ's denial of Palmer's Motion to Dismiss.

### 1. The FAA's Complaint Satisfied Notice Pleading Principles

The NTSB has "long held that in our proceedings, 'notice pleading' principles require the Administrator to 'give only a short and plain statement of the claim showing that the pleader is entitled to relief, and not a complete detailing of all the facts.'" *Adm'r v. Siegel*, NTSB Order No. EA-5838, 2018 WL 2733938, at *6 (2018) (quoting *Adm'r v. Roberts*, NTSB Order No. EA-5556, 2010 WL 4253063, at *4 (2010) and Black's Law Dictionary 1271 (9th ed. 2009)); *Adm'r v. Darby*, NTSB Order No. EA-5521, 2010 WL 2393714, at *8 (2010); *see* A551. "The primary

43

purpose of the complaint is to apprise a Respondent of the charges so that he can prepare a defense." *Adm'r v. Bates*, 3 NTSB 2871, 2873 (1980). And "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Here, as the NTSB properly held, the FAA's amended complaint satisfied notice pleading principles and adequately notified Palmer of the alleged violations. A551-52. First, the amended complaint specifically states that the FAA is proposing to suspend Palmer's pilot certificate for alleged violations of 14 C.F.R. §§ 91.119(a), (c), and 91.13(a) and even provides the complete regulatory text for these provisions, including the prefatory language noting the regulation's applicability "[e]xcept when necessary for takeoff or landing." A15-16. Second, the amended complaint provides facts more than sufficient to put Palmer on notice as to why the FAA had found him in violation of FAA regulations, by alleging altitude and distances and that Palmer

44

operated within close proximity to structures and people. A15. In addition, the amended complaint states that Palmer operated at an altitude that would not have allowed for an emergency landing without undue hazard to persons or property. A16. The FAA's complaint therefore went well beyond mere notice pleading and certainly was, as the NTSB correctly found, "sufficient to place [Palmer] on notice about the charges . . . ." A552.

Despite this, Palmer argues that "those allegations simply do not sufficiently inform the Petitioner that he is liable for the misconduct alleged," Pet'r's Br. 21, and provides a laundry list of other allegations that he suggests the FAA *could* have included in its complaint.[19] Pet'r's Br. 22. For example, Palmer argues that the Administrator could have alleged that Palmer was "buzzing" the neighbors' residence or that he

---

[19] As the NTSB held, "an exchange of additional detail was more appropriate during the discovery and hearing phases." A552. If Palmer was in fact confused as to any of the FAA's allegations (although there is no indication he in fact was) "to the extent that respondent desired more information concerning any aspect of the complaint, discovery procedures were available to him. In any event, respondent has made no attempt to indicate how any alleged lack of specificity in the complaint adversely affected his ability to respond to it in any respect either before or during the hearing." *Adm'r v. Ringer*, 3 NTSB 3946, 3949 (1981).

45

was "otherwise harassing a neighborhood at low altitude to scare or 'traumatize' people on the ground." Pet'r's Br. 22. But, the regulations at issue do not require the FAA to prove these sorts of periphery intentions or Palmer's state of mind. Pursuant to 14 C.F.R. § 91.119(a), (c), the FAA's burden is to show that Palmer was operating at an altitude that would create an undue hazard if an emergency landing was necessary and that Palmer was operating at distances closer than 500 feet to any person, vessel, vehicle, or structure. *See* 14 C.F.R. § 91.119(a), (c). The amended complaint tracks the regulatory language and the facts needed to prove these violations, and thus sufficiently placed Palmer on notice about the alleged violations such that he could prepare a defense (as indeed he did). As the NTSB found, Palmer "was provided sufficient information necessary to prepare a defense," and he "has not demonstrated how the supposed lack of specificity in the amended complaint prejudiced him." A552. Palmer even admits that "[c]ertainly, it is *possible* that the altitudes and distances alleged in the Administrator's Amended Complaint could be consistent with violation of FAR § 91.119(a) & (c), or even § 91.13(a)." Pet'r's Br. 22 (emphasis in

original).[20] The NTSB correctly affirmed the ALJ's denial of Palmer's

Motion to Dismiss.

### 2. Palmer Understood What Was Being Alleged and Asserted an Affirmative Defense

Palmer's arguments regarding the deficiency of the complaint

ultimately rest upon an argument that the Administrator should be

required to plead the exception – that Palmer's low flight was not

necessary for landing. Pet'r's Br. 23-24. However**,** as the NTSB held,

"the burden of proving the applicability of § 91.119's prefatory clause

rests with [the airman]." A553. Contrary to Palmer's assertion that "he

has been unable to find any direct authority on point," he specifically

cites to *In re Wick*, NTSB Order No. EA-5038, 2003 WL 21107129

(2003), an NTSB case that is direct authority on this point. Pet'r's Br.

---

[20] Palmer's reliance on *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) is misplaced. Pet'r's Br. 20-21. In *Iqbal*, the Supreme Court's analysis focused upon whether the complaint contained sufficient facts to state a claim for relief. Iqbal's complaint was filled with legal conclusions, and ultimately the Supreme Court held that because the allegations were conclusory, the allegations were not entitled to an assumption of truth. 556 U.S. at 681.The Supreme Court noted that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In this case, the amended complaint does just that. It not only provides the specific regulatory violations at issue but also the specific facts underlying the violations.

23-24. In *Wick*, the NTSB specifically stated that "[i]t was respondent's burden of proving such exculpatory claims, including his defense that any low flight fell within the ambit of the except for landings exception to the proscriptions contained in FAR section 91.119(c)." *Wick*, 2003 WL 21107129, at *2. The NTSB stated the same in *Administrator v. Essery*, 5 NTSB 609 (1985), *aff'd* 857 F.2d 1286 (9th Cir. 1988). In *Essery*, the NTSB held that "[i]n order to show that a low altitude flight was 'necessary for takeoff or landing,' a respondent must show that the landing site was an appropriate one." *Essery*, 5 NTSB at 615; *see also Adm'r v. Chemello*, NTSB Order No. EA-5503, 2009 WL 2172521, at *7 (NTSB June 10, 2009), *aff'd* NTSB Order No EA-5503, 2010 WL 333632 (2010) (ALJ discussing § 91.119 and finding that "[t]he exception . . .if necessary for takeoff or landing imposes the burden on the proponent of the exception to show that the exception applies"). Thus, to the extent that Palmer argues that his low flight was necessary for takeoff and landing, it is his burden to assert and prove that his flight falls within this exception, not the FAA's burden.[21]

---

[21] Palmer argues that because the complaint in *Wick* specifically alleged that the airman operated "when it was not necessary for take-off or landing," this proves that the Administrator did not believe that

Moreover, Supreme Court case law supports the NTSB's longstanding precedent that Palmer has the burden to prove that his flight falls within the exception to the FAA's regulation. In *Federal Trade Commission v. Morton Salt Co.*, 334 U.S. 37 (1948), the Supreme Court held that it is a "general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." 334 U.S. at 44-45; *see also United States v. First City Nat. Bank of Houston*, 386 U.S. 361, 366 (1967) (holding that the burden generally falls on the one who claims the benefits of the exception); *United States v. Regenerative Sci., LLC*, 741 F.3d 1314, 1322 (D.C. Cir. 2014) (same). Thus, the NTSB properly found that Palmer has the burden of proving his affirmative defense—that his low flight falls within the exception in § 91.119—and appropriately affirmed the ALJ's denial of Palmer's Motion to Dismiss.

---

the exception was an affirmative defense. Pet'r's Br. 23-24. However, as discussed above, in *Wick,* the airman still had the burden to prove that his low flight fell within the exception, regardless of the language found in the complaint. Thus, it is unclear what difference it would have made if the amended complaint alleged that Palmer's flight was not necessary for takeoff or landing.

49

As the NTSB pointed out, Palmer "was on notice that the prefatory language of § 91.119 was at issue given that both before and during the hearing, he asserted as an affirmative defense that his low altitude flight was necessary for landing." A552-53; *see* A30-31. And, indeed, Palmer does not claim, much less prove, that he suffered any prejudice in preparing his defense due to the FAA's purportedly deficient complaint. Thus, the NTSB appropriately found that Palmer's "claim that the amended complaint was inadequate is unconvincing." A553.

## B. The NTSB Correctly Affirmed the ALJ's Denial of Palmer's Request for Dismissal Upon the Unavailable Native Video

The ALJ's decision to exclude the non-native video of Palmer's low flight, rather than dismiss the entire case as requested by Palmer during his closing argument, A447-48, was not an abuse of discretion, and the NTSB properly upheld the ALJ's decision. Palmer argues that the ALJ should have dismissed the entire proceeding because of the FAA's "sloppy investigation" and the unavailability of the native video from the Penas' outdoor security camera. Pet'r's Br. 42-44. But, as the NTSB duly noted, "[w]e have held that in the absence of malfeasance,

50

dismissal of the case or an adverse inference are not appropriate to remedy missing evidence, particularly where other evidence exists." A558 (citing to *Adm'r v. Abiraman*, NTSB Order No. EA-4978, 2002 WL 1301399 (2002); *Adm'r v. Stricklen*, NTSB Order No. EA-3814, 1993 WL 76816 (1993); *Adm'r v. Rauhofer*, NTSB Order No. EA-3268, 1991 WL 320183 (1991)). In this case, even Palmer admits that the FAA was not acting maliciously. Pet'r's Br. 43. Thus, dismissal of the entire case is inappropriate under the circumstances.

In addition, the NTSB found that the ALJ appropriately "excluded the non-native video and did not consider any testimony relying on the excluded video." A557. Moreover, the NTSB held that Palmer did not demonstrate how the ALJ's decision prejudiced him and appropriately rejected Palmer's assertion that the ALJ erred. A558.

Indeed, the video was not necessary in this case, and Palmer does not and cannot demonstrate any prejudice from its unavailability. The original video *could* have been used to support the distance and altitude in which Palmer was operating, but Palmer admitted that he flew his aircraft within 500 feet of structures and below 100 feet above ground level. A152-53, 450-51. The ALJ even noted that "[w]hile the video

51

recording from the garage peak may have been helpful, it was not necessary to the Administrator's case as there were three eye-witnesses and [Palmer's] testimony about his altitude and flight path." A121. Thus, the NTSB properly rejected Palmer's argument that the ALJ erred in refusing to dismiss this case. A557-58.

### C. The NTSB Properly Applied *Pham* and Deferred to the FAA's Choice of Sanction

The Supreme Court has held that courts should only overturn an agency's choice of remedy if it "is unwarranted in law or is without justification in fact." *Am. Power & Light Co. v. SEC*, 329 U.S. at 112-13. Furthermore, with regard to FAA enforcement actions, this Court held in *Pham v. NTSB,* 33 F.4th 576, that the NTSB must accord deference to the FAA's enforcement guidelines and sanction determination and, consistent with Supreme Court precedent, should only adjust a sanction if it "is unwarranted in law or is without justification in fact." *Pham*, 33 F.4th at 583 (citing *Am. Power & Light Co.*, 329 U.S. at 112-13).

Palmer does not challenge the reasonableness of the FAA's sanction determination or the application of FAA Order 2150.3C, but argues only that the NTSB should not have deferred to the FAA's sanction determination. Pet'r's Br. 46. Both Palmer and amici

52

inappropriately attempt to use this case as a vehicle to ask this Court to revisit its holding in *Pham*. Pet'r's Br. 45-46; Amicus Br. 13-23. However, this Court's decision in *Pham* is binding precedent. As this Court held in *LaShawn A. v. Barry,* 87 F.3d 1389 (D.C. Cir. 1996), the "'decision of a division' is the 'decision of the court.'" 87 F.3d at 1395 (citations omitted). "One three-judge panel, therefore, does not have the authority to overrule another three-judge panel of the court." *Id*. In addition, this Court has in fact already rejected a request for rehearing en banc in *Pham*, in which not a single member of the Court requested a vote in support of rehearing. *See Pham v. NTSB*, 2022 WL 1813982 (D.C. Cir. 2022) (denying request for rehearing en banc). Finally, this Court's decision in *Pham* was correct. As this Court held, "'less formal means of interpreting regulations,' such as enforcement guidelines are 'entitled to some weight on judicial review.'" *Pham*, 33 F.4th at 583 (citing *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 157 (1991)).[22] In this case, the FAA reasonably and

---

[22] Palmer and amici's arguments regarding 49 U.S.C. § 44709(d) ignore this Court's analysis in *Pham*. Pet'r's Br. 45-46; Amicus Br. 15-17. In *Pham,* this Court noted that § 44709 previously included a provision that required the NTSB to defer to the FAA's interpretations of sanction guidance. This Court specifically found that "[r]emoving a

appropriately applied its enforcement guidance, and the NTSB properly deferred to the FAA's sanction determination. A560-61. Palmer and amici's attempt to overturn *Pham* through this proceeding is inappropriate and unwarranted.

## III. The Court Should Disregard Amici's Attempt to Raise New Issues on Appeal

This Court does not ordinarily entertain arguments not raised by the parties. *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1338 (D.C. Cir. 1998); *see Michel v. Anderson*, 14 F. 3d 623, 625 (D.C. Cir. 1994); *see also Eldred v. Ashcroft*, 255 F.3d 849, 852 (D.C. Cir. 2001) (Sentelle, J., dissenting from denial of rehearing en banc) (stating that "[t]here is no dispute that an *amicus curiae* may not raise new *issues* in an appeal. Rather, the role of an *amicus* is to assist the court in addressing the issues already raised with new arguments and perspectives.") (emphasis in original). Despite this, amici attempt

_____

provision that provided for deference is not the equivalent of enacting a contrary provision disallowing deference." *Pham*, 33 F.4th at 583. In addition, the Court held that "there is at least some indication in the legislative history that the provision was removed only because it was deemed superfluous in light of *Martin*." *Id.* at 584. Palmer and amici's attempt to argue that the statutory text in § 44709(d) does not require deference flies in the face of § 44709's legislative history and this Court's analysis.

to raise a new argument in their brief by alleging that the "Board has consistently failed to apply the Federal Rules of Civil Procedure and Rules of Evidence," Amicus Br. 5. Amici ask this Court to "hold that the NTSB be required to make a judicially reviewable finding as to the practicality of applying the Federal Rules of Evidence or Civil Procedure." Amicus Br. 9. To support this argument, amici anecdotally reference several NTSB decisions that are not before this Court. *See* Amicus Br. 6. The Court should not consider this argument.

Before the NTSB, Palmer never argued that the Board has consistently failed to apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence, and made no such argument in his opening brief.[23] Therefore, this Court should not entertain amici's argument. In addition, because Palmer did not present this argument to the NTSB, the NTSB never had the opportunity to respond. *See Singleton v. Wulff*, 428 U.S. at 120 (stating that "[i]t is the general rule, of course, that a

---

[23] Indeed, Palmer barely even references the Federal Rules in his appeal. *See* Pet'r's Br. 20 (quoting *Ashcroft v. Iqbal* and its reference to Federal Rule of Civil Procedure 8(a)(2)); Pet'r's Br. 40 (discussing Federal Rules of Evidence 702 and 703 in the context of Inspector Speeg's expert testimony). That is the extent of Palmer's references or arguments related to the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

federal appellate court does not consider an issue not passed upon below"); c*f. Howard v. FAA*, 17 F.3d 1213, 1217 (9th Cir. 1994) (finding that the exhaustion requirement was satisfied where petitioner raised a new argument in its petition for reconsideration because NTSB was able to consider the new claim in its decision). Moreover, amici's attempt to raise a new argument on appeal is even more inappropriate in that they assert a broad attack on the NTSB's adjudication practices. Notwithstanding, amici's argument is meritless, as the Pilot's Bill of Rights states that the NTSB should utilize the Federal Rules of Civil Procedure and the Federal Rules of Evidence "to the extent practicable." Pub. L. 112-153, § 2(a); *see* Amicus Br. 7 (acknowledging that "the language admittedly does not require the Federal Rules of Evidence or Civil Procedure to apply in all situations"). The NTSB appropriately applied the Federal Rules in this case. For all of these reasons, this Court should dispose of amici's attempt to raise a new argument at this juncture.

## CONCLUSION

For the foregoing reasons, this Court should deny the petition for

review.

Respectfully Submitted,

*/s/ Joy K. Park*

JOY K. PARK
  *Senior Attorney*
  *Aviation Litigation Division*
  *Federal Aviation*
    *Administration*
  *800 Independence Avenue SW*
  *Washington, DC 20591*
  *(202) 264-7617*

January 2024

57

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,197 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word for Microsoft 365 MSO in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joy K. Park*

Joy K. Park

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Joy K. Park*
Joy K. Park

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 706 ............................................................................ A1

49 U.S.C. § 1133 ......................................................................... A2

49 U.S.C. § 1153 ......................................................................... A3

49 U.S.C. § 44709 ....................................................................... A4

49 U.S.C. § 46110 ....................................................................... A6

Pub. L. 112-153, § 2(a) ............................................................... A7

14 C.F.R. § 91.13 ........................................................................ A8

14 C.F.R. § 91.119 ...................................................................... A9

49 C.F.R. § 821.64 ...................................................................... A10

**5 U.S.C. § 706(2)(A)**

**§ 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provision, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be –

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . . .

**49 U.S.C. § 1133**

**§ 1133 Review of other agency action**

The National Transportation Safety Board shall review on appeal –

    (1) the denial, amendment, modification, suspension, or revocation of a certificate issued by the Secretary of Transportation under section 44703, 44709, or 44710 of this title;

. . . .

**49 U.S.C. § 1153**

**§ 1153 Judicial Review**

(a) General. – The appropriate court of appeals of the United States or the United States Court of Appeals for the District of Columbia Circuit may review a final order of the National Transportation Safety Board under this chapter. A person disclosing a substantial interest in the order may apply for review by filing a petition not later than 60 days after the order of the Board is issued.

(b) Persons seeking Judicial Review of Aviation Matters. –

(1) A person disclosing a substantial interest in an order related to an aviation matter issued by the Board under this chapter may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60 days only if there was a reasonable ground for not filing within that 60-day period.

(2) When a petition is filed under paragraph (1) of this subsection, the clerk of the court immediately shall send a copy of the petition to the Board. The Board shall file with the court a record of the proceeding in which the order was issued.

(3) When the petition is sent to the Board, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Board to conduct further proceedings. After reasonable notice to the Board, the court may grant interim relief by staying the order or taking other appropriate action when cause for its action exists. Findings of fact by the Board, if supported by substantial evidence, are conclusive.

(4) In reviewing an order under this subsection, the court may consider an objection to an order of the Board only if the objection was made in the proceeding conducted by the Board or if there was a reasonable ground for not making the objection in the proceeding.

. . . .

A3

**49 U.S.C. § 44709**

**§ 44709. Amendments, modifications, suspensions, and revocations of certificates**

. . . .

(b) Actions of the Administrator.--The Administrator may issue an order amending, modifying, suspending, or revoking--

(1) any part of a certificate issued under this chapter if--

(A) the Administrator decides after conducting a reinspection, reexamination, or other investigation that safety in air commerce or air transportation and the public interest require that action; or

(B) the holder of the certificate has violated an aircraft noise or sonic boom standard or regulation prescribed under section 44715(a) of this title; and

(2) an airman certificate when the holder of the certificate is convicted of violating section 13(a) of the Fish and Wildlife Act of 1956 (16 U.S.C. 742j-1(a)).

. . . .

(d) Appeals.—

(1) A person adversely affected by an order of the Administrator under this section may appeal the order to the National Transportation Safety Board. After notice and an opportunity for a hearing, the Board may amend, modify, or reverse the order when the Board finds--

(A) if the order was issued under subsection (b)(1)(A) of this section, that safety in air commerce or air transportation and the public interest do not require affirmation of the order; or

(B) if the order was issued under subsection (b)(1)(B) of this section--

(i) that control or abatement of aircraft noise or sonic boom and the public health and welfare do not require affirmation of the order; or

A4

(ii) the order, as it is related to a violation of aircraft noise or sonic boom standards and regulations, is not consistent with safety in air commerce or air transportation.

(2) The Board may modify a suspension or revocation of a certificate to imposition of a civil penalty.

(3) When conducting a hearing under this subsection, the Board is not bound by findings of fact of the Administrator.

. . . .

(f) Judicial review.--A person substantially affected by an order of the Board under this section, or the Administrator when the Administrator decides that an order of the Board under this section will have a significant adverse impact on carrying out this part, may obtain judicial review of the order under section 46110 of this title. The Administrator shall be made a party to the judicial review proceedings. Findings of fact of the Board are conclusive if supported by substantial evidence.

**49 U.S.C. § 46110. Judicial review**

**(a) Filing and venue.**--Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator of the Federal Aviation Administration) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

. . . .

A6

**Pub. L. 112-153, § 2(a)**

(a) IN GENERAL. – Any proceeding conducted under subpart C, D, or F of part 821 of title 49, Code of Federal Regulations, relating to denial, amendment, modification, suspension, or revocation of an airman certificate, shall be conducted, to the extent practicable, in accordance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

. . . .

**14 C.F.R. § 91.13**

**Careless or reckless operation.**

a) Aircraft operations for the purpose of air navigation. No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

. . . .

**14 C.F.R. § 91.119**

**Minimum safe altitudes; General.**

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

(a) Anywhere. An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

. . . .

(c) Over other than congested areas. An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

. . . .

A9

**49 C.F.R. § 821.64**

**Judicial review.**


(a) General. Judicial review of a final order of the Board may be sought as provided in 49 U.S.C. 1153 and 46110 by the filing of a petition for review with the appropriate United States Court of Appeals or United States District Court, pursuant to the provisions of Pub.L. 112–53, 126 Stat. 1159 (August 3, 2012), 49 U.S.C. 44703 note. Such petition is due within 60 days of the date of entry (i.e., service date) of the Board's order. Under the applicable statutes, any party may appeal the Board's decision. The Board is not a party in interest in such appellate proceedings and, accordingly, does not typically participate in the judicial review of its decisions. In matters appealed by the Administrator, the other parties should anticipate the need to make their own defense.

. . . .